# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

SANDRA GUZMAN,                                      :
                                                    :
                              Plaintiff,            :      No. 09 Civ. 9323 (BSJ)(RLE)
                                                    :
            v.                                      :
                                                    :      **AMENDED COMPLAINT**
NEWS CORPORATION, NYP HOLDINGS,                     :      **JURY TRIAL DEMANDED**
INC., d/b/a THE NEW YORK POST,                      :
and COL ALLAN, in his official and                  :
individual capacities,                              :
                                                    :
                              Defendants.           :

---------------------------------------------------------------X

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sandra Guzman ("Ms. Guzman" or "Plaintiff"), by and through her undersigned

counsel, Thompson Wigdor & Gilly LLP, as and for her Complaint in this action against

Defendants News Corporation ("News Corp."), NYP Holdings, Inc., d/b/a the New York Post

(the "Post"), (together, the "Company") and Col Allan ("Allan") (collectively, "Defendants"),

hereby alleges as follows:

## NATURE OF THE CLAIMS

1.      This is an action for declaratory, injunctive and equitable relief, as well as

monetary damages, to redress Defendants' unlawful employment practices and retaliation

committed against Plaintiff, including Defendants' discriminatory treatment, harassment and

unlawful retaliation against Plaintiff, due to her race, color, national origin and/or gender and

complaints of discrimination, in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), Section 1981 of the Civil Rights Act of 1866,

42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, New York

Executive Law §§ 290 et seq. (the "NYSHRL"), and the New York City Human Rights Law,

New York Administrative Code §§ 8-101 et seq. (the "NYCHRL").

## PRELIMINARY STATEMENT

2.      Known for its often sensational headlines, the New York Post is one of the largest

newspapers in the country, and it is read by people all over the world.  However, behind the

trumpeted headlines and within the four walls of the Post exists a hostile work environment

where female employees and employees of color have been subjected to pervasive and systemic

discrimination and/or unlawful harassment based on their gender, race, color and/or national

origin.

3.      The Post, and its parent company, News Corporation, maintain, condone, tolerate,

directly participate in and contribute to a hostile work environment against female employees

and employees of color.  By way of example only, virtually all of the executives, managing

editors and news reporters at the Post are White males, who wield enormous power and influence

at the Company.  In fact, despite the great diversity throughout New York City, only a handful of

individuals of color or women have ever been allowed to serve as editors at the Post, and very

few Black, Hispanic, Asian or female reporters currently work there.

4.      As a result of the nearly all White and male dominated management and

newsroom at the Post, its work environment is permeated with racist and sexist conduct and

comments toward employees of color and women.  However, the Post's blatant acts of race and

sex discrimination and/or harassment have not been directed solely at its own employees.

Rather, the Post has also repeatedly targeted people of color and women outside of the Company

with its racism and sexism through racially and sexually offensive news headlines, news stories

and humiliating, insulting and degrading cartoons.

5.      Furthermore, when employees complain about the discrimination in the workplace, they are often subjected to unlawful retaliation by the White management and editors at the Company, who, among other things, unlawfully retaliate against them by unfairly criticizing their work performance, overly scrutinizing their work, giving them unjust performance evaluations, denying them assignments and/or terminating their employment.

6.      By way of example only, on February 18, 2009, Defendants published a racist, offensive and dangerous cartoon suggesting the assassination of President Barack Obama, the first Black President of the United States.  More specifically, the cartoon depicted two White police officers pointing a smoking gun at a crazed chimpanzee lying dead on the ground in a pool of blood with three bullet holes in his chest after they had just shot the chimp.  Moreover, one of the White police officers was depicted bragging, "They'll have to find someone else to write the next stimulus bill."  (*See* Ex. A).  Notably, the cartoon immediately followed a page in that day's newspaper containing a large photograph of President Obama signing an economic stimulus bill into law, demonstrating that the chimpanzee was intended to represent President Obama.

7.      With this country's long and tragic history of racist imagery, including depictions of Blacks as apes, gorillas, chimpanzees and monkeys, Defendants were fully aware of the racist and offensive nature of the cartoon and further willfully disregarded the fact that the cartoon could readily be interpreted as approving violence against America's first Black President. Despite knowing that the cartoon was racist, offensive and dangerous on many levels, Defendants nevertheless published the cartoon depicting violence and bigotry against the President of the United States.

8.      After Plaintiff Sandra Guzman – an Emmy award winning journalist author, and the only female editor of color at the Post – repeatedly complained to her direct supervisors, human resources and management that she and other employees had long suffered a hostile work environment based on their race, color, national origin and/or gender, and that the chimpanzee cartoon was yet another in a litany of examples of the racism pervasive in the work environment at the Post, the Company unlawfully retaliated against her and terminated her employment on September 29, 2009.

9.      Defendants' conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff's rights, warranting an award of punitive damages.  Such conduct has caused, and continues to cause, Plaintiff to suffer substantial monetary damages, permanent harm to her professional and personal reputations and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and/or Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

12.      Plaintiff Sandra Guzman is a resident of the State of New York, New York County.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

4

13.     Defendant News Corporation is one of the largest media conglomerates in the world and owns, <u>inter alia</u>, HarperCollins, the New York Post, the Wall Street Journal, the Weekly Standard, Fox News Channel and 20th Century Fox Television.  At all relevant times, Defendant News Corporation has had its principal place of business located at 1211 Avenue of the Americas, New York, New York and regularly transacts business in this district.

14.     Defendant NYP Holdings, Inc., d/b/a the New York Post, is a subsidiary of Defendant News Corporation and is widely viewed as one of the Company's most valuable print assets.  At all relevant times, Defendant NYP Holdings, Inc. has had its principal place of business located at 1211 Avenue of the Americas, New York, New York and regularly transacts business in this district.

15.     At all relevant times, Defendants News Corporation and NYP Holdings, Inc. have met the definition of an "employer" under all applicable statutes.

16.     Upon information and belief, Defendants News Corporation and NYP Holdings, Inc. share common ownership, common premises, common directors and/or officers, and common financial control, operated as an integrated enterprise, and were Plaintiff's joint and/or single employer.

17.     Defendant Col Allan is the Editor-in-Chief of the Post and currently resides in New York, New York.  At all relevant times, he has actively and directly participated in the discrimination, harassment and unlawful retaliation committed against Plaintiff.

18.     At all relevant times, Defendant Allan had authority to make personnel decisions concerning Plaintiff's work schedule, assignments, salary and other employment benefits. Defendant Allan also had, and continues to have, authority to discipline, including the right to terminate, Plaintiff and other Company employees.

## PROCEDURAL REQUIREMENTS

19.     On or about November 9, 2009, Ms. Guzman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e et seq.  Plaintiff's EEOC charge arose out of the same facts alleged herein.

20.     On or about June 4, 2010, Ms. Guzman received notice of her right to sue issued by the EEOC in connection with her previously filed charge of discrimination.  This Amended Complaint has been filed within 90 days of Plaintiff's receipt of the notice of her right to sue from the EEOC.

21.     Prior to the commencement of this action, a copy of Plaintiff's Complaint was served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

22.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I.    Sandra Guzman**

23.     Plaintiff Sandra Guzman is a Black and Puerto Rican former Associate Editor of the New York Post.

24.     In or around July 2003, Ms. Guzman was hired by the Post for the position of Associate Editor.

25.     Prior to joining the Post, Ms. Guzman was an Emmy award winning journalist and author who was nationally recognized for her work in the Latin American community and, particularly, as a leading voice on issues affecting Latina women.

26.     Indeed, Ms. Guzman was hired by the Post as a direct result of her unparalleled journalistic contributions to the Latin American community.  At the time she was hired, Ms.

Guzman was told by Lachlan Murdoch, then Publisher of the Post, that she was being hired partly to increase the Post's readership amongst minorities, most notably Hispanics.

27.     By way of example only, in an effort to meet the Post's goals, Ms. Guzman created the "Tempo" section, a monthly insert to the Post that focused on issues affecting the Latino community.  Ms. Guzman also created the "Tempo Espresso" blog to immediately address daily issues of importance to minority readers in New York City.  As the Editor of "Tempo," Ms. Guzman routinely reported on high-profile people and events that were of interest to Latin Americans

28.     In addition to Ms. Guzman's duties as the Editor of "Tempo," she was also responsible for over 25 other Features sections that were published in the Post each year.  Ms. Guzman also, for example, edited the Post's Black History Month, Environmental and Parade sections, including the St. Patrick's Day, Columbus Day, Israeli Independence Day and Macy's Thanksgiving Day parades, and she was a frequent contributor to other sections of the newspaper.

29.     As a direct result of Ms. Guzman's unflagging commitment to focusing on issues important to Hispanic readers, the Post's readership among Hispanics increased over 40% during Ms. Guzman's employment.

30.     Throughout her employment, Ms. Guzman received exemplary performance reviews and was consistently praised for her impeccable journalistic standards.  In Ms. Guzman's last performance evaluation dated July 8, 2009, her direct supervisor, Joseph Robinowitz, a Managing Editor at the Post, stated: "Sandra oversees and produces first-rate sections. . . .  The sections are well-edited, well-designed and contain interesting reads and

interviews and scores of useful tips, pointers and tidbits of valuable information." Mr. Robinowitz also praised Ms. Guzman's "terrific ability."

31.     Ms. Guzman's stellar work performance was all the more remarkable in light of the fact that, unlike male editors who worked in the News and Features Departments, Ms. Guzman was never given a full-time staff of writers to work with and instead had to recruit writers who were not otherwise busy on other assignments.

## II.     **The Hostile Work Environment at the New York Post**

32.     Despite Ms. Guzman's outstanding work performance and enormous contributions to the Post, she and other female and minority employees were continually subjected to a discriminatory hostile work environment based on gender, race, color and/or national origin.

### A.     **Hostile Work Environment Based on Gender**

33.     In 2001, Defendant Col Allan was appointed as the Editor-in-Chief of the Post, making him the highest-ranking executive in the newsroom at the Post.

34.     Since his appointment as Editor-in-Chief, Defendant Allan's repeated inappropriate and sexist comments and conduct have been widely known throughout the Company, and he wields the unchecked power and authority to engage in such improper conduct with impunity.

35.     By way of example only, on one occasion when Ms. Guzman and three female employees of the Post were sharing drinks at an after-work function, Defendant Allan approached the group of women, pulled out his blackberry and asked them "What do you think of this?" On his blackberry was a picture of a naked man lewdly and openly displaying his

penis.  When Ms. Guzman and the other female employees expressed their shock and disgust at being made to view the picture, Defendant Allan just smirked.

36.     Moreover, although Ms. Guzman complained about Defendant Allan forcing her and other female employees to view this outrageous picture to a member of management at the Post, no investigation was ever conducted and the Company failed to take any steps to address her complaints.

37.     On another occasion, upon information and belief, Defendant Allan approached a female employee during a party at the Post, rubbed his penis up against her and made sexually suggestive comments about her body, including about her breasts, causing that female employee to feel extremely uncomfortable and fearing to be alone with him.

38.     As Editor-in-Chief, Defendant Allan would also routinely talk about the sex lives of other employees at the Post.  Furthermore, while serving as the top editor at the Post, Defendant Allan took two Australian political leaders to the strip club Scores in Manhattan, where they watched strippers perform, reportedly had too much to drink, and were ejected from the club by its bouncers.  Defendant Allan later publicly admitted to going to Scores, an act that shows he views women as mere sex objects who are not equal to men.

39.     On another occasion, a Black female employee was temporarily filling in for one of the Post's receptionists.  Unbeknownst to this employee, part of her duties required her to answer Defendant Allan's telephone while his receptionist was away from her desk.  When this employee did not answer Defendant Allan's telephone, not realizing she was responsible for doing so, Defendant Allan ran into the newsroom, where dozens of employees were working, and screamed, "Will you tell that damn girl to answer the phone!"  As a result of Defendant

Allan's decision to publicly humiliate this Black woman in front of her colleagues and co-workers, the female employee felt deeply ashamed, humiliated and embarrassed.

40.     Following Defendant Allan's example, other male employees at the Post openly disparaged and harassed women.  For example, Les Goodstein, the Senior Vice President of News Corp., repeatedly told Ms. Guzman that she looked "sexy" and "beautiful" and he often referred to her as "Cha Cha #1," which were discriminatory and derogatory terms about Ms. Guzman's race, national origin and/or gender.

41.     Mr. Goodstein also routinely stared at the breasts and butts of other female employees in Ms. Guzman's presence and would often lick his lips while doing so.

42.     Mr. Goodstein's outrageous behavior caused other female employees at the Post to be uncomfortable dealing with him.

43.     As a result of Mr. Goodstein's inappropriate conduct, Ms. Guzman repeatedly complained to management at the Post.

44.     Defendants, however, took no action to appropriately address Ms. Guzman's complaints about Mr. Goodstein.  To the contrary, Defendant Allan incredibly called Ms. Guzman into his office and screamed at her that it was part of her job to be "nice" to Mr. Goodstein and that it was her responsibility to make greater efforts to work cooperatively with him.

45.     Furthermore, upon information and belief, a White male senior editor sexually propositioned a young female Copy Assistant, telling her that, "If you give me a blowjob, I will give you a permanent reporter job."

46.     Similarly, upon further information and belief, during Ms. Guzman's employment, another White male senior editor at the Post openly had sexual relationships with

young female Copy Assistants and news staffers whom he supervised, which was in blatant violation of Company policy.  Yet, the Company took no action to stop this predatory harassment pervading the workplace.

47.    Additionally, on another occasion, a female reporter openly complained to a White male senior editor that a headline the Post ran with an article about actress Lindsey Lohan entitled, "Living La Vida Lesbian," was offensive to women.  That editor, however, completely ignored her complaint.

48.    As further evidence of the way in which women were demeaned at the Post, a high-ranking White male editor told a female employee that he was going to start hiring more "testosterone" because he wanted more "intelligence" in his department, clearly implying that he viewed women – because of their gender alone – to lack the same level of intelligence as their male counterparts.

**B.    Hostile Work Environment Based on Race, Color and National Origin**

49.    Ms. Guzman and other employees of color were also routinely discriminated against on account of their race, color and/or national origin.

50.    For example, following an interview that Ms. Guzman conducted with Pedro Martinez (the Dominican All-Star pitcher and future member of the Baseball Hall of Fame), Defendant Allan asked Ms. Guzman if Mr. Martinez had been carrying a gun or machete during the interview, a racist comment which Ms. Guzman found deeply offensive and insulting.  By making this outrageous statement, Defendant Allan was clearly demonstrating his racial animus towards Hispanics.

51.    A White Managing Editor at the Post also openly made disparaging comments in the workplace about Hispanics.

52.     Equally offensive, a White male columnist would repeatedly walk into Ms. Guzman's office singing songs from the movie "West Side Story" specifically, the words, "I want to live in America" in a mocking and fake Spanish accent, which Ms. Guzman found demeaning.

53.     In yet another example of the pervasive racism at the Post, a reporter asked her White editor if she could write a story about a recent incident in which several cars had been vandalized with the word "Nigger" scratched onto the sides of the cars.  Incredibly, the editor told the reporter that this racist incident was wholly unremarkable, asking the reporter, "So what's the story?"

54.     Moreover, in response to Ms. Guzman's decision to keep scented candles in her office, a high-ranking white editor falsely accused her of engaging in "Santeria," a term intended to demean certain Hispanic and African religions by suggesting that her scented candles represented witchcraft and voodoo.

55.     Ms. Guzman was also routinely told by her White colleagues at the Company that the Post has a policy within its Arts, Photo and Features Department of only hiring White women to be models and to pose for the covers of their sections.  Pursuant to that policy, very few Black or Hispanic women have appeared on those covers.

56.     Furthermore, following Harvard Professor Henry Louis Gates' arrest in 2009 for allegedly breaking into his own house, a White female Managing Editor admitted that she knew nothing about Professor Gates, but yet openly referred to him as a stereotypical "angry Black man" and expressed pleasure that he had been arrested.

57.     The racism that permeated the Post and affected its employees is further underscored by the fact that there is currently only one non-White Editor at the entire newspaper.

58.     Additionally, at the time of Ms. Guzman's termination, the last five employees who were terminated by Paul Carlucci, the Publisher of the Post, as part of the Post's purported financial "cutbacks," were all Black and/or women of color.

59.     Similarly, although White Copy Assistants at the Post are routinely given reporting shifts and/or full time positions shortly after beginning to work for the Post, Black Copy Assistants are forced to wait for as long as more than one year before finally being conferred fewer and less desirable reporting shifts.  Upon information and belief, the White Copy Assistants were given full time jobs and/or assigned to more reporting positions despite having lesser qualifications and experience than the Black Copy Assistants.

60.     Additionally, during Ms. Guzman's employment, White editors at the Post repeatedly used offensive and discriminatory headlines, columns and cartoons to mock, insult and/or humiliate people of color.

61.     By way of example only, in January 2007, the Post published a story about the fact that Governor Bill Richardson of New Mexico, who is Hispanic, had announced that he was going to run for President with the headline "N.M. Gov Throws Sombrero Into Ring," an obvious discriminatory reference to Governor Richardson's Mexican-American heritage.

62.     Similarly, in connection with a story about former President George W. Bush's meeting with Chinese leader Hu Jintao, the Post displayed a front page photograph of President Bush pulling on the arm of Mr. Jintao with the offensive headline "Wok this Way," yet another act of blatant discrimination by the Post to disparage a person of color.

63.     Moreover, in an article on African-American and former New York Giants wide receiver Plaxico Burress, the Post allowed a White columnist to write about Giants head coach Tom Coughlin's punishment of Burress by stating, "Good for Coughlin for tightening the noose

around Plaxico Burress."  Despite knowing full well about the history of lynchings of Black men throughout this country and what the image of a noose symbolizes to Black people, the Post used the imagery of a noose to cheer on punishment inflicted on an African-American athlete.

64.     Ms. Guzman even learned at one point that the Post had planned to run a cartoon in the newspaper depicting Jews as sewer rats.

65.     As a result of these and similar headlines, articles and cartoons, Defendants have made clear to its employees that racial discrimination is not only tolerated, but openly encouraged by management, fostering a poisonous racially discriminatory work environment for all of its employees of color.

## III.     The Racist Cartoon Depicting President Obama as a Dead Chimpanzee

66.     The racist atmosphere at the Post reached unprecedented levels on February 18, 2009 when Defendants published the cartoon depicting the shooting death of a crazed chimpanzee by two White police officers containing the caption, "They'll have to find someone else to write the next stimulus bill."

67.     Any doubt about the identity of the figure that the dead chimpanzee was intended to represent was quickly erased by the fact that the page immediately preceding the cartoon contained a large picture of President Barack Obama signing the stimulus bill into law. Moreover, the editorial page in that same day's edition of the Post referred to the stimulus bill as "President Obama's $787 billion stimulus plan."  Accordingly, there is no doubt that the chimpanzee pictured shot to death and lying in a pool of blood with three bullet holes was intended to be President Obama.

68.     As a Black and Puerto Rican woman, Ms. Guzman was familiar with the long history in America of degrading African-Americans by depicting them as primates. As a result,

Ms. Guzman and other members of the news staff were deeply offended by the Post's decision to publish the racist cartoon.

69.     Indeed, Ms. Guzman's outrage was exacerbated by the fact that Jesse Angelo, the Post's Managing Editor, admitted that he knew the cartoon was offensive prior to publication but decided not to do anything about it.

70.     Dan Greenfield, an Assignment Editor, also admitted that the cartoon was in "poor taste" and that he was "not surprised" that the cartoon led to a storm of protests.

71.     In contrast to items potentially offensive to other groups, Defendants apparently made no efforts to determine whether the racist cartoon depicting President Obama as a dead chimpanzee in a pool of blood with three bullet holes in his chest after being shot by White police officers was potentially offensive or inappropriate, despite the fact the senior members of management admitted to viewing it as such.

72.     The Post's decision to publish the racist cartoon was part of a concerted effort at the Company to undermine President Obama's authority and attack the first African-American President in this country's history.

73.     Indeed, Charles Hurt, the Post's Washington D.C. Bureau Chief and a high ranking journalist at the newspaper, had confirmed to Ms. Guzman that the Post had such a policy in place, telling her that the Post's "goal is to destroy Barack Obama.  We don't want him to succeed."

74.     The publication of the cartoon also created a media controversy, with the NAACP describing the cartoon as "an invitation to assassinate President Barack Obama," and the National Association of Black Journalists decrying, "To compare the nation's first African-American commander-in-chief to a dead chimpanzee is nothing short of racist drivel."

75.    The publication of the cartoon created a public uproar, leading to highly visible protests outside the Company's office buildings here in Manhattan.

76.    However, rather than take steps to address the underlying racist attitudes pervading the Company that gave rise to the public anger, uproar and protests, Defendant Allan and other White editors summarily dismissed them out of hand.  For instance, Defendant Allan, while many protestors were downstairs protesting in front of the Post's building shortly after the cartoon was published, openly demeaned the protesters in racist terms by stating, "Most of them are minorities and the majority of them are uneducated," and then proceeded to laugh at the protestors.

77.    Similarly, other White Managing Editors at the Post, such as Joseph Robinowitz and Frank Zinni, openly made jokes about the cartoon and the protestors and expressed their disbelief that anyone could be offended by the obviously racist cartoon.  In fact, these White Managing Editors even went so far as to say that anyone who took offense to the cartoon depicting President Obama as a dead chimpanzee was "dumb."

78.    This cavalier disregard for the legitimate feelings of outrage among the minority community by senior members of management at the Post clearly demonstrates Defendants' racist animus towards people of color and the racially hostile work environment that exists at the Post, as well as the fact that they would not tolerate individuals who spoke out against the Post's discriminatory employment practices.

IV.    **Ms. Guzman's Complaints of Discrimination**

79.    Moreover, numerous employees at the Post approached Ms. Guzman to complain about how they felt that Defendants were trivializing their offense to the cartoon depicting

President Obama as a monkey and about how the cartoon was emblematic of the racism that permeated the Company's offices.

80.     In light of the Post's decision to publish this openly racist cartoon, as well as the other examples of racism that she had endured and/or witnessed throughout her employment at the Company, Ms. Guzman decided that she had no choice but to again bring her complaints directly to members of management.

81.     First, Ms. Guzman, in tears, brought her complaints to Jennifer Jhen, a Vice President of Human Resources for the Post, telling Ms. Jhen that she felt deeply offended by the Post's decision to liken the country's first African-American President to a monkey and expressing her belief that the cartoon was racist and that the Post should issue an apology both publicly and to its employees.  Ms. Guzman further explained to Ms. Jhen that she and other non-White employees felt that the cartoon was part of a larger practice at the Post of discriminating against and harassing employees on the basis of their race and/or color.

82.     In response, Ms. Jhen dismissed Ms. Guzman's complaints, arrogantly saying that two other White editors saw nothing wrong with the cartoon.  Ms. Jhen also stated that Defendant Allan believed that the Post had nothing to apologize for to anybody.

83.     Similarly, when another Black employee at the Post approached Defendant Allan and asked whether he would listen to that employee's feelings of discrimination with respect to Defendants' decision to publish the cartoon about President Obama, Defendant Allan summarily refused to engage in any such discussion with the employee, stating simply "absolutely not," and walking away.

84.     Thereafter, Ms. Guzman complained to members of management, including Mr. Robinowitz, her direct supervisor, reaffirming her belief that the cartoon was racist and that

racism was pervasive throughout the Company's work environment.  Specifically, Ms. Guzman told Mr. Robinowitz that she believed that she was working in a racially hostile environment and that she felt that she and other non-White employees had been consistently racially degraded by the Post.

85.     As with the other members of the Post's management, Mr. Robinowitz also demonstrated a callous disregard for the complaints of discrimination and/or harassment, remarkably responding that Ms. Guzman was only complaining because she was "listening to Al Sharpton."  Although Ms. Guzman reaffirmed that her complaints were not simply about the cartoon and that she felt that the Post had fostered a work environment hostile to people of color and women, neither Mr. Robinowitz nor any other individual at the Post investigated Ms. Guzman's complaints or followed up with her in any manner.

86.     As a result of the dismissive responses she received from Ms. Jhen and Mr. Robinowitz, coupled with the lack of any responsive action by the Company to address her complaints of discrimination, Ms. Guzman felt the Company was telling her that her feelings of pain and humiliation were illegitimate and worthless.

87.     Notably, Ms. Guzman also sent an e-mail to the entire management staff at the Post and to members of the public that erroneously believed that she was in some way responsible for the decision to publish the cartoon.  In her e-mail, Ms. Guzman stated:

> Thank you for your feedback.  Please know that I had nothing to do with the Sean Delonas cartoon.  I neither commissioned or approved it. I saw it in the paper yesterday with the rest of the world.  And, I have raised my objections to management. --Sandra Guzman.

88.     Ms. Guzman's e-mail soon thereafter became public knowledge, being published in the Huffington Post and other media outlets, making her the only employee at the Post who was publicly identified as having complained internally to management about the racist cartoon.

89.     Despite Ms. Guzman's repeated complaints, the Company made no efforts to address the complaints of discrimination and harassment made by the employees at the Post.

**V.     Defendants' Unlawful Retaliation Against Ms. Guzman**

90.     Instead, Defendants began unlawfully retaliating against Ms. Guzman for her complaints of discrimination by, among other things, stripping her of her job duties, giving her an unfair performance evaluation and subjecting her to increasing scrutiny in performing her job.

91.     For example, on or about August 12, 2009, President Obama held a private reception at the White House in honor of Justice Sonia Sotomayor's confirmation as the first Hispanic and third female member of the United States Supreme Court.  Despite the fact that no members of the press were invited to attend the reception at the White House, Justice Sotomayor, who is a friend of Ms. Guzman, personally invited Ms. Guzman to attend as her guest.

92.     As a result, Ms. Guzman requested that she be permitted to cover the reception on behalf of the New York Post.  Although Greg Birnbaum, the Post's Political Editor, agreed that having Ms. Guzman report from the reception would be a "great story" and a wonderful opportunity for the Post, Ms. Guzman was nevertheless required to obtain Defendant Allan's approval prior to attending the reception.

93.     Prior to Ms. Guzman's complaints of discrimination concerning the cartoon representing President Obama, she had enjoyed almost complete autonomy in determining what assignments she covered.  However, after her complaints, she was required to get approval from either Mr. Robinowitz or Defendant Allan prior to writing any story.  A number of White and/or male editors were not required to seek prior approval before writing their news articles.

94.     Subsequently, Ms. Guzman sent Defendant Allan an e-mail asking if she could cover the event on behalf of the Post, explaining that she would be the only member of the press

attending the event, and stating that Mr. Birnbaum agreed that having Ms. Guzman report exclusively from the reception was a great idea.  In response, Defendant Allan sent Ms. Guzman a one-word e-mail saying "No."

95.     Rather than permitting Ms. Guzman to cover the reception for Justice Sotomayor personally, where she had exclusive access to interview other members of the Supreme Court and President Obama's close political advisors, Defendants instead used a generic story about Justice Sotomayor's visit to the White House from the Associated Press in the newspaper the next day.  The Company's refusal to allow Ms. Guzman to report about the reception was purely retaliatory.

96.     Subsequently, Ms. Guzman requested that she be permitted to attend Justice Sotomayor's investiture in Washington D.C., again as a personal guest of the Justice, to write a profile about her for "Tempo," explaining that Justice Sotomayor's elevation to the Supreme Court was a landmark event in Latin American history and would certainly appeal to the readers of "Tempo."

97.     However, Ms. Guzman's direct supervisor, Mr. Robinowitz, outright rejected Ms. Guzman's request, stating, "That's what we have a Washington correspondent for."

98.     Ultimately, no one at the Post covered Justice Sotomayor's investiture.  Instead, Ms. Guzman covered the investiture as a freelance journalist and sold her story to *Latina* magazine, which is currently scheduled to publish Ms. Guzman's profile as a front-page story next month.

99.     Defendants' retaliatory refusal to permit Ms. Guzman to perform important aspects of her job and cover events of central importance to the Latin American community, and the nation as a whole, undermined her job performance and negatively impacted the performance

of "Tempo."  Defendants' retaliatory conduct was undertaken solely to provide a pretextual basis

for the termination of Ms. Guzman's employment.

100.    As further evidence of retaliation, Defendants refused to provide Ms. Guzman

with a performance review that accurately reflected her work performance.  Specifically, in July

2009, Mr. Robinowitz met with Ms. Guzman to give Ms. Guzman her most recent job

evaluation.  During that meeting, Mr. Robinowitz told Ms. Guzman that he believed that she

deserved a rating of "Exceeds Standards" as a result of her outstanding work for the Post.

However, Mr. Robinowitz went on to explain to her that Defendant Allan had refused to give her

that rating and instead insisted that she be rated as "Meets Standards," despite the fact that Mr.

Robinowitz was Ms. Guzman's direct supervisor and had worked with her frequently and closely

throughout her employment, unlike Defendant Allan.

101.    Defendant Allan denied Ms. Guzman the rating that she deserved in retaliation for

her complaints about discrimination in the workplace, and the racist cartoon about President

Obama and his stimulus plan.

102.    Similarly, after Ms. Guzman complained about the hostile work environment at

the Post, Defendants began subjecting her to increased scrutiny in performing her job.  By way

of example only, Ms. Guzman was questioned about her expenses with much greater frequency

than any of her White and/or male co-workers.

103.    On one occasion, Ms. Guzman was lectured for spending too much money on her

expenses concerning a photo shoot covering the Legends of Salsa Music, despite the fact that

Ms. Guzman had saved the Company substantial money by calling in personal favors to facilitate

the shoot.  No other employees had their expenses scrutinized or criticized so heavily for

organizing a photo shoot, especially one as successful as the one put together by Ms. Guzman.

In fact, the photo shoot was such a success that the Raices Latin Music Museum in Harlem, an affiliate of the Smithsonian Institution, has asked Ms. Guzman to donate a copy of the photograph for its archives.

## VI.    The Unlawful Termination of Ms. Guzman's Employment

104.    Defendants' campaign of unlawful retaliation against Ms. Guzman culminated on September 29, 2009.  On that day, she was summoned into a meeting with Mr. Robinowitz and Amy Levine Scialdone, the Vice President of Human Resources.

105.    During that meeting, Ms. Guzman was told that the Company had decided to terminate her employment because "Tempo" was purportedly struggling to attract advertisers.

106.    In response, Ms. Guzman asked why she was being terminated solely because of the purported struggles of "Tempo" when she was also in charge of over 25 other, even more successful sections.  Indeed, Ms. Guzman's final performance review with the Post made specific note of the fact that "Sandra has shown a terrific ability to work across a variety of subjects to produce lively, timely and engaging special sections.  She is a strong 'ideas' person,' single-handedly coming up with ideas and concepts to populate her sections."

107.    Despite Ms. Guzman's attempt to question Mr. Robinowitz and Ms. Scialdone about her success editing over 25 other sections for the Post, they continued to claim that the Company was forced to terminate her employment due to issues affecting that one section in particular.

108.    However, as further evidence of the discriminatory and retaliatory animus motivating Defendants' decision to terminate Ms. Guzman's employment, when Defendants decided to roll back the publication of *Page Six* magazine, an insert magazine it was publishing,

from weekly to quarterly in 2009, they nevertheless decided to retain the magazine's White editor and several members of her staff.

109.    Additionally, the Post continued to publish Ms. Guzman's other sections after her termination.  In fact, a week after she was fired, the Post published the Columbus Day parade section, which Ms. Guzman had responsibility for editing, and, most recently, on November 5, 2009, it also published the Education section which she was responsible for editing as well. Thus, Defendants' claim that Ms. Guzman's termination was due to the lack of advertising support for the "Tempo" section was merely a pretext for her retaliatory termination.

110.    Moreover, despite Defendants' claims that Ms. Guzman's employment was terminated for budgetary reasons, they nevertheless recently found room in the budget to hire three White male employees, including a new columnist, who, upon information and belief, each earn over $100,000 per year.

111.    Employees at the Post know that Ms. Guzman was terminated in retaliation for her repeated and vocal complaints of discrimination.  In fact, a high-ranking White editor at the Post confided in Ms. Guzman after her termination that she was indeed fired because she complained about the discrimination at the Company and stood up to Defendant Allan.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment in Violation of Section 1981)

112.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

113.    Defendants have discriminated against Plaintiff on the basis of her race, and/or color (Black and Hispanic) in violation of Section 1981 by denying her the same terms and conditions of employment available to employees who are White, including but not limited to,

23

subjecting her to disparate working conditions and unfair discipline, denying her terms and conditions of employment equal to that of employees who are White, and unlawfully terminating her employment.

114.    Defendants have discriminated against Plaintiff on the basis of her race, and/or color (Black and Hispanic), in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination and harassment committed against Plaintiff.

115.    As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

116.    As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

117.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of Section 1981)

118.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

119.    Defendants have retaliated against Plaintiff by, inter alia, stripping her of important job duties and/or assignments, subjecting her to increased scrutiny, providing her with a lower performance evaluation than she deserved, and by ultimately terminating her employment, all in violation of Section 1981 for her opposition to discriminatory practices directed toward herself and other employees of color, and/or her participation in lodging complaints about such discriminatory practices toward herself and other employees of color.

120.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

121.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

122.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## AS FOR A THIRD CAUSE OF ACTION

### (Discrimination and Harassment in Violation of Title VII)

123.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

124.    Defendants News Corporation and the New York Post have discriminated against Plaintiff on the basis of her sex, race, color and/or national origin in violation of Title VII by denying to her equal terms and conditions of employment, including, but not limited to, subjecting her to disparate working conditions and denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

125.    Defendants News Corporation and the New York Post have discriminated against Plaintiff on the basis of her sex, race, color and/or national origin in violation of Title VII by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment of Plaintiff.

126.    As a direct and proximate result of Defendants News Corporation and the New York Post's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

127.    As a direct and proximate result of Defendants News Corporation and the New York Post's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

128.     Defendants News Corporation and the New York Post's unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS FOR A FOURTH CAUSE OF ACTION

### (Retaliation in Violation of Title VII)

129.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

130.     Defendants News Corporation and the New York Post have retaliated against Plaintiff by, inter alia, stripping her of important job duties and/or assignments, subjecting her to increased scrutiny, providing her with a lower performance evaluation than she deserved, and by ultimately terminating her employment, all in violation of Title VII, for her opposition to discriminatory practices directed toward herself and other female employees and/or employees of color, and/or her participation in lodging complaints about such discriminatory practices toward herself and other female and/or employees of color.

131.     As a direct and proximate result of Defendants News Corporation and the New York Post's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

132.     As a direct and proximate result of Defendants News Corporation and the New York Post's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

133.    Defendants News Corporation and the New York Post's unlawful and retaliatory actions constitute malicious willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Discrimination and Harassment in Violation of New York State Human Rights Law)

134.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

135.    Defendants have discriminated against Plaintiff on the basis of her sex, race, color and/or national origin in violation of the New York State Human Rights Law by denying to her the equal terms and conditions of employment, including, but not limited to, subjecting her to disparate working conditions and denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

136.    Defendants have discriminated against Plaintiff on the basis of her sex, race, color and/or national origin, in violation of the New York State Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment of Plaintiff.

137.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

138.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

139.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

140.    Defendants have retaliated against Plaintiff by, inter alia, stripping her of important job duties and/or assignments, subjecting her to increased scrutiny, providing her with a lower performance evaluation than she deserved, and by ultimately terminating her employment, all in violation of the New York State Human Rights Law for her opposition to discriminatory practices directed toward herself and other female employees and/or employees of color, and/or her participation in lodging complaints about such discriminatory practices toward herself and other female and/or employees of color.

141.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

142.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to

suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

143.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

144.    Defendant Allan knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York State Human Rights Law.

145.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss future income, compensation and benefits for which she is entitled to an award of damages.

146.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Discrimination and Harassment in Violation of New York City Human Rights Law)

147.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

148.    Defendants have discriminated against Plaintiff on the basis of her sex, race, color and/or national origin in violation of the New York City Human Rights Law by denying her

equal terms and conditions of employment, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

149.     Defendants have discriminated against Plaintiff on the basis of her sex, race, color and/or national origin in violation of the New York City Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment committed against Plaintiff.

150.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

151.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

152.     Defendants' unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## <u>AS AND FOR A NINTH CAUSE OF ACTION</u>

### (Retaliation in Violation of New York City Human Rights Law)

153.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

154.    Defendants have retaliated against Plaintiff by, <u>inter alia</u>, stripping her of important job duties and/or assignments, subjecting her to increased scrutiny, providing her with a lower performance evaluation than she deserved, and by ultimately terminating her employment, all in violation of the New York City Human Rights Law for her opposition to Defendants' discriminatory practices towards herself and other female and/or employees of color, and/or her complaints about Defendants' discriminatory practices toward her and other female and/or employees of color.

155.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

156.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

157.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A TENTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

158.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

159.     Defendant Allan knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York City Human Rights Law.

160.     As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to, loss future income, compensation and benefits for which she is entitled to an award of damages.

161.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

162.     Defendant Allan's unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of

these unlawful employment practices are eliminated and do not continue to affect her employment and personal life;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages in an amount to be determined at trial;

I.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: August __, 2010
      New York, New York               Respectfully submitted,

                                           **THOMPSON WIGDOR & GILLY LLP**


                                           By: _____
                                              Kenneth P. Thompson

                                         85 Fifth Avenue
                                         New York, NY 10003
                                         Telephone: (212) 257-6800
                                         Facsimile: (212) 257-6845
                                         kthompson@twglaw.com

                                         *COUNSEL FOR PLAINTIFF*