# Exhibit 5



**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

**Kenneth P. Thompson**
kthompson@twglaw.com

July 19, 2010

85 Fifth Avenue
New York, NY 10003
Tel 212.257.6800
Fax 212.257.6845
www.twglaw.com

**VIA HAND DELIVERY**

The Honorable Ronald L. Ellis
United States Magistrate Judge
United States District Court
500 Pearl Street, Room 540
New York, New York 10007

> Re:   *Guzman v. News Corporation, et al.*, No. 09-cv-9323 (BSJ)(RLE)

Dear Magistrate Judge Ellis:

As Your Honor is aware, we represent Plaintiff Sandra Guzman ("Plaintiff" or "Ms. Guzman") in the above-referenced case in which she has filed claims of unlawful discriminatory treatment and a hostile work environment on the basis of gender, race, color and/or national origin, as well as unlawful retaliation, against Defendants News Corporation, NYP Holdings, d/b/a The New York Post (the "Post"), and Col Allan (collectively, "Defendants"). I write pursuant to Your Honor's request during the status conference on July 15, 2010, to provide the Court with: (i) specific examples of the allegations set forth in the Complaint and related affidavits that support her hostile work environment claims, which are relevant to defining Ms. Guzman's "work environment" and, relatedly, the scope of discovery into allegations of discrimination by other employees or executives at Defendants that is reasonably calculated to produce relevant evidence; and (ii) a statement of exactly what Plaintiff "wants Defendants to do" in connection with their search for electronically stored information responsive to Plaintiff's discovery requests.[1]

### I. SPECIFIC ALLEGATIONS ILLUSTRATING THE EXISTENCE OF A HOSTILE WORK ENVIRONMENT AT DEFENDANTS

The following are specific allegations of discrimination and harassment – cited in Plaintiff's Complaint and/or Plaintiff's Affidavit dated July 19, 2010 (Ex. A) – as examples of the hostile

---

[1] Although this letter addresses only the two specific subjects on which Your Honor requested briefing during the conference on July 15, 2010, Plaintiff also respectfully reiterates her request that the Court compel Defendants to produce the materials addressed in Plaintiff's letter to the Court dated July 14, 2010, and by her counsel during the court conference on July 15. In addition, Plaintiff respectfully requests that the Court compel the Post to respond to Plaintiff's Interrogatory No. 18 (which seeks the identity of the individuals who made the decision to retain the editor and/or staff of Page Six Magazine after its reduction), and Defendant Allan to respond to Interrogatories Nos. 7 and 8 (which seek the identity of African-American, Hispanic, Asian and/or females he hired as editors during Plaintiff's employment).

work environment that Plaintiff suffered on the basis of gender, race, color and/or national origin during her employment with Defendants.

### A. Hostile Work Environment Based on Gender

- [O]n one occasion when Ms. Guzman and three female employees of the Post were sharing drinks at an after-work function, Defendant Allan approached the group of women, pulled out his blackberry and asked them "What do you think of this?" On his blackberry was a picture of a naked man lewdly and openly displaying his penis. When Ms. Guzman and the other female employees expressed their shock and disgust at being made to view the picture, Defendant Allan just smirked. Moreover, although Ms. Guzman complained about [this incident] to a member of management at the Post, no investigation was ever conducted and the Company failed to take any steps to address her complaints. [Compl. ¶¶ 35-36; *see also* Guzman Aff. ¶ 21].

- On another occasion . . . Defendant Allan approached a female employee during a party at the Post, rubbed his penis up against her and made sexually suggestive comments about her body, including about her breasts, causing that female employee to feel extremely uncomfortable and fearing to be alone with him. [Compl. ¶ 37].

- As Editor-in-Chief, Defendant Allan would also routinely talk about the sex lives of other employees at the Post. Furthermore, while serving as the top editor at the Post, Defendant Allan took two Australian political leaders to the strip club Scores in Manhattan, where they watched strippers perform, reportedly had too much to drink and were ejected from the club by its bouncers. Defendant Allan later publicly admitted to going to Scores, an act that shows he views women as mere sex objects who are not equal to men. [*Id.* ¶ 38].

- On another occasion, a Black female employee was temporarily filling in for one of the Post's receptionists. . . . When this employee did not answer Defendant Allan's telephone, not realizing she was responsible for doing so, Defendant Allan ran into the newsroom, where dozens of employees were working, and screamed, "Will you tell that damn girl to answer the phone!" As a result of Defendant Allan's decision to publicly humiliate this Black woman in front of her colleagues and co-workers, the female employee felt deeply ashamed, humiliated and embarrassed. [*Id.* ¶ 39; Guzman Aff. ¶ 9].

- Les Goodstein, the Senior Vice President of News Corp., repeatedly told Ms. Guzman that she looked "sexy" and "beautiful" and he often referred to her as "Cha Cha #1," which were discriminatory and derogatory terms about Ms. Guzman's race, national origin and/or gender. Mr. Goodstein also routinely stared at the breasts and butts of other female employees in Ms. Guzman's presence. [Compl. ¶¶ 40-41; *see also* Guzman Aff. 23].

- [In response to] Ms. Guzman's complaints about Mr. Goodstein [sexually harassing her] Defendant Allan incredibly called Ms. Guzman into his office and screamed at her that it was part of her job to be "nice" to Mr. Goodstein and that it was her responsibility to make greater efforts to work cooperatively with him. [Compl. ¶ 44].

- [A] White male senior editor sexually propositioned a young female Copy Assistant, telling her that, "If you give me a blowjob, I will give you a permanent reporter job." [*Id.* ¶ 45; *see also* Guzman Aff. ¶ 27].

- [A]nother White male senior editor at the Post openly had sexual relationships with young female Copy Assistants and news staffers whom he supervised, which was in blatant violation of Company policy. Yet, the Company took no action to stop this predatory harassment pervading the workplace. [Compl. ¶ 46; *see also* Guzman Aff. ¶ 30].

- [A] female reporter openly complained to a White male senior editor that a headline the Post ran with an article about actress Lindsey Lohan entitled, "Living La Vida Lesbian," was offensive to women. That editor, however, completely ignored her complaint. [Compl. ¶ 47].

- [A] high-ranking White male editor told a female employee that he was going to start hiring more "testosterone" because he wanted more "intelligence" in his department, clearly implying that he viewed women – because of their gender alone – to lack the same level of intelligence of their male counterparts. [*Id.* ¶ 48; *see also* Guzman Aff. ¶ 28].

- Sexist . . . comments were made at the executive editorial meetings [attended by Ms. Guzman, the Post's top editors, and Defendant Allan. For example,] Allan expressed his disapproval of a female editor's story list by saying, "It's hard to teach old bitches new tricks." [Guzman Aff. ¶ 17].

- Other male employees at the Post also followed Defendant Allan's example and openly disparaged and harassed female employees. [Guzman Aff. ¶ 24; *see also* Compl. ¶ 41].

### B. Hostile Work Environment Based on Race, Color and National Origin

- [At another executive editorial meeting] following an interview Ms. Guzman conducted with Pedro Martinez, the Dominican All-Star pitcher and a future member of the Baseball Hall of Fame, Defendant Allan asked Ms. Guzman if Mr. Martinez had been carrying a gun or machete during the interview, a racist comment which Ms. Guzman found deeply offensive and insulting. [Compl. ¶ 50; Guzman Aff. ¶ 18].

- During [her] employment, [Ms. Guzman] also learned that, upon information and belief, a White columnist at the Post named Steve Dunleavy referred to Hispanics as "Spics" in drafts of his news articles and called a Black employee a "Nigger." [Guzman Aff. ¶ 19].

- [A] White male columnist would repeatedly walk into Ms. Guzman's office singing songs from the movie "West Side Story," specifically, the words, "I want to live in America," in a mocking and fake Spanish accent which Ms. Guzman found demeaning. [Compl. ¶ 52; *see also* Guzman Aff. ¶ 22].

- [A] reporter asked her White editor if she could write a story about a recent incident in which several cars had been vandalized with the word "Nigger" scratched onto the sides of the cars. Incredibly, the editor told the reporter that this racist incident was wholly unremarkable, asking the reporter, "So what's the story?" [Compl. ¶ 53].

- [I]n response to Ms. Guzman's decision to keep scented candles in her office, a high-ranking white editor falsely accused her of engaging in "Santeria," a term intended to demean certain Hispanic and African religions by suggesting that her scented candles represented witchcraft and voodoo. [*Id.* ¶ 54; *see also* Guzman Aff. ¶ 22].

- Ms. Guzman was also routinely told by her White colleagues at the Company that the Post has a policy within its Arts, Photo and Features Department of only hiring White women to be models and to pose for the covers of their sections. [Compl. ¶ 55]. In addition, other female Post employees with whom [Ms. Guzman] worked to cast models for photo shoots and covers would comment that "Dave Boyle and Col Allan only like skinny White women with big boobs." [Guzman Aff. ¶ 29].

- [F]ollowing Harvard Professor Henry Louis Gates' arrest . . . for allegedly breaking into his own house, a White female Managing Editor admitted that she knew nothing about Professor Gates but yet openly referred to him stereotypically as an "angry Black man" and expressed pleasure that he had been arrested. [Compl. ¶ 56; Guzman Aff. ¶ 10].

- [A] Black female Copy Assistant approached [Ms. Guzman] in tears after she heard Editor-in-Chief Col Allan, while discussing protestors in front of the Post's building on the phone with City Desk Editor Jesse Angelo, say "Most of them are minorities and the majority of them are uneducated," and then laugh at the protestors. [Compl. ¶ 76; Guzman Aff. ¶ 11].

- The dearth of African-American and Hispanic editors and reporters at the Post also contributed to the hostile work environment, and was a common subject of conversation among minority employees. [Guzman Aff. ¶ 31].

### C. Physical Situs of Ms. Guzman's "Work Environment" at Defendants

As set forth in Plaintiff's affidavit and the affidavits of other current or former employees (attached hereto as Exhibits A-E), the events giving rise to her hostile work environment claims in this case occurred in virtually all of the various locations that collectively comprised her "work environment" in and around the vicinity of Defendants' offices located at 1211 Avenue of the Americas in Manhattan (hereinafter, the "Building"). These include: (i) Plaintiff's workstation in the Post's Newsroom, on the 10th floor of the Building (*see* Guzman Aff. ¶¶ 4, 8-11); (ii) Plaintiff's workstation in the vicinity of the Post's advertising staff and Features department on the 9th floor of the Building (*see id.* ¶¶ 4, 12, 22); and (iii) the vicinity of the Defendants' sales offices on the 5th floor of the Building (*see id.* ¶ 23).

Moreover, Plaintiff's Affidavit describes various instances of discriminatory harassment on the basis of gender, race, color and/or national origin that Plaintiff experienced at each of these four locations during her employment at the Company. (*See* Guzman Aff.). Thus, for purposes of obtaining relevant discovery concerning the existence of a hostile work environment at Defendants, Plaintiff respectfully submits that any incidents of discrimination and/or harassment experienced by the following categories of employees and/or executive (including visitors, clients and/or other guests of such employees or executives) are relevant and presumptively discoverable by Plaintiff as probative of her hostile work environment claims: (i) Other employees and/or executives whose workspaces were located on the 5th, 9th or 10th

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW                                                                                                       Page 5

floors of the Building; (ii) Other employees and/or executives who were required to be present on those floors to carry out their duties for Defendants (irrespective of their assigned workstations); and (iii) Other employees and/or executives of Defendants who reported, either directly or indirectly, to supervisors or executives who are, in turn, within the scope of either of the preceding categories (i) and/or (ii).[2] *See generally Kaytor v. Elec. Boat Corp.*, No. 09-1859-cv, 2010 U.S. App. LEXIS 13318, at *26 (2d Cir. June 29, 2010) ("Because the analysis of severity and pervasiveness looks to the totality of the circumstances, "the crucial inquiry focuses *on the nature of the workplace environment as a whole*," and "a plaintiff who herself experiences discriminatory harassment *need not be the target of other instances of hostility in order for those incidents to support her claim*.") (emphasis in original) (citations omitted); *see also Ri Sau Kuen Chan v. NYU Downtown Hosp.*, 03-cv-3003 (CBM), 2004 U.S. Dist. LEXIS 16751, at *16-18 (S.D.N.Y. Aug. 19, 2004) (explaining that in *Hollander*, "the Court of Appeals reversed the dismissal of plaintiff's age discrimination claim on the grounds that the district court improperly limited the scope of plaintiff's discovery to defendant corporation's practices in the discrete facility where plaintiff worked, as opposed to allowing company-wide discovery."); *Jhirad v. TD Securities USA, Inc.*, 02-cv-7509 (VM)(HBP), 2003 U.S. Dist. LEXIS 6034, at *12 (S.D.N.Y. April 10, 2003) ("*Hollander* continues to be consistent with the case law in this Circuit and constitutes binding authority in this case;" defendant required to produce documents regarding charges of gender, religion, or national origin discrimination company-wide).

Accordingly, Plaintiff respectfully requests that the Court order Defendants to produce at least responsive documents and electronically stored information concerning complaints of discrimination, harassment and/or retaliation asserted by and/or against any employees or executives of Defendants who were within the scope of the preceding categories (i) through (iii) at any time during Plaintiff's employment with Defendants.

## II. **PLAINTIFF'S REQUESTS FOR PRODUCTION OF RESPONSIVE ESI**

At the Court conference on July 15, 2010, Your Honor requested that Plaintiff provide a writing describing the nature of the electronic searches that Plaintiff expects Defendants to undertake for purposes of identifying electronically stored information responsive to Plaintiff's discovery requests. As Plaintiff's counsel noted when this subject arose during the parties' "meet and confer" on June 24, 2010, the nature and extent of electronic searches that Defendants are required to conduct to satisfy their discovery obligations in this case is directly related to the nature and format of the databases comprising Defendants' electronically stored information and, particularly, the extent to which Defendants' databases are "reasonably accessible." As Plaintiff's counsel further explained, for those databases that are both (i) "reasonably accessible," and (ii) reasonably suspected to contain information responsive to Plaintiff's discovery requests, Defendants are required to conduct "key word" searches (based on terms

---

[2]     *See generally Lineen v. Metcalf & Eddy, Inc.*, No. 96-cv-2718 (HB)(MHD), 1997 U.S. Dist. Lexis 1767, at *6 (S.D.N.Y. 1997) (holding that "[t]he principal factor in defining the scope of [permissible discovery in a discrimination case] is the level of the decision-maker whose policies are being challenged"); *Masters v. F.W. Webb Co.*, No. 03-cv-6280L (MWP), 2006 U.S. Dist. LEXIS 64645, at *7-8 (W.D.N.Y. Sept. 11, 2006) (citations omitted) ("In a case such as this alleging unlawful discrimination, evidence of the intent and motive of the decision-makers is plainly relevant; furthermore, that intent and motive may be inferred from evidence of their treatment of others within the same protected categories as the plaintiff.").

to be agreed upon by the parties), and to produce all electronic documents containing the agreed upon key words (or, if Defendants prefer, to manually filter those results for responsiveness prior to production).

For example, Plaintiff requested that Defendants search *all* email databases and produce *all* email messages that contain any of eight racial slurs and/or otherwise highly offensive terms that Plaintiff identified during the June 24 meet and confer. Given the highly inappropriate nature of the eight words at issue, and the near total-absence of a potential non-discriminatory context for their use in work-related correspondence, Plaintiff explained that *any* emails in Defendants databases that contain such terms are reasonably calculated to lead to the discovery of admissible evidence as to the existence of a hostile work environment at Defendants. Moreover, by letter dated July 9, 2009, Plaintiff's counsel proposed more detailed groups of search term strings corresponding to five broad categories of material identified in Plaintiff's discovery requests. The various search strings that Plaintiff proposed are designed to isolate – among all "reasonably accessible" databases containing documents or electronic correspondence of Defendants – a manageable sub-set of materials that are likely responsive to each of the five-identified categories of material requested by Plaintiff.[3]

In response to Plaintiff's requests for production and proposed search terms, Defendants have – most recently during the Court conference on July 15 – asserted that Plaintiff's requests are unduly burdensome, unmanageable and otherwise objectionable. Moreover, Defendants have proposed that the only searches for responsive electronically stored information that is required to conduct are to be limited to the hard drives of a handful of Post employees that Defendants have unilaterally proposed. Notwithstanding Defendants' objections, however, Plaintiff's requests to date have been consistent with prevailing authority construing the permissible scope of electronic discovery, and Defendants' unqualified objections have failed to discharge their discovery obligations.

### A. Defendants' Obligations to Search for and Produce Responsive ESI

In general, the rules of discovery presume that "the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). However, the 2006 Amendments to the federal rules included the adoption of Fed. R. Civ. P. 26(b)(2)(B), which creates a limited exception to this principle in the context of discovery requests for production of ESI. Thus, Rule 26(b)(2)(B) provides in part that when responding to such discovery requests, "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." However, in the context of a requesting party's motion to compel production of such assertedly "inaccessible" ESI, a responding party must satisfy a far higher standard. As set forth in Rule 26(b)(2)(B), "[o]n motion to compel discovery or for a protective

---

[3]  Following the June 24 meet and confer, Plaintiff's counsel requested information concerning Defendants' electronic systems for the stated purpose of facilitating Plaintiff's effort to craft meaningful search terms for materials responsive to Plaintiff's discovery requests. The search strings identified in Plaintiff's letter dated July 9 are informed by the limited information that Defendants' counsel ultimately disclosed pursuant to Plaintiff's requests.

order, *the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.*" Fed. R. Civ. P. 26(b)(2)(B) (emphasis added).[4]

This threshold *"evidentiary showing"* as to the inaccessibility of ESI and expense of production cannot be satisfied by a party's mere representation that responsive ESI is not "reasonably accessible," or that that its review and production of such ESI would be "unduly burdensome." *See Auto Club Family Ins. Co. v. Ahner*, 05-CV-5723, 2007 U.S. Dist. LEXIS 63809, at *8-9 (E.D. La. Aug. 29, 2007) (emphasis in original) ("The statement of a lawyer in a memorandum that the electronic information is not readily accessible or that it would be unduly burdensome to comply with the request is not evidence."). If this threshold evidentiary showing is not met, then there is no basis to proceed with a cost-shifting analysis, and all costs of production must be borne by the producing party. *See Quinby v. WestLB AG*, 245 F.R.D. 94, 104 (S.D.N.Y. 2006) ("[C]ost-shifting is appropriate only where electronic discovery imposes an undue burden or expense.") (quoted in *Peskoff v. Faber*, 251 F.R.D. 59, 61 (D.D.C. 2008)); *Mikron Indus. v. Hurd Windows & Doors, Inc.*, C07-532, 2008 U.S. Dist. LEXIS 35166, at *7 n.2 (W.D. Wash. Apr. 21, 2008) ("Because defendants have not met their threshold burden to show undue burden or cost, the Court will not apply the cost-shifting factors.") (citations omitted).

Furthermore, as set forth in the court's seminal analysis of e-discovery in *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003), "reasonable accessibility" relates to whether the ESI "is kept in an accessible or inaccessible format "a distinction that corresponds closely to the expense of production." (*Id.* at 318). More specifically:

> Information deemed "accessible" is stored in a readily usable format. Although the time it takes to actually access the data ranges from milliseconds to days, the data does not need to be restored or otherwise manipulated to be usable. "Inaccessible" data, on the other hand, is not readily usable. Backup tapes must be restored using a process similar to that previously described, fragmented data must be de-fragmented, and erased data must be reconstructed, all before the data is usable. That makes such data inaccessible.

---

[4]  This requirement is further described in the 2006 Advisory Committee notes to Rule 26(b)(2)(B), which provide, *inter alia*, that:

> Under this rule, a responding party should produce electronically stored information that is relevant, not privileged, and reasonably accessible, subject to the [26](b)(2)(C) limitations that apply to all discovery. *The responding party must also identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing.* The identification should, to the extent possible, *provide enough detail to enable the requesting party to evaluate the burdens and costs of providing the discovery* and the likelihood of finding responsive information on the identified sources.
> 
> . . . .
> *The responding party has the burden as to one aspect of the inquiry* – whether the identified sources are not reasonably accessible in light of the burdens and costs required to search for, retrieve, and produce whatever responsive information may be found. [emphasis added]

(*Id.* at 320). In particular, *Zubulake* noted that "back-up" or "archived" copies of email that are stored in their original or "native" format are, by definition, "reasonably accessible," and therefore beyond the scope of cost shifting in civil discovery. *See id.* ("For these sources of e-mails -- active mail files and e-mails stored on optical disks -- it would be wholly inappropriate to even consider cost-shifting."). Moreover, courts that have confronted the question of potential cost-shifting under the 2006 Amendments to Rule 26(b)(2)(B) have continued to apply *Zubulake*'s media-based standards for distinguishing between "accessible" and "inaccessible" ESI.[5]

Accordingly, Plaintiff respectfully requests that the Court compel Defendants – who, unlike Plaintiff, are aware of the various categories of electronic databases in their possession – to search all sources of electronically stored information that are reasonably suspected to contain material that may be responsive to Plaintiff's discovery requests, subject to Defendants' right to propose a reasonable, more limited search, if warranted on the basis of a proper evidentiary showing, and Plaintiff's right to challenge such showing, consistent with Fed. R. Civ. P. 26(b)(2)(B). In particular, Plaintiff has proposed groups of search term strings designed to identify responsive emails and/or electronic documents responsive to four broad categories of her discovery requests, including: (i) Ms. Guzman's duties and work performance at Defendants; (ii) Defendants' HR policies and practices, including with respect to hiring, layoffs and terminations, diversity, discrimination and investigations; (iii) the financial performance and elimination of the Post's Tempo Feature, formerly edited by Ms. Guzman, as well as the financial performance of other Post Special Features;[6] and (iv) discriminatory statements and conducts on the basis of race and/or gender, as well as related complaints and/or investigations by Defendants. As set forth above, Defendants must run the requested searches (or variations of those searches, to be agreed upon by the parties in light of the electronic search capabilities of Defendants ESI systems) on all "accessible" sources of ESI at Defendants. To the extent that responsive material may be contained in "inaccessible" sources of ESI, Defendants must identify those sources, and provide a showing as to their "inaccessibility" and the anticipated costs of converting them into a searchable, "accessible" format. What Defendants may not do is unilaterally restrict the scope of responsive information that Plaintiff has requested and/or limit their search for ESI to the desktop computers of a handful of individuals selected by Defendants, who may not have preserved all responsive ESI that once existed on their computers, which certainly never contained all responsive ESI at Defendants in the first instance.

---

[5]    *See, e.g., Quinby*, 245 F.R.D. at 101-102 (quoting *Zubulake*, 217 F.R.D. at 318-20) ("Data that is 'accessible' is stored in a readily usable format that does need to be restored or otherwise manipulated to be usable. Conversely, data that is 'inaccessible' is not readily useable and must be restored to an accessible state before the data is usable."); *W.E. Aubuchon Co. v. Benefirst, LLC*, 245 F.R.D. 38, 42-43 (D. Mass. 2007) (citing and quoting *Zubalake*) ("I find that it is instructive to apply this media based analytical approach in considering whether electronic data is 'reasonably accessible' for purposes of the new Rule 26(b)(2)(B).") (internal quote marks omitted); *see also Auto Club Family Ins. Co.*, 2007 U.S. Dist. LEXIS 63809, at *11-12; *Canon U.S.A., Inc. v. S.A.M., Inc.*, No. 07-cv-1201, 2008 U.S. Dist. LEXIS 47712, at *7-8 (E.D. La. June 20, 2008); *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 247 F.R.D. 567, 570 (D. Minn. 2007).

[6]    Plaintiff alleges that Defendants' asserted justification for her termination, *i.e.*, the financial performance of Tempo, is a pretext for discrimination and/or retaliation.

Thank you for Your Honor's consideration.

Respectfully submitted,

Kenneth P. Thompson

cc:     Mark Lerner (via email)