# Exhibit 6

## **AFFIDAVIT OF SANDRA GUZMAN**

STATE OF NEW YORK    )
                     )   ss.:
COUNTY OF NEW YORK   )

SANDRA GUZMAN, being duly sworn, deposes and says:

1. I submit this affidavit in connection with the Complaint that I filed against News Corporation, NYP Holdings, Inc., d/b/a The New York Post, (together, the "Company") and Col Allan (collectively, the "Defendants") on November 9, 2009.

2. I am a Black and Puerto Rican female.

3. I worked as an Associate Editor of The New York Post (the "Post") from July 2003 until I was unlawfully terminated on or around September 29, 2009.

4. During my employment, I had several different work stations in the Company's offices located at 1211 Avenue of the Americas in Manhattan (hereinafter, the "Building"). My work stations were located in the Post's newsroom on the 10th floor, as well as on the 9th floor of the Building, which houses the Post's advertising staff and Features department.

5. The work environment at the Post is permeated with racist and sexist conduct and comments towards women and employees of color.

6. During my employment, I and other females and/or employees of color were subjected to a hostile work environment based on gender, race, color, and/or national origin by male White managers and employees of the Company, as well as unlawful retaliation. The unlawful discrimination and harassment to which I was subjected, witnessed and/or learned

1

about occurred on various floors occupied and/or used by employees of the Post, including the 5th, 9th and 10th floors, as well as outside of the Building.

7. The vast majority of the employees located in the newsroom have work stations that are open to the others around them. Executive editors have offices but, with the exception of Defendant Allan, spend much of their time outside on the floor with the rest of the employees. Anything yelled or said loudly on the newsroom floor can be heard by at least several or even dozens of people in the vicinity, depending upon the time of day.

8. Both when I worked in the newsroom and thereafter and walked the floor of the newsroom I would routinely hear male employees make sexual comments, including about female body parts.

9. Furthermore, when Defendant Allan stormed out of his office and screamed "Will you tell that damn girl to answer the phone!" in the newsroom after a Black female employee, who was filling in for a receptionist, did not answer his telephone, he did so when many other employees were present. This incident is described in Paragraph 39 of my Complaint.

10. Another example of an incident taking place in the newsroom that was heard by Post employees and circulated among the staff occurred when White female Managing Editor Lauren Ramsby loudly called Harvard Professor Henry Louis Gates an "angry Black man" and exclaimed "Nice!" in response to his arrest last summer for allegedly breaking into his own home. This incident is described in Paragraph 56 of my Complaint.

11. Additionally, a Black female Copy Assistant approached me in tears after she heard Defendant Allan, while discussing protestors in front of the Post's Building, state "Most of

them are minorities and the majority of them are uneducated," and then laugh at the protestors. This incident is described in Paragraph 76 of my Complaint.

12.     When my work station was located on the 9th floor, my desk was next to other open work stations. Later in or around 2006, my work station was moved to an office on the 9th floor, and I worked at that location until my termination from the Post in September 2009.

13.     When I worked on the 9th floor, I continued to work in and visit the newsroom on the 10th floor several times each day to perform my duties. My time in the newsroom was spent working with the photo and design departments on my sections, talking with editors and reporters from other departments about story ideas and assignments, and using the library.

14.     As an Associate Editor, I was responsible for numerous special sections which covered subjects that touched on various editorial areas. Therefore, to assemble these sections, I worked with Post editors and reporters in many editorial departments or sections of the newspaper, including but not limited to the Business, Sports, Television, Metro/City Desk, and Political departments. For example, for an article in the Hispanic-interest Tempo special section on the most influential Latino New Yorkers, I needed to speak with editors from various sections to identify important individuals and good interview subjects from different industries, such as athletes, politicians, business leaders, and media personalities.

15.     Furthermore, upon information and belief, approximately 25 to 30 editors and 50 to 60 reporters worked at the Post during my tenure. I worked with and had interaction with many of those editors and reporters and otherwise had conversations, email exchanges, or other contact with many of them on a daily basis.

16.    I also attended daily executive editorial meetings at the Post from the time of my hiring in 2003 to approximately 2005. The Post's top editors (e.g., Metro/City Desk, Photo, Political, Business, Sports, Television, Features, Page Six, Fashion, Sunday, Managing Editors, etc.) would attend the meeting, as well as Defendant Allan. Many comments made at these meetings were therefore heard by individuals from across the newspaper's editorial organization.

17.    Sexist and other improper comments were made at the executive editorial meetings. By way of example only, Defendant Allan expressed his disapproval of a female editor's story list by saying, "It's hard to teach old bitches new tricks."

18.    It was also at an executive editorial meeting, in front of the assembled editors, that Defendant Allan asked me whether Major League Baseball pitcher Pedro Martinez, who is Dominican, carried a gun or machete to my interview with him. This incident is described in Paragraph 50 of my Complaint.

19.    During my employment, I also learned that, upon information and belief, a White columnist at the Post named Steve Dunleavy referred to Hispanics as "Spics" in drafts of his news articles and called a Black employee a "Nigger."

20.    The sexually and racially discriminatory, harassing, and demeaning behavior was not confined to the newsroom or the executive editorial staff. During my employment, I experienced and/or learned of discriminatory, harassing and/or retaliatory behavior experienced by Post employees on various floors occupied by the Post, and even outside of the Building.

21.    By way of example only, on one occasion when three female co-workers and I were sharing drinks at Langan's, a local bar, after work, Defendant Allan approached us, pulled

out his Blackberry and asked "What do you think of this?" On his Blackberry was a picture of a naked man lewdly and openly displaying his penis. When we expressed shock and disgust at him showing this picture to us, Mr. Allan just smirked. This incident is described in Paragraph 35 of my Complaint.

22.     It was in or around when my work station was located on the 9th floor that a White co-worker at the Post made a comment asking if I practiced Santeria because of the candles in my office, and another White co-worker sang the lyrics "I want to live in America" in a mocking and fake Latin accent. These incidents are described in Paragraphs 52 and 54 of my Complaint.

23.     I also regularly met with Les Goodstein, a Senior Vice President at the Company, in his office on the 5th floor to discuss sales of advertisements for the Tempo special section. In those meetings, Mr. Goodstein repeatedly told me that I looked "sexy" and "beautiful" and referred to me as "Cha Cha Number 1," all of which I found discriminatory and demeaning based upon my gender, race, color and/or national origin. Mr. Goodstein also routinely stared at the breasts and buttocks of female employees. Female employees at the Post discussed how Mr. Goodstein's open, sexual staring made them feel highly uncomfortable around him. These incidents are described in Paragraphs 40 and 41 of my Complaint.

24.     Other male employees at the Post also followed Defendant Allan's example and openly disparaged and harassed female employees.

25.     After I complained about the Post's hostile work environment, I was unlawfully retaliated against. By way of example only, my expense reimbursements were questioned more closely and frequently than they had been before, and, upon information and belief, more closely and frequently than they were for White and male editors. I exchanged emails with the

accounting department, whose offices are located on the 15th floor, with regard to disputed expenses during this period, particularly with regard to a photo shoot regarding the Legends of Salsa Music. This retaliatory action is described in Paragraphs 102 and 103 of my Complaint.

26.     During my employment, other female and/or employees of color shared with me incidents of discrimination and harassment that occurred on the various floors that I worked on and/or regularly went to throughout the day.

27.     Upon information and belief, a White male editor sexually propositioned a young female Copy Assistant at a Post office holiday party, telling her that, "If you give me a blowjob, I will give you a permanent reporter job." News of this incident spread among the Copy Assistants, and became well-known among employees at the Post, particularly among members of the editorial departments. This incident is described in Paragraph 45 of my Complaint.

28.     On further information and belief, a White male editor whose office was located on the 9th floor told a female employee that he was going to start hiring more "testosterone" in order to bring more "intelligence" into his department, implying that women are less intelligent than men. This incident is described in Paragraph 48 of my Complaint.

29.     In addition, other female Post employees with whom I worked to cast models for photo shoots and covers would comment that "Dave Boyle and Col Allan only like skinny White women with big boobs."

30.     Additionally, it was widely discussed that a White male senior editor had sexual relationships with the young female Copy Assistants and news staffers whom he supervised. This allegation is described in Paragraph 46 of my Complaint.

31.     The dearth of African-American and Hispanic editors and reporters at the Post also contributed to the hostile work environment, and was a common subject of conversation among employees of color.

32.     I am also aware of at least two complaints of discriminatory or harassing conduct that were made and/or filed either with the Post's management or as a lawsuit against the Post during my employment from 2003 to 2009. One of the two complaints concerned the alleged sexually inappropriate conduct of a Post employee in the newsroom.

33.     The discrimination and hostile work environment I experienced during my employment culminated in my discriminatory and retaliatory termination on September 29, 2009 based on my gender, race, color and/or national origin and because of my opposition to the Company's discriminatory practices.

34.     In fact, Greg Birnbaum, a high-ranking White editor at the Post, confirmed to me that I was fired because of my complaints regarding discrimination at the Company and standing up to Defendant Allan. Upon information and belief, this editor also would have discussed my termination with other employees at the Post.

35.     My Complaint does not contain every discriminatory, harassing, retaliatory, offensive, degrading and/or improper comment or act that I witnessed, experienced and/or had described to me during my employment with Defendants.

36. I also have not described in this affidavit every discriminatory, harassing, retaliatory, offensive, degrading and/or improper comment or act that I witnessed, experienced and/or had described to me during my employment with the Defendants.

37. I also rely on the allegations made in my Complaint and in the affidavits submitted by other current and former employees in support of my Complaint.

_____
Sandra Guzman

Sworn to before me on
July 19, 2010

_____
Notary Public

David Evan Gottlieb
Notary Public
State of New York
No. 02G06181079
My Commission Exp 01-22-20 12

8