# Exhibit 7

## AFFIDAVIT OF AUSTIN FENNER

STATE OF NEW YORK    )
                     )   ss.:
COUNTY OF NEW YORK   )

AUSTIN FENNER, being duly sworn, deposes and says:

1. I am an African-American male.

2. I worked as a Senior Reporter on the City Desk at the New York Post (the "Post") from May 2007 through November 9, 2009 when I was unlawfully terminated.

3. Prior to joining the Post, I was a successful and accomplished reporter for the Post's main competitor, the New York Daily News (the "Daily News"). While at the Daily News, I received satisfactory performance reviews and was responsible for covering a number of high-profile stories.

4. However, during my employment with the New York Post, I was subjected to a hostile work environment based on race and color by members of the White management of the Post. Other employees of color were also discriminated against based on their race and/or color.

5. For example, there has not been an African-American, Hispanic, or Asian Editor on the City Desk in almost 10 years.

6. In fact, the vast majority of the reporters and editors at the Post are White.

7. Indeed, currently there are only three non-White reporters in the entire newsroom at the Post and only one non-White Editor.

1

8. Another African-American reporter at the Post, who has been there for over nine years, has repeatedly requested that he be promoted to a daily columnist. However, management at the Post discriminatorily denied his request based on his race and/or color and instead hired White columnists.

9. That same reporter has also been discriminatorily denied an opportunity to become an editor based on his race and/or color, despite his qualifications and numerous requests for such a position.

10. Similarly, there are only three non-White reporters in the entire newsroom at the Post.

11. I was also personally discriminated against on numerous occasions because of my race and/or color.

12. For example, the Post issued me a discriminatorily poor performance review, falsely claiming that my performance was unsatisfactory. However, not only had I received positive performance reviews throughout my tenure at the Daily News, but the Post also continued to assign me to high profile stories such as President Obama's presidential campaign, demonstrating that they had confidence in my work.

13. During my employment at the Post, I was forced to travel more than White reporters. In fact, I was sent on almost 30 trips to distant locations during my two years working there, an excessive number of trips for a Senior Reporter in my position to have to take, which caused me to spend a substantial amount of time away from my family and the newsroom.

14. However, even when I was sent on these trips, the Post failed to provide me with the tools I needed to succeed. For instance, although I was sent to cover President Obama's inauguration, Michelle Gotthelf, my White supervisor, repeatedly denied my requests to have a photographer accompany me on my trips, despite the fact that it was routine practice for a reporter traveling out of town to be given his own photographer and I was covering a historic event.

15. Moreover, in or around February 2009, the New York Post published a racist, offensive and degrading cartoon depicting a chimpanzee with three bullet holes in his chest lying in a pool of his own blood having been shot by two White police officers with the caption, "They'll have to find someone else to write the next stimulus bill."

16. I immediately recognized that the chimpanzee was supposed to represent President Barack Obama.

17. As an African-American, I found the cartoon to be deeply racially offensive. Moreover, I felt the response of various editors and management officials at the Post showed a complete disregard for my feelings as well as the feelings of other employees of color.

18. For example, when one Black reporter approached Jesse Angelo, the White Managing Editor at the Post, to complain about the cartoon, Angelo brushed off his complaints, saying that there was nothing wrong with the cartoon, despite its obviously racist nature.

19. As a result of the Post's callous indifference to the offensive cartoon, I felt compelled to speak out. As such, I agreed to be interviewed by the prominent online media outlet *Journal-isms*. I believed that by speaking out to *Journal-isms*, which was widely read in

the media industry, I would be expressing my objections to the racist cartoon both to the general public and to members of the Post's management.

20. In the article published in *Journal-isms*, entitled "3 Things that Need Fixing at the N.Y. Post," I said that the cartoon "churned my stomach when I saw it."

21. Almost immediately after the article was published, the Post began retaliating against me as a result of my objections to the cartoon.

22. For example, two days after the article was published, a White Assignment Editor at the Post, Daniel Greenfield, berated me over the telephone while I was on assignment in Milwaukee, Wisconsin, screaming, "What the fuck are you doing," "What is wrong with your ass," and "You better get your fucking ass over there."

23. Mr. Greenfield never spoke to White reporters in such a degrading, humiliating and offensive manner.

24. Whenever my supervisor, Ms. Gotthelf, learned about Mr. Greenfield's tirades towards me, she did not ask me for my side of the story at all, and instead only blamed me, saying I had deserved to be yelled at in such a demeaning manner.

25. Thereafter, Mr. Greenfield and Ms. Gotthelf informed me that they had decided to ban me from the newsroom. They also told me that if I ever wanted to enter the newsroom, I would have to call ahead and get Mr. Greenfield's permission first.

26. When I asked them why I was being banned from the newsroom, I was told that the Post was restructuring its offices. However, even after being banned, I continued to have a desk, computer and telephone in the newsroom.

27. No White reporters were ever banned from the newsroom at the Post. As a result, the decision to ban me, even though I was a Senior Reporter, was based on my race and/or color and my decision to speak out against the racist cartoon.

28. As a result of the decision to ban me from the newsroom, and segregate me from my colleagues, I felt deeply humiliated and offended and on the rare occasions I would come to the newsroom, I would make sure that it was late in the evening, after most of the other employees had gone home.

29. In addition, because I was banned from the newsroom, it became incredibly difficult for me to perform my job effectively.

30. For example, I was no longer able to use necessary office equipment such as the computers, printers and telephones that were available to other White reporters in the newsroom.

31. As a result, when my White editors called me with assignments and after I had completed them, I was forced to go to Starbucks and other public venues to work on my stories for the Post.

32. Moreover, all reporters rely on the wire services and discussions with colleagues in order to generate story ideas and to develop leads. However, because I was no longer allowed into the newsroom, I was unable to take advantage of the same resources that White reporters used in writing their stories.

33. Not only was I banned from the newsroom based on my race and/or color, but the Post also changed my work schedule from working an 11 a.m. to 7 p.m. shift that was customary for reporters at my level to a work schedule in which I worked from 9 a.m. to 5 p.m. on four days of the week, and from 2 p.m. to 10 p.m. on the 5th day, which is a shift normally reserved for junior reporters.

34. Even though Mr. Greenfield and Ms. Gotthelf originally told me that this change in my schedule would only last for a month, I was forced to work this shift until my unlawful termination on November 9, 2009.

35. As further evidence of the racial discrimination and retaliation I experienced while working for the Post, I was given a negative performance evaluation in September 2009, despite the fact that I continued to be banned from the newsroom at that time.

36. When I asked Ms. Gotthelf why I received a negative performance review, she falsely claimed I was not writing enough "enterprise" stories for the Post. In response, I asked her for examples of good enterprise stories that I should use as models for my own work. However, Ms. Gotthelf was unable to identify a single example of an acceptable "enterprise" story, proving that the complaints in my performance review were baseless.

37. Finally, on November 9, 2009, Mr. Greenfield, Ms. Gotthelf and Amy Levine Scialdone, Vice President of Human Resources at the Post, informed me that they had decided to terminate my employment.

38. After they informed me of this fact, Ms. Scialdone attempted to force me to sign a separation and release agreement by falsely claiming that I would not receive my 401K benefits

unless I signed the agreement. However, I refused to sign because I knew that I had been the victim of racial discrimination and retaliation during my employment.

39. I was unlawfully terminated based on my race and/or color and due to my opposition to the Company's discriminatory practices, including the belief by editors at the Post that I would be a supportive witness in the Federal employment discrimination lawsuit filed by Sandra Guzman against the Post, News Corporation and the Post's Editor in Chief, Col Allan.

40. I have not described in this affidavit every offensive, degrading or improper comment or act that I have witnessed or experienced at the New York Post.

Austin Fenner

Sworn to before me on

November 24, 2009

Notary Public

VIRGINIA GENTILE
Notary Public, State of New York
No. 01GE4960908
Qualified in Nassau County
Commission Expires January 2, 20 10