```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                         :
4    GUZMAN,                             :   09-CV-9323
                                         :
5                    Plaintiff,          :   July 7, 2011
                                         :
6              v.                        :   500 Pearl Street
                                         :   New York, New York
7    NEWS CORPORATION, et al.,.          :
                                         :
8                    Defendants.         :
     ------------------------------------X
9
         TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
10             BEFORE THE HONORABLE RONALD L. ELLIS
                 UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12

13   For the Plaintiff:        SHAFFIN ABDUL DATOO, ESQ.

14

15

16

17   For the Defendants:       MARK LERNER, ESQ.
                               BLYTHE LOVINGER, ESQ.
18

19

20

21
     Court Transcriber:        SHARI RIEMER
22                             TypeWrite Word Processing Service
                               211 N. Milton Road
23                             Saratoga Springs, New York 12866

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

                                                                        2

1            THE CLERK: Good afternoon.  This is Judge Ellis.

2            Could I have your appearances?

3            MR. DATOO:  Shaffin Datoo for plaintiff in Guzman

4    v. NYP Holdings and for the plaintiffs in Fenner Livingston v

5    NYP Holdings.

6            MR. LERNER:  For the defendants in both of those

7    cases, Mark Lerner and Blythe Lovinger.  Good afternoon, Your

8    Honor.

9            THE COURT: Good afternoon.  This is a conference in

10   Guzman v. News Corporation, 09-CV-9323 and Fenner v. News

11   Corporation, 09-CV-9832.  It is approximately 5:30 p.m. on

12   July 7th.  This conference is a result of discovery disputes

13   the parties are having and the submissions by the parties and

14   a joint submission in each of those cases dated June 30,

15   2011.

16           I have reviewed the submissions by the parties and

17   consistent with the divisions that the parties have had I

18   will discuss the disputes and order.  The first dispute

19   concerns the defendant's submission of documents with

20   redacted portions.  Specifically, these are documents

21   concerning executive committee agenda, executive committee

22   meetings and notes and emails to Guzman related to the

23   executive committee.  The plaintiffs object to the

24   defendant's production of those documents in a redacted form.

25           With respect to the overall question of whether or

3

1   not the information needs to be produced in non redacted

2   form, the court finds that given the descriptions that the

3   information need not be produced in full but may be redacted

4   because in the description the indication is that the

5   information -- as the information is described the court

6   finds that they are not relevant.

7          The ancillary question is whether or not in any

8   discovery assertion by a party the other side has to accept

9   the assertion by that party that the items are what they say

10  they are.  In this regard, I believe that the plaintiff's

11  preferred suggestion would be that the documents be produced

12  for attorney's eyes only and the ultimate suggestion would be

13  that the documents be produced in camera for the court's

14  consideration to determine if the defendant's assertion that

15  the documents do not pertain to the plaintiff then they

16  should not be produced.

17         While my general reaction is that I should not

18  increase my workload unnecessarily -- to the extent that the

19  documents are not relevant it seems to me given the history

20  of the parties in this case that more directly it probably

21  makes sense for me to go ahead and see the documents in the

22  first instance so that I won't have to deal with the parties'

23  disagreement about whether or not they pertain to the

24  plaintiffs in these cases.

25         So, in that regard, Mr. Lerner, at least I need

4

1   to -- I don't know the extent of the documents that we're

2   talking about and I don't know -- so I certainly don't want

3   to see 100,000 documents but I would certainly like to see a

4   sample of redacted documents.  Can you, first of all, tell me

5   how extensive this production is that we're talking about?

6              MR. LERNER: Yes, Your Honor.  The redacted

7   documents are pretty easy to go through in probably -- it's

8   probably a quarter of an inch thick.  The unredacted

9   documents is a stack about an inch thick.

10             THE COURT: Are they -- are they divided in time or

11  how are they divided?

12             MR. LERNER: Yes.  A typical package of executive

13  committee minutes is for a particular meeting on a particular

14  day and the minutes themselves which is all Your Honor --

15  well, the minutes themselves typically stand the first --

16  anywhere from three to half a dozen pages, sometimes less.

17  Then sometimes there are Powerpoint attachments which I think

18  Your Honor could review very quickly.  So I think this is

19  a -- I think it's -- you would find this to be a manageable

20  undertaking.  The number of days for which minutes have been

21  produced is probably about a dozen.

22             THE COURT: Certainly as a matter of full disclosure

23  I think more accurately to say that it would be manageable

24  for my law clerk.

25             MR. LERNER: Understood.

1            THE COURT: So that's the resolution of that.  As I

2  said, as a legal matter as I see the descriptions and if they

3  are what the defendants say you can certainly redact

4  information, the information that's indicated.

5            Now, with respect to the next category having to do

6  with the document -- I guess plaintiff's first set of

7  document requests.  This has to do with request by reporters

8  or editors for approval prior to writing articles.  If I

9  understood correctly part of the issue is that the term --

10  well, first of all, it would seem to me that we would be

11  looking for people who were similarly situated, and I think

12  the complicating fact here is that if I understand the

13  submission from the defendant the term editor is one of those

14  terms which can run the gamut from somebody who's one level

15  to somebody who is at a very low level.

16            So I don't know that the parties could even agree

17  as to who would be similarly situated to either Guzman or

18  Fenner.  You may weigh in on that one.

19            MR. DATOO:  Your Honor, this is Shaffin Datoo for

20  the plaintiff.  I believe Ms. Guzman's official title was

21  associate editor even though she I believe was the editor of

22  Tempo magazine and edited certain other sections.  Her job

23  title was associate editor.  So I would suggest, respectfully

24  suggest that those who would be similarly situated to her

25  were those that carried the title of associate editor and

6

```
1   editor, not anyone who I guess carried a title lower in the
2   hierarchy as editor.
3           THE COURT: Mr. Lerner, I'm not sure that narrows
4   the issue that you raise as to the number of people who would
5   be covered with that designation.  In fact, maybe that
6   includes it if I understood it correctly.
7           MR. LERNER: It's a very large number of some people
8   with very wide ranging responsibilities.
9           THE COURT: Then this may come down to the question
10  of whether or not this issue as raised by the plaintiff in
11  balancing the portion of discovery versus whether or not the
12  issue can be reasonably addressed through other than the
13  document requests is -- in balancing that what seems to be
14  appropriate.  I understand from your submission that if we
15  use the term reporters and editors there would be like
16  hundreds of thousands of emails.  If we took out reporters
17  and just limited it to editors or associate editors, do you
18  have any idea what numbers that would be?
19          MR. LERNER: The number of emails to be searched
20  would still be easily in the hundreds of thousands. A typical
21  email box with the New York Post can easily number in the
22  thousands of emails.  Sandra Guzman's email box had 15,000
23  emails in it.
24          MR. DATOO:  I'm sorry.  This is -- we're only
25  asking for the period from February '09 through September
```

7

1  '09.  I think that's an eight-month period.

2        MS. LOVINGER:  Your Honor, this is Blythe Lovinger

3  speaking.  I recently spoke with Ms. Guzman's former

4  supervisor, Joe Rabinowitz, about this very issue.  Of course

5  we had discussed it previously but I revisited it with him

6  and he told me that at all times Ms. Guzman and the other

7  associate editors and the others who report to him who may or

8  may not have the position of associate editor only needs to

9  seek approval prior to writing articles when there will be

10 some expense involved through writing the article, be it

11 travel expense or renting out some space or something that

12 would -- something that would cost the Post money.

13        So that's the only time when Sandra Guzman -- this

14 is what he told me -- or anyone else reporting to him needed

15 to seek approval.  He said that he wouldn't be aware of what

16 other reporters and editors needed to do to seek approval if

17 they needed to seek approval prior to writing articles but he

18 only knows what the people who reported to him and who still

19 report to him are required to do.

20        So I think the relevant inquiry would really be

21 people who report to Joe Rabinowitz because I don't think

22 that there's a consistent policy necessarily across the

23 board.

24        THE COURT: Mr. Datoo, to the extent that the issue

25 has been framed that way, I agree that part -- as I

1   understand the complaint that Ms. Guzman raised, that is that

2   her being required to seek approval as being a change in her

3   status unless the evidence is clear that the application of

4   the policy of approval are either uniform or done by the same

5   person this does seem to me that you're missing a step in

6   determining whether or not the inquiry should go forward.

7   That is if we're talking about a disparate treatment of Ms.

8   Guzman and we're not talking about a uniform policy among

9   supervisors then the relevant inquiry is with Mr. Rabinowitz

10  and how he's done things and that would be the focus.

11          MR. DATOO: I would agree with that, Your Honor.  I

12  think that's an appropriate middle ground unless depositions

13  reveal otherwise.  I'm [inaudible] editors and associate

14  editors that reported to Mr. Rabinowitz for that eight-month

15  period.

16          THE COURT: How would that -- I guess, Ms. Lovinger,

17  this is Mr. Datoo saying that well, if you're telling me that

18  Mr. Rabinowitz only did this in certain circumstances and

19  therefore it undermined our assertion that there's some

20  disparate treatment with respect to Ms. Guzman we're allowed

21  to test that and see how -- whether or not your assertion is

22  correct that it only bears some expense and at least we can

23  explore -- at least under Rule 26 we're entitled to see if

24  that is a valid distinction.

25          MS. LOVINGER: I agree that that -- that certainly

9

1 makes sense in terms of narrowing the inquiry.  I'm not sure

2 what documents there are.  In an ideal world everyone would

3 make the request in email and no one would have deleted any

4 emails but we're talking about a period from February 2009

5 through her termination in September 2009.  When this

6 complaint was filed we of course advised and instructed

7 everyone to retain all emails relating to Sandra Guzman and

8 the allegations in the complaint but if others who are not

9 involved or mentioned in the complaint were in this case then

10 emails to Joe Rabinowitz they may not have been retained

11 because it's now been two years.

12          So certainly we can go back and look.  So what the

13 search would really entail is looking at all of the

14 individuals who Joe Rabinowitz supervised from that -- at

15 that creative time and go through every email.  I'm not sure

16 what the search terms would be but we could certainly give it

17 some more thought and then discuss it with Mr. Datoo and run

18 the searches but --

19          THE COURT: How many people did he supervise?  I

20 have really no idea what --

21          MS. LOVINGER: It would be -- I think it would be

22 less than five people.

23          THE COURT: Well, it does seem to me that even as

24 the inquiry is framed the policy that Mr. Rabinowitz -- it is

25 Rabinowitz; right?

10

1          MS. LOVINGER: Correct, yes.

2          THE COURT: If his policy was uniform and it was

3    based upon whether or not there was expense to the Post that

4    is an issue which directly addresses the claim that Ms.

5    Guzman has.  So why don't you -- well, first of all, discuss

6    it with Mr. Datoo.  Find out what it would entail and if that

7    compromise works then we don't have to resort to Rule 1 to

8    determine whether or not the benefit is balanced by the cost

9    of doing the search.

10          MS. LOVINGER: We'll do that.

11          THE COURT: Now, there are a series of questions.  I

12   will refer to them as the cartoon discovery and ultimately

13   the question is what's the -- how does the chimpanzee cartoon

14   fit into the claims that are in the cases that are before the

15   court? I know it's been raised several times in the Guzman

16   case.  So the question is whether or not the -- what the

17   plaintiff believes that they can get the chimpanzee cartoon

18   which includes the communications concerning it, the -- that

19   is concerning its development, its production, the complaint

20   surrounding it, how that was handled, Mr. Murdoch's

21   [inaudible] and disclaimers, how that relates to plaintiff's

22   claim.

23          The bottom line is that I do not find that the

24   chimpanzee cartoon offensive though it may be fits within the

25   kind of discovery that would be relevant to the claims that

11

1   Ms. Guzman has raised either in terms of a hostile work

2   environment or retaliation.  That is, I see the cartoon as

3   not relevant to the question of the environment that was

4   created by the News Corporation.  To the extent that the

5   plaintiff is arguing that that says something about the

6   decision makers who are involved with her decision it's my

7   understanding that to the extent that there was

8   communications related to those individuals that has been

9   produced.  Am I wrong on that?

10          MR. DATOO: Your Honor, I think the defendants are

11   in the process of producing those documents.  Am I correct?

12          MR. LERNER: Yes.  We did agree in our conducting

13   searches for documents among the top personnel which are

14   indicated in the joint letter that covered the period after

15   the cartoon was published to see if there are emails that

16   have to do with how are we going to respond to employee's

17   complaints about the cartoon.  That was something that we

18   agreed that we would search for and were in the process of

19   looking for those.

20          We are not aware of any documents along those lines

21   -- we're not aware of any documents existing right now but I

22   can tell you that we're not aware of any documents that are

23   non emails.  In other words, there was no policy or corporate

24   documents drafted to deal with that.  If there were we would

25   produce it.

12

1          THE COURT: Is there anything, for example -- I

2    think the name I kept seeing is Cole Allan.

3          MR. LERNER: Yes, Cole Allan is the editor in chief.

4          THE COURT: I don't know whether he would have

5    either commented on or written anything about the chimpanzee

6    cartoon but to the extent that he would have commented, for

7    example, his motivation I think has been put in to question

8    because he was the decision maker -- he was a decision maker.

9    I think he was a decision maker on the cartoon and with

10   respect to Ms. Guzman.

11         MR. LERNER: Yes, that is -- that's right.  He was

12   certainly the decision maker on the publication of the

13   cartoon.

14         THE COURT: I don't know how much more exploring one

15   needs to do.  Has Allan been deposed?

16         MR. DATOO: No depositions have taken place yet,

17   Your Honor.

18         THE COURT: If there are any documents that relate

19   to specifically Cole Allan -- I'm not sure whether that would

20   be before or after the cartoon but that does seem to me to be

21   a specific person whose actions and motivations have been put

22   into question.

23         MR. LERNER: We did include him on the list of the

24   same [inaudible] personnel that we would search.

25         THE COURT: Mr. Datoo, is there -- did you take

13

1   issue with the list of senior personnel for example?

2         MR. DATOO: Your Honor, I think it was -- the

3   defendants identified several people that were involved in

4   Ms. Guzman's [inaudible] to terminate Ms. Guzman's

5   employment. I'm just trying to pull up the interrogatories

6   right now.  I was [inaudible] that the production be expanded

7   to include all those people that defendants identified in --

8         THE COURT: Because on the joint letter you say that

9   you propose to produce documents concerning communications

10  among these high level persons that concern how the Post

11  would respond to Ms. Guzman or to employees of the Post

12  regarding concerns expressed about the cartoon.  Is that what

13  you were planning to --

14        MR. DATOO: Yes, that's correct, Your Honor.

15        THE COURT: As far as I'm concerned, that seems to

16  be an appropriate response although I said I think in general

17  the question of the cartoon is -- it is not directly on point

18  but the response to the cartoon I think becomes important

19  because of the individuals who are doing the response and how

20  they feel about the response and that issue.

21        MR. DATOO: Your Honor, I just think that one of the

22  interrogatories -- specifically it's defendant's responses to

23  plaintiff's first set of interrogatories and with specific

24  reference to Interrogatory Number 3, we asked that defendants

25  identify each and every person that had knowledge relating to

14

1    the decision to terminate Ms. Guzman's employment.  A few

2    people -- the people that were identified were Cole Allan and

3    Jennifer Jenn.  There were additional people.  Those two

4    people, Cole Allan and Jennifer Jenn are included in the list

5    of people that defendants -- who defendants are going to

6    search.  There were two other people that I don't see on this

7    list who defendants are going to search that were like I said

8    knowledge of the decision to terminate Ms. Guzman and that

9    was Paul Carlucci [Ph.] and Less Gutstein [Ph.] and I'm going

10   to request that those people be added to the list.

11   Especially Mr. Gutstein who I believe was I think Ms. Guzman

12   reported to him or was under him for a while near the end

13   with respect to Capital Magazine.

14          THE COURT: Mr. Lerner, just in conjunction of that

15   interrogatory response and this proposed search, do you have

16   a -- just a response, what's your position?

17          MR. LERNER: I think we can include Mr. Carlucci and

18   Mr. Gutstein in that search.  Mr. Carlucci was never a part

19   of -- I don't want to say never but was not -- typically not

20   a part of the plaintiff's requests in the past so that's why

21   it wasn't included.  He is the publisher of the New York Post

22   but we can include him.

23          THE COURT: So to the extent that these are

24   individuals who had knowledge of the reasons for Ms. Guzman's

25   termination it seems reasonable to include them in these -- I

1  understand that none of the searches may produce anything but

2  if the inquiry has -- certainly the state of mind and the

3  thinking of anyone who could be implicated in the decision to

4  terminate Ms. Guzman I think is fair game for discovery.  But

5  other than that I think the response that you proposed seems

6  appropriate.

7         MR. LERNER: We'll complete our search and we'll

8  include the additional individuals.

9         THE COURT: I think it goes without saying that to

10  the extent that there were questions concerning Mr. Murdoch I

11  did not see a connection there.  The discovery requests

12  concerning Mr. Murdoch I think failed to demonstrate to me a

13  legitimate failure of inquiry.

14         MR. DATOO: Thank you, Your Honor.

15         THE COURT: Now, with respect to the EEO reports.

16  There was a -- the defendants indicated that there was a

17  prior ruling I had on EEO reports.  I have to admit I'm not

18  sure which of my rulings we're talking about.  Not that I

19  wouldn't be consistent with them.  I just don't know what

20  we're talking about.

21         MR. LERNER:  Not specifically on EEO reports but in

22  Your Honor's decision last fall there had been a -- one of

23  the matters before the court was a request for some large

24  body of material that presumably the plaintiffs could use

25  [inaudible] for some sort of statistical basis.  What Your

16

1   Honor stated in the order which is dated on October 20th of

2   2010 is that -- it stated in large part Ms. Guzman's request

3   is premature, the record is not clear as to the specific

4   reason for her termination, the relevance of complaints by

5   other employees is therefore questionable on any question of

6   pretext.  The paragraph before that had indicated that one of

7   the things that you were focusing on was the large body of

8   material and potential for some sort of statistical analysis.

9   So that was the context in which we referred to the prior

10  order.

11          Then Judge Jones in her affirmance actually

12  referenced your order.  She said additionally Judge Ellis

13  specifically stated on the record that statistical evidence

14  of defendant's employment practices could be relevant to the

15  plaintiff's disparate treatment claim.  However, it explains

16  that a request for statistical evidence information is

17  different than plaintiff's broad request for all records of

18  individual complaints of discrimination by any employee and

19  that it was premature.

20          So our position on this is that what we have is a

21  very -- without really any basis in the facts of the case a

22  demand for the most -- the broadest, actually the broadest

23  categories of statistical information.  It's actually not

24  even asking for statistical information.  It's asking for the

25  raw data in 21 categories across hundreds of employees and

17

1    many years.  In fact, with respect to Ms. Livingston because

2    she was employed at the Post since 1997 the plaintiffs have

3    requested something like 20 categories of information about

4    every reporter at the New York Post since 1997.  These are

5    not tailored crafted directed document requests and for all

6    the reasons we stated we really think it's very burdensome

7    and not adequately supported yet as a request.

8              THE COURT: Mr. Datoo, let me just say that with

9    respect to broad EEO data I think the underpinnings of the

10   relevance of data is that if you show that decision makers

11   have made decisions which resulted in certain kinds of

12   skewing of the data then that can have a probative value.

13   That means that if you just look at just raw numbers for

14   example it would be important to show that somebody that you

15   claim is discriminating doesn't hire anybody of a certain

16   kind and therefore as you look at the broad numbers there's a

17   disparity that by implication calls into question that they

18   might make otherwise.  But I think the underpinnings of that

19   and in all disparate treatment cases that there had to be a

20   tie in to the people who you're claiming are decision makers.

21             Now, I don't know that with respect to the EEO data

22   that we're talking about that the individuals who have been

23   identified as decision makers with respect to Ms. Guzman

24   would also be the people who would be implicated in any

25   statistical disparity that you might show if you got the

18

1   information that you're requesting if you understand what I'm

2   saying.

3           MR. DATOO: I think I do, Your Honor.  I do think

4   even for my own sanity that [inaudible] should be narrowed

5   because what we're essentially trying to figure out are who

6   are Ms. Guzman's comparators.  We can't do that without

7   knowing who worked there and whether they matched any of Ms.

8   Guzman's protected characteristics.  That's partly why we

9   would like to [inaudible] report as well.  I don't think with

10  respect to Ms. Guzman reporters would be considered her

11  comparators.  It would be editors and it's sort of limiting

12  it to Mr. Rabinowitz.  I think it's a little bit beyond

13  because Mr. Allan who was involved in the decision -- in

14  fact, I think he made the decision to terminate.

15          So in this case we're requesting a little bit of a

16  broader [inaudible] of employees so we can just figure out

17  whether she was treated differently than similarly situated

18  people.

19          THE COURT: I would suggest this then.  Ask the

20  question you want to ask and don't ask for this EEO data.  If

21  what you just described is what you want to ask you can ask

22  the defendant to identify the people who are in the category

23  of editors or assistant editors for a certain period of time

24  that would be comparable to Ms. Guzman.  If between 2003 and

25  2009 there were 20 people who were editors -- maybe those

19

1  people could be identified but this idea of broad statistical

2  data seems to me to be making it less likely that you

3  identify comparators than if you just ask for comparators.

4         MR. DATOO: Okay.  So we'll narrow I guess Requests

5  Number 1, 3 and 7.  I don't know what kind of data that the

6  defendants have.  One of the reasons why we want to

7  [inaudible] reports is so we can match up in case the

8  defendants [inaudible] what kind of data they have but if

9  they don't know what race or what gender or what national

10  origin or what color some of these people may be.

11         THE COURT: Well, that -- let's start out with names

12  and identifying people.

13         MR. DATOO: Okay.

14         THE COURT: I suggest to you that identifying people

15  by race and gender won't be as difficult as all that once you

16  know who they are.

17         MR. DATOO: Okay.  That's perfectly fine with

18  plaintiffs, Your Honor.

19         THE COURT: Mr. Lerner.

20         MR. LERNER: We'll --

21         THE COURT: You want to see what it comes up with.

22         MR. LERNER: I do, yes.

23         THE COURT: But you understand that I agree with him

24  if he wants comparators whether or not the two of you agree

25  on what are comparators may depend on some discussion that

20

1    the two of you have but certainly I don't think raw

2    statistical data is the way to go in terms of seeing who's

3    comparable to Ms. Guzman and how they were treated.

4         MR. LERNER: We'll see what the requests we receive

5    is and we'll work with Mr. Datoo to see if we can come to an

6    agreement.

7         MS. LOVINGER: This is Ms. Lovinger.  If I can just

8    clarify something for the record.  I'm looking at the

9    interrogatory answers and there was one interrogatory that

10   asked defendants to identify each and every person who has

11   knowledge in any way relating to the decision to terminate

12   Ms. Guzman's employment with defendants.  An answer was

13   provided and it was defendants state that Paul [inaudible],

14   Cole Allan, Less Goodstein and Jennifer Jenn had knowledge

15   relating to the decision to terminate plaintiff's employment,

16   and this may not be a major point but because we're on the

17   record and we're discussing it I just want to put it out

18   there that it was not stated that those individuals made the

19   decision to terminate plaintiff's employment.

20        MR. DATOO: That's what we said, Blythe.

21        MS. LOVINGER: Okay.  Because I was surprised

22   because I thought that you said that they actually --

23        MR. DATOO: No, no. [inaudible] interrogatory as it

24   was.

25        MS. LOVINGER: I'm sorry. I apologize then.

21

1          THE COURT: Actually I didn't understand it to be

2    that they were decision makers and I did see the question as

3    a broad question but it never hurts to clarify.  So don't

4    worry about that.

5          MS. LOVINGER: Thank you, Your Honor.

6          THE COURT: As to Guzman, I think that covers the

7    questions that the plaintiffs had with the defendants.

8          MR. LERNER:  Your Honor, if I may.

9          THE COURT: Oh, I'm sorry, the profit and loss

10   statements.

11         MR. LERNER: Yes.

12         THE COURT: I guess the issue here is Tempo was a

13   special section and at least from the defendant's point of

14   view that there are no comparators at Tempo.  Is that

15   correct?

16         MR. LERNER: That's correct.  We actually -- yes.

17   Tempo was the only monthly section that was a special pullout

18   section.  It had its own dedicated editor and it was closed.

19   There is really no other section that fits that description

20   that was monthly pullout and closed.  The closest thing, and

21   this is -- and we did provide information, is that there was

22   a weekly called Page Six Magazine which went from being a

23   weekly to a quarterly and the Post laid off almost the entire

24   staff which was several dozen people.  It was a big operation

25   and literally a magazine produced every week and there were a

1   couple of dozen, maybe more people, and those people were

2   laid off.  We supplied a document reflecting the names, dates

3   of employment, date of termination and other information

4   about all of those individuals from Page Six Magazine but --

5   as well as what happened with the editor in chief of that

6   magazine, Margie Conklin.  She was the closest thing that we

7   could envision as a comparator.  She was retained by the Post

8   after the Page Six went to a quarterly and I understand that

9   defendants -- plaintiffs may wish to argue that the retention

10  is probative of something.  We have a response but because we

11  understood plaintiffs may want to make that argument we

12  supplied her employment agreement and other -- I guess some

13  other information.

14        We have not supplied -- we've objected to producing

15  P&Ls which show what sort of expenses and revenues are

16  generated by the special sections and we just -- it's been

17  our position that the data is too far afield both based on

18  the fact that there are -- most of these sections are not

19  comparable at all and what the probative value of that

20  information would be.  There is no dispute that Tempo was

21  closed in September of 2009.  It seems like plaintiff may

22  want to argue that the Post should have closed other sections

23  if the P&Ls show that they lost money or were losing money at

24  one point in time. We respectfully submit that that's not the

25  question.  There's no dispute Tempo was closed.  The question

23

1   is was -- should Ms. Guzman's employment have been retained

2   or was it terminated for improper discriminatory reasons.  So

3   we feel the P&Ls for other special sections are not relevant

4   to that.

5          THE COURT: First of all, let me ask this.  I recall

6   that earlier the question had come up and I had advised the

7   parties to tie this down but is -- there was a specific

8   question asked I assume as to why Ms. Guzman was terminated

9   and then there was a specific answer given.  Did one of the

10  answers have to do with Tempo being closed or being

11  financially -- what were the specific reasons that were given

12  for Ms. Guzman's termination?

13         MR. LERNER: There were a variety of reasons and --

14  but certainly the closing of Tempo which was -- which she was

15  hired, the job she was hired in 2003 to perform and which she

16  performed, the closing of Tempo was a primary factor in her

17  termination.

18         THE COURT: So that to the extent that there were

19  other sections that were closed even though as you frame the

20  issue it's not whether or not the section was closed or

21  whether or not the individual was retained.  Clearly,

22  however, it might lead to discoverable evidence to find out

23  when other sections were closed to explore what happened to

24  the individuals who were associated with that section.

25         So to the extent that there are comparable sections

24

1   information concerning those that were deemed not appropriate

2   to continue are relevant under Rule 26.  I'm not sure that

3   strictly speaking from a newspaper that's a P&L decision all

4   the time.

5          MR. LERNER: It certainly is not.

6          MR. DATOO: Your Honor, with respect to Tempo, what

7   the defendants produced during discovery was I believe

8   [inaudible] revenue and I think that's how -- I believe

9   that's how they made the decision that Tempo was losing money

10  but there was some way the defendants gauged how Tempo was

11  doing financially.  Whether it's a P&L statement or whatever

12  else they call it I think those are the documents that would

13  be relevant here to determine how a special section was doing

14  financially.

15         THE COURT: Which still [inaudible] to the ultimate

16  question of what's an appropriate comparator.

17         MR. DATOO:  Your Honor, I understand defendant's

18  point that Page Six won't be the closest special section to

19  Tempo but the New York Post had several other sections.  I'm

20  not quite sure if they came out once a year or twice a year

21  but I think they had weekly publications.  I think Travel

22  Tuesday --

23  [Side B of tape.]

24         MR. DATOO:  -- but these weekly sections are the

25  same as the Page Six Magazine which was weekly for a while

25

1  and then it became quarterly.  I [inaudible] these weekly

2  sections would be [inaudible] comparators.

3          MR. LERNER: This is Mr. Lerner.  I think if the

4  sections are not closed we don't really have any basis for

5  comparison to what happened to Ms. Guzman when Tempo was sent

6  down. We can inquire, Your Honor, as to in addition --

7  whether in addition to Page Six which wasn't actually closed,

8  it went from weekly to quarterly, whether or not any of their

9  special sections that were regularly published were closed

10  and if they had a dedicated editor that was -- what happened

11  with that editor.

12          THE COURT: Well, from my point of view that might

13  be over inclusive but I think it's a better formulation of

14  what would be an appropriate inquiry.  Because this really is

15  a question of whether or not the determination was I guess

16  pretextual and therefore whether or not if a section is

17  closed and what happens to the personnel who were associated

18  with it.

19          So as Mr. Lerner describes the issue if there are

20  others besides Page Six where the section was illuminated I

21  think that's a fair area of inquiry because I think that's

22  the comparison that we're talking about.

23          MR. DATOO:  Your Honor, I think one of the other

24  issues in this case is that if the sections were losing money

25  or not generating ad revenue Tempo was closed for that reason

1  apparently.  We also want to inquire into these other

2  sections, comparable sections whether they were losing money

3  and if they were whether they were closed or not and if they

4  weren't closed we want to inquire into why probably at

5  deposition.

6           THE COURT: Right.  I understand what you're saying

7  but there are two problems.  One is I think ultimately the

8  question of what's similarly situated you haven't

9  demonstrated to me just because something is a special

10 section it is comparable to Tempo which seems frankly to

11 be -- I'm not even sure they're special sections in and of

12 themselves or comparable to each other.  So I think even the

13 concession that Page Six might be comparable is a concession

14 that I'm not so sure that is compelled by the facts.

15          So since special sections are called special I'm

16 sure for a particular reason some of them regardless of what

17 revenue they pull in they're not going to be terminated for

18 different reasons.  If you have -- if you want to explore

19 with an appropriate party why or what considerations go into

20 the closing of a section I mean it could be ad revenue, it

21 could be other things.  I'd like to hear for example why one

22 might not close a section that is losing money.  It happens

23 in industries.  I don't doubt that it happens in this

24 industry but there -- unless you have evidence that this is

25 an if and only if situation, that is you closed if you're not

27

1   profitable and only if you're not profitable then I think the

2   exploration of profit and loss is not sufficiently probative

3   to inquire to comparison of things which don't seem to

4   actually be comparable.

5         MR. DATOO: Your Honor, I think this will give us a

6   basis to explore at a deposition so we would know which

7   sections are -- if any of them are losing money then we can

8   present the witness with the name of the section and if it

9   was losing money we could ask them what considerations go

10  into closing these special sections and why wasn't this one

11  closed, why wasn't that one closed, why was this one closed,

12  things of that nature.

13        THE COURT: But let me back up a minute.  If that's

14  what you need for a deposition you don't need profit and loss

15  statements.  You just need to ask the defendants which

16  special sections have lost money over whatever period of time

17  you want to identify.

18        MR. DATOO: So perhaps fashion that as an

19  interrogatory to make it -- I guess it would make it easier

20  on both parties.

21        THE COURT: Yes, and that therefore you could say --

22  what I'm saying is there's a less intrusive and less broad

23  inquiry if all you want to know is did the section that was

24  donated Sports Legends ever lost money so that you could ask

25  somebody why Sports Legends wasn't closed down but you don't

28

1   need to have quarterly, annual monthly profit losses to ask

2   somebody that question.  You just need somebody to identify

3   which special section may have lost money at a particular

4   time in history.

5          MR. DATOO: Your Honor, maybe that's not all I want

6   then.  I will -- I understand --

7          THE COURT: I understand that's not all you want but

8   I think we're talking about being hampered at a deposition.

9          MR. DATOO: Correct.

10          THE COURT: But if you -- if I were -- if I were

11   trying to find out which law clerks didn't get terminated for

12   giving me the wrong result I don't need to get a long

13   inquiry.  I just need to find out which ones have given me

14   the wrong result and then I could ask why wasn't that person

15   terminated.

16          MR. DATOO: I think I will serve a new interrogatory

17   then that will cover I guess the issue I just raised but like

18   I said I'm happy with what you just ordered.

19          MR. LERNER: The one area where I think -- I hope

20   don't want to get lost in this thread is he issue of

21   comparison or comparators and we've got as Your Honor said

22   special means special.  Each one is different.  Some are

23   pullout. Some run -- some are a few pages in the newspaper.

24   Some are handed out at parades as part of a newspaper.  Each

25   one is unique and they also serve different promotional

29

1   purposes for the paper.  It may be that a special section is

2   offered because it generates new visibility for the New York

3   Post among certain group of readers and that there may be --

4           THE COURT: Mr. Lerner, I don't disagree with you.

5   In fact, I think you make a good argument on that score as to

6   them being special.  As to the discovery issue, I think

7   what's clear is that the plaintiff's request is too broad

8   based upon the evidence that they brought to bear and if they

9   have some question as to whether or not there's some

10  disparate treatment in terms of how Tempo was created they

11  obviously have a two-fold pass.  One is they have to -- they

12  ultimately would have to prove that any special section was

13  comparable to Tempo and they can do whatever discovery they

14  want in that regard and second, they'd have to prove that

15  that section was treated differently from Tempo.

16          If they think that had to do with some financial

17  issue, if they want to make the assertion that a particular

18  section was not profitable and therefore should have been

19  terminated like Tempo if that was the reason Tempo was

20  terminated that may not ultimately be a viable argument but

21  right now it seems to me all they really are entitled to is

22  the information about which sections fit that description and

23  that's not a burdensome inquiry and I don't think it's

24  intrusive.  I think the profit and loss statements would be

25  intrusive based upon where we are now.

30

1           But if one of those inserts lost money and it

2   only -- and it lost money for one quarter but -- like I said,

3   there could be lots of reasons why you would want to keep

4   something that wasn't profitable.  In any case, I have

5   interns.  I keep them there.  They're not profitable but

6   they've very valuable.

7           MS. LOVINGER: Your Honor, this is Blythe Lovinger.

8   I'm just -- just to be clear, are we now engaging in

9   discovery with respect to the special sections really looking

10  to see -- are they looking to see whether or not the closing

11  of Tempo was a discriminatory act or a retaliatory act

12  against Ms. Guzman?

13          THE COURT: I don't know the answer to that

14  question.  All I'm saying is that based upon how the

15  plaintiffs have described what they were looking for in this

16  request in terms of trying to show how Ms. Guzman was treated

17  that they've asked a broader inquiry than is warranted at

18  this point.

19          MS. LOVINGER: Right.  Your Honor, I understand that

20  but going back to what my colleague Mr. Lerner said earlier

21  isn't the relevant inquiry how an editor was treated after

22  the decision to close this section was made rather than

23  whether or not what special section should have been closed

24  because as Your Honor noted there may be many reasons as to

25  why a section is kept going or --

31

1          THE COURT: Again, even if you're correct and that's

2    the formulation, I don't' know how the plaintiff gets to

3    answer that question until they find out which sections have

4    been closed and what happened before they could even

5    determine whether or not something happened to the people who

6    are associated with that section.  So your formulation is you

7    want to see how the people were treated after the closure but

8    I don't think the plaintiffs have enough information now to

9    even make that comparison because they don't know what

10   sections have been closed.  I thought that was what we were

11   trying to do.

12          MS. LOVINGER: Okay.  I understand.  Thank you, Your

13   Honor.

14          THE COURT: Again, the only thing is I wouldn't

15   characterize these as orders in the sense that -- I have not

16   reformulated the questions so I don't know what ultimately

17   plaintiff is going to come up with but as I understand the

18   inquiry if it's limited to identifying sections then you can

19   anticipate that I'll look more favorably upon it but I see

20   need to see the formulation.

21          That brings us to the defendant's claims about

22   deficiencies of the plaintiff in Guzman.  How does that stand

23   right now?

24          MR. DATOO: I think that concludes the issue in the

25   Guzman matter.

32

1          MR. LERNER: I understand, Shaffin, that the

2    Magistrate Judge is asking about defendant's deficiency

3    claims.

4          MR. DATOO: Yes, sorry.

5          THE COURT: Yes, that's what I'm asking about.

6          MR. DATOO: There were no -- we have no issues with

7    respect to the issues raised in defendant's letters.  I think

8    most -- I think actually all of them had to do with updating

9    certain production and following up on documents we agreed to

10   produce.  We have no -- plaintiff takes no issue with any of

11   those points phrased in defendant's letters.

12         THE COURT: You mean defendants take no issue.

13         MR. DATOO: I'm sorry.  I think we're getting

14   confused.  Are we talking about defendant's --

15         THE COURT: Right.  You said plaintiffs take no

16   issue with the way it stands now.  You meant defendants take

17   no issue.  You're not talking about deficiencies in

18   plaintiff's production, are you?

19         MR. DATOO: No.  Yes, that's what I thought we were

20   talking about now, that we -- I'm sorry, Your Honor.  I think

21   I'm just getting confused because it's late in the day for

22   me.

23         THE COURT: I think sometimes you say defendant when

24   you mean plaintiff.

25         MR. DATOO: Your Honor, in all honesty I was

33

1  representing defendants for ten-and-a-half years and

2  [inaudible] unintentionally.

3         THE COURT: But basically you're saying that right

4  now the defendants have -- they have no quarrel with the way

5  plaintiff's production stands right now.

6         MR. DATOO: [inaudible] be the one that --

7         MR. LERNER: As Your Honor -- the bottom line on

8  that is that we notified them of what we believed to be

9  deficiencies.  The plaintiffs have said we don't take issue

10  with what you've told us about.  We have some updating to do

11  and we take them at their word they're going to do that and

12  that's where it stands.

13         THE COURT: Then maybe it was me who is wrong on

14  that.  Basically you're saying that the plaintiffs don't

15  contest the things that you've complained about.

16         MR. LERNER: Right.

17         MR. DATOO: Correct, Your Honor.

18         THE COURT: But the problem is to supplement.

19         MR. LERNER: Yes, Your Honor.

20         THE COURT: I think you may not have misspoken.

21  It's just that I was thinking of it a different way when you

22  said who's not taking issue.  So maybe it's not so late as

23  you think.

24         Now, with respect to Fenner, I don't know what

25  issues are unique that wouldn't be covered by what I've said

34

1  in Guzman.  Let me check.

2                    [Pause in proceedings.]

3            THE COURT: Much of what I said could be transposed

4  to Fenner with adjustments for the different requests that

5  are in Fenner but I want to make sure that we've covered all

6  of the issues that might be unique in Fenner.  For example,

7  to the extent that Fenner raises a question about redaction

8  it seems to me that I would make the same ruling that the

9  information seemed to be appropriately redacted as described

10  but that to the extent that the plaintiff would have the

11  right to question the -- what the defendants did in

12  redactions will take that responsibility on here, and that's

13  the royal we.

14            MR. LERNER: I don't think it's going to be

15  burdensome on anybody in Chambers.

16            THE COURT: With respect to the cartoon the --

17  there's a question in Fenner concerning a request for a

18  photographer.

19            MR. LERNER: There are no documents responsive to

20  that request.

21            THE COURT: Is there a verified or an affidavit to

22  the effect that there are no responsive documents?

23            MR. LERNER: We haven't supplied an affidavit.

24            THE COURT: That's what I would generally require

25  under those circumstances if somebody says they have no

35

1  documents.

2          MR. LERNER: We will do that.

3          THE COURT: With a person who has specific knowledge

4  of who was involved in the determination that there were no

5  documents.

6          MR. LERNER: Okay. We've actually been in touch

7  with that person recently to verify that and we can provide

8  that affidavit.

9          THE COURT: Similarly with respect to the cartoon

10 defendants say that they have produced the documents

11 regarding the cartoon that relate to Fenner and Livingston

12 and have agreed to search for documents that relate to how

13 the Post responded to employee concerns in the aftermath of

14 the publication of the cartoon.

15         MR. LERNER: Right. Yes, Your Honor. I think that

16 this was analogous to the Guzman case.

17         THE COURT: That seems sufficient to me.

18         MR. DATOO: That's fine, Your Honor.

19         THE COURT: Now, the plaintiff wants to -- I guess

20 Interrogatory 18, identify each employee at the company who

21 complained in any way about the chimpanzee cartoon published

22 in the Post.

23         MR. LERNER: Your Honor, we think that your prior

24 ruling covers this request.

25         THE COURT: I'm not -- I don't know whether or not

36

1   it covers it but I would deny the plaintiff's request with

2   regard to complaints by other employees about the cartoon as

3   relevant to the hostile work environment. I know we had had a

4   back and forth about subjective/objective. So I don't know

5   that this specifically is covered by -- I apparently have

6   come to the same conclusion.

7          The next one concerns documents 11 and 12.  This

8   has to do with performance evaluations.

9          MR. DATOO:  Yes.  This one is unique to the Fenner

10  and Livingston case.

11         THE COURT: I guess I always fall back on the

12  question of people who are similarly situated and I don't

13  know whether or not this broad -- I mean the person, persons

14  identified -- there could be any number of people under their

15  supervision.  How many would be comparable to Fenner?

16         MS. LOVINGER: Your Honor, this is Blythe Lovinger.

17  I don't know exactly how many in terms of a number but the

18  issue here is that both Fenner and Livingston were runner

19  reporters and there are a number of runner reporters but they

20  all have different levels of experience and expertise.  They

21  may be assigned to different areas on a regular basis.  So

22  it's kind of difficult to say who is their comparator but

23  even going more than -- one step further, looking at the

24  warnings or the evaluations won't be very meaningful because

25  you'd have to basically, and I think we put this in our

37

1   letter, look at the underlying facts and work product and
2   that would be impossible to do because with respect to the
3   facts that was pretty much require conducting a mini trial
4   and with respect to the work product an issue in this case is
5   that the Post doesn't save early drafts of articles and
6   stories that are written on a regular basis because there are
7   so many stories every day that that would be impossible.
8           Looking at an evaluation it all would just appear
9   very subjective and you'd really have to evaluate the work
10  product.  So I don't know how that would really help the
11  plaintiffs in this instance to see what kind of numerical
12  rating someone was given or a couple of lines what may have
13  been written in a review.
14          THE COURT: I understand.  You can certainly argue
15  about that to the judge and admissibility and whatever but as
16  far as discovery is concerned to some extent all evaluations
17  are subjective.  On the other hand, if you had evaluations
18  and all the women's evaluations were lower than the men's
19  evaluations even if you didn't have their work product to say
20  okay, here's why the women were rated lower that would be
21  discoverable information.  As to whether or not the parties
22  could run with it, they could point out the uniqueness of it
23  or the differences in assignments or a whole host of other
24  things but I don't think that means that the information
25  concerning the evaluations is not discoverable.

38

1          MS. LOVINGER: I understand your point, Your Honor.

2    In terms of number of reporters, there may be between 60 and

3    100 reporters reporting ultimately to Michelle Bahill and Dan

4    Greenfield on the city or metro desk.

5          THE COURT: Are these numerical performances

6    something that's -- is it like computerized so that, for

7    example -- again, this would be like if you went to a school

8    where they give you a grade but then they also give you an

9    opportunity to comment.  You could pin out the grade and you

10   can see what they are and they may show a pattern; they may

11   not show a pattern.  Is this something that, for example, for

12   these 50 people would it be a simple matter of printing out

13   what their numerical performance ratings were?

14         MR. DATOO:  Your Honor, it's my understanding based

15   on the evaluations I've seen of my client -- these are two-

16   page documents and if there are 100 people we're talking

17   about maybe 400 pieces of paper here.  I don't think the

18   evaluations were -- it's my understanding this is a new

19   thing, these evaluations.  They were only around for a couple

20   of years.

21         THE COURT: But the answer to my question is what?

22         MS. LOVINGER: Your Honor, I believe the answer to

23   your question is no, they are not computerized.

24         THE COURT: So you couldn't spit out the numbers.

25   You'd have to do the hard copy anyway.

39

1          MS. LOVINGER: Correct.

2          THE COURT: Is Mr. Datoo correct in terms of the

3   number of evaluations and piece of paper we're talking about?

4          MS. LOVINGER: I don't think there are two pages but

5   I think it's accurate or fair to say that they're less than

6   five pages.

7          THE COURT: Per individual?

8          MS. LOVINGER: Per individual.

9          THE COURT: Is that -- the request says 2007 to the

10  present.  Is that five pages per year?

11         MS. LOVINGER: I believe each evaluation would be

12  five pages -- would be somewhere between three and five pages

13  long.

14         THE COURT: Does it have a summary page?

15         MS. LOVINGER: I don't know that there's something

16  that says summary page.  There may be a page with the overall

17  numerical rating.  There are a few pages with shorter

18  questions and a summary answer and then there's a numerical

19  rating.

20         THE COURT: Well, the short answer is that to the

21  extent that the plaintiffs have contended that they're

22  getting unfairly low performance ratings while you may have

23  arguments about subjectivity and individuality this really

24  goes to a specific claim that's made in the complaint by the

25  plaintiffs.

40

1          MS. LOVINGER: I also note that Mr. Fenner was only

2    employed with the Post for approximately two years and

3    performance evaluations were only given once a year.

4          THE COURT: So what years would that mean that you'd

5    have to produce?  Again, let me back up and say that this

6    certainly seems relevant under Rule 26. So the question is

7    whether or not it is burdensome to produce.  If it's in files

8    and even if it's 50 people and it's five pages or ten pages

9    that's 500 pages.  That's a ream of paper.  That's not an

10   overly burdensome --

11         MS. LOVINGER: I think the number of pages is not

12   what's at issue that we're not -- we're not saying that --

13   we're not arguing that the number of pages required to be

14   produced is too voluminous.  It's just that all different --

15   there are different supervisors evaluating the reporters on

16   the city desk.  So the people who evaluated John Smith are

17   not the same people necessarily who evaluated Austin Fenner

18   or Kim Livingston but Mr. Datoo is correct when he says that

19   the performance evaluations -- I'm sure he knows this from

20   his client Ms. Livingston who's been at the Post for quite

21   some time, but the performance evaluations are a relatively

22   new procedure for the Post.  So they're not very detailed or

23   lengthy and he's right in that.  I think they were just

24   implemented in recent years.

25         THE COURT: That means that Mr. Datoo has some work

41

1    to do before he can use them in a trial but as for discovery

2    they're discoverable.  If some of them are done by different

3    supervisors that may mean that one has to do some sorting to

4    see if there's any pattern based upon supervisors or

5    otherwise but under Rule 26 it seems to me they've made out a

6    prima facie showing that to the extent that they claim that

7    the ratings are skewed you've got to see the ratings.

8             MS. LOVINGER: Right.  I understand what you're

9    saying, Your Honor.  One of our points was that plaintiff

10   has -- plaintiffs have not limited their request to

11   individuals who are similarly situated to plaintiff and

12   rather they're seeking evaluations for everyone who worked on

13   the desk and a lot of people who worked on the desk have

14   different positions.  They've performed different job

15   functions and again they have different levels of experience

16   and tenure with the Post.  So it really is or will be in many

17   instances comparing apples to oranges.

18            THE COURT: Well, I agree actually -- I agree with

19   you that it should be similarly situated.  I'm just not so

20   sure that we can parse it ahead of time so that we can make

21   an appropriate distinction about who should be the

22   appropriate comparators.  I understand that sometimes it just

23   takes more effort to try to figure out how to produce

24   dissimilarly situated because you can spend time arguing over

25   whether or not they're similarly situated.  The fact that

42

1  people have different experience -- for example, people with

2  the same amount of experience in a slightly different job or

3  location may be more comparable than somebody who's in the

4  same location but with a different level of experience.

5          I can't answer that question based upon what

6  information is in front of me and it seems to me that we're

7  not dealing with something where it makes sense to try to

8  have you two argue over who's comparable because I'm not even

9  sure even if you briefed it I could answer that question.  If

10 Mr. Datoo and the plaintiffs [sic] want to show that they're

11 similar they ultimately have to show what makes them similar.

12         MS. LOVINGER: Right.  But perhaps because there's

13 so many different job categories on the city desk or -- by

14 the way, it's referred to as either the city desk or the

15 metro desk in various documents but we're talking about the

16 same desk.  But there were editors, runners, rewrites, copy

17 editors, junior personnel.  Perhaps Mr. Datoo and I can talk

18 offline and discuss who or which folks had the most similar

19 job to Livingston.

20         THE COURT: I have no quarrel with that if you two

21 can agree.  All I'm saying though is that in the best case

22 scenario it's easier to determine that ahead of time and

23 [inaudible] off.  If on the other hand you two are going to

24 have to spend time and argue with me and with each other it

25 might make more sense to -- you might not get down to a total

43

1   agreement.  If you can eliminate half the people that would

2   be great.

3            MS. LOVINGER: Right.  So, Shaffin, would you like

4   to speak either after this call or tomorrow?

5            MR. DATOO: That's fine.

6            THE COURT: Good.

7            MS. LOVINGER: Thank you, Your Honor.

8            THE COURT: Wait a minute.  There's one other one.

9   A list of reporters of -- employees who worked as reporters

10  at the Post between '97 and the present.

11           MR. DATOO: I think that mirrors the other request

12  we made in Guzman regarding the [inaudible].  Initially I

13  agreed to narrow my request.

14           THE COURT: And ask the question you really want the

15  answer to.

16           MR. DATOO: Correct.

17           THE COURT: Should I assume that with respect to the

18  defendant's complaints about the plaintiffs you had a similar

19  conversation in Fenner?

20           MR. DATOO: Yes, Your Honor.

21           THE COURT: And that you confessed error and you're

22  working on it?

23           MR. DATOO: I don't know about error, Your Honor,

24  but we are -- we are going to be supplementing our

25  production.

44

1          MS. LOVINGER: Yes, Your Honor.  There is one

2    outstanding -- there was one request Mr. Datoo was unsure

3    whether or not he would be supplementing a section and that

4    was with respect to our request for complaints filed by

5    plaintiffs against prior employees, and that one we've said

6    we would discuss.  I don't know if you have an answer at this

7    point.

8          MR. DATOO: We -- I can tell you now we withdraw our

9    objection and we will respond to that request.

10          MS. LOVINGER: Thank you.  So we have no outstanding

11    issues on our end.

12          THE COURT: We're getting along so well.

13          We'll be adjourned. I know it might take a

14    little -- a day or two to sort this out and you'll be talking

15    also but if you have any issues that still remain I know you

16    know how to contact my law clerk.

17          MS. LOVINGER: Yes, we do.  Thank you very much,

18    Your Honor, for your time.

19          THE COURT: We're adjourned.

20          MR. DATOO: Thank you, Your Honor.

21          MS. LOVINGER: Thank you.

22                         *  *  *  *  *

23

24

25

45

1    I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the

3  above-entitled matter.

4

5                                    _____

6                                         Shari Riemer

7  Dated:   July 18, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25