UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                              :

SANDRA GUZMAN,                    :     Civ. No.: 09 CV 9323 (BSJ) (RLE)
                              :

                 Plaintiff,    :

                              :

               vs.            :

                              :

NEWS CORPORATION, NYP HOLDINGS,  :
INC., d/b/a THE NEW YORK POST,      :
and COL ALLAN, in his official and     :
individual capacities,             :
                              :

               Defendants.  :
------------------------------------------------------------x

## DEFENDANTS' RULE 72(a) OBJECTIONS TO MAGISTRATE JUDGE ELLIS' ORDER, DATED JUNE 29, 2012

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700

WILLIAMS & CONNOLLY
Kevin T. Baine (kbaine@wc.com)
James M. McDonald (jmcdonald@wc.com)
725 Twelfth St. N.W.
Washington, DC 20005
Tel.:   (202) 434-5000

Attorneys for Defendants

## <u>CONTENTS</u>

Table of Authorities ................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

PROCEDURAL BACKGROUND.......................................................................... 9

LEGAL ARGUMENT............................................................................................ 10

I.      STANDARD OF REVIEW ........................................................................ 10

II.     THE MAGISTRATE JUDGE ACTED CONTRARY TO
        LAW IN FAILING TO RECOGNIZE THE FIRST AMENDMENT
        INTERESTS AT STAKE AND IN ORDERING RESPONSES
        TO CONCEDEDLY IRRELEVANT QUESTIONS ..................................... 10

        A.      The First Amendment Protects Editorial
                Processes and Decision-Making ..................................................... 12

                i.      The First Amendment Guarantees the
                        Unfettered Freedom of the Press.......................................... 12

                ii.     The First Amendment Protects Editorial
                        Processes and Decision-Making ........................................... 14

                iii.    The First Amendment Requires a Showing
                        of Overriding Need Before Allowing Inquiry
                        into Editorial Decisions and Communications ...................... 15

        B.      The Post's First Amendment Interests
                Outweigh Plaintiff's Need for Civil Discovery ............................. 17

                i.      The Requested Discovery Goes to the
                        Core  Protection of the First Amendment .............................. 19

                ii.     Guzman Has Already Obtained Any Potentially
                        Relevant Information Related to Her Claims Through
                        Deposition Answers Already Provided by Mr. Allan.............. 21

                iii.    The Nature of Guzman's Suit Weighs Against
                        the Civil Discovery She Seeks .............................................. 21

                iv.     The Information Guzman Seeks Is Not Relevant .................. 22

CONCLUSION....................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Ark. Educ. Television Comm. v. Forbes,
    523 U.S. 666 (1998)........................................................................................14

Baker v. F & F Investment,
    470 F.2d 778 (2d Cir. 1972)...........................................................................22

Bridges v. California,
    314 U.S. 252, 265 (1941)...............................................................................13

Catskill Dev., L.L.C. v. Park Place Entm't Corp.,
    206 F.R.D. 78 (S.D.N.Y. 2002) ....................................................................10

Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,
    412 U.S. 94 (1973)...................................................................................14, 15

Gonzales v. National Broadcasting Company, Inc.,
    194 F.3d 29 (2d Cir. 1999)..........................................................................2, 18

Grosjean v. Am. Press. Co.,
    297 U.S. 233 (1936).......................................................................................13

Herbert v. Lando,
    441 U.S. 153 (1979) (Powell, J., concurring) ..........................................*passim*

Hustler Mag., Inc. v. Falwell,
    485 U.S. 46 (1988).........................................................................................20

In re Consumers Union of U.S., Inc.,
    495 F. Supp. 582 (S.D.N.Y. 1980) ..........................................................*passim*

Kenneally v. Suzuki Motor Co., Ltd.,
    No. M-8-85, 1994 WL 48840 .......................................................................16

Landmark Comms., Inc. v. Virginia,
    435 U.S. 829, 838, 843 (1978)......................................................................17

Lovell v. City of Griffin, Ga.,
    303 U.S. 444 (1938).......................................................................................13

Maughan v. NL Indus.,
    524 F. Supp. 93 (D.D.C. 1981)......................................................................17

McGraw-Hill v. Arizona, 680
    F.2d 5 (2d Cir. 1982)...........................................................................................2, 18

Miami Herald v. Tornillo,
    418 U.S. 241 (1974)...........................................................................................13, 14

Mills v. Alabama,
    384 U.S. 214 (1966)...........................................................................................12, 20

Morse v. Frederick,
    551 U.S. 393 (2007)...........................................................................................11

Near v. Minnesota ex rel. Olson,
    283 U.S. 697 (1931)...........................................................................................13

Nebraska Press Ass'n v. Stuart,
    427 U.S. 539, 562 (1976)....................................................................................17

New York Times v. Sullivan,
    376 U.S. 254 (1964)...........................................................................................13, 18, 22

NLRB v. Catholic Bishop of Chicago,
    440 U.S. 490 (1979)...........................................................................................15

O'Neill v. Oakgrove Constr., Inc.,
    71 N.Y.2d 521 (1988)........................................................................................13, 20

People ex rel. Arcara v. Cloud Books, Inc.,
    68 N.Y.2d 553 (1986)........................................................................................13

Pugh v. Avis Rent A Car Sys., Inc.,
    No. M8-85, 1997 WL 669876 (S.D.N.Y. Oct. 28, 1997) ......................................16

Rosario v. New York Times Co.,
    84 F.R.D. 626 (S.D.N.Y. 1979) ......................................................................... passim

S.E.C. v. McGoff,
    647 F.2d 185 (D.C. Cir. 1981) (Ginsburg, J.)......................................................16

Sheppard v. Maxwell,
    384 U.S. 333 (1966)...........................................................................................13

Smith v. Daily Mail Pub. Co.,
    443 U.S. 97 (1979) (Rehnquist, J., concurring) ...................................................17

Stanley v. The Lawson Co.,
    993 F. Supp. 1084 (N.D. Ohio 1997).................................................................21

Times Square Books, Inc. v. City of Rochester,
    223 A.D.2d 270 (N.Y. App. Div. 1996) .......................................................................13

Turner Broad. Sys., Inc. v. F.C.C.,
    512 U.S. 622 (1994)......................................................................................................14

U.S. ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.,
    600 F. Supp. 667 (S.D.N.Y. 1985) .............................................................................16

U.S. v. Cuthbertson,
    630 F.2d 139 (3d Cir. 1980).........................................................................................16

U.S. v. Isiofia,
    370 F.3d 226 (2d Cir. 2004).........................................................................................10

U.S. v. U.S. Gypsum Co.,
    333 U.S. 364 (1948).....................................................................................................10

U.S. v. Marcos,
    No. 87-cr-598, 1990 WL 74521 (S.D.N.Y. June 1, 1990).........................................16

STATUTES

28 U.S.C. § 636(b)(1)(A).......................................................................................................10

FED. R. CIV. P. 72(a) ......................................................................................................... *passim*

OTHER AUTHORITIES

U.S. CONST. AMEND. I ........................................................................................................ *passim*

Potter Stewart, 26 HASTINGS L. J. 631, 633 (1975) ........................................................13

Defendants News Corporation, NYP Holdings, Inc., d/b/a the New York Post (the "Post") and Col Allan (together, "defendants") respectfully submit this memorandum of law objecting to the order of the Honorable Magistrate Judge Ronald L. Ellis, dated June 29, 2012 (the "Order"), denying defendants' Motion for a Protective Order, pursuant to FED. R. CIV. P. 72(a).

## PRELIMINARY STATEMENT

In this employment discrimination case, plaintiff, faced with a complete lack of evidence of any discriminatory animus by any supervisor or decision-maker involved in her employment, is attempting to fill this fatal void in her proof by attacking a political cartoon published in the Post. The cartoon is quintessential political speech entitled to the strongest protections of the First Amendment. Intended to mock Congress's drafting of economic stimulus legislation, the cartoon makes no reference to race and is, as the magistrate judge himself concluded, itself irrelevant to plaintiff's employment discrimination case. Plaintiff's discovery inquiry here is thus nothing more than a fishing expedition that would invade and chill the editor's and newspaper's First Amendment rights to political expression.

The magistrate judge presiding over discovery has ordered the Editor-in-Chief of the Post to answer questions concerning his decision to publish the cartoon and concerning his discussions with the Chairman of the newspaper about that decision. His Order requires the Editor-in-Chief of the Post to provide answers notwithstanding his explicit determination that "answers to the challenged questions . . . do not shed light on the question of racial motivation" in the case. (ECF No. 96 at 6.) The magistrate judge declined to recognize any applicable First Amendment privilege or to take into account in any way the First Amendment interests that are at stake in such inquiries into editorial judgments and communications. This was clear error.

Had the magistrate judge considered the First Amendment interests at stake, he would have disallowed these questions, as we now request that this Court do.  As explained below, all of the relevant decisions in this Circuit require that discovery into the reportorial and editorial processes be permitted only upon a showing of overriding need based upon the following four factors:  (1) the impact of the requested discovery on First Amendment interests; (2) whether the party seeking discovery has exhausted other sources for the information in question; (3) the nature of the suit in which discovery is being sought; and (4) the degree of relevance of the information to the issues in the case.  See Gonzales v. National Broadcasting Company, Inc., 194 F.3d 29, 32–36 (2d Cir. 1999) (nonconfidential press materials); McGraw-Hill v. Arizona, 680 F.2d 5, 7 (2d Cir. 1982) (confidential sources); In re Consumers Union of U.S., Inc., 495 F. Supp. 582, 586 (S.D.N.Y. 1980) ("reportorial and editorial processes"); Rosario v. New York Times Co., 84 F.R.D. 626, 631 (S.D.N.Y. 1979) (editorial communications) (quoting Herbert v. Lando, 441 U.S. 153, 179 (1979) (Powell, J., concurring)).

In this case, all of the relevant factors compel reversal of the Order:  (1) the editorial judgments and communications at issue involve political speech that lie at the core of the First Amendment; (2) ample means exist to explore discriminatory animus without posing questions concerning an unrelated political cartoon, and the editor in fact answered numerous questions pertaining to that issue; (3) the nature of the suit itself does not assert a claim based on editorial decisions, but rather on employment decisions; and (4) as Judge Ellis himself appeared to acknowledge, the questions posed are not themselves relevant to the issues in the case.  (ECF No. 96 at 6; see also Lerner Decl., Exh. A at 11:1-2).[1]

---

[1] Deposition transcript excerpts and all other exhibits cited herein are attached to the Declaration of Mark W. Lerner, Esq., dated July 13, 2012 ("Lerner Decl.").

Because the magistrate judge failed to acknowledge any First Amendment interest at stake with respect to the requested testimony, and plaintiff has not met her burden to overcome the First Amendment protections, defendants respectfully request that their Rule 72(a) Objections be granted and the Order be reversed.

## STATEMENT OF FACTS

Plaintiff Sandra Guzman is a former associate editor of the Post who was hired in July 2003 to be the editor of a new monthly section, to be known as *Tempo*, intended to focus on Latin American culture and other topics of interest to New York's Latino community.  In the Spring of 2006, after approximately two and one half years of publication and chronic financial losses, the Post's publisher ordered the section closed and the editor's position eliminated, but that decision was stayed at the eleventh hour to give an advisor to the Post a chance to turn the business around.  Nonetheless, in 2009, *Tempo* was again incurring consistent financial losses and, by September 2009, every *Tempo* staff member except Sandra Guzman had been laid off, *Tempo* had dwindled to a few pages each month, and there was no future advertising revenue in the pipeline.  Based on these and other facts, the Post made the business decision to close *Tempo* as a monthly section.  Its final issue ran in September 2009, and it was never published again. As a consequence of the closing of *Tempo*, Ms. Guzman's position was eliminated and her employment was terminated on September 29, 2009.

Unrelated to *Tempo* and Ms. Guzman's termination, on February 18, 2009, the Post published a political cartoon intended to mock Congress, depicting a chimpanzee that had been shot by two police officers, bearing the caption, "They'll have to find someone else to write the next stimulus bill" (the "Stimulus Cartoon").  Cartoons are selected for publication in the Post by the Post's Editor-in-Chief Col Allan.  The Post's frequent cartoonist, Sean Delonas, sends

cartoons to Col Allan's fax machine, whereupon he reviews them for publication in the following day's newspaper.  Mr. Allan alone selected the Stimulus Cartoon for publication on February 17, 2009, and it was published in the next day's newspaper.

Plaintiff "saw [the cartoon] in the paper . . . with the rest of the world."  She asserts that she was personally offended by the Stimulus Cartoon, which she alleges was "racist."  Ms. Guzman, as did some other Post employees and members of the public, expressed her view to the Post; Ms. Guzman specifically spoke with a member of the Post's human resources department about it the day it was published, and seven months prior to her termination.

The discovery process – including the testimony of plaintiff and her own witnesses – has yielded no evidence that any supervisor, decision-maker or individual she worked with harbored any racist animus against her.  She was subject to no racist comments, no racist acts, and no hostile work environment.  To compensate for this lack of evidence, plaintiff has made the cartoon the centerpiece of her litigation strategy.  She argues that since the Post published the purportedly "racist" Stimulus Cartoon (which makes no reference to race itself), it necessarily follows that Post editors also must be racist and the editorial decision to publish the cartoon demonstrates discriminatory animus ***in employment decisions***.  She also claims that she was terminated in retaliation for making her views that the cartoon was "racist" known to senior employees of the Post, including the head of the Human Resources department, notwithstanding that termination of her employment was ***seven months*** after she spoke with Human Resources.

On February 14, 2012, plaintiff deposed defendant Allan for more than seven hours.  At this time, plaintiff's strategy of prosecuting this case based on the publication of the Stimulus Cartoon was on full display as Mr. Allan was subjected to extensive questioning about the cartoon.  Mr. Allan readily answered almost all questions posed on the topic, which ran the

4

gamut of his understanding of what the cartoon meant, whom he spoke to about the cartoon, and

his response to employee complaints about the cartoon.

Mr. Allan testified to his belief as to what the cartoon meant and represented, and

whether he considered it to be offensive:

> **A:  [I]t mocked the Congressional stimulus bill, and that that
> was clear, and that it was my opinion that it was
> inoffensive.**  (Lerner Decl., Exh. B at 44:13-16)

* * *

> Q:  Based on your knowledge of the history of black people being
> portrayed as primates in this country, do you now believe that
> cartoon itself was offensive?

> **A:  No**.  (Id. at 344:15-22 [objection omitted])

* * *

> Q:  The ape in the picture was intended to be President Barack
> Obama; is that correct?

> **A:  That is incorrect.**  (Id. at 350:25-351:4)

Mr. Allan, an Australian, was questioned about his knowledge of "history in this country

of black people being portrayed as monkeys and apes":

> Q:  [D]o you know that there is a history in this country of black
> people being portrayed as monkeys and apes?

> **A:  No.**

* * *

> Q:  You don't understand the history of [depicting African-
> Americans of primates in this country]?

> **A:  I don't understand the history of the affiliation of black
> people and primates, I am not aware of that.**

> Q:  Has anyone at the Post ever told you that there is a history in
> this country of black people being portrayed as primates?

5

> **A: I became aware of that after we published the cartoon.** (Id.
>     at 336:22-339:9 [objections omitted])

Mr. Allan explained his own family's heritage and how that informed his own

understanding about the offensiveness of certain racial slurs:

> **A: I have been married for almost 30 years, my wife's mother
>     is black. She is a Aborigine, my wife is part Aborigine, my
>     four children are part Aborigine. Therefore the [racial
>     slur] is deeply offensive to me. For it to be anything else
>     would be a betrayal of my family.** (Id. at 256:6-12)

Mr. Allan testified about whether he thought apologizing for the cartoon was appropriate:

> Q: Do you believe that Rupert Murdoch was wrong to issue an
>     apology regarding the cartoon?
>
> **A: I disagreed with the decision.** (Id. at 345:10-23 [objection
>     omitted])

Mr. Allan answered questions about plaintiff's complaint about the cartoon and his

response thereto:

> Q: Do you know if [Ms. Guzman] raised her concerns about the
>     cartoon with any editor at the New York Post?
>
> **A: I don't recall.**
>
> Q: Do you know if she raised the concerns about the cartoon to
>     anyone in human resources?
>
> **A: Yes.**
>
> * * *
>
> Q: Did you at that point say to yourself, let me go talk to Sandra
>     Guzman because she is upset about the cartoon?
>
> **A: No. The procedure is that she is – her complaint is dealt
>     with by the HR department.** (Id. at 64:17-74:10)

Even more importantly, Mr. Allan answered all questions relating to plaintiff's

employment – the only issues arguably relevant to this ***employment discrimination*** case:

6

Q: Mr. Allan, do you know if Sandra Guzman was fired because she had any performance issues?

A: **She was terminated because the Tempo section that she was hired to produce ceased to exist.**

Q: That was the only reason she was terminated, correct?

A: **Correct.**

Q: If the Tempo section was not closed she would still be employed by the company, correct?

A: **That is true.** (Id. at 388:12-24.)

Mr. Allan testified about any communications he had with K. Rupert Murdoch regarding Ms. Guzman, her termination, and her public e-mail about the cartoon:

Q: Mr. Allan, have you ever communicated with Rupert Murdoch verbally or in writing about Sandra Guzman when she was an associate editor for the Post?

A: **No.**

\* \* \*

Q: Have you ever spoken to or communicated with Rupert Murdoch about [Ms. Guzman's e-mail to the public about the cartoon]?

A: **No.**

Q: Have you ever spoken to him or communicated to him about Sandra Guzman's termination?

A: **No.** (Id. at 37:9-38:4.)

Finally, Mr. Allan testified about showing on his Blackberry to Ms. Guzman and other editors a few-inches small image of a photograph which hung in former New Jersey Governor Jim McGreevey's bedroom that Mr. Allan had just received via email, which was to be published in the newspaper and depicted a naked man. Mr. Allan testified about the photograph – which he

showed at their request – and the circumstances surrounding this incident, including that such picture was subsequently published in the Post.  (Id. at 206:7-20.)

While answering these questions, Mr. Allan objected and declined to answer on First Amendment grounds a very small number of questions – eleven in total – which sought to elicit irrelevant testimony about (i) his decision-making process in publishing the Stimulus Cartoon (id. at 45:13-14, 340:5-9); (ii) his decision-making concerning the publication of a statement following the Stimulus Cartoon (id. at 347:5); (iii) conversations between him, as Editor-in-Chief, and Mr. Murdoch, the Chairman of the Post's Board, concerning the editorial decision to publish a public apology in response to controversy over the Stimulus Cartoon (id. at  40:21-24, 46:14-16, 49:3-11, 49:21-23, 50:6-8, 50:23-24, 51:21-22); and (iv) the editorial decision to redact part of the McGreevey Picture prior to publication (id. at 214:11).

The questions to which Mr. Allan objected and declined to answer on First Amendment grounds are as follows:

## Decision to Publish the Stimulus Cartoon

Q:  Do you believe that it was a mistake to publish that cartoon?
(Id. at 45:13-15)

Q:  In light of your awareness after the monkey cartoon was published that black people had been portrayed as primates in this country, do you now believe it was a mistake to publish that cartoon?  (Id. at 340:5-9)

## Decision to Publish Statement Responding to the Stimulus Cartoon

Q:  What role did you have, sir [in publishing a response to the cartoon]?  (Id. at 347:5)

## Discussions between Mr. Allan and Mr. Murdoch

Q:  So tell us in substance what you said to your boss Rupert Murdoch about the monkey cartoon when he called you the day it was published?  (Id. at 40:21-24)

8

Q: So it was your understanding that Rupert Murdoch believed that it was a mistake to publish the cartoon?  (Id. at 46:14-16)

Q: Why [did you disagree with the decision to publish an apology in the Post]?  (Id. at 49:3-11)

Q: Did you tell Mr. Murdoch that you didn't think it was a mistake for publishing the cartoon?  (Id. at 49:21-23)

Q: Did you tell Mr. Murdoch that you disagreed with apologizing for this publication?  (Id. at 50:6-8)

Q: What happened the following day [when Mr. Allan spoke to Mr. Murdoch about the cartoon]?  (Id. at 50:23-24)

Q: What did you say to [Mr. Murdoch] about the cartoon on that second call?  (Id. at 51:21-22)

**Decision to Redact McGreevey Picture**

Q: Why was his waist covered up?  (Id. at 214:11)[2]

**PROCEDURAL BACKGROUND**

On February 22, 2012, plaintiff submitted pre-motion correspondence to the Court asking that Mr. Allan be required to answer those questions posed at deposition to which he had asserted a First Amendment objection.  Defendants responded to plaintiff's application on February 28, 2012.  Plaintiff submitted a reply on March 6, 2012, requesting permission to fully brief the application of the First Amendment to Defendants' objections and it was decided that defendants would submit first.  On April 27, 2012, defendants filed their Motion for a Protective Oder.  (See ECF No. 75.)  Plaintiff opposed on May 7, 2012 (see ECF No. 83), and defendants submitted their reply on May 14, 2012 (see ECF No. 85).  On June 29, 2012, Judge Ellis issued the Order that is the subject of the present Rule 72(a) Objections.  (See ECF No. 96.)

---

[2] During deposition, plaintiff posed a series of questions regarding a reporter at the New York Post.  Although counsel engaged in a brief discussion on the record regarding the application of the First Amendment's protections, Mr. Allan answered all questions in this line of inquiry.  (See Lerner Decl., Exh. B at 372:25-373:17.)  Notably, the Order incorrectly states that Mr. Allan refused to answer such questions.

**LEGAL ARGUMENT**

**I.**

**STANDARD OF REVIEW**

When considering objections to a magistrate's ruling on a non-dispositive matter, a district judge will modify or set aside any portion of the magistrate's order found to be "clearly erroneous or contrary to law." Fᴇᴅ. R. Cɪᴠ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any [nondispositive] pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law"). A finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." U.S. v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); U.S. v. Isiofia, 370 F.3d 226, 232 (2d Cir. 2004) ("Thus, a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed") (internal quotations omitted). An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (internal quotations omitted).

**II.**

**THE MAGISTRATE JUDGE ACTED CONTRARY TO LAW IN
FAILING TO RECOGNIZE THE FIRST AMENDMENT INTERESTS
AT STAKE AND IN ORDERING RESPONSES TO CONCEDEDLY
IRRELEVANT QUESTIONS**

The discovery sought by the plaintiff goes to the heart of the editorial process. Plaintiff seeks to ask the editor responsible for selecting and publishing a political cartoon whether he thought it was mistake to do so, what role he had in publishing a response, what communications he had with the Post's Chairman of the Board concerning the original publication and the

10

publication of an apology, whether he believed it was a mistake to publish an apology, and why a decision was made to cover the genitals on a nude photograph.  All of these questions implicate the editorial process.

Where, as here, a party seeks discovery of material that is protected by the First Amendment, courts have recognized a qualified privilege that imposes a burden on the party seeking discovery of First Amendment protected materials to make a showing of overriding need.  As explained below, the precise level of protection varies depending upon the nature of the First Amendment interest at stake, but as a general matter discovery into the "reportorial and editorial processes" requires the court to consider several factors:  (1) the impact of the requested discovery on First Amendment interests; (2) whether the party seeking discovery has exhausted other sources for the information in question; (3) the nature of the suit in which discovery is being sought; and (4) the degree of relevance of the requested information to the issues in the case.  In re Consumers Union of U.S., Inc., 495 F. Supp. 582, 586 (S.D.N.Y. 1980).  As Justice Powell put it more generally, in a case like involving inquiry into editorial decisions, "when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the needs of the parties and the public concerns implicated."  Herbert v. Lando, 441 U.S. 153, 179 (Powell, J., concurring).

These factors weigh in favor of the Post's First Amendment rights and against plaintiff's requested discovery.  First, plaintiff's requested discovery implicates pure "political speech," which is "at the core of what the First Amendment is designed to protect."  Morse v. Frederick, 551 U.S. 393, 402 (2007) (internal quotation marks omitted).  Second, plaintiff has multiple other ways to pursue the issue in question – i.e., Mr. Allan's motivation with regards to the termination of Ms. Guzman – and, indeed, plaintiff did in fact ask questions to that effect, which

11

Mr. Allan answered.  <u>Third</u>, the nature of this lawsuit – an employment discrimination suit – similarly weighs against plaintiff, for such suits "are directed to business judgments, not editorial judgments."  <u>Rosario v. New York Times Co.</u>, 84 F.R.D. 626, 631 (S.D.N.Y. 1979).  <u>Finally</u>, questions concerning the cartoon are irrelevant to her claim of employment discrimination – a point Judge Ellis recognized when he explained that the political cartoon did not "fit[] within the kind of discovery that would be relevant to the claims . . . of a hostile work environment or retaliation" (Lerner Decl., Exh. A at 11:1–2), and that "the challenged questions of Allan do not shed light on the question of racial motivation."  (ECF No. 96 at 6.)

In sum, plaintiff seeks to pose questions that are both irrelevant to her case and intrusive into editorial judgments on a matter of core political speech.  Under these circumstances, as explained below, the First Amendment forbids these inquiries.

### A.  **The First Amendment Protects Editorial Processes and Decision-Making**

The Post unquestionably raised issues implicating the First Amendment before the magistrate judge.  As set forth in greater detail below, extensive precedent holds that the editorial processes at issue here – such as the freedom to select content for publication and internal communications about such content, among others – are protected by the First Amendment.  The magistrate judge's failure to recognize such is clearly erroneous and contrary to law.

> i.    The First Amendment Guarantees the
>       <u>Unfettered Freedom of the Press</u>

The Constitution "specifically selected the press . . . to play an important role in the discussion of public affairs."  <u>Mills v. Alabama</u>, 384 U.S. 214, 219 (1966).  The reason for that First Amendment protection is simple:  Any abridgement of the freedom of the press "muzzles one of the very agencies the Framers of the Constitution thoughtfully and deliberately selected to improve our society and keep it free."  <u>Id.</u>

In light of this foundation, the First Amendment's broad protections of the press should not be surprising.  Indeed, "[t]he 'unqualified prohibitions laid down by the framers were intended to give the liberty of the press . . . the broadest scope that could be countenanced in an orderly society.'"  Sheppard v. Maxwell, 384 U.S. 333, 350 (1966) (quoting Bridges v. California, 314 U.S. 252, 265 (1941)).  "The evils to be prevented" by the First Amendment "were not the censorship of the press merely, but any action of the government by which it might prevent such free and general discussion of public matters . . . ."  Grosjean v. Am. Press. Co., 297 U.S. 233, 249-50 (1936).  See also Lovell v. City of Griffin, Ga., 303 U.S. 444, 452 (1938) (recognizing the First Amendment is of "vital importance of protecting this essential liberty *from every sort of infringement*") (emphasis added).

The Supreme Court has repeatedly reaffirmed these First Amendment guarantees.  The Court, for example, has struck down laws that served as prior restraints on publication, Near v. Minnesota ex rel. Olson, 283 U.S. 697, 707 (1931), that imposed taxes inhibiting the robust exercise of the freedom of the press, Grosjean, 297 U.S. at 244-49, that subjected publishers to tort liability for defamation on an issue of public concern absent a showing of "actual malice," New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964), and that interfered with editorial selection of content, Miami Herald v. Tornillo 418 U.S. 241, 258 (1974).  As Justice Stewart put it, the Supreme Court's "approach to all these cases has uniformly reflected its understanding that the Free Press guarantee is, in essence, a *structural* provision of the Constitution."  Potter Stewart, 26 HASTINGS L. J. 631, 633 (1975) (emphasis in original).[3]

---

[3]  The protections afforded free expression are even broader under New York's Constitution than under the U.S. Constitution.  Times Square Books, Inc. v. City of Rochester, 223 A.D.2d 270, 274 (N.Y. App. Div. 1996) (citing O'Neill v. Oakgrove Constr., Inc., 71 N.Y.2d 521, 529 n.3 (1988).  See also People ex rel. Arcara v. Cloud Books, Inc., 68 N.Y.2d 553, 557-58 (1986) (reaching beyond "the minimal standard established by the Supreme Court for First Amendment rights" to find that the closure of a bookstore implicated the guarantee of free expression under the State Constitution).

ii.     The First Amendment Protects Editorial
        Processes and Decision-Making

Against that background, it makes sense that the First Amendment's protections of the

press extend to editorial processes and decision-making.  Indeed, the Supreme Court has

repeatedly recognized the First Amendment interests implicated by editorial decisions.  In

Tornillo, for example, the Supreme Court addressed the constitutionality of a statute that

required newspapers to publish the statements of a political candidate in response to press

criticism of that candidate.  Tornillo, 418 U.S. at 247.  The Supreme Court held the statute

unconstitutional as an impingement of the editorial decision-making process protected by the

First Amendment:  "Even if a newspaper . . . would not be forced to forego publication of news

or opinion by the inclusion of a reply, the . . . statute fails to clear the barriers of the First

Amendment because of its intrusion into the function of editors."  Id. at 258.  "The choice of

material to go into a newspaper," the Court continued, "and the decisions made as to limitations

on the size and content of the paper, and treatment of public issues and public officials – whether

fair or unfair – constitute the exercise of editorial control and judgment."  Id.

Subsequent decisions have reaffirmed that editorial decision-making and the selection of

content for publication are plainly within the rubric of the First Amendment's protections.  See,

e.g., Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622 (1994) (holding that free speech and press

provisions of the First Amendment protect a cable provider's editorial selection of what material

it chooses to publish); Ark. Educ. Television Comm. v. Forbes, 523 U.S. 666, 674 (1998)

("When a public broadcaster exercises editorial discretion in the selection and presentation of its

programming, it engages in speech activity" that is protected by the First Amendment.).

The First Amendment thus recognizes the common sense principle: "For better or worse,

editing is what editors are for; and editing is selection and choice of material."  Columbia Broad.

Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 124 (1973).  Indeed, "[t]he power of a

privately owned newspaper to advance its own political, social, and economic views is bounded

by only two factors:  first the acceptance of a sufficient number of readers – and hence

advertisers – to assure financial success; and, second, the journalistic integrity of its editors and

publishers."  Id. at 117 (plurality opinion).

> iii.    The First Amendment Requires a Showing
>         of Overriding Need Before Allowing Inquiry
>         into Editorial Decisions and Communications

Like other aspects of the First Amendment, the protection afforded to editorial judgments

is broad:  it is not limited to protection against being compelled to publish content, but extends to

protection against being compelled to justify or explain editorial decisions.  As the Supreme

Court stated in the related context of a church's right to control its internal decision-making, "[i]t

is not only the conclusions that may be reached [as a result of inquiry into the good faith of labor

decisions] which may impinge on rights guaranteed by the Religion Clauses, but also the very

process of inquiry leading to findings and conclusions."  NLRB v. Catholic Bishop of Chicago,

440 U.S. 490, 502 (1979).  The First Amendment's protection for the institution of religion is

comparable to its protection for the press.  And the Supreme Court's admonition about intrusive

inquiries into protective spheres of action applies equally to the press.

Thus, in a series of cases this Court has rejected efforts to compel reporters and editors to

testify concerning their editorial decisions and communications, in the absence of a showing of

overriding need.  In Rosario, 84 F.R.D. at 631, for example, the Court upheld objections to

deposition questions concerning discussions between the publisher and executive editor of the

New York Times regarding a published column on First Amendment grounds.  Likewise, in

Consumers Union, 495 F. Supp. at 586, the Court quashed a subpoena seeking discovery of

various unpublished materials sought in connection with a civil antitrust case, explaining that the

First Amendment protects "the reportorial *and editorial* processes." Id. (emphasis added).  And

in United States v. Marcos, No. 87-cr-598, 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990), the

Court quashed a subpoena requesting testimony from various employees concerning portions of

a television interview for use in a criminal case, explaining that the First Amendment protects

"the press' independence in its 'selection and choice of material for publication.'"  Id. (quoting

Columbia Broad. Sys., 412 U.S. at 124); see also Pugh v. Avis Rent A Car Sys., Inc., No. M8-85,

1997 WL 669876, at *3-4 (S.D.N.Y. Oct. 28, 1997) (quashing subpoena seeking unpublished

materials relating to a television broadcast, which were sought in a civil rights lawsuit,

explaining again that a qualified privilege "protects the press's independence in its 'selection and

choice of material for publication'") (quoting Columbia Broad. Sys., 412 U.S. at 124); Kenn+ally

v. Suzuki Motor Co., Ltd., No. M-8-85, 1994 WL 48840, at *1 ("When the First Amendment is

implicated . . . the Second Circuit has held that the seeker" of discovery bears the burden of

demonstrating need); U.S. ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc., 600 F. Supp. 667,

670-71 (S.D.N.Y. 1985) (denying request for subpoena requesting unpublished out-takes of

published program in criminal case based on burden on First Amendment freedoms including

"the process of editorial analysis").

    Numerous courts in other jurisdictions similarly have barred discovery into editorial

processes and decision-making in the absence of a strong showing of need for the testimony.

See, e.g., S.E.C. v. McGoff, 647 F.2d 185, 191 (D.C. Cir. 1981) (Ginsburg, J.) (holding that First

Amendment interests of publisher prevented government from discovering documentation

relating to "editorial policy" and "news gathering" of publisher); U.S. v. Cuthbertson, 630 F.2d

139, 147 (3d Cir. 1980) (quashing subpoena for editorial materials, explaining that the First

Amendment interests of the press extend to "preventing intrusion into the editorial process, and

16

avoiding the possibility of self-censorship"); Maughan v. NL Indus., 524 F. Supp. 93, 95 (D.D.C. 1981) (quashing subpoena for editorial materials, explaining that "[t]he right of a newspaper to determine for itself what it is to publish and how to fulfill its mandate of dissemination must be given great respect if an unfettered press is to exist and information is to flow unhindered from it to the public").

### B. The Post's First Amendment Interests Outweigh Plaintiff's Need for Civil Discovery

Given that, as demonstrated above, the editorial decision-making and discussions involved here lie at the core of the First Amendment, the magistrate judge committed clear error in, first, failing to recognize the First Amendment interests at stake and, second, not appropriately balancing those interests against plaintiff's asserted need for the testimony.  The Supreme Court has "shown a special solicitude for freedom of speech and of the press," and, when competing interests are asserted, has employed a "delicate calculus that carefully weighs the conflicting interests to determine which demands the greater protection under the particular circumstances presented."  Smith v. Daily Mail Pub. Co., 443 U.S. 97, 106 (1979) (Rehnquist, J., concurring) (citing Landmark Comms., Inc. v. Virginia, 435 U.S. 829, 838, 843 (1978)); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 562 (1976); Am. Comm. Ass'n v. Douds, 339 U.S. 382, 400 (1950)).  Justice Powell emphasized that point in the particular context of inquiries into the editorial process:

> [W]hen a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated.

Herbert v. Lando, 441 U.S. 153, 179 (Powell, J., concurring).[4]

---

[4]  Herbert v. Lando, a defamation case, and similar libel cases universally are distinguishable on their facts:  in such cases, the plaintiff seeks to inquire into the state of mind of the journalist to determine whether he had published

The Second Circuit has explained that the precise standard to be applied varies depending upon the nature of the First Amendment interest involved. Thus, a party seeking to identify a confidential source bears a particularly heavy burden:

> [T]o protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.

Gonzales v. National Broadcasting Company, Inc., 194 F.3d 29, 33 (2d Cir. 1999) (quoting McGraw-Hill v. Arizona, 680 F.2d 5, 7 (2d Cir. 1982)). The Court of Appeals has held that a somewhat lesser standard applies to the discovery of "nonconfidential press materials," such as outtakes from interviews conducted for broadcast:

> [W]hile nonconfidential press materials are [also] protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought. Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case and are not reasonably obtainable from other available sources.

Gonzales, 194 F.3d at 36.

Although the present matter does not involve confidential sources, neither does it involve "nonconfidential press materials" that were gathered for publication. It involves *confidential* editorial communications and judgments that were never intended for publication. There is no doubt that the First Amendment protects the "editorial process," as well as the "newsgathering process," and the level of protection, we submit, should correspond to that for confidential sources. But even if the lesser Gonzales standard were applied, the result here would be the

---

with "actual malice," as required by New York Times Co. v. Sullivan, 376 U.S. 254 (1964). Quite obviously, that issue could not be resolved without inquiry into the editorial process.

same, for the discovery at issue is not "of likely relevance to a significant issue in the case," as the magistrate judge himself concluded.

Whatever precise standard is applied, the factors to be considered are well-recognized: (1) the impact of the requested discovery on First Amendment interests; (2) whether the party seeking discovery has exhausted other sources for the information in question; (3) the nature of the suit in which discovery is being sought; and (4) the degree of relevance of the requested information.  In re Consumers Union of U.S., Inc., 495 F. Supp. at 586.

Here, the magistrate judge rejected altogether defendants' invocation of First Amendment protections, holding that the qualified privilege recognized in this circuit applies only to the "newsgathering process" and not the "editorial process," and that Rosario in particular did not recognize any qualified privilege for the editorial process.  (ECF 96 at 4-5.)  As demonstrated above, however, this Court in several cases has acknowledged a qualified privilege against discovery into the editorial process, and Rosario itself clearly endorsed the application of Justice Powell's approach requiring that requests for discovery into the editorial process be measured against the First Amendment interests at stake.

The magistrate judge committed clear error by failing to give any weight to the First Amendment interests at issue here.  As explained below, all of the relevant factors weigh heavily against the discovery that Guzman seeks.

   i.  The Requested Discovery Goes to the Core
       Protection of the First Amendment

Guzman seeks to ask Mr. Allan, the editor of the Post and the individual responsible for the publication of the material at issue, questions that go to the heart of the editorial process – i.e., whether he thought the publication of a political cartoon was a mistake, what role he had in publishing a response, and what communications he had with the Post's Chairman of the Board

19

concerning the original publication and the publication of an apology.  And the editorial

decisions in this case, in turn, lay at the heart of the First Amendment's protection.  The political

cartoon at issue relates to a controversial political issue – the drafting of the stimulus bill, one of

the most important and controversial laws to be enacted in years.  The Supreme Court has

emphasized that "a major purpose of [the First] Amendment was to protect the free discussion of

governmental affairs."  Mills, 384 U.S. 214, 218 (1966).

That protection extends in full to political cartoons.  Indeed, political cartoons of the sort

at issue here have deep roots in the First Amendment:  "Despite their sometimes caustic nature

from the early cartoon portraying George Washington as an ass down to the present day . . .

graphic depictions and satirical cartoons have played a prominent role in public and political

debate."  Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 54 (1988).  "Lincoln's tall, gangling

posture, Teddy Roosevelt's glasses and teeth, and Franklin D. Roosevelt's jutting jaw and

cigarette holder have been memorialized by political cartoons with an effect that could not have

been obtained by the photographer or the portrait artist."  Id. at 55.  "From the viewpoint of

history it is clear that our political discourse would have been considerably poorer without

them."  Id.  So too here.

In short, the political cartoon at issue here is entitled to the highest level of protection

under the First Amendment.  And, as noted above, New York's Constitution provides even

broader protection than the First Amendment – indeed, it provides "the broadest possible

protection to the sensitive role of gathering and disseminating news of public events."  O'Neill,

71 N.Y.2d at 529.

ii.     Guzman Has Already Obtained Any Potentially
        Relevant Information Related to Her Claims Through
        Deposition Answers Already Provided by Mr. Allan

The issues in this case concern whether Mr. Allan engaged in racial discrimination or

retaliation in connection with Ms. Guzman's employment.  And her counsel had every

opportunity to explore those issues during the seven hours of Mr. Allan's deposition.  Mr. Allan

was asked – and answered – questions concerning why she was terminated, who was involved in

that decision, what types of information was considered in reaching the termination decision and

the like.  (See Statement of Facts, supra.)  Mr. Allan's own racial attitudes were explored through

a variety of questions.[5]  Mr. Allan also answered all questions relating to his response to

employee complaints regarding the Stimulus Cartoon.  He even answered irrelevant questions

regarding his belief as to what the cartoon meant, whether he considered it offensive, and

whether he thought publicly apologizing for it was appropriate.[6]  Mr. Allan also testified as to

whether he found the McGreevey Picture sexually offensive or inappropriate to show to female

journalists at the Post.  No proper purpose is served by additional questions in those areas.

iii.    The Nature of Guzman's Suit Weighs Against
        the Civil Discovery She Seeks

This case involves employment decisions, not editorial judgments.  As this Court stated

in rejecting inquiries into editorial communications in another employment discrimination case,

"Title VII and Section 1981 are directed to business judgments, not editorial judgments."

Rosario, 84 F.R.D. at 631; cf. Stanley v. The Lawson Co., 993 F. Supp. 1084, 1089 (N.D. Ohio

---

[5]  Indeed, the testimony Mr. Allan provided on the subject undercuts Guzman's allegations of racial animus.  When asked about the offensiveness of a certain racial slur, Mr. Allan responded as follows: "I have been married for almost 30 years, my wife's mother is black.  She is Aborigine, my wife is part Aborigine, my four children are Aborigine.  Therefore, the [racial slur] is deeply offensive to me.  For it to be anything else would be a betrayal of my family."  (Lerner Decl., Exh. B at 256:6-12.)
[6]  Mr. Allan testified that he believed the cartoon "mocked the Congressional stimulus bill, and that that was clear, and that it was [his] opinion that it was inoffensive."  (Lerner Decl., Exh. B at 44:13–16.)  In response to the question:  "Do you believe that the New York Post should have apologized for that cartoon?"  Mr. Allan answered: "No."  Id. at 48:24-49:2.

1997) ("[I]f Title VII . . . required Defendant to remove the adult magazines from its stores because an employee found them offensive, those laws would violate the First Amendment."). This fact weighs heavily against the requested discovery.

In contrast to defamation claims, which place the editorial processes and the publisher's state of mind at the time of publication directly at issue as an element of the claim, see Sullivan, 376 U.S. at 279-80; Lando, 441 U.S. at 174, the employment discrimination claims Guzman alleges do not directly implicate the editorial processes and deliberative discussions she seeks to discover. Where a plaintiff brings a defamation claim, she is presenting a "specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false," and, in appropriate circumstances, the nature of such a defamation suit might counsel in favor of discovery. Id. But where, as here, a plaintiff brings an employment discrimination lawsuit – that does not present a specific claim of injury arising from a publication about which discovery is sought – the connection between the suit and the publication is far more attenuated, and cannot support discovery into First-Amendment-protected material. See Baker v. F & F Investment, 470 F.2d 778, 783, 785 (2d Cir. 1972) (comparing civil rights claim to libel and prohibiting discovery of confidential-source information as nonessential to the civil rights claims)[7]; In re Consumers Union, 495 F. Supp. at 586-87 (rejecting discovery request for reportorial and editorial processes where the "claimed need for the discovery in question is rather attenuated").

    iv.    The Information Guzman Seeks Is Not Relevant

Not surprisingly, given that her case turns on employment decisions, the questions Guzman seeks to ask about editorial judgments are simply not relevant to her claims. Indeed, Judge Ellis so held. First, in an earlier ruling, the judge noted: "I do not find that the

---

[7] Although Baker involved confidential sources, the cases cited in the text make clear that the protections of the First Amendment are not limited to such sources.

chimpanzee cartoon . . . fits within the kind of discovery that would be relevant to the claims that Ms. Guzman has raised either in terms of a hostile work environment or retaliation." (Lerner Decl., Exh. A at 10:23-11:2.)  And in this ruling, Judge Ellis concluded as follows with respect to the very questions at issue:  "Although the Court finds that the answers to the challenged questions of Allan ***do not shed light on the question of racial motivation***, Guzman was prevented from developing this line of inquiry, and Allan is ordered to submit to a deposition that is limited to two hours."  (ECF No. 96 at 6 [emphasis added].)

In short, although Judge Ellis concluded that the answers to these questions were not relevant to the issue in the case, his ruling permits Guzman to pursue the questions – for two hours beyond the seven-hour deposition limit – presumably because answers to the challenged questions might lead Guzman to other questions, which themselves might produce relevant testimony.  But if the First Amendment means anything in this context, it prohibits precisely this type of fishing expedition.

Questions concerning the redaction for publication of the McGreevey Picture, which was shown in un-redacted form to Ms. Guzman and other Post editors on a BlackBerry prior to its publication, are likewise irrelevant.  Indeed, the considerations behind the decision to redact a portion of the photograph prior to publication in the Post – a newspaper of general circulation which would be available for perusal by wide audiences, including children who simply happen to walk by a newsstand or pick up the newspaper in their home – has absolutely no relevance to whether the photograph may appropriately be shown to an experienced editor at the Post.  Given the complete lack of relevance and the important First Amendment protections at stake, there is no reason to permit this line of inquiry.

*      *      *

In sum, Guzman's discovery requests were both irrelevant to her case and improperly intrusive into editorial judgments on a matter of core political speech.  Her requests should have been denied.  The magistrate judge committed error by failing to give any consideration whatsoever to the important First Amendment interests implicated by Guzman's questions.  The magistrate judge also committed error by permitting Guzman to ask questions, "the answers" to which, he himself concluded, "do not shed light on the question of racial motivation" in this case.  (ECF No. 96 at 6.)

## CONCLUSION

Based on the foregoing reasons, defendants News Corporation, NYP Holdings, Inc., d/b/a The New York Post, and Col Allan respectfully request that this Court sustain defendants; Objections pursuant to FED. R. CIV. P. 72(a) and protect defendant Allan from further questioning on these subjects.

Dated: July 13, 2012
      New York, New York

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:    /s/ Mark W. Lerner
      Marc E. Kasowitz (mkasowitz@kasowitz.com)
      Mark W. Lerner (mlerner@kasowitz.com)
      Blythe Lovinger (blovinger@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.:(212) 506-1700
Fax:(212) 506-1800

WILLIAMS & CONNOLLY

By:    /s/ Kevin T. Baine
      Kevin T. Baine (kbaine@wc.com)
      James M. McDonald (jmcdonald@wc.com)

725 Twelfth St. N.W.
Washington, DC 20005
Tel.: (202) 434-5000

Attorneys for Defendants News Corporation,
NYP Holdings, d/b/a the New York Post,
and Col Allan

25