**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
SANDRA GUZMAN,                                      :
                                                    :
                                   Plaintiff,       :         No. 09 Civ. 9323 (BSJ)(RLE)
                                                    :
                       v.                           :
                                                    :
NEWS CORPORATION, NYP HOLDINGS,                     :
INC., d/b/a THE NEW YORK POST,                      :
and COL ALLAN, in his official and                 :
individual capacities,                             :
                                                    :
                                   Defendants.      :
-------------------------------------------------------------X


### PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 72(A) OBJECTIONS TO MAGISTRATE JUDGE ELLIS' ORDER, DATED JUNE 29, 2012



THOMPSON WIGDOR LLP

Kenneth P. Thompson, Esq.
Shaffin A. Datoo, Esq.
Paul A. Clark, Esq.

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ..................................................................................................2

PROCEDURAL HISTORY..................................................................................................6

ARGUMENT ......................................................................................................................9

JUDGE ELLIS CORRECTLY HELD THAT THERE IS NO "EDITORIAL PRIVILEGE" AND THE QUESTIONS POSED TO DEFENDANT ALLAN ARE RELEVANT TO ANIMUS AND MOTIVATION ....................................................................................................................9

    I.    Governing Law and Burden of Proof................................................................9

    II.    Defendants' Objections Fail to Mention an "Editorial Privilege," Implicitly Acknowledging That No Such Privilege Exists.................................................9

    III.    None of the Cases Cited by Defendants Recognize an "Editorial Privilege" and the Cases Do Not Support the Creation of a Generic Privilege............................15

    IV.    The First Amendment Does Not Shield the Press from Laws of General Applicability, Such as Anti-discrimination Laws ..................................................................20

    V.    The Issues for Which Defendants Invoke an "Editorial Privilege" Are Relevant to Ms. Guzman's Claims, and Defendants Mischaracterize Judge Ellis' Ruling .......22

CONCLUSION..................................................................................................................24

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bondi v. Grant Thornton Intern.*,
No. 04 Civ. 9771(LAK)(HB), 2006 WL 2088193 (S.D.N.Y. July 27, 2006) ..................13

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ...............................................................................................17, 19

*Chevron Corp. v. Berlinger*,
629 F.3d 297 (2d Cir. 2011) ............................................................................................15

*Consumers Union of U. S., Inc. v. American Medical Association*,
495 F.Supp. 582 (S.D.N.Y. 1980) .............................................................................17, 18

*Doe v. City of New York*,
583 F. Supp. 2d 444 (S.D.N.Y. 2008) ............................................................................22

*E.E.O.C. v. Pipefitters Association Local Union 597*,
334 F.3d 656 (7th Cir. 2003) ...........................................................................................20

*Gonzalez v. National Broadcasting Company, Inc.*,
194 F.3d 29 (2d Cir. 1999) ..............................................................................................15

*Herbert* in *Calder v. Jones*,
465 U.S. 783 (1984) ........................................................................................................14

*Herbert v. Lando*,
441 U.S. 153 (1979) ...............................................................11, 12, 13, 14, 16, 17, 19

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*,
968 F.2d 286 (2d Cir. 1992) ............................................................................................21

*Johnson v. Nyack Hosp.*,
169 F.R.D. 550 (S.D.N.Y. 1996) .....................................................................................13

*Kenneally v. Suzuki Motor Co., Ltd.*,
No. M-8-85, 1994 WL 48840 (S.D.N.Y.) .......................................................................18

*Legg v. Conklin*,
No. 04 Civ. 6549T (MWP) 2008 WL 2704348 (W.D.N.Y. July 2, 2008) ......................13

*Miller v. California*,
413 U.S. 15 (1973) ..........................................................................................................20

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...........................................................................16

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ...........................................................10, 20, 22

*Rosario v. New York Times Co.*,
    84 F.R.D. 626 (S.D.N.Y. 1979)....................................................16, 19

*Saxe v. State College Area School District*,
    240 F.3d 200 (3d Cir. 2001) ...........................................................21

*Securities and Exchange Commission v. McGoff*,
    647 F.2d 185 (D.C. Cir. 1981) ........................................................19

*Solarex Corp. v. Arco Solar, Inc.*
    121 F.R.D. 163 (E.D.N.Y. 1988) ................................................16, 18

*Thomasson v. Perry*,
    80 F.3d 915 (4th Cir. 1996)..........................................................21

*United States v. Marcos*,
    No. 87-cr-598, 1990 WL 74521 (S.D.N.Y. June 1, 1990) ................18

*University of Pennsylvania v. E.E.O.C.*,
    493 U.S. 182 (1990) .......................................................................11

*U.S. ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*,
    600 F. Supp. 667 (S.D.N.Y. 1985) .................................................18

*U.S. v. O'Brien.*
    391 U.S. 367 ...................................................................................21

*U.S. v. Nixon*,
    418 U.S. 683 (1974) .......................................................................11

*Von Bulow by Auersperg v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987)..............................................................9

*Westmoreland v. CBS, Inc.*,
    97 F.R.D. 703 (S.D.N.Y. 1983)......................................................17

**STATE CASES**

*First United Fund Ltd. v. American Banker, Inc.*,
    485 N.Y.S.2d 489 (Sup. Ct. Nassau Cnty., 1985) ...........................14

*Greenleigh Associates, Inc. v. New York Post Corp.,*
79 A.D.2d 588 (1st Dep't 1980)............................................................14

**OTHER AUTHORITIES**

28 U.S.C. § 636(b)(1)(A)......................................................................9

42 U.S.C. § 1985(3)..............................................................................21

New York Civ. Rights Law § 40 ...........................................................21

New York Executive Law § 296(2)(a)....................................................21

## PRELIMINARY STATEMENT

In February 2009, Defendant NYP Holdings, Inc. d/b/a The New York Post ("The Post"), with the approval of Defendant Col Allan, published a racist cartoon depicting President Barack Obama as a chimpanzee.  Plaintiff Sandra Guzman, and other employees of the corporate Defendants, complained about, among other things, this offensive, racist cartoon.  In response to complaints by their employees, The Post and Defendant Allan did virtually nothing to address the concerns of employees of color who were highly offended that their employer viewed Black people as subhuman.  The decision to publish the racist cartoon shows the animosity of Defendants towards Blacks, including Black employees of the corporate Defendants.

During the depositions of Col Allan and other editors of The Post, Defendants asserted an "editorial privilege" when questioned about decisions relating to the selection of the cartoon and other related matters.  Defendants then sought a protective order from Judge Ellis asking him to recognize the existence of this purported "editorial privilege."  Judge Ellis noted that "the party claiming privilege has the burden 'to establish those facts that are the essential elements of the privileged relationship.'" (Thompson Decl. Ex. N, p. 4).[1]  Judge Ellis then ruled that Defendants did not demonstrate any applicable privilege, and that if Ms. Guzman could show "racial motivation with regard to 'editorial' decisions it could potentially lead to admissible evidence on the issue of discrimination in the firing process." (Thompson Decl. Ex. N, pp. 4-6).

In objecting to Judge Ellis' ruling, Defendants appear to entirely drop their assertion of the existence of an "editorial privilege."  The phrase "editorial privilege" does not appear in Defendants' Objections.  Indeed, the word "privilege" appears on only five pages.  Instead of arguing for an "editorial privilege," Defendants now make a new, broader argument that "[t]he

---

[1]     All exhibits referred to herein are attached to the Declaration of Kenneth P. Thompson, which is cited to herein as "(Thompson Decl.)."

magistrate judge committed error by failing to give any consideration whatsoever to the important First Amendment interests implicated by Guzman's question." (Defendants' Objections, p. 24).[2]  Because Defendants are unable to establish the existence of any applicable privilege, they are forced to rely on a vague, general appeal to the First Amendment.

These general appeals to the First Amendment, which are being raised in this manner for the first time in their Objections, fail to address the real issue in this case: there is no privilege that permits Defendants to refuse to explain the reasons for their publication decisions that affect Ms. Guzman.  Although, the First Amendment permits Defendants to publish all the offensive racist cartoons they wish, there is no privilege protecting them from having to explain their reasons for doing so -- or for their other decisions at issue here.  Accordingly, this Court should affirm the ruling of Judge Ellis.

## STATEMENT OF FACTS

As an employee of The Post, Ms. Guzman was the victim of racial and sexual discrimination and harassment, and was eventually terminated in retaliation for, among other things, her complaints about the same. (Thompson Decl. Ex. A, ¶¶ 33-65, 90-110).  Ms. Guzman was also terminated for discriminatory reasons. (*Id.* at ¶¶ 104-11).

As part of the ongoing sexual harassment experienced by Ms. Guzman, Defendant Allan showed her an obscene photograph of a nude man (the "McGreevy photo").[3]  (Thompson Decl. Ex. A, ¶ 35; Thompson Decl. Ex. B, pp. 474-75).  Ms. Guzman testified that Defendant Allan, while smirking, showed her and other female employees of The Post a photograph on his

---

[2]      Defendants' Rule 72(a) Objections to Magistrate Judge Ellis' Order, Dated June 29, 2012 are cited to herein as "(Defendants' Objections)".

[3]      Ms. Guzman was also subjected to constant unwelcome comments about her appearance from Defendant News Corporation Vice President Les Goodstein, who also often leered at her body.  (Thompson Decl. Ex. B, pp. 385-418).

Blackberry and said: "[l]ook at this." (*Id.* at pp. 474:19-475:4).   This nude photograph was eventually published in The New York Post, <u>in a redacted form</u>, yet Defendant Allan showed Ms. Guzman the photograph unredacted.   Incidentally, this photo was not the only nude photograph Defendant Allan showed people on his Blackberry; witnesses have testified to two other incidents in which Defendant Allan showed employees photos of nude men on his Blackberry. (Thompson Decl. Ex. C, pp. 216:5-217:16; Thompson Decl. Ex. D, p. 358:15-25.)

Defendant Allan admitted showing the McGreevy photo to Ms. Guzman. (Thompson Decl. Ex. C, pp. 206-07).   However, when asked why the photograph was not published in its unredacted form, Defendant Allan invoked a baseless "editorial privilege" and refused to answer the question. (Thompson Decl. Ex. C, p. 214:2-14).

With respect to her allegations of racial discrimination, Ms. Guzman alleges a variety of ways in which employees of color, including herself, were subjected to disparate treatment and a hostile work environment. (Thompson Decl. Ex. A, ¶¶ 49-78).   Additionally, Ms. Guzman obtained affidavits from a number of former and current employees of The Post detailing this treatment.   For instance, Leonard Greene, a current African-American employee of The Post believes he has been unfairly denied a promotion to a regular columnist position because of his race. (Thompson Decl. Ex. E, ¶ 16).   Mr. Greene's affidavit also states that The Post regularly filled open columnist positions with less qualified White employees. (*Id.* at ¶ 21).   When asked to explain why Mr. Greene was not given the chance to be a full-time columnist, Defendant Allan testified as follows:

> Q:   Why hasn't Leonard Greene become a columnist at the New York Post?
>
> A:   Because I don't think that he would be a good columnist for the newspaper.

> Q:       Why not sir?
>
> MR. LIPPNER:   Objection.   This goes to your editorial [privilege].

(Thompson Decl. Ex. C, pp. 372:21-373:2).   While Defendant Allan did answer a number of questions about Mr. Greene, Defendants' invocation of this purported privilege prevented Mr. Guzman from fully developing this line of questioning.

Another example of the racist attitudes of Defendant Allan and other high ranking executives of the corporate Defendants was their decision to publish a blatantly racist cartoon in which President Barack Obama was portrayed as a dead chimpanzee. (Thompson Decl. Ex. F; Thompson Decl. Ex. E, ¶¶ 32-33).   More specifically, page 11 of the February 18, 2009 edition of The New York Post contained a photograph of President Obama sitting at a table, writing on a paper, signing a bill into law. (Thompson Decl. Ex. F, p. 1).   An article, which appeared just below the photograph, explicitly referred to the bill signed by Mr. Obama as "his $787 billion economic stimulus plan." (*Id.*) (emphasis added).   The article also stated that "the White House didn't rule out another stimulus package." (*Id.*).   An additional clue as to the racist intent behind the racist cartoon is that the caption in the photograph of Mr. Obama said: "SHOT IN THE ARM: President Obama signs the stimulus bill into law in Denver yesterday." (*Id.*). (Capital letters in original).   On page 12 of the same edition, directly behind the photograph of President Obama, was a cartoon of a chimpanzee shot dead by White police officers with the caption "They'll have to find someone else to write the next stimulus bill." (*Id.*).   Rupert Murdoch, Chairman and CEO of News Corp., issued a public apology for the racist cartoon insisting that "it was not meant to be racist."  (Thompson Decl. Ex. D, p. 96:2).

At Defendant Allan's deposition, Defendants repeatedly invoked the baseless "editorial privilege" and instructed Defendant Allan not to answer questions about decisions made by him.

For example, when Mr. Allan was asked about what he had told Rupert Murdoch about the decision to publish the cartoon, counsel for Defendants interrupted as follows:

> MR. LERNER:  Hold on.  Mr. Allan, with respect to your process of selecting the cartoon, evaluating it for publication, there is an editorial privilege which you have as a journalist which protects you from needing to disclose those subjects.  You can comment about things that occurred after the fact, but you should not testify about what your state of mind was or thinking was as a journalist relating to your decision to publish the cartoon[.]

(Thompson Decl. Ex. C, p. 41:3-14).  Throughout his deposition, Defendants invoked what they repeatedly termed an "editorial privilege." (Thompson Decl. Ex. C, pp. 45, 214, 347).  Although Defendant Allan is one of the central individuals in this case, Defendants also asserted an "editorial privilege" with respect to other editors such as Jesse Angelo, Executive Editor of The New York Post.  (Thompson Decl. Ex. D, pp. 40, 48).  In fact, at one point during Mr. Angelo's deposition, Defendants were given an opportunity to clarify if the privilege invoked was a journalistic privilege, and Defendants stated as follows:

> Q.      Do you agree that the cartoon was not meant to be racist?
>
> MR. LERNER:  Objection.
>
> Mr. Angelo, I'm going to direct you on the basis of editorial privilege not to testify to what was meant by the editors of the paper or anybody else that was involved in the publication of the cartoon in connection with this publication.
>
> MR. CLARK:  Well, two things I want to make clear.  Are you invoking an editorial privilege or a journalistic privilege?
>
> MR. LERNER:  Editorial.

(Thompson Decl. Ex. D, p. 96:11-25).

Jesse Angelo also invoked a "personal" privilege and refused to answer when asked if he agreed with Rupert Murdoch's public statement that the racist cartoon was not intended to be racist:

> MR. CLARK:  How can you invoke a privilege when you've taken a public position and you won't even let him say whether he agrees or disagrees with the public position taken by an employee?
>
> MR. LERNER:  Privilege is personal to Mr. Angelo.

(Thompson Decl. Ex. D, p. 99:10-11).

## PROCEDURAL HISTORY

Ms. Guzman filed her complaint against Defendants on November 9, 2009.  On December 20, 2009, Defendants filed a motion to dismiss in which they argued that, on First Amendment "constitutional grounds alone, the complaint must be dismissed" because "[t]o hold otherwise would effectively permit newspaper employees to censor or, at a minimum, chill, the exercise of free expression."  (Thompson Decl. Ex. G, p. 1).

On September 27, 2010, this Court issued an order denying Defendants' motion and rejected their First Amendment argument, ruling that:

> Mindful of the First Amendment protections enjoyed by newspaper organizations, the Court notes that Plaintiff has sufficiently alleged that she objected not just to the paper's content but to the general work environment at the Post and the way the editorial staff dealt with the publication of the content at issue.

(Thompson Decl. Ex. H, p. 2).  Thus, this Court explicitly ruled that "the way the editorial staff dealt with the publication of the content at issue" was relevant, and not prohibited by the First Amendment. (Thompson Decl. Ex. H, p. 2).

Despite this clear ruling, Defendants filed a Motion to Strike Certain Allegations the next month, again arguing that "[i]n order to vindicate critical First Amendment values the Court

6

should strike certain portions of the pleading." (Thompson Decl. Ex. I, p. 1.)   Specifically, Defendants asked the Court to strike "references to the Post's editorial content." (*Id.* at 3).

In an Order dated April 26, 2011, Judge Ellis ruled that "allegations involving the published content and editorial decisions may be relevant because they provide context for the complaints made by Guzman, and Defendants' reaction to those complaints may also be probative of Defendants' discriminatory animus towards Guzman." (Thompson Decl. Ex. J, p. 6).

On February 14, 2012, Defendant Allan was deposed.  After Defendant Allan invoked an "editorial privilege," Defendants moved for a protective order.  In Defendants' application for a protective order, Defendants were unequivocal that they sought to assert an "editorial privilege." Defendants asserted that "Mr. Allan properly invoked the editorial process privilege." (Thompson Decl. Ex. K, p. 2).  At times, Defendants referred to an "editorial process privilege." (*Id.* at 5 ("Mr. Allan asserted the editorial process privilege").  The "editorial privilege," or "editorial process privilege," was also mentioned and argued on pages 6, 9-10, 12-14, and 20-21 of Defendants' memorandum in support of their motion for a protective order.   In short, Defendants' entire argument before Judge Ellis was premised upon the existence of a purported "editorial privilege."

Defendants' reply memorandum again centered on the existence of an "editorial privilege" arguing that "**The Editorial Privilege Is Alive and Well.**" (Thompson Decl. Ex. L, p. 6) (emphasis in original).  The phrase "editorial privilege" was also found on pages 1-3, 5-9 and 17 of their reply memorandum.

On May 31, 2012, the parties appeared before Judge Ellis for a status conference.  Judge Ellis asked both parties if they had anything to add with respect to the purported "editorial

privilege."  Both parties acknowledged that the issue had been fully briefed, and counsel for Ms. Guzman pointed out to the Court that the specific questions asked during deposition were not the only questions Ms. Guzman wished to inquire about:

> I just wanted to make sure the record was clear that the way they shut us down, when we were unable to ask certain questions, there may have been -- in fact, there would have been more than just those 11 questions, because obviously we weren't going to keep asking questions that they had made clear they weren't going to answer.  So there are additional things we want to ask along the lines of where they are claiming a privilege.  So it's not just those 11 or so questions.[4]  I just want that to be clear.

(Thompson Decl. Ex. M p. 5).

In response, the Court stated:

> I will say that I believe that probably would be the case, that it would not be limited to the 11 questions that were specifically asked.  Given the history of this case, I think it would be a fair assumption that there would be more questions at issue, so I will take that into account in the ruling.

(Thompson Decl. Ex. M, p. 5).

On June 29, 2012, Judge Ellis, in a written ruling, denied Defendants' motion for a protective order because they did not demonstrate that any privilege was applicable. (Thompson Decl. Ex. N pp. 4-5).  In fact, even though Defendants did not invoke the journalist's privilege, Judge Ellis held that Defendants could not invoke that privilege in response to the questions presented to Defendant Allan during his deposition. (*Id.* at p. 4).  Finally, with respect to relevance, Judge Ellis ruled that the questions were relevant because "[i]f Guzman were to show that Allan showed racial motivation with regard to 'editorial' decisions it could potentially lead to admissible evidence on the issue of discrimination in the firing process." (*Id.* at p. 6).  Judge Ellis also went on to state that although the "answers to the challenged questions of Allan do not

---

[4]       Defendants had specifically objected to some eleven questions posed to Defendant Allan.

shed light on the question of racial motivation, Guzman was prevented from developing this area of inquiry . . ." (*Id.*).

## ARGUMENT

### JUDGE ELLIS CORRECTLY HELD THAT THERE IS NO "EDITORIAL PRIVILEGE" AND THE QUESTIONS POSED TO DEFENDANT ALLAN ARE RELEVANT TO ANIMUS AND MOTIVATION

**I.     Governing Law and Burden of Proof**

A District Court may overrule a magistrate judge's order on a non-dispositive motion "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

Federal Rule of Evidence 501 provides that privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The federal common law of privileges applies to all causes of action where there is a federal cause of action and pendant jurisdiction over state claims. *See Von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987). Although state privilege law does not apply here, federal courts look to state law as persuasive authority. *Id.* at 144 ("In examining the boundaries of the journalist's privilege, we may consider also the applicable state law . . . ").

**II.     Defendants' Objections Fail to Mention an "Editorial Privilege," Implicitly Acknowledging That No Such Privilege Exists**

When Defendants invoked a privilege during relevant depositions, they stated unequivocally that they were asserting an "editorial privilege." Similarly, in requesting a protective order from Judge Ellis, Defendants repeatedly asserted an "editorial privilege" or "editorial process privilege." However, in their Objections, Defendants appear to have

abandoned their assertion of an "editorial privilege" since the phrase does not appear anywhere in their Objections.

Insofar as Defendants make any privilege argument at all, it appears to be an unnamed and generic "qualified privilege" based on the First Amendment. For example, on page 11 of their Objections, Defendants assert "[w]here as here, a party seeks discovery of material that is protected by the First Amendment, courts have recognized a qualified privilege that imposes a burden on the party seeking discovery of First Amendment protected materials to make a showing of overriding need." (Defendants' Objections, p. 11). Needless to say, this assertion is remarkably vague and over-broad as phrased. Most racist comments are protected by the First Amendment. Burning crosses and openly displaying Nazi swastikas are protected by the First Amendment. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 380 (1992). Surely, such activity neither gives rise to a privilege, nor prevents a plaintiff from asking a defendant about such actions. However, Defendants' vague, generalized assertions, untethered to a specific privilege, suggests such an absurd result.[5]

Defendants' abandonment of their earlier claim to an "editorial privilege," and the apparent assertion of an unnamed, generic "qualified privilege," presumably reflects the fact that no legal precedent recognizes an "editorial privilege."

As a general principle, the Supreme Court has repeatedly cautioned against the creation of evidentiary privileges:

> Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances. . . . As we stated, in referring to existing limited privileges against disclosure, "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor

---

[5]     For a more detailed discussion of the relation of the First Amendment to anti-discrimination statutes, see Section IV, below.

> expansively construed, for they are in derogation of the search for
> truth."

*Herbert v. Lando*, 441 U.S. 153, 174-75 (1979) (quoting *U.S. v. Nixon*, 418 U.S. 683, 710

(1974)); *see also*, *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 187 (1990).

In *Herbert*, the Supreme Court rejected the existence of a so-called "editorial privilege"

where a party to the lawsuit attempted to invoke it.  In that case, Col. Anthony Herbert brought a

defamation action against Barry Lando, the Producer of "60 Minutes."  Although the Second

Circuit found that an editorial privilege existed, the Supreme Court reversed, and explained that

neither Supreme Court precedent nor case law from any state supported the existence of such a

privilege.   Indeed, the Court noted that:

> Courts have traditionally admitted any direct or indirect evidence
> relevant to the state of mind of the defendant and necessary to
> defeat a conditional privilege or enhance damages.  The rules are
> applicable to the press and to other defendants alike, and it is
> evident that the courts across the country have long been accepting
> evidence going to the editorial processes of the media without
> encountering constitutional objections.

*Herbert*, 441 U.S. at 165.   In a criticism which applies equally to the instant case, the Court

explained that one of the problems with the proposed privilege is that the limits of any such

privilege would be impossible to discern.  For example, the Court stated that:

> the outer boundaries of the editorial privilege now urged are
> difficult to perceive.   The opinions below did not state, and
> respondents do not explain, precisely when the editorial process
> begins and when it ends.  . . .  <u>It is worth noting here that the
> privilege as asserted by respondents would also immunize from
> inquiry the internal communications occurring during the editorial
> process and thus place beyond reach what the defendant
> participants learned or knew as the result of such collegiate
> conversations or exchanges</u>.

*Id.* at 170-71 (emphasis added).

11

Thus, the Court rejected the notion that any privilege would protect editors from revealing damaging admissions. Moreover, in this case, Defendants' vague assertion of a generic privilege only illustrates the same concern the Supreme Court expressed. Just as in *Herbert*, Defendants do not even attempt to explain "when the editorial process begins and when it ends." It should also be noted that the scope of the privilege claimed goes well beyond anything considered in *Herbert*. In *Herbert*, the privilege would have applied to internal communications, whereas in this case, Defendants' counsel instructed Defendant Allan that "you should not testify about what your state of mind was or thinking was as a journalist relating to your decision to publish the cartoon." (Thompson Decl. Ex. C, p. 41:3-14).

In an important paragraph, the Court in *Herbert* went on to note:

> This is not to say that the editorial discussions or exchanges have no constitutional protection from casual inquiry. There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed. No such problem exists here, however, where there is a specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false.

*Id.* at 174. (Emphasis added).

While the Court acknowledged that "casual inquiry" should not be permitted, where there is a specific injury alleged, which Ms. Guzman has done in this case, it is a different issue. The above quote also makes clear that any protections against an inquiry into editorial processes come from the general power of the court to prevent harassing litigation, and not from a privilege. This point was emphasized by Justice Powell in a concurring opinion in *Herbert*, explaining that "the District Court must ensure that the values protected by the First Amendment,

though entitled to no constitutional privilege in a case of this kind, are weighed carefully in striking a proper balance." *Id.* at 180. (Emphasis added).[6]

While *Herbert* considered the alleged privilege in the context of a defamation case, the reasoning of the *Herbert* Court applies equally to discrimination cases.   In a public-figure defamation case, the plaintiff must show malice, and examining the decision to publish can reveal evidence that the publisher knew the publication was false.   Just as the decision to publish a false story goes to the state of mind of a defendant in a defamation action, the decision to publish a racist cartoon and ignore employee complaints about it tends to show the state of mind of a defendant in a discrimination case.

Defendants' minimal attempt to distinguish *Herbert* is fruitless.   In their Objections, Defendants devote a single sentence in a footnote to the majority opinion of *Herbert*, asserting that "libel cases universally are distinguishable on their facts: in such cases, the plaintiff seeks to inquire into the state of mind of the journalist to determine whether he had published." (Defendants' Objections, p. 17 n.4).   This comment does not attempt to discuss the privilege issue, but the idea of a privilege that applies in one type of civil case but not in another is a creature unknown to the law.   In short, *Herbert* simply refused to create an "editorial privilege."

---

[6]   This point has also been repeatedly noted by lower courts.   In *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996), the court explained:

> This power [to limit discovery], moreover, may be employed where the burden is not measured in the time or expense required to respond to requested discovery, but lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material. *See Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979) (rejecting editorial process privilege, but suggesting that district court nevertheless limit discovery as appropriate). (Emphasis added).

*See also Legg v. Conklin*, No. 04 Civ. 6549T (MWP), 2008 WL 2704348 at *1 (W.D.N.Y. July 2, 2008) (quoting the above); *Bondi v. Grant Thornton Intern.*, No. 04 Civ. 9771(LAK)(HB), 2006 WL 2088193 at *1 (S.D.N.Y. July 27, 2006).

Furthermore, several years after *Herbert*, in *Calder v. Jones*, 465 U.S. 783 (1984), the Court reiterated that there was no First Amendment privilege shielding a litigant from inquiry into editorial processes:

> We have already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws. *See, e.g., Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (no First Amendment privilege bars inquiry into editorial process).

*Id.* at 790-91 (emphasis added).  This illustrates the Supreme Court's own understanding that no First Amendment privilege precludes an inquiry into the editorial process.

Finally, as courts frequently look to the law of privilege in the state courts as persuasive authority, it is worth noting that New York courts have rejected the existence of an "editorial privilege."   In *Greenleigh Associates, Inc. v. New York Post Corp*., 79 A.D.2d 588, 588-89 (1st Dep't 1980), the Appellate Division enforced a "journalist privilege," but denied any "editorial privilege" stating that "we would restrict the deposition at this juncture solely to editorial process, which may be pursued, provided it does not intrude into the area of sources." (Emphasis added.)  In applying this decision, one New York court concluded that:

> Since the Court of Appeals has not fashioned an editorial process privilege and the *Korkala* [99 A. D. 2d 161, (N.Y. App. Div. 1st Dep't 1984)] court itself had previously permitted discovery of "editorial process" without comment (*Greenleigh Associates, Inc. v. New York Post Corp*., 79 A.D.2d 588, 434 N.Y.S.2d 388 [1980]), it appears that no such privilege exists in this jurisdiction.

*First United Fund Ltd. v. American Banker, Inc*., 485 N.Y.S.2d 489, 495 (Sup. Ct. Nassau Cnty., 1985) (emphasis added).

Remarkably, Defendants assert that "New York's Constitution provides even broader protection than the First Amendment." (Defendants' Objections, p. 20).  However, they fail to

14

address the above precedents.  Insofar as New York law may be used as persuasive authority, that law clearly supports Ms. Guzman's position.  In short, the "editorial privilege" has been rejected by the U.S. Supreme Court, and the First Department.

### III.   None of the Cases Cited by Defendants Recognize an "Editorial Privilege" and the Cases Do Not Support the Creation of a Generic Privilege

The cases cited by Defendants do not support the creation of a privilege to shield their witnesses from answering the questions at issue.  For example, the cases they cite from the Court of Appeals refer to the journalistic privilege which Defendants admit they were not relying upon. (Thompson Decl. Ex. D, p. 96:21-25).  In any event, Defendants appear to argue by analogy that editorial processes should be treated like newsgathering from confidential sources.  Defendants simply assert, "[t]here is no doubt that the First Amendment protects 'editorial process,' as well as the 'newsgathering process,' and the level of protection, we submit, should correspond to that for confidential sources." (Defendants' Objections, p. 18).  This passage is important for two reasons.  First, it appears to concede that the journalistic privilege does not apply here.  Indeed, the Second Circuit has addressed the scope of the journalistic privilege in numerous cases, and as it explained most recently, "[t]he [journalistic] privilege is designed to support the press in its valuable public service of seeking out and revealing truthful information." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011).

Second, Defendants' comparison with newsgathering is inapt.  The reason for the journalistic privilege is that newsgathering would be difficult "if potential sources were deterred from speaking to the press . . . because of the likelihood that they would be sucked into litigation." *Id.* at 307 (quoting *Gonzalez v. National Broadcasting Company, Inc.*, 194 F.3d 29, 35 (2d Cir. 1999).  But the purported privilege suggested by Defendants encompasses an editor's own personal "editorial . . . judgments." (Defendants' Objections, p. 18).  Allowing editors to

testify about their judgments can not be expected to stop them from having judgments, so the two circumstances are not even remotely analogous.

The primary case cited by Defendants in support of their position for a First Amendment privilege is *Rosario v. New York Times Co*., 84 F.R.D. 626, 631 (S.D.N.Y. 1979).  However, the *Rosario* opinion itself never states that any such privilege exists.  As Judge Ellis correctly explained, "[w]hile it is true that one of Defendants' bases for the objection was the invocation of the purported editorial privilege, it does not follow that the Court's decision to grant the application was based on a recognition of privilege.  Instead the Court focused on the relevance of the areas of inquiry." (Thompson Dec. Ex. N, p. 5).  *Rosario* cited no precedent (only a concurring opinion in *Herbert*), so it is unclear what rule of law the court was applying.  The concurring opinion cited in *Rosario* stated: "I agree with the Court that the explicit constitutional protection of First Amendment rights in a case of this kind, as articulated by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), <u>should not be expanded to create an evidentiary privilege</u>." *Herbert*, 441 U.S. at 178 (Powell, J. concurring) (emphasis added).  The fact that the court cited the concurring opinion of Justice Powell suggests that the holding in *Rosario* was based on relevance grounds, and not on a constitutional privilege.  It is hardly plausible to read *Rosario* as creating a new privilege out of thin air without citing any authority or explaining the contours of the potential privilege.

Finally, most of the cases cited by Defendants in which a protective order was granted for a journalist were in cases in which the journalist was not a party to the suit.  The distinction between party and non-party journalists is important.  As the District Court explained in *Solarex Corp. v. Arco Solar, Inc.*:

> The Supreme Court's 1976 decision in *Herbert v. Lando* rejected a
> first amendment "editorial privilege" in a case where a defamation

16

> plaintiff was seeking disclosure from a defendant publisher bearing on the issue of malice.  In the decade since *Herbert*, however, courts have distinguished that context from circumstances in which litigants have sought from <u>non</u>-party journals or journalists discovery which intrudes upon the editorial process.

121 F.R.D. 163, 172 (E.D.N.Y. 1988) (emphasis original).

Similarly, in *Westmoreland v. CBS, Inc.*, 97 F.R.D. 703 (S.D.N.Y. 1983), when CBS attempted to invoke an editorial privilege, the court denied the application and based its decision on the distinction between party and non-party journalists:

> CBS' additional claims of privilege invoke the importance of protecting a free press from intrusion and inquisition into the editorial process.  Without doubt this is a substantial and important interest, not lightly to be overridden in litigation. *See Herbert v. Lando*, supra, 441 U.S. at 178, 99 S.Ct. at 1650 (Powell, J., concurring). . . .  In other litigations, I have declined to permit intrusion by discovery into the editorial or information gathering process of <u>non-party journalists, where the countervailing interests were insufficient</u>.
>
> The question in this case has, however, already been substantially answered by the Supreme Court in *Herbert v. Lando*, which went much further.

*Id.* at 706-07 (emphasis added) (citing *Application of Consumers Union of U.S., Inc. v. American Medical Association* 495 F.Supp. 582, 586 (S.D.N.Y. 1980)) (additional citations omitted).

In *Consumers Union*, the district court stated that: "The Supreme Court instructs in *Branzburg v. Hayes*, 408 U.S. 665, 710, 92 S.Ct. 2646, 2671, 33 L.Ed.2d 626 (1972), that resolution of the balance of interests implicated by subpoenas of <u>non-party</u> journalists should be approached on a case-by-case basis, with careful attention to the facts of each case." (Emphasis added).  The court went on to explain that "it seems clear at least that First Amendment interests could be implicated in each instance by subpoenas directed to <u>nonparty</u> journalists." *Id.* at 586, n. 1 (emphasis added).

17

Amazingly, *Consumers Union* is the very first case cited by Defendants in their argument section, and they argue that a four factor test should be used when "First Amendment issues [are] at stake . . . as a general matter." (Defendants' Objections, p. 11).  However, Defendants fail to mention that *Consumers Union* was a case involving a subpoena to a non-party, and hence, plainly inapplicable to the instant case.[7]  Defendants, however, fail to acknowledge this distinction between party and non-party journalists.  The word "non-party" does not appear anywhere in Defendants' Objections.  Because the instant case involves a <u>party</u> seeking to invoke a privilege, it is akin to *Solarex* and *Westmorland*, and easily distinguishable from the cases cited by Defendants.

Defendants' approach to *Consumers Union* is typical of their overall approach which essentially cobbles together various First Amendment cases with little or no analysis of how those cases apply in a discrimination context.  Thus, on pages 15-17 of their Objections, Defendants assert that "in a series of cases this Court has rejected efforts to compel reporters and editors to testify concerning their editorial decisions and communications, in the absence of a showing of overriding need." (Defendants' Objections, p. 15).  Again, the cases cited are plainly inapplicable.

Defendants also cite *United States v. Marcos*, No. 87-cr-598, 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990), *U.S. ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*, 600 F. Supp. 667, 670 (S.D.N.Y. 1985), and *Pugh v. Avis Rent a Car*, No. M8-85, 1997 WL 669876, at *1 (S.D.N.Y. Oct 28, 1997), all of which involved a <u>non-party</u> motion to quash a subpoena. Defendants cite *Kenneally v. Suzuki Motor Co., Ltd.*, No. M-8-85, 1994 WL 48840, at *1

---

[7]     It should also be noted that the word "privilege" does not appear in *Consumers Union*. Accordingly, Defendants' comment in this same paragraph on page 11 of their Objections that "courts have recognized a qualified privilege . . ." is not supported by *Consumers Union*.

(S.D.N.Y.) (S.D.N.Y. Feb 10, 1994), which involved a "motion of defendants ('Suzuki') to compel production of certain documents held by <u>non-party</u>." (Emphasis added.)  These cases are plainly inapplicable as they involved motions to quash by third-party journalists.

The cases cited from other circuits also fail to support Defendants' position.  Two of the cases cited (*U.S. v. Cuthebertson*, 630 F. 2d 139 (3d Cir. 1980) and *Maughan v. NL Industries*, 524 F. Supp. 93 (D.D.C. 1981)) again involve <u>non-party</u> journalists.  The other case Defendants cite is *Securities and Exchange Commission v. McGoff*, 647 F.2d 185 (D.C. Cir. 1981), which held that news organizations "enjoy no special privilege as 'press entities' to withhold information others must furnish to the investing public." *Id.* at 190.   The court there went on to explain:

> The Supreme Court has consistently rejected claims that the press is shielded by the Constitution against laws of general applicability of the kind involved here. . . . *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 244 (1972) (reporters asked relevant questions in a grand jury probe are not privileged to conceal their sources and information conveyed to them under promise of confidentiality); *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (no special exemption for the media from the general rules of pretrial discovery).

*Id.* (additional citations omitted).

Whether cited to support a purported privilege or otherwise, the cases cited by Defendants do not support their novel assertion that a party to a lawsuit may refuse to disclose relevant information based on the First Amendment.   Other than *Rosario*, none of these cases even mentions an "editorial privilege."   Although some of the cases discuss a journalistic privilege, Defendants did not invoke that privilege, and under Second Circuit precedent the journalistic privilege is not applicable.

**IV.    The First Amendment Does Not Shield the Press from Laws of General Applicability, Such as Anti-discrimination Laws**

Defendants' position is essentially that because there is a First Amendment right to publish racist cartoons, decisions about what to publish cannot be examined without meeting a heightened test.  This argument was already rejected by this Court in its September 27, 2010 Order which explained that the First Amendment does not insulate Defendants from allegations of racial and sexual harassment in the workplace. (Thompson Decl. Ex. H).

More substantively, the fact that there is a First Amendment right to publish has absolutely no bearing on the question of whether Defendants must answer questions about these decisions.  Defendants' position, in fact, is internally inconsistent.  One of the questions to which a privilege is asserted involves the publication of an obscene photograph (or more specifically the decision to publish the photograph in a redacted, non-obscene form).  There is no First Amendment right to publish obscenity. *See Miller v. California*, 413 U.S. 15 (1973).  Whether Defendants had a right to publish obscenity is really irrelevant to the issues raised in this case, which is simply whether Defendants can claim a privilege as a basis to refuse to answer questions about publication decisions affecting their employees.

To use an extreme example to illustrate the point, there is a First Amendment right to display a swastika.  *R.A.V.*, 505 U.S. at 380.  But displaying a swastika in the workplace would contribute to a hostile work environment, and could be used as evidence of same.  *See E.E.O.C. v. Pipefitters Association Local Union 597*, 334 F.3d 656, 658 (7th Cir. 2003).  Defendants' overly simplistic argument is that because publishing a newspaper is protected by the First Amendment, editorial decisions displaying racial hostility towards employees may not be used as evidence in a discrimination lawsuit.  That is simply wrong.

Moreover, the Second Circuit has held that the First Amendment does not shield a defendant in the context of an employment discrimination lawsuit.  In *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*,  968 F.2d 286, 295 (2d Cir. 1992), the Second Circuit rejected the defendants' argument "that the state and federal anti-discrimination statutes are unconstitutional as applied to them because they impermissibly regulate defendants' 'speech.'"  The Second Circuit held that laws prohibiting workplace discrimination "easily" passed constitutional muster:

> A law or regulation directed at conduct that places an incidental burden on speech will be upheld "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  [*U.S. v. O'Brien.* 391 U.S. 367,] 377, 88 S.Ct. at 1679.

> We observe initially that the statutes at issue in this case that bar "direct" discrimination on the basis of, among other things, race or religion, see 42 U.S.C. § 1985(3); New York Civ. Rights Law § 40; New York Executive Law § 296(2)(a), easily satisfy these criteria.

*Id.* at 295.

Other federal appellate courts have reached the same conclusion. *See Saxe v. State College Area School District*, 240 F.3d 200, 208 (3d Cir. 2001) ("[W]e see no constitutional problem with using an employer's offensive speech as evidence of motive or intent in a case involving an allegedly discriminatory employment action."); *Thomasson v. Perry*, 80 F.3d 915, 931 (4th Cir. 1996) ("Discriminatory words often provide the basis for challenges to discriminatory acts under Title VII, yet employers enjoy no First Amendment right to keep those words out of court.") (internal citation omitted).

Finally, Your Honor addressed this precise issue in *Doe v. City of New York*, 583 F. Supp. 2d 444, 448-49 (S.D.N.Y. 2008), ruling:

> Tefft contends that his emails were protected speech under the First Amendment.  Specifically, he argues that the emails were a form of political speech and that he cannot be held liable for their content under Section 1981 or its state analogs.  However, any restraints on speech stemming from these anti-discrimination provisions are merely incidental to the statutes' objective of remedying racial discrimination.  As the Supreme Court has noted, "[w]here the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. St. Paul Minnesota*, 505 U.S. 377, 389, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). . . . Accordingly, the First Amendment does not preclude Plaintiff's discrimination claims.

Thus, Defendants' argument that discriminatory and harassing speech is not admissible because that speech is protected in other contexts has been repeatedly rejected, and has no merit.  An individual has a First Amendment right to use racially offensive epithets, but they are still proper evidence of a defendant's racial animus.

**V.    The Issues for Which Defendants Invoke an "Editorial Privilege" Are Relevant to Ms. Guzman's Claims, and Defendants Mischaracterize Judge Ellis' Ruling**

Defendants' Objections repeatedly take Judge Ellis' comment out of context that the "answers to the challenged questions of Allan do not shed light on the question of racial motivation . . ." (Thompson Decl. Ex. N, p. 6).  This comment, which Defendants read in isolation, must be read in context of the entire decision, as well in light of Judge Ellis' comments during the May 31, 2012 court conference in which the Court explained:

> I will say that I believe . . . that it would not be limited to the 11 questions that were specifically asked.  Given the history of this case, I think it would be a fair assumption that there would be more questions at issue, so I will take that into account in the ruling.

(Thompson Decl. Ex. M, p. 5).

The court's written Order then went on to explain:

> If Guzman were to show that Allan showed racial motivation with regard to "editorial" decisions it could potentially lead to admissible evidence on the issue of discrimination in the firing process.

> \*       \*       \*

> Although the Court finds that the answers to the challenged questions of Allan do not shed light on the question of racial motivation, Guzman was prevented from developing this area of inquiry, and Allan is ordered to submit to deposition that is limited to two hours.

(Thompson Dec. Ex. N, p. 6).  Clearly, Judge Ellis was saying that the topics addressed were relevant, even though the specific questions asked were nothing more than preliminary questions, because the whole line of questioning was curtailed by Defendant Allan's refusal to answer.

Moreover, all of the lines of questioning to which Defendants asserted a privilege are relevant to Ms. Guzman's claims.  Defendant Allan admits that he showed Ms. Guzman a lewd photograph.  (Thompson Decl. Ex. C, p. 203:13-14).  However, Defendant Allan simply refused to acknowledge that the photograph was obviously unsuitable for publication.  With respect to the treatment of Leonard Greene, Defendants apparently do not challenge the relevance of this issue and appear to have withdrawn their objection, but Ms. Guzman was prevented from fully exploring this topic as well.

With respect to the racist cartoon, Your Honor's September 27, 2010 Order held that "the way the editorial staff dealt with the publication of the content at issue" was relevant. (Thompson Decl. Ex. H, p. 2).  Thus, this Court has essentially ruled on the issue.  Putting that aside, the publication of the racist cartoon is clearly relevant to Defendants' attitude towards minorities.  Because the editors who have been deposed have refused to answer questions about the process by which the racist cartoon was approved, we can only speculate on what those

23

answers might be.  However, while Defendant Allan denied knowing about the history of Blacks being depicted as subhuman, Jesse Angelo, who was Executive Editor of The New York Post at the time the chimpanzee cartoon was published, admitted to knowing about this shameful history and admitted to seeing the cartoon prior to publication. (Thompson Decl. Ex. D, p. 141). However, Mr. Angelo and Defendant Allan refuse to answer questions about any conversations they may have had about the publication of the cartoon.

## **CONCLUSION**

Defendants bear the burden of establishing that Judge Ellis' ruling was clearly erroneous. Defendants also bear the burden of establishing the existence and application of a privilege entitling them to refuse to answer questions about their decisions.  They have failed to do so. Accordingly, for all of the reasons set forth above, Plaintiff Sandra Guzman respectfully requests that the Defendants' Objections to Judge Ellis' ruling be overruled.

Dated: New York, New York
   July 27, 2012

        Respectfully submitted,

        THOMPSON WIGDOR LLP

By: _____
        Kenneth P. Thompson
        Shaffin A. Datoo
        Paul A. Clark

        85 Fifth Avenue
        New York, NY 10003
        Telephone: (212) 257-6800
        Facsimile: (212) 257-6845

        COUNSEL FOR PLAINTIFF