# Exhibit B

CONTAINS CONFIDENTIAL PORTIONS

Page 379

1                       Guzman
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------x
     SANDRA GUZMAN,
4
                  Plaintiff,
5
         vs.              90 Civ. 9323(BSJ)(RLE)
6
     NEWS CORPORATION, NYP
7    HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and
8    COL ALLAN, in his official
     and individual capacities,
9
                  Defendants.
10   -------------------------------x
11
12                SANDRA GUZMAN
13              New York, New York
14          Monday, February 13, 2012
15    CONTAINS CONFIDENTIAL PORTIONS
16
17
18
19
20
21
22
23
24   Reported by:  Steven Neil Cohen, RPR
25   Job No. 46187

CONTAINS CONFIDENTIAL PORTIONS

Page 380

1  Guzman
2  February 13, 2012
3  10:16 a.m.
4
5  Continued Videotaped Deposition of
6  SANDRA GUZMAN, taken by Defendants, pursuant
7  to notice, at the offices of Kasowitz,
8  Benson, Friedman & Torres LLP, 1633
9  Broadway, New York, New York, before Steven
10 Neil Cohen, a Registered Professional
11 Reporter and Notary Public of the State of
12 New York.

Page 381

1  Guzman
2  APPEARANCES
3
4  THOMPSON WIGDOR
5  85 Fifth Avenue
6  New York, New York 10003
7      Attorneys for Plaintiff
8  BY:  KENNETH THOMPSON, ESQ.
9       SHAFFIN DATOO, ESQ.
10      PAUL CLARK, ESQ.
11
12 KASOWITZ BENSON TORRES & FRIEDMAN
13 1633 Broadway
14 New York, New York 10019
15     Attorneys for Defendants
16 BY:  MARK LERNER, ESQ.
17      GARRETT KENNEDY, ESQ.
18      BLYTHE LOVINGER, ESQ.
19
20
21 ALSO PRESENT: Jordan Lippner, Esq.
22     Carlos Lopez, Videographer

Page 382

1  Guzman
2
3      IT IS HEREBY STIPULATED AND
4  AGREED, by and between counsel for the
5  respective parties hereto, that the sealing
6  and filing of the within deposition be
7  waived; that such deposition may be signed
8  and sworn to before any officer authorized
9  to administer an oath; that all objections,
10 except as to form are reserved to the time
11 of trial.

Page 383

1  Guzman
2      THE VIDEOGRAPHER: This is the
3  start of videotape number 1 of the
4  videotaped deposition of Sandra Guzman
5  in the matter Sandra Guzman versus News
6  Corp.
7      This deposition is being held at
8  1633 Broadway, New York, New York on
9  February 13, 2012 at approximately
10 10:16 a.m.
11     My name is Carlos Lopez from TSG
12 Reporting, Inc. and I am the legal video
13 specialist.
14     The court reporter is Steve Cohen
15 in association with TSG Reporting.
16     Will counsel please introduce
17 yourself for the record?
18     MR. THOMPSON: Kenneth Thompson,
19 Paul Clark, Shaffin Datoo; Thompson
20 Wigdor for the plaintiff, Sandra Guzman.
21     MR. LERNER: For the defendants
22 Mark Lerner, Blythe Lovinger, Garrett
23 Kennedy of Kasowitz Benson Torres &
24 Friedman and Jordan Lippner, in-house
25 counsel for the defendants.

CONTAINS CONFIDENTIAL PORTIONS

Page 384

1    Guzman
2         THE VIDEOGRAPHER: Will the court
3    reporter please swear in the witness?
4    SANDRA GUZMAN, called as a witness by the
5    Defendants, having been duly sworn,
6    testified as follows:
7         MR. THOMPSON: Let the record
8    reflect that this deposition was
9    scheduled to begin at 10:00 a.m.
10        We did not start at 10:00 a.m.
11   despite the fact that Ms. Guzman was
12   sitting and ready to begin because of
13   opposing counsel. This deposition is
14   starting almost 20 minutes after the
15   start date.
16        MR. LERNER: The record will also
17   reflect if you look it up that the FDR
18   Drive has been closed for two to three
19   hours this morning due to a tractor
20   trailer getting on the southbound FDR
21   and getting stuck and created
22   significant traffic problems in the
23   city. I come from the north to get to
24   the deposition. To get to the office so
25   I was delayed some minutes by that. And

Page 385

1    Guzman
2    that is the reason so I apologize,
3    Mr. Thompson, but that is the reason for
4    the delay.
5    EXAMINATION
6    BY MR. LERNER:
7       Q.   Ms. Guzman, you testified in
8    October that Les Goodstein told you you
9    looked sexy and beautiful in the office,
10   right?
11       Do you remember that?
12       A.   Yes.
13       Q.   Where did he tell you you looked
14   sexy and beautiful?
15       A.   When I saw him in the elevator.
16       When I saw him in the News Corp.
17   cafeteria on the third floor.
18       And when I met with him in his
19   office on the fifth floor.
20       And any chance and any moment that
21   I bump into him randomly in the building, he
22   would comment.
23       Q.   All right.
24       When was the first time he told
25   you that you looked sexy and beautiful?

Page 386

1    Guzman
2       A.   It was probably the second
3    meeting. He commented --
4       Q.   Was that in his office?
5       A.   He commented on my dress and on my
6    shoes and how beautiful I looked in them.
7       Q.   And what kind of dress, what was
8    the dress you were wearing?
9       A.   Simple black dress.
10      Q.   What were your shoes?
11      A.   Black shoes.
12      Q.   And what was the location of that
13   conversation?
14      A.   Elevator on the third floor.
15      Q.   And was that a chance meeting in
16   the elevator or were the two of you going
17   somewhere together?
18          MR. THOMPSON: Objection.
19          THE WITNESS: We were going to a
20   meeting.
21   BY MR. LERNER:
22      Q.   What meeting?
23      A.   A meeting that he called to
24   discuss one of the sections that I worked
25   on.

Page 387

1    Guzman
2       Q.   And where were you going for that
3    meeting?
4       A.   Third floor conference room.
5       Q.   Was Sami Marerro also in
6    attendance at that meeting?
7       A.   Yes.
8       Q.   What about Tony Martinez?
9       A.   I don't remember if Tony was
10   there.
11      Q.   And he told you that -- did he say
12   that your dress looked -- what exactly was
13   the word or words he used to describe your
14   black dress on that occasion?
15      A.   You are looking beautiful and sexy
16   today.
17      Q.   And was Ms. Marerro with the two
18   of you in the elevator when he said that?
19      A.   No.
20      Q.   The two of you proceeded from the
21   elevator to the third floor conference room
22   and joined Ms. Marerro?
23      A.   Yes. We joined about 20 people
24   from the sales staff.
25      Q.   And where did you get on the

CONTAINS CONFIDENTIAL PORTIONS

Page 388

```
 1              Guzman
 2   elevator?
 3      A.   The ninth floor.
 4      Q.   Do you know why -- withdrawn.
 5           Mr. Goodstein's office was not on
 6   the ninth floor of the building, right?
 7      A.   No.
 8      Q.   So do you know why it is that
 9   Mr. Goodstein and you got on the elevator at
10   the ninth floor? If you understand the
11   question why was Mr. Goodstein getting on
12   the elevator with you on the ninth floor?
13           MR. THOMPSON: Objection.
14           THE WITNESS: I didn't say that he
15      got on the elevator on the ninth floor.
16   BY MR. LERNER:
17      Q.   Okay. So how did you -- were you
18   already on the elevator when he got on?
19      A.   I told you this happened on the
20   third floor elevator so I was going down.
21      Q.   To the third floor?
22      A.   And I was -- right. On the third
23   floor by the elevators.
24      Q.   So it wasn't in the elevator now
25   you are saying it was by the elevator?
```

Page 389

```
 1              Guzman
 2           MR. THOMPSON: Objection.
 3           THE WITNESS: I am saying it was
 4      by the elevators, yes, on the third
 5      floor.
 6   BY MR. LERNER:
 7      Q.   Okay. Because earlier you
 8   testified that it was in the elevator.
 9      A.   It was outside the elevators on
10   the third floor.
11      Q.   So five minutes ago when you said
12   it was in the elevator you were wrong?
13      A.   I am clarifying exactly where this
14   man Les Goodstein approached me and sexually
15   harassed me.
16      Q.   Well, I appreciate the
17   clarification.
18      A.   Thank you.
19      Q.   But it doesn't appear to be a
20   clarification. It appears to be a change.
21           MR. THOMPSON: Objection. Is that
22      a question?
23   BY MR. LERNER:
24      Q.   Is that correct?
25           MR. THOMPSON: Objection.
```

Page 390

```
 1              Guzman
 2           THE WITNESS: You asked me a
 3      question and I am answering it. I am
 4      clarifying the exact place where this
 5      exchange took place. The third floor by
 6      the elevator banks.
 7   BY MR. LERNER:
 8      Q.   You testified before the last time
 9   we were together that -- you understand it
10   is important to be precise and clear with
11   your words, right?
12      A.   I understand.
13      Q.   And was anybody else present
14   within earshot when Mr. Goodstein told you
15   that your dress looked sexy and beautiful?
16      A.   Not that I can recall.
17      Q.   Did the two of you then walk
18   together to the third floor conference room?
19      A.   Yes.
20      Q.   And is there anything else he said
21   on that occasion about you or your
22   appearance that you can recall?
23      A.   No.
24      Q.   And is there anything else about
25   his -- did he -- is there anything else that
```

Page 391

```
 1              Guzman
 2   he did on that occasion that caused you to
 3   feel -- that you believe was inappropriate?
 4      A.   Yes.
 5      Q.   On that particular occasion?
 6      A.   Yes. Every time I saw
 7   Mr. Goodstein.
 8      Q.   No. Ms. Guzman, I am asking
 9   specifically about the occasion when you
10   were outside the elevators on the third
11   floor on your second meeting walking to the
12   conference room, do you have a recollection
13   of anything Mr. Goodstein did on that
14   occasion?
15           MR. THOMPSON: Mr. Lerner, don't
16      raise your voice to the witness.
17           THE WITNESS: Is there a reason
18      why you are raising my voice. I am --
19   BY MR. LERNER:
20      Q.   I just want to be clear in your
21   testimony.
22           MR. THOMPSON: I want the record
23      to be clear that Mark Lerner is raising
24      his voice at Ms. Guzman. She is not a
25      child. She is a grown woman. You have
```

CONTAINS CONFIDENTIAL PORTIONS

Page 392

1  Guzman
2  to give her respect. If you are not
3  going to give her respect we are going
4  to stop this deposition. You will not
5  raise your voice to this witness.
6      MR. LERNER: We will stop the
7  deposition if you interfere with it. We
8  have a video recorder here so the record
9  does not require you to characterize
10 what is going on in the room. My --
11     MR. THOMPSON: I will state my
12 position.
13     MR. LERNER: Excuse me, I am not
14 done.
15     MR. THOMPSON: Any time you raise
16 your voice to my client --
17     MR. LERNER: I am not finished.
18     MR. THOMPSON: That is a fact.
19     MR. LERNER: I am not finished.
20     MR. THOMPSON: Don't do that. It
21 is --
22     MR. LERNER: I will conduct the
23 deposition in the tone of voice --
24     MR. THOMPSON: Properly.
25     MR. LERNER: I will conduct the

Page 393

1  Guzman
2  deposition.
3      MR. THOMPSON: Not improperly.
4  BY MR. LERNER:
5      Q. Ms. Guzman, is there anything else
6  that you recall specifically on the occasion
7  of your second meeting with Mr. Goodstein
8  when you were walking from the elevators on
9  the third floor to a conference room that he
10 did besides telling you your dress or you
11 looked sexy and beautiful?
12     A. He looked at me in a very
13 lascivious way and he looked at me, checked
14 me out up and down.
15     Q. And how long did that take?
16     MR. THOMPSON: Objection.
17     THE WITNESS: It felt like an
18 eternity.
19     I am not going to work to be
20 looked at lasciviously by somebody who
21 is supervising sales of the section I
22 worked for.
23 BY MR. LERNER:
24     Q. Did you say anything to him about
25 it?

Page 394

1  Guzman
2      A. No.
3      Q. What was your response?
4      A. Disgusted.
5      Q. No. What was your verbal or
6  physical response if any?
7      A. I just ignored him and I walked to
8  the conference room.
9      Q. What was lascivious about his
10 look?
11     A. The way that he looked at me up
12 and down as if he is checking someone who is
13 naked, a woman is naked.
14     Q. And what does that look like?
15     A. As a woman?
16     Q. No. What did it look like to you?
17     A. As a woman -- I am going to
18 describe it, sir. As a woman you know it
19 when you see it.
20     Q. Well, explain for the jury which
21 will be composed of potentially men and
22 women how that appears or what it actually
23 consists of?
24     A. So he is slowly taking a look from
25 head to toe at my body as if he is observing

Page 395

1  Guzman
2  someone who is naked. A woman is naked.
3      Q. But his comment to you was on your
4  dress, right?
5      A. I was wearing the dress. It is
6  how the dress looked on me.
7      Q. And he commented on the dress,
8  right?
9      A. On how the dress looked on me.
10     Q. Did he make a comment about your
11 body?
12     A. You look beautiful and sexy in
13 that dress.
14     Q. And when you walked from the
15 elevator area to the conference room was
16 there anything that occurred during that
17 walk that you considered objectionable or
18 lascivious that you can recall?
19     A. No. But I remember that I walked
20 in back of him so that he would not look at
21 me as he walked, I walked behind him. I
22 remember that. I purposefully slowed down
23 my steps so that he can be in front of me.
24     Q. Is there anything else that you
25 recall about your encounter with

CONTAINS CONFIDENTIAL PORTIONS

Page 396

```
              Guzman
 1    Mr. Goodstein outside the elevators on the
 2    third floor on that occasion that is
 3    relevant to your claim?
 4        A.   I felt harassed and I felt
 5    disgusted that this happened. That is what
 6    I recall. I recall feeling this is not
 7    right. This is wrong. I don't come to work
 8    to be gawked at.
 9        Q.   When was the next time that you
10    experienced anything from Mr. Goodstein that
11    you regard as harassing?
12        A.   Put it this way, I would see
13    Mr. Goodstein in the News Corp. cafeteria on
14    the third floor. I would see him in the
15    elevator banks in the lobby and every time
16    I -- during meetings and every time we had
17    an encounter Mr. Goodstein had to comment on
18    something that I was wearing on how I looked
19    in my shoes or in my dress.
20        Q.   I am asking you when specifically
21    you recall was the next time that
22    Mr. Goodstein commented?
23        A.   So I met with him on his fourth
24    floor office.
```

Page 397

```
              Guzman
 1        Q.   Okay. You testified last time we
 2    were in a deposition together that
 3    Ms. Marerro was in those meetings with you
 4    and Mr. Goodstein?
 5        A.   Most of the time, yes, Ms. Marerro
 6    was present.
 7        Q.   You testified that she was always
 8    with you in those meetings and that
 9    sometimes Mr. Martinez was with you?
10        A.   Well, Ms. Marerro stopped working
11    for The New York Post so the times -- there
12    were times that I met with Ms. Goodstein
13    that Ms. Marerro was not present or
14    Mr. Martinez because they both stopped --
15    they were both laid off.
16        Q.   And how many times did that occur?
17        MR. THOMPSON: Objection.
18        THE WITNESS: How many times? I
19    am sorry.
20    BY MR. LERNER:
21        Q.   How many times did you meet with
22    Mr. Goods without the presence of
23    Ms. Marerro?
24        A.   On numerous occasions.
```

Page 398

```
              Guzman
 1        Q.   How many?
 2        A.   I can't give you a number but
 3    numerous occasions.
 4        Q.   Where?
 5        A.   Mostly his fourth floor office.
 6    Fourth or fifth floor office. Maybe fifth
 7    floor, yes, where News America marketing is
 8    located.
 9        Q.   Again, I would like to know when
10    the second time you felt harassed by
11    Mr. Goodstein was with specific
12    recollections if you have them. If you
13    don't have them answer I don't remember.
14        A.   I don't remember the second time
15    but I remember the numerous occasions when
16    we would randomly bump into each other in
17    meetings and I remember there was one
18    meeting where as soon as I walked in he
19    chose to comment on the shoes again that I
20    was wearing.
21        Q.   Did you ask him not to comment on
22    your shoes?
23        A.   No.
24        Q.   Is that the occasion when you
```

Page 399

```
              Guzman
 1    said, when you offered to let him borrow
 2    them as a joke?
 3        A.   Yes.
 4        Q.   Why was the comment on your shoes
 5    offensive?
 6        A.   I think if I were a white male he
 7    would not be commenting on the way I
 8    dressed.
 9        I think that he meant to objectify
10    me as a sexual object and I found that
11    offensive.
12        Q.   Anything else?
13        A.   I found his conduct inappropriate,
14    Mark.
15        Q.   Is there anything else about his
16    commenting on your shoes -- what was
17    specifically did he say about your shoes?
18        A.   Sexy shoes.
19        Q.   Were they sexy shoes?
20        MR. THOMPSON: Wait. She wasn't
21    finished.
22        THE WITNESS: Sexy shoes. He
23    wouldn't even refer to me by my first
24    name or by my last name.
```

CONTAINS CONFIDENTIAL PORTIONS

Page 400

     Guzman
1  BY MR. LERNER:
2     Q.  Were they sexy shoes?
3     A.  No.
4     Q.  Describe the shoes?
5     A.  Black shoes, black pumps.
6     Q.  Back pumps. Pumps means high
7  heels?
8     A.  Black high heels, yes.
9     Q.  It is your testimony that those
10 are not sexy shoes?
11    A.  No. They are black.
12    Q.  They are black pumps?
13    A.  High heels, yes.
14    Q.  What did you like about those
15 shoes?
16    A.  They were comfortable.
17    Q.  Did you like the fact that they
18 were high heels?
19       MR. THOMPSON: Objection.
20       THE WITNESS: I liked them.
21 BY MR. LERNER:
22    Q.  Did anyone else ever comment on
23 those shoes?
24    A.  Not that I can recall right now.

Page 401

     Guzman
1     Q.  Do you still own those shoes?
2     A.  Yes.
3     Q.  Who were they manufactured by?
4        MR. THOMPSON: Objection.
5        THE WITNESS: YSL.
6  BY MR. LERNER:
7     Q.  If you recall any other specific
8  occasions during which Mr. Goodstein made
9  what you regard as harassing comments about
10 your appearance can you please describe them
11 specifically now?
12    A.  So there was another occasion when
13 again we were meeting in his office and as I
14 was walking in instead of greeting me with
15 my name he called me Cha-Cha.
16    Q.  Okay. We discussed this incident
17 the last time you were deposed, correct?
18    A.  Yes.
19    Q.  And he stopped doing that when you
20 let him know you didn't appreciate it,
21 correct?
22    A.  Yes.
23    Q.  And how did you let him know that?
24    A.  Don't call me that.

Page 402

     Guzman
1     Q.  How did he respond when you said
2  don't call me that?
3     A.  He was confused.
4     Q.  But he stopped calling you that,
5  correct?
6     A.  Yes.
7     Q.  And with respect to him calling
8  you sexy and beautiful you never said don't
9  call me sexy and beautiful, correct?
10    A.  No.
11    Q.  No, you did not say that?
12    A.  No. I did not. I would ignore
13 him.
14    Q.  Mr. Goodstein's office was on the
15 fifth floor of the building at 1211 Avenue
16 of the Americas, right?
17    A.  Yes.
18    Q.  What was offensive about the term
19 Cha-Cha to you?
20    A.  First of all, I have a name.
21       Second of all, there is a
22 stereotype that all Latin women are, you
23 know, hot and dancers and Cha-Cha is
24 referring to a dance move on a dance floor.

Page 403

     Guzman
1  Why couldn't he call me by my
2  name?
3     Q.  Did you ever write about somebody
4  who Tempo referred to in a headline as
5  Cha-Cha Willie?
6     A.  Are you looking at something that
7  maybe I should review?
8     Q.  I am looking at an -- a page from
9  Tempo from 2007 with a headline Cha-Cha
10 Willie, is that a headline that I approved
11 for Tempo?
12    A.  Can I see it?
13    Q.  No.
14    A.  I can't?
15    Q.  There is a question pending. Did
16 you approve a headline Cha-Cha Willie for
17 Tempo regarding someone named Willie Perry?
18    A.  Can you read some more so that I
19 can -- can you refresh my memory?
20    Q.  Have you ever heard of Willie
21 Perry?
22    A.  I can't recall right now.
23    Q.  Do you know who Willie Perry is?
24    A.  I have interviewed and I have

Page 404

1  Guzman
2  edited hundreds and hundreds and hundreds of
3  pages throughout my career.
4      Q.  Did you review all of the pages of
5  Tempo before it was published?
6      A.  Yes.
7      Q.  Each month?
8      A.  Yes.
9      Q.  So a headline in Tempo would be
10 reviewed by you before it would be
11 published, right?
12     A.  Yes, yes.
13     Q.  So if a headline ran Cha-Cha
14 Willie then you reviewed it before it ran?
15     A.  Yes. And actually that is not
16 Tempo. That is the Black History Month
17 section.
18     Q.  Is it a section that you edited?
19     A.  Yes.
20     Q.  So same question. If it is a
21 section you edited did you review the
22 mockups before they were printed?
23     A.  Yes.
24     Q.  And approved the headlines?
25     A.  Yes.

Page 405

1  Guzman
2      MR. LERNER: Let's mark it.
3      (Page from the Harlem Week section
4  was marked Guzman Exhibit 32 for
5  identification)
6  BY MR. LERNER:
7      Q.  Is Exhibit 32 a page from Harlem
8  Week section that you edited?
9      A.  Yes.
10     Q.  And you approved the headline,
11 Cha-Cha Willie?
12     A.  Yes.
13     Q.  Did you write that headline?
14     A.  That is his name. No. My copy
15 editor did.
16     Q.  His name is Cha-Cha Willie?
17     A.  That is his nickname.
18     Q.  Did you interview him?
19     A.  No.
20     Q.  Do you know who did?
21     A.  Georgette Roberts.
22     Q.  Georgette Roberts is a reporter at
23 The Post?
24     A.  Part time. She is a freelancer.
25     Q.  She is an African American

Page 406

1  Guzman
2  employee of The Post?
3      A.  Yes.
4      Q.  Do you regard this story or the
5  headline as offensive?
6      A.  No.
7      Q.  Were you ever on the fifth floor
8  of the New York -- withdrawn.
9          Were you ever on the fifth floor
10 of 1211 Avenue of the Americas for a reason
11 other than meeting with Mr. Goodstein?
12     A.  Yes.
13     Q.  How many times other than for a
14 meeting with Mr. Goodstein?
15     A.  Several times.
16     Q.  How many is "several"?
17     A.  About a dozen times.
18     Q.  Do you have a specific
19 recollection of being on the floor?
20     A.  Yes.
21     Q.  For what reasons?
22     A.  I was asked to help edit and think
23 about the content for a series of community
24 newspapers that News Corp. purchased,
25 Brooklyn and Queens Courier, there were

Page 407

1  Guzman
2  dozens of newspapers that Rupert Murdoch
3  purchased and I was asked to think about
4  content for them.
5          I was being considered as -- we
6  were exploring the potential of starting a
7  Queens section and the person in charge of
8  the community papers was Mr. Goodstein and
9  his deputy, I can't recall her name, Kylie
10 or something, I can't recall her name, his
11 deputy was charged with supervising these
12 papers and so we would meet on the fifth
13 floor to talk about content. And stories
14 and how we could, what was the word we used,
15 just cross-pollinate the content that I was
16 creating for The Post and vice versa.
17     Q.  Mr. Goodstein was not in these
18 meetings, correct?
19     A.  On some of them he was not.
20     Q.  You never testified before that
21 Mr. Goodstein was in meetings with you about
22 the community newspapers.
23     A.  You didn't ask me.
24     Q.  Do you have a recollection of
25 that?

CONTAINS CONFIDENTIAL PORTIONS

Page 408

Guzman

 1    A.  Yes.
 2    Q.  When you bumped into him in the
 3  cafeteria or in the elevators or in the
 4  hallways how long did these meetings or
 5  encounters last?
 6    A.  Anywhere -- I don't know.
 7  Anywhere from hello, how are you, five
 8  minutes, they seemed longer because they
 9  were always really uncomfortable.
10    Q.  And these were in -- these
11  encounters were in public areas in the
12  building, right?
13    A.  Yes, sir.
14    Q.  And you were free to walk away or
15  keep going where you were going during these
16  meetings, right?
17    A.  I am not really sure what you are
18  asking me.
19    Q.  Well, if you stood around to talk
20  to Mr. Goodstein for any length of time that
21  was of your own free will, correct?
22    A.  Well, he was supervising the sales
23  of sections that I was working on.
24    Q.  He wasn't your supervisor,

Page 409

Guzman

 1  correct?
 2    A.  He was not my supervisor but he
 3  was supervising the sales so we worked in
 4  the -- with the same projects, we worked on
 5  the same projects. So he wasn't a total
 6  stranger to me, I would greet him and that
 7  is when he took the opportunity to say
 8  inappropriate comments.
 9    Q.  Specifically the inappropriate
10  comments were sexy and beautiful?
11    A.  Mark, he would always comment on
12  my appearance. He would always comment on
13  the dresses that I wore or the shoes that I
14  wore and he would always gawk.
15    Q.  And the comments were to use the
16  terms either sexy or beautiful?
17        MR. THOMPSON:  Objection.
18  BY MR. LERNER:
19    Q.  Correct?
20    A.  Yes.
21    Q.  Were these being -- these meetings
22  where you would be standing up during the
23  meeting speaking to him?
24        MR. THOMPSON:  Objection.

Page 410

Guzman

 1        THE WITNESS:  The meetings by the
 2    elevator banks, the random meetings --
 3  BY MR. LERNER:
 4    Q.  Correct.
 5    A.  -- in the News Corp. cafeteria?
 6    Q.  Yes.
 7    A.  I would be usually going
 8  somewhere.
 9        The meetings in his office, I
10  would be sitting down.
11    Q.  There came a time in 2007 when he
12  stopped being involved in Tempo, right?
13    A.  Yes.
14    Q.  How many of these encounters with
15  Mr. Goodstein on the premises of the 1211
16  Avenue of the Americas occurred after he
17  stopped being involved in Tempo?
18    A.  I also told you that we continued
19  to meet after because of his involvement
20  with the Brooklyn and community papers,
21  okay.
22    Q.  How many times did you meet with
23  Mr. Goodstein on the Brooklyn and community
24  papers after he was no longer involved with

Page 411

Guzman

 1  Tempo?
 2    A.  Numerous times.
 3    Q.  How many?
 4    A.  I would say two dozen times.
 5  Maybe more.
 6    Q.  Where were those meetings?
 7    A.  His office, at News Corp. office
 8  on the fifth floor, News America offices.
 9    Q.  And who was in those meetings, you
10  and his deputy?
11    A.  Yes. Sometimes there were two
12  deputies and sometimes one deputy.
13    Q.  And who were the names -- what
14  were the names of the two deputies?
15    A.  I cannot recall the names.
16    Q.  Were they male or female?
17    A.  One of them was a female and her
18  name starts with a K, K something. And I
19  believe that she went on maternity leave and
20  then another staffer took over her
21  responsibilities but I can't recall his
22  name.
23    Q.  Did the two deputies ever say
24  anything to you that you considered

CONTAINS CONFIDENTIAL PORTIONS

Page 412

```
 1            Guzman
 2   harassing or abusive?
 3      A.  No, sir.
 4      Q.  And did you ever say anything to
 5   them about Mr. Goodstein's conduct?
 6      A.  No, sir.
 7      Q.  Were they ever present during
 8   Mr. Goodstein engaging in conduct that you
 9   considered offensive?
10      A.  No.
11      Q.  Did you ever tell them about it?
12      A.  The two deputies?
13      Q.  Yes.
14      A.  About Mr. Goodstein's --
15      Q.  Yes.
16      A.  -- inappropriate behavior?  No.
17          I told other people.  I complained
18   to other people.
19      Q.  My question was did you tell them
20   about it.
21      A.  Okay.
22      Q.  During what period of time did you
23   have meetings with Mr. Goodstein about the
24   community newspapers?
25          MR. THOMPSON:  Objection.
```

Page 413

```
 1            Guzman
 2          THE WITNESS:  During what period
 3   of time?  When the newspapers were first
 4   initially purchased, there were a lot of
 5   discussion about what to do with them,
 6   how to integrate them into The New York
 7   Post properties.  There were News Corp.
 8   properties and so we were trying to
 9   figure out what their role was going to
10   be.
11   BY MR. LERNER:
12      Q.  Did Mr. Goodstein ever trap you in
13   a room?
14      A.  Trap me in a room?
15      Q.  Yes.
16      A.  No.
17      Q.  Did he ever -- did he ever touch
18   you?
19          MR. THOMPSON:  Objection.
20   BY MR. LERNER:
21      Q.  In an offensive way?
22      A.  No.
23      Q.  Did he ever ask you out on a date?
24      A.  No.
25      Q.  Did he ever mention sex acts with
```

Page 414

```
 1            Guzman
 2   you?
 3      A.  No.
 4      Q.  Did he ever comment specifically
 5   by using the word breasts?
 6      A.  No.
 7      Q.  Did he ever use the word ass with
 8   you to comment about your body?
 9      A.  No.
10      Q.  Did he ever refer to your legs
11   specifically?
12      A.  I don't recall.  He may have.
13      Q.  You don't recall, right?
14      A.  I don't recall specifically.
15      Q.  Okay.  Were there times that you
16   were with Mr. Goodstein that he spoke to you
17   in a professional way discussing the
18   business you were doing?
19      A.  Yes.
20      Q.  Did he look you in the eye when he
21   spoke to you?
22      A.  No.
23      Q.  Never?
24      A.  Very few times.  That was part of
25   the problem.  He was always looking at my
```

Page 415

```
 1            Guzman
 2   body, at my breasts, at my legs, at my
 3   shoes.  That was the inappropriate behavior
 4   I was trying to describe.
 5      Q.  Did you ever ask him to make more
 6   eye contact with you?
 7      A.  No.
 8      Q.  Did you ever tape record any
 9   meetings with Mr. Goodstein?
10      A.  No.
11      Q.  Did you ever write down notes
12   about Mr. Goodstein after your meetings?
13      A.  I don't remember if I wrote down
14   notes about his behavior.
15      Q.  And you never told him that you
16   didn't like the way he was looking at you,
17   correct?
18      A.  No, Mark.
19      Q.  Did he ever prevent you from
20   publishing Tempo?  That sounds like an odd
21   question but --
22      A.  Yes, it is.  I don't understand
23   what you are trying to ask me.
24      Q.  He never stood in the way of
25   getting Tempo out, right?
```

CONTAINS CONFIDENTIAL PORTIONS

Page 416

Guzman

1
2  A.  I don't know.
3  Q.  He was -- your understanding is he
4  facilitated Tempo, right?
5  A.  My understanding is that he was a
6  fan of the work that Tempo and my team were
7  doing.
8  Q.  You don't have any reason to doubt
9  that, correct?
10 A.  No.
11 Q.  So during the time you were
12 working with Mr. Goodstein you continued to
13 focus your efforts on getting Tempo out,
14 getting any other sections you were working
15 on out and doing a good job, correct?
16 A.  Can you repeat the question?
17 Q.  Sure.
18     During the time you were working
19 with Mr. Goodstein you continued to focus
20 your efforts on getting Tempo out, getting
21 any other sections you were working out and
22 doing a good job, correct?
23 A.  Yes.
24 Q.  And you did a good job, right?
25 A.  Yes.

Page 417

Guzman

1
2  Q.  And did you think that your
3  performance was good during this time
4  period?
5  A.  Notwithstanding the conditions
6  that I had to work under, yes.
7  Q.  You produced the section that you
8  wanted to produce, right?
9  A.  To the best of my ability.  I
10 ignored all the other harassment that I was
11 experiencing.
12 Q.  And you were able to do your job,
13 right?
14 A.  I did my job to the best of my
15 ability.
16 Q.  You were able to do your job well,
17 right?
18 A.  Yes.
19 Q.  You produced an excellent section,
20 right?
21 A.  Yes.  But that didn't mean that I
22 was not affected by his lewd behavior.
23 Q.  My question is your work did not
24 suffer for it, right?
25 A.  No.

Page 418

Guzman

1
2  Q.  No, it did not suffer for it,
3  right?
4     MR. THOMPSON:  Objection.  She
5  just answered that question.
6     THE WITNESS:  No.
7  BY MR. LERNER:
8  Q.  You have actually described
9  yourself as sexy and beautiful, have you
10 not?
11 A.  I may have.
12 Q.  Do you recall writing a list of
13 words to describe yourself and including
14 sexy and beautiful on that list?
15 A.  No.
16 Q.  Who is Sol, S-O-L?
17 A.  Sol is a friend of mine.
18 Q.  Do you remember writing a list of
19 words to describe Sol and writing a list of
20 words to describe yourself and comparing the
21 two?
22 A.  No.
23 Q.  I am going to show you a document,
24 showing you a document marked Guzman Exhibit
25 33.

Page 419

Guzman

1
2     (Handwritten list was marked
3  Guzman Exhibit 33 for identification)
4  BY MR. LERNER:
5  Q.  Ms. Guzman, is this a piece of
6  paper where you wrote down lists of
7  adjectives to describe Sol and yourself?
8  A.  Yes.
9  Q.  Sol is the column on the left and
10 you are the column on the right?
11 A.  Yes.
12 Q.  And who -- is Sol somebody you
13 were involved with?
14 A.  Involved with?
15 Q.  Yes.
16 A.  How do you mean?
17 Q.  Were you ever romantically
18 involved with Sol?
19 A.  No.
20 Q.  What is Sol's last name?
21 A.  Rivera.
22 Q.  Were you involved in any business
23 dealings with Sol?
24 A.  Yes.
25 Q.  What were those dealings?

CONTAINS CONFIDENTIAL PORTIONS

### Page 472

Guzman

disgusting.
Q. And you stuck around to listen to the story, right?
A. I stuck around to hang out with my girlfriends.
Q. Nobody was chaining you to the bar stool, right?
A. No.
Q. You could have walked away?
A. Yes.
Q. Right?
You wrote in the same paragraph that, "Col Allan only befriends ugly female editors, the she-males."
Who were you referring to?
MR. THOMPSON: What paragraph are you referring to?
MR. LERNER: Same paragraph we have been on, five lines from the bottom.
MR. THOMPSON: I see.
THE WITNESS: A former features editor.

### Page 473

Guzman
BY THE VIDEOGRAPHER:
Q. Who is that?
A. Fay Penn.
Q. Well, you actually wrote plural, "He only befriends ugly female editors, she-males."
A. That is what I was thinking.
Q. Is "she-males" a term that you use for women you regard as ugly?
A. No.
Q. Did you regard Fay Penn as ugly?
A. Her attitude more than physically. I was referring to her energy, to her energy, not to her physical appearance.
Q. Well, you wrote that "Col Allan doesn't know how to handle himself around pretty women, he only befriends ugly female editors." You are talking about physical appearance, correct?
A. When I was thinking about this particular editor, I was thinking more about her energy.
Q. What is a she-male?
A. It is very strong, muscular,

### Page 474

Guzman

androgenous-looking female.
Q. Is there anybody else at The Post that you regard as an ugly female editor who Col Allan befriends?
A. Who has ugly female energy, male ugly she-male female energy. No. I can't think of anybody else at this time.
Q. Isn't a she-male a man who surgically altered to have breasts?
A. No. Not as I understand it.
Q. And, so you listened to the story about Dunleavy having sex in the closet, right, correct?
A. Correct.
Q. And you did not walk away, correct?
A. Correct.
Q. And then Col Allan displays a photograph on his BlackBerry of a naked man, correct?
A. So after several stories about Dunleavy's sexual exploits Col Allan digs into his pocket, pulls out his BlackBerry and hands it to me and he says, "Look," and

### Page 475

Guzman

he smirks and he says, "Look at this," and it is a picture of a naked man with his genitalia exposed.
Q. And so Mr. Allan had told several stories about Dunleavy at this point?
A. At this point he had told several sexual stories.
Q. What were the other stories about Dunleavy besides the one about the closet?
A. There was one where Dunleavy slept over his house. He had given him keys to his apartment and Dunleavy came in the middle of the night and when Mr. Allan went to the restroom or he heard noise he walked into Dunleavy trying to pee in a closet or something, something to that effect so he may have seen Dunleavy's penis.
Q. Do you remember any other stories?
A. And then there was a story, something about Dunleavy once -- Dunleavy has such a voracious sexual appetite that he would probably, to use Mr. Allan's word, fuck a woman without limbs or something to that effect so there were more. Those were