# Exhibit C

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 1

1               Allan
2        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
3
    SANDRA GUZMAN,                    )
4                                     )
             Plaintiff,               )
5                                     )
         vs.                          ) 09CIV9323
6                                     ) (BSJ(RLE)
    NEWS CORPORATION, NYP HOLDINGS,)
7   INC., d/b/a THE NEW YORK POST, )
    and COL ALLAN, in his official )
8   and individual capacities,        )
                                      )
9            Defendants.              )
    ----------------------------------)
10
11  (Contains Confidential & Attorneys' Eyes Only Portions Bound Separately)
12
13      VIDEOTAPED DEPOSITION OF COLIN ALLAN
14             New York, New York
15          Tuesday, February 14, 2012
16
17
18
19
20
21
22
23  Reported by:
24  Philip Rizzuti
25  JOB NO. 46188

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 2

1   Allan
2
3
4
5        February 14, 2012
6        10:08 a.m.
7
8   Videotaped deposition of COLIN
9   ALLAN, held at the offices of Thompson
10  Wigdor, LLP, 85 Fifth Avenue, New
11  York, New York, pursuant to notice,
12  before Philip Rizzuti, a Notary Public
13  of the State of New York

Page 3

1   Allan
2   APPEARANCES:
3
4   THOMPSON WIGDOR
5       Attorneys for Plaintiff
6           85 Fifth Avenue
7           New York, New York 10003
8   BY:  KENNETH THOMPSON, ESQ.
9        PAUL CLARK, ESQ.
10
11  KASOWITZ BENSON TORRES & FRIEDMAN
12      Attorneys for Defendants
13          1633 Broadway
14          New York, New York 10019
15  BY:  MARK LERNER, ESQ.
16       GARRETT KENNEDY, ESQ.
17       BLYTHE LOVINGER, ESQ.
18
19  NEWS AMERICA INCORPORATED
20          1211 Avenue of the Americas
21          New York, New York 10036
22  BY:  J. JORDAN LIPPNER, ESQ.
23
24  ALSO PRESENT:
25       CARLOS LOPEZ, Videographer

Page 4

1        Allan
2        IT IS HEREBY STIPULATED AND AGREED
3   by and between counsel for the respective
4   parties hereto, that the filing, sealing and
5   certification of the within deposition shall
6   be and the same are hereby waived;
7        IT IS FURTHER STIPULATED AND AGREED
8   that all objections, except as to the form
9   of the question, shall be reserved to the
10  time of the trial;
11       IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be signed
13  before any Notary Public with the same force
14  and effect as if signed and sworn to before
15  the Court.

Page 5

1        Allan
2        THE VIDEOGRAPHER:  This is the
3   start of the tape labelled number 1 of
4   the videotape deposition of Colin Allan
5   in the matter of Sandra Guzman versus
6   News Corp.  This deposition is being held
7   at 85 Fifth Avenue, New York, New York,
8   on February 14, 2012 at approximately
9   10:08 a.m.
10       My name is Carlos Lopez from TSG
11  Reporting Inc., I am the legal video
12  specialist.  The court reporter is Phil
13  Rizzuti in association with TSG
14  Reporting.
15       Will counsel please introduce
16  themselves?
17       MR. LERNER:  For the defendants
18  Mark Lerner, Kasowitz, Benson, Torres &
19  Friedman.  Blythe Lovinger and Garrett
20  Kennedy also for Kasowitz, Benson, Torres
21  & Friedman.
22       MR. LIPPNER:  Jordan Lippner,
23  in-house counsel, counsel for Colin
24  Allan.
25       MR. THOMPSON:  Ken Thompson,

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 38

```
1        Allan
2   communicated to him about Sandra Guzman's
3   termination?
4       A.   No.
5       Q.   Have you ever spoke to or
6   communicated with Mr. Murdoch about Austin
7   Fenner?
8       A.   No.
9       Q.   About Ikimalisa Livingston?
10      A.   No.
11      Q.   I want to now to look at Exhibit
12  1 again?
13      A.   Yes.
14      Q.   And I specifically direct you to
15  the paragraph that says over the past couple
16  of days, you see that sir?
17      A.   Yes.
18      Q.   It states: Over the past couple
19  of days I have spoken to a number of people
20  and I now better understand the hurt this
21  cartoon has caused.  At the same time I have
22  had conversations with Post editors about the
23  situation and I can assure you, without a
24  doubt, that the only intent of that cartoon
25  was to mock a badly written piece of
```

Page 39

```
1        Allan
2   legislation.  It was not meant to be racist,
3   but unfortunately it was interpreted by many
4   as such.
5            Do you see that?
6       A.   Yes.
7       Q.   Mr. Allan, were you one of the
8   editors that spoke to Rupert Murdoch about the
9   cartoon?
10      A.   Yes.
11      Q.   When did you first speak to him
12  about that monkey cartoon?
13      A.   The day it was published.
14      Q.   Did you speak to him before or
15  after it was published?
16      A.   After.
17      Q.   And describe the substance --
18  strike that.
19           Was it an in person or telephone
20  conversation?
21      A.   Telephone.
22           MR. LIPPNER: Objection.
23      Q.   Where were you at the time?
24      A.   In the office.
25      Q.   Did he call you or did you call
```

Page 40

```
1        Allan
2   him?
3            MR. LIPPNER: Objection.
4       A.   He called me.
5       Q.   When he called you what did he
6   say?
7       A.   He said that he was aware that
8   there were -- that some people had been
9   offended by the cartoon.
10      Q.   What else did he say?
11      A.   Nothing more.
12      Q.   How long did the conversation
13  last?
14      A.   Not long.
15      Q.   Okay, how long?
16      A.   Couple of minutes.
17      Q.   So now clearly he had to say more
18  to you during those couple of minutes Mr.
19  Allan; right?
20      A.   I spoke.
21      Q.   Okay.  So tell us in substance
22  what you said to your boss Rupert Murdoch
23  about the monkey cartoon when he called you
24  that day when it was published?
25      A.   I told him that I had chosen the
```

Page 41

```
1        Allan
2   cartoon.
3            MR. LERNER:  Hold on.  Mr. Allan,
4   with respect to your process of selecting
5   the cartoon, evaluating it for
6   publication, there is an editorial
7   privilege which you have as a journalist
8   which protects you from needing to
9   disclose those subjects.  You can comment
10  about things that occurred after the
11  fact, but you should not testify about
12  what your state of mind was or thinking
13  was as a journalist relating to your
14  decision to publish the cartoon?
15           THE WITNESS: I understand.
16           MR. THOMPSON: This is why we
17  disagree.  We do not believe that that
18  privilege applies here.  Are you going to
19  instruct her not to answer the question I
20  am asking regarding his conversations
21  with Mr. Murdoch and what he said about
22  the cartoon.
23           MR. LERNER:  What I am instructing
24  him is that if his conversations with
25  Mr. Murdoch go into the editorial process
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 42

```
                        Allan
 1
 2   of selecting a cartoon, then he should
 3   not answer the question based on the
 4   editorial privilege.
 5       MR. THOMPSON: So we will mark the
 6   questions you instruct him not to answer,
 7   we will get a ruling. Also I just want
 8   to make it clear both of you should not
 9   be speaking on the record. You should
10   not object. We have Jordan Lippner
11   objecting, we have you speaking. Who is
12   defending this deposition?
13       MR. LERNER: I am here as counsel
14   for the papers. Mr. Lippner is here as
15   counsel for Mr. Allan.
16       MR. THOMPSON: So Mr. Lippner is
17   going to be counsel for Mr. Allan and
18   your 30(b)(6) witness in this case;
19   because that is what we were told?
20       MR. LERNER: Yes.
21   Q.  All right, let's continue Mr.
22   Allan. So before Rupert Murdoch called you
23   did you know that people were offended by the
24   cartoon?
25   A.  I became aware, yes.
```

Page 43

```
                        Allan
 1
 2   Q.  How did you become aware?
 3   A.  I don't recall.
 4   Q.  You don't recall?
 5   A.  I don't.
 6   Q.  Well do you recall the first
 7   person who told you that people were offended?
 8   A.  No.
 9   Q.  So as you sit here today the first
10   person you can identify who told you that
11   people were offended was Rupert Murdoch?
12       MR. LERNER: Objection.
13       MR. LIPPNER: Objection.
14   A.  I was aware before then.
15   Q.  I understand that, but my question
16   is different sir. My question is can you
17   identify the first person who told you that
18   people were offended by that cartoon?
19   A.  I cannot.
20   Q.  So as you sit here now the only
21   person that you can recall telling you first
22   that the cartoon offended people was Rupert
23   Murdoch?
24       MR. LERNER: Objection.
25   A.  I was aware people were offended,
```

Page 44

```
                        Allan
 1
 2   it was on the blogs.
 3   Q.  So let's go back to that
 4   conversation you had with your boss. He
 5   called you up and he told you that he was
 6   aware that people were offended by that
 7   cartoon; correct?
 8   A.  Yes.
 9   Q.  What did you say to him in
10   response to his statement that he knew that
11   people were offended?
12   A.  I told him the cartoon was not
13   offensive. I told him that it mocked the
14   Congressional stimulus bill, and that that was
15   clear, and that it was my opinion that it was
16   inoffensive.
17   Q.  It was not offensive?
18   A.  Yes.
19   Q.  Did you say anything else to
20   Mr. Murdoch during that telephone call?
21   A.  I don't recall.
22   Q.  Do you recall if he said anything
23   else to you about the cartoon during that
24   call?
25   A.  I don't believe so.
```

Page 45

```
                        Allan
 1
 2   Q.  Well when you told your boss that
 3   the cartoon wasn't offensive how did he
 4   respond to that statement?
 5   A.  I don't recall.
 6   Q.  As you sit here today do you still
 7   believe that cartoon is not offensive?
 8   A.  Yes.
 9 DI Q.  So I want to direct your attention
10   again to Deposition Exhibit 1, well let me ask
11   you another question before I go to that
12   exhibit again.
13       Do you believe that it was a
14   mistake to publish that cartoon?
15       MR. LIPPNER: Mr. Allan, with
16   respect to the decision to publish the
17   cartoon you as a journalist have an
18   editorial privilege not to comment on the
19   decision to publish or not publish
20   material in your newspaper, and on that
21   basis I would advise you not to answer
22   that question.
23   Q.  Mr. Allan, are you going to answer
24   that question?
25   A.  I am going to take the advice of
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 46

1      Allan
2  counsel.
3       MR. THOMPSON:  Can we mark that
4    for a ruling.
5    Q.   I want to direct your attention to
6  Exhibit 1, the paragraph that starts last week
7  we made a mistake.
8    A.   Yes.
9    Q.   What was your understanding of
10 what Mr. Rupert Murdoch was referring to when
11 he said we made a mistake?
12      MR. LERNER:  Objection.
13   A.   In publishing the cartoon.
14 DI Q.   So it was your understanding that
15 Rupert Murdoch believed that it was a mistake
16 to publish the cartoon?
17      MR. LERNER:  Objection.  You can
18   ask him what this piece of paper says,
19   but with respect to his conversations
20   with Mr. Murdoch and any other belief
21   that he may have formed based on a
22   privileged conversation as a journalist,
23   I am going to advise him not to answer.
24      MR. THOMPSON:  That is improper,
25   and Mr. Lerner, are you now Mr. Allan's

Page 47

1      Allan
2  attorney, because Jordan Lippner is not
3  saying anything.  So who is objecting on
4  whose behave; that is why it is
5  confusing.  Jordan Lippner says he is his
6  attorney and he is silent, but you are
7  objecting on behalf of Mr. Allan.
8       MR. LERNER:  Yes.  I am objecting
9    on behalf of the defendants.
10      MR. THOMPSON:  The objection is
11   baseless.  We are going to get a ruling.
12 DI Q.   Mr. Allan, do you agree or
13 disagree with Rupert Murdoch's statement that
14 the publication of the cartoon was a mistake?
15      MR. LERNER:  Objection.  Instruct
16   you not to answer that.
17   Q.   Are you going to answer that
18 question?
19   A.   I am going to take the advice of
20 counsel.
21   Q.   Do you believe -- strike that.
22      Going back to this exhibit, that
23 same paragraph it goes on and says:  Rupert
24 Murdoch goes on and says we ran a cartoon that
25 offended many people?

Page 48

1      Allan
2    Do you see that?
3    A.   Yes.
4    Q.   Do you agree that it offended many
5  people?
6       MR. LERNER:  Objection.
7    Q.   You can answer.
8       MR. LERNER:  You can answer if you
9    know.
10   A.   Yes.
11   Q.   Why do you believe it offended
12 many people?
13      MR. LIPPNER:  Objection.
14   A.   Well there were hundreds of
15 protesters outside our building.
16   Q.   People were protesting the fact
17 that the New York Post published a cartoon of
18 an ape being shot; correct?
19   A.   Yes.
20   Q.   People believed that that ape
21 represented President Barack Obama; correct?
22      MR. LIPPNER:  Objection.
23   A.   Yes, and they believed that.
24   Q.   Do you believe that the New York
25 Post should have apologized for that cartoon?

Page 49

1      Allan
2    A.   No.
3    Q.   So in this E-mail that reflects
4  Mr. Murdoch's public apology he stated:  Today
5  I want to personally apologize to any readers
6  who felt offended and even insulted.
7       So you disagree with his decision
8  to apologize?
9       MR. LERNER:  Objection.
10   A.   Yes.
11 DI Q.   Why?
12      MR. LERNER:  Hold on.  The witness
13   should not answer these questions.
14      MR. THOMPSON:  Are you instructing
15   him not to answer that?
16      MR. LERNER:  Yes.
17   Q.   Mr. Allan, are you going to answer
18 that question?
19   A.   I am going to take the advice of
20 counsel.
21 DI Q.   Did you tell Mr. Murdoch that you
22 didn't think it was a mistake for publishing
23 the cartoon?
24      MR. LERNER:  Objection.  Don't
25   answer the question.

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 50

Allan

Q. Are you going to answer the question?
A. I am going to take the advice of counsel.
DI Q. Did you tell Mr. Murdoch that you disagreed with apologizing for this publication?
      MR. LERNER: Instruct the witness not to answer.
Q. Are you going to answer the question?
A. I am going to take the advice of counsel.
Q. Now you spoke to Mr. Murdoch the day the monkey cartoon was published about the cartoon and the fact that people were offended by it; correct?
A. Correct.
Q. Did you speak to him on any other occasion about that cartoon?
A. I believe the following day.
DI Q. Well what happened the following day?
      MR. LERNER: Mr. Allan, if it

Page 51

Allan

relates to any editorial decisionmaking you should not answer the question.
A. I take the advice of counsel.
Q. Are you going to answer the question?
A. I am going to take the advice of counsel.
Q. But you did meet with Mr. Murdoch -- strike that.
      Did you meet with him in person or speak to him by telephone the second time you spoke to him about the cartoon?
      MR. LIPPNER: Objection.
Q. You can answer?
A. Telephone.
Q. Did he call you or you called him?
A. I don't recall.
Q. How long did you speak to him?
A. I don't recall.
DI Q. What did you say to him about the cartoon on that second call?
      MR. LERNER: Objection. He has already indicated based on the journalistic privilege he will not answer

Page 52

Allan

that question.
      MR. THOMPSON: That is an improper invocation of that privilege Mr. Lerner.
      MR. LERNER: You don't know that because you don't know what the conversation was about, and the witness has been clearly instructed on the contours of privilege, and he has told us that he can't answer the question based on the privilege.
      MR. THOMPSON: He has been coached on that, not that he has told us.
      MR. LERNER: He has been instructed on the record here and he made his decision in front of you here.
Q. Mr. Allan, did you ever meet with Rupert Murdoch in person regarding the cartoon?
A. No.
Q. Do you know if Rupert Murdoch spoke to any other editors of the New York Post about the cartoon?
A. No.
Q. So in his public apology when he

Page 53

Allan

stated I have had conversations with Post editors, plural, did you know if that was true in February of 2009?
A. I don't know.
Q. I am asking you in February of 2009 when you saw this did you know if it was true that Rupert Murdoch spoke with other New York Post editors?
      MR. LERNER: Objection.
      MR. LIPPNER: Objection.
Q. You can answer?
A. I don't know who he spoke to.
Q. Well did any of the editors in the New York Post tell you that they had spoken to Rupert Murdoch about the cartoon?
A. No.
Q. So as far as you know the only editor at the Post that he spoke to about the cartoon was you; is that correct?
      MR. LERNER: Objection.
A. Yes.
Q. Do you have any reason to doubt that Rupert Murdoch spoke to more than one editor at the New York Post about the cartoon?

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 202

```
1        Allan
2     Q.  So Sandra Guzman, and was she with
3  Danica Lo or somebody else?
4     A.  I think Danica Lo was there, I am
5  sorry, I don't remember.
6     Q.  So continue, what happened after
7  Ms. Guzman and other employees came up to you?
8     A.  I bought them a drink.  At some
9  point I received an E-mail from the office
10 that contained for my perusal a picture of a
11 naked man.
12    Q.  Who sent you that picture?
13    A.  Somebody on the photo desk.
14    Q.  Do you recall who?
15    A.  I don't.
16    Q.  Did the E-mail say anything about
17 the picture of the naked man?
18    A.  I don't recall.
19    Q.  What happened after you received
20 the picture of the naked man by E-mail?
21    A.  I was aware of what it was.  I had
22 been told by whomever was editing the Sunday
23 paper at the time that we were likely going to
24 obtain a picture, a lewd picture of a man that
25 sat above the bed of the governor of New
```

Page 203

```
1        Allan
2  Jersey.
3     Q.  Who at the time --
4     MR. LIPPNER:  Are you done with
5  your answer?
6     THE WITNESS:  Yes.
7     Q.  When you say the governor of New
8  York are you referring to Jim McGreevey?
9     A.  Yes.
10    Q.  So you knew that, or thought that
11 the Post was going to get a picture --
12    A.  I knew that we had --
13    Q.  A lewd picture?
14    A.  Yes, I knew that we had obtained a
15 lewd picture of the governor.
16    Q.  Right.
17    A.  And I had asked before I left the
18 office because it was getting late in the day,
19 that they might E-mail it to me.
20    Q.  Please continue?
21    A.  The purpose of the E-mailing it to
22 me was for me to consider it for publication.
23 This was undertaken in the context of the
24 scandal surrounding the governor's sex life,
25 which was public knowledge.  And I showed it
```

Page 204

```
1        Allan
2  to Jesse Angelo who was with me and we briefly
3  discussed it.  Whether or not or how we might
4  be able to publish the picture in a way that
5  was not offensive to people.
6     Q.  What did you say to Mr. Angelo and
7  what did he say to you about that?
8     A.  Well we discussed the obvious,
9  that we would have to disguise his groin, we
10 would have to cover it up.
11    Q.  Because you didn't want to offend
12 anyone; right?
13    A.  Precisely.
14    Q.  Because you would agree people,
15 some people may get offended if they had to
16 look at a picture of a naked man with his
17 genitals exposed?
18    A.  Possibly.
19    Q.  So did you and Jesse Angelo talk
20 about anything else regarding that picture?
21    A.  No, we just discussed that it was
22 sort of a striking image for the governor of
23 New Jersey to have over his bed, and that we
24 discussed how we might be able to make it
25 suitable for publication.
```

Page 205

```
1        Allan
2     Q.  Did you receive this picture on
3  your Blackberry?
4     A.  Yes, sir.
5     Q.  Do you still have that picture on
6  your Blackberry?
7     A.  I have an iPhone now, so I don't
8  know.
9     Q.  Did you ever save that picture on
10 your Blackberry?
11    A.  I don't know.
12    Q.  So what happened -- strike that.
13    Were you and Jesse Angelo just
14 talking among yourselves about how you can
15 publish this photo without offending anyone?
16    MR. LIPPNER:  Objection.
17    A.  We were standing at the bar
18 discussing it.
19    Q.  Was it just the two of you
20 discussing it at that time?
21    A.  Yes.
22    Q.  Then what happened next?
23    A.  One of the ladies asked us what we
24 were talking about.
25    Q.  Who?
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 206

```
1              Allan
2      A.   I don't recall.
3      Q.   What did they say -- strike that.
4           What did that person say?
5      A.   They said -- I don't remember
6  exactly the words.
7      Q.   In substance what did that person
8  say?
9      A.   What is so interesting.
10     Q.   What did you say?
11     A.   I said there is a picture here of
12 a naked guy that decorates Governor
13 McGreevey's bedroom.
14     Q.   Was there any other conversation
15 about that?
16     A.   Sure.
17     Q.   Continue to describe it?
18     A.   They wanted to see it.
19     Q.   Who wanted to see it?
20     A.   The ladies.
21     Q.   Well you said one of the ladies
22 asked you what was going on.  What did the
23 other lady say?
24     A.   Nothing.
25     Q.   Do you know if Sandra Guzman was
```

Page 207

```
1              Allan
2  the person who asked you what was going on?
3      A.   I don't recall.
4      Q.   Do you recall if Sandra Guzman
5  said anything to you about that picture?
6      A.   I don't.  I don't recall.
7      Q.   But you do recall a female
8  employee asked you what was going on in
9  connection with the picture?
10     A.   Yes, they asked me what was so
11 interesting.
12     Q.   Do you recall if the second female
13 employee said anything to you at all during
14 this conversation about the picture?
15     A.   I can only tell you one of them
16 asked me can we see it please.
17     Q.   One of them, but they both did not
18 ask you that?
19     A.   No, one of them asked.
20     Q.   Then what did you do at that point
21 Mr. Allan?
22     A.   I showed them.
23     Q.   How did you show them?
24     A.   I handed them my Blackberry.
25     Q.   So you physically handed your
```

Page 208

```
1              Allan
2  Blackberry to them?
3      A.   Yes.
4      Q.   How did they respond -- strike
5  that.
6           Who did you hand your Blackberry
7  to first?
8      A.   I don't recall.
9      Q.   Was that the first time as
10 Editor-in-Chief of the Post that you showed a
11 naked picture to a female employee?
12     A.   No.
13     Q.   So you showed naked pictures to
14 other female employees?
15     A.   Possibly.
16     Q.   Do you recall as you sit here now
17 any other occasions when you showed a naked
18 picture to a female employee as
19 Editor-in-Chief of the Post?
20     A.   Yes.
21     Q.   So how many other times have you
22 shown a picture of a naked man to a female
23 employee at the New York Post?
24     A.   How many times?
25     Q.   Yes.
```

Page 209

```
1              Allan
2      A.   Twice.
3      Q.   Was this the very first time that
4  you had shown a picture of a naked man?
5      A.   I don't remember.
6      Q.   Where were you the second time
7  that you showed a picture of a naked man to a
8  female employee?
9      A.   I don't recall.  It may have been
10 in the office.
11     Q.   Do you recall the identity of that
12 female employee who you showed the other
13 picture of a naked man to?
14     A.   I don't.  But again it was
15 somebody who was in the midst of a group of
16 people who were curious about the image.
17     Q.   I am going to the second time, I
18 want to finish talking to you about this time
19 in Langan's?
20     A.   Right.
21     Q.   So you handed your Blackberry to
22 one of the women?
23     A.   Yes.
24     Q.   And what did they do at that
25 point?
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 214

1  Allan
2  A. No, sir.
3  Q. Was this picture subsequently
4  published in the New York Post?
5  A. Yes.
6  Q. Was it published just like this?
7  A. No, sir.
8  Q. How did the picture that was
9  published in the Post differ from this one?
10 A. His waist was covered up.
11 DI Q. Why was his waist covered up?
12    MR. LIPPNER: Objection. Instruct
13    you not to answer on the editorial
14    privilege.
15    MR. THOMPSON: Baseless objection.
16    Please mark this part of the deposition
17    for another ruling.
18 Q. Mr. Allan, I am showing you now
19 what has been marked as Allan Deposition
20 Exhibit 9, Bates stamped NYP 3998.
21    (Allan Exhibit 9, document Bates
22    numbered NYP 3998, marked for
23    identification, as of this date.)
24 Q. Tell me if you recognize this
25 document?

Page 215

1  Allan
2  A. Yes.
3  Q. What is that exhibit?
4  A. Who is it?
5  Q. What is this exhibit, what does it
6  show?
7  A. Page 3 of the Post.
8  Q. So this is the subsequent
9  publication of the picture with the
10 individual's crouch blocked out?
11 A. Yes, sir.
12 Q. Now I want to direct your
13 attention to the second time you said you
14 showed a female employee a picture of a naked
15 man. Was that in the news room?
16 A. It could have been.
17 Q. Who was present?
18 A. I don't recall. I mean there are
19 journalists.
20 Q. Where were you specifically when
21 you showed this picture?
22 A. I mean I don't recall. I mean I
23 could have been in the office. I don't know.
24 Q. Mr. Allan, as the Editor-in-Chief
25 of the Post do you have a habit of showing

Page 216

1  Allan
2  pictures of naked men to female employees?
3    MR. LIPPNER: Objection.
4  A. No, sir.
5  Q. So this is the second time you say
6  you showed a picture of a naked man to a
7  female employee and yet you don't recall where
8  you were at the time?
9  A. These people are journalists, they
10 see offensive material constantly.
11 Q. So the picture you showed the
12 second time was offensive; right?
13    MR. LERNER: Objection.
14 Q. I am asking was it offensive?
15 A. It was news.
16 Q. Was it offensive?
17    MR. LIPPNER: Objection.
18    MR. LERNER: Asked and answered.
19 Q. You can answer the question?
20 A. Was it offensive; no.
21 Q. Was it lewd?
22 A. Maybe.
23 Q. Why do you say maybe?
24 A. Well it was a news picture.
25 Q. Describe the picture you showed

Page 217

1  Allan
2  another female employee of a naked man?
3  A. It was a photograph of a man who
4  was standing on a fire escape in The Bronx and
5  who was subsequently -- he was naked and he
6  was subsequently tasered by the police and he
7  died. And as I do I sought the counsel of
8  some of my colleagues about taste, and whether
9  or not it was appropriate for the paper to run
10 such a picture, or how we might run such a
11 picture so that it was not offensive to our
12 readers.
13 Q. So you believed that some of your
14 readers might have found the picture offensive
15 the way you had it?
16 A. Yes.
17 Q. So you recall soliciting counsel
18 from some of your staff members about whether
19 you should publish the picture and if so how?
20 A. Yes.
21 Q. But yet you don't recall if that
22 was in the news room or somewhere else?
23 A. Sir I do it every day, I don't
24 recall.
25 Q. Was it in the offices of the New

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 370

Allan

1  Q.  Did Jesse Angelo ever tell you
2  that Leonard Greene complained to him about
3  the cartoon?
4  A.  I don't recall.
5  Q.  If Leonard Greene complained to
6  Jesse Angelo about that cartoon would you have
7  expected Jesse Angelo to have told you about
8  it?
9  A.  He may have done. I don't recall.
10  Q.  That is not my question. My
11  question is would you have expected Jesse
12  Angelo to have told you about it?
13  A.  Yes.
14  Q.  Why?
15  A.  It would be the right thing to do.
16  Q.  Did anyone in human resources ever
17  tell you that Leonard Greene had complained
18  about the monkey cartoon?
19  A.  I don't recall.
20  Q.  Well Mr. Allan if your black
21  reporters -- strike that.
22      If you learned that your black
23  reporters complained about the monkey cartoon
24  you would recall that; right?

Page 371

Allan

1  A.  Excuse me.
2  Q.  If you knew at one point that your
3  black reporters had complained about the
4  monkey cartoon that is not something that you
5  would forget; right?
6  A.  I guess yes, I wouldn't forget.
7  Q.  As you sit here now do you know if
8  Leonard Greene ever complained about the
9  monkey cartoon?
10  A.  I don't know.
11  Q.  Did you ever talk to him about the
12  monkey cartoon?
13  A.  No.
14  Q.  Mr. Allan, I am showing you what
15  has been marked as Allan Deposition Exhibit
16  17, please take a moment to review it?
17  A.  Sure.
18      (Allan Exhibit 17, affidavit of
19  Leonard Greene, marked for
20  identification, as of this date.)
21      MR. LIPPNER:  Take your time and
22  read the whole thing please.
23  A.  Yes.
24  Q.  Mr. Allan, do you agree that

Page 372

Allan

1  Leonard Greene has been subjected to race
2  discrimination during his employment at the
3  Post?
4  A.  I do not.
5  Q.  Did he ever apply to become an
6  editor?
7  A.  I don't know.
8  Q.  Did he ever apply to become a
9  columnist?
10  A.  Yes.
11  Q.  When did he apply to become a
12  columnist?
13  A.  I don't recall.
14  Q.  How many times did he apply to
15  become a columnist?
16  A.  A couple.
17  Q.  Why didn't he become a columnist
18  at the New York Post?
19  A.  I'm sorry?
20  Q.  Why hasn't Leonard Greene become a
21  columnist at the New York Post?
22  A.  Because I don't think that he
23  would be a good columnist for the newspaper.
24  Q.  Why not sir?

Page 373

Allan

1  MR. LIPPNER:  Objection. This
2  goes to your editorial.
3  MR. THOMPSON:  It does not. The
4  fact that I am asking him why he didn't,
5  Mr. Lippner, please don't invoke this
6  baseless privilege to coach the witness.
7  My question is why didn't he think that
8  Leonard Greene would make a good
9  columnist at the newspaper.
10  MR. LERNER:  You can talk about
11  what you regard as his qualifications for
12  being a columnist at the New York Post.
13  A.  I think that Leonard is an
14  excellent reporter, an excellent writer, but I
15  don't believe that he would make a strong
16  columnist for the newspaper.
17  Q.  Why not?
18  A.  I think it takes a certain kind of
19  attitude. In many ways Leonard is too even
20  tempered, too nice to be a good columnist for
21  the newspaper.
22  Q.  Well he has the writing skills to
23  be a columnist; right?
24  A.  Yes, I would agree with that.

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 338

1       Allan
2  correct?
3       A.   Correct.
4       Q.   Would you agree Mr. Allan that in
5  this country there has been a -- strike that.
6            Would you agree that in this
7  country there have been racist images
8  depicting black people?
9       A.   Yes.
10           MR. LERNER: Objection.
11      Q.   Would you agree that some of those
12 racist images depict black people as primates?
13           MR. LERNER: Objection.
14      A.   I am not familiar with them, I
15 don't understand that history.
16      Q.   You don't understand the history
17 of what?
18      A.   I don't understand the history of
19 the affiliation of black people and primates,
20 I am not aware of that.
21      Q.   Has anyone at the Post ever told
22 you that there is a history in this country of
23 black people being portrayed as primates?
24           MR. LERNER: You can answer that
25      question if it doesn't involve

Page 339

1       Allan
2  conversations with lawyers.
3            MR. LIPPNER: And if it doesn't
4       involve decisions or discussions
5       concerning putting something in the -- in
6       any of your editorial decisions with the
7       New York Post.
8       A.   I became aware of that after we
9  published cartoon.
10      Q.   Who made you aware of it?
11      A.   The people who were upset, who
12 protested.
13      Q.   Did any employees at the Post make
14 you aware of that?
15      A.   I don't recall. Possibly.
16      Q.   You would recall if someone who
17 was part of your editorial staff told you that
18 black people have been portrayed as primates?
19      A.   Mr. Thompson, they may have said
20 so, but I don't recall. I recall becoming
21 aware of that history.
22      Q.   What specific knowledge did you
23 become aware of regarding the history of how
24 black people have been portrayed in the
25 country?

Page 340

1       Allan
2       A.   I became aware that there was a
3  derogatory association between black people
4  and primates.
5  DI   Q.   In light of your awareness after
6  the monkey cartoon was published that black
7  people had been portrayed as primates in this
8  country, do you now believe it was a mistake
9  to publish that cartoon?
10           MR. LERNER: Objection. You
11      should not answer questions that relate
12      to editorial decisionmaking at the Post.
13      That question gets to the editorial
14      decision to publish the material, and
15      therefore it should not be answered.
16           MR. THOMPSON: Please mark this
17      for a ruling. Mr. Lerner, you are
18      completely wrong. We are asking him
19      about whether he now believes in
20      retrospect that it was a mistake. First
21      of all are you instructing him not to
22      answer?
23           MR. LERNER: It was asked and
24      answered this morning.
25           MR. THOMPSON: Are you instructing

Page 341

1       Allan
2  him not to answer that question?
3            MR. LERNER: I am advising him
4       that he has an editorial privilege.
5            MR. THOMPSON: Okay. As you know
6       you are not sitting here as Mr. Allan's
7       attorney. It is completely improper for
8       you to sit here on the record and give
9       him any type of legal advice when Mr.
10      Lippner claims to be representing him at
11      this deposition.
12           This is another issue that we are
13      going to raise with the court. It is
14      completely inappropriate for you and Mr.
15      Lippner to tag team making objections and
16      now you have decided to provide Mr. Allan
17      who you don't even represent with legal
18      advice on the record. That is improper.
19           MR. LERNER: I disagree with your
20      characterization of the deposition. I
21      disagree with tag team. And I disagree
22      with the notion that I am not Mr. Allan's
23      attorney and I can't give him legal
24      advice.
25           MR. THOMPSON: Okay, now is it

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 346

1  Allan
2       THE VIDEOGRAPHER:  The time is
3  5:53, we are going off the record.
4       (Recess taken.)
5       THE VIDEOGRAPHER:  The time is
6  6:13 p.m., we are back on the record,
7  video number 6.
8       Q.  Mr. Allan, did you ever make any
9  public statements about the monkey cartoon?
10      MR. LIPPNER:  Objection.
11      A.  I don't believe so.
12      Q.  Did you ever make any statements
13 to the press about the monkey cartoon?
14      A.  I don't believe so.
15      Q.  Did you ever say anything about
16 the monkey cartoon to Al Sharpton in the
17 press?
18      A.  Say it again.
19      Q.  I will rephrase it.
20      Mr. Allan, was there ever an
21 editorial published in the Post after the
22 monkey cartoon that was published that made
23 reference to the protesters outside the
24 building?
25      A.  I believe so, yes.

Page 347

1  Allan
2       Q.  Did you have any role in
3  connection with that editorial?
4       A.  Yes.
5  DI   Q.  What role did you have, sir?
6       MR. LERNER:  Objection.
7       MR. LIPPNER:  Objection.  Instruct
8  you not to answer on the grounds of
9  editorial privilege.
10      MR. THOMPSON:  Mark that as
11 another baseless objection.  Are you
12 instructing Mr. Allan not to answer the
13 question?
14      MR. LIPPNER:  I am instructing him
15 that he has an editorial privilege and if
16 the question would require him to reveal
17 what went into the decisionmaking and the
18 creation of an editorial, then he is not
19 to answer.
20      Q.  Mr. Allan, are you going to answer
21 that question?
22      A.  I am going to act on the advice of
23 counsel.
24      Q.  Do you recall what the actual
25 editorial that appeared in the paper said

Page 348

1  Allan
2  about the protests over the cartoon?
3       A.  No.
4       Q.  Well didn't it say that Al
5  Sharpton was partly responsible for the
6  protests?
7       MR. LERNER:  Objection.
8       A.  I don't recall.
9       Q.  Do you recall if that editorial
10 apologized for the cartoon?
11      A.  I don't recall.
12      Q.  There is an allegation in Ms.
13 Guzman's complaint that at one point the New
14 York Post was going to depict Jews as sewer
15 rats?
16      A.  Excuse me.
17      Q.  At one point the New York Post was
18 going to depict Jews as sewer rats; is that
19 true?
20      A.  I never heard that, I don't know
21 about that.
22      Q.  I am going to show you what has
23 been marked as Allan Exhibit 15, and I am
24 going to ask that you take a look at it and
25 tell us if you recognize it.

Page 349

1  Allan
2       (Allan Exhibit 15, cartoon,
3  marked for identification, as of this
4  date.)
5       A.  Yes.
6       Q.  What is Exhibit 15?
7       A.  It is a Delonas cartoon published
8  in the New York Post.
9       Q.  This is the cartoon that I have
10 been referring to as the monkey cartoon;
11 correct?
12      A.  Yes.
13      Q.  And it was published in the New
14 York Post on February 18, 2009; right?
15      A.  Yes.
16      Q.  And would you agree Mr. Allan that
17 it depicts two white police officers shooting
18 it looks like an ape?
19      A.  Yes.
20      Q.  Would you agree that the cartoon
21 depicts the ape with several bullet holes?
22      A.  Yes.
23      Q.  Would you also agree that the
24 cartoon depicts, shows one of the police
25 officers holding a gun that is smoking;

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 350

1        Allan
2   correct?
3       A.   Yes.
4       Q.   Would you agree that one of the
5   cops depicted in this cartoon is stating --
6   strike that -- states: They will have to find
7   someone else to write the next stimulus bill?
8       A.   Yes.
9       Q.   Now, Mr. Allan, would you agree
10  that in the February 18, 2009 edition of the
11  New York Post there was a picture of President
12  Barack Obama signing the stimulus bill in
13  Denver, Colorado?
14      A.   I don't recall.
15      Q.   Do you recall that there was a
16  picture of the president signing the stimulus
17  bill before the page that contained this
18  cartoon?
19      A.   I don't recall.
20      Q.   Do you recall that the New York
21  Post also ran an editorial which referred to
22  the stimulus bill as Obama's stimulus bill in
23  that same paper on February 18, 2009?
24      A.   I don't recall.
25      Q.   The ape in this picture was

Page 351

1        Allan
2   intended to be President Barack Obama; is that
3   correct?
4       A.   That is incorrect.
5       Q.   Do you recall ever referring to
6   the protesters outside the building as being
7   minorities and uneducated?
8       A.   No.
9       Q.   Did you ever refer to the
10  protesters outside of the building at 1211
11  Avenue of the Americas as being minorities?
12      A.   No.
13      Q.   Did you ever refer to the
14  protesters outside the building as being
15  uneducated?
16      A.   No.
17      Q.   Were the protesters -- strike
18  that.
19          You said earlier I think there
20  were hundreds of protesters in front of the
21  building?
22      A.   Yes.
23      Q.   Did you see them?
24      A.   Yes.
25      Q.   Could you tell if they were mostly

Page 352

1        Allan
2   people of color?
3       A.   Yes.
4       Q.   Did they have signs?
5       A.   I don't recall.
6       Q.   Did they appear to be angry?
7       A.   Yes.
8       Q.   Did you know that they were
9   accusing the New York Post of being racist in
10  connection with this cartoon?
11      A.   Yes.
12      Q.   Mr. Allan, your attorneys in this
13  case filed an answer to Ms. Guzman's amended
14  complaint on behalf of News Corporation, New
15  York Post and yourself. Are you aware of
16  that?
17      A.   Yes.
18      Q.   In paragraph 81 of the answer that
19  was filed on your behalf states that: The
20  plaintiff spoke with Ms. Jennifer Jehn
21  regarding the cartoon.
22          Do you know if that was true or
23  not?
24      A.   Yes.
25      Q.   In paragraph 84 of the answer

Page 353

1        Allan
2   filed on your behalf it states that: The
3   plaintiff spoke with Mr. Rabinowitz about the
4   cartoon.
5           Do you know if that is true?
6       A.   I don't know.
7       Q.   Joe Rabinowitz never told you that
8   Ms. Guzman spoke to him about the cartoon?
9       A.   Not that I recall.
10      Q.   Did you review this answer before
11  it was filed?
12      A.   I don't recall.
13      Q.   Would you have expected Joseph
14  Rabinowitz to tell you that Ms. Guzman spoke
15  to him about the cartoon if that had happened?
16      A.   Yes.
17      Q.   Why?
18      A.   It is not unimportant.
19      Q.   So you would agree, would you not
20  Mr. Allan, the fact that Ms. Guzman spoke to
21  Joe Rabinowitz about the cartoon was
22  important?
23      A.   Yes.
24      Q.   This is something that you should
25  have known about; correct?