# Exhibit D

Contains Confidential Portions

Page 1

1                    JESSE ANGELO
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------------------X
     SANDRA GUZMAN,
4                      Plaintiff,
5                      -against-    09CIV9323 (BSJ)(RLE)
6    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and COL ALLAN, in his
7    official and individual capacities,
8
                       Defendants.
9    ----------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
10
11                     Plaintiffs,
12                     -against-    09CIV9832 (BSJ)(RLE)
13   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST and DAN GREENFIELD and
14   MICHELLE GOTTHELF,
15                     Defendants.
     ----------------------------------------X
16
17
18          VIDEOTAPED DEPOSITION OF JESSE ANGELO
19                   New York, New York
20                 Wednesday, April 25, 2012
21
22   REPORTED BY:   BARBARA R. ZELTMAN
                    (BOBBIE)
23                  Professional Stenographic Reporter
24
25   Job Number:  48821

## Page 2

Contains Confidential Portions

1  JESSE ANGELO
2
3           April 25, 2012
           10:05 a.m.
4
5     Videotaped deposition of JESSE ANGELO
6  taken by Plaintiffs, pursuant to Notice, at the
7  offices of THOMPSON WIGDOR, LLP, 85 Fifth Avenue,
8  New York, New York, before BARBARA R. ZELTMAN, a
9  Professional Stenographic Reporter and Notary Public
10 within and for the State of New York.

TSG Reporting - Worldwide    877-702-9580

## Page 3

Contains Confidential Portions

1  JESSE ANGELO
2  A P P E A R A N C E S:
3
4  THOMPSON WIGDOR
5  Attorneys for the Plaintiffs
6     85 Fifth Avenue
7     New York, New York 10003
8  BY: PAUL CLARK, ESQ. and
       SHAFFIN A. DATOO, ESQ.
9
10
11 KASOWITZ BENSON TORRES & FRIEDMAN
12 Attorneys for the Defendants
13    1633 Broadway
14    New York, New York 10019
15 BY: MARK W. LERNER, ESQ., and
       BLYTHE E. LOVINGER, ESQ.
16
17
18 ALSO PRESENT: Jordan Lippner,
                News America Incorporated
19
20              Dale Swindell, Videographer

TSG Reporting - Worldwide    877-702-9580

## Page 4

Contains Confidential Portions

1        JESSE ANGELO
2
3      IT IS HEREBY STIPULATED AND AGREED
4  by and between the attorneys for the respective
5  parties herein that filing and sealing be and
6  the same are hereby waived.
7      IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to the form of
9  the question, shall be reserved to the time
10 of trial.
11     IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be signed and
13 sworn to before any officer authorized to
14 administer an oath with the same force and
15 effect as if signed and sworn to before
16 the Court.

TSG Reporting - Worldwide    877-702-9580

## Page 5

Contains Confidential Portions

1        JESSE ANGELO
2      THE VIDEOGRAPHER: This is the
3  start of media labeled Number 1 of
4  the videotaped deposition of Jesse
5  Angelo in the matter of Sandra Guzman
6  versus NewsCorp.
7      This deposition is being held at
8  85 Fifth Avenue, New York, New York, on
9  April 25, 2012 at approximately
10 10:05 a.m.
11     My name is Dale Swindell from TSG
12 Reporting, Incorporated and I'm the
13 certified legal video specialist. The
14 court reporter is Bobbie Zeltman in
15 association with TSG Reporting.
16     Will counsel please introduce
17 yourselves.
18     MR. CLARK: Paul Clark and
19 Shaffin Datoo for the plaintiffs
20 Sandra Guzman -- and this is also
21 going to be taken for Austin Fenner
22 and Ikimulisa Livingston -- from
23 Thompson Wigdor.
24     MR. LERNER: For the
25 defendants, Mark Lerner, Blythe

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 38

1  JESSE ANGELO
2  Q  When was the last time you spoke
3  with Rupert Murdoch in the newsroom?
4  A  The newsroom of The New York Post?
5  Q  The newsroom of The New York Post,
6  yes.
7  A  I would say summer 2010.
8  Q  In the summer of 2010, what did you
9  speak to Mr. Murdoch about?
10     MR. LERNER: Objection.
11     If the topic of the conversation
12  had to do with the editorial process or
13  editorial policy, then I'm going to
14  instruct you not to answer. And if you
15  need advice depending on what the
16  specific answer is, we can talk offline.
17     THE WITNESS: Okay.
18  A  I don't recall what I spoke to him
19  about in the newsroom of The New York Post
20  in summer 2010.
21  Q  Have you spoken to Rupert Murdoch
22  in any other newsroom than The New York Post
23  newsroom?
24  A  Yes.
25  Q  What other newsrooms have you

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 39

1  JESSE ANGELO
2  spoken to Rupert Murdoch in?
3  A  The Daily.
4  Q  What is The Daily?
5  A  The Daily is the first newspaper
6  for the iPad.
7  Q  Who runs The Daily?
8     MR. LERNER: Object to form.
9  A  I'm the Editor-in-Chief.
10  Q  Who do you report to?
11  A  Chase Carey.
12  Q  So The Daily and The New York Post
13  have separate newsrooms?
14  A  Correct.
15  Q  When was the last time you spoke to
16  Rupert Murdoch in the newsroom of The Daily?
17  A  A year ago.
18  Q  So 2011?
19  A  Yes.
20  Q  What did you speak to Rupert
21  Murdoch about in 2011 in the newsroom of
22  The Daily?
23     MR. LERNER: Objection. Same
24  instruction, Mr. Angelo.
25     THE WITNESS: What's the

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 40

1  JESSE ANGELO
2  instruction?
3     MR. LERNER: If the
4  conversation had to do with editorial
5  policy or editorial decision-making,
6  I'm going to instruct you not to
7  answer based on the editorial
8  privilege. And if we need to discuss
9  that so you can understand what the
10  implications of your answer would be,
11  we can do that.
12     THE WITNESS: Okay.
13  A  I showed him the newsroom of
14  The Daily. He had not seen it.
15  Q  So you didn't talk to him about
16  anything, you just showed him the newsroom?
17  A  Yes. I walked him around and
18  showed him the desks and the ...
19  Q  Have you ever discussed editorial
20  content with Rupert Murdoch?
21     MR. LERNER: Objection.
22  A  Have I ever discussed editorial
23  content with Rupert Murdoch?
24  Q  Yes.
25  A  I've discussed the news with Rupert

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 41

1  JESSE ANGELO
2  Murdoch.
3  Q  Had you ever discussed the
4  editorial content of the newspaper?
5     MR. LERNER: Of what newspaper?
6  Q  Fair enough. Of The Daily. Have
7  you ever discussed the editorial content of
8  The Daily with Rupert Murdoch?
9  A  Yes.
10  Q  So Rupert Murdoch plays a role in
11  formulating the policies -- of The Daily?
12     MR. LERNER: Objection.
13  A  No.
14  Q  So why would you discuss editorial
15  policy with Rupert Murdoch if he plays no
16  role in formulating the editorial policies?
17     MR. LERNER: Objection.
18  A  I did not say I discussed editorial
19  policy with Rupert Murdoch. It's a
20  mischaracterization of what I said.
21  Q  Okay.
22     Have you ever discussed editorial
23  policy of The Daily with Rupert Murdoch?
24     MR. LERNER: Objection.
25  A  No.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 46

```
 1        JESSE ANGELO
 2   A    Go ahead.
 3        MR. LERNER: Do you want to
 4   finish a couple questions?
 5        MR. CLARK: Yes.
 6        MR. LERNER: But we do want to
 7   take a break.
 8   Q    Tell me what you mean when you say
 9   you chatted about the news. What does that
10   mean?
11   A    As you and I might chat about the
12   news, what happened, what's happening in the
13   news on any given day.
14        I mean, what the government's
15   doing, what the mayor's doing, what's
16   happening with a fire or police story. Just
17   chats about the news just as you and I would
18   chat about the news.
19   Q    But you don't work for me, do you?
20   A    No.
21        THE WITNESS: Can I take a
22   break now?
23        MR. LERNER: He finished the
24   question.
25        THE WITNESS: I finished the
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 47

```
 1        JESSE ANGELO
 2   question.
 3        MR. CLARK: Let me ask one
 4   more. We've been here less than an
 5   hour.
 6        MR. LERNER: You actually
 7   instructed him --
 8        MR. CLARK: I'm right in the
 9   middle of line of questioning. Give
10   me two minutes.
11        MR. LERNER: I think the
12   witness is requesting consultation
13   with counsel about the question, or
14   perhaps not.
15        MR. CLARK: That was not clear
16   to me.
17        MR. LERNER: It doesn't matter.
18   Your instruction was at the outset
19   that he can take a break any time he
20   wanted as long as he didn't take a
21   break while there was a question
22   pending.
23        He's asked for a break.
24        MR. CLARK: I'm right in the
25   middle of the line of questioning. I
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 48

```
 1        JESSE ANGELO
 2   have one more question.
 3   BY MR. CLARK:
 4   Q    So did any of these chats about the
 5   news with Rupert Murdoch involve him
 6   suggesting what stories you should cover?
 7        MR. LERNER: Objection. Hold
 8   on.
 9        I'm going to instruct the witness
10   not to answer that on the basis of
11   editorial privilege because I don't know
12   what the answer's going to be.
13        This would be a perfect time to
14   take a break because I need to find out
15   if an answer to that question would
16   breach a privilege.
17        MR. CLARK: I understand and I
18   appreciate that. But this witness
19   already testified that he's never had
20   any conversations about editorial
21   content with Mr. Murdoch, but that's
22   fine.
23        MR. LERNER: You are asking him
24   about the same subject again that
25   would potentially go into this area,
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 49

```
 1        JESSE ANGELO
 2   so I need to know what -- the answer
 3   to this particular question.
 4        MR. CLARK: Okay. We'll take
 5   five minutes.
 6        THE VIDEOGRAPHER: The time is
 7   10:47. We're going off the record.
 8        (A brief recess was
 9   taken.)
10        THE VIDEOGRAPHER: The time is
11   10:54. We're back on the record.
12        MR. CLARK: Bobbie, could you
13   read back the last question for me.
14        (Requested portion of record read:
15        "Q. So did any of these chats
16   about the news with Rupert Murdoch
17   involve him suggesting what stories you
18   should cover?")
19        (End of read-back.)
20        MR. LERNER: You can answer.
21   A    No.
22   Q    Did any of these chats involving
23   news with Rupert Murdoch involve him telling
24   you which stories you should cover?
25   A    No.
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 94

1  JESSE ANGELO
2  that Rupert Murdoch spoke with about the
3  situation?
4  A   No.
5  Q   Do you know if he spoke to any
6  other Post editors about the situation?
7  A   I don't know.
8  Q   Now, in this statement by
9  Mr. Murdoch, he says he spoke with "Post
10 editors," plural, correct?
11 A   Yes.
12 Q   Do you have any reason to think
13 that that is incorrect?
14 A   I don't know.
15 Q   So you don't know whether he spoke
16 to anyone other than Col Allan?
17 A   Correct.
18 Q   Other than Post editors, do you
19 know if he, Mr. Murdoch, spoke to anyone
20 else who is an employee of The New York Post
21 or any NewsCorp subsidiary about the
22 situation with the cartoon?
23     MR. LERNER: Objection.
24 A   I don't know.
25 Q   Did you ever speak to Col Allan

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 95

1  JESSE ANGELO
2  about -- let me narrow it down.
3      In February of 2009, did you ever
4  speak to Rupert Murdoch about the situation
5  involving the cartoon?
6  A   Not that I recall.
7  Q   So you might have spoken to Rupert
8  Murdoch about the cartoon in February 2009
9  but you don't recall?
10 A   That's you phrasing it. It is
11 possible I spoke to him. I don't recall
12 speaking to him.
13 Q   Do you recall ever speaking to
14 Rupert Murdoch about the cartoon described
15 in this e-mail in February -- of
16 February 2009? At any point in time, did
17 you speak to Rupert Murdoch about the
18 cartoon?
19 A   I don't recall ever speaking to him
20 about it.
21 Q   But you can't say that you have not
22 spoken to him about the cartoon?
23     MR. LERNER: Objection.
24 A   That is correct.
25 Q   That same paragraph goes on to say

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 96

1  JESSE ANGELO
2  "It was not meant to be racist, but
3  unfortunately it was interpreted by many as
4  such."
5      Do you see that?
6  A   Yes.
7  Q   Do you agree with me that "it"
8  refers to the cartoon, so he's saying that
9  the cartoon was not meant to be racist?
10 A   Yes.
11 Q   Do you agree that the cartoon was
12 not meant to be racist?
13     MR. LERNER: Objection.
14     Mr. Angelo, I'm going to direct you
15 on the basis of editorial privilege not
16 to testify to what was meant by the
17 editors of the paper or anybody else that
18 was involved in the publication of the
19 cartoon in connection with this
20 publication.
21     MR. CLARK: Well, two things I
22 want to make clear.
23     Are you invoking an editorial
24 privilege or a journalistic privilege?
25     MR. LERNER: Editorial.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 97

1  JESSE ANGELO
2      MR. CLARK: Okay.
3      So could you read the question
4  back.
5      (Requested portion of record read:
6  "Q. Do you agree that the cartoon
7  was not meant to be racist?")
8      (End of read-back.)
9      MR. CLARK: Are you directing
10 him not to answer? We have a
11 question pending.
12     MR. LERNER: Oh, we haven't
13 changed our position, if that's what
14 you are asking me based on the
15 rereading of the question.
16     MR. CLARK: Well, I have not
17 heard a direction to the witness not
18 to answer, so I assume the witness
19 should be answering the question.
20     MR. LERNER: I thought I did so
21 direct him.
22     The witness should not answer the
23 question. The witness can testify about
24 his interpretation of the cartoon in the
25 wake of its publication.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 98

JESSE ANGELO

You are free to ask him those questions, but I'm going to instruct him that he should invoke a privilege with respect to the decision to publish the cartoon, such if even he has any knowledge about it.
(Directive to witness.)
BY MR. CLARK:
Q   Mr. Angelo, are you refusing to answer the question whether you agree with the statement that the cartoon was not meant to be racist?
MR. LERNER: He's not going to answer that question.
(Directive to witness.)
MR. LERNER: The answer to that question is yes.
MR. CLARK: Yes, he's not going to answer it?
MR. LERNER: Yes.
Q   Do you agree with the statement by Rupert Murdoch that it was intended by many as such, meaning to be racist?
MR. LERNER: Mr. Angelo is not

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 99

JESSE ANGELO

going to answer that question.
(Directive to witness.)
MR. CLARK: How can you invoke a privilege when you've taken a public position and you won't even let him say whether he agrees or disagrees with the public position taken by an employee?
MR. LERNER: Privilege is personal to Mr. Angelo.
MR. CLARK: It's personal to Mr. Angelo?
MR. LERNER: Yes.
MR. CLARK: Is it also held by the company or just by Mr. Angelo.
MR. LERNER: We've asserted the privilege.
If you want to move to compel answers to those questions, you are free to do that.
MR. CLARK: I'm trying to understand the scope of this privilege so I can tailor my questions. I mean, obviously I

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 100

JESSE ANGELO

disagree. I don't think there is a editorial privilege and I don't see how you can invoke it when you've had a public statement on the matter.
But I just want to understand your position is so I can question in corresponding to that.
MR. LERNER: No editor of this paper has made a public statement about the cartoon.
And Mr. Angelo hasn't made a public statement about the cartoon. I should say that the statement that you are asking questions about is not a statement of Mr. Angelo or an editor of The New York Post.
BY MR. CLARK:
Q   Mr. Angelo, did you ever discuss Mr. Murdoch's apology contained here with any other employees of The New York Post?
MR. LERNER: You can answer that.
A   Yes.
Q   Who did you discuss the employee --

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 101

JESSE ANGELO

who did you discuss the apology with who were employees of The New York Post?
A   I recalled --
MR. LERNER: Are these discussions before the apology was printed or after the apology was printed?
MR. CLARK: The question encompasses both.
MR. LERNER: I want to know what the witness' answer is going to be, so I can instruct him accordingly.
MR. CLARK: Well, that can't possibly be privileged who he spoke to. I'm not asking him about content.
BY MR. CLARK:
Q   I merely want the names of who you spoke with, Mr. Angelo, about Mr. Murdoch's apology.
A   Before or after publication.
Q   Either one, at any time.
MR. LERNER: You can answer

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 138

```
 1         JESSE ANGELO
 2   else who complained about the cartoon.
 3      Q    So you are saying that -- do you
 4   recall that other employees complained about
 5   the cartoon?
 6         MR. LERNER:  Objection.
 7         You can answer.
 8      A    I remember speaking with other
 9   reporters about the -- other people at
10   The Post about the cartoon.
11         It was a characterization of
12   "complaints."
13      Q    When you were speaking to these
14   other employees about the cartoon, were any
15   of these other employees offended by the
16   cartoon?
17      A    I can't speak to their exact state
18   of mind, but I spoke to a number of
19   employees about the cartoon that day.
20      Q    Did any of these employees you
21   spoke to about the cartoon that day express
22   that they were offended by the cartoon?
23      A    Not that I specifically recall.
24      Q    Do you believe the cartoon is
25   offensive?
```
TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 139

```
 1         JESSE ANGELO
 2      A    No.
 3      Q    Mr. Greene says "Angelo admitted
 4   that the cartoon could be seen as racist."
 5         Did you tell Mr. Greene that?
 6      A    I think that's a
 7   mischaracterization of my words.
 8         And if I may clear up something I
 9   said earlier.
10         You asked me if I had any reason to
11   doubt Mr. Greene's honesty, and I'd like to
12   recharacterize my answer which was I hadn't
13   in the past until I read this affidavit.
14      Q    So tell me why this is a
15   mischaracterization when Mr. Greene says
16   "Angelo admitted that the cartoon could be
17   seen as racist"?
18      A    Again, I don't recall what my exact
19   words were.
20         As I said, what I would have said
21   to Leonard that day, as I said to any member
22   of staff:  I can understand how people might
23   have misconstrued the cartoon and therefore
24   been offended by it but I don't see it as
25   racist.
```
TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 140

```
 1         JESSE ANGELO
 2      Q    How is it that people can
 3   misconstrue the cartoon and be offended by
 4   it, in your understanding?
 5      A    I'm not going put myself in anyone
 6   else's mind and say how they may or may not
 7   construe.
 8      Q    You testified earlier that you were
 9   familiar with blacks being portrayed as
10   subhuman, as animals, chimpanzees, apes,
11   things like that, correct?
12      A    You just listed a number of
13   categories of what you are defining as
14   subhuman, and I don't think I agreed to my
15   previous answer.
16      Q    Did you say that you were aware
17   that blacks had been portrayed as apes?
18      A    Yes.
19      Q    Would you -- have blacks in the
20   past been portrayed as chimpanzees?
21      A    Yes.
22      Q    You were aware of this at the time
23   you approved the cartoon, correct?
24      A    I didn't say that.
25      Q    Didn't you testify earlier that at
```
TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 141

```
 1         JESSE ANGELO
 2   the time the cartoon was published, you were
 3   aware of these historical predictions?
 4      A    I'm aware of that historical fact
 5   over a long period of time.
 6         The way you phrase it, it says I
 7   have an awareness of the fact as I approved
 8   the publication of the cartoon, and I can't
 9   say that I did.  It was not in my mind as I
10   approved the cartoon for publication.
11      Q    So you are telling me when you
12   approved the cartoon for publication, you
13   were generally aware that blacks had been
14   portrayed as chimpanzees but you did not
15   connect that knowledge with this particular
16   cartoon?
17      A    I was aware of the historical fact
18   that blacks had been portrayed as
19   chimpanzees in the past in American history.
20         I never brought that knowledge to
21   bear in any way, shape or form on the
22   publication of this cartoon.
23      Q    Are you saying then it never
24   occurred to you that people could connect
25   this particular chimpanzee cartoon with a
```
TSG Reporting - Worldwide   877-702-9580

---

## Page 338

Contains Confidential Portions

1  JESSE ANGELO
2  A   Is there a time frame?
3  Q   Well, was there any time you
4  thought it was not a well done section?
5      MR. LERNER: Objection.
6  A   My recollection is it started out
7  pretty strong. You know, there was some
8  good stuff in there.
9      Over time, my recollection is it
10 got smaller and not as good in quality, was
11 my general recollection.
12 Q   Are you aware of any budget cuts
13 that were made to the Tempo section while
14 you were City editor?
15     MR. LERNER: Objection.
16 A   No.
17 Q   Were you privy to that kind of
18 discussion?
19     MR. LERNER: Objection.
20 A   No.
21 Q   Did you ever attend meetings with
22 Sandra Guzman and other people?
23 A   Yes.
24 Q   What types of meetings would you
25 attend?

TSG Reporting - Worldwide    877-702-9580

## Page 339

Contains Confidential Portions

1  JESSE ANGELO
2      MR. LERNER: With Sandra Guzman
3  and other people?
4      MR. CLARK: Uh-huh.
5  A   I remember -- I recall being in
6  editorial meetings with Sandra Guzman and
7  other people.
8      MR. CLARK: Can you mark this
9  as 29.
10     (Angelo Exhibit 29,
11 Handwritten note, Bates Number
12 SG-2343, was marked for
13 Identification.)
14 BY MR. CLARK:
15 Q   Take a look at that for a moment,
16 if you would, Mr. Angelo.
17 A   Okay.
18 Q   This is labeled SG-2343.
19     And I can represent to you,
20 Mr. Angelo, this was a sketch that was
21 produced in this case by Ms. Guzman.
22     I call your attention. You see
23 there's a "Jesse" on --
24     (Pause.)
25 BY MR. CLARK:

TSG Reporting - Worldwide    877-702-9580

## Page 340

Contains Confidential Portions

1  JESSE ANGELO
2  Q   Mr. Angelo, there is a "Jesse"
3  labeled in this sketch. If you see on the
4  right, second from the top, it says Jesse.
5      And then above that it says CM and
6  then at the top CA.
7      In the meetings you had involving
8  Sandra Guzman, would these meetings involve
9  Col Allan?
10 A   I'm sorry. I have no idea what
11 this is. So ...
12 Q   I understand that.
13 A   So you referenced some words that
14 are on this picture that you just gave me,
15 and then you asked me a question about
16 meetings with Sandra Guzman and Col Allan.
17 Q   Fair enough.
18     Have you been in editorial meetings
19 with Sandra Guzman and Col Allan?
20 A   Yes.
21 Q   And other people?
22 A   I'm sorry. You talked over what I
23 said.
24 Q   That's fine.
25 A   So what's the question?

TSG Reporting - Worldwide    877-702-9580

## Page 341

Contains Confidential Portions

1  JESSE ANGELO
2  Q   No. You answered it. That's fine.
3  A   Whoa. What did I answer? I'm
4  sorry. I just want to know.
5  Q   You've been in meetings with Col
6  Allan and Sandra Guzman, right? Editorial
7  meetings?
8  A   Yes.
9  Q   In these editorial meetings, would
10 other people usually be present besides the
11 three of you?
12 A   Yes.
13 Q   Would Col Allan normally sit at the
14 head of the table?
15 A   Yes.
16 Q   So if this were a sketch and "CA"
17 stands for Col Allan.
18     And you can see at the left, it
19 says Robo.
20     Would that be Robinowitz?
21     MR. LERNER: Objection.
22 Q   Would it make sense that that means
23 Robinowitz?
24 A   I have no idea who made this sketch
25 and what they intended this to be.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 358

1      JESSE ANGELO
2  testimony is you are certain you have never
3  seen this photograph that I provided you on
4  Col Allan's Blackberry or iPhone or some
5  kind of device like that, correct?
6     A   Yes.
7     Q   And Col Allan -- I think you
8  already said this but just to be clear. Col
9  Allan has never shown you this photograph at
10 any time?
11    A   No, he's never shown me this
12 photograph.
13    Q   Have you ever seen Col Allan show a
14 photograph of a naked man to anyone?
15    A   The only time that I ever saw
16 anything like that, I remember seeing a
17 front page on his Blackberry that had a news
18 photograph in it, with a naked man in it.
19    Q   When was that?
20    A   I don't recall the exact date.
21    Q   Do you recall what naked man was
22 depicted on this front-page story on the
23 Blackberry?
24    A   It was a crazy guy who ran naked
25 through Times Square.
   TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 359

1      JESSE ANGELO
2     Q   And was anyone else present when he
3  showed you this photograph?
4     A   Not that I recall.
5         And again just to be clear, he
6  didn't show me the photograph. He showed me
7  a pdf of the front page of The New York Post
8  that had that photograph.
9     Q   Where did this take place?
10    A   At Langan's.
11    Q   And you don't know if anyone else
12 saw this photograph?
13    A   No.
14        MR. CLARK: We have to change
15    the tape. Why don't we take a break
16    and we'll wrap up.
17        THE VIDEOGRAPHER: The time is
18    6:55. We're going off the record.
19         (A brief recess was
20    taken.)
21        THE VIDEOGRAPHER: The time is
22    7:00. We're back on the record.
23 BY MR. CLARK:
24    Q   Mr. Angelo, who is Steve Dunlevy?
25    A   Steve Dunlevy used to be a
   TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 360

1      JESSE ANGELO
2  columnist at The New York Post.
3     Q   Did Steve Dunlevy ever use a racial
4  epithet in your presence?
5     A   Yes.
6     Q   Where did this happen?
7     A   At Langan's.
8     Q   What did he say?
9     A   He used a racial epithet in
10 conjunction with another member of staff,
11 and I reprimanded him for it.
12    Q   Can you be more specific?
13        What did he say exactly?
14    A   He was referring to a member of
15 staff named Robert George and he referred to
16 him as the token N-word. And I heard him
17 say it and I immediately reprimanded him for
18 it.
19    Q   When did in occur?
20    A   I don't recall the exact date.
21    Q   Was anyone else present?
22    A   Yes.
23    Q   Who else was present?
24    A   Robert George was present.
25    Q   He says this in Robert George's
   TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 361

1      JESSE ANGELO
2  presence?
3     A   Yes.
4     Q   Was anyone else present?
5     A   Col Allan was present.
6     Q   Anyone else?
7     A   I believe there were other people
8  around. I don't recall who they were or in
9  what proximity.
10    Q   What was Col Allan's reaction?
11    A   You know, I don't recall Col's
12 reaction.
13    Q   You said you reprimanded
14 Mr. Dunlevy?
15    A   That is correct.
16    Q   How did you reprimand him?
17    A   I told him it was unacceptable,
18 inappropriate and he couldn't speak that
19 way.
20    Q   Was any other action ever taken
21 against Mr. Dunlevy?
22    A   For what?
23    Q   For this incident.
24    A   Not that I am aware of.
25    Q   So you thought that a verbal
   TSG Reporting - Worldwide    877-702-9580

91 (Pages 358 to 361)