# Exhibit E

## AFFIDAVIT OF LEONARD GREENE

STATE OF NEW YORK    )
                     )   ss.:
COUNTY OF NEW YORK   )

Leonard Greene, being duly sworn, deposes and says:

1. I am an African-American male.

2. I work as a Senior Reporter on the City Desk at the *New York Post* (the "Post" or the "Company").

3. I have worked at the Post since 2000.

4. Prior to joining the Post, I had a successful and accomplished career working for over a decade at numerous newspapers throughout the country, including the *Boston Herald* and the *San Francisco Chronicle*.

5. Moreover, throughout my employment at the Post I have received positive performance reviews and have been praised for my writing, work ethic and story ideas.

6. However, during my employment with the Post, I have been subjected to racial discrimination by members of the White management of the Post.

7. For example, for the last five years, I have repeatedly asked to be allowed to work as a columnist at the newspaper, which is a position of prestige that I am well qualified for based on my previous experience working as a columnist for over eight years at the *Boston Herald*.

1

8. However, the Company has repeatedly denied my requests to become a full time columnist based on several inconsistent and false reasons, and instead has filled open columnist positions with White employees.

9. By way of example only, during my last performance review during the Summer of 2009, I was told by Michelle Gotthelf, the Metropolitan Editor of the Post's City Desk, that there were no open full time columnist positions at the Company and that the position did not exist.

10. In response, I offered to write a column for the Post part time, every Monday, to demonstrate again that I would be an invaluable asset in this role.

11. However, Ms. Gotthelf informed me that the Post had a policy against permitting columnists to write columns on specific days of the week.

12. Shortly thereafter, the Post hired Michael Goodwin, a White male, to write a full time column after I was told that there were no open columnist positions available.

13. Moreover, the Post has recently permitted both Mr. Goodwin and Andrea Peyser, another White columnist, to have their columns published on specific days of the week, which Ms. Gotthelf had told me violated the Post's policies.

14. However, the most outrageous example of the false statements made to me by the Post in response to my requests to be made columnist was demonstrated when the Post recently hired Ashley Dupre, the former prostitute who had an affair with ex-New York Governor Eliot Spitzer, as a columnist. Ms. Dupre, who is White, now writes a column appearing every Sunday,

despite the fact that I was told the position did not exist and that the Post had a policy in place preventing columnists from being assigned to specific days of the week.

15.    The Post's decision to hire a former prostitute, who has no prior journalism experience, to write a regular column, despite rejecting my repeated requests and substantial prior experience, is evidence of the discrimination being committed against me based on my race.

16.    There is no doubt in my mind that I would have been promoted to the columnist position if I were a White employee of the Post. Indeed, many of my colleagues have openly expressed their belief that I was well qualified for the position and that I deserved to be a columnist.

17.    Similarly, I have also applied for an editorial position at the Post during my tenure with the Company, but I have not yet been given such a position.

18.    Most recently, the Post has permitted four White employees from outside of the Company to try out for an open editorial position, despite my request that I be permitted to apply for the position.

19.    As part of their try outs, these White editors were permitted to temporarily fill the position, during which time they assigned stories to me and other reporters and performed other editorial functions.

20.    I found it deeply humiliating and offensive that I was required to accept assignments from White individuals who had no prior experience at the Post, while I have yet to

3

be made editor, despite my years of loyalty, hard work and enormous contributions to the Company.

21. Instead, the Post has consistently filled open columnist and editorial positions with less qualified White employees.

22. In fact, there has not been an African-American, Hispanic, or Asian Editor on the City Desk in almost 10 years.

23. Moreover, I am the only non-White reporter at the Post that is in the newsroom on a regular basis.

24. Other employees of color at the Post were also discriminated against on the basis of their race, color and/or gender.

25. For example, Douglas Montero, a Hispanic reporter at the Post who had been a full time columnist, had his column taken away from him without explanation.

26. Moreover, Austin Fenner, another highly qualified African-American reporter, was discriminatorily banned from the newsroom at the Post for over five months and, in fact, had to request permission from his White editors before he could enter the newsroom.

27. No White reporters were ever banned from the newsroom at the Post and had to seek anyone's permission before entering the newsroom.

28. Prior to being banned from the newsroom, Mr. Fenner was an excellent reporter who consistently performed outstanding work for the Post.

29. As a result of being banned from the newsroom, Mr. Fenner was denied the tools necessary to succeed at his job, including valuable face time with other reporters to discuss and/or generate story ideas.

30. Nevertheless, despite being banned and being denied necessary resources, Mr. Fenner continued to work hard for the Post.

31. Similarly, another African American reporter, Ikimulisa Livingston, is also rarely in the newsroom at the Post and does not have a desk, telephone or computer in the newsroom to carry out her duties as a reporter, which are necessary resources given to White reporters at the Company.

32. Moreover, in or around February 2009, the New York Post published a racist, offensive and degrading cartoon depicting a chimpanzee with three bullet holes in his chest lying in a pool of his own blood having been shot by two White police officers with the caption, "They'll have to find someone else to write the next stimulus bill."

33. I immediately recognized that the chimpanzee was supposed to represent President Barack Obama.

34. As an African-American, I found the cartoon to be deeply racially offensive. Moreover, I felt the response of various editors and management officials at the Post showed a complete disregard for my feelings as a person of color.

35. I immediately called Jesse Angelo, the White Managing Editor at the Post, to complain about the cartoon. Incredibly, Angelo told me that he had approved the cartoon prior to its publication and did not believe that there was anything wrong with the cartoon, despite its

obviously racist message. However, after the cartoon had been published, and in response to my phone call, Angelo admitted that the cartoon could be seen as racist.

36. The Post's decision to publish the cartoon comparing President Obama to a dead chimp was particularly shocking in light of the fact that Sean Delonas, the cartoon's artist, apparently submits several cartoons for possible publication on a daily basis. Accordingly, the White editors at the Post apparently specifically chose the offensive and racist cartoon over other options.

37. In light of the justifiable anger that the cartoon's publication created, I asked Ms. Gotthelf if I could write a story about the cartoon on behalf of the Post, responding to the public outrage. I believed that by allowing me, as an African-American reporter, to write a column addressing the cartoon, the Post would demonstrate that it recognized the offensiveness of the cartoon and show that it was apologetic for causing such a racist and dangerous message to be published.

38. In response, Ms. Gotthelf told me that the White editors at the Post decided that there was no reason for me to write a column concerning the cartoon.

39. Shortly thereafter, I was contacted by a representative for Governor David Paterson, the first African American governor of the State of New York, who told me that Governor Paterson was interested in doing an exclusive interview with me concerning the cartoon. I responded that I would be interested in doing the interview, but only if I were permitted to ask questions about other topics as well, a request that the Governor accepted.

40. Incredibly, the White editors at the Post rejected the offer, saying that they were not interested in this exclusive and rare opportunity to conduct a sit down interview with New York's first Black Governor. The Post's decision to decline an exclusive interview with a sitting governor was unprecedented and practically unheard of in journalism.

41. I have not described in this affidavit every offensive, degrading or improper comment or act that I have witnessed or experienced at the New York Post.

*Leonard Greene*

Sworn to before me on 28

December __, 2009

*Virginia Gentile*
Notary Public

VIRGINIA GENTILE
Notary Public, State of New York
No. 01GE4960908
Qualified in Nassau County
Commission Expires January 2, 20 10