# Exhibit I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                :

SANDRA GUZMAN,                  :     Civ. No.: 09 CV 9323 (BSJ) (RLE)

                         :
               Plaintiff,    :

                         :
              vs.           :

NEWS CORPORATION, NYP HOLDINGS,  :
INC., d/b/a THE NEW YORK POST,    :
and COL ALLAN, in his official and   :
individual capacities,          :

                    Defendants.  :
------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE CERTAIN ALLEGATIONS

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:   (212) 506-1800

Attorneys for Defendants News Corporation,
NYP Holdings, Inc. d/b/a the New York Post,
and Col Allan

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 4

ARGUMENT ........................................................................................................... 5

I.  PLAINTIFF'S CONTENT-BASED ALLEGATIONS SHOULD BE STRICKEN ................. 5

    A.  Motions to Strike Are Granted to Remove
        Inappropriate Material From a Pleading ........................................................... 5

    B.  The Protections of the First Amendment Are
        a Basis For Striking Portions of a Pleading ..................................................... 6

    C.  Plaintiff's Allegations Relating to the *Post's*
        First Amendment-Protected Content Must be Stricken ....................................... 7

    D.  The First Amendment Protects the *Post's* Editorial
        Process and Requires That Plaintiff's Allegations Concerning It be Stricken ................. 16

II.  PLAINTIFF'S SUBJECTIVE AND INFLAMMATORY DESCRIPTIONS
    OF THE POST'S CONTENT AND EDITORS MUST BE STRICKEN ........................... 18

III.  THE COURT SHOULD STRIKE TWO ADDITIONAL ALLEGATIONS
     WHICH ARE IMMATERIAL, IMPERTINENT AND SCANDALOUS ........................... 21

CONCLUSION .......................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

Atlantic City Electric Co. v. General Electric Co.,
    207 F.Supp. 620, 624 (S.D.N.Y. 1962) ........................................................... 22

Budget Dress Corp. v. Int'l Ladies' Garment Worker's Union,
    25 F.R.D. 506, 508 (S.D.N.Y. 1959) ............................................................ 21

Burger v. Health Ins. Plan of Greater New York,
    684 F. Supp. 46, 52 (S.D.N.Y. 1988) ............................................... 13, 23, 24

Cabble v. Rollieson,
    2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006) ............................ 7, 23, 25

Dent v. U.S. Tennis Ass'n, Inc.,
    2008 WL 2483288, at *4 (E.D.N.Y. June 17, 2008) ........................... 14, 22, 23

FCC v. Pacifica Foundation,
    438 U.S. 726, 745-46 (1978) ........................................................................ 8

Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,
    402 F. Supp. 636 (S.D.N.Y. 1975) ................................................................ 22

Guzman v. News Corp.,
    09-Civ-9323 (BSJ), Slip Op., at 3 (S.D.N.Y. Sept. 24, 2010) ................... *passim*

Heller Fin., Inc. v. Midwhey Powder Co.,
    883 F.2d 1286, 1294 (7th Cir. 1989) .............................................................. 6

Husain v. Springer,
    494 F.3d 108, 128 (2d Cir. 2007) ................................................................. 19

Hustler Magazine v. Falwell,
    485 U.S. 46, 54 (1988) ................................................................................. 7

Kunzler v. Canon USA, Inc.,
    257 F. Supp. 2d 574, 579-80 (S.D.N.Y. 2003) ............................................. 16

Lukowski v. County of Seneca,
    2009 WL 467075, at *14 (S.D.N.Y. Feb. 24, 2009) ......................................... 6

M'Baye v. World Boxing Ass'n,
    2007 WL 844552, at *4 (S.D.N.Y. Mar. 21, 2007) ........................................ 17

Metrokane, Inc. v. The Wine Enthusiast,
    160 F. Supp. 2d 633, 642 (S.D.N.Y. 2001) ................................................................ 6

Miami Herald Pub. Co. v. Tornillo,
    418 U.S. 241, 255 (1974) ............................................................................ *passim*

National Organization for Women, Inc. v. Scheidler,
    897 F. Supp. 1047, 1087 n.28 (N.D. Ill. 1995) .............................................. 7, 12, 13

Near v. Minnesota ex rel. Olson,
    283 U.S. 697 (1931) ................................................................................................ 14

New York Times v. Sullivan,
    376 U.S. 254, 266 (1964) .......................................................................................... 8

Nextel of New York, Inc. v. City of Mount Vernon,
    361 F. Supp. 2d 336, 339-40 (S.D.N.Y. 2005) ...................................................... 23

Red Ball Interior Demolition Corp. v. Palmadessa,
    908 F. Supp. 1226, 1241-42 (S.D.N.Y. 1995) ........................................................ 6

Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.,
    657 F. Supp. 136, 144 (E.D.N.Y. 1987) ................................................................ 22

Stanley v. The Lawson Co.,
    993 F. Supp. 1084, 1089 (N.D. Oh. 1997) ...................................................... 15, 16

U.S. v. Marcos,
    1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990) ................................................... 19

U.S. v. National Treasury Employees Union,
    513 U.S. 454, 468 (1995) ........................................................................................ 14

**Statutes**

FED. R. CIV. P. 12(e) .......................................................................................................... 1

FED. R. CIV. P. 12(f) ............................................................................................... *passim*

FED. R. CIV. P. 8(a)(2) ................................................................................................ 2, 18

**Other Authorities**

U.S. CONST. amend. I ............................................................................................. *passim*

**Treatises**

2 James Wm. Moore et al., Moore's Federal Practice ¶12.21(2) (2d ed. 1948) ........................... 23

Defendants News Corporation, NYP Holdings, Inc., d/b/a The New York Post, and Col Allan (together, "defendants") submit this memorandum of law in support of their motion pursuant to FED. R. CIV. P. 12(e) and 12(f) to strike certain allegations from the Amended Complaint (the "AC") of plaintiff Sandra Guzman.[1]

## PRELIMINARY STATEMENT

On September 24, 2010, the Court issued an Order ruling that the Complaint in this action should not be dismissed at this early stage because, based on the allegations in the Complaint, the plaintiff did not complain "<u>solely</u> about the cartoon" published by the *New York Post* newspaper on February 18, 2009 depicting a chimpanzee having been shot by two police officers (the "cartoon" or "Stimulus Cartoon"). <u>Guzman v. News Corp.</u>, 09-Civ-9323 (BSJ), Slip Op., at 3 (S.D.N.Y. Sept. 24, 2010) (the "Order") (emphasis added). However, the Amended Complaint is replete with material "solely about the cartoon" and other published editorial content of the *New York Post* newspaper (the "*Post*") – material that has no relation to any alleged "employment practice." In order to vindicate critical First Amendment values, the Court should strike certain portions of the pleading as set forth below.

Under Rule 12(f) of the Federal Rules of Civil Procedure, a Court may "order stricken from any pleading any . . . redundant, immaterial, impertinent, or scandalous matter." The AC here is not a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather, plaintiff has made the AC (as with its predecessor pleading) a vehicle to indict whatever aspects of the *Post's* published editorial content and editorial judgment she finds objectionable or offensive. The document is not a descriptive notice of her claims of alleged unlawful <u>employment</u> practices – although portions of it purport to be – but it

---

[1] The objectionable allegations that should be stricken are indicated in the Strike-Through version of the AC, attached hereto as Exhibit A, and are identified and discussed with further specificity below.

is to great extent – and improperly – a repository of her (subjective and false) criticism of the *Post's* published, First Amendment-protected content.  Such (false) statements as, "Despite knowing that the cartoon was racist, offensive and dangerous on many levels, Defendants nevertheless published the cartoon depicting violence and bigotry against the President of the United States" (AC ¶ 7), and "the Post has also repeatedly targeted people of color and women outside of the Company with its racism and sexism through racially and sexually offensive news headlines, news stories and humiliating, insulting and degrading cartoons" (id. at ¶ 4, emphasis added), demonstrate that the AC is not a notice of claim but instead a personal manifesto of protest over the *Post's* published content.

The published editorial content of a newspaper is protected by the First Amendment and has no place as the focal point of an employment discrimination complaint.  As the United States Supreme Court has held:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials-whether fair or unfair-constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 255 (1974).  Consistent with this holding, the *Post's* published content does not constitute an employment practice and complaining about it does not constitute protected conduct.  This Court so indicated in its September 24, 2010 Order denying the motion to dismiss because the complaints alleged were not "solely about the cartoon."  Guzman, Slip Op., at 3.  Further to this Court's holding, because the *Post's* published content challenged by plaintiff is political speech, it is granted the greatest constitutional protection:  the U.S. Supreme Court explicitly has cautioned against interference with editorial judgment of newspapers and warned of the chilling effect such inquiries will have on the

freedom of the press. The prejudice to defendants here is palpable. Plaintiff will attempt to use this material to confuse the issues before a potential jury, bias it against the *Post*, and expand improperly the scope of the case, as her attorneys already have done in the press, by improperly making the discovery process and any trial a referendum on the *Post's* content and editorial discretion. Further, striking this material will properly focus the issues before the Court on only the <u>employment</u> practices which are alleged to have been unlawful, thereby streamlining the litigation.[2]

The material that should be stricken consists of references to the *Post's* editorial content, including headlines, stories and a political cartoon, and the *Post's* alleged editorial decisions not to publish different cartoons, or to cover or publish certain news stories. Much of the material is also laced with scandalous modifiers expressing plaintiff's subjective beliefs about content as "racist," "dangerous," or "offensive." The paragraphs containing these allegations are indeed redundant, immaterial, impertinent and scandalous. They add nothing factual, but serve only to try to inflame and prejudice the jury against the *Post*.

Accordingly, defendants' motion to strike certain allegations in the AC should be granted.

---

[2] In fact, even now, document requests were served upon counsel (on October 19, 2010) which seek evidence directly placing the editorial content and processes of the *Post* into issue. (<u>See</u> Plaintiff's Second Set of Document Requests, attached hereto as Exhibit B.) The intent of plaintiff is evident from these requests: plaintiff seeks all communications between all News Corporation employees relating to the Stimulus Cartoon, all communications between all News Corporation employees concerning Mr. Rupert Murdoch's decision to issue a public apology to those offended by the cartoon, and all documents relating to the <u>intent</u> behind the Stimulus Cartoon. Clearly, such information is only relevant for the purpose of putting the Stimulus Cartoon on trial. In fact, plaintiff does not even attempt to disguise her intent with respect to the *Post's* published content, having argued in her opposition to the *Post's* motion to dismiss: "[I]rrespective of the protections afforded the contents of Defendants' speech, there is absolutely no question that the message proliferated by the derogatory headlines and cartoons published by the Post are relevant to Ms. Guzman's claims insofar as they demonstrate Defendants' discriminatory animus towards people of color . . . ."

## STATEMENT OF FACTS

Plaintiff Sandra Guzman is a former associate editor at the *Post*. (AC ¶ 24.)  On
February 18, 2009 the *Post* published the Stimulus Cartoon which plaintiff asserts offended her
as an African-American.  (Id. at ¶ 66.)  Plaintiff was terminated from her employment with the
*Post* seven months later, on September 29, 2009.  (Id. at ¶ 104.)

Plaintiff raises various claims against defendants in the AC, including claims of hostile
work environment based on race, color, national origin and color, and disparate treatment.
Plaintiff also contends that as a result of an automatic-response email that she sent out on the day
of the publication of the cartoon, as well as a complaint made to a member of the *Post's* human
resources department on the day the cartoon was published, she was retaliated against in several
ways, including by her termination seven months later.

The AC ranges well beyond allegations of employment discrimination and retaliation.
Large portions of the AC describe and pillory editorial content such as the Stimulus Cartoon (id.
at ¶¶ 6, 7, 66-74) and other published content relating to politicians, sports figures and celebrities
(id. at ¶¶ 47, 60-65).  Other portions decry alleged editorial decisions such as:  (i) the decision
not to run a "cartoon . . . depicting Jews as sewer rats" (id. at ¶ 64); (ii) the decision to use an
Associated Press piece, in lieu of having plaintiff travel to Washington, D.C., to cover a
reception for and the investiture of Justice Sonia Sotomayor (id. at ¶¶ 90-99); (iii) the decision
not to publish a story relating to racial epithets scrawled on cars (id. at ¶ 53); and (iv) the entirely
untrue allegation that the *Post* has a "policy in place" seeking to "destroy President Obama" (id.
at ¶¶ 72-73), among others.

Plaintiff also raises allegations that are entirely inflammatory, immaterial and irrelevant,
including:  (i) the reactions to the cartoon by the NAACP and the National Association of Black

Journalists (id. at ¶ 74); and (ii) a visit to Scores in New York City by Defendant Allan in 2003 (id. at ¶ 38).

On September 24, 2010, the Court issued an order denying defendants' motion to dismiss the Complaint.  Among other arguments, defendants contended that publication of the Stimulus Cartoon and other editorial content was protected by the First Amendment and that complaints "solely about the cartoon" could not constitute conduct protected by the employment discrimination laws.  The Court held:

> Mindful of the First Amendment protections enjoyed by newspaper organizations, the Court notes that Plaintiff has sufficiently alleged that she objected not just to the paper's content but to the general work environment at the Post and the way the editorial staff deal with the publication of the content at issue.

Guzman, Slip Op. at 2.  Moreover, the Court held that "Plaintiff's complaints were about the working climate generally at the Post, rather than solely about the content published by the paper." Id.

## ARGUMENT

### I.

### PLAINTIFF'S CONTENT-BASED ALLEGATIONS SHOULD BE STRICKEN

A.  Motions to Strike Are Granted to Remove Inappropriate Material From a Pleading

Rule 12(f) of the Federal Rules of Civil Procedure permits a Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "[M]otions to strike, while not favored, may be granted where the allegations challenged have no real bearing on the subject matter or are likely to prejudice the movant." Red Ball Interior Demolition Corp. v. Palmadessa, 908 F. Supp. 1226, 1241-42 (S.D.N.Y. 1995).

Where "motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay." Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989).

A court may grant a motion to strike allegations as immaterial where a defendant shows that "no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant." Alloco v. Dow Jones & Co., Inc., 2002 WL 1484400, at *1 (S.D.N.Y. July 10, 2002) (citing Metrokane, Inc. v. The Wine Enthusiast, 160 F. Supp. 2d 633, 642 (S.D.N.Y. 2001)); see also Lukowski v. County of Seneca, 2009 WL 467075, at *14 (S.D.N.Y. Feb. 24, 2009) (motion to strike will be granted where "challenged portion of the pleading has no bearing on the subject matter of the litigation and that its inclusion would prejudice the defendant"). These principles apply to improper attacks on First Amendment protected speech. See, e.g., National Organization for Women, Inc. v. Scheidler, 897 F. Supp. 1047, 1087 n.28 (N.D. Ill. 1995).

Finally, claims may also be stricken as scandalous where the "allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court . . . . Even where matter in a pleading is relevant to the controversy, it nonetheless may be stricken if it is scandalous or set out in 'needless detail.'" Cabble v. Rollieson, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006) (internal citations omitted).

B.   The Protections of the First Amendment Are a Basis
     For Striking Portions of a Pleading

Allegations in a complaint should be stricken on First Amendment grounds, when, as one court put it, they "are wholly void of merit and serve only to implicate validly exercised First Amendment activities." Scheidler, 897 F. Supp. at 1087 n.28.

The publishing of a newspaper, including the selection and publication of its headlines, articles and cartoons, is undeniably a First Amendment protected activity. See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46, 54 (1988) (holding the First Amendment protects provocative political cartoons); New York Times v. Sullivan, 376 U.S. 254, 266 (1964) (finding newspaper publication protected by First Amendment, the purpose of which is to "secure . . . 'the widest possible dissemination of information from diverse and antagonistic sources'"). The Supreme Court has held that a newspaper's editorial independence is fundamental, regardless of how controversial such content may be. Miami Herald, 418 U.S. at 255. That someone might find such content to be offensive is irrelevant, as "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." FCC v. Pacifica Foundation, 438 U.S. 726, 745-46 (1978). This Court has of course acknowledged such First Amendment protections afforded to newspaper organizations by holding in this very matter that such protections are appropriately extended to the *Post*. Guzman, Slip Op., at 2 ("Mindful of the First Amendment protections enjoyed by newspaper organizations . . . .").

C.     Plaintiff's Allegations Relating to the *Post's* First
       Amendment-Protected Content Must be Stricken

The Amended Complaint is replete with attacks on the content of the *Post* newspaper which are redundant, immaterial, impertinent, or scandalous. By Paragraph 4 of the AC, Plaintiff opens her attack on the editorial content of the *Post*, specifically alleging that the *Post* has used its "news headlines, news stories and . . . cartoons" to "target" minorities who do not work at the *Post*:

> 4.     [T]he Post's blatant acts of race and sex
> discrimination and/or harassment have not been directed solely
> at its own employees. Rather, the Post has also repeatedly targeted
> people of color and women underline of the Company with its racism
> and sexism through racially and sexually offensive news headlines,

news stories and humiliating, insulting and degrading cartoons.
(Emphasis added.)

Plaintiff's attack on editorial content continues in Paragraph 6, describing to the reader a

political cartoon published in the *Post*, complete with inflammatory verbiage to illustrate the

cartoon as "racist, offensive and dangerous," and making the (entirely unsupported) leap that this

editorial content "suggest[s] the assassination of President Barack Obama":

> 6.      By way of example only, on February 18, 2009,
> Defendants published a racist, offensive and dangerous cartoon
> suggesting the assassination of President Barack Obama, the first
> Black President of the United States.  More specifically, the
> cartoon depicted two White police officers pointing a smoking
> gun at a crazed chimpanzee lying dead on the ground in a pool of
> blood with three bullet holes in his chest after they had just shot
> the chimp.  Moreover, one of the White police officers was
> depicted bragging, "They'll have to find someone else to write the
> next stimulus bill."  (See Ex. A).  Notably, the cartoon
> immediately followed a page in that day's newspaper containing a
> large photograph of President Obama signing an economic
> stimulus bill into law, demonstrating that the chimpanzee was
> intended to represent President Obama.

While continuing to assail the *Post* for the content of the cartoon, plaintiff purports to offer her

own factually unsupported and conclusory "analysis" of the *Post's* intent and awareness in

publishing the cartoon:

> 7.      With this country's long and tragic history of racist
> imagery, including depictions of Blacks as apes, gorillas,
> chimpanzees and monkeys, Defendants were fully aware of the
> racist and offensive nature of the cartoon and further willfully
> disregarded the fact that the cartoon could readily be interpreted as
> approving violence against America's first Black President.
> Despite knowing that the cartoon was racist, offensive and
> dangerous on many levels, Defendants nevertheless published the
> cartoon depicting violence and bigotry against the President of the
> United States.

Plaintiff makes no secret of her desire to decry broad categories of the *Post's* protected

content:  she proclaims that "headlines, columns and cartoons" are published by the *Post* to

"mock, insult and/or humiliate people of color":

> 60.    Additionally, during Ms. Guzman's employment,
> White editors at the Post repeatedly used offensive and
> discriminatory headlines, columns and cartoons to mock, insult
> and/or humiliate people of color.

She attacks the *Post's* coverage of a 2008 presidential candidate, a presidential visit from a

foreign leader, and a notorious incident involving a professional football player:

> 61.    By way of example only, in January 2007, the Post
> published a story about the fact that Governor Bill Richardson of
> New Mexico, who is Hispanic, had announced that he was going to
> run for President with the headline "N.M. Gov Throws
> Sombrero Into Ring," an obvious discriminatory reference to
> Governor Richardson's Mexican-American heritage.

> 62.    Similarly, in connection with a story about former
> President George W. Bush's meeting with Chinese leader Hu Jintao,
> the Post displayed a front page photograph of President Bush
> pulling on the arm of Mr. Jintao with the offensive headline "Wok
> this Way," yet another act of blatant discrimination by the Post to
> disparage a person of color.

> 63.    Moreover, in an article on African-American and
> former New York Giants wide receiver Plaxico Burress, the Post
> allowed a White columnist to write about Giants head coach Tom
> Coughlin's punishment of Burress by stating, "Good for Coughlin
> for tightening the noose around Plaxico Burress." Despite knowing
> full well about the history of lynchings of Black men throughout this
> country and what the image of a noose symbolizes to Black people,
> the Post used the imagery of a noose to cheer on punishment
> inflicted on an African-American athlete.

Incredibly, having chastised the *Post* for publishing material which plaintiff considers offensive,

Ms. Guzman then proceeds to chastise the *Post* for a cartoon which it considered <u>but did not</u>

<u>publish</u>:

64.     Ms. Guzman even learned at one point that the Post had planned to run a cartoon in the newspaper depicting Jews as sewer rats.

Plaintiff then alleges that the editorial decisions and published content of the *Post* described in Paragraph 60 through 64 are affirmative statements to employees "encourag[ing]" discrimination within the workplace:

65.     As a result of these and similar headlines, articles and cartoons, Defendants have made clear to its employees that racial discrimination is not only tolerated, but openly encouraged by management, fostering a poisonous racially discriminatory work environment for all of its employees of color.

Plaintiff's focus on the *Post's* content continues in Section III of the AC – entitled "The Racist Cartoon Depicting President Obama as a Dead Chimpanzee":

66.     The racist atmosphere at the Post reached unprecedented levels on February 18, 2009 when Defendants published the cartoon, depicting the shooting death of a crazed chimpanzee by two White police officers containing the caption, "They'll have to find someone else to write the next stimulus bill."

67.     Any doubt about the identity of the figure that the dead chimpanzee was intended to represent was quickly erased by the fact that the page immediately preceding the cartoon contained a large picture of President Barack Obama signing the stimulus bill into law.  Moreover, the editorial page in that same day's edition of the Post referred to the stimulus bill as "President Obama's $787 billion stimulus plan."  Accordingly, there is no doubt that the chimpanzee pictured shot to death and lying in a pool of blood with three bullet holes was intended to be President Obama.

68.     As a Black and Puerto Rican woman, Ms. Guzman was familiar with the long history in America of degrading African-Americans by depicting them as primates.  As a result, Ms. Guzman and other members of the news staff were deeply offended by the Post's decision to publish the racist cartoon.

In Paragraph 69, plaintiff asserts that her outrage was "exacerbated" by the fact that the *Post's* Managing Editor was aware that the cartoon might be offensive prior to publication.   In Paragraph 70, plaintiff offers the opinion of Assignment Editor Dan Greenfield, who felt that the

10

cartoon was in "poor taste" (although plaintiff fails to even indicate whether Greenfield was aware of it prior to publication).   Plaintiff thus accuses the *Post* of having failed to appropriately analyze whether the cartoon was "potentially offensive or inappropriate":

> 71.    In contrast to items potentially offensive to other groups, Defendants apparently made no efforts to determine whether the racist cartoon depicting President Obama as a dead chimpanzee in a pool of blood with three bullet holes in his chest after being shot by White police officers was potentially offensive or inappropriate, despite the fact the senior members of management admitted to viewing it as such.

Finally, plaintiff alleges – as proof of the nature of the <u>content</u> of the cartoon – that the *Post* published the cartoon as a part of a wider "concerted effort" to "destroy Barack Obama." (<u>Id.</u> at ¶¶ 72-73.) (<u>See also id.</u> at ¶ 8 (describing the cartoon as the "chimpanzee cartoon."))

The above-referenced allegations attack First Amendment-protected editorial content that was directed to general public "<u>outside</u> of the [*Post*]" (<u>id.</u> at ¶ 4) (emphasis added), and, as such, <u>are not employment practices</u> and are immaterial, irrelevant and scandalous matters incapable of supporting a claim for <u>employment</u> discrimination.

Under Rule 12(f), allegations may be stricken where "no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant." <u>Alloco</u>, 2002 WL 1484400, at *1. In <u>National Organization for Women, Inc. v. Scheidler</u>, the complaint alleged that statements in a book published by the defendant describing methods to disrupt abortion clinics could be used to demonstrate the defendant's intent to violate federal RICO statutes. The court disagreed that the statements were incitements to violence, and then ordered them stricken from the complaint "because they allege protected speech without any direct correlation with violent activity . . . ." 897 F. Supp. at 1088-89.

11

Just as in <u>Scheidler</u>, the inflammatory allegations described above have no bearing on plaintiff's claims. Published content about diplomatic relations between the United States and China, a football player, a possible presidential campaign by the governor of New Mexico, a political cartoon, the *Post's* alleged goal to destroy the President, or the *Post's* purported decision <u>not to run</u> "a cartoon in the newspaper depicting Jews as sewer rats" all have no relevance to whether the *Post* engages in discriminatory treatment <u>of its employees</u>. This case does not concern libel, where the content of defamatory speech and the newspaper's knowledge of its falsity might be at issue. Rather, the claims in this case are <u>employment</u> discrimination and retaliation, and do not justify exploration of the *Post's* published content, especially given that the risk of prejudice is so high. Indeed, this Court's recent decision on defendants' motion to dismiss allowed the case to proceed because this Court found, in the context of a motion to dismiss, that "Plaintiff's complaints were about the working climate generally at the *Post*, <u>rather than solely about the cartoon</u>." <u>Guzman</u>, Slip Op., at 3 (emphasis added).

Further, the inclusion of these allegations significantly prejudices defendants. There is a plain danger that a fact-finder would confuse the question whether the *Post's* editorial processes are objectionable with that of whether its employment practices are objectionable and illegal. Striking plaintiff's descriptions of the Stimulus Cartoon will avoid undue prejudice to the defendants through confusion of the issues, especially where the AC may be submitted to a jury. <u>Burger v. Health Ins. Plan of Greater New York</u>, 684 F. Supp. 46, 52 (S.D.N.Y.1988) (finding irrelevant matter in complaint prejudicial if placed before a jury); <u>Dent v. U.S. Tennis Ass'n, Inc.</u>, 2008 WL 2483288, at *4 (E.D.N.Y. June 17, 2008) (same).

Allowing a plaintiff to handpick headlines from a daily tabloid newspaper to plead in support of <u>employment</u> discrimination claims would undoubtedly have a severe chilling effect on

editorial content in newspapers.  See, e.g., U.S. v. National Treasury Employees Union, 513 U.S.

454, 468 (1995); Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931).  If the *Post's* published

content were to be fair game for an employment discrimination case, then any employee of a

newspaper could freely allege claims of employment discrimination based on articles or

headlines of their choosing, essentially seeking to dictate or affect the editorial content of a paper

under the coercive threat of exorbitant costs of employment litigation.  Any employee could

easily scour the hundreds of articles published by a newspaper in any given week and find a

headline, article or cartoon sufficient to be pled in an allegation, creating the undesirable and

impossible task of mandating that newspapers sterilize their content of all potentially offensive

content.  Such a theory of "free speech" would eviscerate political satire, political-opinion

reporting and tabloid journalism, which regularly use provocative language and imagery that

encourage the free flow of ideas, thus making it ripe for a litigious and profiteering employee.

Likewise, under the theory espoused in plaintiff's allegations, a newspaper would have to be

cognizant of what combinations of articles are run in the same newspaper, even if neither is

individually offensive, or else be subject to potential liability.  (See AC ¶ 67.)

    Moreover, under the approach taken by the Amended Complaint, so long as the *Post* even

considers content that Ms. Guzman deems "offensive" – whether the *Post* decides to publish that

content or not – such consideration would serve to demonstrate that employment "discrimination

is . . . openly encouraged by management . . . ."  Plaintiff criticizes the *Post* for publishing

certain content – an article about Governor Bill Richardson, for instance – and then criticizes the

*Post* for content it allegedly considered but did not publish – the carton "depicting Jews as sewer

rats."  Under this framework, the only safe editorial content is that which is never considered,

and anything else, once considered – whether published or not – may form the basis for an

actionable claim of discrimination.  If this does not represent an inappropriate restriction on free speech, it is unclear what could.  Miami Herald Pub. Co. v. Tornillo, 418 U.S. at 255 (holding First Amendment does not allow government to regulate "choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials"); Stanley v. The Lawson Co., 993 F. Supp. 1084, 1089 (N.D. Oh. 1997) ("[I]f Title VII . . . required Defendant to remove the adult magazines from its stores because an employee found them offensive, those laws would violate the First Amendment.").

Moreover, these statements describe only statements published in a newspaper and made to the general public, not employment practices, and thus cannot be the basis of employment discrimination claims.  Kunzler v. Canon USA, Inc., 257 F. Supp. 2d 574, 579-80 (S.D.N.Y. 2003) (Acts of discrimination "against private individuals, who are not in an employment relationship with the person complained about, are not within the area of unlawful employment practices prohibited by Title VII.").  The act of publishing a political cartoon (and other content) is not an employment practice, nor is it evidence of unlawful racial animus.  Much in the manner that pornography sold by a store proprietor and advertised to the general public cannot serve as the basis for a claim of employment discrimination, a political cartoon published to the general public may not create or evidence such a claim, as the publication is not an action "aimed at the Plaintiff" because of any protected class.  Stanley, 993 F. Supp. at 1089.  Plaintiff explicitly acknowledges that the editorial content was directed at individuals "outside of the [Post]" (AC ¶ 4 (emphasis added); see also id. at ¶¶ 60, 71) and that she, like "the rest of the world," only "learned" about the cartoon "in the paper" (id. at ¶ 87).  In short, plaintiff concedes that the

editorial content she prosecutes was directed at the general public, and thus is not an employment practice.

In addition, inclusion of protected content impermissibly and unnecessarily widens and complicates the scope of discovery by suggesting that the plaintiff would be permitted to delve into matters entirely unrelated to actionable claims – a threat that is all the more salient in light of the recent document requests filed by plaintiff which demand, inter alia, all communication regarding the publication of a cartoon. (See Exh. B.) Striking this material would have the opposite effect – it would expedite and streamline the litigation. This alone is an independent basis for striking the material. M'Baye v. World Boxing Ass'n, 2007 WL 844552, at *4 (S.D.N.Y. Mar. 21, 2007) (finding prejudice sufficient to strike allegation where allegation would "would impermissibly widen the scope of discovery"). That discovery into these matters would be improper is plain and has been ruled on in this courthouse. For example, in Rosario v. New York Times Co., the New York Times asserted editorial privilege in objecting to discovery into "discussions between [editors] as to the nature of the column to be written" in an employment discrimination case. 84 F.R.D. 626, 631 (S.D.N.Y. 1979). The Court refused to allow the discrimination plaintiff such discovery, holding that it was "not concerned here with what [the New York Times] gathers or what it publishes . . . . Title VII and Section 1981 are directed to business judgments, not editorial judgments." Id. (emphasis added).

As stated above, Paragraphs 4, 6, 7 and 60 through 73 must be struck in full as they serve solely to indict the Post for its editorial content. Even if there are isolated fragments of language within these allegations that could survive this motion to strike, they are few and far between and so interlaced with what is overwhelmingly protected speech (and inappropriate subjective impressions which should also be struck, see, infra, Section II), they ought not survive. Plaintiff

could attempt to recast her claim of retaliation by, for example, pleading in Paragraph 66 that "[O]n February 18, 2009, Defendants published a cartoon that plaintiff found offensive. Following its publication, plaintiff engaged in the following protected activity . . . ." Such a "short and concise statement" would clearly state plaintiff's alleged claim of retaliation and would eliminate the danger of prejudice arising from placing the content of the Stimulus Cartoon at issue.  See FED. R. CIV. P. 8(a)(2).

For the above stated reasons, defendants ask that the Court strike all references and descriptions within plaintiff's AC to the *Post's* content, including but not limited to all headlines, articles, cartoons and other published content contained Paragraphs 4, 6, 7, 8 and 60 through 73, as well as Exhibit A to the AC, and any other portions of the AC that this Court deems proper.

D.   The First Amendment Protects the *Post's* Editorial
     Process and Requires That Plaintiff's Allegations
     Concerning It be Stricken

Allegations relating to the editorial process, including what not to publish, are similarly irrelevant and should be stricken.  A number of allegations in the Amended Complaint purport to take the Post to task for decisions made in the course of the *Post's* routine editorial processes, such as: (i) declining to publish a story relating to a racial epithet written on cars (id. at ¶ 53); (ii) the decision not to publish a cartoon "depicting Jews as sewer rats" (id. at ¶ 64); (iii) failing "to determine whether the racist cartoon . . . was potentially offensive or inappropriate" (id. at ¶ 71); (iv) deciding to use an Associated Press article relating to a reception held for Justice Sonia Sotomayor, as opposed to financing plaintiff's coverage of the event (id. at ¶¶ 91, 92, 94, 95); (v) the *Post's* alleged decision not to offer coverage of Justice Sotomayor's investiture (id. at ¶¶ 96-98); (vi) Jesse Angelo's consideration of the cartoon as "offensive" (id. at ¶ 69); (vii) the recklessly false and irrelevant accusation that the *Post* engaged in concerted activity to "destroy

President Obama" (id. at ¶¶ 72-73); and (viii) the *Post's* decision to run a story regarding
Lindsey Lohan despite the alleged protest of an employee (id. at ¶ 47).  Moreover, plaintiff
asserts that certain of these editorial decisions were deliberately undertaken by the editorial staff
for the purpose of undermining her job performance.  (Id. at ¶ 99.)

 Just as published content is protected, editorial decisions about what to include and what
not to include in the newspaper are protected.  The exercise of editorial control and judgment
includes making decisions as to "content of the paper, and treatment of public issues and public
officials – whether fair or unfair . . . ."  Miami Herald, 418 U.S. at 258.  The need to protect
newspapers from claims arising from editorial judgments is particularly acute because punishing
newspapers for what they publish or do not publish "creates a chilling effect which gives rise to a
First Amendment injury."  Husain v. Springer, 494 F.3d 108, 128 (2d Cir. 2007).  Compelled
disclosure of such editorial information "could prompt reporters or editors to purge from
publication any information they fear would excite the interest of current or prospective
litigants."  U.S. v. Marcos, 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990).

 Whether these editorial decisions are sound is not a matter for the courts.  Miami Herald,
418 U.S. at 255 (holding the only proper boundaries on a newspaper's editorial judgment are
"the acceptance of a sufficient number of readers – and hence advertisers – to assure financial
success; and . . . the journalistic integrity of its editors and publishers").  And the implication of
requiring the *Post* to respond – for example in an answer to a complaint and in discovery – to
lawsuit allegations regarding which particular news stories that it did or did not decide to run or
cover on any given day, what source – either *Post* employee or Associated Press – the *Post*
decided to utilize in publishing a given article, or the tone and manner of presentation used for a
particular news story, demonstrates why this material must be stricken from the AC.  See id. at

258 ("The choice of material to go into a newspaper, and the decisions made as to limitations on

the size and content of the paper, and treatment of public issues and public officials – whether

fair or unfair – constitute the exercise of editorial control and judgment."). Forcing the *Post* to

answer these allegations and be held accountable by a jury or judge for such answers is

tantamount to stripping away a newspaper's editorial independence. For example, such a

holding would require a newspaper to cover news events of certain subjects if the subject matter

is of particular interest to a protected minority of readers who also happen to be employees.

Further, under plaintiff's theory, if interests of a minority group are invoked, a newspaper is

potentially liable for discrimination whenever it refuses to permit a reporter to cover such story,

even if that newspaper used cost-effective manners to cover the story, i.e., use of Associated

Press coverage, or it quite simply decides not to cover the event. The Constitution plainly

forbids such a result.

## II.

### PLAINTIFF'S SUBJECTIVE AND INFLAMMATORY DESCRIPTIONS OF THE POST'S CONTENT AND EDITORS MUST BE STRICKEN

In addition to the detailed and specific references to published content itself, the AC is

replete with subjective and critical – and false – descriptions and characterizations of content

(primarily the Stimulus Cartoon, as well as headlines and articles) and the *Post's* editors for

publishing it. This inflammatory verbiage has no probative value, is redundant, immaterial and

scandalous, and should therefore be stricken. (These requested strike-outs are indicated in the

attached Exhibit A, specifically in ¶¶ 6, 7, 67, 68, 71, 73, 74, 77, 79, 81, 83, 84, 88, 93, 101 as

well as in paragraphs otherwise sought to be stricken by this motion.)

The pleading frequently repeats plaintiff's assertion that the cartoon depicts President

Barack Obama as a chimpanzee, including:

> 67.   [T]here is no doubt that the chimpanzee pictured
> shot to death and lying in a pool of blood with three bullet holes
> was intended to be President Obama.

(Id. at ¶ 67.)  Moreover, plaintiff repeatedly asserts as if fact that the cartoon is "about,"

"intended to represent," "liken[s]", "depict[s]", or is "meant to represent" President Obama.  (Id.

at ¶¶ 6, 74, 77, 79, 81, 83, 93, 101.)  Plaintiff couches this baseless assumption that the cartoon is

"intended to represent" President Obama in scandalously graphic detail, solely to incite an

emotional response from any potential juror, stating:  the cartoon "depict[s] President Obama as

a dead chimpanzee in a pool of blood with three bullet holes in his chest after being shot by

White police officers."  (Id. at ¶ 71.)  As if plaintiff's conclusory "finding" that the cartoon was

about President Obama were not enough, plaintiff further explains that the cartoon is in fact a

call by the *Post* for the public to assassinate or otherwise commit violence against the President:

the cartoon "suggest[s] the assassination of President Barack Obama, the First Black President of

the United States."  (Id. at ¶¶ 6, 7.)

These scandalous descriptions of the *Post's* published content also include the use of the

adjectives and adjective phrases "racist" (AC ¶¶ 68, 71, 72, 74, 81, 84, 88, 101), "racist,

offensive and dangerous" (id. at ¶¶ 6, 7), "racist and offensive nature" (id. at ¶ 7), "obviously

racist (id. at ¶77), "depicting violence and bigotry" (id. at ¶ 7), and "openly racist" (id. at ¶ 80).

First, these allegations plainly refer to protected, published political speech not at issue in

this action.  (See, infra, Section I.)  They give expression only to plaintiff's anger about matters

for which the employment laws provide no relief.  Budget Dress Corp. v. Int'l Ladies' Garment

Worker's Union, 25 F.R.D. 506, 508 (S.D.N.Y. 1959) ("Courts will not permit a party to use his

pleadings as a dumping ground for that evidence which he may not otherwise be able to present

to the trier of the facts.").

Second, the material is highly prejudicial, invoking inflammatory and highly charged language designed to incite emotion and mislead potential jurors from the actual matters at issue. Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co., 657 F. Supp. 136, 144 (E.D.N.Y. 1987) ("Where the materiality of the alleged matter is highly unlikely, or where its effect would be prejudicial, the Court may order it stricken."); see also Atlantic City Electric Co. v. General Electric Co., 207 F. Supp. 620, 624 (S.D.N.Y. 1962). The phrases in question offer no facts to buttress plaintiff's claims of unlawful retaliation or discrimination, but are merely self-serving, conclusory exclamations designed solely to generate bias against the defendants.

Third, these words and phrases "go well beyond the 'short and plain statement of the claim' contemplated by . . . the Federal Rules of Civil Procedure." Dent, 2008 WL 243288, at *4; Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 402 F. Supp. 636 (S.D.N.Y. 1975) (noting that allegations are appropriately stricken where "unduly prejudicial"); see also 2 James Wm. Moore et al., Moore's Federal Practice ¶12.21(2) (2d ed. 1948).

Finally, the descriptive material should be stricken as scandalous. Beyond the fact that they are not even relevant to the causes of action brought by the plaintiff, the Court may strike scandalous allegations which "reflect[] unnecessarily on the defendant's moral character, or use[] repulsive language that detracts from the dignity of the court . . . ." Cabble, 2006 WL 464078, at *11 (internal citations omitted). Moreover, a court may strike statements which "are entirely unnecessary to the statement of plaintiff's claims, and would be prejudicial if ever reviewed by a jury." See Dent, 2008 WL 2483288, at *4 (citing Nextel of New York, Inc. v. City of Mount Vernon, 361 F. Supp. 2d 336, 339-40 (S.D.N.Y. 2005)).

There can be no question that these allegations seek to (falsely) attach the *Post*, and through it, its editorial staff (and the other defendants), as "racist" and as having deliberately

threatened the life of President Obama.  In graphic and unnecessary language, the allegations are

crafted to debase and disgrace the defendants' moral character, and they serve no legitimate

purpose.  See Burger, 684 F. Supp. at 52.  As plaintiff's counsel is well aware, use of "con-

clusory" language that is "inflammatory and go[es] well beyond the 'short and plain statement of

the claim'" is appropriately stricken from complaints.  See Dent, 2008 WL 2483288, at *3-4

(striking as scandalous and inflammatory those portions of a pleading brought by Kenneth

Thompson, plaintiff's counsel here, that related to an unsubstantiated allegations of a "legacy of

discrimination").

### III.

### THE COURT SHOULD STRIKE TWO ADDITIONAL ALLEGATIONS<br>WHICH ARE IMMATERIAL, IMPERTINENT AND SCANDALOUS

Finally, this Court should strike allegations from Paragraphs 38 and 74 of plaintiff's AC

which are immaterial, impertinent and scandalous.  They are:  (i) the reactions to the cartoon by

the NAACP and the National Association of Black Journalists (id. at ¶ 74); and (ii) a visit to

Scores by Defendant Allan after work seven years ago (id. at ¶ 38).

Paragraph 74 of the AC references the NAACP's purported reaction to the Stimulus

Cartoon, calling the cartoon "an invitation to assassinate President Barack Obama."

Paragraph 74 refers to the National Association of Black Journalists describing the cartoon as

"compar[ing] the nation's first African-American commander-in-chief to a dead chimpanzee is

nothing short of racist drivel."  Besides falsely attacking the editorial content of the Post (see,

infra, Section I) and using clearly inflammatory language (see, infra, Section II), Paragraph 74 is

entirely immaterial, irrelevant and scandalous.  The subjective statements of third-parties

regarding published editorial content in an employment discrimination case would in no way be

admissible at trial.  Moreover, plaintiff attempts to prejudice the defendants by insinuating –

21

falsely -- that defendants both condone the assassination of the President and are deliberately "racist." The paragraph prejudices defendants by its attempt to evoke disdain and hatred for the defendants "for reasons having no connection with the alleged discrimination practiced by the defendants." Burger, 684 F. Supp. at 52.

Moreover, plaintiff's assertion that -- in 2003 -- Col Allan visited Scores is devoid of probative value and simply seeks to use provocative and scandalous material to turn opinion against Mr. Allan. It asserts no connection to plaintiff's work environment. See Cabble, 2006 WL 464078, at *11.

<u>**CONCLUSION**</u>

Based on the foregoing reasons, defendants News Corporation, NYP Holdings, Inc., d/b/a

The New York Post, and Col Allan respectfully request that their motion to strike certain

allegations in the Amended Complaint be granted.

Dated: October 27, 2010
       New York, New York

                      Respectfully submitted,

                      KASOWITZ, BENSON, TORRES
                        & FRIEDMAN LLP

                      By:    _____
                          Marc E. Kasowitz (mkasowitz@kasowitz.com)
                          Daniel R. Benson (dbenson@kasowitz.com)
                          Mark W. Lerner (mlerner@kasowitz.com)
                          Blythe Lovinger (blovinger@kasowitz.com)

                      1633 Broadway
                      New York, New York 10019
                      Tel.:(212) 506-1700
                      Fax:(212) 506-1800

                      Attorneys for Defendants News Corporation,
                      NYP Holdings, d/b/a the New York Post,
                      and Col Allan