# Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

SANDRA GUZMAN,                                    :          Civ. No.: 09 CV 9323 (BSJ) (RLE)
                                                  :
                            Plaintiff,            :
                                                  :
                   vs.                            :
                                                  :
NEWS CORPORATION, NYP HOLDINGS,                   :
INC., d/b/a THE NEW YORK POST,                    :
and COL ALLAN, in his official and               :
individual capacities,                           :
                                                  :
                            Defendants.  :
-------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION FOR PROTECTIVE ORDER</u>


KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700

Attorneys for Defendants

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

PROCEDURAL BACKGROUND......................................................................................... 9

LEGAL ARGUMENT........................................................................................................... 10

I.      THE EDITORIAL DECISION-MAKING PROCESS IS
PRIVILEGED AND SHOULD BE PROTECTED FROM DISCLOSURE.................. 10

     A.    Mr. Allan Appropriately Asserted the Editorial Privilege ...................................... 10

          1.    Legal Standards Applicable To the Editorial Privilege ............................ 10

          2.    Mr. Allan Properly Invoked the Privilege in
Response to Questions Implicating His Editorial
Discretion and Decision-Making ............................................................. 13

     B.    The Information Sought is Irrelevant and Thus Incapable
of Overcoming the Editorial Privilege ................................................................... 14

          1.    This Court Already Has Held That the Stimulus
Cartoon and Editorial Decisions Relating Thereto
are Not Relevant to Plaintiff's Claims ..................................................... 14

          2.    Editorial Content and Decisions Relating Thereto
Are Not Relevant to a Claim of Employment Discrimination.................. 16

          3.    The Decision to Redact the McGreevy Picture is
Irrelevant to Plaintiff's Claims................................................................. 19

CONCLUSION...................................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

CASES

Baker v. F and F Inv.,
    339 F. Supp. 942 (S.D.N.Y. 1972) ...............................................................................10

Branzburg v. Hayes,
    408 U.S. 665 (1972) .......................................................................................................11

Church of Scientology Int'l v. Daniels,
    992 F.2d 1329 (4th Cir. 1993) .......................................................................................12

Damiano v. Sony Music Ent., Inc.,
    168 F.R.D. 485 (D.N.J. 1996)........................................................................................11

Downey v. The Coalition Against Rape and Abuse, Inc.,
    No. 99-3370, 2003 WL 23164082 (D.N.J. Apr. 10, 2003).............................................12

FCC v. Pacifica Found.,
    438 U.S. 726 (1978) .......................................................................................................17

Herbert v. Lando,
    441 U.S. 153 (1979) .......................................................................................................12

Hustler Mag. v. Falwell,
    485 U.S. 46 (1988).........................................................................................................18

Lonegan v. Hasty,
    No. CV-04-2743 (NG)(VVP), 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008) ........................11, 12

Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League,
    89 F.R.D. 489 (D.C. Cal. 1981) ....................................................................................13

Maughan v. NL Indus.,
    524 F. Supp. 93 (D.C.D.C. 1981) ..................................................................................11

McDermott v. Ampersand Pub., LLC,
    593 F.3d 950 (9th Cir. 2010) .........................................................................................19

Miami Herald Pub. Co. v. Tornillo,
    418 U.S. 241 (1974).......................................................................................................18

N.Y. Times v. Sullivan,
    376 U.S. 254 (1964).......................................................................................................18

Near v. Minnesota ex rel. Olson,
  283 U.S. 697 (1931) ......................................................................................17

Palandjian v. Pahlavi,
  103 F.R.D. 410 (D.D.C. 1984) ....................................................................11

Persky v. Yeshiva Univ.,
  No. 01 Civ. 5278 (LMM), 2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002) ..........................11

Pugh v. Avis Rent A Car System, Inc.,
  No. M8–85, 1997 WL 669876 (S.D.N.Y. Oct. 28, 1997)................................. *passim*

Rosario v. New York Times Co.,
  84 F.R.D. 626 (S.D.N.Y. 1979) ......................................................12, 17

S.E.C. v. McGoff,
  647 F.2d 185 (D.C. Cir. 1981) ....................................................................12

Solargen Elec. Motor Car Corp. v. Amer. Motors Corp.,
  506 F. Supp. 546 (N.D.N.Y. 1981) ............................................................11

Stanley v. The Lawson Co.,
  993 F. Supp. 1084 (N.D. Oh. 1997) ..........................................................17

U.S. v. Cuthbertson,
  630 F.2d 139 (3d Cir. 1980) ........................................................................11

U.S. v. Marcos,
  No. 87 CR. 598 (JFK), 1990 WL 74521 (S.D.N.Y. June 1, 1990)........................10

U.S. v. National Treasury Employees Union,
  513 U.S. 454 (1995) ....................................................................................17

Valjean Mfg., Inc. v. Michael Werdiger, Inc.,
  332 Fed. Appx. 648 (2d Cir. 2009) ............................................................14

Zerilli v. Smith,
  656 F.2d 705 (D.C. Cir. 1981) .............................................................12, 13

OTHER AUTHORITIES

FED. R. CIV. P. 26(b)(1) .......................................................................................1, 21

FED. R. CIV. P. 26(c) .............................................................................................1, 21

FED. R. EVID. 501 ..............................................................................................1, 2, 21

U.S. CONSTIT., AMEND. I..........................................................................*passim*

Defendants News Corporation, NYP Holdings, Inc., d/b/a The New York Post (the "Post"), and Col Allan (together, "Defendants") respectfully submit this memorandum of law in support of their motion for a protective order, pursuant to FED. R. CIV. P. 26(b)(1) and 26(c), precluding Plaintiff Sandra Guzman ("Plaintiff") from seeking certain discovery which is privileged and protected against disclosure by the First Amendment of the United States Constitution (the "First Amendment") and Rule 501 of the Federal Rules of Evidence.

## PRELIMINARY STATEMENT

In this employment case, Plaintiff claims that Defendants unlawfully discriminated against her based on her race and/or gender (sexual harassment), and that her employment with the Post was terminated in purported retaliation for complaining about, among other things, certain editorial content of the Post, in violation of various federal and state anti-discrimination laws.  Plaintiff, unable to muster together proof of any unlawful discriminatory or retaliatory intent, has set upon an improvident course to try to prove her disparate treatment claims by attempting to show that the Post and its senior editors are, in general, racists as purportedly evidenced by the Post's published content (and therefore she must have been discriminated against because of her race).

At issue in this Motion is testimony sought by Plaintiff regarding the Post's decision to publish a cartoon in February 2009 which depicted a chimpanzee having been shot by two police officers (the "Stimulus Cartoon").  Plaintiff claims the Stimulus Cartoon was "racist" and, by extension, now argues that its publication is relevant because since it is "racist", *ipso facto*, it therefore evidences racial animus on the part of the Post's editors.  Also at issue is testimony concerning the Post's decision to publish a picture of a naked man which was evidence in former Governor James McGreevey's divorce proceedings (the "McGreevey Picture").  In particular, Plaintiff claims that Mr. Allan showed her (and other Post journalists) the McGreevy Picture and

argues that the decision to redact a portion of this image, i.e., the genital area, prior to its publication somehow is relevant to her sexual harassment claim.

In furtherance of this theory of the case, on February 14, 2012, Plaintiff sought certain testimony – eleven questions in all – from Col Allan, a journalist by trade and Editor-in-Chief of the Post, relating to (i) the editorial decision-making regarding the Stimulus Cartoon and published responses thereto, as well as the McGreevey Picture, and (ii) communications between Mr. Allan and the Post's Chairman of the Board, K. Rupert Murdoch, regarding the publication of the Stimulus Cartoon.  In response to these questions, and these questions only, Mr. Allan properly invoked the editorial process privilege.  As set forth herein, in addition to being entirely irrelevant to any issue in this case – a conclusion reached by this Court several times prior to this Motion – the matters upon which Mr. Allan's testimony is sought clearly are privileged and protected against disclosure by the First Amendment and FED. R. EVID. 501.

For decades, courts have applied the editorial privilege, recognized under the First Amendment and federal common law, to preclude inquiry into the decision-making of journalists and editors regarding the creation and selection of content for publication.  This privilege, though qualified, attaches unless a party can show that the information sought is "highly relevant," "material," and "necessary or critical" to her claims.  The issue presented is whether Plaintiff can carry this extremely lofty burden.  She cannot.

As a preliminary matter, during his deposition Mr. Allan answered all questions relating to his response to employee complaints about the Stimulus Cartoon, and even answered irrelevant questions regarding his belief as to what the cartoon meant, whether he considered it offensive, whether he thought publicly apologizing for it was appropriate, and his knowledge of "the history of the affiliation of black people and primates" (about which this Australian stated

2

he had none).  He also testified as to whether he found the McGreevey Picture sexually offensive or inappropriate to show to female journalists of the Post.  Having obtained such testimony, as irrelevant as it is, Defendants submit there is no need, let alone a "critical or necessary" one, for Plaintiff to delve into any editorial deliberative processes.

Nevertheless, the information sought is neither "highly relevant" nor "material" to Plaintiff's discrimination claims.  Indeed, with respect to questions regarding the publication of the Stimulus Cartoon, this Court already has held – in rulings issues on April 26, 2011 and July 7, 2011 – that its only <u>possible</u> relevance is to demonstrate the <u>context</u> for Ms. Guzman's complaint, and for demonstrating how individuals accused of engaging in discriminatory conduct responded to complaints about the cartoon.  In so doing, this Court recognized that the editorial content of a newspaper, and the deliberative processes behind it, cannot form the basis of an employment discrimination claim.  That is the law of this case.

Since the Stimulus Cartoon is not relevant to Ms. Guzman's employment claims, it necessarily follows that any discussions relating to the editorial decision to publish it and to publish responses to public inquiries about it cannot be "highly relevant," "material" and "critical" to Plaintiff's claims.  This reasoning similarly applies to the McGreevy Picture, and the Court's prior rulings should extend to that editorial content as well.

Finally, the decision to redact the McGreevey Picture for publication, which Ms. Guzman alleges Mr. Allan showed her in unredacted form, has no bearing on Plaintiff's sexual harassment claim.  Mr. Allan already has testified that he showed Plaintiff and other editors the picture prior to publication, why he did so, and that he did not find the picture offensive or inappropriate to show Plaintiff, an editor.  Thus, discovery into the reasons for redacting the

3

McGreevey Picture for publication simply is not relevant, let alone "highly relevant," "material" and "critical," to Plaintiff's sexual harassment claim.

Based on the foregoing, and the argument presented herein, Defendants' respectfully request that their Motion for a protective order be granted.

## STATEMENT OF FACTS

Plaintiff Sandra Guzman is a former associate editor of the Post who was hired in July 2003 to create, supervise and edit the publication of the Post's monthly "Tempo" section, which focused Latin American culture.  (See Amended Complaint ("Compl."), at ¶ 24.)  However, Tempo struggled to attract advertising, and, by September 2009, it had dwindled to a scant few pages each month.  With the section facing mounting financial losses, and unable to attract a single advertiser for any of its upcoming putative editions, the decision was made to close Tempo.[1]  (Lerner Decl., Exh. A, at 139:16-20.)  In connection with the closing of Tempo, Ms. Guzman's position was eliminated and her employment was terminated on September 29, 2009. (Ibid. at 140:2-3.)

On February 18, 2009, more than seven months prior to the elimination of her position, the Post published the Stimulus Cartoon, depicting a chimpanzee that had been shot by two police officers, with a caption lampooning Congress by comparing their drafting of a stimulus bill with a recent chimpanzee attack which had garnered national attention.  Plaintiff claims she was personally offended by the Stimulus Cartoon, which she alleged was "racist," and that she complained about it to a member of the Post's human resources department.  (Compl.  ¶81.) Plaintiff has argued that, since the Post published this purportedly "racist" Stimulus Cartoon, it

---

[1] Deposition transcript excerpts and all other exhibits cited herein are attached to the Declaration of Mark W. Lerner, Esq., dated April 27, 2012 ("Lerner Decl.").

necessarily follows that any Post editors involved with its publication also must be racist. (Lerner Decl., Exh. B, at 2.)

On February 14, 2012, counsel for Plaintiff deposed Defendant Col Allan, the Post's Editor-in-Chief, for more than seven hours.  (See Lerner Decl., Exh. A.)  During this time, Mr. Allan was questioned about a broad array of topics, many of which were entirely irrelevant to any claim or allegation in this case, and he answered almost all questions posed by Plaintiff's counsel.  Mr. Allan, however, asserted the editorial process privilege in response to a very small number of questions which sought to elicit testimony about (i) his decision-making process in publishing the Stimulus Cartoon (id. at 45:13-14, 340:5-9); (ii) his decision-making concerning the publication of a statement following the Stimulus Cartoon (id. at 347:5); (iii) conversations between him, as Editor-in-Chief, and K. Rupert Murdoch, the Chairman of the Post's Board, concerning the editorial decision to publish a public apology in response to controversy over the publication of the Stimulus Cartoon (id. at  40:21-24, 46:14-16, 49:3-11, 49:21-23, 50:6-8, 50:23-24, 51:21-22); and (iv) the decision to redact part of the McGreevey Picture prior to publication (id. at 214:11).

The questions to which Mr. Allan asserted the editorial process privilege are as follows:

### Decision to Publish the Stimulus Cartoon

- Do you believe that it was a mistake to publish that cartoon?  (Id. at 45:13-15)

- In light of your awareness after the monkey cartoon was published that black people had been portrayed as primates in this country, do you now believe it was a mistake to publish that cartoon?  (Id. at 340:5-9)

### Decision to Publish Statement Responding to the Stimulus Cartoon

- What role did you have, sir [in publishing a response to the cartoon]?  (Id. at 347:5)

### Discussions between Mr. Allan and Mr. Murdoch

- So tell us in substance what you said to your boss Rupert Murdoch about the monkey cartoon when he called you the day it was published?  (Id. at 40:21-24)

- So it was your understanding that Rupert Murdoch believed that it was a mistake to publish the cartoon?  (Id. at 46:14-16)

- Why [did you disagree with the decision to publish an apology in the Post]?  (Id. at 49:3-11)

- Did you tell Mr. Murdoch that you didn't think it was a mistake for publishing the cartoon?  (Id. at 49:21-23)

- Did you tell Mr. Murdoch that you disagreed with apologizing for this publication?  (Id. at 50:6-8)

- What happened the following day [when Mr. Allan spoke to Mr. Murdoch about the cartoon]?  (Id. at 50:23-24)

- What did you say to [Mr. Murdoch] about the cartoon on that second call?  (Id. at 51:21-22)

### Decision to Redact McGreevey Picture

- Why was his waist covered up?  (Id. at 214:11)[2]

Important for purposes of this Motion, however, is the fact that Mr. Allan answered extensive questions about a number of matters, including many relating to the cartoon.  By way of example, Mr. Allan testified to his belief as to what the cartoon meant and represented:

> Q: As you sit here today do you still believe that cartoon is not offensive?
>
> **A: Yes.** (Id. at 45:6-8)

* * *

---

[2] Counsel also engaged in a brief discussion on the record regarding the application of the editorial privilege in response to a specific question posed.  (See Lerner Decl., Exh. A, at 372:25-373:17.)

> Q: The ape in the picture was intended to be President Barack
>    Obama; is that correct?
>
> **A: That is incorrect.** (<u>Id.</u> at 350:25-351:4)

Mr. Allan likewise testified about whether he considered the cartoon offensive:

> Q: Based on your knowledge of the history of black people being
>    portrayed as primates in this country, do you now believe that
>    cartoon itself was offensive?
>
> **A: No.**
>
> Q: After gaining knowledge about how black people in this
>    country have been portrayed as primates, do you now believe
>    that the cartoon was hurtful to black employees at the Post?
>
> **A: No.**
>
> Q: Do you believe that based on the knowledge you now have of
>    how black people were portrayed as primates that the cartoon
>    was offensive to black employees at the Post?
>
> **A: No.** (<u>Id.</u> at 344:15-345:9 [objection omitted].)

Moreover, Mr. Allan testified about whether he thought apologizing for the cartoon was

appropriate:

> Q: Do you believe that Rupert Murdoch was wrong to issue an
>    apology regarding the cartoon?
>
> **A: I disagreed with the decision.** (<u>Id.</u> at 345:10-23 [objection
>    omitted].)

Mr. Allan also was questioned about whether he, an Australian, was aware of "the history

of the affiliation of black people and primates"; Mr. Allan testified that he only became so aware

as a result of public protests following the cartoon.  (<u>Id.</u> at 338:18-339:9.)

Further, Mr. Allan answered questions relating to Plaintiff's complaint about the cartoon

and his response thereto, and who he spoke to about that complaint:

> Q: Do you know if [Ms. Guzman] raised her concerns about the
>    cartoon with any editor at the New York Post?

7

A: **I don't recall.**

Q: Do you know if she raised the concerns about the cartoon to anyone in human resources?

A: **Yes.**

Q: Who did she raise her concerns to?

A: **Jennifer Jehn.**

* * *

Q: Did Mr Robinowitz [Ms. Guzman's supervisor] tell you that she complained to him about the cartoon?

A: **I don't recall.**

* * *

Q: Did you at that point say to yourself, let me go talk to Sandra Guzman because she is upset about the cartoon?

A: **No.  The procedure is that she is — her complaint is dealt with by the HR department.**

* * *

Q: Did any editor who worked under you, Mr. Allan, tell you that an employee complained about the monkey cartoon?

A: **I don't recall.** (Id. at 64:17-74:10)

Equally important, Mr. Allan answered all questions relating to Plaintiffs employment and the terms and conditions thereof — the only issues arguably relevant to this <u>employment discrimination</u> case.  By way of example, Mr. Allan testified:

Q: Mr. Allan, do you know if Sandra Guzman was fired because she had any performance issues?

A: **She was terminated because the Tempo section that she was hired to produce ceased to exist.**

Q: That was the only reason she was terminated, correct?

A: **Correct.**

> Q: If the Tempo section was not closed she would still be
>    employed by the company, correct?
>
> **A: That is true.** (Id. at 388:12-24.)

Mr. Allan similarly testified about any communications he had with Mr. Murdoch

regarding Ms. Guzman, her termination, and her public e-mail about the cartoon:

> Q: Mr. Allan, have you ever communicated with Rupert Murdoch
>    verbally or in writing about Sandra Guzman when she was an
>    associate editor for the Post?
>
> **A: No.**
>
>          \* \* \*
>
> Q: Have you ever spoken to or communicated with Rupert
>    Murdoch about [Ms. Guzman's e-mail to the public about the
>    cartoon]?
>
> **A: No.**
>
> Q: Have you ever spoken to him or communicated to him about
>    Sandra Guzman's termination?
>
> **A: No.** (Id. at 37:9-38:4)

It should be added that the undisputed testimony is that Mr. Murdoch had no involvement

whatsoever in any employment decision relating to Ms. Guzman (or any decision relating to

Tempo), so the sole and obvious purpose of these questions is to attempt to prove Mr. Allan's

state of mind regarding the selection of the Stimulus Cartoon for publication.

## PROCEDURAL BACKGROUND

On February 22, 2012, Plaintiff submitted pre-motion correspondence to the Court,

arguing that disclosure of the editorial decision-making process is required because the "cartoon

may be admissible to show racial animus" and demanding that Mr. Allan be required to answer

all of the questions to which he asserted the editorial privilege.  (See Lerner Decl., Exh. B.)

Defendants responded to Plaintiff's application on February 28, 2012.  (See Lerner Decl., Exh.

C.)  In addition to citing the substantial legal landscape supporting applicability of the editorial privilege, Defendants pointed to this Court's prior rulings, i.e., the law of this case, holding that the Stimulus Cartoon was not relevant to Plaintiff's substantive claims and could not be utilized by Plaintiff to prove discriminatory animus, as well as the irrelevance of the Post's redacting of the McGreevey Picture to her claims.  Id.  Plaintiff submitted a reply on March 6, 2012, requesting permission to fully brief the application of the editorial privilege.  (See Lerner Decl., Exh. D.)  On April 17, 2012, the Court instructed Defendants to submit the instant Motion for its consideration.

## LEGAL ARGUMENT

### I.

### THE EDITORIAL DECISION-MAKING PROCESS IS PRIVILEGED AND SHOULD BE PROTECTED FROM DISCLOSURE

**A.**     **Mr. Allan Appropriately Asserted the Editorial Privilege**

1.     Legal Standards Applicable To the Editorial Privilege

Courts of the Second Circuit recognize an editorial process privilege "protecting the press's independence in its 'selection and choice of material for publication'" and the "privacy of [its] editorial processes . . . ."  Pugh v. Avis Rent A Car System, Inc., No. M8–85, 1997 WL 669876, at *3-4 (S.D.N.Y. Oct. 28, 1997) (quoting CBS, Inc. v. Dem. Nat'l Comm'n, 412 U.S. 94, 124 (1973)); U.S. v. Marcos, No. 87 CR. 598 (JFK), 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990).[3]  This privilege arises from "a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matter . . . ."  Id. at *4.  Given the strong public interests at stake, discovery into "reportorial and editorial processes . . . represent[s] a substantial intrusion on fact gathering

---

[3]  Where a privilege is invoked in a federal court proceeding, the court will apply the federal constitutional and/or common law privileges.  See Baker v. F and F Inv., 339 F. Supp. 942 (S.D.N.Y. 1972).

and editorial privacy which are significant aspects of a free press." Application of Consumers Union of U.S., Inc., 495 F. Supp. 582, 586 (S.D.N.Y. 1980).[4] The privilege protects from discovery both documents and witness testimony. See, e.g., Solargen Elec. Motor Car Corp. v. Amer. Motors Corp., 506 F. Supp. 546, 553 (N.D.N.Y. 1981) (quashing subpoena *duces tecum*); Application of Behar, 779 F. Supp. 273 (S.D.N.Y. 1991) (quashing subpoena *ad testificandum*); Lonegan v. Hasty, No. CV-04-2743 (NG)(VVP), 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008) (narrowing scope of deposition).

Even though it initially was recognized to protect journalists' confidential sources, see Branzburg v. Hayes, 408 U.S. 665 (1972), courts have extended the privilege's scope to protect from discovery, among other things, the editorial processes that underlie the creation and publication of a newspaper. See id. (protecting journalist's confidential sources); Persky v. Yeshiva Univ., No. 01 Civ. 5278 (LMM), 2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002) (reporter's research privileged); Palandjian v. Pahlavi, 103 F.R.D. 410 (D.D.C. 1984) (unpublished interview materials); Consumers Union, 495 F. Supp. 582 (reporter's methodology); Damiano v. Sony Music Ent., Inc., 168 F.R.D. 485 (D.N.J. 1996) (reporter's "resource materials," including interview notes).

The scope of this privilege extends to editorial decision-making. Indeed, within its purview are the very editorial processes which underlie the creation of a newspaper, including discussions between editors and reporters regarding content and the selection thereof. For instance, the Southern District of New York has recognized that the privilege protects from disclosure testimony relating to discussions between the paper's publisher, executive editor and

---

[4] Other courts have reached similar results. See, e.g., U.S. v. Cuthbertson, 630 F.2d 139, 147 (3d Cir. 1980) (finding journalists' privilege extends from an "interest . . . preventing intrusion into the editorial process, and avoiding the possibility of self-censorship . . . ."); Maughan v. NL Indus., 524 F. Supp. 93, 95 (D.C.D.C. 1981) ("The right of a newspaper to determine for itself what it is to publish . . . must be given great respect if an unfettered press is to exist and information is to flow unhindered from it to the public.").

assistant managing editor regarding, among other things, the nature of a published column.
Rosario v. New York Times Co., 84 F.R.D. 626, 631 (S.D.N.Y. 1979).  Likewise, in S.E.C. v.
McGoff, 647 F.2d 185, 191 (D.C. Cir. 1981), the D.C. Circuit Court of Appeals applied the
privilege to the "editorial policy" and "news gathering" activities of a newspaper, protecting
financial and editorial documents to the extent they described the paper's "activities and
associations as a newspaper publisher."  Similarly, the Fourth Circuit recognized it to protect a
journalist's relating to or describing events that occurred in an editorial board meeting.  See
Church of Scientology Int'l v. Daniels, 992 F.2d 1329, 1335 (4th Cir. 1993).

    Although qualified in nature, courts have made it clear that "in the ordinary case the civil
litigant's interest in disclosure should yield to the journalist's privilege."  Zerilli v. Smith, 656
F.2d 705, 712 (D.C. Cir. 1981).  As the Court aptly held in Zerilli, "if the privilege does not
prevail in all but the most exceptional cases, its value will be substantially diminished."  Id.  See
also Downey v. The Coalition Against Rape and Abuse, Inc., No. 99-3370, 2003 WL 23164082,
at *4 (D.N.J. Apr. 10, 2003) (discussing Herbert v. Lando, 441 U.S. 153 (1979); noting that "the
Supreme Court in Herbert did not hold that the First Amendment provided no privilege to a
newspaper person.  Rather, the Supreme Court held that the evidentiary privilege accorded to a
newspaper person is not absolute.  In addition . . . Herbert did not abrogate a journalist's federal
common law protection.").  Courts of the Second Circuit have adopted and applied the editorial
privilege.  See, e.g., Lonegan, 2008 WL 41445, at *2 (citations omitted).

    To overcome the editorial privilege, a party must make "a 'clear and specific showing'
that the information sought is (1) highly material and relevant, (2) necessary or critical to the
maintenance of the claim by the party and (3) not obtainable from other available sources."
Pugh, 1997 WL 669876, at *3 (citing U.S. v. Burke, 700 F.2d 70, 77 (2d Cir. 1983)).  As

demonstrated below, the information sought by Plaintiff relates directly to the Post's confidential

editorial processes (the information sought has not been disclosed to any third party) and not to

any <u>employment decision,</u> and is not, therefore, relevant to Plaintiff's employment

discrimination claims.

Even assuming the testimony sought was somehow relevant – and it is not – it certainly is

not "highly material and relevant" nor "necessary or critical" to Plaintiff's claims.  This is

especially so because Plaintiff already has elicited testimony from Mr. Allan regarding his

personal views about the Stimulus Cartoon, the apology issued in response to complaints about

it, and his views regarding the McGreevey Picture and why he shared it with Plaintiff and other

Post journalists.  In short, this is not the "exceptional case" which might justify allowing Plaintiff

to overcome the editorial privilege.  <u>Zerilli</u>, 656 F.2d at 712.

      2.      **Mr. Allan Properly Invoked the Privilege in
Response to Questions Implicating His Editorial
<u>Discretion and Decision-Making</u>**

Mr. Allan invoked the editorial privilege only in response to questions seeking testimony

concerning his editorial decision-making.  These questions related to (i) his decision-making

process in publishing the Stimulus Cartoon (Lerner Decl., Exh. A at 45:13-14, 340:5-9); (ii) his

decision-making concerning the publication of a statement following the Stimulus Cartoon (<u>id.</u> at

347:5); (iii) conversations between him, as Editor-in-Chief, and K. Rupert Murdoch, the

Chairman of the Post's Board, concerning the editorial decision to publish a public apology in

response to controversy over the publication of the Stimulus Cartoon (<u>id.</u> at 40:21-24, 46:14-16,

49:3-11, 49:21-23, 50:6-8, 50:23-24, 51:21-22);[5] and (iv) the decision to redact part of the

---

[5] As the editorial privilege is held by the journalist, it cannot be waived by any other person.  <u>See Los Angeles Mem.
Coliseum Comm'n v. Nat'l Football League</u>, 89 F.R.D. 489, 494 (D.C. Cal. 1981) ("The journalist's privilege
belongs to the journalist alone and cannot be waived by persons other than the journalist.").  To the extent that Mr.

McGreevey Picture prior to publication (id. at 214:11).  The record is clear that the privilege was

invoked solely with respect to questions that went to core functions of the "press's independence

in its 'selection and choice of material for publication'" which fall squarely within the scope of

the editorial privilege.  Pugh, 1997 WL 669876, at *4.

**B.      The Information Sought is Irrelevant and Thus Incapable
         of Overcoming the Editorial Privilege**

> 1.      This Court Already Has Held That the
>         Stimulus Cartoon and Editorial Decisions Relating
>         Thereto are Not Relevant to Plaintiff's Claims

The Stimulus Cartoon, and by extension the decision-making process in publishing the

Stimulus Cartoon and editorial responses thereto, are not relevant to Plaintiff's claims of

employment discrimination.  Indeed, in several prior rulings, this Court unequivocally limited

the so-called relevance of the Stimulus Cartoon to providing context only, if even.  The logic and

reasoning of the Court's prior rulings clearly apply with equal force to the McGreevy Picture.

This being the case, the testimony sought cannot possibly be deemed "highly material and

relevant" and "necessary or critical" to Plaintiff's claims as required by Pugh.  1997 WL 669876,

at *3 (citing Burke, 700 F.2d at 77).

This Court has held that the mere publication of the Stimulus Cartoon is not relevant to

any purported racially hostile work environment Plaintiff experienced, and is moreover not

relevant to showing that the Post's editors hold racial animus.  (Lerner Decl., Exh. E, at 10:23-

11:2.)  Rather, the Court explicitly limited the Stimulus Cartoon's relevance, if any, to (i)

providing context for Ms. Guzman's complaint, and (ii) demonstrating how individuals accused

of engaging in discriminatory conduct responded to complaints about the cartoon.  The foregoing

is the law of this case, see, e.g., Valjean Mfg., Inc. v. Michael Werdiger, Inc., 332 Fed. Appx.

---

Murdoch revealed that he communicated with other "editors" or "people" in his published apology, this would not
waive the privilege as to Mr. Allan.

648, 650 (2d Cir. 2009) (rejecting argument previously raised in course of litigation), and, as noted above, Plaintiff explored both issues with Mr. Allan extensively at his deposition.  None of the testimony which is the subject of this Motion is relevant, let alone "highly material" and "critical or necessary," to either of the issues for which the Court held it might be used.

During a teleconference on July 7, 2011, the Court held as follows:  "The bottom line is that I do not find that the chimpanzee cartoon . . . fits within the kind of discovery that would be relevant to the claims that Ms. Guzman has raised either in terms of a hostile work environment or retaliation." (Lerner Decl., Exh. E, at 10:23-11:2.)  The Court further stated:  "I see the cartoon as not relevant to the question of the environment that was created by News Corporation." (Id. at 11:2-4.)  Finally, the Court limited the cartoon's relevance to Defendants' response to complaints of the cartoon:  "As far as I'm concerned . . . I think in general the question of the cartoon is – it is not directly on point but the response to the cartoon I think becomes important because of the individuals who are doing the response and how they feel about the response and that issue." (Id. at 13:15-20 (emphasis added).)

Simply put, the Court held in no uncertain terms that the Stimulus Cartoon was not relevant to claims of "a hostile work environment or retaliation"; rather, the Court limited the scope of discovery to "documents concerning communications among [the relevant decision-makers] that concern how the Post would respond to Ms. Guzman or to employees of the Post regarding concerns expressed about the cartoon." (Id. at 13:8-13.)  Notably, Plaintiff explored these issues with Mr. Allan extensively at his deposition.

The Court's July 7, 2011 ruling was entirely consistent with its prior rulings on this issue. Indeed, on April 26, 2011, this Court issued an Order limiting the relevance, if any, of the Stimulus Cartoon to two narrow issues, namely, (i) to demonstrate context (i.e., what Ms.

Guzman complained about) and (ii) to gauge the relevant decision-makers' reaction to Ms. Guzman's complaint about the cartoon. Specifically, this Court held: "The allegations involving the published content and editorial decisions _may_ be relevant <u>because they provide context</u> for the complaints made by Guzman, and <u>Defendants' reaction to those complaints _may_ also be probable</u> of Defendants' discriminatory animus towards Guzman." <u>Guzman v. News Corp.</u>, 09-Civ-9323, at *6 (S.D.N.Y. Apr. 26, 2011) (emphasis added). Likewise, in its Order of September 27, 2010, the Court held that Plaintiff "sufficiently put Defendants on notice of the retaliation claims against it by alleging that Plaintiffs' [_sic_] complaints were about the working climate generally at the Post, <u>rather than solely about the content published by the paper</u>." <u>Guzman v. News Corp.</u>, 09-Civ-9323, at *3 (S.D.N.Y. Sept. 27, 2010) (emphasis added).

In short, this Court's prior rulings hold that the decision to publish the Stimulus Cartoon and the Post's editorial responses thereto, as well as discussions relating to those responses, are not relevant to Plaintiff's allegations. And the logic and rationale behind those decisions apply equally to the McGreevy Picture. The questions posed at deposition, which go directly to the editorial decision-making process behind the publication of the Stimulus Cartoon and the McGreevy Picture, or the editorial decisions to publish a statement to the general public (as opposed to responses to employee complaints), are not relevant. Since the questions posed seek neither "material" nor "highly relevant" information, a protective order precluding inquiry into Mr. Allan's editorial decision-making properly should be issued.

> 2.     Editorial Content and Decisions Relating Thereto
>         <u>Are Not Relevant to a Claim of Employment Discrimination</u>

It is abundantly clear that the editorial content of a newspaper and the deliberative process behind it cannot form the basis for an allegation of employment discrimination. Therefore, testimony about such content and decisions related thereto cannot be sufficiently

"material" or "highly relevant" to overcome the editorial privilege.  Any ruling to the contrary would depreciate the First Amendment protections afforded to newspapers and impermissibly threaten to chill the freedom of the press by dissuading publication of provocative material.  See, e.g., U.S. v. National Treasury Employees Union, 513 U.S. 454, 468 (1995) (recognizing danger of chilling of editorial content); Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931) (recognizing chilling effect of prior restraints).

      It is well settled law that editorial content in a newspaper has no bearing on the terms and conditions of an employee's work environment and the decision to publish content is not illustrative of any animus possessed by that editor.  Claims raised under "Title VII and Section 1981 are directed to business judgments, not editorial judgments." Rosario, 84 F.R.D. at 631.  See also Stanley v. The Lawson Co., 993 F. Supp. 1084, 1089 (N.D. Oh. 1997) ("[I]f Title VII . . . required Defendant to remove the adult magazines from its stores because an employee found them offensive, those laws would violate the First Amendment.").  This is because a court, in determining relevance to a claim of employment discrimination, is "not concerned with what [a newspaper] gathers or what it publishes . . . ." Rosario, 84 F.R.D. at 631.  Indeed, this Court previously has applied the privilege to preclude inquiry into the editorial processes of a newspaper in an employment discrimination suit, finding that the privilege protected from disclosure (i) discussions between the paper's publisher, executive editor and assistant managing editor concerning the nature of a published column; and (ii) a question relating to a "regular minority columnist on the 'Op-Ed' page," notwithstanding their potential relevance.  Id.

      This holding comports with the broader protections afforded by the First Amendment to the publishing of a newspaper, and in particular the publication of potentially offensive material.  See FCC v. Pacifica Found., 438 U.S. 726, 745-46 (1978) ("[I]f it is the speaker's opinion that

gives offense, that consequence is a reason for according it constitutional protection."). Critical

to these protections is a newspaper's editorial independence, which includes the freedom of

"choice of material to go into a newspaper, and the decisions made as to . . . content of the paper,

and treatment of public issues and public officials . . . ." Miami Herald Pub. Co. v. Tornillo, 418

U.S. 241, 255 (1974). Included within this realm of protections is a newspaper's selection and

publication of headlines, articles and cartoons. See, e.g., Hustler Mag. v. Falwell, 485 U.S. 46,

54 (1988) (holding First Amendment protects provocative political cartoons); N.Y. Times v.

Sullivan, 376 U.S. 254, 266 (1964) (finding newspaper publication protected by First

Amendment to "secure . . . 'the widest possible dissemination of information from diverse and

antagonistic sources'").

In short, the editorial content of a newspaper and the decision-making and selection

process underlying that content are fundamentally protected and cannot be relevant to

demonstrating any racial animus of a newspaper's editors or employees. A contrary result would

severely undercut the important public interests in the independence of the press by creating

prior restraints on publishers by making them liable for non-defamatory editorial content.  In

fact, such a holding would mean that any time a newspaper employee suffered an adverse

employment action she only need find some editorial content that is "offensive" to her in order to

maintain a case of discrimination. This simply cannot be.

To be sure, publications that exalt in racy or controversial material would face a Morton's

Fork of either:  (i) avoiding hiring members of protected classes about whom they publish; (ii)

hiring members of that protected class and facing a *prima facie* claim of discrimination for any

and all adverse actions; or (iii) stopping publishing certain content. For instance, under such a

construction, *Playboy* magazine would be automatically liable for sex discrimination against its

female employees for any adverse employment action due to the mere fact it publishes images of women that portray them as sex objects, thereby establishing an anti-female animus.  These types of limitations certainly are not the purpose of Title VII and, in any event, it is not for Congress to "circumscrib[e] the full freedom and liberty of [a newspaper] to publish the news as it desires" through such regulation.  McDermott v. Ampersand Pub., LLC, 593 F.3d 950 (9th Cir. 2010) (quoting Assoc. Press v. N.L.R.B., 301 U.S. 103, 133, 57 S.Ct. 650 (1937)).

In sum, case law firmly supports that the publication of the Stimulus Cartoon (and the McGreevy Picture) and responses to it, and the editorial decision-making relating to these acts, cannot be used to demonstrate racial, gender or any other form of prohibitive animus in connection with employment discrimination claims.  It follows, therefore, that such "evidence" could not possibly be deemed "highly relevant" and "critical" to Plaintiff's claims.  Holding otherwise would severely endanger the fundamental purposes of the First Amendment by threatening to chill speech and would subordinate the protections afforded by the First Amendment to federal and state statutory discrimination claims, which clearly cannot be the case.  Therefore, this Court should issue a protective order precluding Plaintiff from seeking any testimony relating to the editorial processes behind the publication of the Stimulus Cartoon and the matters relating thereto.

> 3.     The Decision to Redact the McGreevy Picture
>        is Irrelevant to Plaintiff's Claims

Plaintiff alleges that Mr. Allan showed her and Post journalists an image on his Blackberry of a picture of a naked man that had hung in the bedroom of former New Jersey Governor Jim McGreevey and was evidence in his divorce proceedings.  (Lerner Decl., Exh. H, at 137:6-139:24.)  Ms. Guzman testified that this newsworthy photograph subsequently ran in the Post in redacted form.  (Id. at 143:21-144:3)  At Mr. Allan's deposition, Plaintiff's counsel posed

the question "Why was his waist covered up?", referencing this redaction.  (Lerner Decl., Exh.

A, at 214:11.)  Mr. Allan chose not to respond, properly asserting the editorial privilege

Simply put, the testimony sought by Plaintiff has no relevance to Ms. Guzman's claims.

Whether a decision was made to redact a photograph for publication in a newspaper clearly has

no relevance whatsoever to whether Mr. Allan showed Ms. Guzman the unredacted version of

the photograph (which he admitted doing), or whether he did so in an effort to "sexually harass"

her.  In fact, Mr. Allan testified extensively about the unredacted photograph, his legitimate non-

discriminatory reasons for showing the picture to Plaintiff and other Post journalists (that he was

asked to show it), and that the picture was subsequently published in the Post in redacted form.

(Lerner Decl., Exh. A, at 198:6-222:18.)

In short, Plaintiff has asked all relevant questions relating to the McGreevy Picture.

There is no need, let alone a "critical" one, for Plaintiff to delve into the editorial process behind

the decision to redact the McGreevey Picture for publication.  Pugh, 1997 WL 669876, at *3.

Nor, as set forth above, could such evidence be deemed "highly material" to her sexual

harassment claim.  Id.  For these reasons, this Court should issue a protective order precluding

Plaintiff from seeking any testimony relating to the editorial processes behind the publication of

the McGreevy Picture.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that this Court issue a protective order, pursuant to FED. R. CIV. P. 26(b)(1) and 26(c), precluding Plaintiff from seeking or obtaining any discovery which is privileged and protected against disclosure by the editorial privilege under the First Amendment of the United States Constitution, Rule 501 of the Federal Rules of Evidence and federal common law, and issuing such other and further relief as this Court deems necessary and proper.

Dated: April 27, 2012
     New York, New York

                            Respectfully submitted,

                            KASOWITZ, BENSON, TORRES
                              & FRIEDMAN LLP

                            By:    /s/ Mark W. Lerner
                                 Marc E. Kasowitz (mkasowitz@kasowitz.com)
                               Mark W. Lerner (mlerner@kasowitz.com)
                               Blythe Lovinger (blovinger@kasowitz.com)

                            1633 Broadway
                            New York, New York 10019
                            Tel.:(212) 506-1700

                            Attorneys for Defendants News Corporation,
                            NYP Holdings, d/b/a the New York Post,
                            and Col Allan