# **EXHIBIT 1**

```
 1                    JORDAN LIPPNER
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ---------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
 4
 5                    Plaintiffs,
 6                    -against-
                                09 CIV 9832 (BSJ)(RLE)
 7
     NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
 8   THE NEW YORK POST and DAN GREENFIELD and
     MICHELLE GOTTHELF,
 9
                     Defendants.
10   ---------------------------------------X
     SANDRA GUZMAN,
11                   Plaintiff,
12                   vs.       09 CIV 9323 (BSJ)(RLE)
13   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and COL ALLAN, in his
14   official and individual capacities,
15
                     Defendants.
16   ---------------------------------------X
17
18        VIDEOTAPED DEPOSITION OF JORDAN LIPPNER
19                New York, New York
20             Wednesday, February 29, 2012
21
22   REPORTED BY:  BARBARA R. ZELTMAN
                   (BOBBIE)
23                 Professional Stenographic Reporter
24
25   Job Number:  46779
```

Page 18

JORDAN LIPPNER

1
2    Q    As you sit here now, you can't
3    recall any other documents that they showed
4    you beyond the ones that we produced this
5    week?
6    A    No.
7    Q    Did you do anything else to prepare
8    for your deposition today?
9    A    No.
10   Q    Are you employed by News Corp.?
11   A    No.
12   Q    Who is your employer?
13   A    News America Incorporated.
14   Q    What's the difference between News
15   America Incorporated and News Corp.?
16   MR. LERNER:  Objection.
17   A    They're two different corporations.
18   Q    Well, describe what is News
19   Corporation.
20   MR. LERNER:  Objection.
21   A    I don't understand the question.
22   Q    Okay.
23   There is a company called News
24   Corporation, correct?
25   A    Agreed.

Page 19

JORDAN LIPPNER

1
2    Q    Describe that company, Mr. Lippner.
3    MR. LERNER:  Objection.
4    A    It's a company that -- it's a
5    multi -- it's a company that owns various
6    media entities throughout the world in the
7    newspaper industry, television, movies,
8    in-store advertising, various online visual
9    properties.
10   I think worldwide News Corp. has
11   about 50-, 60,000 employees among all the
12   different subsidiaries that it owns.  It's
13   headquartered in New York.  It's a Delaware
14   corporation.
15   I don't know how else to answer
16   your question.
17   Q    Is there a chairman of News
18   Corporation?
19   A    Yes.
20   Q    Who is that?
21   A    Chairman of the Board of News
22   Corporation is K. Rupert Murdoch.
23   Q    So there is a board of directors at
24   News Corporation?
25   A    That is correct.

Page 20

JORDAN LIPPNER

1
2    Q    Now, what is News America
3    Incorporated?
4    A    It is a --
5    MR. LERNER:  Objection.
6    You've asked in your 30(b)(6)
7    Deposition Notice, Mr. Thompson, to
8    explain how the operations of the
9    defendants are interrelated, how labor
10   relations are managed at the defendants,
11   common management of the defendants, and
12   common ownership and control of the
13   defendants.  The defendants are News
14   Corporation and NYP Holdings.
15   That's what Mr. Lippner is here to
16   testify about.
17   Those are the entities which you've
18   directed the witness to be prepared to
19   speak about and that is what he's
20   prepared to speak about.
21   MR. THOMPSON:  Mr. Lerner,
22   we'll just bring him back.
23   Are you instructing him not to
24   answer this question?
25   MR. LERNER:  Yes.

Page 21

JORDAN LIPPNER

1
2    (Directive to witness.)
3    MR. THOMPSON:  Okay.
4    BY MR. THOMPSON:
5    Q    Mr. Lippner, are you going to
6    answer my last question?
7    A    I'm following my attorney's advice.
8    MR. THOMPSON:  Will you please
9    mark that again for another ruling.
10   BY MR. THOMPSON:
11   Q    How long have you worked for News
12   America Incorporated?
13   A    Ten years.
14   Q    What is your title?
15   A    Senior vice president, deputy
16   general counsel.
17   Q    Now you are appearing here as a
18   30(b)(6) witness, correct?
19   A    That's correct.
20   Q    And you also appeared at every
21   other deposition in this case, correct?
22   A    I've been present, yes.
23   Q    And you've also represented a
24   witness who was deposed in this case -- in
25   Ms. Guzman's case, correct?

Page 42

```
1          JORDAN LIPPNER
2   to Mr. Lippner while this question is
3   pending, whispering in his ear while
4   this question is pending, which is
5   improper.
6        MR. LERNER:  The record can so
7   reflect.
8        MR. THOMPSON:  The record will
9   not only reflect, the video will
10  reflect that while a question is
11  pending, you leaned over and
12  whispered something in his ear, which
13  was improper.
14       Please conduct yourself
15  professionally here.
16       MR. LERNER:  Mr. Thompson,
17  we're trying to proceed with the
18  deposition without further
19  interruption.
20   (Requested portion of record read:
21       "Q.  So my question to you is
22  different.  I will ask it to you this
23  way:  Were you serving as in-house
24  counsel for NYP Holdings at Sandra
25  Guzman's deposition on October 13,
```

Page 43

```
1          JORDAN LIPPNER
2   2011?")
3        (End of read-back.)
4    A    No.
5    Q    What capacity were you serving that
6   day?
7    A    Deputy general counsel for News
8   America Incorporated.
9    Q    What role does News America
10  Incorporated have with The New York Post?
11   A    News America Incorporated is the
12  parent company of NYP Holdings which is the
13  company that owns and publishes The Post.
14   Q    And both News America Incorporated
15  and The New York Post are subsidiaries of
16  News Corporation, correct?
17   A    They are indirect subsidiaries.
18   Q    What do you mean "indirect
19  "subsidiaries"?
20   A    They are not directly owned by News
21  Corporation.
22   Q    How do you know that?
23   A    Because I'm familiar with the
24  corporate structure.
25   Q    Well, who actually owns The New
```

Page 44

```
1          JORDAN LIPPNER
2   York Post?
3    A    I just told you who does.
4    Q    Okay.
5        Who owns News America Incorporated?
6    A    News Publishing Australia Holdings
7   Limited.
8    Q    Isn't it fair to say, Mr. Lippner,
9   that Rupert Murdoch owns News Corporation,
10  News America Incorporated. and The New York
11  Post?
12       MR. LERNER:  Objection.
13   A    No.
14   Q    Is it your testimony that Rupert
15  Murdoch does not own The New York Post?
16       MR. LERNER:  Objection.
17   A    Correct.
18   Q    Now, do you know how many employees
19  work at The New York Post?
20   A    Hundreds.
21   Q    How many?
22   A    I don't know for sure.
23   Q    Mr. Lippner, you are testifying
24  today as the 30(b)(6) witness for The New
25  York Post.
```

Page 45

```
1          JORDAN LIPPNER
2        Is it your testimony that you
3   have -- you do not know how many employees
4   work for The Post?
5    A    That's exactly what I just said,
6   Mr. Thompson.
7        MR. LERNER:  And he answered
8   you with a rough number.
9    Q    Mr. Lippner, how is it possible
10  that you came here today as 30(b)(6) witness
11  for News Corporation but yet you don't know
12  how many employees work for News
13  Corporation?  And yet you came here also as
14  a 30(b)(6) witness for New York Post and you
15  don't know how many employees work for
16  The New York Post?
17       MR. LERNER:  Objection.
18   A    Mr. Thompson, you served a 30(b)(6)
19  Notice.  You wrote the 30(b)(6) Notice in
20  the manner that you did.  Nowhere in the
21  30(b)(6) Notice that you personally wrote
22  does it say anywhere that the 30(b)(6)
23  witness is supposed to be prepared to
24  testify exactly how many employees each
25  corporate defendant employs.
```

JORDAN LIPPNER

1
2     That's my answer.
3     Q    How many employees work at News
4  America Incorporated?
5     A    I don't know.
6     Q    You don't even know how many
7  employees work at the company that employs
8  you?
9          MR. LERNER:  Objection.
10         Mr. Thompson, again, you have not
11  asked him to come and testify as a
12  30(b)(6) witness on the number of
13  employees of these companies.
14         If you had wanted him to prepare to
15  tell you how many employees certain
16  companies have, your Notice could have
17  said that.
18         You could ask him hundreds of
19  questions about the characteristics of
20  each of these companies that are not
21  listed in the 30(b)(6) Deposition Notice.
22         He is not clairvoyant and neither
23  am I.  We do not know in advance, we did
24  not have your list of questions that your
25  were going to ask at this deposition.

JORDAN LIPPNER

1
2  What we have is your 30(b)(6) Notice.
3         That specifies what Mr. Lippner
4  prepared for and that specifies what he
5  will testify to today.
6          MR. THOMPSON:  Mr. Lerner, I
7  state again you are unduly
8  restricting the scope of the 30(b)(6)
9  Deposition Notice.
10         We will take it up with the Court.
11  BY MR. THOMPSON:
12     Q    Mr. Lippner, I want you to identify
13  the subsidiaries of News Corporation.
14     A    I couldn't possibly identify all of
15  them.
16     Q    Identify as many as you can.
17     A    News Publishing Australia Holdings,
18  News America Incorporated, NYP Holdings,
19  News Marketing America, HarperCollins
20  Publishers, FOX Television Stations.
21         There are hundreds and hundreds of
22  subsidiaries.
23     Q    Where are the corporate
24  headquarters of News Corp. located?
25     A    In Manhattan, 1211 Avenue of the

JORDAN LIPPNER

1
2  Americas.
3     Q    Where are the corporate and
4  editorial offices of The New York Post
5  located?
6     A    The editorial offices of The New
7  York Post are located on the tenth floor and
8  a little bit of the ninth floor of that
9  address.
10         The corporate offices, I'm not sure
11  what you mean by the "corporate offices of
12  The New York Post."
13     Q    Where are the business offices of
14  The New York Post located?
15     A    Business offices of The New York
16  Post are now located at 1185 Avenue of the
17  Americas.
18     Q    How long had the business offices
19  of The New York Post been located at
20  1185 Avenue of the Americas?
21     A    I think around a year.  About a
22  year.
23     Q    About a year.
24         Before the business offices of
25  The New York Post were located at

JORDAN LIPPNER

1
2  1185 Avenue of the Americas, where were they
3  located?
4     A    They were located in a couple of
5  spots.
6         Some part of the ninth floor.
7     Q    At 1211 Avenue of the Americas?
8     A    Correct.  And some part of the
9  15th floor of that same building.
10     Q    Okay.
11         So is it fair to say that -- strike
12  that.
13         How long were the business offices
14  of The New York Post located at 1211 Avenue
15  of the Americas?
16         MR. LERNER:  Objection.
17         If you know.
18     A    There was a time when they were
19  located down on South Street.  I don't
20  believe that they've been located down on
21  South Street since the early '90s.
22     Q    So is it fair to say that as far as
23  you know, the business offices of The New
24  York Post have been located at 1211 Avenue
25  of the Americas since the early '90s?

| | |
|---|---|
| Page 50 | Page 51 |

**Page 50**

JORDAN LIPPNER

1
2    A    I can certainly say that since the
3  entire time that Ms. Guzman has -- was
4  employed by The Post, they were located on
5  the ninth floor at The Post.
6    Q    What about since the entire time
7  that Ms. Livingston has been employed?
8    A    I don't recall when Ms. Livingston
9  began her employment.  But I think to use
10 your word, it's probably a fair statement to
11 say that certainly the overwhelming majority
12 of the time Ms. Livingston was employed, the
13 business offices were located at 1211 Avenue
14 of the Americas.
15   Q    So is it fair to say that during
16 Ms. Guzman's employment, News Corp. and
17 The New York Post shared office space at
18 1211 Avenue of the Americas?
19       MR. LERNER:  Objection.
20   A    No.
21   Q    Is it fair to say that during
22 Ms. Guzman's employment, News Corp. and
23 The New York Post had office space in
24 1211 Avenue of the Americas?
25       MR. LERNER:  Objection.

**Page 51**

JORDAN LIPPNER

1
2    A    News Corp. and The New York Post
3  each had their own offices at 1211 Avenue of
4  the Americas during Ms. Guzman's employment.
5    Q    During Ms. Guzman's employment,
6  what floors did News Corp. occupy at
7  1211 Avenue of the Americas?
8        And just for the record, Ms. Guzman
9  worked at the company from 2003 to almost
10 the end of 2009.
11   A    Right.
12       The eighth floor was occupied by
13 News Corp.
14   Q    What offices did News Corp. have on
15 the eighth floor at 1211 Avenue of the
16 Americas during that time?
17   A    That's where the senior executives
18 are housed.
19   Q    Was Rupert Murdoch's office located
20 on the eighth floor during that time frame?
21   A    It was.
22   Q    Is it still located on that floor?
23   A    It is.
24   Q    What other executives of News Corp.
25 had offices on the eighth floor at

| | |
|---|---|
| Page 52 | Page 53 |

**Page 52**

JORDAN LIPPNER

1
2  1211 Avenue of the Americas during
3  Ms. Guzman's employment?
4    A    The chief financial officer.
5    Q    Who was that?
6    A    David Devoe.  D-E-V-O-E.
7        The deputy chief financial officer.
8    Q    Who was that?
9    A    John Nallen, N-A-L-L-E-N.
10       The group general counsel.
11   Q    Who was that during Ms. Guzman's
12 employment?
13   A    During her employment there were
14 two group general counsels.
15       The first was Arthur Siskind.  And
16 he was succeeded by Lawrence Jacobs.
17   Q    Who is the current group general
18 counsel for News Corp.?
19   A    A gentleman by the name of Gerson
20 Zweifach, Z-W-E-I-F-A-C-H.
21   Q    When did he become the general
22 counsel of News Corp.?
23   A    About three/four weeks ago.
24   Q    And before he became general
25 counsel, was Lawrence Jacobs the general

**Page 53**

JORDAN LIPPNER

1
2  counsel for News Corp.?
3    A    There was an interim acting general
4  counsel.
5    Q    Who was that?
6    A    Janet Nova.
7    Q    Do you know if the current general
8  counsel of News Corp. also has an office on
9  the eighth floor at 1211 Avenue of the
10 Americas?
11   A    I do.
12   Q    Are there any other officers or
13 executives who occupy offices on the eighth
14 floor of 1211 Avenue of the Americas who
15 work for News Corp.?
16   A    Yes.
17   Q    Who else?
18   A    Joel Klein.
19   Q    What position does Joel Klein have
20 with News Corp.?
21   A    He heads the company's education
22 division.
23       He's also, I believe he's a member
24 of the Office of the Chairman.
25   Q    Do you know if anyone else has an

JORDAN LIPPNER

1  office on the eighth floor of 1211 Avenue of
2  the Americas who works for News Corp.?
3      A   Are we talking presently?
4      Q   Yeah.  Tell me presently.
5      A   I believe Jeff Mook.
6      Q   Who is Jeff Mook?
7      A   He is head of human resources for
8  News Corporation.
9      Q   Was the head of human resources for
10 News Corp. also located on the eighth floor
11 when Sandra Guzman was employed?
12     A   Correct.
13     Q   And who was that at the time?
14     A   There were a couple of different
15 people.
16         The first was Ian Moore and the
17 second was a woman named Beryl, B-E-R-Y-L,
18 Cook.
19     Q   Do you know if any other News Corp.
20 executives occupied office on the eighth
21 floor at 1211 Avenue of the Americas?
22     A   There may be a few others, but
23 those are the ones that come to mind.
24     Q   What about during Ms. Guzman's

JORDAN LIPPNER

1  employment, can you think of anyone else?
2      A   At the --
3          MR. LERNER:  Objection.  These
4  are the people that presently occupy
5  that space.  So when you say can you
6  think of anyone else --
7          MR. THOMPSON:  I just said
8  during Ms. Guzman's employment.
9          MR. LERNER:  Understood.  But
10 when you said can you think of anyone
11 else, to me the question supposes
12 that these people occupied that space
13 during Ms. Guzman's employment which
14 is not his testimony.
15         MR. THOMPSON:  Then I'll make
16 it crystal clear.
17     Q   Can you think of any other News
18 Corp. executive that occupied the eighth
19 floor during Ms. Guzman's employment?
20     A   While Ms. Guzman was employed,
21 Mr. Murdoch, Mr. Nallen, Mr. Devoe,
22 Mr. Siskind, Mr. Jacobs, Mr. Moore, Ms. Cook
23 had office space up there.
24         There were others such as -- there

JORDAN LIPPNER

1  was a gentleman by the name of Andrew
2  Butcher.
3      Q   Who was Andrew Butcher?
4      A   He was head of our communications
5  department at one point.
6          There was a gentleman by the name
7  of Gary Ginsburg.  He was also in
8  communications.
9          A woman by the name of Rachel
10 Webber.
11         Gentleman by the name of Leon
12 Hertz.
13         Those are all the names that I
14 think of.
15         MR. THOMPSON:  Can you go back
16 to his statements just now.
17     Q   You testified, Mr. Lippner, when I
18 asked you who Andrew Butcher was, you said
19 he was head of our communications department
20 at one point.
21         What do you mean by "head of our
22 communications department at one point"?
23     A   I mean he was head of News
24 Corporation.

JORDAN LIPPNER

1          I thought that that was what we
2  were talking about, who were the News
3  Corporation employees on the eighth floor.
4      Q   So when you say "our," do you
5  consider yourself to be part of News
6  Corporation?
7      A   In a global sense.
8      Q   What do you mean by "in a global
9  sense"?
10     A   Well, I work for a company that's
11 owned by News Corporation.
12     Q   But do you believe you work for
13 News Corporation?
14     A   No.
15     Q   Now, during Ms. Guzman's employment
16 from 2003 to 2009, did News Corporation
17 occupy any of the floors at 1211 Avenue of
18 the Americas, that you know of?
19     A   There were News Corp. employees on
20 the fourth floor and there were News Corp.
21 employees at some point on the seventh
22 floor.
23         That's it.
24     Q   Identify the News Corp. employees

JORDAN LIPPNER

1   JORDAN LIPPNER
2   scope of the 30(b)(6) Deposition
3   Notice.
4       MR. THOMPSON: It's not. It's
5   not, Mr. Lerner. If you instruct him
6   not to answer, that's your right but
7   it's not.
8       MR. LERNER: He's already told
9   you he can't answer.
10      Q   Well, my question is why can't you
11  answer?
12      MR. LERNER: Hold on. Since
13  it's not part of the 30(b)(6)
14  Deposition Notice --
15      MR. THOMPSON: It is.
16      MR. LERNER: -- he's not
17  prepared to answer the names of
18  employees of News America Marketing
19  which is not a defendant in the case.
20      The 30(b)(6) Deposition Notice asks
21  questions about the defendants in the
22  case.
23      MR. THOMPSON: Well,
24  Mr. Lerner, what you fail to
25  understand is that News Corporation,

1   JORDAN LIPPNER
2   based on his testimony and the
3   testimony of Col Allan, is one
4   company that has different division.
5   You can call them subsidiaries. It's
6   clearly one company that's
7   interrelated.
8   BY MR. THOMPSON:
9       Q   My question, sir, is why can't you
10  tell me us the identities of those News
11  America Marketing employees?
12      A   There's a few reasons.
13      Q   Okay. Tell us.
14      A   There's never been a point in my
15  life where I've learned the identity of all
16  the employees for News America Marketing.
17      Q   I'm not asking you to identify all
18  of them. Identify some.
19      MR. LERNER: Hold on. I don't
20  think he was finished with the answer
21  to the question that you asked him,
22  which is why can't he name all the
23  people from News America Marketing
24  that occupied the fifth floor of
25  1211 Avenue of the Americas at a time

1   JORDAN LIPPNER
2   before Paul Carlucci became publisher
3   of The Post.
4       A   It's also not information that was
5   covered by the 30(b)(6) Notice, so I did not
6   prepare to be able to testify as to who did
7   or did not work for News America Marketing
8   in 2003, for example.
9       Q   Well, do you know who Les Goodstein
10  is?
11      A   I do.
12      Q   Who is he?
13      A   He is an employee of News America
14  Incorporated.
15      Q   How long has he been an employee of
16  News America Incorporated?
17      A   I think he joined us around 2006.
18      Q   And what position did he join the
19  company as?
20      A   He joined us I think in a marketing
21  capacity and also to work on the small
22  community newspapers that the company had
23  acquired or was intending to acquire.
24      Q   What company acquired the community
25  newspapers?

1   JORDAN LIPPNER
2       A   News America Incorporated.
3       Q   Do you know the specific title
4   Mr. Goodstein assumed when he joined News
5   America Incorporated?
6       A   I did at one point. I don't know
7   his specific title today.
8       Q   Is Mr. Goodstein still an employee
9   of News America Incorporated?
10      A   Yes.
11      Q   Has he ever worked for News
12  Corporation?
13      A   No.
14      Q   When Ms. Guzman worked at the
15  company, was there like an employee
16  cafeteria at 1211 Avenue of the Americas?
17      A   Yes.
18      Q   What floor was that cafeteria
19  located on?
20      A   The third floor.
21      Q   Who occupied the third floor in
22  terms of companies?
23      MR. LERNER: Objection.
24      A   Nobody occupies the third floor.
25      Q   Well, do you know if the third

JORDAN LIPPNER

1
2  A    My understanding is that the
3  conference rooms were available for use by
4  any employees of any subsidiary of News
5  Corporation.
6        So News America Marketing
7  employees, HarperCollins employees, FOX
8  television employees, New York Post
9  employees.
10        You just had to sign up and request
11  them.
12  Q    Now, when Ms. Guzman worked at the
13  company -- and she worked at 1211 Avenue of
14  the Americas, correct?
15  A    When Ms. Guzman worked for The New
16  York Post, she worked -- started on the
17  tenth floor and for most of the time was on
18  the 9th floor.
19  Q    At 1211 Avenue of the Americas,
20  correct?
21  A    That's correct.
22  Q    Now, when she worked at the
23  company, were there other organizations,
24  separate and apart from News Corporation and
25  its subsidiaries, located at 1211 Avenue of

JORDAN LIPPNER

1
2  the Americas?
3  A    Yes.
4        MR. LERNER:  Objection.
5        Hold on.
6        You said when she worked at the
7  company.
8        There are two corporate defendants
9  here.  So we'll take it to mean when you
10  say "the company," she was employed by
11  The New York Post, we'll take it to mean
12  The New York Post.
13        MR. THOMPSON:  No, I don't mean
14  that.
15        MR. LERNER:  Then you should
16  state what corporate entity you mean.
17        MR. THOMPSON:  When I say "the
18  company" I mean News Corporation and
19  The New York Post.
20  A    Let me clarify my answer.  As I
21  stated in my prior answer to your prior
22  question, Ms. Guzman worked for The New York
23  Post.
24        So if -- I don't know what your
25  last question was.

JORDAN LIPPNER

1
2  Q    Well, I'll have it read back since
3  you forgot it.
4        MR. THOMPSON:  Will you read it
5  back, please.
6        (Requested portion of record read:
7        "Q.  Now, when she worked at the
8        company, were there other organizations,
9        separate and apart from News Corporation
10        and its subsidiaries, located at 1211
11        Avenue of the Americas?")
12        (End of read-back.)
13  A    When Ms. Guzman worked for The New
14  York Post, there were and are other
15  companies that have nothing to do whatsoever
16  with News Corporation and its subsidiaries
17  that have their offices located at 1211
18  Avenue of the Americas.
19  Q    Now when she worked at the company,
20  did employees of those organizations that
21  had nothing to do with News Corporation, did
22  they have access to the employee cafeteria?
23        MR. LERNER:  Objection.
24  A    They could have gained access if
25  they wanted to.

JORDAN LIPPNER

1
2  Q    Why do you say that?
3  A    Well --
4  Q    Well, let me ask it differently.
5        When you walk into 1211 Avenue of
6  the Americas, do you have to use some type
7  of electronic security pass to get up to the
8  floors occupied by News Corp. or The New
9  York Post?
10  A    You have to use an ID card to get
11  access to -- I believe there are four
12  different elevator banks.  Once you gain
13  access to that general area, you do not need
14  your ID card to go up in the elevator.
15  Q    Do you know if there's one type of
16  ID card that all the employees who work at
17  the various subsidiaries of News Corp. use
18  at that building?
19  A    I know that employees of the
20  different companies have different ID cards.
21  Q    Okay.
22        Now, when you -- I believe you said
23  that the cafeteria was on the fifth floor?
24  A    The cafeteria is on the third
25  floor.

Page 106

JORDAN LIPPNER

1   MR. LERNER: Objection.
3   A   On the days that The New York Post
4   security guards are not at 1211, they are
5   providing security for New York Post
6   employees at 900 East 132nd Street.
7   Q   So I'm going to ask the question
8   differently.
9      When there are no New York Post
10  security officers at 1211 Avenue of the
11  Americas, who provides security for The New
12  York Post employees at 1211 Avenue of the
13  Americas?
14  A   The building owner -- and I don't
15  know who the building owner is but it is not
16  News Corp. or any of its subsidiaries --
17  provides security for the tenants of the
18  building.
19  Q   Okay.
20     So what role does the Security
21  Department for News Corp. play differently
22  than the security that the building owner
23  provides?
24     MR. LERNER: Objection. Beyond
25  the scope of 30(b)(6) Deposition

Page 107

JORDAN LIPPNER

1
2   Notice.
3      MR. THOMPSON: It's not.
4      MR. LERNER: Instructing the
5   witness not to answer the question.
6      (Directive to witness.)
7   Q   Mr. Lippner, are you going to
8   answer that question?
9   A   I'm going to follow the advice of
10  my counsel.
11  Q   Isn't it fair to say that the
12  Security Department for News Corp. also
13  provides security for The New York Post
14  employees at 1211 Avenue of the Americas?
15  A   No.
16  Q   Do you have an e-mail address at
17  work?
18  A   Yes.
19  Q   What is it?
20  A   Jlippner@newscorp.com.
21  Q   Do you have a -- strike that.
22     Has that been your e-mail address
23  for the past several years?
24  A   It has.
25  Q   Was it your e-mail address when

Page 108

JORDAN LIPPNER

1
2   Ms. Guzman worked at the company?
3   A   Absolutely.
4   Q   Now, do you also have an e-mail
5   address that is specifically tied to News
6   America Incorporated?
7      MR. LERNER: Objection.
8   A   I only have one address and it is
9   jlippner@newscorp.com and that is my News
10  America Incorporated e-mail address.
11  Q   So is it fair to say, Mr. Lippner,
12  that employees who work for The New York
13  Post have a different e-mail address than a
14  News Corp. e-mail address?
15     MR. LERNER: Objection.
16  A   Employees who work for The New York
17  Post do not have a News America Incorporated
18  e-mail address or a News Corporation e-mail
19  address. They have a New York Post e-mail
20  address.
21  Q   Do you know why you have a newscorp
22  e-mail address if you work for News America
23  Incorporated?
24     MR. LERNER: Object to form.
25  A   I do not have a News Corporation

Page 109

JORDAN LIPPNER

1
2   e-mail address. I have a News America
3   Incorporated e-mail address.
4   Q   Okay.
5      Is it fair to say, Mr. Lippner,
6   that your e-mail address is
7   jlippner@newscorp.com?
8   A   My work e-mail is that e-mail, yes.
9   Q   And I'm only talking about your
10  work e-mail. I'm not talking about private
11  e-mail right now or personal e-mail.
12     Why, Mr. Lippner, do you have a
13  newscorp.com e-mail address if you work for
14  News America Incorporated?
15     MR. LERNER: Objection.
16     Mr. Thompson, the reason for
17  Mr. Lippner's e-mail address has nothing
18  to do with the relationship between
19  The New York Post and News Corp.
20     Mr. Lippner does not work for
21  The New York Post. He doesn't have an
22  office at The New York Post and he's
23  testified to that.
24     MR. THOMPSON: Yes. But,
25  Mr. Lerner, as you know, Mr. Lippner

Page 110

JORDAN LIPPNER

1
2  has maintained an office at
3  1211 Avenue of the Americas for
4  years.
5      The same address where the
6  editorial and business offices of The New
7  York Post are located.
8      I have a right to probe this
9  witness regarding the e-mail addresses
10 used by News Corp. employees and The New
11 York Post employees, and I'm asking him
12 why does he have a newscorp e-mail
13 address if he works for News America
14 Incorporated.
15     It is a fair area to inquire to
16 determine if News Corp. and News America
17 Incorporated are the same company.
18     MR. LERNER: It's beyond the
19 scope.
20     MR. THOMPSON: It is not.
21     MR. LERNER: I'm directing the
22 witness not to answer that question.
23     (Directive to witness.)
24 BY MR. THOMPSON:
25     Q    Mr. Lippner, do you know if there

Page 111

JORDAN LIPPNER

1
2  is one computer server for News Corp.
3  employees and New York Post employees?
4      MR. LERNER: Objection.
5      A    I know there is not one computer
6  server.
7      Q    Tell us -- describe the different
8  computer servers for The New York Post
9  employees and -- as opposed to the computer
10 server for the News Corp. employees?
11     MR. LERNER: As best you can
12 and understanding that you are not an
13 IT specialist.
14     MR. THOMPSON: Mr. Lerner, he
15 doesn't have to be an IT specialist.
16 He has to be prepared to answer the
17 questions that are relevant to the
18 30(b)(6) Dep Notice.
19     MR. LERNER: I'm not even sure
20 what a server is.  And Mr. Lippner
21 and I are both lawyers, as are you.
22 So he can answer that question as
23 best he can with that understanding.
24     A    I am not what you would call a
25 computer geek or very IT savvy.

Page 112

JORDAN LIPPNER

1
2      What I can tell you is that The New
3  York Post maintains separate and distinct
4  computer databases, computer servers from
5  News Corporation.
6      They have nothing to do with each
7  other.  Each company has separate IT
8  departments.
9      I don't know how else to answer
10 your question.
11     Q    Do you know anyone who has a
12 newsamerica.com e-mail address?
13     A    Yes.
14     Q    Who?
15     A    Every employee of News America
16 Marketing.
17     Q    News America Marketing?
18     A    Yes.
19     Q    So what's the e-mail address for
20 employees at News America Marketing?
21     MR. LERNER: Objection.
22     A    Something to do with their name,
23 @newsamerica.com.
24     Q    Is it fair to say, Mr. Lippner,
25 that you and other attorneys for News

Page 113

JORDAN LIPPNER

1
2  America Incorporated have a newscorp.com
3  e-mail address at work?
4      A    I'm sorry, can you repeat the
5  question.
6      (Requested portion of record read:
7      "Q.  Is it fair to say,
8  Mr. Lippner, that you and other attorneys
9  for News America Incorporated have a
10 newscorp.com e-mail address at work?")
11     (End of read-back.)
12     A    Yes.  My and my News America
13 Incorporated legal colleagues, our e-mail
14 addresses end with newscorp.com.
15     Q    Do you know why your e-mail
16 addresses end with newscorp.com as opposed
17 to newsamerica.com?
18     MR. LERNER: Objection.  This
19 is exactly the same question in which
20 we already had a colloquy and we have
21 objected to the question, and I
22 instruct the witness not to answer
23 beyond the scope of this Deposition
24 Notice.
25     (Directive to witness.)

Page 134

JORDAN LIPPNER

1
2     But let me move on because you read
3 one part of the 30(b)(6) Deposition
4 Notice, and you forgot to read the most
5 important part that goes to this area of
6 inquiry.
7     "One:  Explain how, if at all, the
8 operations of the Defendants are
9 interrelated."
10     Now, we've established, Mr. Lerner,
11 through this witness that News Corp. has
12 a board of directors, and we've
13 established through this witness that
14 The New York Post has a board of
15 directors, so we need to probe and we
16 have a right to probe whether there is
17 any interrelated activity between the
18 board of directors or any members of the
19 board of directors of News Corp. with the
20 board of directors at The New York Post.
21     It is improper for you to suggest
22 that this is not a fair area of inquiry.
23 It is completely fair and dead on in
24 terms of the Dep Notice.
25 BY MR. THOMPSON:

Page 135

JORDAN LIPPNER

1
2     Q    Mr. Lippner, I just want the record
3 to be clear, as a 30(b)(6) witness for
4 The New York Post, is it your testimony that
5 all you know about The New York Post board
6 of directors is that one exists?
7     A    That's not my testimony.
8     Q    So tell us what you know about the
9 board of directors at The New York Post.
10     For example, how often does it
11 meet?
12     A    Paul Carlucci, Dave Devoe, Rupert
13 Murdoch and Lon Jacobs sat on the board of
14 directors for The New York Post as of the
15 date of Ms. Guzman's employment termination.
16     Q    How often did the board of
17 directors at The New York Post meet during
18 Ms. Guzman's employment?
19     A    I do not know.
20     Q    How often does the board of
21 directors at The New York Post meet today?
22     A    I don't know.
23     Q    Did you seek to get that
24 information before your deposition today?
25     A    No.

Page 136

JORDAN LIPPNER

1
2     Q    Why not?
3     A    Because it's not part of the scope
4 of the Notice that you sent.
5     Q    So you don't believe that finding
6 out more information about the board of
7 directors is relevant to the Dep Notice that
8 we sent; is that your testimony?
9     MR. LERNER:  Objection.
10     A    I think my prior statement stands
11 on its own.
12     Q    Okay.
13     Where do the board of directors of
14 The New York Post meet?
15     A    I do not know.
16     Q    Where does the board of directors
17 of News Corp. meet?
18     A    I do not know.
19     Q    How often does the board of
20 directors of News Corp. --
21     MR. LERNER:  Mr. Thompson,
22 there is clear case law that the
23 boards of directors and memberships
24 of the boards of directors and the
25 operations of boards in which members

Page 137

JORDAN LIPPNER

1
2 wear different hats has no relevance
3 to the questions that of where this
4 is all going, which is, as I
5 understand it, joint employment,
6 joint control.
7     MR. THOMPSON:  You don't
8 understand it.
9     If that's your belief, you are
10 mistaken.  Okay.  Because that's not --
11     MR. LERNER:  It's not even
12 relevant to the subject matter.
13     MR. THOMPSON:  These questions
14 are relevant.
15     I'm going to continue.
16     MR. LERNER:  Excuse me one
17 second.
18     (Lippner Exhibit 2, Defendant
19 NYP Holdings, Inc. d/b/a The New
20 York Post, Objections and Responses
21 to Plaintiffs' First Set of
22 Interrogatories, was marked for
23 Identification.)
24 BY MR. THOMPSON:
25     Q    Mr. Lippner, I'm now showing you

Page 146

JORDAN LIPPNER

1
2  ten-year employment at News America
3  Incorporated.
4          And during that ten-year period, I
5  have not once had a discussion with any
6  executive at The New York Post about a
7  policy that they were implementing or a new
8  policy that was handed down.  Period.
9          And no new policies have been
10 handed down in that regard.
11         So I'm basing that as my statement
12 that I don't believe a single policy has
13 been handed down by the board of directors
14 of The New York Post on New York Post
15 employees.
16     Q    Do you know if Paul Carlucci ever
17 set policy for The New York Post employees?
18     A    Yes.
19     Q    How do you know that?
20     A    Because I do.
21     Q    What's the basis besides "I do"?
22     A    The New York Post a few years ago
23 implemented a formal annual performance
24 appraisal system.  It was the first time in
25 The Post history that they were implementing

Page 147

JORDAN LIPPNER

1
2  such a procedure, and they were implementing
3  it because Paul Carlucci wanted to implement
4  it.
5      Q    Do you know if Paul Carlucci
6  discussed that particular policy during any
7  board meeting?
8      A    I do not.
9      Q    Strike that.
10         Do you know if Paul Carlucci
11 discussed that particular policy during any
12 meeting of the board of directors of The New
13 York Post?
14     A    I do not.
15     Q    Mr. Lippner, who has final
16 authority over personnel decisions at News
17 Corporation?
18     A    It would depend on the employee
19 that we're talking about.
20     Q    Well, is there one person who had
21 final authority over personnel decisions at
22 News Corp.?
23     A    No.
24     Q    Is there one person who has final
25 authority over personnel decisions at The

Page 148

JORDAN LIPPNER

1
2  New York Post?
3      A    I mean every situation stands on
4  its own.
5      Q    I understand that.  My question is
6  different.
7          My question is:  Is there a person
8  at The New York Post who has final authority
9  over personnel decisions affecting New York
10 Post employees?
11         MR. LERNER:  Objection.
12     A    You know, I think I don't then
13 really understand your question.
14     Q    I'll ask it differently.
15         Does Paul Carlucci have final say
16 over personnel decisions at The New York
17 Post?
18         MR. LERNER:  Objection.
19     A    No.
20     Q    Does Rupert Murdoch have final say
21 over personnel decision at The New York
22 Post?
23     A    No.
24     Q    Who has final say over personnel
25 decisions at The New York Post?

Page 149

JORDAN LIPPNER

1
2      A    Your question has a faulty premise.
3  You are suggesting that such a person
4  exists.
5      Q    I'll ask it differently then.
6          Does any person or group have final
7  say over personnel decisions at The New York
8  Post?
9          MR. LERNER:  Objection.
10     A    As I said before, each situation
11 will stand on its own.
12         If you are talking about, for
13 example, Bob Smith, random employee who
14 works in the sales department, is going to
15 get fired and the manager in the sales
16 department is go going to be handling that.
17         If you are talking about one in
18 editorial, some senior editor will be
19 handling that.
20         There is no mandatory policy or
21 procedure that dictates at The New York Post
22 how someone gets fired.
23     Q    Who is the highest ranking person
24 at The New York Post?
25     A    Paul Carlucci.

Page 150

JORDAN LIPPNER

1    Q    Who does he report to?
2    A    He reports to the chairman of the
3  board of directors.
4    Q    Who is that?
5    A    Rupert Murdoch.
6    Q    So at any time isn't it fair to say
7  that Rupert Murdoch has final authority over
8  The New York Post?
9        MR. LERNER:  Objection.
10   A    No.
11   Q    Is it your testimony, Mr. Lippner,
12 that Paul Carlucci has more authority over
13 The New York Post than Rupert Murdoch?
14       MR. LERNER:  Objection.
15   A    Yes.  Paul Carlucci runs the
16 day-to-day operations of The Post.  He is
17 the senior-most executive at The Post.
18   Q    So if Paul Carlucci wanted to fire
19 someone in sales at The New York Post, he
20 had final authority to do that?
21       MR. LERNER:  Objection.
22   A    I don't know what you mean by
23 "final authority."
24   Q    It is your testimony that Paul

Page 151

JORDAN LIPPNER

1  Carlucci is the highest ranking person at
2  The New York Post, correct?
3    A    It's my testimony that he is the
4  highest ranking executive of The New York
5  Post.
6    Q    Okay.
7        And who is the highest ranking
8  editor at The New York Post?
9    A    Col Allan.
10   Q    And who does Col Allan report to?
11   A    He also reports in to, as I
12 understand it, he reports in to the chairman
13 of the board of The New York Post, Rupert
14 Murdoch.
15   Q    So is it your testimony that Paul
16 Carlucci would have more authority over
17 firing an employee at The New York Post than
18 Rupert Murdoch?
19       MR. LERNER:  Objection.
20   A    Yes.
21   Q    Is it also your testimony that Col
22 Allan would have more authority in firing
23 someone who works in the Editorial
24 Department at The New York Post over Rupert

Page 152

JORDAN LIPPNER

1  Murdoch?
2        MR. LERNER:  Objection.
3    A    Mr. Murdoch does not get involved
4  with employee terminations at The New York
5  Post.
6    Q    That's not my question.
7        Can you answer my question.
8    A    I just answered it.
9    Q    No you have not.
10       (Requested portion of record read:
11       "Q.  Is it also your testimony that
12 Col Allan would have more authority in
13 firing someone who works in the Editorial
14 Department at The New York Post over
15 Rupert Murdoch?")
16       (End of read-back.)
17   A    Yes.  Mr. Murdoch does not get
18 involved in employee terminations at The New
19 York Post.
20       MR. THOMPSON:  Move to strike
21 the last part of his answer as
22 nonresponsive.
23       Don't worry, Bobbie, we'll take a
24 break.

Page 153

1       JORDAN LIPPNER
2       MR. LERNER:  Ken, it's five
3  after 1.
4       MR. THOMPSON:  Want to take a
5  break now?
6       MR. LERNER:  It's -- I actually
7  have 1:10 on my watch.
8       MR. THOMPSON:  Do you want to
9  take a lunch break?
10      MR. LERNER:  Yes.
11      MR. THOMPSON:  What time do you
12 want to resume?
13      MR. LERNER:  2:00.
14      THE VIDEOGRAPHER:  The time is
15 1:09 p.m.  We're off the record.
16      (A luncheon recess was
17 taken at 1:09 p.m. 2:15 p.m.)
18   A F T E R N O O N   S E S S I O N
19      JORDAN LIPPNER,
20 resumed, having been previously
21 duly sworn, was examined
22 and testified further as follows:
23      THE VIDEOGRAPHER:  The time is
24 2:15 p.m.  We're on the record.
25 CONTINUED EXAMINATION BY MR. THOMPSON:

1          JORDAN LIPPNER
2  specifically?
3      A    She did.
4      Q    But is Mr. Goodstein now a member
5  of the executive committee at The New York
6  Post?
7      A    He is.
8      Q    So when did he become a member on
9  that committee?
10     A    I believe it occurred January 2010.
11     Q    Can you now take a moment, sir, and
12 look at Deposition Exhibit 7 and tell us if
13 you recognize it.
14     A    Okay.
15     Q    Do you recognize this exhibit?
16     A    I recognize the exhibit as being
17 minutes of the executive committee from
18 different dates.
19         I don't have specific recollection
20 of the particular documents.
21     Q    I want to focus your attention on
22 Page NYP-1979.
23         Do you see that it's dated
24 March 24, 2008?
25     A    I do.

1          JORDAN LIPPNER
2      Q    Do you see it says "third floor,
3  Dining Room 4"?
4      A    I do.
5      Q    Who actually controlled the dining
6  rooms on the third floor in March 2008?
7          MR. LERNER:  Objection.
8  Objection.  Asked and answered.
9      A    Either News America Incorporated or
10 News Corporation.  I'm not sure which.
11     Q    So based on this deposition
12 exhibit, is it fair to say that The New York
13 Post business was discussed in one of the
14 dining rooms at 1211 Avenue of the Americas
15 in March 2008?
16     A    I think that that is a fair
17 statement.
18     Q    Now, do you know why Les Goodstein
19 was present for the executive committee
20 meeting in March 2008?
21         MR. LERNER:  Objection.
22     A    I can't tell specifically why.
23     Q    Do you know if he was a member of
24 that committee or guest on that date?
25     A    As I stated previously, I believe

1          JORDAN LIPPNER
2  that until January 2010, Mr. Goodstein
3  participated not as a formal member of the
4  committee, but as a guest of the committee.
5          His primary responsibility was
6  running our Community Newspaper Group and
7  there were -- there was a lot of interaction
8  between the Community Newspaper Groups -- I
9  don't know if I should say a lot, but there
10 were definitely attempts at The New York
11 Post to explore leveraging, being able to
12 reach more people in the communities through
13 the Community Newspaper Group and sell
14 advertising than could be done in one paper
15 versus the Community Newspaper Group and
16 things like that.
17         So for sure that had something to
18 do with why he was there.
19     Q    When you say that Mr. Goodstein ran
20 the Community Newspaper Group, what do you
21 mean by that?
22     A    He was in charge of all the
23 community newspapers that existed within our
24 company, The Bronx Times and Queens
25 Courier-Life and the other 16 other titles.

1          JORDAN LIPPNER
2      Q    So is it your understanding that
3  when Mr. Goodstein's name is listed on the
4  executive committee agenda, you believe it
5  was in connection with his duties running
6  the Community Newspaper Group?
7      A    That would be my assumption, but
8  again I don't know for sure.
9      Q    Can you turn to the next page,
10 Bates stamp NYP-1980.
11     A    Sure.
12     Q    Do you see where it says "Jennifer
13 is confident that half of the employees will
14 be placed at other News Corporation
15 businesses"?
16     A    Yup.
17     Q    Isn't it correct, Mr. Lippner, that
18 personnel matters were discussed during the
19 executive committee meetings?
20         MR. LERNER:  Objection.
21     A    I don't know that to be true.
22     Q    So what is your understanding when
23 it says "Jennifer's confident that half of
24 the employees will be placed at other News
25 Corporation businesses"?

JORDAN LIPPNER

1  A   I'm sorry, Mr. Thompson, but you
2  asked me a very specific question which was,
3  and I believe -- and if I misheard I
4  apologize -- but I believe since the first
5  time you asked me this line of questioning,
6  that the operative word was did the
7  committee "discuss."  And as I understand
8  the word "discuss" it, that would require
9  multiple people going back and forth over
10 the issue.
11      And as I read what's in here, what
12 this is announcing is that Jennifer just
13 informed -- is informing the committee
14 what's happening with certain people.
15      And I'm sorry if I'm being legal,
16 lawyer or not, I'm mean, I'm being -- wasn't
17 a discussion.
18  Q   Why do you think Jennifer Jane
19 informed the other committee members about
20 the fact that some employees would be
21 retained at the paper?
22      MR. LERNER:  Objection.
23  A   I have no idea what motivates
24 Jennifer Jane.  You know, what I can tell

JORDAN LIPPNER

1  you is that the point of my understanding of
2  the point of these meetings is for the
3  various heads of the different departments
4  to get together and inform the rest of them
5  what's going on in their department or over
6  in the areas over wish they had
7  responsibility.
8      So I would think that -- I'm
9  assuming that the reason Jennifer was
10 motivated for her responsibility was to
11 inform the rest of the committee of
12 something that was happening over which she
13 was overseeing.
14  Q   When someone informs a committee
15 about a particular matter, do the committee
16 members ask questions about it?
17      MR. LERNER:  Objection.
18  A   They may or they may not.
19      As I stated before, I haven't
20 attended an executive committee meeting, so
21 I couldn't answer that question.
22  Q   Well, do you know if Les Goodstein
23 was present when Jennifer Jane informed the
24 group about personnel decisions?

JORDAN LIPPNER

1      MR. LERNER:  Objection.
2  A   I don't.
3      I mean we have agreed that NYP-2067
4  states on its face that Jennifer Jane was in
5  attendance and that Les Goodstein was in
6  attendance.  So it's entirely possible that
7  Les was there when Jennifer made this
8  announcement.  But as I was not there, I
9  couldn't tell you one way or the other.
10  Q   Based on your review of these New
11 York Post executive committee agenda
12 minutes, do you know if Les Goodstein
13 attended New York Post executive committee
14 meetings during Sandra Guzman's employment?
15  A   Based on my review of the
16 documents, I don't know that.
17  Q   Well, you know that Ms. Guzman
18 worked at the company from -- from 2003 to
19 2009, correct?
20  A   I believe she worked starting in
21 June or July 2003 till September '09.  Yes.
22  Q   So look at the dates of some of
23 these New York Post executive committee
24 meetings.

JORDAN LIPPNER

1  A   I have.
2  Q   Now, isn't it correct that
3  Mr. Goodstein is present at New York Post
4  executive committee meetings during
5  Ms. Guzman's employment?
6      MR. LERNER:  Objection.  He's
7  answered your question.
8  A   I have no personal knowledge that
9  that's the case.
10  Q   Did you review any of these minutes
11 that we just went over in connection with
12 performing your job as senior vice president
13 and deputy general counsel at News America
14 Incorporated?
15      MR. LERNER:  Objection.
16  A   I have no specific recollection of
17 whether or not these minutes were minutes
18 that I reviewed.
19  Q   So is it fair to say that there
20 might have been minutes that you've never
21 reviewed of New York Post executive
22 committee meetings?
23  A   I think it is not only fair, it is
24 one hundred percent accurate to say that

Page 202

JORDAN LIPPNER

1 there are minutes that I have never reviewed
2 of The New York Post executive committee.
3    Q    And since you've never attended a
4 single meeting of The New York Post
5 executive committee, would you also agree
6 there may have been many discussions that
7 you are completely unaware of?
8    A    I would a hundred percent agree
9 with that.
10    Q    And those discussions could have
11 also involved personnel decisions of New
12 York Post employees, correct?
13    A    Anything is possible, sir.
14    Q    And in fact, do you know if The New
15 York Post executive committee ever discussed
16 Sandra Guzman?
17       MR. LERNER:  Objection.
18    A    I know that The New York Post
19 executive committee discussed Tempo on a
20 number of occasions as early as -- well, on
21 a number of occasions and discussed closing
22 it as early as '06.
23       Whether those conversations also
24 included a discussion of Ms. Guzman, that, I

Page 203

JORDAN LIPPNER

1 don't know.  But I know for sure that they
2 discussed Tempo, how it was doing and
3 whether it should be folded or not.
4    Q    How do you know the committee
5 discussed how Tempo was doing and whether it
6 should be folded or not?
7       MR. LERNER:  Objection.
8       This is not within the scope of the
9 30(b)(6) Notice.
10       I'm going to instruct the witness
11 not to answer.
12       (Directive to witness.)
13 BY MR. THOMPSON:
14    Q    Are you going to answer the
15 question, Mr. Lippner?
16    A    I'm going to follow the advice of
17 counsel.
18       MR. THOMPSON:  Do you want to
19 take a break before I go into these
20 other documents?
21       THE WITNESS:  That would be
22 great.
23       THE VIDEOGRAPHER:  The time is
24 3:09 p.m.  We're off the record.

Page 204

JORDAN LIPPNER

1       (A brief recess was
2 taken.)
3       THE VIDEOGRAPHER:  The time is
4 3:21 p.m.  We're on the record.
5 BY MR. THOMPSON:
6    Q    Mr. Lippner, do you know whether
7 during the time Ms. Guzman worked at the
8 company any employees of The New York Post
9 served on any committees at News Corp.?
10    A    Yes, I'm aware.
11    Q    How were you aware that New York
12 Post employees served on News Corp.
13 committees during Ms. Guzman's employment?
14    A    News Corp. established -- one
15 committee comes to mind, for example, a
16 committee called Cool Change.
17       Worldwide the company -- when I say
18 "the company," I'm talking about News
19 Corporation -- adopted a Green initiative, a
20 Go Green Initiative.
21       And the idea was -- and I don't
22 recall exactly which year this started, but
23 one of the goals -- of going carbon neutral,
24 for example, is one of the goals and that

Page 205

JORDAN LIPPNER

1 was achieved already.
2       And one of the ways -- as a very
3 big company, I think the company likes to
4 play off its various resources so they'd
5 say, hey New York Post, hey FOX Television,
6 hey 20th Century Films, hey V Sky B, you
7 know, hey the Australian, whatever the
8 entity may be, we're going to have a
9 committee, can you get your people excited
10 about it, put someone on the committee.  And
11 then you guys can go back and try to develop
12 ideas, for example, The New York Post, FOX
13 Television, whatever it may be, for ideas on
14 how to, in this instance, help the company
15 go Green with suggestions and things like
16 that.
17       I think Ms. Guzman volunteered for
18 that committee so I believe that committee
19 existed.
20    Q    Are you aware that any other
21 committees at News Corporation existed that
22 New York Post employees served on during
23 Ms. Guzman's employment?
24    A    I'm not sure.

Page 206

JORDAN LIPPNER

1
2    Q    Do you know if any committees at
3  The New York Post that News Corp. employees
4  or executives served on during Ms. Guzman's
5  employment?
6    A    No, I don't think there were any.
7    Q    Do you know of any committees
8  currently at News Corp. that New York Post
9  employees serve on?
10    A    If the Cool Change still exists, I
11  would imagine that New York Post employees
12  participate, but I don't know that for sure.
13    Q    During Ms. Guzman's employment, you
14  testified that she served on this Cool
15  Change committee?
16    A    I'm pretty sure she did.
17    Q    Do you know of other members who
18  also served on that committee who were New
19  York Post employees?
20    A    I don't.
21    Q    Do you know the identity of any of
22  the members besides Ms. Guzman on the Cool
23  Change committee when she worked at the
24  company?
25    A    I don't.

Page 207

JORDAN LIPPNER

1
2    Q    Do you know where the Cool Change
3  committee met when Ms. Guzman was a member?
4    A    I don't, and although I'm
5  struggling to answer your question because I
6  think "met" is a difficult word in the sense
7  that they might have had some like video
8  conferences going on. So I don't know where
9  you say that is a meeting taking place if
10  you have people in LA or Australia or London
11  or whatnot participating in a meeting.
12    Q    Do you know if any members of the
13  News Corp. Cool Change committee met in
14  person at 1211 Avenue of the Americas during
15  Ms. Guzman's employment?
16    A    I don't know the answer to that.
17    Q    Do you know what the News Corp.
18  Hispanic Council is?
19    A    I don't.
20    (Lippner Exhibit 8, E-mail
21  chain, top e-mail dated April 9,
22  2009, 2:24 p.m., Bates Numbers
23  NYP-685 through NYP-686, was marked
24  for Identification.)
25  BY MR. THOMPSON:

Page 208

JORDAN LIPPNER

1
2    Q    Showing you now what's been marked
3  as Lippner Deposition Exhibit 8, Bates
4  stamped NYP-685 through 686. And I'll
5  represent to you, Mr. Lippner, that the
6  Defendant New York Post produced these
7  documents in discovery in this case.
8    THE WITNESS:  Ken, you know
9  that my name is misspelled here.
10    MR. THOMPSON:  I didn't know
11  that.
12  BY MR. THOMPSON:
13    Q    Mr. Lippner, have you seen this
14  exhibit before?
15    A    It's possible.  It doesn't
16  immediately come to mind.
17    Q    Do you recognize it?
18    A    I just said it doesn't come to
19  mind.
20    Q    Well, it appears to be an exchange
21  of -- an e-mail exchange between Joe
22  Robinowitz and Sandra Guzman dated --
23  starting on April 8, 2009 going into
24  April 9, 2009.
25    Do you see that?

Page 209

JORDAN LIPPNER

1
2    A    It starts on the 8th and ends on
3  the 9th.  Yes, I see that.
4    Q    Who is Joe Robinowitz?
5    A    Joe is an editor at The New York
6  Post and I believe at one point he was
7  Sandra's supervisor.
8    Q    Do you see at the bottom of this
9  exhibit the first e-mail is from
10  Mr. Robinowitz to Ms. Guzman.  The subject
11  is: "Committees, organizations, Hispanic
12  journalists conferences."
13    Do you see that?
14    A    I do.
15    Q    Next page, Mr. Robinowitz asks
16  Ms. Guzman, "Can you please e-mail the
17  following two items to me today."
18    And the first item on it was "The
19  list of The New York Post/News Corp.
20  committees you serve on as well as any
21  professional organizations you are a part
22  of."
23    Do you see that?
24    A    I do.
25    Q    Do you see Ms. Guzman responded on

Page 214

JORDAN LIPPNER

1  JORDAN LIPPNER
2  Page 4 of your position statement, which is
3  Bates stamped NYP-7.
4      A   Yes.
5      Q   Now, isn't it correct, Mr. Lippner,
6  that the information you put in this EEOC
7  statement was accurate at the time, correct?
8      A   I believe so.
9      Q   You would not want to mislead the
10  EEOC, would you?
11     A   I believe in being accurate,
12  Mr. Thompson.
13     Q   And as far as you know today,
14  everything contained in this EEOC position
15  statement is accurate, correct?
16     A   I believe so.
17     Q   You reviewed it before you
18  submitted it to the EEOC, correct?
19     A   Yes.
20     Q   Direct your attention to Page 4.
21         There is a headline you had there,
22  "The Post Commitment to Equal Opportunity."
23         Do you see that?
24     A   Yes.
25     Q   You state "During the course of

Page 215

JORDAN LIPPNER

1  JORDAN LIPPNER
2  charging party's employment, The Post has
3  maintaining equal employment policy which is
4  distributed to all employees."
5         Do you see that?
6      A   I do.
7      Q   Now, for the record, "charging
8  party" refers to Sandra Guzman, correct?
9      A   Yes, sir.
10     Q   So you are stating in this
11  particular EEOC statement on Page 4 that
12  during Ms. Guzman's employment, The Post
13  maintained an equal employment policy,
14  correct?
15     A   That is correct.
16     Q   And that policy was distributed to
17  all employees, right?
18     A   That is correct.
19     Q   How is that policy distributed to
20  all employees?
21     A   It's part of the new hire packet.
22  Any time an employee gets hired.
23     Q   What do you mean "part of the new
24  hire packet"?
25     A   When an employee gets hired, there

Page 216

JORDAN LIPPNER

1  JORDAN LIPPNER
2  are all kinds of documents and forms that
3  they are provided with.
4         Everything from filling out their
5  healthcare elections to giving them
6  different policy documents of the company,
7  whether it's The New York Post travel
8  reimbursement policy or the Standards of
9  Business Conduct or any other document that
10  The Post provides to its employees.
11     Q   In that paragraph, top paragraph on
12  Page 4, you state "The company's Equal
13  Employment Opportunity philosophy applies to
14  all aspects of employment with the company."
15         Do you see that?
16     A   I do.
17     Q   What company were you referring?
18     A   The New York Post.
19     Q   And then you write "including but
20  not limited to recruiting, hiring, training,
21  transfer, promotion, employee benefits,
22  compensation, termination, educational
23  assistance, leave of absence, and social and
24  recreation activities."
25         Do you see that?

Page 217

JORDAN LIPPNER

1  JORDAN LIPPNER
2      A   I absolutely do.
3      Q   Now, you also made it a point to
4  the EEOC to let them know that you say "In
5  addition, through this policy The Post
6  informs its employees how they may make
7  complaints about any perceived unlawful
8  treatment."
9         Do you see that?
10     A   I do.
11     Q   How did The New York Post inform
12  its employees how to make complaints about
13  any perceived unlawful treatment?
14     MR. LERNER:  Objection.
15     Q   When Ms. Guzman worked at the
16  company.
17     MR. LERNER:  Objection.
18         I don't believe this question is
19  within the scope of the 30(b)(6).
20     MR. THOMPSON:  I'm not going to
21  fight you on that.  I have a more
22  pressing matter.
23     Q   I want to direct your attention to
24  the statement -- you actually attached a
25  copy of The Post EEOC policy in Exhibit 1,

Page 218

JORDAN LIPPNER

1
2  correct?
3      A    I did.
4      Q    In fact, on Page 4 you say "A true
5  and correct copy of The Post's EEO policy is
6  attached as Exhibit 1," correct?
7      A    That's correct.
8      Q    Let's look at Exhibit 1 of this
9  EEOC position statement.
10         And you will find that on
11 Page NYP-20.
12         You see where it says "Exhibit 1"?
13     A    I do.
14     Q    And then you go on, you included
15 this exhibit which is entitled Equal
16 Employment Opportunity, Unlawful Harassment,
17 correct?
18     A    That is correct.
19     Q    Now, so when you were referring to
20 a true and correct copy of The Post EEO
21 policy, the EEO policy is actually contained
22 in Exhibit 1, correct?
23     A    Yes.
24     Q    Now, is this the policy that New
25 York Post employees were expected to follow

Page 219

JORDAN LIPPNER

1
2  when Ms. Guzman worked there?
3      A    It is one of the policies, yeah.
4      Q    One of the policies that New York
5  Post employees were expected to follow,
6  correct?
7      A    Correct.  Absolutely.
8      Q    Is this a policy of News
9  Corporation?
10     A    It's a policy that was originally
11 promulgated by News Corporation.
12     Q    How do you know that this is a
13 policy originally promulgated by News
14 Corporation?
15     A    Because I know where it comes from.
16     Q    Where does it come from?
17     A    It comes from the News Corporation
18 Standards of Business Conduct.
19     Q    So the record is clear, when you
20 were describing this policy to the EEOC,
21 this EEO policy, you were talking about a
22 policy that was created by News Corporation,
23 correct?
24     A    I was talking about a policy that
25 The New York Post uses as its fair work

Page 220

JORDAN LIPPNER

1
2  environment policy.
3      Q    Yes.  But that policy was created
4  by News Corporation, correct?
5          MR. LERNER:  Objection.
6      A    I mean, I've already stated that
7  that's the case.
8      Q    Okay.
9          So is it fair to say that when
10 Ms. Guzman worked at The New York Post, she
11 was expected to follow the EEOC policy
12 created by News Corporation?
13         MR. LERNER:  Objection.
14     A    When Ms. Guzman worked at The New
15 York Post, she was expected to comply with
16 the Standards of Business Conduct, among
17 other policy documents which were provided
18 to her by The Post.
19         The Post uses the News Corporation
20 Standards of Business Conduct which among
21 other things contains a fair work
22 environment policy or as the section is
23 called Equal Opportunity and Unlawful
24 Harassment.
25         There's no factual dispute that the

Page 221

JORDAN LIPPNER

1
2  document Standards of Business Conduct
3  originates from the parent company.
4          (Lippner Exhibit 10, Standards
5      of Business Conduct, Bates Numbers
6      NYP-58 through NYP-75, was marked
7      for Identification.)
8  BY MR. THOMPSON:
9      Q    Mr. Lippner, I'm now showing you
10 what's been marked Lippner Deposition
11 Exhibit 10.  It's Bates stamped NYP-58
12 through NY-P75.
13         And I'll represent to you that the
14 defendant, The New York Post, produced this
15 document in discovery.
16         Please take a moment and look it
17 and tell us if you recognize it.
18         Do you recognize it?
19     A    I do.
20     Q    What is it?
21     A    It is one of the versions of the
22 Standards of Business Conduct.
23     Q    And this is News Corporation's
24 Standards of Business Conduct, correct?
25     A    It is both News Corporation's and

JORDAN LIPPNER

1       JORDAN LIPPNER
2  to these News Corp. Standards of Business
3  Conduct, if an employee violated these
4  standards, they could be terminated?
5     A  As I said, you are asking a
6  hypothetical question whether or not someone
7  could be disciplined.  Whether they could be
8  disciplined at this point can result in
9  their discharge, you know, is a
10  determination that could only be made by
11  that employee's supervisor in conjunction
12  likely with that company's HR Department.
13     It's not -- there's no answer -- if
14  we flip through every page of the Standards
15  of Business Conduct, we are not going to
16  find anywhere where it states, for example,
17  if you do X, you'll be disciplined in this
18  way, if you do Y, you'll be disciplined in
19  that way.  That's not what this document
20  means.
21     Q  Let me ask you this:  Where it says
22  in this document "board of directors of the
23  company," as the 30(b)(6) witness for News
24  Corporation and The New York Post, what
25  board of directors is referred to there?

1       JORDAN LIPPNER
2     A  I don't know.
3     Based on the way the Standards is
4  written, I would take that to mean the board
5  of directors of that particular company, but
6  I don't know.  It could be either.  But then
7  I already said that to you.
8     Q  Mr. Lippner, we don't want you to
9  guess.
10     A  I don't want to guess either.  And
11  as I said to you, I don't know what it
12  refers to.
13     Q  Mr. Lippner, you are here as the
14  30(b)(6) witness for News Corp. and The New
15  York Post.  Is it your testimony that you
16  have no idea what board of directors it
17  referred to when it states "These standards
18  have been adopted by the board of directors
19  of the Company"?
20     MR. LERNER:  Objection.  Asked
21  and answered twice already.
22     MR. THOMPSON:  Not this
23  question, Mr. Lerner.
24     MR. LERNER:  No.  Yeah.  This
25  question is just said in a more

1       JORDAN LIPPNER
2  combative and obstructive way.
3     MR. THOMPSON:  It's not said in
4  a more combative way.  It's said in a
5  more specific way to make it clear.
6     A  Mr. Thompson, you can add a
7  different word or two to your question or
8  change your tone of voice, as you have.  I
9  can't answer your question in any other way
10  than the way I already have.
11     Q  Well, Mr. Lippner, you knew you had
12  to provide testimony at this deposition
13  today in these federal lawsuits against the
14  company.
15     Did you endeavor in preparing for
16  your deposition today to determine which
17  board of directors is referred to when it
18  says "board of directors of the Company"?
19     A  No.
20     Q  Why not?
21     A  I didn't deem it part of my
22  preparation for the 30(b)(6) Notice.
23     Q  So Mr. Lippner, is it correct that
24  as you sit here today as a 30(b)(6) witness
25  for the News Corp. and The New York Post,

1       JORDAN LIPPNER
2  that you do not know the identity of any
3  members of the board of directors referred
4  to in this particular Standards of Business
5  Conduct?
6     MR. LERNER:  Objection.
7     A  Ken, I don't know what you expect
8  me to answer.  I've given you my answer.
9     Q  And the answer is you don't know?
10     A  I think four or five times I've
11  said that.
12     Q  Mr. Lippner, I want to direct your
13  attention to the page Bates stamped NYP-68.
14     A  Okay.
15     Q  Do you see where it stays "Fair
16  Work Environment"?
17     A  I do.
18     Q  Now, when you did training of New
19  York Post employees regarding fair work
20  environment, did you use this particular
21  policy as part of your training?
22     A  It depends what particular training
23  session we're talking about, what documents
24  were used.
25     If you are asking me have I ever

JORDAN LIPPNER

1   used it, I'm sure I've used it.
2   Q   Where it says "B, Fair Work
3   Environment." It says "the Company."
4   A   Yes.
5   Q   Is it your understanding that the
6   company referred to there is News
7   Corporation?
8   A   No. It would depend on who I was
9   doing the training for. If I was doing the
10  training for The New York Post, "the
11  Company" would refer to The New York Post.
12  Q   Wait. Let me ask it differently.
13  Is it your testimony, Mr. Lippner,
14  that the policies stated in the Fair Work
15  Environment section on NYP-68 are News Corp.
16  policies?
17  A   No -- well, again it depends on the
18  situation.
19  Q   What do you mean "it depends on the
20  situation"?
21  A   Well, as I've already testified,
22  these policies -- and it states quite
23  clearly, I think it was the third page of
24  this exhibit, that the use of the word

JORDAN LIPPNER

1   "Company" refers to interchangeably News
2   Corporation as well as the particular -- you
3   know, the various individual companies that
4   the company -- that News Corporation owns
5   throughout the world.
6   So if I am, for example, a -- I'm a
7   News America Incorporated employee, when I
8   read this document and I read the words "the
9   Company," I could replace the words "the
10  Company" each time that appears with the
11  words "News America Incorporated."
12  Likewise, if I'm a New York Post
13  employee, I could replace the words "the
14  Company" with "The New York Post maintains a
15  strong equal employment." Et cetera.
16  Q   Okay, the policy reflected in the
17  Fair Work Environment is a policy
18  promulgated by News Corporation, correct?
19  MR. LERNER: Objection.
20  A   The entire document was originally
21  adopted, as we've discussed, by the News
22  Corporation staff, board of directors.
23  I don't know what you by
24  "promulgate."

JORDAN LIPPNER

1   Q   Well, earlier you mentioned
2   "promulgate," did you not?
3   MR. LERNER: He's not finished.
4   A   I'm not finished with my answer.
5   Q   Okay.
6   A   Since we're dealing with
7   Ms. Guzman, Mr. Fenner, Ms. Livingston, all
8   of whom are New York Post employees, I will
9   tailor my answer accordingly.
10  This document, Standards of
11  Business Conduct, is utilized and
12  disseminated by The New York Post for its
13  employees, and The New York Post requires
14  its employees to comply with the policies
15  set forth herein.
16  These policies are New York Post
17  policies.
18  Q   Okay.
19  My question is different now: Is
20  the policy set forth in the Fair Work
21  Employment section a policy that was adopted
22  by the board of directors of News
23  Corporation?
24  A   The entire document, the entire

JORDAN LIPPNER

1   Standards of Business Conduct, was
2   originally adopted by News Corp.'s board of
3   directors.
4   Q   So News Corp.'s board of directors
5   adopted a policy reflected in the Fair Work
6   Environment section that New York Post
7   employees had to abide by during
8   Ms. Guzman's employment, correct?
9   A   New York Post employees had to
10  abide by the Fair Work Environment section
11  because The New York Post requires its
12  employees to do so.
13  Q   Can The New York Post adopt its own
14  policies regarding Fair Work Environment
15  separate and apart from any policy
16  promulgated by News Corporation?
17  A   It can.
18  Q   Has it done so, as far as you know?
19  A   I believe The New York Post used
20  to -- I don't know if it's still does --
21  have a stand-alone fair work environment
22  policy that was not a policy that was
23  contained in the Standards of Business
24  Conduct.

Page 238

JORDAN LIPPNER

1
2    Q    When did that occur?
3    A    I know such policy existed while
4  Ms. Guzman was employed.
5         The Post has adopted lots of
6  policies on its own for its employees.
7         You know, News Corporation doesn't
8  get involved on a micro level with how
9  The New York Post polices its own employees.
10   Q    When you see the term "The Company
11 will endeavor to keep the workplace free of
12 any conduct that creates an intimidating,
13 hostile or abusive work environment," is it
14 your understanding that the company referred
15 there includes News Corporation?
16   A    No.
17   Q    I want to direct your attention to
18 Page 60, NYP-60, again at the top.
19   A    Okay.
20   Q    Can you read into the record the
21 first sentence of these Standards of
22 Business Conduct?
23   A    Sure. "News Corporation, the
24 Company, has a firmly established policy of
25 conducting its affairs in compliance with

Page 239

JORDAN LIPPNER

1
2  all applicable laws and regulations and
3  observing the highest standards of business
4  ethics."
5    Q    Now, Mr. Lippner, as someone who
6  has worked as an attorney for News America
7  Incorporated for many years, would you agree
8  that the term "Company" in that sentence
9  means News Corporation?
10        MR. LERNER:  Objection.
11   A    What I would agree is that in this
12 document, the word "the Company" changes
13 depending on where you are employed.
14        If you are a New York Post
15 employee, the word "the Company" means
16 The New York Post.  If you are a News
17 Corporation employee, it means the News
18 Corporation.
19   Q    I want you to show us, Mr. Lippner,
20 and take your time, where it says that
21 anywhere in this document, that the term
22 "company" changes depending on where you
23 work within the family of the News Corp.
24 companies.
25        I want you to show us.  Take your

Page 240

JORDAN LIPPNER

1
2  time.  Don't rush.  Show us anywhere where
3  it says that in this document.
4    A    Sure.  I believe it says that in
5  the next sentence of the next paragraph.
6    Q    Okay.
7         Point us to the language that says
8  that.
9    A    First the paragraph states that the
10 standards apply to all the subs, and then it
11 specifically says "References to the Company
12 include its subsidiaries and divisions."
13        So that is why I say to you, Ken,
14 that when the word "the company" appears
15 here, if you are a New York Post employee,
16 it means The New York Post.
17        If you are a HarperCollins
18 employee, it means the HarperCollins.  If
19 you are a News America Marketing employee,
20 the phrase "the company" means America
21 Marketing, and so on.
22   Q    But at the end of the day, whether
23 you work for The New York Post or Harpers
24 Collins, the bottom line is these policies
25 were created by News Corporation, correct?

Page 241

JORDAN LIPPNER

1
2    A    These policies, for the umpteenth
3  time, were as it states adopted by the board
4  of directors of News Corporation.
5    Q    So is it fair to say, Mr. Lippner,
6  that the board of directors at News
7  Corporation adopted policies that affect the
8  workplace at The New York Post?
9    A    It's fair to say that the board of
10 directors of News Corporation adopted
11 policies that when accepted by the various
12 divisions, and more specifically in this
13 case The New York Post, and disseminated to
14 its employees, that policy affects those
15 employees.
16   Q    And the term "the Company" includes
17 all subsidiaries of News Corporation,
18 correct?
19   A    The term "the Company" means
20 whichever company you are employed by.
21   Q    Show me where it says that in the
22 document, Mr. Lippner.  Take your time.
23   A    Ken, Paragraph 2, "References to
24 the Company include its subsidiaries."
25   Q    I understand that.  It says "it

JORDAN LIPPNER

1
2  Q    How do you know she was involved in
3  putting out the Electronic Communications
4  Policy that's reflected in this particular
5  deposition exhibit?
6     A    Because I discussed it with her.
7     Q    Were there any other News Corp.
8  employees or lawyers who were involved for
9  putting out the Electronic Communications
10  Policy?
11    A    Yes.
12    Q    Who else?
13    A    The head of -- the then head of
14  News Corporation's Information Technology
15  Department was involved.  I was involved.
16    Q    Who was the head --
17    A    I'm sure that general counsel was
18  involved.
19        I don't remember who else may have
20  been involved.
21    Q    I want you to identify the person
22  you referred to as being a part of the
23  technical -- I think you said technical --
24    A    I said Information Technology
25  Department.

JORDAN LIPPNER

1
2     Q    Who was that?
3     A    I don't recall who that was at the
4  time.
5     Q    Was he a News Corp. or she a News
6  Corp. employee?
7     A    I don't recall if he or she was a
8  News Corp. employee or News America
9  Incorporated employee.
10    Q    So when you and the other attorney
11  from News Corp. discussed the Electronic
12  Communications Policy, was it your
13  understanding that New York Post employees
14  had to comply with it?
15    A    It was my understanding that when
16  the policy was finalized, with one exception
17  that I'll state, all employees around the
18  world and including The New York Post and
19  every subsidiary of News Corporation would
20  have to comply with the policy.  The
21  exception being that it was -- we couldn't
22  draft the policy that would take into
23  account all the restrictions or requirements
24  under different laws around the world.
25        And so to the extent that there was

JORDAN LIPPNER

1
2  something in the policy that a particular
3  jurisdiction would have made unlawful, that
4  part of the policy would not have applied to
5  those employees working at a particular
6  company in that location.
7     Q    Did News Corporation disseminate
8  this Electronic Communications Policy to New
9  York Post employees?
10        MR. LERNER:  Objection.
11    A    No.  New York Post disseminated
12  that policy to its own employees.
13    Q    Did News Corp. disseminate the
14  Electronic Communications Policy to anyone
15  at The New York Post to forward on to New
16  York Post employees?
17    A    Yes.
18    Q    Who at News Corp. disseminated the
19  Electronic Communications Policy to someone
20  at The New York Post to distribute to New
21  York Post employees?
22    A    I don't know.
23    Q    When did the Electronic
24  Communications Policy get disseminated to
25  New York Post employees?

JORDAN LIPPNER

1
2     A    I don't recall when it was first
3  promulgated, first created.
4     Q    Well, is it still in effect to this
5  day?
6     A    Yes.
7     Q    Was it in effect during Sandra
8  Guzman's employment?
9     A    Perhaps not at the start, but
10  certainly during her employment, yes.
11    Q    Was she expected to comply with
12  that policy during her employment?
13    A    I would imagine The New York Post
14  expected her to comply.  That's what this
15  document says.
16    Q    Was Austin Fenner expected to
17  comply with this policy when he worked at
18  the company?
19    A    Same answer.
20    Q    Was Irkimulisa Livingston expected
21  to comply with this policy?
22    A    Same answer.
23    Q    Were News Corporation employees
24  expected to comply with the Electronic
25  Communications Policy when Ms. Guzman worked

JORDAN LIPPNER

1
2    A    I believe it states and stated that
3    employees could be subject to discipline for
4    violations.
5         I don't recall whether or not it
6    specifically said that they would be subject
7    to termination.
8    Q    Do you know if only one version of
9    the communications -- strike that.
10        Do you know if only one version of
11   the Electronic Communications Policy was
12   disseminated to New York Post employees
13   during your employment?
14   A    During whose employment?
15   Q    Your employment.
16   A    During my employment there have
17   been I believe two iterations of the
18   Electronic Communications Policy.
19   Q    Okay.
20        Do you know when the first version
21   of the Electronic Communications Policy came
22   out?
23   A    I want to say roughly 2004.
24   Q    And when did the second version of
25   the Electronic Communications Policy come

JORDAN LIPPNER

1
2    out?
3    A    I'm not exactly sure.
4    Q    Do you have any idea as the 30B --
5    do you have any idea as a 30(b)(6) witness
6    for News Corp. and The New York Post when
7    the second version of the Electronic
8    Communications Policy was disseminated?
9    A    I think it came out about three to
10   four years ago.
11   Q    How did the second version of the
12   Electronic Communications Policy differ from
13   the first version?
14   A    There were word cleanups.  It was
15   streamlined a bit.  The original version had
16   been repetitive in the sense of employees
17   being cautioned about the same kind of thing
18   not to do in multiple sections of the
19   document.
20        I think those were the principal
21   changes.
22   Q    Do you know if any News Corporation
23   attorneys were involved in creating the
24   second version of the Electronic
25   Communications Policy?

JORDAN LIPPNER

1
2    A    I do.
3    Q    I want you to identify the News
4    Corporation attorneys who were involved in
5    creating the second version of that
6    document?
7    A    Ellen Agress.
8    Q    Anyone else?
9    A    Not to my knowledge.
10   Q    Do you know if any other News
11   Corporation employees were involved in
12   creating the second version of the
13   Electronic Communications Policy?
14   A    I do not.
15   Q    Were you involved in that?
16   A    I was not.
17   Q    How do you know that Ms. Agress was
18   involved in creating the second version of
19   the Electronic Communications Policy?
20   A    I remember talking to her about it.
21   Q    What did she say about it?
22   A    She told me how she was working on
23   it.
24   Q    Do you know how that second version
25   of the company's Electronic Communications

JORDAN LIPPNER

1
2    Policy was disseminated to employees at
3    The New York Post?
4    A    I don't know if it was e-mailed to
5    them, handed to them.  No, I don't know the
6    method that was used.
7    Q    The next document listed in this
8    Exhibit Bates stamped NYP-97 is entitled New
9    York Post E-mail Policy.
10        Do you see that?
11   A    I do.
12   Q    When did that policy go into
13   effect?
14   A    I don't know.
15   Q    Is that policy still in effect?
16   A    I don't know.
17   Q    What does that policy say?
18   A    I have no idea.
19   Q    Mr. Lippner, you are here as a
20   30(b)(6) witness to cover the areas that we
21   set forth in our Deposition Notice, correct?
22   A    Correct.
23   Q    And in our Deposition Notice that
24   we sent, it states that "The 30(b)(6)
25   witness should be prepared to explain how

Page 318

JORDAN LIPPNER

1    this deposition, can you tell us anything
2    that The New York Post E-mail Policy states?
3       A    No.
4       MR. LERNER:  Objection.
5       Q    Mr. Lippner, the next policy listed
6    is New York Post Cellphone Policy.
7       You see that?
8       A    I do.
9       Q    When did that go into effect?
10      A    I cannot tell you.
11      Q    Is it still in effect?
12      A    It is.
13      Q    Who created that policy?
14      A    The New York Post.
15      Q    Who at The New York Post?
16      A    I cannot tell you.
17      Q    Did any News Corp. employee have
18   any role in creating The New York Post
19   Cellphone Policy?
20      A    No.
21      Q    How do you know that someone at
22   The New York Post created The New York Post
23   Cellphone Policy?
24      A    Because I reviewed it with New York

Page 319

JORDAN LIPPNER

1    Post HR.
2       Q    Who in New York Post HR did you
3    review The New York Post Cellphone Policy
4    with?
5       A    I believe it was Amy Saldone.
6       Q    When did you review The New York
7    Post Cellphone Policy with Ms. Saldone?
8       A    I can't tell you that.
9       Q    What year?
10      A    I just said I can't tell you that.
11      Q    Tell us what The New York Post
12   Cellphone Policy says.
13      A    I already told you I can't tell you
14   what it says.
15      Q    No, you didn't tell me that.  We
16   talked about The New York Post E-mail
17   Policy, and that's a different policy.
18      A    And that was one of the first
19   questions, Mr. Thompson, to me when you
20   moved on was what does it say, and I and
21   said to you I don't recall what it says.
22      And I will reiterate, if you would
23   like to provide me with copy of the
24   document, I'd be happy to discuss what it

Page 320

JORDAN LIPPNER

1    says.
2       Q    Mr. Lippner, you are the 30(b)(6)
3    witness who knows these policies very well,
4    correct?
5       MR. LERNER:  Objection.
6       Q    Yes.
7       A    Is there a question?
8       Q    Yes.
9       A    What's the question?
10      MR. THOMPSON:  Can you read it
11   back.
12      (Requested portion of record read:
13      "Q.  Mr. Lippner, you are the
14   30(b)(6) witness who knows these policies
15   very well, correct?")
16      (End of read-back.)
17      A    Mr. Thompson, what I'm is a
18   30(b)(6) witness who can tell you which
19   policies apply to The New York Post
20   employees and which policies apply to News
21   Corporation employees.
22      That is why I'm here today.  I'm
23   not here so that I can give you a recital of
24   the substance of each such policy.

Page 321

JORDAN LIPPNER

1       Q    I'm not asking you to give me a
2    recital of the substance of each such
3    policy.  I'm asking you as 30(b)(6) witness
4    to tell us one thing The New York Post
5    Cellphone Policy says.
6       MR. LERNER:  And what is the
7    relevance of what the cellphone
8    policy says to this matter?
9       MR. THOMPSON:  Because the
10   relevance, Mr. Lerner, this witness
11   was supposed to come here with
12   knowledge of employee policies, and
13   he is completely clueless.
14      MR. LERNER:  No, that's not an
15   answer to what the relevance is.
16      MR. THOMPSON:  I'm answering
17   your question.  You may not like my
18   answer.
19      This is a witness who has an
20   obligation to sit here and answer
21   questions about the application of
22   The New York Post employment policies.
23   He's got to know what those policies say.
24      MR. LERNER:  I disagree with

Page 326

```
1              JORDAN LIPPNER
2      A    I do.  And he did.
3      Q    Who was if at the time?
4      A    Lon Jacobs.
5      Q    Do you know if anyone at News
6  Corporation approved The New York Post
7  E-mail Policy before it was put into effect?
8      A    No one at News Corporation had
9  anything to do with The New York Post E-mail
10 Policy.
11     Q    Do you know if anyone at News
12 Corporation approved The New York Post
13 Cellphone Policy before it was put into
14 effect?
15     A    No one at News Corporation had
16 anything to do with The New York Post
17 Cellphone Policy.
18     Q    Do you know if anyone at News
19 America Incorporated approved The New York
20 Post E-mail Policy before it was put into
21 effect?
22     A    Same answer.  No one at News
23 America Incorporated had anything to do with
24 The New York Post E-mail Policy.
25     Q    Same question regarding The New
```

Page 327

```
1              JORDAN LIPPNER
2  York Post Cellphone Policy.
3      A    No one at News America Incorporated
4  had any approval -- involvement with The New
5  York Post Cellphone Policy.
6      Q    Do you know if there had been
7  different versions of The New York Post
8  Cellphone Policy distributed to New York
9  Post employees?
10     A    I do not.
11     Q    Now, looking at this Exhibit Bates
12 stamped NYP-97, it also states "News
13 Corporation Records Management Policy."
14         Do you know if that policy was ever
15 put into effect?
16     A    I do.
17     Q    Do you know when the News
18 Corporation Records Management Policy became
19 effective?
20     A    I don't.
21     Q    Do you know if any News Corporation
22 employee approved the News Corporation
23 Records Management Policy before it became
24 effective?
25     A    I know the News Corporation Record
```

Page 328

```
1              JORDAN LIPPNER
2  Management Policy was created by News
3  Corporation.
4          I know that Genie Gavenchak, Ellen
5  Agress, the group general counsel were
6  involved in creating and finalizing the
7  policy.  There may have been other people.
8          I know that, for example -- I
9  believe I contributed, for example, to
10 giving them reference for how long you need
11 to keep employment-related documents based
12 on relevant stats at issue.
13         Whether there is a business
14 executive at News Corp. who had the final
15 say or it was the group general counsel's
16 final say, I can't answer that question.
17     Q    Besides your involvement, do you
18 know if any other News America Incorporated
19 employee was involved in the creation of the
20 News Corporation Records Management Policy?
21     A    I do not.
22     Q    Do you know if that particular
23 policy is still in effect today?
24     A    It is.
25     Q    And does that policy apply to New
```

Page 329

```
1              JORDAN LIPPNER
2  York Post employees?
3      A    I believe that the News Corporation
4  Records Management Policy applies to News
5  Corporation as well as to all of its wholly
6  owned subsidiaries.
7      Q    Do you know if this News
8  Corporation Records Management Policy was in
9  effect during Ms. Guzman's employment as an
10 associate editor?
11     A    When Ms. Guzman was employed by
12 The Post as an associate editor, I believe
13 that this policy -- I'm not a hundred
14 percent positive.  I believe that it was
15 promulgated towards the end of her
16 employment at The Post but I'm not positive.
17         I'd be happy to give you a
18 supplemental answer on that if you would
19 like.
20     Q    Who has responsibility for
21 enforcing News Corporations Record
22 Management Policy?
23     A    Again, that's a company-by-company
24 thing.
25         For News Corporation itself, News
```

JORDAN LIPPNER

1
2  Corp. people do.  If it was The New York
3  Post it would be somebody at The New York
4  Post or multiple people.  It's up to each
5  company to designate people who are in
6  charge of the records management.
7      Q    You see where it says "New York
8  Post Travel and Entertainment Policy"?
9      A    I do.
10     Q    Is that a policy currently in
11 effect?
12     A    It is.
13     Q    How long has it been in effect?
14     A    I couldn't tell you.
15     Q    Was it in effect during
16 Ms. Guzman's employment as an associate
17 editor?
18     A    Yes.  Ms. Guzman was employed at
19 The New York Post as an associate editor
20 when The New York Post T & E Policy was
21 definitely in effect.
22     Q    Do you know who approved the Travel
23 and Entertainment Policy before it went into
24 effect?
25     A    No, I don't, but I can say that

JORDAN LIPPNER

1
2  News Corporation had no role in its
3  approval.
4      Q    Can you describe what The New York
5  Post Travel and Entertainment Policy states,
6  in substance?
7      A    In general terms, it speaks to what
8  kind of expenses The Post will approve and
9  procedures for submitting expenses and
10 getting reimbursed by The Post for incurring
11 expenses on the company's behalf in the
12 course of performing one's job duties.
13         Talks about acquiring certain kinds
14 of documentation.
15         It's a fairly detailed policy.
16 Generally speaking, that's what it speaks
17 to.
18     Q    Did you review The New York Post
19 Travel and Entertainment Policy before it
20 was put into effect?
21     A    I don't believe so.
22     Q    Did anyone at News America
23 Incorporated review The New York Post Travel
24 and Entertainment Policy before it became
25 effective?

JORDAN LIPPNER

1
2      A    Not to my knowledge.
3      Q    And can you describe, going back to
4  the prior policy, what News Corporation
5  Records Management Policy states, in
6  substance?
7      A    It provides time frames for how
8  long different types of documents are to be
9  kept and procedures following the expiration
10 of such documents, of, you know, getting rid
11 of them.
12     Q    Do you see, Mr. Lippner, where it
13 says Standards of Business Conduct and there
14 appears to be an asterisk there?
15     A    I do.
16     Q    Do you see where it says Electronic
17 Communications Policy and it also appears to
18 have an asterisk?
19     A    I do.
20     Q    You see where it says New York Post
21 Code of Conduct and there is an asterisk?
22     A    I do.
23     Q    Do you know what that means?
24     A    I believe, according to this piece
25 of paper, employees were supposed to sign a

JORDAN LIPPNER

1
2  form that was attached to those three
3  documents and return it to Human Resources.
4      Q    Do you know who in Human Resources
5  would have had responsibility for collecting
6  those forms from employees?
7      A    At The New York Post?
8      Q    Yes.
9      A    I don't know which Human Resources
10 professional had that responsibility, no.
11     Q    I want to direct your attention to
12 the next document listed, New York Post Code
13 of Conduct.
14         Do you see that?
15     A    I do.
16     Q    What is that particular document?
17     A    It's a -- I believe it's a one-page
18 document that -- it's not all inclusive, but
19 it purports to describe a bunch of different
20 kinds of misconduct that an employee can
21 engage in, and if that employee engages in
22 such conduct, it's informing that employee
23 that they will be subject to discipline.
24     Q    Is that the same one-page document
25 that you testified earlier that was created

Page 334

JORDAN LIPPNER

1  for New York Post employees?
2     A    It's possible I was confusing the
3  two. I certainly was starting to feel faint
4  at that point in time. But I don't know.
5        Because the other thing I was
6  saying, too, is that I know that one of the
7  other companies, FOX Television Stations,
8  for example, I know that they have a
9  stand-alone also and I don't know if I was
10  confusing The Post with them or not.
11        But FOX Television is one of my
12  clients as well.
13     Q    So as you are sitting here now with
14  your head clearing, I want you to tell us if
15  The New York Post Code of Conduct is the
16  one-page document that you were referring to
17  earlier?
18     A    It may have been. You know, and if
19  you would like I'm happy to provide you a
20  supplemental interrogatory answer on that
21  after tonight. I'm just not a hundred
22  percent positive.
23        MR. THOMPSON: Mr. Lerner, we
24  don't believe that we have been given

Page 335

JORDAN LIPPNER

1  The New York Post Code of Conduct,
2  the one-page document.
3        If you have, can you just tell us
4  the Bates Number so we can double-check.
5        MR. LERNER: We have.
6        MR. THOMPSON: That's fine.
7  BY MR. THOMPSON:
8     Q    When did The New York Post Code of
9  Conduct go into effect?
10     A    That I'm not entirely sure.
11        The Post has a couple of different
12  codes of conduct. I believe the one that's
13  referenced on is this page is referring to
14  one that's is given to employees who work in
15  The New York Post offices at 1211.
16        I know that the plant where The New
17  York Post newspaper is actually produced,
18  that there are a bunch of different codes of
19  conduct depending on which union you are in.
20        So -- and I know that they've
21  evolved over time, so I'm not exactly sure
22  when this particular one was created.
23     Q    How many different New York Post
24  codes of conduct are there?

Page 336

JORDAN LIPPNER

1     A    For the folks that are -- the
2  employees at The Post that work at 1211, I
3  think there's only one. But then for the
4  employees who work up at the plant in
5  The Bronx, there are a few different ones
6  and it depends which union you are in which
7  code of conduct applies to you.
8     Q    Do you know who approved The New
9  York Post Code of Conduct before it was
10  disseminated to employees?
11     A    I don't know for a fact as I sit
12  here tonight. I know that it was developed
13  by Human Resources at The New York Post.
14        I believe it was given final
15  signoff by Paul Carlucci, the publisher of
16  The Post.
17        And once that final signoff
18  occurred, it was then put into use.
19     Q    Do you know if any lawyer at News
20  Corporation played any role in the creation
21  of The New York Post Code of Conduct?
22     A    I don't think any News Corporation
23  lawyer played a role in the Code of Conduct.
24     Q    But do you know if any News

Page 337

JORDAN LIPPNER

1  Corporation employee played any role with
2  respect to The New York Post Code of
3  Conduct?
4     A    No News Corporation employee played
5  a role with The New York Post Code of
6  Conduct.
7     Q    How about any News America
8  Incorporated employee?
9     A    Yes.
10     Q    Who was that person?
11     A    That would be me.
12     Q    What role did you play with respect
13  to The New York Post Code of Conduct?
14     A    Well, I'm a lawyer and The Post is
15  one of my clients, and I provided The Post
16  with advice with respect to how the Code of
17  Conduct was worded and what was listed
18  there.
19     Q    Did you provide that advice to
20  The New York Post during Ms. Guzman's
21  employment?
22     A    I may have. I don't remember
23  exactly when the Code of Conduct was
24  implemented.

Page 342

```
 1              JORDAN LIPPNER
 2   when you drafted that policy?
 3      A   No.
 4      Q   Did anyone at News Corp. play any
 5   role in the creation or approval of the
 6   Family Medical Leave Policy that you
 7   created?
 8      A   No.
 9      Q   Was there ever any other versions
10   of the Family Medical Leave Policy
11   distributed to New York Post employees
12   during your employment?
13      A   Not that I recall.
14      Q   So there's only one version of the
15   Family Medical Leave Policy that you know of
16   that's been distributed to The New York Post
17   employees?
18      A   I believe that's correct.
19      Q   And is that policy still in effect?
20      A   I believe so.
21      Q   And does it still apply to current
22   New York Post employees?
23      A   I would think so, yes.
24         (Lippner Exhibit 13, Family
25      and Medical Leave Policy, Bates
```

Page 343

```
 1              JORDAN LIPPNER
 2      Number NYP-87, was marked for
 3      Identification.)
 4   BY MR. THOMPSON:
 5      Q   I'm now showing you what's been
 6   marked as Lippner Exhibit 13, Bates stamped
 7   NYP-87.
 8         It's been provided to us by New
 9   York Post in discovery.
10         Take a moment to look at it and
11   tell us if you recognize it.
12         Is this a document you drafted
13   for The New York Post employees?
14      A   It's the document I drafted for
15   News America Incorporated and then I
16   distributed it to, among other the wholly
17   owned subsidiaries, The New York Post.
18      Q   Is this the Family and Medical
19   Leave Policy that governs the employment of
20   New York Post employees?
21      A   If this is the one they're still
22   using, the answer is yes.
23      Q   Do you know if this particular
24   Family Medical Leave Policy is still in
25   effect or not?
```

Page 344

```
 1              JORDAN LIPPNER
 2      A   I would have no reason to believe
 3   that it's not.
 4      Q   So based on your belief that this
 5   policy is likely still in effect, are New
 6   York Post employees covered by this policy?
 7      MR. LERNER:  Objection to form.
 8      A   As I stated, if The Post is still
 9   using this policy, then this is the one that
10   covers The New York Post employees.
11      Q   Well, is this the policy that you
12   recall drafting?
13      A   It definitely is because it says
14   "News America Incorporated" on it.
15         The reason I'm just giving you a
16   slight hesitation in my answer or caveat is
17   that when I distributed it to the various
18   wholly owned subsidiaries, my expectation
19   was that they would use it but they would
20   actually take off the name News America
21   Incorporated and put, for example
22   HarperCollins Publishers or New York Post or
23   something else on it.
24         Because News America Incorporated
25   has nothing to do with whether or not a New
```

Page 345

```
 1              JORDAN LIPPNER
 2   York Post employee takes family medical
 3   leave and has nothing to do with the
 4   approval of that or the denial of that or
 5   the administration of it.
 6         So that's the only reason I'm
 7   giving you a hesitation.
 8         (Lippner Exhibit 14, New York
 9      Post document, Bates Number
10      NYP-495, was marked for
11      Identification.)
12   BY MR. THOMPSON:
13      Q   Mr. Lippner, I'm now going to show
14   you what is marked as Lippner Deposition
15   Exhibit 14, Bates stamped NYP-495.
16         It's a document that The New York
17   Post produced in discovery in this case.
18   Please take a moment to look at it and tell
19   us if you recognize it.
20         Do you recognize this document?
21      A   I don't.
22      Q   You see at the top says "New York
23   Post," correct?
24      A   I do.
25      Q   And it says "This is to acknowledge
```

JORDAN LIPPNER

1
2 with her in connection with any revisions or
3 changes to the Electronic Communications
4 Policy after she became a News Corp. lawyer?
5    A    When we did the second iteration, I
6 was mostly out of the loop.  I don't recall
7 whether or not I may have read it before it
8 was finalized, but I was not involved in the
9 editing and drafting of it.
10   Q    Who was involved in editing and
11 drafting of the second version of this
12 electronic --
13   A    Ellen Agress.
14   Q    Do you know if she was a News Corp.
15 attorney at the time?
16   A    I believe she was.
17   Q    Do you see the language in bold
18 that states "It is imperative and mandatory
19 that you sign the receipt page and return
20 that signed receipt page to your HR
21 representative for placement in your
22 personnel file"?
23   A    I do.
24   Q    So employees at The New York Post
25 were required to sign the receipt page

JORDAN LIPPNER

1
2 acknowledging that they got a copy of this
3 Electronic Communications Policy, correct?
4    A    Well, they were supposed to.
5    Q    And it also goes on to say
6 "Violations of the policy may result in
7 disciplinary action up to and including
8 immediate discharge."
9       Do you see that?
10   A    I don't.  Can you tell me where
11 you're reading?
12   Q    It's in the fourth paragraph.
13   A    I do, okay.  I see that.
14   Q    Do you know who -- strike that.
15      Do you know who would make the
16 determination about whether disciplinary
17 action should be taken against an employee
18 who violated this policy?
19   A    Well, if, for example, we're
20 speaking about a New York Post employee who
21 violated the policy, the decision-makers
22 would be New York Post employees.
23      We don't -- there is no
24 intercompany decision-making process.
25   Q    Okay.

JORDAN LIPPNER

1
2      Turn to the second page of this
3 document which is Bates stamped NYP-115.
4    A    Sure.
5    Q    Do you see where it says "News
6 Corporation and affiliated companies"?
7    A    Yes.
8    Q    And it says "October 1, 2002,
9 Electronic Communications Policy"?
10   A    Yes, sir.
11   Q    So is it your understanding that
12 when it states "News Corporation and
13 affiliated companies" that this Electronic
14 Communications Policy is a News Corporation
15 policy?
16   A    No.  It's my understanding that
17 this is a policy that applies to -- well, at
18 the time the company was technically called
19 News Corporation Limited and that it applied
20 to the News Corporation Limited as well as
21 all of its US subsidiaries and affiliates,
22 as it goes on to say in the first sentence
23 there.  And then it lists a bunch of them
24 that it applied to in a nonexclusive list.
25   Q    At one point News Corporation was

JORDAN LIPPNER

1
2 called News Corporation Limited?
3    A    Yes.  Back when it was an
4 Australian corporation.
5    Q    How long -- strike that.
6      Did there come a time when News
7 Corporation was no longer considered News
8 Corporation Limited?
9    A    Yes.
10   Q    When did that happen?
11   A    I'm going to venture to say around
12 2004.  It was approximately 2004.
13      The company -- News Corporation
14 Limited reincorporated as a US corporation
15 and eventually the name was changed to just
16 News Corporation.
17   Q    If an employee saw another employee
18 using the electronic communications system
19 in an improper manner, could they complain
20 to Jan Constantine at the time?
21      MR. LERNER:  Objection.
22   A    I don't believe that that's --
23 before I answer it, let me take a look at
24 the policy.
25   Q    Look at Page Bates stamp NYP-1154

Page 374

JORDAN LIPPNER

1
2      Q     When she was a lawyer for News
3    Corporation?
4      A     Exactly.
5      Q     Do you know if anyone in News
6    Corporation approved this document before it
7    was disseminated to New York Post employees?
8      A     No one at News Corporation
9    disseminated this policy to New York Post
10   employees.
11         It was distributed to New York Post
12   employees by The New York Post.
13     Q     But my question is:  Do you know if
14   there was any News Corp. employee who
15   approved this document before it was
16   disseminated to New York Post employees?
17     A     I don't know who at News
18   Corporation would have given the final
19   signoff, but I do know that Ellen Agress was
20   heading up the revisions on it.
21     Q     What role did Ellen Agress play
22   with respect to this particular version of
23   News Corporation's Electronic Communications
24   Policy?
25     A     My recollection is she was the one

Page 375

JORDAN LIPPNER

1
2    who was streamlining the policy and making
3    the changes to it.
4          And as you can see, I believe it's
5    shorter, more concise than the previous
6    policy we had looked at, and I think that
7    was one of the goals she had set out to edit
8    it was to -- I think I had testified earlier
9    today about cutting down duplication and
10   there had been some duplication.
11     Q     Since Ms. Guzman worked as an
12   associate editor for The Post in July 2006,
13   was this Electronic Communications Policy
14   applicable to her employment?
15     A     If The Post distributed to its
16   employees, then yes.
17     Q     Do you know if The Post distributed
18   this policy to its employees?
19     A     I don't.  I know that The Post was
20   supposed to have done so.  I can't testify
21   for sure that it did.
22     Q     Tell us as a 30(b)(6) witness for
23   The New York Post what electronic
24   communications policy applied to New York
25   Post employees in 2006.

Page 376

JORDAN LIPPNER

1
2      A     I believe it's this one.
3          But again, it would have been that
4    Amy Saldone or somebody else at The New York
5    Post distributed it to New York Post
6    employees.
7          No one at News Corporation took it
8    upon themselves to distribute it to New York
9    Post employees.
10     Q     As you sit here today as a 30(b)(6)
11   witness for The New York Post, what
12   electronic communications policy applies to
13   current New York Post employees?
14     A     I believe it's this one.
15     Q     Now, Mr. Lippner, do you know if
16   The New York Post and News Corp. used the
17   same travel agency when employees had to
18   travel for business at any point during your
19   employment?
20     A     I believe for economies of scale,
21   yes, News Corp. has arranged for a travel
22   company -- one travel company where we get
23   increased buying power because more people
24   are using it through the different wholly
25   owned subsidiaries, and I think it's called

Page 377

JORDAN LIPPNER

1
2    HRG Worldwide.
3      Q     How long has HRG Worldwide been the
4    travel company for News Corp. and The New
5    York Post?
6      A     I don't know the answer to that
7    question.
8      Q     Was it the travel company for the
9    News Corp. and The New York Post when Sandra
10   Guzman worked as an associate editor?
11     A     I think so.
12     Q     Do you know which entity, News
13   Corp. or The New York Post -- strike that.
14         Do you know which entity paid this
15   travel agency for the services it performed
16   for News Corp. and New York Post employees?
17     A     Yes.
18     Q     What entity paid?
19     A     News Corp. pays for the travel of
20   its employees, and The New York Post pays
21   for the travel of its employees.
22     Q     So is it your testimony that News
23   Corporation provides separate -- pays
24   separate invoices from this travel agency
25   than The New York Post?

Page 378

JORDAN LIPPNER

1        JORDAN LIPPNER
2        MR. LERNER: Objection.
3      A    I'm not sure I understand the
4    question.
5      Q    I'll rephrase it.
6           As you testified, there's one
7    travel agency that News Corp. employees and
8    The New York Post employees use, correct?
9      A    I did.
10     Q    Now my question to you is:  Do you
11   know if that travel agency sends its bills
12   for its travel-related services to News
13   Corp. or The New York Post?
14     A    It depends on what services we're
15   talking about.
16          If it's for services that were
17   provided to New York Post employees, then
18   The New York Post pays those bills.
19          If it was for services that News
20   Corporation employees were provided with,
21   then News Corporation pays those bills.
22     Q    How do you know that The New York
23   Post pays this travel agency directly for
24   services provided for New York Post
25   employees?

Page 379

JORDAN LIPPNER

1        JORDAN LIPPNER
2      A    I'm sorry.  Can you repeat that?
3      Q    Well, you said that The New York
4    Post pays the invoices it receives from this
5    travel agency for travel that it helped
6    arrange for New York Post employees,
7    correct?
8      A    Uh-huh.
9      Q    How do you know that?
10     A    Because The New York Post maintains
11   a separate financial operation than News
12   Corporation.
13          New York Post operates as -- you
14   know, it's an independent company that
15   ultimately is wholly owned by News
16   Corporation.  But The New York Post gets
17   bills for all of the expenses that it incurs
18   in the course of its operations and it pays
19   for those bills.
20     Q    Have you ever seen a bill from this
21   travel agency sent to The New York Post?
22     A    No.
23     Q    Have you ever seen a bill from this
24   travel agency sent to News Corp.?
25     A    I probably have for my own

Page 380

JORDAN LIPPNER

1        JORDAN LIPPNER
2    traveling.
3      Q    I'm asking you as you sit here, do
4    you know for a fact that you've seen a bill
5    from this travel agency sent to News
6    Corporation?
7      A    As I sit here, I can't a hundred
8    percent say yes.
9      Q    So is it your testimony, then, when
10   you travel News Corporation pays the travel
11   agency for your travel?
12     A    No.  News America Incorporated
13   does.
14     Q    I'm asking about News Corporation.
15   As you sit here today, have you ever seen a
16   bill from the travel agency sent to News
17   Corporation for any travel arrangement that
18   it arranged for News Corp. employees?
19     A    No.
20     Q    Who made the decision to use one
21   travel agency for News Corp. and The New
22   York Post employees?
23          MR. LERNER:  Objection.
24     A    I have no idea when or how the
25   arrangement originally started, but also as

Page 381

JORDAN LIPPNER

1        JORDAN LIPPNER
2    I testified earlier it's not just for
3    The New York Post but it's for a lot of
4    different companies that News Corporation
5    wholly owns.
6      Q    Do you know who made the decision
7    to use this travel agency for any of News
8    Corporation's companies?
9      A    I don't know who selected it.
10          (Lippner Exhibit 18, Travel
11   document, Bates Numbers NYP-3894
12   through NYP-3900, was marked for
13   Identification.)
14     Q    Mr. Lippner, I'm showing you now
15   what's been marked as Lippner Deposition
16   Exhibit 18, NYP-3894 through 3900.
17          I'll represent to you this is a
18   document that was produced by New York Post
19   in discovery in this case.
20          Please take a moment to review it
21   and tell us if you recognize it.
22          MR. LERNER:  There's some
23   handwritten notations on this
24   document.
25          I'd like to consult with my client

Page 382

JORDAN LIPPNER

1          JORDAN LIPPNER
2      about them, make sure that I
3      understand --
4          MR. THOMPSON:  Go ahead.  Let's
5      take a break.  Sure.
6          MR. LERNER:  Very short break.
7          MR. THOMPSON:  Okay.
8          THE VIDEOGRAPHER:  The time is
9      7:16 p.m.  Off the record.
10         (A brief recess was
11     taken.)
12         THE VIDEOGRAPHER:  The time is
13     7:27 p.m.  We're on the record.
14  BY MR. THOMPSON:
15     Q    Mr. Lippner, does News Corporation
16  maintain a business bank account?
17     A    I don't understand the question.
18     Q    News Corporation, does it maintain
19  a business bank account as a corporation?
20     A    It has its own bank account.
21     Q    Where, in what bank does News Corp.
22  maintain its business bank account?
23     A    I don't know which bank it is.
24     Q    Does New York Post have a business
25  bank account?

Page 383

JORDAN LIPPNER

1          JORDAN LIPPNER
2      A    Yes.
3      Q    What bank does The New York Post
4  maintain its business bank account?
5      A    I don't know the name of the bank.
6      Q    Mr. Lippner, as the 30(b)(6)
7  witness for News Corp. and The New York
8  Post, why don't you know where News Corp.
9  maintains its business bank account?
10         MR. LERNER:  Objection.
11         Your 30(b)(6) Deposition Notice
12     states, on 4, if that's the one are focus
13     on --
14         MR. THOMPSON:  No, I'm not.
15     I'm focused on Item 1,
16     Interrelatedness of the companies.
17         MR. LERNER:  How the operations
18     of the companies are related.
19         MR. THOMPSON:  That's right and
20     banking is part of the operations.
21         MR. LERNER:  I would disagree.
22         MR. THOMPSON:  You can disagree
23     all you want.  It's clear in terms of
24     the Dep Notice.
25  BY MR. THOMPSON:

Page 384

JORDAN LIPPNER

1          JORDAN LIPPNER
2      Q    Mr. Lippner, is it your testimony
3  that you have absolutely no idea --
4          MR. LERNER:  Objection.  You
5      are not going to harass and badger
6      the witness with terms like "you have
7      absolutely no idea" and as the
8      30(b)(6) witness, which you have done
9      repeatedly during the course of this
10     deposition.
11         If you have a question to ask him
12     about the scope of his knowledge, please
13     ask it to him in a professional and even
14     manner.
15         MR. THOMPSON:  I asked you to
16     lower your voice, Mr. Lippner.  I
17     know it's late, but just remain calm.
18         MR. LERNER:  My voice wasn't
19     raised.
20         MR. THOMPSON:  State your
21     objection.  Don't raise your voice.
22         MR. LERNER:  My voice wasn't
23     raised.
24     Q    Mr. Lippner, does News Corporation
25  have a system in place for paying employees

Page 385

JORDAN LIPPNER

1          JORDAN LIPPNER
2  their salaries?
3          MR. LERNER:  Objection.
4      A    News Corporation pays its employees
5      salaries.
6          I'm not -- I don't really
7      understand the question.
8      Q    Let me ask it differently.
9          How does News Corporation go about
10  paying salaries of its employees?
11         MR. LERNER:  Objection.
12     A    It issues paychecks from its
13  Payroll Department.
14     Q    Do you know or are you guessing?
15     A    I'm telling you that there's a
16  Payroll Department and Payroll Department
17  pays paychecks.
18         I'm not really sure what you are
19  asking me.
20     Q    Do you know if News Corp. pays
21  employees their salaries by making direct
22  deposit to an employee's bank account?
23     A    If an employee signs up for direct
24  deposit.
25     Q    What company does News Corp. use to

Page 386

JORDAN LIPPNER

1
2  make the direct deposit payments to
3  employees' bank accounts?
4     A   I don't understand the question.
5     Q   Well, do you know if News Corp.
6  makes direct deposit payments to employees
7  when they pay them their salary?
8     A    What I know is that a company
9  called ADP is used.
10    Q   Okay.
11    A    And people will get either hard
12 copy paychecks or they will get direct
13 deposit paychecks if they have signed up for
14 direct deposit.
15    Q    And do you know if this company ADP
16 also makes -- strike that.
17       Do you know if The New York Post
18 also uses ADP to pay its employees their
19 salaries?
20    A   I believe that The New York Post
21 does use ADP.
22    Q    How long has News Corp. and The New
23 York Post both used ADP to pay employees
24 their salaries?
25    A   I don't know the answer to that

Page 387

JORDAN LIPPNER

1
2  question.
3     Q    When did News Corp. first start
4  using ADP to start paying its employees
5  their salaries?
6     A   I don't know the answer to that
7  question.
8     Q    When did The New York Post first
9  start using ADP to pay its employees their
10 salaries?
11    A   I don't know the answer to that
12 question.
13    Q    Who made the decision to use ADP to
14 pay the salaries of News Corp. employees?
15       MR. LERNER:  Objection.
16    A   I don't know specifically who, but
17 I can tell you it would have been a News
18 Corporation employee.  And likewise, I can
19 tell you that when The New York Post decided
20 to go with ADP, it would have been The New
21 York Post making that decision.
22    Q   I want you to identify The New York
23 Post employee who made the decision to use
24 ADP to pay The New York Post salaries.
25    A   I can't.

Page 388

JORDAN LIPPNER

1
2     Q   Well, do you know if there's one
3  individual at ADP who is responsible for
4  paying the salaries to News Corp. and
5  salaries to New York Post employees?
6        MR. LERNER:  Objection.
7     A   No, I don't.
8     Q   Do News Corp. and The New York
9  Post -- strike that.
10       Do you know if News Corp. and
11 The New York Post use any companies in
12 common with respect to health benefits given
13 to their employees?
14    A   Yes.
15    Q   What companies do News Corp. and
16 The Post share in common with respect to
17 employee health benefits?
18    A    News America Incorporated has on
19 behalf of News Corporation, News America
20 Incorporated, FOX Television -- I believe
21 FOX Television, I'm pretty sure it's FOX
22 Television, HarperCollins Publishers, News
23 America Marketing -- there may be others --
24 has gone out and purchased health insurance
25 plans using the economy of scale for

Page 389

JORDAN LIPPNER

1
2  bringing in the purchasing power of all of
3  the employees of all these wholly owned subs
4  to lower the costs of getting health
5  insurance for everybody.
6        And that News America Incorporated
7  purchases and sets up these plans, and then
8  they are then available for the different
9  subsidiaries, and in one case the parent
10 company, to participate either exactly as
11 News America Incorporated has set it up for
12 its own employees or to modify the plan.
13 You know, whether it's tweaking what the
14 plan offers or adjusting what the rates are
15 for the employee to participate and purchase
16 that health insurance.
17       But that what's done, so there's a
18 couple health insurance plans that News
19 America Incorporated has purchased.  In
20 these schemes that I've discussed I think
21 there's a United Healthcare plan.
22       There may be more but that's
23 generally how it works.
24    Q    So is it your understanding,
25 Mr. Lippner, that News Corp. employees and

Page 390

```
 1        JORDAN LIPPNER
 2  New York Post employees share the same
 3  healthcare company with respect to some of
 4  their benefits?
 5     A   I believe that Aetna plans and
 6  United Healthcare plans are available to
 7  News Corp. employees, to News America
 8  employees, HarperCollins employees, yes.
 9     Q   How long have News Corp. and New
10  York Post employees been allowed to use the
11  same health plans, as far as you know?
12     A   News America Incorporated has been
13  purchasing on behalf of others, meaning
14  other companies that are wholly owned by
15  News Corp., for many years.
16        Definitely dating back to the time
17  when your clients were employed.
18        And again, it's up to each
19  individual company if they just want to
20  participate in the same way that News
21  America Incorporated does or if they want to
22  alter the plan and set it up for themselves.
23     Q   Do you know if News Corp. employees
24  share the same life insurance company with
25  New York Post employees?
```

Page 391

```
 1        JORDAN LIPPNER
 2        MR. LERNER:  Objection.
 3     A   I don't.
 4     Q   Now, when Ms. Guzman worked at the
 5  company, did News Corp. employees and New
 6  York Post employees also share the same
 7  healthcare plans with Aetna and United
 8  Healthcare?
 9     A   Well, again, I'm not sure what you
10  mean when you say "share."
11        You know, these are plans that
12  exist that Aetna offers to millions of
13  people.
14        News America Incorporated has
15  purchased plans that offer, for example,
16  News America Incorporated employees a
17  handful of choices, different choices of
18  benefits at different costs, and News
19  America Incorporated for its employees,
20  which includes me, sets the rates of
21  participation.
22        The New York Post can choose to
23  take that exact plan and offer it to its
24  people, it can modify it if it wants to and
25  it can change the rates.
```

Page 392

```
 1        JORDAN LIPPNER
 2        And that structure has been going
 3  on for years.
 4     Q   Was that structure in place before
 5  Ms. Guzman started working as an associate
 6  editor?
 7     A   I can't say for sure that it was in
 8  place before she started.  I believe -- I'm
 9  not exactly positive when it began.  I know
10  that it definitely was in place while she
11  was employed.
12     Q   Is that structure still in place to
13  this day?
14     A   Yes.
15     Q   Do you know who made the decision
16  to have News America Incorporated purchase
17  these health benefit plans for News Corp.
18  and its subsidiaries?
19        MR. LERNER:  Object to form.
20     A   I don't -- I believe that decision
21  was made before I started.  And assuming I'm
22  correct about that, that would actually
23  answer your prior question which means it
24  did start before your client started.
25        But again, it was a decision that
```

Page 393

```
 1        JORDAN LIPPNER
 2  was based on economies of scale, that the
 3  buying power for lots and lots of employers
 4  would lower the cost for everybody.
 5        And that's why it was done as
 6  opposed to just letting each individual
 7  wholly owned subsidiary fend for itself and
 8  purchase on the phone health insurance which
 9  would have in the end cost each individual
10  company more money, cost all the employees
11  more money, and in the end put a drain on
12  the whole company going up to News
13  Corporation as a whole.
14     Q   I want to now direct your attention
15  to Deposition Exhibit 18.
16     A   Yes, sir.
17     Q   Do you see where it says Section 2,
18  Designated Agency?
19     A   I do.
20     Q   It says "All employees are required
21  to use the News Travel online booking system
22  or, as a second choice, the corporate travel
23  agents listed blow to handle all business
24  travel arrangements."
25        Do you see that?
```