# **EXHIBIT 2**

Page 1

1

2           IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF NEW YORK

3           Case No. 09-CIV-9832 (BSJ)(RLE)

            Case No. 09-CIV-9323 (BSJ)(RLE)

4

5     ---------------------------------------x

      AUSTIN FENNER and IKIMULISA LIVINGSTON,

6

7                         Plaintiffs,

8           v.

9     NEWS CORPORATION, NYP HOLDINGS, INC.,

10    d/b/a THE NEW YORK POST and DAN GREENFIELD

11    and MICHELLE GOTTHELF,

12                        Defendants.

      ---------------------------------------x

13    SANDRA GUZMAN,

14                        Plaintiff,

15          v.

16    NEWS CORPORATION, NYP HOLDINGS, INC.,

17    d/b/a THE NEW YORK POST and COL ALLAN, in

18    his official and individual capacities,

19                        Defendants.

      ---------------------------------------x

20                      CONFIDENTIAL

21        VIDEOTAPED DEPOSITION OF AMY SCIALDONE

22        New York, New York

23        Thursday, June 28, 2012

24    Reported by:

      Amy A. Rivera, CSR, RPR, CLR

25    JOB NO. 51053

Page 6

AMY SCIALDONE - CONFIDENTIAL
1
2  truthfully?
3      A.   No.
4      Q.   Have you consumed or taken anything
5  today that would affect your ability to think
6  clearly?
7      A.   No.
8      Q.   Is there any other reason that you
9  might not be able to testify fully and truthfully
10 today?
11     A.   No.
12     Q.   Now, I want to go over some basic
13 ground rules for the deposition.
14          The first thing is you need to answer
15 verbally so we have a clear record.  Is that
16 clear?
17     A.   Yes.
18     Q.   If you want to take any breaks, that's
19 fine, let me know when you'd like to take one for
20 whatever reason.  The only thing I would ask you
21 if there's a question pending, that we answer the
22 question before we take a break.  Is that clear?
23     A.   Yes.
24     Q.   And please wait until I finish the
25 question.  A lot of times in conversation people

Page 7

AMY SCIALDONE - CONFIDENTIAL
1
2  will jump in, but it's important that I finish my
3  question completely before you answer.  Is that
4  clear?
5      A.   Yes.
6      Q.   The same token, I will try not to cut
7  you off, but you might pause for a reason and you
8  might not be done with your answer and I may begin
9  to ask another question.  So please let me know if
10 you're not done with your answer and I start to
11 ask something else, please let me know.  Stop me
12 and say, wait, I'm not done with my answer.  I
13 need to complete it."  Is that clear?
14     A.   Yes.
15     Q.   If -- if -- if you stop and then I go
16 on and you don't stop me, I'll have to assume that
17 was -- that was your full answer.  Is that
18 understood?
19     A.   Yes.
20     Q.   Now, if you don't understand the
21 question, it's no problem, just ask me to repeat
22 it.  I'll try and repeat it or rephrase it, or if
23 you just need to have a question read back, we can
24 have the question repeated.  Is that clear?
25     A.   Yes.

Page 8

AMY SCIALDONE - CONFIDENTIAL
1
2      Q.   If -- if you answer a question, it
3  will be assumed that you understand it.  So, it's
4  important that you understand the question before
5  you answer.  Okay?  Is that clear?
6      A.   Yes.
7      Q.   Now, could you describe your
8  educational background after high school?
9      A.   I went to University -- University of
10 Florida and received a bachelor of science in
11 advertising and a minor in marketing.
12     Q.   Did you do any postgraduate work?
13     A.   No.
14     Q.   Have you received any other degrees
15 other than the bachelor of science from the
16 University of Florida?
17     A.   No.
18     Q.   Now, what is your current job
19 assignment?
20     A.   Vice president of human resources for
21 the New York Post.
22     Q.   And how long have you been vice
23 president of human resources for the New York
24 Post?
25     A.   Six and a half years.

Page 9

AMY SCIALDONE - CONFIDENTIAL
1
2      Q.   Are you currently head of human
3  resources for the New York Post?
4          MR. PIESCO:  Objection.
5          You can answer.
6      A.   Yes.
7      Q.   So, there's no one in human resources
8  that would be above you, correct?
9      A.   Correct.
10     Q.   Now, at one point was there a senior
11 vice president of human resources that you
12 reported to?
13     A.   Yeah, there was a senior vice
14 president of human resources, marketing and
15 digital media.
16     Q.   And you were vice president for a
17 period of time when there was also a senior vice
18 president that you reported to?
19          MR. PIESCO:  Objection.
20          You can answer.
21     A.   Yes.
22     Q.   And who was that senior vice
23 president?
24     A.   Jennifer Jehn.
25     Q.   Have your job responsibilities --

Page 10

```
1              AMY SCIALDONE - CONFIDENTIAL
2    well, actually, strike that.
3              When did Jennifer Jehn cease being
4    senior vice president at New York Post?
5              MR. PIESCO:  Objection.
6              You can answer.
7         A.   In 2010.
8         Q.   Did your job responsibilities change
9    in 2010 when Jennifer Jehn left?
10        A.   Yes.
11        Q.   How did they change?
12        A.   I had more broad responsibility and
13   decision making.
14        Q.   So, at that point, you became the head
15   of HR for the New York Post?
16        A.   Yes.
17        Q.   And did you take over all of
18   Ms. Jehn's responsibilities with respect to human
19   resources?
20        A.   Yeah, that's my understanding.
21        Q.   So, you've been vice president for
22   human resources you said about six and a half
23   years.  Is that right?
24        A.   Yes.
25        Q.   Did you work for The Post prior to
```

Page 11

```
1              AMY SCIALDONE - CONFIDENTIAL
2    becoming senior -- I'm sorry, strike that.
3              Did you work for The Post prior to
4    becoming vice president for human resources about
5    six and a half years ago?
6         A.   Yes.
7         Q.   What position did you have with the
8    New York Post prior to becoming vice president for
9    human resources?
10        A.   I was a director of training and
11   development.
12        Q.   Director of training and development
13   for what aspect of the company?
14             MR. PIESCO:  Objection.
15             You can answer.
16        A.   In HR, for all aspects of the company.
17        Q.   So, you conducted HR training prior to
18   becoming vice president of human resources?
19        A.   Yes.
20        Q.   And how long were you director of
21   training for the New York Post?
22        A.   Approximately a year.
23        Q.   One year?
24             Did you have any other position with
25   the New York Post other than the two we've already
```

Page 12

```
1              AMY SCIALDONE - CONFIDENTIAL
2    discussed?
3              MR. PIESCO:  Objection.
4              You can answer.
5         A.   Yes, several.
6         Q.   Okay.  What was the next most recent
7    position you had with the New York Post before
8    being director of training?
9         A.   Director of sales training and
10   development within the sales organization.
11        Q.   And how long were you director of
12   sales training?
13        A.   About a year.
14        Q.   And what was your position -- next
15   most recent position with the New York Post before
16   you became director of sales training?
17        A.   I was an advertising sales manager.
18        Q.   How long were you an advertising sales
19   manager?
20        A.   Approximately 10, 11 years.
21        Q.   Did you have a position with the New
22   York Post before you were advertising sales
23   manager?
24        A.   Yes.
25        Q.   What was that position?
```

Page 13

```
1              AMY SCIALDONE - CONFIDENTIAL
2         A.   Advertising account executive.
3         Q.   How long were you an advertising
4    account executive?
5         A.   A couple years.
6         Q.   Did you have any other positions with
7    the New York Post other than those we've just
8    covered?
9         A.   No.
10        Q.   So, how long in total have you been
11   working for the New York Post?
12        A.   Twenty-one years.
13        Q.   Have you worked for any companies
14   other than the New York Post?
15        A.   Can you clarify -- during the 21
16   years?
17        Q.   Well, sure.  During the 21 years, has
18   there been any other employers you've worked for
19   other than the New York Post?
20        A.   No.
21        Q.   Prior to coming to the New York Post,
22   did you have any other employment?
23        A.   Yes.
24        Q.   What was the most recent company you
25   worked for before you came to the New York Post?
```

Page 14

AMY SCIALDONE - CONFIDENTIAL

1
2    A.    Festival Productions.
3    Q.    What is Festival Productions.
4    A.    An entertainment company.
5    Q.    Is Festival Productions associated
6  with News Corporation in any way?
7    A.    No.
8    Q.    How long were you at Festival
9  Productions?
10   A.    A one-year assignment.
11   Q.    Who did you work for just prior to
12 coming to Festival Productions?
13   A.    Scali, McCabe, Sloves Advertising
14 Agency.
15   Q.    How long did you work for Scali,
16 McCabe Advertising?
17   A.    Two years.
18   Q.    Did you work for anyone else prior to
19 Scali, McCabe Advertising?
20   A.    Grey Advertising.
21   Q.    Grey Advertising?
22   A.    Yes.
23   Q.    Did you work for anyone prior to Grey
24 Advertising?
25   A.    No.

Page 15

AMY SCIALDONE - CONFIDENTIAL

1
2    Q.    Is either Scali, McCabe Advertising or
3  Grey Advertising associated with News Corp. in
4  anyway?
5    A.    No.
6    Q.    Do you remember who first hired you to
7  work for the New York Post?
8    A.    Gilda Hicks.
9    Q.    And is Gilda Hicks still with The
10 Post?
11   A.    No.
12   Q.    Do you recall who promoted you from
13 advertising account executive to advertising sales
14 manager?
15   A.    Bob Scott.
16   Q.    Bob Stott?
17   A.    Bob Scott.
18   Q.    Scott?
19   A.    Yeah, Scott.
20   Q.    S-C-O-T-T?
21   A.    Yes.
22   Q.    And do you recall who promoted you to
23 director of sales training?
24   A.    John Ancona.
25   Q.    Who is John Ancona?

Page 16

AMY SCIALDONE - CONFIDENTIAL

1
2    A.    The vice president of advertising.
3    Q.    For the New York Post?
4    A.    Yes.
5    MR. PIESCO:  At the time?
6    THE WITNESS:  At the time.
7    Q.    So, he's no longer vice president of
8  advertising?
9    A.    Correct.
10   Q.    Is he -- John Ancona still with the
11 New York Post?
12   A.    No.
13   Q.    And do you recall who promoted you to
14 director of training?
15   A.    I don't.
16   Q.    Okay.  Would it have been Jennifer
17 Jehn?
18   A.    No.
19   Q.    Could you describe for me your basic
20 job responsibilities when you were director of
21 training for the New York Post?
22   A.    In the HR department?
23   Q.    Right.
24   A.    Right.  I was looking at the entire
25 organization and how we can implement training

Page 17

AMY SCIALDONE - CONFIDENTIAL

1
2  initiatives, similar things we did in the sales
3  team, to expand them out through the organization.
4    Q.    What kind of training initiatives are
5  you talking about?
6    A.    It began with management essentials
7  training.
8    Q.    Okay.  Anything else?
9    A.    I was doing assessments on what the
10 needs were at that point.
11   Q.    When you were director of training for
12 HR at the New York Post, did you conduct any
13 training on harassment in the workplace?
14   MR. PIESCO:  Objection.
15   You can answer.
16   A.    No.
17   Q.    When you were director of training in
18 HR for the New York Post, did you conduct any
19 training with respect to discrimination in the
20 workplace?
21   MR. PIESCO:  Objection.
22   You can answer.
23   A.    No, not personally.
24   Q.    When you were director of training,
25 did you conduct any training of employees with

1                AMY SCIALDONE - CONFIDENTIAL
2   respect to retaliation in the workplace?
3        MR. PIESCO: Objection.
4        You can answer.
5        A.   No, I didn't personally.
6        Q.   When you were director of training, do
7   you know if anyone conducted training of New York
8   Post employees with respect to The Post policy
9   towards harassment in the workplace?
10       MR. PIESCO: Objection.
11       You can answer.
12       A.   Yes.
13       Q.   Who was that person or persons?
14       A.   My legal counsel, Jordan Lippner.
15       Q.   Was there anyone else?
16       A.   No.
17       Q.   Just to clarify, was there anyone also
18  you know of or do you know if there was anyone
19  else other than Jordan Lippner who conducted
20  training on harassment in the workplace?
21       MR. PIESCO: Objection.
22       You can answer.
23       A.   While I was the director?
24       Q.   Right, when you were the director.
25       A.   When I was the director, Jordan

1                AMY SCIALDONE - CONFIDENTIAL
2   conducted the training for harassment.
3        Q.   Who promoted you to vice president of
4   human resources?
5        A.   Jennifer Jehn.
6        Q.   And who do you report to now?
7        A.   Paul Carlucci.
8        Q.   Do you know if there were any
9   discussions when Jennifer Jehn left as to whether
10  or not there would be another senior vice
11  president appointed to take over her role in HR?
12       MR. PIESCO: Objection.
13       A.   No.
14       Q.   Was there ever any discussion as far
15  as you know of promoting you to senior vice
16  president of HR?
17       MR. PIESCO: Objection.
18       A.   No.
19       Q.   And do you currently report to Paul
20  Carlucci?
21       A.   Yes.
22       Q.   Who is Paul Carlucci?
23       A.   The publisher of the New York Post.
24       Q.   And who does Paul Carlucci report to?
25       A.   I don't know.

1                AMY SCIALDONE - CONFIDENTIAL
2        Q.   Do you know who Paul Carlucci works
3   for?
4        MR. PIESCO: Objection.
5        A.   No.
6        Q.   Do you know if he is an employee of
7   some division or subsidiary of News Corporation?
8        MR. PIESCO: Objection.
9        A.   I don't know exactly.
10       Q.   I didn't ask you exactly, I'm merely
11  asking you do you know if he works for some
12  company affiliated with News Corporation?
13       MR. PIESCO: Objection.
14       A.   I know he works for the New York Post
15  and News America Marketing.
16       Q.   So, Paul Carlucci works for News
17  America Marketing?
18       MR. PIESCO: Objection.
19       A.   Yes.
20       Q.   And is News America Marketing
21  affiliated with News Corporation in any way?
22       MR. PIESCO: Objection.
23       A.   It's my understanding they're a
24  subsidiary.
25       Q.   Do you have any idea why Paul

1                AMY SCIALDONE - CONFIDENTIAL
2   Carlucci, the publisher of The Post, is employed
3   by News America Marketing?
4        MR. PIESCO: Objection.
5        A.   I don't know who Paul's employed by.
6        Q.   I thought you just said that Paul
7   Carlucci works for News America Marketing?
8        MR. PIESCO: Objection.
9        A.   Paul's the publisher of the New York
10  Post and oversees News America Marketing.
11       Q.   And he --
12       A.   That's my understanding --
13       Q.   -- he oversees --
14       A.   -- if I misspoke.
15       Q.   He oversees News America Marketing.
16       MR. CLARK: Now, could you read back
17  the -- the answer about -- about two
18  questions ago on News America Marketing?
19       (Record read.)
20  BY MR. CLARK:
21       Q.   Okay. So, you testified a minute ago
22  that Paul Carlucci works for News America
23  Marketing. Is that correct?
24       A.   That's my understanding.
25       Q.   Okay.

Page 22

AMY SCIALDONE - CONFIDENTIAL
1
2        And do you have any understanding as
3  to why the publisher of the New York Post works
4  for News America Marketing?
5        MR. PIESCO:  Objection.
6     A.  No.
7     Q.  Do you know what Paul Carlucci's role
8  at the paper is?
9        MR. PIESCO:  Objection.
10     A.  At the New York Post?
11     Q.  Right.  Actually, let me rephrase
12  that.
13        As the publisher, what -- what is the
14  role of publisher at the New York Post?
15        MR. PIESCO:  Objection.
16        If you know.
17     A.  I don't know.
18     Q.  You don't know any of his job
19  responsibilities?
20        MR. PIESCO:  Objection.
21        Don't guess.
22     A.  No.
23     Q.  Does Paul Carlucci ultimately oversee
24  human resources decisions made at The Post?
25        MR. PIESCO:  Objection.

Page 23

AMY SCIALDONE - CONFIDENTIAL
1
2     A.  I don't know.
3     Q.  Have you ever gone to Paul Carlucci
4  for a decision about human resources?
5        MR. PIESCO:  Objection.
6     A.  Yes.
7     Q.  So, at least in some instances, Paul
8  Carlucci had a say after you about human resources
9  decision, correct?
10        MR. PIESCO:  Objection.
11  Mischaracterization of the testimony.
12     Q.  Would you agree with that?
13     A.  Can you repeat the question, please?
14        MR. CLARK:  Could you read that back?
15        (Record read.)
16        MR. PIESCO:  Please note my objection.
17     A.  Yes.
18     Q.  Now, in your -- when you became --
19  when -- I'm sorry.
20        When you were vice president of human
21  resources but before Ms. Jehn left, could you
22  describe your job responsibilities during that
23  period of time?
24     A.  I was overseeing the HR team.  We had
25  created a sales development program and

Page 24

AMY SCIALDONE - CONFIDENTIAL
1
2  implemented it.  We had created and implemented
3  performance appraisals.  We delivered training.
4  We did recruiting.
5     Q.  Anything else?
6     A.  Those are the major pieces.
7     Q.  Who made the decision to implement
8  performance appraisals?
9     A.  Paul.
10     Q.  Paul Carlucci?
11     A.  Yes.
12     Q.  And when was that decision made to
13  implement performance appraisals?
14     A.  I don't know.
15     Q.  When you were involved in recruiting
16  in the period we just talked about, that is when
17  you were vice president but before Ms. Jehn left,
18  were you involved in any attempt to recruit
19  minorities for the paper?
20        MR. PIESCO:  Objection.
21        You can answer.
22     A.  All the recruiting we do, we follow
23  our equal opportunity -- we're an equal
24  opportunity employer, so we follow that guideline.
25  And when we advertise, we advertise en masse

Page 25

AMY SCIALDONE - CONFIDENTIAL
1
2  locations to make sure that we're reaching people
3  who are interested in our jobs and the best
4  qualified candidates.
5     Q.  Have you made -- again, though, when
6  you were in this position and involved in
7  recruiting, do you know of any efforts
8  specifically to recruit minorities to work for the
9  paper?
10        MR. PIESCO:  Objection.
11     A.  We also attended -- I had someone on
12  my team attend the National Association of Black
13  Journalists Convention.  We hosted interns from
14  high school who could further stay in touch and
15  develop.
16        MR. PIESCO:  You need to speak up
17  because I can't --
18        THE WITNESS:  Okay.
19        MR. PIESCO:  -- with the nose outside.
20  I'm having trouble.
21        I'm sorry, Paul.
22        MR. CLARK:  That's fine.  It does tend
23  to get noisy here.
24     Q.  But please continue.  You were talking
25  you hosted interns?

Page 58

AMY SCIALDONE - CONFIDENTIAL
1
2    A.   I don't know that.
3    Q.   Okay.  Col Allan -- "he" being Col
4  Allan.
5         Do you know if Dan Greenfield has
6  taken COMPASS?
7    A.   I don't recall.
8    Q.   Do you know if Dan Greenfield has
9  reviewed the standards of business conduct?
10   A.   I don't know.
11   Q.   Do you know if Michelle Gotthelf has
12 taken COMPASS?
13   A.   I don't recall.
14   Q.   Do you know if Michelle Gotthelf has
15 reviewed the standards of business conduct?
16   A.   I don't know.
17   Q.   Have you ever personally trained New
18 York Post employees about how to file a complaint
19 of employment discrimination?
20        MR. PIESCO:  Objection.
21        Paul -- Paul, you want to read that
22   one and try it again?
23        MR. CLARK:  Can you read it back?
24        (Record read.)
25

Page 59

AMY SCIALDONE - CONFIDENTIAL
1
2  BY MR. CLARK:
3    Q.   Go ahead.
4        MR. PIESCO:  Objection.
5        MR. CLARK:  I don't know what your
6  objection is.
7    A.   Can you define "trained," "personally
8  trained"?
9        MR. PIESCO:  Can you define
10  "complaint."
11        I mean, train them to go file a
12  corporate complaint against The Post?
13        MR. CLARK:  No.  There are other
14  types -- there are other types of
15  complaints.
16        MR. PIESCO:  I -- I get that.  I'm
17  just -- I will object to the question.
18        I'm sorry.  Answer it, if you
19  understand it.
20   Q.   You said -- you said you provided
21 training, correct, ma'am?
22   A.   Yes.
23   Q.   All I want to know is have you
24 provided training to employees on how to make a
25 complaint or an allegation of harassment in the

Page 60

AMY SCIALDONE - CONFIDENTIAL
1
2  workplace?
3        MR. PIESCO:  Objection.
4        You can answer.
5    A.   In training, we let people know they
6  should be coming to HR if they have a complaint of
7  any kind, in the standards of business conduct, in
8  the policies, it states the same thing, and that
9  there's an alert line.
10   Q.   Have you personally provided that
11 training to New York Post employees?
12        MR. PIESCO:  Objection.
13        You can answer.
14   A.   In the -- in the management training,
15 I have.
16   Q.   Describe for me what you tell
17 employees about how they should make the complaint
18 about discrimination in the workplace.
19        MR. PIESCO:  Objection.
20   A.   In the training for the managers, we
21 tell them if they are aware of a complaint, that
22 they should call us, call our legal counsel, or
23 the alert line, and make us aware of it.
24   Q.   And when you say, "our legal counsel,"
25 are you referring to Jordan Lippner?

Page 61

AMY SCIALDONE - CONFIDENTIAL
1
2    A.   Yes.
3    Q.   Would there be other attorneys other
4  than Jordan Lippner they could complain to?
5        MR. PIESCO:  Objection.
6    A.   I don't know.
7    Q.   And what is the "alert line"?
8    A.   It's a confidential number that
9  employees are made aware of if they have any
10 complaints.
11   Q.   How are employees made aware of this
12 confidential number?
13   A.   It's listed in the standards of
14 business conduct.
15   Q.   So, if an employee wanted to know what
16 number to call, they would look in the standards
17 of business conduct?
18   A.   Yes.
19   Q.   Is this alert line operated by the New
20 York Post?
21   A.   No.
22   Q.   Who is it operated by?
23   A.   I don't know who it's operated by.
24   Q.   Is it operated by News Corporation?
25        MR. PIESCO:  Objection.

|  | Page 62 |  | Page 63 |
|---|---|---|---|

**Page 62**

AMY SCIALDONE - CONFIDENTIAL
1
2     A.   I don't know who it's operated by.
3     Q.   Is it operated by an entity associated
4 with News Corporation?
5         MR. PIESCO:  Objection.
6     A.   I don't know who it's operated by.
7     Q.   You don't know whether it's operated
8 by any entity associated with News Corporation?
9         MR. PIESCO:  Objection.
10    A.   I don't know who it's operated by.
11    Q.   That's not the question.  I mean, I
12 assume what you're saying is you don't know
13 specifically.
14    A.   I don't know.
15    Q.   So, you don't know if it is operated
16 by a company associated with News Corporation?
17        MR. PIESCO:  Objection.
18        How many times do you want her to
19 answer?
20        MR. CLARK:  That's a yes-or-no
21 question.  She answered it --
22        MR. PIESCO:  She did.  She said, I
23 don't know three times.  I'm looking at it.
24 I don't know, I don't know, I don't know.
25

**Page 63**

AMY SCIALDONE - CONFIDENTIAL
1
2 BY MR. CLARK:
3     Q.   So, your answer is no, you don't know
4 whether it's associated with News Corporation?
5         MR. PIESCO:  Objection.
6         Either you know or you don't know.
7     A.   I don't know.
8     Q.   It's a yes or a no, either you know or
9 you don't?
10    A.   I don't know.
11        MR. PIESCO:  Would you mind if we take
12 a break?
13        MR. CLARK:  No, that's fine.
14        How long do you need?
15        MR. PIESCO:  Two minutes?  Five
16 minutes?  I just need to use the restroom.
17        VIDEOGRAPHER:  The time is 11:10 a.m.
18        We're off the record.
19        (Recess.)
20        VIDEOGRAPHER:  The time is 11:17 a.m.
21        We're on the record.
22 BY MR. CLARK:
23    Q.   Ms. Scialdone, when --
24    A.   Yeah.
25    Q.   -- we took our break, we were

**Page 64**

AMY SCIALDONE - CONFIDENTIAL
1
2 discussing ways employees could complain about
3 harassment in the workplace, and I want to make
4 sure we've covered all of those.
5         I think you mentioned a couple.  You
6 mentioned calling alert line, speaking to legal
7 counsel.  Are there any other ways consistent with
8 the New York Post policy that employees would
9 complain about harassment in the workplace?
10        MR. PIESCO:  Objection.
11        She -- she also testified coming to
12 HR.
13        THE WITNESS:  Yeah, I was going to
14 clarify that.
15        MR. PIESCO:  That's okay.
16        Go ahead.
17    Q.   Okay, good.  So -- so, coming to -- to
18 human resources department would be another way?
19    A.   Yes, and their manager directly, or a
20 supervisor.
21    Q.   Or their -- have -- it would have to
22 be their direct supervisor or would coming to any
23 supervisor be appropriate?
24    A.   They could go to any supervisor --
25 supervisor.

**Page 65**

AMY SCIALDONE - CONFIDENTIAL
1
2     Q.   Okay.  Are that any other ways that an
3 employee -- that -- strike that.
4         Are there any other ways available
5 under the New York Post policies for an employee
6 to make a complaint about harassment in the
7 workplace?
8         MR. PIESCO:  Objection.
9         You can answer.
10    A.   Those are the ones we discussed.
11    Q.   There's no others -- no others you can
12 think of today?
13        MR. PIESCO:  Objection.  Asked and
14 answered.
15    A.   No.
16    Q.   Now, would that same -- those same
17 paths apply to complaints of retaliation in the
18 workplace?
19        MR. PIESCO:  Objection.
20        You can answer.
21    A.   Yes.
22    Q.   So, in 2009, was Jennifer Jehn one of
23 the people that it would be appropriate to
24 complain to about discrimination in the workplace?
25        MR. PIESCO:  Objection.

1        AMY SCIALDONE - CONFIDENTIAL
2         You can answer.
3         A.   If an employee had any complaint, they
4    could go to Jennifer Jehn, yes.
5         Q.   And would -- would you have been
6    another person that an employee could complain to
7    about discrimination in the workplace?
8              MR. PIESCO:  Objection.
9         You can answer.
10        A.   Yes.
11             MR. CLARK:  I'd like to mark this as
12   Exhibit 1 -- Scialdone 1.
13             (Exhibit Scialdone 1, a newspaper
14        cartoon printout dated February 18, 2009,
15        was marked for identification at this time.)
16   BY MR. CLARK:
17        Q.   Ms. Scialdone, we've just marked as
18   Exhibit 1 a page that has a cartoon on it, and the
19   page is dated February 18, 2009.
20        Do you see that?
21        A.   Yes.
22        Q.   Have you ever seen this cartoon
23   before?
24        A.   Yes.
25        Q.   Is this a cartoon that ran in the New

1        AMY SCIALDONE - CONFIDENTIAL
2    York Post in February 2009?
3         A.   That's what the date states, yes.
4         Q.   Do you have any reason to think that
5    date's not correct?
6         A.   I can't hear you with the trucks.  I'm
7    sorry --
8         Q.   I'm sorry --
9         A.   -- can you repeat that?
10        Q.   -- do you have any reason to think
11   that date is incorrect?
12        A.   No.
13        Q.   When was the first time you saw this
14   cartoon?
15        A.   I don't recall.
16        Q.   Did you see it before it was published
17   in the paper?
18        A.   No.
19        Q.   Do you recall if you saw it the day it
20   was published?
21        A.   I don't recall.
22        Q.   What was your reaction the first time
23   you saw the cartoon?
24             MR. PIESCO:  Objection.
25        A.   I don't recall.  I was on vacation.  I

1        AMY SCIALDONE - CONFIDENTIAL
2    can't -- I don't recall the first time I saw it or
3    what my reaction was.
4         Q.   Okay.  So, you were on vacation on
5    February 18, 2009?
6         A.   Yes.
7         Q.   When did you come back from vacation?
8         A.   The following week.
9         Q.   And did you learn about the cartoon
10   before you returned from vacation?
11        A.   Yes.
12        Q.   How did you learn about the cartoon
13   being published?
14        A.   On the radio.
15        Q.   Do you recall when that was?
16        A.   It may have been that afternoon that
17   it ran.
18        Q.   And what did you hear on the radio
19   that -- that first time when you learned about the
20   cartoon?
21        A.   I don't recall exactly, but that there
22   was concern about it.
23        Q.   What kind of concern?
24        A.   I don't recall exactly.
25        Q.   As you sit here today, do you find

1        AMY SCIALDONE - CONFIDENTIAL
2    this cartoon to be personally offensive to you?
3              MR. PIESCO:  Objection.
4         You can answer.
5         A.   No.
6         Q.   You don't believe this cartoon is
7    offensive --
8              MR. PIESCO:  Objection.
9         Q.   -- in your opinion?
10             MR. PIESCO:  Asked and answered.
11        A.   No.
12        Q.   Are you aware of the history of
13   African Americans being depicted as chimpanzees
14   and apes?
15             MR. PIESCO:  Objection.
16        A.   No.
17        Q.   No, you're not aware of that?
18        A.   No.
19        Q.   As you sit here today, you do not know
20   that African Americans have been depicted as
21   chimpanzees?
22             MR. PIESCO:  Objection.  Asked and
23   answered.
24        A.   No.
25        Q.   Prior to returning from vacation, did

Page 186

AMY SCIALDONE - CONFIDENTIAL
1   AMY SCIALDONE - CONFIDENTIAL
2   Q.   Are there any written guidelines that
3   say that a written warning must be considered in
4   an APA?
5   A.   Not a written warning, but it says to
6   take into consideration all things that have
7   happened throughout the year.
8   MR. CLARK:  Could we mark this as --
9   is this 4?
10  (Exhibit Scialdone 4, a memo dated
11  January 27, 2009 bearing Bates stamp SG 177
12  and SG 178, was marked for identification at
13  this time.)
14  MR. PIESCO:  I don't know if this is
15  one document.
16  MR. CLARK:  I'm going to ask her about
17  that.  I don't know if this is one document
18  but we'll ask her about that.
19  MR. PIESCO:  Okay.
20  MR. CLARK:  Well, they're
21  consecutively dated, so -- but anyway, let
22  me ask the witness about it.
23  THE WITNESS:  Consecutively dated?
24  MR. CLARK:  It's not numbered.
25  MR. PIESCO:  All right.

Page 187

1   AMY SCIALDONE - CONFIDENTIAL
2   BY MR. CLARK:
3   Q.   Okay.  So, Ms. Scialdone, the first
4   page -- and these are two pages that are Bates
5   stamped SG 177 and SG 178.
6   Have you seen the first document
7   before?
8   A.   Yes.
9   Q.   And is this the written warning you
10  were referring to earlier?
11  A.   Yes.
12  Q.   And you see you're cc'd on that?
13  A.   Yes.
14  Q.   Now, the first question I have,
15  there's -- there's a second page to it, I'm just
16  not clear -- do you know if the second page of
17  this, which is marked "company policies," was
18  attached to this written warning?
19  MR. PIESCO:  Objection to form.
20  It's the second page.
21  MR. CLARK:  The second page of the
22  exhibit.
23  MR. PIESCO:  Okay.
24  Q.   Do you know if it was attached to this
25  written warning?

Page 188

1   AMY SCIALDONE - CONFIDENTIAL
2   A.   No.
3   Q.   No, you don't know, or no, it was not?
4   A.   No, I don't -- I don't recall that.  I
5   don't recall it being attached.
6   Q.   Okay.  Did you have any role in
7   drafting this written warning?
8   A.   Yes.
9   Q.   What was your role?
10  A.   I worked with Mr. Rabinowitz and
11  legal.
12  MR. PIESCO:  Just remind the witness
13  not to discuss anything that was discussed
14  with either in-house or outside counsel with
15  respect to this document or the creation
16  thereof.
17  Thank you.
18  Q.   Who wrote the first draft of this
19  memo?
20  MR. PIESCO:  Objection.
21  THE WITNESS:  Is that privileged?
22  MR. PIESCO:  No.
23  MR. LIPPNER:  If you know.
24  MR. PIESCO:  If you know, and by who,
25  it could be more than one person.

Page 189

1   AMY SCIALDONE - CONFIDENTIAL
2   A.   I don't -- I don't recall.
3   Q.   Okay.  Did you -- did you draft --
4   sorry.
5   Did you do the first draft of this
6   memo?
7   A.   I don't recall.
8   Q.   Do you recall reviewing a memo after a
9   memo had been drafted?
10  MR. PIESCO:  Objection.
11  A.   I don't recall.
12  Q.   Can you say anything more about your
13  role with respect to this memo?
14  I mean, what -- what did you do?
15  A.   I gathered the information and spoke
16  with the manager and I spoke with counsel.
17  Q.   What information did you gather?
18  A.   Make sure I understood what the
19  situation was and the information regarding what
20  she violated.
21  Q.   And what was your conclusion as to
22  what she violated?
23  A.   The conflicts of interest in our
24  standards of business conduct.
25  Q.   Now, looking at the second page -- and