# **EXHIBIT 4**

Page 1

```
 1                    JENNIFER JEHN
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------------------X
     SANDRA GUZMAN,
 4                     Plaintiff,
 5                     -against-    09CIV9323 (BSJ)(RLE)
 6   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and COL ALLAN, in his
 7   official and individual capacities,
 8
                       Defendants.
 9   ----------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
10
11                     Plaintiffs,
12                     -against-    09CIV9832 (BSJ)(RLE)
13   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST and DAN GREENFIELD and
14   MICHELLE GOTTHELF,
15                     Defendants.
     ----------------------------------------X
16
17
18        VIDEOTAPED DEPOSITION OF JENNIFER JEHN
19                  New York, New York
20                Tuesday, June 26, 2012
21
22   REPORTED BY:   BARBARA R. ZELTMAN
                    (BOBBIE)
23                  Professional Stenographic Reporter
24
25   Job Number:  51052
```

### Page 14

```
 1            JENNIFER JEHN
 2      Q    How long have you worked for Dow
 3   Jones?
 4      A    Over two years.
 5      Q    What's your current position with
 6   them?
 7      A    I'm the head of circulation.
 8      Q    What does it mean being head of
 9   circulation; in other words, what are your
10   job duties as head of circulation?
11      A    I'm responsible for acquisition and
12   retention and marketing to acquire
13   subscriptions to The Wall Street Journal and
14   all of the products of The Wall Street
15   Journal.
16      Q    And prior to two years ago, that
17   is, prior to coming to The Wall Street
18   Journal, what was your employer -- who was
19   your employer?
20           MR. LERNER:  Objection.
21      A    The New York Post.
22      Q    And what was your last position at
23   The New York Post?
24      A    I was the Senior Vice President of
25   Marketing, Digital Media and Human
```

### Page 15

```
 1            JENNIFER JEHN
 2   Resources.
 3      Q    Senior Vice President of Marketing
 4   and Human Resources.
 5           Is that one job title or did you
 6   actually have two job titles?
 7           MR. LERNER:  Objection.
 8           Go ahead.
 9      A    I was Senior Vice President of
10   Marketing, Digital Media and Human
11   Resources.
12      Q    Okay.  So that was just one job
13   title?
14      A    Yes.
15      Q    And how long were you senior vice
16   president of Marketing and Human Resources?
17           MR. LERNER:  Objection.
18      Q    For the New York Post?
19      A    Over five years.
20      Q    So as senior vice president of
21   Human Resources, did you basically run the
22   Human Resources Department?
23           MR. LERNER:  Objection.
24           You can answer.
25      A    I was responsible for Human
```

### Page 16

```
 1            JENNIFER JEHN
 2   Resources reporting to me.
 3      Q    Was there anyone in the Human
 4   Resources Department at The Post that was
 5   senior to you?
 6      A    No.
 7      Q    So you were the highest-ranking
 8   human resources executive at The Post?
 9      A    Yes.
10      Q    And as senior vice president of
11   Human Resources, who did you report to?
12      A    Paul Carlucci.
13      Q    And who is Paul Carlucci?
14      A    Paul Carlucci is the publisher of
15   the New York Post.
16      Q    Do you know who Paul Carlucci works
17   for?
18           MR. LERNER:  Objection.
19      A    I do not.
20      Q    Have you ever been an employee of
21   News Corporation?
22      A    No.
23      Q    Who hired you -- actually, other
24   than being senior vice president of
25   Marketing and Human Resources, did you have
```

### Page 17

```
 1            JENNIFER JEHN
 2   any other positions at The New York Post?
 3      A    No.
 4      Q    So you said you were senior vice
 5   president for about five years.  That was
 6   the entire time that you were at The New
 7   York Post; is that correct?
 8      A    Yes.
 9      Q    And who hired you to work for The
10   New York Post?
11      A    Paul Carlucci.
12      Q    And you were never promoted during
13   your time at The Post; you were just at the
14   same position?
15           MR. LERNER:  Objection.
16           Do you understand the question?
17           THE WITNESS:  I don't
18   understand the question.
19      Q    Your job title -- was your job
20   title the same the entire five years you
21   worked for The New York Post?
22      A    Yes.
23      Q    So would it be fair to say you were
24   never promoted?  You came in at a position
25   and you left at the same position, correct?
```

Page 34

```
1              JENNIFER JEHN
2         MR. LERNER:  Objection.
3      A    I don't know.
4      Q    Did she work for News America?
5         MR. LERNER:  Objection.
6      A    I don't know.
7      Q    Does Jordan Lippner work for News
8  America?
9      A    I don't know.
10     Q    Has Jordan Lippner ever told you
11 who he works for?
12        MR. LERNER:  Objection.
13        Don't answer that.
14       (Directive to witness.)
15        MR. LERNER:  It's privileged.
16        MR. CLARK:  Who Jordan Lippner
17 works for is privileged?
18        Could you explain that one?
19        MR. THOMPSON:  Let's take a
20 moment.  Let's call the Court.
21        MR. CLARK:  Can we go off the
22 record.
23        THE VIDEOGRAPHER:  The time is
24 10:50 a.m.  Going off the record.
25        (A brief recess was
```

Page 35

```
1              JENNIFER JEHN
2  taken.)
3         THE VIDEOGRAPHER:  The time is
4  11:00 a.m.  We're back on the record.
5         MR. LERNER:  The witness is
6  going to answer the same question
7  about Mr. Lippner.
8         MR. CLARK:  Could you read back
9  the last question, please.
10        (Requested portion of record read:
11        "Q.  Has Jordan Lippner ever told
12 you who he works for?")
13        (End of read-back.)
14     A    No.
15     Q    Has Jan Constantine ever told you
16 who she worked for in 2009?
17        MR. LERNER:  Objection.
18     A    No.
19     Q    And there were no other lawyers
20 that assisted you in learning how to conduct
21 an investigation into an allegation of
22 employment discrimination?
23        MR. LERNER:  Objection.
24     A    I don't recall any others.
25     Q    You mentioned earlier that you had
```

Page 36

```
1              JENNIFER JEHN
2  a number of jobs in HR; is that correct?
3      A    I worked in HR.
4      Q    What was the first job you had in
5  HR?
6      A    I worked in HR for News America
7  FSI.
8      Q    And that's News America
9  Freestanding Inserts?
10     A    Yes.
11     Q    What year did you begin working for
12 News America FSI?
13     A    I don't remember the exact date.
14     Q    Do you know the year?
15     A    Around 1994 or '5.
16     Q    Is News America FSI a subsidiary of
17 News Corporation?
18     A    I don't know.
19     Q    What was your title at News America
20 FSI?
21     A    I don't remember.
22     Q    Can you describe any training you
23 received while conducting an investigation
24 into an allegation of employment
25 discrimination while you were at News
```

Page 37

```
1              JENNIFER JEHN
2  America FSI?
3         MR. LERNER:  Objection.
4      A    I received training and support and
5  guidance from our lawyers and employment
6  lawyers.
7      Q    Can you describe what that training
8  consisted of?
9         MR. LERNER:  Objection.
10     A    I don't recall.
11     Q    Do you recall the names of any of
12 these employment lawyers that helped train
13 you at News America FSI?
14     A    The lawyer would be Jan
15 Constantine.
16     Q    Earlier when you spoke about Jan
17 Constantine, were you referring to training
18 you received when you were at News America
19 FSI?
20        MR. LERNER:  Objection.
21     A    Could you repeat that question?
22     Q    Did Jan Constantine provide you
23 training when you were anyplace other than
24 during your position at News America FSI?
25        MR. LERNER:  Objection.
```

Page 38

```
1           JENNIFER JEHN
2     A    I still don't understand what you
3  are asking me.
4     Q    Did Jan Constantine help to train
5  you when you were an employee of The New
6  York Post regarding the conducting of an
7  investigation of employment discrimination?
8     A    Could you repeat it again?
9     Q    Did Jan Constantine help to train
10 you in any HR matters when you worked for
11 The New York Post?
12    A    I don't remember.
13    Q    So Ms. Constantine may have trained
14 you both at The New York Post and at News
15 America FSI?
16         MR. LERNER:  Objection.
17    A    I don't recall.
18    Q    Were there any other attorneys who
19 helped train you in HR matters when you were
20 at News America FSI?
21    A    I don't recall.
22    Q    Was there anyone else who helped to
23 train you in HR when you were at News
24 America FSI?
25         MR. LERNER:  Objection.
```

Page 39

```
1           JENNIFER JEHN
2     A    I don't recall.
3     Q    Do you recall any other training
4  that you received in how to conduct an
5  investigation into an allegation of
6  employment discrimination when you were at
7  News America FSI?
8          MR. LERNER:  Objection.
9     A    I don't recall.
10    Q    How long were you at News America
11 FSI?
12    A    Could you repeat that question?
13    Q    How long were you employed by News
14 America FSI?
15    A    I don't remember the specific
16 number of years.  Around five.
17    Q    And did you have any HR positions
18 other than your position at News America FSI
19 and The New York Post?
20    A    Yes.
21    Q    What was the next HR position you
22 had after News America FSI.
23         Strike that last question.
24         News America FSI was the first HR
25 job you ever had, correct?
```

Page 40

```
1           JENNIFER JEHN
2     A    Yes.
3     Q    So after you left News America FSI,
4  what was the next HR job you had after that?
5     A    I had HR responsibilities at
6  TV Guide.
7     Q    What is the name of the corporation
8  that owns TV Guide?
9     A    I don't know.
10    Q    Are they a subsidiary of News
11 Corporation?
12    A    I do not know.
13    Q    What was your job title at
14 TV Guide?
15    A    I don't recall.
16    Q    Describe any training you received
17 when you were at TV Guide regarding how to
18 conduct an investigation into an allegation
19 of employment discrimination.
20         MR. LERNER:  Objection.
21         You can answer.
22    A    I had training and advice and
23 support from employment lawyers and legal
24 counsel.
25    Q    What were the names of the lawyers
```

Page 41

```
1           JENNIFER JEHN
2  who gave you this training at TV Guide?
3     A    I don't remember.
4     Q    Was Linda Babajko one of them?
5          I'm sorry.  Strike that.
6          Was Jan Constantine one of them?
7     A    Yes.
8     Q    Did Jan Constantine work for
9  TV Guide during the time that you worked for
10 TV Guide?
11    A    No.
12    Q    So why was Jan Constantine giving
13 you advice about how to conduct an
14 investigation into employment discrimination
15 when you were an employee of TV Guide?
16         MR. LERNER:  Objection.
17    A    Jan Constantine was a lawyer in
18 employment who was a resource available to
19 me.
20    Q    Why was Jan Constantine a resource
21 available to you as an employee of TV Guide?
22         MR. LERNER:  Objection.
23    A    She was a resource available to me.
24    Q    Wasn't she available to you because
25 TV Guide is a subsidiary of NewsCorp. and
```

Page 42

```
 1            JENNIFER JEHN
 2   Jan Constantine works for NewsCorp.?
 3         MR. LERNER:  Objection.
 4     A   You need to repeat that question.
 5   Please, will you repeat that.
 6         MR. CLARK:  Read it back.
 7         (Requested portion of record read:
 8     Q.  Wasn't she available to you
 9   because TV Guide is a subsidiary of
10   NewsCorp. and Jan Constantine works for
11   NewsCorp.?")
12         (End of read-back.)
13         MR. LERNER:  Objection.
14     A   No.
15     Q   What's the basis for you saying no?
16         MR. LERNER:  Objection.
17     A   I don't know who Jan Constantine
18   works for.
19     Q   So how can you possibly say she's
20   not an employee of NewsCorp.?
21         MR. LERNER:  Objection.
22     A   I don't know who Jan Constantine
23   worked for.
24     Q   Isn't it true that when you worked
25   for News America FSI, Jan Constantine was a
```

Page 43

```
 1            JENNIFER JEHN
 2   resource available to you because News
 3   America FSI is a subsidiary of NewsCorp. and
 4   Jan Constantine works for NewsCorp.?
 5         MR. LERNER:  Objection.
 6     A   That's not true.
 7     Q   What's your basis for saying it's
 8   not true?
 9     A   I don't know who Jan Constantine
10   works for.
11     Q   So what's your basis for saying
12   it's not true?
13     A   I don't know who Jan Constantine
14   works for.
15     Q   After TV Guide, did you have any
16   other HR jobs other than New York Post?
17     A   I don't recall.
18     Q   What year did you -- what was your
19   last year that you worked for TV Guide?
20     A   I don't remember the exact year.
21     Q   You don't recall if you worked --
22   had any employment between TV Guide and The
23   New York Post?
24     A   I was employed between TV Guide and
25   The New York Post, yes.
```

Page 44

```
 1            JENNIFER JEHN
 2     Q   So you don't recall if any of those
 3   jobs involved HR?
 4     A   I don't recall.
 5     Q   Who did you work for directly after
 6   you left TV Guide?
 7     A   News America Marketing.
 8     Q   Is News America Marketing a
 9   subsidiary of NewsCorp.?
10         MR. LERNER:  Objection.
11     A   I don't know.
12     Q   Did you work for anyone between
13   News America Marketing and The New York
14   Post?
15     A   Yes.
16     Q   Who did you work for directly after
17   News America Marketing?
18     A   Liquidmetal Technologies.
19     Q   Where are they located?
20     A   At the time, Tampa Florida.
21     Q   And did your job with Liquidmetal
22   involve human resources?
23     A   No.
24     Q   Did you work for anyone else
25   between Liquidmetal and The New York Post?
```

Page 45

```
 1            JENNIFER JEHN
 2     A   Yes.
 3     Q   What was your next job after
 4   Liquidmetal?
 5     A   Fortress Technologies.
 6     Q   And did that job involve human
 7   resources?
 8     A   No.
 9     Q   Who did you work for directly after
10   Fortress Technologies?
11     A   The New York Post.
12     Q   At any of your HR positions, did
13   you ever receive training with respect to
14   how to conduct an investigation with respect
15   to sexual harassment in the workplace?
16         MR. LERNER:  Objection.
17     A   Could you repeat that question?
18         MR. CLARK:  Could you read it
19   back, please.
20         (Requested portion of record read:
21     "Q.  At any of your HR positions,
22   did you ever receive training with
23   respect to how to conduct an
24   investigation with respect to sexual
25   harassment in the workplace?")
```

Page 54

```
 1        JENNIFER JEHN
 2      "Q. What other ways would be a way
 3  to retaliate against an employee other
 4  than losing their job?")
 5      (End of read-back.)
 6   A   If an employee had responsibilities
 7  taken away from them because they filed a
 8  complaint against their supervisor.
 9   Q   Any other ways?
10      MR. LERNER: Objection.
11   A   I don't remember.
12   Q   When you were head of HR in 2009,
13  were employees advised about how to file a
14  complaint of harassment or discrimination?
15      MR. LERNER: Objection.
16      You can answer if you understand
17  the question.
18   A   Employees were advised that they
19  can make a complaint to New York Post Human
20  Resources, they can complain to their
21  manager, they can report it to an alert
22  line.
23   Q   What is Alert Line?
24   A   An alert line is made available to
25  New York Post employees that they can file a
```

Page 55

```
 1        JENNIFER JEHN
 2  complaint or grievance.
 3   Q   Who runs this alert line that New
 4  York Post employees can call to complain
 5  about a complaint?
 6      MR. LERNER: Objection.
 7   Q   To complain about a grievance.
 8   A   I don't know who runs it.
 9   Q   Does The New York Post run it?
10      MR. LERNER: Objection.
11   A   I don't know.
12   Q   Is there one alert line for all of
13  the NewsCorp. subsidiaries?
14   A   I don't know.
15   Q   From what you described, are there
16  any other ways that an employee can complain
17  about employment discrimination?
18   A   An employee can complain to their
19  manager, to Human Resources, anyone in Human
20  Resources, and to the alert line.
21   Q   Could an employee of The New York
22  Post complain to an attorney?
23   A   Employees at The New York Post can
24  complain to HR, their manager, the alert
25  line. That's who they know they can
```

Page 56

```
 1        JENNIFER JEHN
 2  complain to.
 3   Q   Suppose an employee of The New York
 4  Post wanted to make a complaint to Jordan
 5  Lippner? Would that be acceptable, in your
 6  experience as head of HR for The New York
 7  Post?
 8      MR. LERNER: Objection.
 9      Do you understand the question?
10      THE WITNESS: Actually, I don't
11  understand the question.
12  BY MR. CLARK:
13   Q   Would it be an acceptable way to
14  complain about employment discrimination for
15  an employee of The New York Post to complain
16  to Jordan Lippner?
17      MR. LERNER: Objection.
18   A   New York Post employees can
19  complain to HR, their manager, an alert
20  line. That's who they can complain to.
21   Q   So your answer is no, it would
22  not -- complaining to Jordan Lippner would
23  not be an acceptable way in your view to
24  make a complaint about employment
25  discrimination as an employee of The New
```

Page 57

```
 1        JENNIFER JEHN
 2  York Post?
 3      MR. LERNER: Objection.
 4   A   Can you repeat the question?
 5      MR. CLARK: Could you read it
 6  back?
 7      (Requested portion of record read:
 8      "Q. So your answer is no, it would
 9  not -- complaining to Jordan Lippner
10  would not be an acceptable way in your
11  view to make a complaint about employment
12  discrimination as an employee of The New
13  York Post?")
14      (End of read-back.)
15   A   Jordan Lippner, as a resource to
16  Human Resources at The New York Post, a New
17  York Post employee could make a complaint to
18  him.
19   Q   So it would be an acceptable way to
20  make a complaint if you were an employee of
21  The New York Post?
22      MR. LERNER: Objection. I
23  think the issue is the word
24  "acceptable."
25      I don't know what it means but I
```

```
                                                Page 234
 1            JENNIFER JEHN
 2     A    It was a decision made by consensus
 3   by our Executive Committee that the Tempo
 4   section was going to be reduced in its
 5   frequency, which that decision resulted in
 6   the position elimination and that position
 7   was the editor's position.
 8     Q    Who participated in this decision
 9   to eliminate Sandra Guzman's position?
10     A    The Executive Committee.
11     Q    Who does that include?
12          Withdraw that.
13          Was this a decision made at a
14   specific meeting of the Executive Committee?
15          Strike the last question.
16          Who was on the Executive Committee
17   in 2009 when this decision to reduce Tempo
18   was made and to eliminate Sandra Guzman's
19   position?
20     A    I don't recall all the members of
21   Executive Committee on that day.
22     Q    Who do you recall being on the
23   Executive Committee in 2009?
24     A    I recall myself, Col Allan, Paul
25   Carlucci, Michael Racano, Howard Adler, Amy
```

```
                                                Page 235
 1            JENNIFER JEHN
 2   Scaldone, Patrick Judge, Chris Shaw.
 3     Q    Was Les Goodstein on the Executive
 4   Committee in 2009?
 5     A    I don't know if Les Goodstein is a
 6   member of the Executive Committee.
 7     Q    Why do you not know if Les
 8   Goodstein is on the Executive Committee?
 9          MR. LERNER: Objection.
10     A    He participants in Executive
11   Committee. I don't know if he's a member of
12   Executive Committee.
13     Q    Was Les Goodstein present at the
14   committee meeting in which it was decided
15   that the frequency of Tempo would be reduced
16   which would result in the elimination of
17   Sandra Guzman's position?
18     A    I don't recall if he was present
19   specifically.
20     Q    What do you mean that "reducing the
21   frequency of the section would result in the
22   elimination of Sandra Guzman's position"?
23          MR. LERNER: Objection.
24     A    The Tempo section was going to be
25   produced less, and the editor's position was
```

```
                                                Page 236
 1            JENNIFER JEHN
 2   eliminated as a result of that.
 3     Q    So did the Executive Committee
 4   decide to eliminate Sandra Guzman's
 5   position?
 6     A    The Executive Committee, yes, did
 7   decide to eliminate the position of editor
 8   of Tempo.
 9     Q    Did the Executive Committee decide
10   to lay off Sandra Guzman?
11     A    We didn't talk specifically about
12   Sandra Guzman but we decided that the editor
13   position would be eliminated.
14     Q    What do you mean "we decided it
15   would be eliminated"? Who are you talking
16   about?
17     A    The Executive Committee.
18     Q    Did Col Allan have a role in
19   determining to lay off Sandra Guzman?
20          MR. LERNER: Objection.
21     A    Yes. He was part of the Executive
22   Committee.
23     Q    What did he say at that meeting?
24     A    I don't recall.
25     Q    What did you say at the meeting?
```

```
                                                Page 237
 1            JENNIFER JEHN
 2     A    I don't recall.
 3     Q    Do you recall Paul Carlucci saying
 4   anything?
 5     A    I don't recall what he said.
 6     Q    Do you recall anything said by
 7   anyone at that meeting with respect to Tempo
 8   and Sandra Guzman?
 9          MR. LERNER: Objection.
10     A    I recall that we agreed that the
11   Tempo section was going to be reduced and
12   then that would result in the Tempo editor
13   position being eliminated.
14     Q    When you say the Tempo section and
15   the editor of Tempo being eliminated, does
16   that necessarily mean that Sandra Guzman
17   would be laid off?
18          MR. LERNER: Objection.
19     A    That means that the position of the
20   Tempo editor would have been eliminated.
21   There are options when you have those
22   discussions.
23          We decided that the position, the
24   Tempo position, editor position, was going
25   to be eliminated.
```