# **EXHIBIT 6**

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 1

1                           Allan
2              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
3

       SANDRA GUZMAN,                    )
4                                        )
                 Plaintiff,              )
5                                        )
                 vs.                     ) 09CIV9323
6                                        ) (BSJ(RLE)
       NEWS CORPORATION, NYP HOLDINGS,)
7      INC., d/b/a THE NEW YORK POST, )
       and COL ALLAN, in his official )
8      and individual capacities,        )
                                         )
9                Defendants.             )
       -------------------------------)
10
11     (Contains Confidential & Attorneys' Eyes Only Portions Bound Separately)
12
13        VIDEOTAPED DEPOSITION OF COLIN ALLAN
14                  New York, New York
15              Tuesday, February 14, 2012
16
17
18
19
20
21
22
23     Reported by:
24     Philip Rizzuti
25     JOB NO. 46188

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 6

1  Allan
2  Thompson Wigdor for the plaintiff Sandra
3  Guzman, with my colleague Paul Clark.
4         THE VIDEOGRAPHER: Will the court
5  reporter please swear in the witness.
6  C O L I N  A L L A N, called as a witness,
7        having been duly sworn by a Notary
8        Public, was examined and testified as
9        follows:
10 EXAMINATION BY
11 MR. THOMPSON:
12    Q.   I am Ken Thompson, I am Sandra
13 Guzman's attorney. I also represent Austin
14 Fenner and Ikimalisa Livingston in lawsuits
15 that they brought against the New York Post
16 and News Corp.
17        Have you ever had your deposition
18 taken before?
19    A.   One time.
20    Q.   When was that?
21    A.   I guess back in 2002 or '3.
22    Q.   Was that case here in New York?
23    A.   Yes, sir.
24    Q.   What type of case?
25    A.   It was a case of age

Page 7

1  Allan
2  discrimination.
3     Q.   Who brought that age
4  discrimination case?
5     A.   Gentleman named Sid Simon.
6     Q.   Were you accused of any wrongdoing
7  in that case?
8     A.   The newspaper was.
9     Q.   What did that plaintiff allege in
10 that particular lawsuit?
11    A.   He alleged he had been dismissed
12 because of his age.
13    Q.   How old was he at the time of his
14 dismissal?
15    A.   I don't recall.
16    Q.   What position did he have at the
17 New York Post?
18    A.   He was a part-time columnist.
19    Q.   So you had your deposition taken
20 in that particular matter?
21    A.   Yes, I did.
22    Q.   Did that matter end up going to
23 court?
24    A.   No, sir.
25    Q.   What happened to that case?

Page 8

1  Allan
2     A.   It was settled.
3     Q.   So I want to go over a couple of
4  rules that will cover this deposition. If I
5  ask you a question and you don't understand it
6  just tell me. I have an obligation to ask it
7  again so you do understand it. Okay?
8     A.   I understand.
9     Q.   The other important rule to follow
10 is both of us have to speak on the record, so
11 all your answers have to be verbal. As you
12 can see there is a court reporter sitting next
13 to you that is creating a deposition
14 transcript. Do you understand that?
15    A.   Yes.
16    Q.   If there is any reason why you
17 want to take a break, stretch your legs or go
18 to the restroom just let me know and we will
19 take breaks. I would ask that if I am in the
20 middle of asking a question or series of
21 questions, let me finish and then we can take
22 a break?
23    A.   I understand.
24    Q.   Is there any reason why you can't
25 testify truthfully today?

Page 9

1  Allan
2     A.   No.
3     Q.   Mr. Allan, are you an employee of
4  News Corporation?
5     A.   I am an employee of the New York
6  Post.
7     Q.   Do you know where News Corp.'s
8  corporate offices are located?
9     A.   1211 Sixth Avenue.
10    Q.   Here in New York City?
11    A.   Yes.
12    Q.   And where is the business and
13 editorial offices of the New York Post
14 located?
15    A.   1211 Sixth Avenue.
16    Q.   So the corporate offices of News
17 Corp. and the editorial and the business
18 offices of the New York Post are located in
19 the same building here in New York City?
20    A.   Correct.
21    Q.   Have they been located in that
22 same building throughout your tenure at the
23 company?
24    A.   Yes.
25    Q.   Does News Corp. occupy any

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 82

```
1        Allan
2    A.  I don't know.
3    Q.  How do you know that he is on the
4  board?
5    A.  I know he is on the board.
6    Q.  I am asking you what is the basis
7  of your knowledge; have you been at board
8  meetings?
9    A.  No.
10   Q.  So how do you know that he is on
11 the board?
12   A.  I have seen his name on the list
13 of members of the board.
14   Q.  Does James Murdoch have an office
15 at 1211 Avenue of the Americas?
16   A.  I don't know.
17   Q.  Have you ever spoken to James
18 Murdoch in connection with performing your
19 duties as Editor-in-Chief of the New York
20 Post?
21   A.  Never.
22   Q.  You ever communicate with James
23 Murdoch about Sandra Guzman at all?
24   A.  Never.
25   Q.  About Austin Fenner?
```

Page 83

```
1        Allan
2    A.  Never.
3    Q.  About Ikimalisa Livingston?
4    A.  Never.
5    Q.  About the monkey cartoon?
6    A.  Never.
7    Q.  You ever spoke to Lachlan Murdoch
8  about Sandra Guzman?
9    A.  Yes.
10   Q.  How many times have you spoken to
11 him about Sandra Guzman?
12   A.  I don't recall.
13   Q.  What is Lachlan Murdoch's position
14 at News Corp.?
15       MR. LERNER: Objection.
16   A.  He is on the Board of Directors.
17   Q.  Do you recall when you spoke to
18 him about Sandra Guzman?
19   A.  When she was hired.
20   Q.  Can you describe the substance of
21 your conversation with Lachlan Murdoch about
22 Sandra Guzman when she was hired?
23   A.  The first conversation I had with
24 Lachlan was Sandra was in the room, that
25 was -- he was in the process of hiring her.
```

Page 84

```
1        Allan
2    Q.  So Lachlan Murdoch hired Sandra
3  Guzman?
4    A.  Yes, when he was publisher of the
5  Post.
6    Q.  What happened in that meeting with
7  you, Lachlan Murdoch and Sandra Guzman?
8    A.  Lachlan introduced me to Sandra
9  and he informed me that he was employing
10 Sandra to produce a Latino section for the
11 paper.
12   Q.  Did he say anything else about
13 her?
14   A.  I don't recall.
15   Q.  Did you speak to Ms. Guzman at the
16 time?
17   A.  I welcomed her.
18   Q.  Welcomed her to --
19   A.  The Post.
20   Q.  So she had already been hired?
21   A.  Yes.
22   Q.  You had nothing to do with her
23 hiring; correct?
24   A.  No, sir.
25   Q.  You had nothing to do with the
```

Page 85

```
1        Allan
2  idea to create a Latino section?
3    A.  No, sir.
4    Q.  Was anyone else in that meeting?
5    A.  Geoff Booth I think.
6    Q.  Who is Geoff Booth?
7    A.  He was the general manager.
8    Q.  Of the New York Post?
9    A.  Yes.
10   Q.  Is he still at the company?
11       MR. LERNER: Objection. Form.
12   A.  No.
13   Q.  Is he at -- strike that.
14       Is he an executive of News Corp.?
15   A.  No.
16   Q.  Other than speaking to Lachlan
17 Murdoch about Sandra Guzman in that meeting
18 did you ever speak with him again about Ms.
19 Guzman on any occasion?
20   A.  I am sure I did, but I don't
21 recall.
22   Q.  You can't recall any other
23 substantive conversations that you had with
24 Lachlan Murdoch regarding Sandra Guzman?
25   A.  I can't.
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 138

Allan
1 you said in the meeting with Joe Rabinowitz,
2 Paul Carlucci and Jennifer Jehn regarding
3 Ms. Guzman's 2009 employee evaluation?
4 A. No.
5 Q. Did you ever speak to Paul
6 Carlucci on any other occasion about Sandra
7 Guzman?
8 A. Yes. Insofar as the decision to
9 close Tempo was fundamentally made at the
10 Executive Committee.
11 Q. What did you say to Paul Carlucci
12 about Sandra Guzman when you talked about
13 closing Tempo?
14 A. Nothing, I listened.
15 Q. Did anyone mention Sandra Guzman
16 in that meeting?
17 A. I don't recall.
18 Q. Well let me make it clear, make
19 sure the record is clear. The meeting that
20 you were in with Paul Carlucci, Amy Scialdone
21 and Jennifer Jehn and Joe Rabinowitz was a
22 meeting where her performance was being
23 evaluated; correct?
24 A. Yes.

Page 139

Allan
1 Q. Was there a separate meeting that
2 you had where Paul Carlucci was present where
3 you also discussed Sandra Guzman?
4 A. Yes.
5 Q. Who was in that meeting?
6 A. I believe Jennifer Jehn and/or Amy
7 Scialdone.
8 Q. Anyone else?
9 A. I don't recall.
10 Q. Was Paul Carlucci in that meeting?
11 A. Yes.
12 Q. Who mentioned Sandra Guzman in
13 that meeting?
14 A. Either Paul or Jennifer.
15 Q. What did either Paul or Jennifer
16 say about Ms. Guzman in the meeting?
17 A. Paul said that he had made the
18 decision to close Tempo, and that this meant
19 that Sandra Guzman would be terminated.
20 Q. Did he say anything else?
21 A. I don't recall.
22 Q. So who made the decision to
23 terminate Ms. Guzman?
24 A. Paul Carlucci.

Page 140

Allan
1 Q. Why was she terminated?
2 A. The section was closed.
3 Q. Do you recall speaking to Paul
4 Carlucci on any other occasion about Sandra
5 Guzman?
6 A. No.
7 Q. Did you have any role in the
8 decision to terminate Ms. Guzman?
9 A. No.
10 Q. I am showing you now what has been
11 marked as Allan Deposition Exhibit number 4.
12         (Allan Exhibit 4, Defendant News
13         Corporation's Objections and Responses
14         to Plaintiff's First Set of
15         Interrogatories, marked for
16         identification, as of this date.)
17 Q. I want to direct your attention to
18 page 15, and specifically to interrogatory
19 number 19.
20 A. Page 15?
21 Q. Yes. You see at the top
22 interrogatory number 19?
23 A. Yes.
24 Q. That interrogatory -- first of all

Page 141

Allan
1 for the record if you turn to the first page
2 of Allan Deposition Exhibit 4, it is entitled
3 Defendant News Corporation's Objections and
4 Responses to Plaintiff's First Set of
5 Interrogatories. If you go to interrogatory
6 number 19 it says: Identify each member of
7 the Board of Directors of Defendants News
8 Corporation, Post. And objection and
9 responses stated, it says: Defendants states
10 that Jose Maria Aznar, Natalie Bancroft, Peter
11 Barnes, Chase Carey, Kenneth Cowley, David
12 Devoe, Viet Dinh, Roderick Eddington, Mark
13 Hurd, James Rupert Murdoch, Andrew S.B.
14 Knight, Keith Rupert Murdoch, Lachlan Murdoch,
15 Thomas J. Perkins, Arthur M. Siskind and John
16 L. Thornton comprise the Board of Directors of
17 Defendant News Corp.
18      Do you see that, sir?
19      MR. LIPPNER: Objection.
20 A. Yes.
21 Q. Who is David Devoe, Mr. Allan?
22 A. He is the CFO of News Corp.
23 Q. Now I am showing you what has been
24 marked as Allan Deposition Exhibit 5, and it

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 394

Allan

1  sir?
2
3  A. I don't recall.
4  Q. Was she allowed to go to cover
5  that ceremony for the New York Post?
6  A. No.
7  Q. Why not?
8  A. Because she had told us that she
9  was a friend of Justice Soto Mayor and
10 therefore I felt that she had been conflicted.
11 Q. Conflict?
12 A. Yes. We don't assign people to
13 cover people on the basis of friendships.
14 Q. When Kevin Rudd ran for Prime
15 Minister of Australia did you cover him in the
16 New York Post?
17 A. No.
18 Q. Is it your testimony that there
19 was not a single article written in the New
20 York Post -- can I finish -- about the fact
21 that Kevin Rudd was running for Prime Minister
22 of Australia?
23 A. I don't recall it.
24 Q. Do you recall if there was ever an
25 article in the New York Post about Kevin Rudd?

Page 395

Allan

1
2  A. I don't recall.
3  Q. Would it have been inappropriate
4  for an article to have been published about
5  Kevin Rudd in the New York Post based on your
6  relationship with him?
7  A. I didn't have a relationship with
8  him.
9     MR. LERNER: Objection.
10 Q. He was a friend of yours; correct?
11 A. No. I never testified that he was
12 a friend. I knew him for one day.
13 Q. Now Ms. Guzman was terminated in a
14 meeting with Joe Rabinowitz and someone from
15 HR; correct?
16 A. I don't know.
17 Q. Let me ask you, do you know who
18 conveyed to Ms. Guzman that she was being
19 terminated as an associate editor at the Post?
20 A. Jennifer Jehn.
21 Q. How do you know that Jennifer Jehn
22 conveyed that to her?
23 A. She is the head of HR.
24 Q. Other than the fact that she is
25 the head of HR do you know if Jennifer Jehn

Page 396

Allan

1
2  actually met with Ms. Guzman in connection
3  with the termination?
4  A. That is my recollection.
5  Q. Mr. Allan, I am now showing you
6  Allan Deposition Exhibit 21, which is Bates
7  stamped NYP 3892, I ask you to take a moment
8  to look at that document.
9     (Allan Exhibit 21, Bates stamped
10    NYP 3892, marked for identification,
11    as of this date.)
12 A. Yes.
13 Q. Do you recognize this document
14 sir?
15 A. Yes.
16 Q. What is it?
17 A. An open jobs report.
18 Q. What is an open jobs report?
19 A. Jobs that are vacant at the
20 newspaper.
21 Q. This one is dated October 12,
22 2009; correct?
23 A. Yes.
24 Q. So this is dated weeks after Ms.
25 Guzman was terminated; correct?

Page 397

Allan

1
2  A. Yes.
3  Q. Do you see it states open,
4  Haberman, Z, associate metro editor?
5  A. Yes.
6  Q. So when Ms. Guzman was terminated
7  there was an open associate editor position at
8  the paper; is that correct?
9  A. Correct.
10 Q. Was any discussion Mr. Allan about
11 possibly allowing Ms. Guzman to remain
12 employed at the company after Tempo was
13 closed?
14 A. Yes. I asked three editors if
15 there was a position in their departments or
16 anywhere at the paper that Ms. Guzman might
17 fill at her compensation.
18 Q. Who were those three editors?
19 A. Michelle Gotthelf, Jesse Angelo
20 and Catherine Pushkar.
21 Q. Who is Catherine Pushkar?
22 A. She was a features editor.
23 Q. Did you meet with those three
24 editors together or individually when you
25 inquired as to whether there was another

Page 398

```
1            Allan
2  position for Ms. Guzman?
3         MR. LIPPNER:  Objection.
4     A.   Independent.
5     Q.   Did you take any notes?
6     A.   No.
7     Q.   Where did those meetings take
8  place?
9     A.   I don't recall.
10    Q.   Was anyone else present besides
11 you and each of those editors?
12    A.   No.
13    Q.   What is the metro desk at the
14 Post?
15    A.   Metro desk is the city desk, it is
16 responsible for the reporters who cover the
17 city.
18    Q.   Heart of the paper; correct?
19    A.   Yes.
20    Q.   Why wouldn't Ms. Guzman be allowed
21 to take that open position when Zach Haberman
22 left the paper?
23    A.   Her compensation was $135,000 a
24 year, this job is open at $82,000 a year.
25    Q.   Mr. Allan, I understand that there
```

Page 399

```
1            Allan
2  was a difference between the salary, but why
3  didn't you at least offer it to Ms. Guzman
4  before she was fired?
5     A.   It is my view that an employee who
6  had been forced to take a very large pay cut
7  in the order of $55,000 or $50,000, would not
8  be a happy employee.
9     Q.   Is it your position that that
10 employee would be happier losing $137,000 as
11 opposed to 50,000?
12        MR. LERNER:  Objection.
13    A.   I made that decision in the
14 interest of the newspaper.  I didn't believe
15 it was appropriate or right to offer her a job
16 that would have caused her such a significant
17 pay cut.
18    Q.   Did you think it was more
19 appropriate to fire her, she would have no
20 job?
21    A.   She was hired to produce Tempo,
22 Tempo had ceased to exist.
23    Q.   But she worked on 25 other
24 sections --
25        MR. LIPPNER:  Were you done with
```

Page 400

```
1            Allan
2  your answer?
3         THE WITNESS:  Yes.
4     Q.   She was working on 25 other
5  sections of the paper at the time the Tempo
6  was closed; is that correct?
7         MR. LERNER:  Objection.  That is a
8  fact not in evidence.
9     Q.   Correct?
10    A.   Sorry?
11    Q.   Isn't it a fact that Ms. Guzman
12 was working on 25 other sections of the paper
13 at the time she was terminated?
14        MR. LERNER:  Objection.
15    A.   She was working on other sections.
16    Q.   How many other sections?
17    A.   I don't know.
18    Q.   So she wasn't only working on
19 Tempo; correct?
20    A.   I asked that she be offered work
21 on other sections of the newspaper because
22 Tempo had become so emaciated that it was no
23 longer occupying much of her time.  I mean it
24 was coming out once a month and it was tiny,
25 it was small.
```

Page 401

```
1            Allan
2     Q.   Isn't it true that you never once
3  considered offering Ms. Guzman that open
4  position that became vacant after Zach
5  Haberman left the paper?
6     A.   I considered it and I decided not
7  to do it.
8     Q.   Mr. Allan, could you put the
9  Deposition Exhibit 4 in front of you?
10    A.   Exhibit 4.
11    Q.   It should be there?
12    A.   Sorry.
13    Q.   It is number 5 -- look at this
14 one?
15    A.   Yes.
16    Q.   I want to direct your attention to
17 page 7 of that document?
18        MR. LERNER:  What exhibit number?
19        MR. THOMPSON:  5.
20    Q.   Do you see where it says
21 interrogatory number 8?
22    A.   Yes.
23    Q.   Do you see there is a list of
24 names there and in response to that
25 interrogatory, Bill Hoffman, Zach Haberman,
```