UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                            :

SANDRA GUZMAN,                    :       Civ. No.: 09 CV 9323 (LGS)
                                                :

                           Plaintiff,   :

                                                  :

                    vs.               :

                                                  :

NEWS CORPORATION, NYP HOLDINGS,   :
INC., d/b/a THE NEW YORK POST,       :
and COL ALLAN, in his official and      :
individual capacities,                 :

                                                  :

                          Defendants.   :
---------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS NYP HOLDINGS, INC. AND
## COL ALLAN'S MOTION FOR SUMMARY JUDGMENT

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
Garrett D. Kennedy (gkennedy@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700

Attorneys for Defendants NYP Holdings,
Inc., d/b/a the New York Post, and Col Allan

Table of Contents

Table of Authorities ................................................................................................ 3

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 3

    A.  The Closing of Tempo and Elimination of Plaintiff's Position ..................... 3

    B.  Facts Relating to Guzman's Claim of Retaliation ......................................... 6

    C.  Facts Relating to Guzman's Claim of Harassment
        Based on Race, National Origin and Color .................................................. 8

    D.  Facts Relating to Guzman's Claim of Sexual Harassment ........................... 9

        1.  Allegations Relating to a Conversation at a Bar in April 2007 ............. 9

        2.  Allegations Relating to Les Goodstein ............................................... 10

        3.  Allegations Relating to David Boyle ................................................... 11

        4.  Guzman's Own Conduct Shows She Could
            Not Have Felt Subjective Offense ....................................................... 11

    E.  Guzman's Various, Undisputable Fabrications ........................................... 12

ARGUMENT ...................................................................................................... 13

I.    SUMMARY JUDGMENT STANDARD ....................................................... 13

II.   PLAINTIFF'S CLAIMS OF DISCRIMINATORY
     EMPLOYMENT TERMINATION MUST BE DISMISSED ............................... 14

    A.  Plaintiff Cannot Establish a *Prima Facie*
        Case of Discriminatory Termination ........................................................ 14

    B.  Guzman Cannot Dispute the Post's Legitimate
        Non-Discriminatory Reason for Terminating Her Employment ................ 17

III.  17GUZMAN'S RETALIATION CLAIMS MUST BE DISMISSED ................... 17

IV.  GUZMAN DID NOT SUFFER A HOSTILE WORK
     ENVIRONMENT AT THE POST .................................................................. 20

    A. Guzman Was Not Subject to a Hostile Work
        Environment Based on Her Race, National Origin, or Color .................... 21

B. Guzman Was Not Subject to a Hostile Work
Environment Based on Her Sex ................................................................. 24

V.  GUZMAN'S FAILURE TO TIMELY NOTIFY THE POST
OF ALLEGED MISCONDUCT REQUIRES DISMISSAL
OF HER HARASSMENT CLAIMS ..................................................................... 27

VI. ALLAN IS NOT INDIVIDUALLY LIABLE TO PLAINTIFF ............................................ 29

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Albuja v. Nat'l Broad. Co. Universal, Inc.,
   2012 WL 983566 (S.D.N.Y. Mar. 16, 2012) ...................................................................14

Alfano v. Costello,
   294 F.3d 365 (2d Cir. 2002)....................................................................................20, 21

Beachum v. AWISCO New York,
   785 F. Supp. 2d 84 (S.D.N.Y. 2011),
   aff'd, 459 Fed. Appx. 58 (2d Cir. 2012) ........................................................................18

Bennett v. Health Mgmt. Sys., Inc.,
   92 A.D.3d 29 (1st Dept. 2011).......................................................................................17

Bermudez v. City of New York,
   783 F. Supp. 2d 560 (S.D.N.Y. 2011)............................................................................26

Brennan v. Metro. Opera Assoc., Inc.,
   192 F.3d 310 (2d Cir. 1999)....................................................................................20, 25

Burlington Indus., Inc. v. Ellerth,
   524 U.S. 742 (1998).......................................................................................................28

Campbell v. Cellco Partnership,
   2012 WL 400959 (S.D.N.Y. Feb. 7, 2012)..........................................................21, 23, 27

Campbell v. Cnty. of Onondaga,
   2009 WL 3163498 (N.D.N.Y. Sept. 29, 2009) ...............................................................15

Carter v. New Venture Gear, Inc.,
   310 Fed. Appx. 454 (2d Cir. 2009).................................................................................14

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986).......................................................................................................13

Chandler v. AMR Am. Eagle Airline,
   251 F. Supp. 2d 1173 (E.D.N.Y. 2003) ..........................................................................25

Clarke v. Pacifica Foundation,
   2011 WL 4356085 (E.D.N.Y. Sept. 16, 2011) ................................................................26

Claybrooks v. Am. Broad. Cos., Inc.,
   2012 WL 4890686 (M.D. Tenn. Oct. 15, 2012) ..............................................................15

Cloke-Browne v. Bank of Tokyo-Mitsubishi UFJ, Ltd.,
   2011 WL 666187 (S.D.N.Y. Feb. 9, 2011)................................................................29

Coleman v. Prudential Relocation,
   975 F. Supp. 234 (W.D.N.Y. 1997)........................................................................15

Cristofaro v. Lake Shore Cent. School Dist.,
   2012 WL 1082567 (2d Cir. Apr. 2, 2012) .............................................................26

Danzer v. Norden Sys., Inc.,
   151 F.3d 50 (2d Cir. 1998)....................................................................................14

Davis v. Oyster Bay–East,
   2006 WL 657038 (E.D.N.Y. Mar. 9, 2006),
   aff'd, 220 Fed. Appx. 59 (2d Cir. 2007) ...............................................................20

Durkin v. Verizon N.Y., Inc.,
   678 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................................29, 30

Eichler v. Am. Int'l Group, Inc.,
   2007 WL 963279 (S.D.N.Y. Mar. 30, 2007) .....................................................18, 28

Emmons v. City Univ. of New York,
   715 F. Supp. 2d 394 (E.D.N.Y. 2010) ...............................................................29, 30

Farragher v. Boca Raton,
   524 U.S. 775 (1998).............................................................................................17

Ferraro v. Kellwood Co.,
   440 F.3d 96 (2d Cir. 2006)....................................................................................28

Field v. Tonawanda City Schl. Dist.,
   604 F. Supp. 2d 544 (W.D.N.Y. 2009) ...................................................................20

Fierro v. Saks Fifth Ave.,
   13 F. Supp. 2d 481 (S.D.N.Y. 1998)......................................................................23

Foxworth v. Am. Bible Soc.,
   2005 WL 1837504 (S.D.N.Y. July 28, 2005),
   aff'd, 180 Fed. Appx. 294 (2d Cir. 2006) ..............................................................19

Fullwood v. Assoc. for the Help of Retarded Children, Inc.,
   2010 WL 3910429 (S.D.N.Y. Sept. 28, 2010).......................................................23

Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,
   136 F.3d 276 (2d Cir. 1998)..................................................................................24

Garrett v. Garden City Hotel, Inc.,
    2007 WL 1174891 (E.D.N.Y. April 19, 2007) ....................................................................18

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000)................................................................................................14

Green v. Harris Pubs., Inc.,
    331 F. Supp. 2d 180 (S.D.N.Y. 2004)...............................................................................16

Hamilton v. Bally of Switz.,
    2005 WL 1162450 (S.D.N.Y. May 17, 2005) ..............................................................25, 26

Harris v. Forklift Sys., Inc.,
    510 U.S. 17 (1993)........................................................................................................20, 26

HealthCare Exch., Inc. v. Global Healthcare Exch., LLC,
    470 F. Supp. 2d 345 (S.D.N.Y. 2007)...............................................................................29

Hill v. Rayboy–Brauestein,
    467 F. Supp. 2d 336 (S.D.N.Y. 2006)...............................................................................21

Hollander v. Amer. Cyanamid Co.,
    895 F.2d 80 (2d Cir. 1990)................................................................................................18

Howe v. Town of Hempstead,
    2006 WL 3095819 (E.D.N.Y. Oct. 30, 2006).....................................................................15

Hussein v. Hotel Employees & Rest. Union, Local 6,
    2002 WL 10441 (S.D.N.Y. Jan. 3, 2002),
    aff'd, 50 Fed. Appx. 473 (2d Cir. 2002) ............................................................................18

Hustler Mag. v. Falwell,
    485 U.S. 46 (1988)............................................................................................................16

Idrees v. City of N.Y.,
    2009 WL 142107 (S.D.N.Y. Jan. 21, 2009) ......................................................................21

Jackson v. Citiwide Corp. Transp., Inc.,
    2004 WL 307243 (S.D.N.Y. Feb. 17, 2004)...................................................................24, 25

Jackson v. City of New York,
    2013 WL 541510 (S.D.N.Y. Feb. 14, 2013)......................................................................22

Kelly v. Howard I. Shapiro & Assocs. Consulting Eng., P.C.,
    2012 WL 3241402 (E.D.N.Y. Aug. 2, 2012)......................................................................20

Kemp v. A & J Produce Corp.,
    164 Fed. Appx. 12 (2d Cir. 2005)......................................................................................22

v

Kemp v. A & J Produce Corp.,
     2005 WL 5421296 (E.D.N.Y. June 7, 2005),
     aff'd, 164 Fed. Appx. 12 (2d Cir. 2005) .................................................................25

Komoroski v. Dept. of Consumer Prot., Conn.,
     2007 WL 1238618 (D. Conn. Apr. 25, 2007),
     aff'd, 300 Fed. Appx. 59 (2d Cir. 2008) ..................................................................25

Krause v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
     2011 WL 1453791 (S.D.N.Y. Apr. 13, 2011) ..........................................................25

Kulak v. City of New York,
     88 F.3d 63 (2d Cir. 1996) ........................................................................................14

Lenhoff v. Getty,
     2000 WL 977900 (S.D.N.Y. July 17, 2000) ............................................................15

Li v. Educ. Broadcasting Corp.,
     2011 WL 3204689 (Sup. Ct. July 5, 2011) ..............................................................27

Lore v. City of Syracuse,
     670 F.3d 127 (2d Cir. 2012) ....................................................................................29

Lugo v. City of New York,
     2012 WL 3202969 (E.D.N.Y. Aug. 3, 2012) ..........................................................14

Mack v. Otis Elevator Co.,
     326 F.3d 116 (2d Cir. 2003) ....................................................................................27

Martinez v. Conn. State Library,
     817 F. Supp. 2d 28 (D. Conn. 2011) .......................................................................23

McBain v. Smiley Bros. Inc.,
     2013 WL 621932 (N.D.N.Y. Feb. 19, 2013) ..........................................................20

Meiri v. Dacon,
     759 F.2d 989 (2d Cir.), cert. den., 474 U.S. 829 (1985) .........................................13

Miami Herald Pub. Co. v. Tornillo,
     418 U.S. 241 (1974).................................................................................................16

Murray v. Visiting Nurse Servs. of N.Y.,
     528 F. Supp. 2d 257 (S.D.N.Y. 2007).....................................................................18

Nawrocki v. Daeman College,
     1997 WL 211338 (W.D.N.Y. Apr. 25, 1997) .........................................................15

Near v. Minnesota ex rel. Olson,
    283 U.S. 697 (1931)................................................................................16

Negron v. Rexam Inc.,
    104 Fed. Appx. 768 (2d Cir. 2004)..........................................................23

Nidzon v. Konica Minolta Busi. Solutions, USA, Inc.,
    752 F. Supp. 2d 336 (S.D.N.Y. 2010).......................................................15

Nieves v. Dist. Council 37 (DC 37), AFSCME, AFL-CIO,
    2009 WL 4281454 (S.D.N.Y. Nov. 24, 2009),
    aff'd, 420 Fed. Appx. 118 (2d Cir. 2011) ................................................26

O'Dell v. Trans World Entertainment Corp.,
    153 F. Supp. 2d 378 (S.D.N.Y. 2001),
    aff'd, 40 Fed. Appx. 628 (2d Cir. 2002) ..................................................28

O'Neal v. State Univ. of N.Y.,
    2006 WL 3246935 (E.D.N.Y. Nov. 8, 2006)...........................................25

Owens v. N.Y.C. Dept. of Sanitation,
    2013 WL 150245 (S.D.N.Y. Jan. 15, 2013) .............................................19

Patterson v. Cnty. of Oneida,
    375 F.3d 206 (2d Cir. 2004)....................................................................29

Petrosino v. Bell Atl.,
    385 F.3d 210 (2d Cir. 2004)..............................................................27, 29

Phillip v. City of New York,
    2012 WL 1356604 (E.D.N.Y. Apr. 19, 2012) .........................................21

Ponticelli v. Zurich Am. Ins. Group,
    16 F. Supp. 2d 414 (S.D.N.Y. 1998)........................................................18

Powell v. Nat'l Bd. of Med. Exam'rs,
    364 F.3d 79 (2d Cir.2004).......................................................................13

Quinn v. Green Tree Credit Corp.,
    159 F.3d 759 (2d Cir. 1998)....................................................................26

R.A.V. v. City of St. Paul,
    505 U.S. 377 (1992)................................................................................15

Redd v. N.Y.S. Div. of Parole,
    678 F.3d 166 (2d Cir. 2012)....................................................................22

Reeves v. Sanderson Plumbing Prods., Inc.,
  530 U.S. 133 (2000)........................................................................................17

Rios v. Buffalo and Fort Eric Pub. Bridge Auth.,
  2008 WL 657121 (W.D.N.Y. Mar. 7, 2008),
  aff'd, 326 Fed. Appx. 612 (2d Cir. 2009)................................................22, 23

Rivera v. Rochester Genesee Regional Transp. Auth.,
  761 F. Supp. 2d 54 (W.D.N.Y. 2011)..............................................................23

Rodriguez v. Hudson Square Pharma., LLC,
  2012 WL 3195554 (S.D.N.Y. Aug. 2, 2012)....................................................26

Rodriguez v. Maricopa County Comm. Coll.,
  605 F.3d 703 (9th Cir. 2010) ...........................................................................16

Romano v. Stora Enso Corp.,
  2010 WL 986535 (E.D.N.Y. Feb. 12, 2010)....................................................24

Romero v. City of New York,
  839 F. Supp. 2d 588 (E.D.N.Y. 2012) .............................................................29

Rosario v. New York Times Co.,
  84 F.R.D. 626 (S.D.N.Y. 1979) ......................................................................15

Rozenfeld v. Dept. of Design and Const. of the City of N.Y.,
  2012 WL 2872157 (E.D.N.Y. July 12, 2012)..................................................20

Sardina v. UPS, Inc.,
  254 Fed. Appx. 108 (2d Cir. 2007)..................................................................26

Snyder v. Phelps,
  131 S.Ct. 1207 (2011)......................................................................................16

Stanley v. The Lawson Co.,
  993 F. Supp. 1084 (N.D. Oh. 1997).................................................................15

Stembridge v. City of New York,
  88 F. Supp. 2d 276 (S.D.N.Y. 2000)...............................................................23

Sundaram v. Brookhaven Nat'l Labs.,
  424 F. Supp. 2d 545 (E.D.N.Y. 2006) .............................................................19

Taneus v. Brookhaven Mem. Hosp. Med. Ctr.,
  99 F. Supp. 2d 262 (E.D.N.Y. 2000) ...............................................................19

Turner v. N.Y.U. Hosps. Ctr.,
  470 Fed. Appx. 20 (2d Cir. 2012)....................................................................17

Vazquez-Bonilla v. United Union of Roofers Local 8,
    2010 WL 1005905 (E.D.N.Y. Mar. 17, 2010) ....................................................15

Williams v. City of New York,
    2012 WL 2524726 (S.D.N.Y. June 26, 2012) ....................................................27

Wimmer v. Suffolk County Police Dep't,
    176 F.3d 125 (2d Cir. 1999)................................................................................19

Woodard v. TWC Media Solutions, Inc.,
    2011 WL 70386 (S.D.N.Y. Jan. 4, 2011) ..........................................................27

Woods v. Enlarged City Schl. Dist. of Newburgh,
    473 F. Supp. 2d 498 (S.D.N.Y. 2007),
    aff'd, 288 Fed. Appx. 757 (2d Cir. 2008) ...........................................................18

Wright v. Stern,
    450 F. Supp. 2d 335 (S.D.N.Y. 2006).................................................................18

Zambrano–Lamhaouhi v. N.Y. City Bd. of Educ.,
    2011 WL 5856409 (E.D.N.Y. Nov. 21, 2011)...............................................21, 23

## STATUTES, REGULATIONS AND RULES

42 U.S.C. § 1981 ......................................................................................... *passim*

42 U.S.C. § 2000e ........................................................................................ *passim*

FED. R. CIV. P. 56(c)(2) ....................................................................................13

N.Y.C. Admin. Code § 8-107 ....................................................................... *passim*

N.Y. EXEC. § 296 .......................................................................................... *passim*

U.S. CONST. amend. 1....................................................................................15, 16

Defendants NYP Holdings, Inc., d/b/a the New York Post (the "Post"), and Col Allan

(collectively, the "Defendants") submit this memorandum of law in support of their motion for

summary judgment dismissing the Amended Complaint ("AC") of plaintiff Sandra Guzman as a

matter of law.[1]

## PRELIMINARY STATEMENT

In September 2009, the Post stopped publishing what had become an unprofitable

monthly section called *Tempo*.  As a result, the Post terminated the employment of *Tempo's* only

remaining dedicated employee, editor Sandra Guzman.  Although it had once run at 30 to 40

pages per month with a staff of six, by 2009 *Tempo's* size had dwindled to less than five pages

and was operating at a loss, with no hope of a turnaround.  In fact, before it closed, *Tempo* was

so diminished that Guzman, employed to create and helm *Tempo* and who was earning a salary

of just under $138,000 per year, was directed to fill her substantial unused time by sharing a

nominal portion of the work of a more junior, $81,000 per year, editor.  When *Tempo* closed,

Guzman's position was automatically eliminated, and her employment was terminated because

there were no open editor positions at her salary level to place her in. The only open editor

position would have required a more than $55,000 pay cut, something the Post deemed

unworkable. Thus, Guzman was laid off and her non-*Tempo* work was *returned* to the lower-paid

colleague, who easily resumed her former responsibilities.  That is all that happened.

Guzman, who identifies herself as Puerto Rican, Hispanic and black, brings the present

lawsuit claiming discrimination, retaliation and harassment under 42 U.S.C. § 2000e ("Title

---

[1] Submitted herewith in support of the motion are the affidavits of Michael Racano, dated May 8, 2013 ("Racano Aff."), Carole Sovocool, dated May 6, 2013 ("Sovo. Aff."), and Michael Riedel, dated May 7, 2013 ("Riedel Aff."), as well as the declaration of Mark W. Lerner, dated May 10, 2013 ("Lern. Dec."), to which all other exhibits referenced herein, unless otherwise specified, are attached.

VII"), 42 U.S.C. § 1981 ("Section 1981"), N.Y. EXEC. § 296 (the "NYSHRL"), and N.Y.C. Admin. Code § 8-107 (the "NYCHRL").  But the evidence is clear that Guzman was let go only because her section was closed and position eliminated, not for any unlawful reason.

Guzman bases her hostile work environment claims on scant evidence and much hyperbole, and they fail upon examination of admissible evidence.  Her race, national origin and color claims rely on three isolated and trivial episodes over her six years of employment:  she was *once* greeted as "Cha Cha"; she was *once* asked if candles in her office related to "Santeria" or "Voodoo"; and the Post's Broadway columnist, with whom she admits to being "friendly," sang "I Want To Live In America" in a Spanish accent, as it was performed in the Broadway musical *West Side Story* on no more than three occasions.  Guzman also invokes a political cartoon published in the Post that she regards as offensive, but this is plainly First Amendment-protected speech, not an employment action or practice, and incapable of supporting her claims.

Guzman's sexually hostile work environment claim likewise relies on "petty slights and trivial inconveniences" and is legally deficient.  Her allegations to this end concern *one* barroom discussion in which she heard a sexual anecdote and saw an unredacted news photograph of a naked man that was being published in the Post; a series of objectively inoffensive compliments she received from a non-Post employee; and a photography editor's purported reference to some women who reported to him as a "harem."

Finally, because Guzman made no timely use of the Post's complaint procedure, and was not subjected to a hostile work environment by a supervisor, no liability can be imputed to the Post.  Nor can liability be assigned to defendant Col Allan, whose alleged conduct was so minor and inoffensive that he played no role in any purported hostile environment.  Accordingly, as set forth more fully below, summary judgment should be granted and this action dismissed.

## STATEMENT OF FACTS

The facts supporting this motion are set forth in Defendants' Rule 56.1 Statement of Undisputed Facts, submitted in support of Defendants' motion for summary judgment, as well as the Affidavits and other evidence submitted in support of Defendants' motion for summary judgment.  (See fn. 1, supra.)  Those facts may be summarized as follows.

### A.     The Closing of Tempo and Elimination of Plaintiff's Position

In July 2003, the Post hired Guzman to create and edit what became *Tempo,* a monthly newspaper section relating to Hispanic culture which first published in October 2003.  (Lern. Dec., Exh. 1; Racano Aff. at ¶ 9.)  Tempo was initially successful:  in 2003 and 2004, it ran at 28 to 40 pages in length, and its staff grew from one to six dedicated employees.  (See Racano Aff. at  ¶ 10, 12.)

However, in 2005 and well into 2006, advertising sales began to fall.  *Tempo* was unprofitable, and issue-length – determined by advertising sold – decreased in kind, falling to an average of just 24 pages per issue in 2005.  (Id. at ¶10.)  As a result, in April 2006, the Post's Executive Committee decided to close *Tempo* and terminate all of its staff, including Guzman (id., Exh. 2 at NYP-459-61).  At the last minute, the Post gave *Tempo* one more chance, imposing cost-cutting measures (reducing its full-time staff from six to two, retaining only Guzman and the sales manager, Sami Haiman-Marrero) while striving for a higher advertising to editorial content ratio to make it profitable.  (See id. at NYP-443-44; Racano Aff. at ¶¶ 11-12.)

In 2007, poor advertising sales drove *Tempo's* size down again, to about 16 pages per issue.  (Racano Aff. at ¶10, 13.)  With only a fraction of these pages editorial content, Guzman was editing only a few pages per month.  As a result, a limited number of special sections – periodic topical newspaper inserts – were temporarily reassigned to Guzman from Carole

3

Sovocool, the Post's Special Sections editor who previously edited of all of them, to give Guzman work to justify her high salary.  (Robin. at 282; Racano Aff., Exh. 3; Sovo. Aff. at ¶¶ 4-6.)[2]

In 2008, *Tempo's* average revenue, profit and page length decreased again.  (Racano Aff. at ¶ 10, 13.)  In February and April 2008, *Tempo* ran at only 8-page sections, "tiny one[s]" in Guzman's mind.  (Lern. Dec., Exh. 4; see also id., Exh. 3 [Guzman noting January section down to 10 pages].)  And in May 2008, she expressed frustration that Haiman-Marrero struggled to sell advertising for the June issue:  "I'm looking at last year's issue . . .  And you were able to get so many gorgeous ads."  (Id., Exh. 5.)  Paul Armstrong, a Post executive, responded by noting the overall economic downturn was affecting the Post generally:

> I understand your disappointment . . . .  The economy is tanking
> and we are down against last year in all sectors.

(Id.)  The following month, Guzman again lamented the dwindling sales and poor economy, especially as they related to *Tempo's* advertising sales:

> I'm sorry Sami.  I feel your pain.  But the economy really is in the
> dumps – and you know when the general market sneezes, the
> ethnic market gets the flu.[3]

(Id., Exh. 6 [discussing the decreased size of the September 2008 issue].)

In 2009, *Tempo's* advertising sales collapsed further:  while in 2007, *Tempo* had generated average revenue per issue of $77,638.25, with an average profit of $28,206.67, by 2009 these numbers dwindled to average revenue of $20,479.67 – a decline of 74% – and a monthly *loss* of $3,766.33.  (Id. at ¶¶ 10, 13.)  On January 19, 2009, Allan directed Managing

---

[2] True and correct copies of referenced excerpts of the deposition of Joseph Robinowitz, dated June 14, 2012 ("Robin. at [page]"), are attached to the Lern. Dec. as Exhibit 2.
[3] Similarly, in October 2007, Guzman wrote Haiman-Marrero an e-mail asking if she was attending a symposium called, "Is Hispanic Advertising Dead?"  Haiman-Marrero replied, "Nope.  It's a waste of time and money. Hispanic agencies are on the brink of extinction."  (Lern. Dec., Exh. 7.)

Editor Joseph Robinowitz to "closely examine all costs associated with [*Tempo*] *and other sections* . . . with a view to eradicating all but the most essential costs as we continue to battle this miserable economic climate."  (Lern. Dec., Exh. 8 [emphasis added].)

In 2009, *Tempo* averaged less than 5 pages, and the July through September issues were a paltry 3, 2, and 5 pages in length, respectively.  (Racano Aff., Exh. 1 at NYP -420.)  By mid-September, not a single advertisement was committed for the October *Tempo*, even though advertising is often sold far in advance of publication, and it was not attracting future advertisers. (Id. at ¶ 14.)

On September 8, 2009, it was clear that the "September issue . . . will also not make a profit" (id. at NYP-4619-20).  Whereas in prior years, *Tempo* had much higher revenue *and* cost-cutting opportunities (such as reducing the number of dedicated employees working on the section), by September 2009 *Tempo* was down to only a single employee (Guzman), costs had already been cut by the Editors, and revenues were down almost 75% from 2007.  (Racano Aff. at ¶ 12-14.)  Under those circumstances, the Post saw no way to make the monthly *Tempo* section profitable, closed it as a monthly, and eliminated the $137,807 per year editor position. (Racano Aff. ¶¶, 4, 14; Jehn at 234; see Racano Aff., Exh. 4).[4]  The October issue sold no advertising and was not published (Racano Aff. at ¶ 14; Lern. Dec., Exh. 10), and *Tempo* was never published again (Scial. at 375-76).[5]

Following the elimination of the *Tempo* editor position, those sections that had been temporarily reassigned from Sovocool to Guzman were returned to Sovocool, who easily

---

[4] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn, dated June 26, 2012 and February 14, 2013 ("Jehn at [page]"), are attached to the Lern. Dec. as Exhibit 9.
[5] True and correct copies of referenced excerpts of the deposition of Amy Scialdone, dated June 28, 2012 and April 16, 2013 ("Scial. at [page]"), are attached to the Lern. Dec. as Exhibit 11.

reabsorbed them into her workload while earning $80,850.[6]   (Robin. at 91-92; Sovo. Aff. at ¶ 8;

see Racano Aff., Exh. 3.)  Col Allan then "asked three editors if there was a position . . .

anywhere at the paper that Ms. Guzman might fill at her compensation," which there was not.

(Allan at 397.)[7]  He did not offer her the sole open editor position, as Associate Metro Editor,

which would have required a 41% pay cut to edit hard news (Racano Aff., Exh. 5), because:

> Her compensation was $135,000 [*sic*] a year, this job is open at
> $82,000 a year. . . .  It is my view that an employee who had been
> forced to take a very large pay cut in the order of $55,000 or
> $50,000 would not be a happy employee. . . .  I made that decision
> in the interest of the newspaper.  I didn't believe it was appropriate
> or right to offer her a job that would have caused her such a
> significant pay cut.

(Allan at 398-99.)  On September 29, 2009, Guzman's employment was terminated due to the

closure of *Tempo* and the lack of an appropriate available position.  (Scial. at 287.)

**B.**     **Facts Relating to Guzman's Claim of Retaliation**

On February 18, 2009, the Post published a political cartoon critical of the 2009

economic stimulus bill (the "Stimulus Cartoon").  (AC, Exh. A; Lern. Dec., Exh. 14.)  Guzman

believed that a chimpanzee depicted in the cartoon, which ran two days after police famously

shot and killed a pet chimpanzee that had attacked a woman in Connecticut, was intended to

depict President Obama and was racist.  (AC, ¶ 68.)  Allan, the Post's Australian Editor-in-

Chief who selected the cartoon for publication, believed the chimpanzee symbolized the

Congressional authors of the stimulus bill, as the cartoon made explicit reference to the *writers*

of the bill.  (Allan at 44, 350-51.)

---

[6] The non-*Tempo* special sections assigned to Guzman from 2007 to 2009 were never onerous, and many required little to no editing.  (Sovo. Aff. at ¶ 5.)  Some of these sections edited have since been closed.  (Sovo. Aff. at ¶ 9.)
[7] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Lern. Dec. as Exhibit 12.

On the day of the cartoon's publication, Jennifer Jehn, the Post's Senior V.P. of Human Resources, visited Guzman in her office after becoming aware that Guzman was upset by the cartoon.  (Jehn at 187.)  Guzman told Jehn that she thought the cartoon was racist.  (Id. at 191-99.)  She also claims that she told Jehn that the Post discriminated against its employees (which Jehn disputes but is assumed true for this motion).  (Guz. at 151-53, 188.)[8]  Guzman then e-mailed persons outside of the Post to disassociate herself from the cartoon.  (AC at ¶ 87.)

Without evidentiary support, Guzman alleges retaliation based on (i) her employment termination *seven months* later and (ii) and her admittedly baseless claim that her *Tempo*-related expenses were more closely scrutinized.  She claims that denial of requests to cover two separate events relating to the investiture of Justice Sonia Sotomayor was retaliatory, but they were denied because she had a close personal friendship with Justice Sotomayor that created a "conflict" (Allan at 394; see also Guz. at 572 ["I love Sonia Sotomayor.  Q:  So you are biased in her favor, correct?  A:  I love her, yes."]), and the Post's Washington bureau could cover the event without incurring travel costs (Lern. Dec., Exh. 16).  Finally, her 2009 performance score, "Meets Standards," was not higher because she had engaged in serious misconduct in January 2009 that earned her a written warning and almost resulted in her firing, not because of retaliation.[9]  None of these matters affected the terms and conditions of her employment, including her salary, which was subject to a freeze.  (See Racano Aff., Exh. 2 at NYP-4434-36.)

---

[8] True and correct copies of referenced excerpts of the deposition of Sandra Guzman, dated October 13, 2011 and February 13, 2012 ("Guz. at [page]"), are attached to the Lern. Dec. as Exhibit 15. True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 15, 2012 ("Good. at [page]"), are attached to the Lern. Dec. as Exhibit 21.

[9] In January 2009, *a month prior to the Stimulus Cartoon's publication*, Guzman was disciplined for using a Post vendor to obtain personal benefits, in breach of Post policy.  (Lern. Dec., Exh. 17 at NYP-528.)  Without the Post's knowledge, Guzman solicited a vendor to style her free of charge for a personal event relating to the presidential inauguration, who in turn, and with her knowledge, solicited free goods and clothing from designers on her behalf using Guzman's and the Post's names.  (Id. at NYP-247-48.)  Guzman received a disciplinary warning for using the vendor to provide her with free services, and her misconduct being compounded by the vendor's demanding goods from designers in the Post's name.  (Id. at NYP-528.)  At the time, she admitted using the Post vendor but denied

C.      **Facts Relating to Guzman's Claim of Harassment**
        **Based on Race, National Origin and Color**

In 2007 Les Goodstein, an employee of News America Incorporated ("NAI") (Good. at

14) and someone who helped sell advertising for *Tempo*, once greeted Guzman as "Cha Cha."

(Guz. at 189.)  She immediately objected, and admitted it never happened again.  (Guz. at 189-

90, 401-02.)   On one undated occasion, Anne Aquilina, the Post's administrative editor, once

allegedly asked Guzman if candles in her office related to "Santeria" or "Voodoo."  (Guz. at

227.)  Santeria is "one of [Guzman's religious practices]."  (Id. at 225-26.)  She also claims

Michael Riedel, the Post's Broadway columnist with whom she was "friendly" for years (Guz. at

422), sang a song from *West Side Story* in a Spanish accent – the way it was performed on

Broadway – when he walked past or into her office.  (Guz. at 210.)  She never objected,

considered them to be "friendly", was never offended by him on any other occasion (they sat

close to one another for years), and could not testify as to how many times it happened (Guz. at

209-10, 214-15, 219-20, 433-34, 529-30).   Guzman was not deterred from reaching out to Riedel

on numerous occasions to discuss *West Side Story*.[10]   Riedel sang the song in the office on no

more than three occasions, and did not do so because of any of Guzman's protected classes, but

---

knowing he sought free merchandise.  (Lern. Dec., Exh. 8.)  In discovery, it was learned that Guzman had lied:  she had solicited his services and provided him with a written "letter of authorization" to solicit merchandise in the Post's name.  (See, e.g., Lern. Dec., Exh. 17 at NYP-1585.)

[10] Guzman's e-mails with Riedel evidence their "friendly" relationship during the period when *West Side Story* was revived.  On July 22, 2008, she wrote to Riedel, "When are you back in the office? . . . [H]aven't seen you in weeks. wanna [*sic*] talk to you about west side story [*sic*].  don't [*sic*] forget me . . . ."  (Riedel Aff., Exh. 1 at NYP-4413.) On September 15, 2008 she wrote to again, "Is it fair to say that you've completely forgotten about me?  wanted [*sic*] to touch base with you about those two classics."  (Id. at NYP-4421-22.)  Later in the same e-mail chain, she wrote, who was in Greece:  "If you are trying to make me jealous, mission accomplished.  Wine, ruins, fresh olive oil, sun . . .  damn you Michael.  I want to be you right about now, except of course, I'd love a hot Greek man."  (Id. at NYP 4421.)  In October 2008, Guzman asked him to gain "touch base" with her, and to put one of her friends in contact with the casting director for *West Side Story*.  (Id. at NYP-1781.)  On December 28, 2008, Guzman highlighted her appreciation of Riedel by declaring that a television recap of Broadway in 2008 "sucks" because Riedel was not on it, and then stating, "While I can't be your agent, I can be your cheerleader!  I know a high ranking dude at NY 1 and I will talk you up.  You'd be awesome on TV."  (Id. at NYP-4412.)  On March 6, 2009, two days after Guzman published a story on the revival including an interview of Chita Rivera, the star of the original *West Side Story* (NYP-3683), she sent Riedel an e-mail stating, "You crack me up!"  (Id. at NYP-4397.)  On June 2, 2009, she asked him about the play *God of Carnage*:  "Did you like this?  I wanna see it."  (Id. at NYP-4415.)  And of course Guzman made sure to wish Riedel a happy birthday.  (Id. at NYP-4414.)

because of their mutual appreciation of the musical, which Guzman described as a "classic."
(Riedel Aff. at ¶¶ 7-11, Exh. 1 at NYP-4422.)

**D.**     **Facts Relating to Guzman's Claim of Sexual Harassment**

Guzman's sexual harassment claim is based on her allegations that (i) once at a bar, she was shown a news photo of a naked man on a BlackBerry and was told an anecdote of a mild sexual nature, (ii) she was for a time complimented by Goodstein, an employee of another company, and (iii) the Post's Photograph Editor described on at least four occasions (during her more than six years of employment) his staff as his "harem" when speaking to Guzman.

     1.     Allegations Relating to a Conversation at a Bar in
            April 2007

In April 2007, Guzman was drinking with four female work friends at Langan's, a bar near the Post's offices, gossiping about (in Guzman's words) "who fucked who."  (Guz. at 148, 466-67; Lern. Dec., Exh. 19.)  According to Guzman, Allan joined the conversation and shared an anecdote that a famous Post columnist, Steve Dunleavy, purportedly had sex with a fan in a closet at that bar.  (Guz. at 137, 469; Allan at 237.)  Guzman later wrote that her companions laughed and she responded "eww," not from offense, but because "[t]he thought of anyone fucking a near dead drunk skeleton [Dunleavy] was not funny.  I [Guzman] fuck for pleasure."  (Guz. at 471-72; Lern. Dec., Exh. 19.)  Allan testified that he did not think the story would offend, and no one expressed any offense at the story.  (Allan at 241; Guz. at 472-74.)

That same night Allan received a photograph via e-mail to his BlackBerry from the Post's Photo Desk and showed it to the journalists with whom he was socializing.  (Guz. at 474-75.)  The image, which was being offered for sale to the Post, was evidence in the child custody case of former New Jersey Governor Jim McGreevy because it hung in his bedroom, was visible to his child, and depicted a naked man on a beach.  (See Lern. Dec., Exh. 20.)  Allan approved the

purchase of the photograph that night and it was published in the Post, genitals redacted.  (Guz. at 138-39; Allan at 201-05.)  Guzman's account reflects that she looked at the image and told Allan jocularly, "How Chelsea of you."  (Lern. Dec., Exh. 19; Guz. at 477.)  She expressed no offense and later wrote that showing such a photograph was a "normal thing to do" in her neighborhood.  (Guz. at 138, 142-43, 477; Lern. Dec., Exh. 19; Allan at 209-10.)  Allan showed the item because the journalists asked to see it, because it was of professional interest, and because he did not think any professional journalist would be offended by it.  (Allan at 201-11, 216.)

       2.    <u>Allegations Relating to Les Goodstein</u>

Guzman dubiously claims that Goodstein excessively complimented her and/or her clothing.  When *Tempo* was being closed in 2006, Goodstein, who had no prior involvement with *Tempo*, lobbied the Post's Publisher to stay its execution and allow him a chance to use his sales expertise and contacts in the Hispanic community to boost advertising sales.  (Good. at 90-92; Guz. at 110, 118; Racano Aff. at ¶ 11.)  He was never Guzman's supervisor (Guz. at 408-09), and his office was on a different floor, and later in a different building, from the Post's offices (Good. at 75; Guz. at 388-90).  Goodstein worked on Tempo only from mid-2006 through the latter part of 2007 (Good. at 103, 118), and there is no evidence of the two meeting thereafter.

With few specifics, Guzman claims that when she saw Goodstein (either before a meeting or passing in a corridor), roughly monthly though possibly more frequently, he complimented her by telling her that she and/or her clothing looked "sexy" and/or "beautiful."  (Guz. at 192, 205-06.)  She recalled only two examples at deposition, namely Goodstein saying, "[Y]ou are looking beautiful and sexy in that dress," said in an elevator bank (<u>id.</u> at 395), and a reference to her shoes being "sexy," to which she responded jokingly, "[I]f you want to borrow my shoes, you can."  (<u>Id.</u> at 191-92, 398-99.)  She admits these comments were never accompanied by any

lewd remark, proposition, touching, or closeness, although she claims she felt he "leered."[11]  (Id. at 189, 398, 413-15.)  And she admits her work "did not suffer for [the compliments]" (id. at 416-18), and she never told Goodstein that she was offended or asked him to stop (id. at 192).[12]

> 3.      Allegations Relating to David Boyle

During her second day of deposition, and for the first time in this litigation, then ongoing for more than two years, Guzman obliquely alleged that Photo Editor David Boyle referred to his staff as his "harem," though she could provide no timeframe, frequency, or even a specific instance of this conduct.  (Id. at 486.)  She admits that Boyle "didn't personally sexually harass me" (id. at 485) and did not threaten her (id. at 494), and describes his conduct as merely "unprofessional" (id. at 494).  Boyle did not supervise Guzman (id. at 494), she never asked him to stop (id. at 491), and there is no evidence she complained to anyone of this conduct.

> 4.      Guzman's Own Conduct Shows She Could Not
>         Have Felt Subjective Offense

Guzman's claimed "harassment" pales in comparison to the undisputed evidence of her own sexual workplace behavior, including: ████████████████████████████

---

[11] Guzman could not describe this look, stating, "As a woman you know it when you see it."  (Guz. at 394.)

[12] Guzman's failure to complain to Goodstein about his compliments flies in the face of her own "code" of behavior, published in 2002 and republished in 2010, in her work, *The Latina's Bible*:

> You set the tone of how people will treat you, including your *jefa* [boss] and colleagues. . . . 'You have the right to be treated with dignity and respect.'  Nip a disrespectful colleague's (or boss's) attitude in the bud by standing up the first time it happens. . . .  Know your legal rights, treat people with respect, and demand it in return whenever anyone crosses the line.

(Lern. Dec., Exh. 22, at 265; 293).  She explained that she lives by this code:

> I stand up to authority when I need to, with my eyes firmly planted on those I challenge.  I refuse to look away in shame or fear. . . .  I have learned to challenge those in positions of power over me (first teachers, then college professors, and finally bosses) when I am not treated fairly.

(Id. at 4; 5-6.)  In living by this code, after Goodstein once called her "Cha Cha," she immediately told him, "Don't call me that," and he never did so again.  (Guz. at 189-90, 401.)  In 2009, she wasted no time in telling Jehn she thought the Post published a racist cartoon.  (Id. at 331.)  Given her willingness to voice objections, her failure to ever object to Goodstein's compliments belies that she took any offense.

████████████████████████████; lifting her shirt in a "best nipples" competition with coworkers at a bar (id. at 282-86); "flirting" with at least one co-worker at a work function by making sexual comments (id. at 325); making joking "aspersions about [the] sexuality" of a co-worker (Lern. Dec., Exh. 24 at NYP-1379; Guz. at 319-21); initiating communications with male and female co-workers about sexually explicit matters, including sex toys, erotic fiction, and seeking solace with a well-endowed male stripper (see, e.g., Lern. Dec., Exh. 24 at NYP-3954, -3933, -3903; Guz. at 287-88); referring to male colleagues as "guapo" (handsome), "lindo" (pretty), "baby," and "babe" (see, e.g., Lern. Dec., Exh. 24 at NYP-1638, -2352, -3941, -3950); discussing the physical attractiveness of others with colleagues (id. at NYP-1634, -3944, -3945, -3951); referring to other women as "puta" and "bitch" (id. at NYP-3949, -3944); and calling the body-parts of celebrities "sexy" in the workplace (see, e.g., id. at NYP-3945).

**E.    Guzman's Various, Undisputable Fabrications**

The remainder of Guzman's Complaint is nothing but demonstrably false.  For instance, she alleges that Allan "rubbed his penis against" a female employee (AC ¶37), but admits she has no personal knowledge of this (Guz. at 171) and the alleged victim and Allan *testified it never happened*.  (Faux at 34-38; Allan at 504.)  She alleges that the Post employed only one non-white editor at the time of her termination (AC ¶ 57), but it is undisputed that this is grossly untrue, that there were at least 16 non-white editors at the time of her employment termination. (Lern. Dec., Exh. 18, at No. 9).  She claims *Tempo* increased the Post's Hispanic readership by 40% (AC ¶ 29), but admits this to be untrue (Guz. at 504-08).  Guzman alleges that the Post had a "policy . . . of only hiring White women" to be models for photography shoots (AC ¶ 55) but there is no evidence of this, and Guzman herself modeled for the Post.  (Lern. Dec., Exh. 32 [depicting Guzman and other non-white models].)  And she claimed Angelo, a senior editor, engaged in improper relationships (AC ¶46), but she has no knowledge of this (Guz. at 243) and

the record evidence proves this untrue (Angelo at 81, 381).[13]   These are but some of the

unfortunate, blatant fabrications populating Guzman's Complaint.

## ARGUMENT

## I.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).

Summary judgment is "properly regarded . . . as an integral part of the Federal Rules as a whole,

which are designed to secure the just, speedy and inexpensive determination of every action."

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  The purposes of summary judgment "apply

no less to discrimination cases than to commercial or other areas of litigation."  Meiri v. Dacon,

759 F.2d 989, 998 (2d Cir.), cert. den., 474 U.S. 829 (1985).

Summary judgment is proper where a party fails to produce evidence "sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  A non-moving party "must

demonstrate more than some metaphysical doubt as to the material facts, and come forward with

specific facts showing that there is a genuine issue for trial."  Powell v. Nat'l Bd. of Med.

Exam'rs, 364 F.3d 79, 84 (2d Cir.2004) (quotation marks omitted).  That evidence must be more

than a "mere scintilla in support of nonmovant's position," and must be sufficient that "a jury

could reasonably find for the nonmovant."  Powell, 364 F.3d at 84 (quoting Anderson v. Liberty

---

[13] True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 ("Angelo at [page]"), are attached to the Lern. Dec. as Exhibit 13.

Lobby, Inc., 477 U.S. 242, 252 (1986)).  Claims based on "conclusory statements, conjecture, or speculation" must be dismissed.  Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

## II.

### PLAINTIFF'S CLAIMS OF DISCRIMINATORY EMPLOYMENT TERMINATION MUST BE DISMISSED

Guzman claims that her employment was discriminatorily terminated (in Counts I, VI and IX of her AC) as a result of her race (Hispanic), national origin (Puerto Rican) and/or color (black).  These claims fail as the evidence does not (i) establish a *prima facie* case of discrimination, or (ii) rebut the Post's legitimate, non-discriminatory reasons for her termination.

**A.      Plaintiff Cannot Establish a *Prima Facie* Case of Discriminatory Termination**

To establish a *prima facie* claim of discriminatory termination, Guzman must show that: "(1) she is a member of a protected class; (2) she is qualified to perform the job in question; (3) there was an adverse employment action; and (4) the employment action [her termination] occurred under circumstances supporting an inference of discrimination." Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 456 (2d Cir. 2009) (citations omitted).[14]  Here, there is neither direct nor circumstantial evidence – such as derogatory remarks related to the employment decision, see Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998), or more favorable treatment of one not in her protected class, see, e.g., Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) – that the decision to terminate Guzman was affected by any protected characteristic.  Her position was eliminated, no replacement was hired (Scial. at 258-60), and there is no comparator "similarly situated in *all* material facts" to Guzman who was treated more favorably.  Lugo v. City of New York, 2012 WL 3202969, at *4-5 (E.D.N.Y. Aug. 3, 2012).

---

[14] Discriminatory termination claims under the NYSHRL, NYCHRL and Section 1981 are analyzed in the same manner as those under Title VII.  See Albuja v. Nat'l Broad. Co. Universal, Inc., 2012 WL 983566, at *4 (S.D.N.Y. Mar. 16, 2012) (citations omitted).

Thus, instead of evidence of discrimination, Guzman relies on the *published* content of

the *New York Post* newspaper, including the Stimulus Cartoon and other cherry-picked

headlines.  (AC ¶¶ 47, 61, 62.)  These are, of course, irrelevant to her termination and only serve

to distract.  First, *Guzman's subjective perception* of the Post's content, which she claims is

offensive, is not probative of discriminatory intent.  See Campbell v. Cnty. of Onondaga, 2009

WL 3163498, at *22 (N.D.N.Y. Sept. 29, 2009)  (subjective interpretation of ambiguous flyer

not probative of discrimination).  Second, no "sufficient nexus exists" between the published

content – which cannot be evidence of discriminatory animus – and Guzman's termination,

mandating that it be disregarded as, at most, non-probative "stray remarks."  Howe v. Town of

Hempstead, 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006) (citation omitted).  See also

Nidzon v. Konica Minolta Busi. Solutions, USA, Inc., 752 F. Supp. 2d 336 (S.D.N.Y. 2010) (two

derogatory remarks by decision-maker unrelated to action were "stray remarks" and non-

probative).[15]  Additionally, the Stimulus Cartoon could not have any probative value since the

seven month gap between its publication and her termination renders it too temporally remote.

See, e.g., Nawrocki v. Daeman College, 1997 WL 211338, at *3 (W.D.N.Y. Apr. 25, 1997)

(comment three months prior to termination not temporally related).[16]

---

[15] See also Vazquez-Bonilla v. United Union of Roofers Local 8, 2010 WL 1005905 (E.D.N.Y. Mar. 17, 2010) (no inference where plaintiff was subject to "personal mistreatment . . . racial slurs and gestures" that did not relate to employment decision); Lenhoff v. Getty, 2000 WL 977900, at *5 (S.D.N.Y. July 17, 2000) ("hateful" anti-Semitic comments by company's owner were "stray remarks" as they did not relate to the decisional process); Coleman v. Prudential Relocation, 975 F. Supp. 234, 243-44 (W.D.N.Y. 1997) (supervisor's statements "I'm sick of that [n-word]" and "That black bitch pissed me off," unrelated to termination, do not evidence discrimination).

[16] Moreover, the Stimulus Cartoon, political in nature, is "[c]ore political speech" that "occupies the highest, most protected position" in the "hierarchy" of First Amendment protected speech, R.A.V. v. City of St. Paul, 505 U.S. 377, 422 (1992) (Stevens, J. concurring), and the decision of a newspaper to publish content is its alone, and not subject to regulation by the courts or legislature through anti-discrimination laws.  See Rosario v. New York Times Co., 84 F.R.D. 626, 631 (S.D.N.Y. 1979) (noting that in a discrimination claim, a court is "not concerned with what [a newspaper] publishes").  See also Claybrooks v. Am. Broad. Cos., Inc., 2012 WL 4890686 (M.D. Tenn. Oct. 15, 2012) (recognizing First Amendment prohibits liability under §1981 where that would regulate content of television program); Stanley v. The Lawson Co., 993 F. Supp. 1084, 1089 (N.D. Oh. 1997) ("[I]f Title VII . . . required Defendant to remove the adult magazines from its stores because an employee found them offensive, those laws would violate the First Amendment.").  Subjecting a newspaper such to sanction for a message it conveys is a

The same analysis applies to the various workplace comments found in Guzman's complaint.  These are so unrelated to the decisional process that they are only notable because they highlight the complete absence of evidence of discriminatory animus in her termination. For instance, she claims an editor, Lauren Ramsby – who had no part in Guzman's termination – referred to Henry Louis Gates as an "angry black man," even though the junior employee who overheard this testified it was an excerpt from a longer dialogue on Mr. Gates' July 2009 arrest, and how "a lot of people characterized him" "outside of the Post" with that trope.  (Logan at 60-61, 214-215.)[17]  Likewise, in February 2009 another junior employee claims to have overheard Allan – while speaking on the phone in his private office – say, "Number one many of these people are not smart.  And second the majority of them are minorities," but she heard no other part of the conversation, did not know to whom he spoke, and could only guess as to what he referred (surmising he was referring to critics of the Stimulus Cartoon).  (Clark at 137-39, 147-48.)[18]  See Green v. Harris Pubs., Inc., 331 F. Supp. 2d 180, 192 (S.D.N.Y. 2004) (racial epithet overheard in phone conversation a "stray remark").  And once, Allan referred to the same junior employee as a "damn girl," but did so from frustration because she failed to answer his phone, as

---

content-based restriction prohibited by voluminous precedent.  See, e.g., Snyder v. Phelps, 131 S.Ct. 1207, 1219 (2011) (quoting Boos v. Barry, 485 U.S. 312, 322 (1988) ("[I]n public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment."); Hustler Mag. v. Falwell, 485 U.S. 46, 54 (1988) (holding First Amendment protects provocative political cartoons); Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 255 (1974) (First Amendment affords unequivocal protection "to editorial judgment and to the free expression of views"); Rodriguez v. Maricopa County Comm. Coll., 605 F.3d 703, 708 (9th Cir. 2010) (holding that employee's e-mails directed from one co-worker to others espousing racially-charged political theories were non-actionable due to their expressive content, as "it is axiomatic that the government may not silence speech because the ideas it promotes are thought to be offensive"). Any finding to the contrary depreciates the protections afforded newspapers and political speech by the First Amendment and threatens to chill the freedom of the press by dissuading the publication of provocative material. See, e.g., Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931) (recognizing chilling effect of prior restraints).  It would give any potential plaintiff at a news organization carte blanche to cherry-pick content she considers offensive to satisfy the fourth element of the McDonnell Douglas prima facie case.

[17] True and correct copies of referenced excerpts of the deposition of Shari Logan, dated March 9, 2012 ("Logan. at [page]"), are attached to the Lern. Dec. as Exhibit 30.

[18] True and correct copies of referenced excerpts of the deposition of Ebony Clark, dated May 30, 2012 ("Clark. at [page]"), are attached to the Lern. Dec. as Exhibit 31.

her job required, made no derogatory reference, and has similarly raised his voice at white

employees.  (Clark at 331-34; Allan at 324.)  See Farragher v. Boca Raton, 524 U.S. 775, 788

(1998) ("Sporadic use of abusive language . . . is an ordinary tribulation[ ] of the workplace").

**B.    Guzman Cannot Dispute the Post's Legitimate
Non-Discriminatory Reason for Terminating Her Employment**

Even assuming Guzman made out a *prima facie* case of discriminatory termination, her

claim fails because she cannot demonstrate that Defendants' legitimate, non-discriminatory

reason was pretextual, as she must under all applicable laws, see Bennett v. Health Mgmt. Sys.,

Inc., 92 A.D.3d 29, 43-44 (1st Dept. 2011) (addressing NYCHRL), and that the real reason was

discrimination, additionally required under Title VII, Section 1981, and the NYSHRL.  See

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (falsity alone insufficient).

Stated simply, the Post's non-discriminatory reason is as follows:  *Tempo* failed and was

closed, Guzman's position – like those of the five *Tempo*-dedicated employees before her – was

eliminated, and no suitable alternative position was available.  (Facts, § A.) After *Tempo* closed,

Guzman's few remaining duties were *returned* to Sovocool, and no suitable alternative position

was available for Guzman.  Guzman can offer no evidence to rebut these legitimate business

reasons for her termination.  See Turner v. N.Y.U. Hosps. Ctr., 470 Fed. Appx. 20 (2d Cir. 2012)

(eliminating plaintiff's position for budgetary reasons is legitimate, non-discriminatory reason).

### III.

### GUZMAN'S RETALIATION CLAIMS MUST BE DISMISSED

In Counts II, IV, VI, VII, and IX, Guzman falsely alleges that she was retaliated against

for complaining to the Post's HR officer in February 2009. This is without evidentiary support.

To establish a *prima facie* claim of retaliation, a plaintiff must show that (1) she engaged

in protected activity known to her employer; (2) the employer took an adverse action against her;

and (3) a causal connection exists between the protected activity and the adverse action.  Woods v. Enlarged City Schl. Dist. of Newburgh, 473 F. Supp. 2d 498, 527 (S.D.N.Y. 2007), aff'd, 288 Fed. Appx. 757 (2d Cir. 2008).[19]  If a plaintiff establishes a *prima facie* case, the employer must proffer a legitimate, non-retaliatory reason for its action, whereupon the plaintiff bears the burden to show that this reason was a pretext for unlawful retaliation.  Eichler v. Am. Intern. Group, Inc., 2007 WL 963279, at *17 (S.D.N.Y. Mar. 30, 2007).

Initially, Guzman cannot establish a *prima facie* claim of retaliatory termination as no evidence causally connects her termination to her complaint *seven months earlier*.  A causal connection is proven either:  "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence . . . or (2) directly, through evidence of retaliatory animus . . . ."  Beachum v. AWISCO New York, 785 F. Supp. 2d 84, 98 (S.D.N.Y. 2011), aff'd, 459 Fed. Appx. 58 (2d Cir. 2012) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).  There is no direct evidence, see, e.g., Wright v. Stern, 450 F. Supp. 2d 335, 374 (S.D.N.Y. 2006) (supervisors discouraged complaining and asked plaintiff not to file lawsuit), nor is there circumstantial evidence, such as the protected activity being "followed closely by discriminatory treatment . . . ."  Beachum, 785 F. Supp. at 98 (quoting Gordan, 232 F.3d at 117).  And the termination, seven months after her complaint, is too temporally remote to create an inference of retaliation, as courts "have consistently held that the passage of two to three months . . . does not allow for an inference of causation."  Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y.  2007).[20]

---

[19] Claims of retaliation under the NYSHRL, NYCHRL and Section 1981 are analyzed in the same manner as under Title VII.  See Eichler v. Am. Int'l Group, Inc., 2007 WL 963279, at *7 (S.D.N.Y. Mar. 30, 2007).

[20] See also Hollander v. Amer. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (no connection after three and a half months); Garrett v. Garden City Hotel, Inc., 2007 WL 1174891, at *21 (E.D.N.Y. April 19, 2007) (two and a half months); Hussein v. Hotel Employees & Rest. Union, Local 6, 2002 WL 10441 (S.D.N.Y. Jan. 3, 2002), aff'd, 50 Fed. Appx. 473 (2d Cir. 2002) (two months); Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two and a half months).

Moreover, the Publisher, who closed *Tempo* for financial reasons, was unaware of Guzman's complaint.  (Carl. at 129.)[21]  Sundaram v. Brookhaven Nat'l Labs., 424 F. Supp. 2d 545, 584 (E.D.N.Y. 2006) (no *prima facie* case where "decisionmakers [were not] aware of the plaintiff's protected activity").  And Allan (who looked for alternative positions) was aware only that she had objected to the publication of the Stimulus Cartoon – which is not protected[22] – and *not* that she had complained about any employment practices.  (Allan at 68; Jehn at 246-48).

Finally, even if the evidence made out a *prima facie* claim of retaliatory termination, the Post has shown a legitimate, non-discriminatory reason for the termination which Guzman is unable to rebut.  (See, supra, § II.B.)

Guzman's other retaliation claims are frivolous.  She claims that *Tempo's* expenses were scrutinized more closely than those of other special sections, but admits she has no proof.  (Guz. at 569.)  The rejection of her requests to cover the investiture of her close "friend" Justice Sotomayor (who Guzman testified she "love[s]") were based on her obvious conflict and unjustifiable travel costs.  (See, Facts, § B, supra.)  Lastly, her performance rating was lowered one notch to "Meets Standards" because she committed an egregious ethical breach in January 2009 for which she received a written disciplinary warning.  (Id.)  In any event, none of this is "'materially adverse' employer conduct that might 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'"  Owens v. N.Y.C. Dept. of Sanitation, 2013 WL

---

[21] True and correct copies of referenced excerpts of the deposition of Paul Carlucci, dated June 22, 2012 ("Carl. at [page]"), are attached to the Lern. Dec. as Exhibit 32.

[22] Guzman's objection to the Stimulus Cartoon is not *protected conduct* under employment discrimination statutes. Publication of the cartoon in the Post newspaper is not an employment practice, and cases draw a clear distinction between complaints concerning *employment practices*, on the one hand, and complaints about conduct "not directed at employees but, instead . . . individuals who are not in an employment relationship with the defendant." Taneus v. Brookhaven Mem. Hosp. Med. Ctr., 99 F. Supp. 2d 262, 266 (E.D.N.Y. 2000) (complaint about internal manual providing for discriminatory care of hospital patients not protected); see also Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 135 (2d Cir. 1999) (complaint about police department's discriminatory conduct to public was not a protected act); Foxworth v. Am. Bible Soc., 2005 WL 1837504 (S.D.N.Y. July 28, 2005), aff'd, 180 Fed. Appx. 294 (2d Cir. 2006) (complaint about discriminatory marketing practices to the public not protected).  The Stimulus Cartoon was unquestionably directed to the public and not Post employees.

150245, at *5 (S.D.N.Y. Jan. 15, 2013) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548

U.S. 53, 68 (2006)).[23]  Nor is there any evidence of causal connection to her alleged complaint.

**IV.**

**GUZMAN DID NOT SUFFER A HOSTILE WORK
ENVIRONMENT AT THE POST**

In Counts I, III, V, and VIII, Guzman alleges that she was subject to a hostile

environment (i) on the basis of her race, national origin, and color, and (ii) on the basis of her

sex, female, in violation of Title VII, Section 1981, the NYSHRL and the NYCHRL.

To prevail under Title VII, § 1981, and the NYSHRL, a plaintiff must show harassment

"sufficiently severe or pervasive to alter the conditions of employment . . . ." Alfano v. Costello,

294 F.3d 365, 373 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.

1997)).[24]  Guzman must show conduct that (i) would be "objectively severe or pervasive" to a

reasonable person, and (ii) "creates an environment that [she] subjectively perceives as hostile . .

. ." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng., P.C., 2012 WL 3241402, at *6

(E.D.N.Y. Aug. 2, 2012).  To prove objective hostility, the workplace must be "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the

conditions of the victim's employment . . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21

(1993).  "[I]solated, minor acts or occasional episodes do not warrant relief." Brennan v. Metro.

Opera Assoc., Inc., 192 F.3d 310, 318 (2d Cir. 1999) (citation omitted).  The conduct "must be

---

[23] See, e.g., McBain v. Smiley Bros. Inc., 2013 WL 621932 (N.D.N.Y. Feb. 19, 2013) (citations omitted) (adverse act must materially alter terms and conditions of employment).  See also Field v. Tonawanda City Schl. Dist., 604 F. Supp. 2d 544, 557 (W.D.N.Y. 2009) ("[I]ncreased employer scrutiny is not sufficient . . . ."); Rozenfeld v. Dept. of Design and Const. of the City of N.Y., 2012 WL 2872157, at *8 (E.D.N.Y. July 12, 2012) (negative evaluation not adverse if no change in "responsibilities, benefits, salary, or anything else").

[24] See Davis v. Oyster Bay–East, 2006 WL 657038, at *8 n. 12 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 Fed. Appx. 59 (2d Cir. 2007) ("[D]iscrimination claims under Title VII, 42 U.S.C. §§ 1981 . . . and [NYSHRL] are analyzed together, as the same analytic framework applies to each").

sufficiently continuous and concerted . . . to be deemed pervasive." Alfano, 294 F.3d at 374

(quoting Perry, 115 F.3d at 149).

Under the NYCHRL, a plaintiff must show "she has been treated less well than other

employees because of her [protected class]." Zambrano–Lamhaouhi v. N.Y. City Bd. of Educ.,

2011 WL 5856409, at *9 (E.D.N.Y. Nov. 21, 2011) (citations omitted). "[T]he NYCHRL, like

Title VII and the NYSHRL, is . . . not a general civility code, and petty slights and trivial

inconveniences are not actionable." Campbell v. Cellco Partnership, 2012 WL 400959, at *8

(S.D.N.Y. Feb. 7, 2012) (citations and internal quotations omitted).

A.  **Guzman Was Not Subject to a Hostile Work
    Environment Based on Her Race, National Origin, or Color**

Guzman alleges in Counts I, III, V, and VIII that she was subject to a hostile work

environment based on her race, national origin and color because: *once* in 2007, Goodstein

referred to her as "Cha Cha"; *once* in an unspecified year, Aquilina asked if candles in Guzman's

office related to Santeria (which Guzman admits to practicing) or Voodoo; and on three

occasions, Riedel, the Post's Broadway critic, sang a song from *West Side Story*.[25]  (Facts, § C.)

As a threshold matter, Guzman must demonstrate that those acts which she purports to

contribute to her hostile work environment "occurred because of her membership in a protected

class." Hill v. Rayboy–Brauestein, 467 F. Supp. 2d 336, 359 (S.D.N.Y. 2006).  If she cannot

adduce evidence that "facially neutral incidents were in fact motivated by bias," such incidents

are not actionable and may not be considered.  Idrees v. City of N.Y., 2009 WL 142107

(S.D.N.Y. Jan. 21, 2009) (citations omitted).  The conduct at issue was not "because of" any

---

[25] Guzman also alleges three statements by Allan that she claims are derogatory offense, relating to (i) an individual named Juan Rodriguez in December 2004 (Lern. Dec., Exh. 24); (ii) a comment about pitcher Pedro Martinez in December 2004 (id); and (iii) a second comment about Martinez in March 2005 (Guz. at 114).  The *latest* comment is in March 2005 and is time barred (Guzman filed her complaint on November 9, 2009).  See Phillip v. City of New York, 2012 WL 1356604, at *6 n.5 (E.D.N.Y. Apr. 19, 2012) (longest relevant statute of limitations is four years).

protected class.  Riedel, *the Broadway critic*, sang because he and Guzman were discussing the revival of *West Side Story*, and he has sung songs in the Post's offices unrelated to this musical. (Facts, § C.)  "Santeria" makes no allusion to Guzman's protected classes, but inquires about one of Guzman's *admitted* religious practices.  And both Guzman (in a headline [Guz. at 402-03]) and Goodstein (in reference to his Caucasian sister [Good. at 146]), admit to using "Cha Cha" not in reference to Guzman's protected classes.  See Jackson v. City of New York, 2013 WL 541510 (S.D.N.Y. Feb. 14, 2013) (disregarding ambiguous alleged racial epithet).

To establish a claim, the challenged conduct must, as a threshold matter, cumulatively rise to the level of a hostile work environment.  Title VII, Section 1981 and the NYSHRL require that conduct be "severe and pervasive" and "more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."  Kemp v. A & J Produce Corp., 164 Fed. Appx. 12, 14 (2d Cir. 2005) (quoting Shwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)) (internal quotation marks and citations omitted).  Where only verbal comments are alleged, courts consider its "*frequency*" and "*severity*," and "whether it is *physically threatening* or *humiliating*" and/or "*unreasonably interferes*" with work performance.  Redd v. N.Y.S. Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (quoting Forklift Sys., Inc., 510 U.S. at 23) (emphasis in Redd).  Here, the alleged conduct was not frequent, only five incidents; was not severe – no epithets were used nor was it physically threatening; and it had no effect on Guzman's performance.  (Guz. at 415-17; Robin. at 262.)  See Rios v. Buffalo and Fort Eric Pub. Bridge Auth., 2008 WL 657121, at *4 (W.D.N.Y. Mar. 7, 2008), aff'd, 326 Fed. Appx. 612 (2d Cir. 2009) (dismissing where no effect

on performance).  Courts routinely grant summary judgment when faced with far more egregious conduct.[26]

Guzman must also show subjective offense, see Fierro v. Saks Fifth Ave., 13 F. Supp. 2d 481 (S.D.N.Y. 1998) (dismissing where no subjective offense), which she cannot:  she never complained about any of this conduct (see § IV.C) and maintained a "friendly" relationship with Riedel (see, Facts, §C, n.10, supra), which facts are "simply incompatible with her allegation that [Post employees] engaged in conduct so severe and pervasive that it altered the conditions of her employment."  Martinez v. Conn. State Library, 817 F. Supp. 2d 28, 51 (D. Conn. 2011).

The NYCHRL requires a separate analysis, but the same conclusion.  Guzman must show that "she has been treated less well," Zambrano–Lamhaouhi, 2011 WL 5856409, at *9, but conduct amounting to "petty slights and trivial inconveniences" is not actionable, Campbell, 2012 WL 400959, at *8.  Guzman claims no more than "petty slights," see Fullwood v. Assoc. for the Help of Retarded Children, Inc., 2010 WL 3910429, at *9 (S.D.N.Y. Sept. 28, 2010) (dismissing "sporadic" comments, including referring to black employees working in cotton fields and sitting in back of bus), her work did not suffer, and she alleges no misconduct by a supervisor.  Her own behavior evidences this:  she never complained about any of this conduct (see § IV.C); she stayed "friendly" with Riedel, asking him about West Side Story and for his help to get a friend an audition for the musical, and never asked him to stop singing; she approved a headline calling an individual "Cha Cha"; and she later voluntarily attended a dinner honoring him, where she greeted both him and his wife (Good. at 147; Guz. at 190-91).

---

[26] See Rios, 2008 WL 657121, at *4 (plaintiff told to either not "speak Puerto Rican" or go back to her own country, shown multiple offensive cartoons, had coffee spit on her, and had "Puerto Rican scum" written on her car, among other things); Rivera v. Rochester Genesee Regional Transp. Auth., 761 F. Supp. 2d 54, 57-58 (W.D.N.Y. 2011) (granting summary judgment where plaintiff called, inter alia, "'n*gger,' 'boy' and 'monkey'"); Negron v. Rexam Inc., 104 Fed. Appx. 768, 770 (2d Cir. 2004) (employee called a racial epithet "a handful of times," including over a loudspeaker, insufficient); Stembridge v. City of New York, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (granting summary judgment where plaintiff was referred to as an "uppity n*gger" and a "boy," harasser called other African-American "animals" and "washroom attendant," and hung a black doll).

**B.     Guzman Was Not Subject to a Hostile Work
        Environment Based on Her Sex**

Guzman alleges in Counts III, V, and VIII that she suffered a hostile work environment

based on her sex because:  Goodstein called her "sexy" and "beautiful" on two occasions, and

possibly others; once in 2007 Allan showed her a news photograph of a naked man on his

Blackberry that was being published in the *Post* two days later, and told a story of a co-worker

having sex in a barroom closet; and Boyle, on unspecified and undated occasion(s), used the

term "harem" to describe some of his female photography staff.[27]

As with her ethnicity-based claims, as a threshold matter, Guzman must show that each

of the acts she claims contributed to her sex-based harassment claim in fact occurred because

"she was a woman"; if she cannot do this, such incidents may not form any part of her hostile

work environment.  Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d

Cir. 1998).  Here, Guzman cannot demonstrate that alleged misconduct occurred "because of"

her gender.  Allan showed a topical news photograph to a group of journalists, including Angelo,

a male with whom he discussed publishing the picture (Allan at 203-06), and the Dunleavy story

was prompted by Guzman's ongoing lewd conversation.  (Guz. at 467; Allan at 241-42.)

Goodstein's compliments were not "because of" Guzman's sex – he never propositioned her,

made a sex-based comment, or referred to specific body parts – and complimenting a co-worker

on clothing and/or appearance is "facially neutral conduct," Romano v. Stora Enso Corp., 2010

WL 986535, at *20 (E.D.N.Y. Feb. 12, 2010), especially where, as here, compliments were also

---

[27] Guzman alleges she heard sexual comments in the Post's editorial meetings and/or newsroom, but could not recall a single one and admits all concerned news stories or celebrities.  (Guz. at 44, 48-49, 109, 248, 253.)  Even assuming that these were "jokes" and not discussions of newspaper content, "[w]ithout any detail or even the sum and substance of the jokes, no reasonable jury could evaluate the severity of the purported jokes" and cannot be considered on summary judgment.  Jackson v. Citiwide Corp. Transp., Inc., 2004 WL 307243, at*3 (S.D.N.Y. Feb. 17, 2004) (not considering vague allegations of "sexual" and "perverted" jokes).  Of course, it speaks volumes as to "severity" that Guzman cannot recall a single comment.  Further, these claims are substantially *time-barred*: Guzman voluntarily stopped attending the editorial meetings in late 2005 (Guz. at 44), and her desk was no longer in the newsroom as of 2004 (id. at 251).

directed at men.  (Good. at 147.)[28]  And there is no evidence that Boyle's purported "harem"

comment(s), if made, was made "because of" Guzman's sex, as such was made without

reference to her sex or unaccompanied by any risqué or sex-based commentary.

Conduct surviving this threshold analysis must then cumulatively rise to the level of a

hostile work environment.  However, it is not in fact "severe or pervasive" as per Title VII,

§ 1981 or the NYSHRL.  *Once* being shown a news picture of a naked man and told a story of a

sexual nature is not actionable.  See, e.g., Brennan v. Met. Opera Assoc., Inc., 192 F.3d 310 (2d

Cir. 1999) (daily display of nude pictures inactionable).  Guzman's allegations against Boyle and

Goodstein are, by and large, fatally vague,[29] and she alleges with specificity only two

compliments by Goodstein, and none specifically by Boyle.  Even assuming Goodstein

complimented Guzman at each of their approximately monthly meetings from mid-2006 to late

2007, and Boyle at some time stated "harem," this does not create a hostile environment,

particularly given neither disparaged her sex, discussed women's body parts or sex acts,

propositioned her, touched her, asked her on a date, or attempted to be alone with her.  (Guz. at

189, 398, 413-15, 494.)  See Hamilton v. Bally of Switz., 2005 WL 1162450, at *7 n.5 (S.D.N.Y.

May 17, 2005) ("numerous compliments about [plaintiff's] looks, how elegant and sexy her

[clothing], shoes, and general looks were . . . are not objectively offensive") (internal quotation

---

[28] Guzman's vague claim that Goodstein "leered" at her is facially neutral conduct and, without more, cannot form part of her claim. See O'Neal v. State Univ. of N.Y., 2006 WL 3246935, at *11 (E.D.N.Y. Nov. 8, 2006) (Title VII: "[G]iven the absence of any explicitly sexual nature to [the harasser's] 'odd' and 'demeaning' looks . . . a reasonable juror could not find . . . that [a harasser's] 'looks' give rise to an inference of discriminatory intent[.]").

[29] Guzman's vague characterizations of the Boyle's and Goodstein's conduct occurring at "every" meeting is fatally non-specific and these allegations should be disregarded.  See Jackson, 2004 WL 307243, at*3.  See also Krause v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2011 WL 1453791, at *4 (S.D.N.Y. Apr. 13, 2011) (testimony that plaintiff was "daily" and "openly" called, inter alia, "sexy" not considered); Komoroski v. Dept. of Consumer Prot., Conn., 2007 WL 1238618, at *4 (D. Conn. Apr. 25, 2007), aff'd, 300 Fed. Appx. 59, 60-61 (2d Cir. 2008) ("vague" "allegations that [harasser] sexually harassed [plaintiff] lack the specificity and support . . . to survive summary judgment"); Kemp v. A & J Produce Corp., 2005 WL 5421296, at *20 (E.D.N.Y. June 7, 2005), aff'd, 164 Fed. Appx. 12 (2d Cir. 2005) ("vague allegations that do not identify what the comments were, who spoke them, and who they were directed to" insufficient); Chandler v. AMR Am. Eagle Airline, 251 F. Supp. 2d 1173, 1185 (E.D.N.Y. 2003) (allegations "too vague in nature and non-specific as to time and frequency of occurrence to serve as a basis for his hostile work environment claim").

marks omitted).[30]  The benign nature of Goodstein's compliments is highlighted by *Guzman's directing the same compliment to co-workers*, which she considered to be "something a friend does, as a colleague does."  (Id. at 170.)  Courts routinely reject far more offensive claims.[31]

Guzman also cannot show subjective offense, as she must.  Connolly, 2010 WL 5491109, at *8-10 (dismissing where no showing that plaintiffs "subjectively . . . regarded their work environment to be abusive").  Guzman admits Boyle "didn't personally sexually harass me" (Guz. at 485) and that his actions were merely "unprofessional," and "if the victim does not subjectively perceive the environment to be abusive . . . there is no Title VII violation."  Forklift Sys., Inc., 510 U.S. at 21-22.  Guzman joked upon seeing the McGreevey photograph and hearing Goodstein's shoe compliment, expressed offense at neither, and only claims to have mentioned them to HR years later (despite immediately objecting to being called "Cha Cha"). (§ IV.C.)  And none of this prevented Guzman from proposing lunch with Goodstein (Lern. Dec., Exh. 27 at NYP-2315), suggesting their sons meet for a play date (Guz. at 191), referring to other women as "gorgeous" in e-mail to him (Lern. Dec., Exh. 27 at NYP-2312), and voluntarily attending a National Hispanic Federation event honoring him, where she greeted him and his wife (Good. at 147; Guz. at 190-91).  And the *undisputed* record is replete with Guzman's own bawdy and sexual work-related conduct.  (See Facts, at § C.3, supra.)

---

[30] See Rodriguez v. Hudson Square Pharma., LLC, 2012 WL 3195554, at *4 (S.D.N.Y. Aug. 2, 2012) (repeatedly calling plaintiff "beautiful," "pretty" and commenting on appearance, plus, insufficient); Nieves v. Dist. Council 37 (DC 37), AFSCME, AFL-CIO, 2009 WL 4281454, at *6 (S.D.N.Y. Nov. 24, 2009), aff'd, 420 Fed. Appx. 118 (2d Cir. 2011) ("sexy" and sexual jokes insufficient).

[31] See also Cristofaro v. Lake Shore Cent. School Dist., 2012 WL 1082567 (2d Cir. Apr. 2, 2012) (comments on appearance, betting with co-workers about having sex with plaintiff, and beckoning to, throwing paper at and making bodily contact with plaintiff insufficient); Sardina v. UPS, Inc., 254 Fed. Appx. 108, 110 (2d Cir. 2007) (supervisor calling women "office bitches" and "bimbettes," as well as telling sexual jokes, not actionable); Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) (supervisor's remarks about plaintiff's body, including that she had a "sleek ass," and once touching breast, insufficient); Bermudez v. City of New York, 783 F. Supp. 2d 560 (S.D.N.Y. 2011) (weekly comments that women should, *inter alia*, not be police officers and should "stay at home" to "mak[e] babies," insufficient); Clarke v. Pacifica Foundation, 2011 WL 4356085 (E.D.N.Y. Sept. 16, 2011) (supervisor pressing women to view and/or read his personal pornography not actionable).

Separately, NYCHRL is not a "general civility code,' and the alleged conduct does not rise to the level of "petty slights and trivial inconveniences."  Campbell, 2012 WL 400959, at *8. Guzman was never subjected to any sex-based commentary or conduct, was never touched, was never propositioned, and was never the subject of ridicule or insult due to her sex, but rather received compliments, heard a topical story, saw a news photo, and heard the word "harem." These allegations are "trivial," especially given that she did not complain until (allegedly) years later (§ IV.C, below), and her interactions with Goodstein, described above, dispel any myth that she was slighted by his conduct.  See Williams v. City of New York, 2012 WL 2524726, at *6 (S.D.N.Y. June 26, 2012) ("episodic" slurs and epithets directed less than "petty slights and inconveniences"); Woodard v. TWC Media Solutions, Inc., 2011 WL 70386 (S.D.N.Y. Jan. 4, 2011) (approximately 10 comments in 11 months, and other conduct, dismissed); Li v. Educ. Broadcasting Corp., 2011 WL 3204689 (Sup. Ct. July 5, 2011) (dismissing where plaintiff alleged improper touching on multiple occasions and inappropriate comments).

**V.**

**GUZMAN'S FAILURE TO TIMELY NOTIFY THE POST OF ALLEGED MISCONDUCT REQUIRES DISMISSAL OF HER HARASSMENT CLAIMS**

Liability for a hostile work environment may be imputed to an employer only if it knew or should have known of the offending conduct.  Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004) ("Employers are not . . . vicariously liable for [a] hostile work environment . . . unless the employer knew or reasonably should have known about the harassment but failed to take appropriate remedial action.").  Knowledge of misconduct may be presumed only if committed by a "supervisor with immediate (or successively higher) authority" over the plaintiff.  Mack v. Otis Elevator Co., 326 F.3d 116, 123 (2d Cir. 2003).  Where the employer is aware of the offending conduct, it may defend itself by proving that "(a) it exercised reasonable care to

27

prevent and promptly correct harassing behavior, and (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer . . . ." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 745 (1998).  Reasonable care is demonstrated "by showing the existence of an anti-harassment policy during the period of the plaintiff's employment . . . ."  Ferraro v. Kellwood Co., 440 F.3d 96, 102 (2d Cir. 2006).

Guzman's hostile work environment claims against the Post fail under these standards. The Post had at all relevant times a written anti-harassment policy directing complaints of discrimination to the Post's HR department or an attorney for the Post.  (See Lern. Dec., Exh. 28; Scial. at 64-66; Jehn at 54, 57.)  Guzman was aware of this policy (Guz. at 126-28), and all evidence shows that it is and was effective.  (See, e.g., Scial. at 152-53.)

Nonetheless, Guzman failed to reasonably avail herself of this policy.  With respect to her racial harassment claim, no alleged harasser – Goodstein, Riedel, or Aquilina – supervised her (see, e.g., Guz. at 409 [Goodstein "was not my supervisor . . . ."]), and Guzman did not complain to Jehn about the alleged harassment in February 2009.  (Guz. at 151-53.)  Guzman could not recall if she told Jehn about Riedel's singing, but Jehn testified Guzman did not.  (Compare id. at 231, 223, with Jehn at 193, 197.)  It is undisputed Guzman did not complain about the "Cha Cha" comment (Jehn at 191-93) or the "Santeria" comment.  (Guz. at 230-31.)

The sole specific acts Guzman claims (and Jehn disputes) she told Jehn about relate to her claim of sexual harassment:  (i) the naked man photograph and story from April 2007 (Guz. at 184); and (ii) Goodstein's compliments.  (Id. at 188.)  A two-year delay in making a complaint after a night at a bar and three years after mild compliments started is unreasonable as a matter of law, and liability cannot be imputed to the Post.  See, e.g., Eichler v. Am. Int'l Group, Inc., 2007 WL 963279 (S.D.N.Y. Mar. 23, 2007) (one year delay unreasonable); O'Dell v. Trans World

Entertainment Corp., 153 F. Supp. 2d 378 (S.D.N.Y. 2001), aff'd, 40 Fed. Appx. 628 (2d Cir. 2002) (11 month delay unreasonable).  Absent actionable harassment by a Guzman supervisor (i.e., the conduct of Allan, the only supervisor against whom she makes an allegation falls far short), and in light of Guzman's failure to complain, liability cannot be imputed to the Post and claims for harassment against it must be dismissed.  Petrosino, 385 F.3d at 225.

## VI.

## ALLAN IS NOT INDIVIDUALLY LIABLE TO PLAINTIFF

Allan is not individually liable as a matter of law.  First, "individuals are not subject to liability under Title VII."  Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004); see also Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012).  Second, Allan is not an "aidor or abettor" under any of NYSHRL, NYCHRL or Section 1981 because, as shown above, there has been no actionable discrimination, retaliation, or harassment.  HealthCare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) ("accessory liability may only be found where a primary violation has been established") (citation omitted).

To be liable, an individual must "actually participate[] in the [discriminatory] conduct," Emmons v. City Univ. of New York, 715 F. Supp. 2d 394, 420 (E.D.N.Y. 2010) (quoting Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004)), by "encouraging, condoning, or approving it."  Durkin v. Verizon N.Y., Inc., 678 F. Supp. 2d 124, 136 (S.D.N.Y. 2009) (citation omitted).  Such liability "is not judged under *respondeat superior*, but instead requires . . . that the employer had knowledge of and acquiesced in . . . the discriminatory conduct."  Romero v. City of New York, 839 F. Supp. 2d 588, 635 (E.D.N.Y. 2012) (citation omitted).  Separately, Section 1981 liability attaches where a showing of "either direct participation in the alleged violations, negligent supervision . . . or a failure to take action" by the defendant.  Cloke-Browne

v. Bank of Tokyo-Mitsubishi UFJ, Ltd., 2011 WL 666187, at *9 (S.D.N.Y. Feb. 9, 2011)

(quoting Patterson, 375 F.3d at 229).

Even assuming *arguendo* that the evidence established a hostile work environment, Allan cannot be liable because he was not involved in creating it.  There is no evidence Allan was aware of, "participated" in, or "encourag[ed], condon[ed], or approv[ed]" any conduct contributing to Guzman's race-based harassment claim, or was involved in her sex-based claim through the one-time telling a story and showing a news photograph.  Emmons, 715 F. Supp. 2d at 420 (quoting Feingold, 366 F.3d at 157); Durkin, 678 F. Supp. 2d at 136 (citation omitted). This single-occurrence is insufficient to create a hostile work environment.

Thus, all claims against Allan must be dismissed for these reasons as well.

## CONCLUSION

For the foregoing reasons, Defendants NYP Holdings, Inc., d/b/a The New York Post, and Col Allan respectfully request that this Court grant summary judgment dismissing with prejudice Guzman's Amended Complaint in its entirety.

Dated: May 10, 2013
      New York, New York             Respectfully submitted,

            KASOWITZ, BENSON, TORRES
              & FRIEDMAN LLP

            By:  /s/ Mark W. Lerner             
               Marc E. Kasowitz (mkasowitz@kasowitz.com)
               Mark W. Lerner (mlerner@kasowitz.com)
               Blythe E. Lovinger (blovinger@kasowitz.com)
               Garrett D. Kennedy (gkennedy@kasowitz.com)
            1633 Broadway
            New York, New York 10019
            Tel.: (212) 506-1700
            Fax: (212) 506-1800
            Attorneys for Defendants NYP Holdings, d/b/a
            New York Post, and Col Allan