KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
Garrett D. Kennedy (gkennedy@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700

*Attorneys for Defendants*
NYP Holdings, Inc. d/b/a
the New York Post, and Col Allan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
SANDRA GUZMAN,                                              :
                                                            :
                                    Plaintiff,              :        Civil Action No.: 09 CV 9323 (LGS)
                                                            :
                        vs.                                 :
                                                            :
NEWS CORPORATION, NYP HOLDINGS,                             :
INC., d/b/a/ THE NEW YORK POST,                            :
and COL ALLAN, in his official and individual              :
capacities,                                                 :
                                                            :
                                    Defendants.            :
------------------------------------------------------------x

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, NYP Holdings, Inc., d/b/a the New York Post (the "Post") and

Col Allan, in his official and individual capacities (together, the "Defendants"), by their

attorneys Kasowitz, Benson, Torres & Friedman LLP, respectfully submit this Statement of

Undisputed Material Facts in support of their Motion for Summary Judgment against Plaintiff

Sandra Guzman ("Plaintiff").

## I.    Guzman's Employment and Subsequent Termination

1.    Plaintiff began her employment with the Post in July 2003 as an Associate Editor, when she was hired to "plan . . . a regular [newspaper] section aimed at [the Latino] community."  (Lern. Dec., Exh. 1.)[1]

2.    That newspaper section, what would be called *Tempo*, was to be published on a monthly basis and was expected to generate a profit (or "operating income") based on revenue generated from the sale of advertising into it.  (Racano Aff. at ¶ 9.)[2]  The number of total pages and pages of editorial content per issue was to be driven by the amount of advertising sold.  (Id.)

3.    *Tempo* was first published in October 2003.  (Id. at ¶ 9.)

4.    In 2003, *Tempo's* per issue length, revenue and operating income averaged as follows:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 25.3 | 16 | 9.3 | $111,529.33 | $42,071.33 |

(Id. at ¶ 10.)

5.    In 2004, *Tempo's* overall size increased but it's operating income decreased:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 30.7 | 18.1 | 13.6 | $111,978.67 | $22,468.25 |

(Id. at ¶ 10.)

6.    In 2003 and 2004, *Tempo* regularly ran between 28 and 40 total pages per issue.

(Id., Exh. 1 at NYP-1298.)

---

[1] Submitted herewith in support of the motion is the declaration of Mark W. Lerner, dated May 10, 2013 ("Lern. Dec."), to which exhibits referenced herein, unless otherwise specified, are attached.

[2] The affidavit of Michael Racano, dated May 8, 2013, submitted in support of Defendants' motion for summary judgment, is herein designated "Racano Aff."

7.      In 2005, *Tempo's* length, advertising, and revenue all fell, and it operated at a loss throughout the year, with the following average results per issue:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 24 | 14.25 | 9.75 | $68,147.42 | ($24,631.75)[3] |

(Id. at ¶ 10.)

8.      In 2005, 11 out of the 12 issues of *Tempo* posted negative operating income. (Id., Exh. 1 at NYP-1299.)

9.      The Post also published a weekly, single page edition of *Tempo* that typically did not have any advertising and always lost money. (See, e.g., id. at NYP-1299.)

10.     *Tempo* remained unprofitable into early 2006, and lost money in four of its first five issues for that year. (Id. at NYP-1303.)

11.     Because *Tempo* was losing money, on or about April 17, 2006, Paul Carlucci, then the Post's Publisher, made the decision to cancel *Tempo*. (Id., at NYP-462-63, NYP-472-73.) Carlucci's decision to close *Tempo* was accompanied by the decision to lay off *Tempo's* dedicated staff, including Guzman. (Id. at ¶¶11-12.)

12.     However, before the Post implemented this decision, Les Goodstein, an employee of a Post affiliated company who attended these meetings because he was responsible for running certain community newspapers, suggested keeping *Tempo* as a monthly, but with implementing certain cost-saving and sales initiatives. (Id. at ¶11-12, Exh. 3 at NYP-445-46) Carlucci adopted this suggestion and reversed his decision to close *Tempo* and lay off Guzman. (Id.)

---

[3] Negative operating income is designated with parentheses.

13.     Thereafter, the Post took steps to increase *Tempo's* profitability, including, among other things, increasing the ratio of advertising to editorial content (id. at ¶ 20), cutting *Tempo's* staff, from six to two full-time employees, Guzman and Sami Haiman-Marrero (id.), and increasing revenue, including by permitting the Post's sales staff to offer promotional sales not typically offered by the Post, such as a free twelfth ad if an advertiser purchased ads in eleven issues of *Tempo*.  (Id. at ¶ 20.)

14.     As a result, for calendar year 2006, *Tempo's* overall size decreased, but its operating income improved, with the following average results per issue:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 17.67 | 9.33 | 8.33 | $77,257.33 | $14,107.75 |

(Id. at ¶ 15.)

15.     In 2007, *Tempo's* overall size continued to shrink while its average revenue per issue remained stagnant:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 15.8 | 8.1 | 7.8 | $77,638.25 | $28,206.67 |

(Racano Aff. at ¶¶ 10, 16.)

16.     Because of the decrease in the number of *Tempo's* editorial pages, Guzman was editing few pages per month; as a result, her editors gave her "additional work to support her salary."  (Id., Exh. 2 at NYP-437-38.)

17.     As a result, in early 2007 a limited number of special sections – periodic topical newspaper inserts – were temporarily reassigned to Guzman, then earning $137,807 per year,

from Carole Sovocool, the Post's Special Sections editor who earned $80,850 per year.  (Id.,

Exhs. 3, 4; Robin. at 282; Sovo. Aff. at ¶¶ 4-6.)[4]

18.     Guzman first started working on sections other than *Tempo* in 2007.  (Guz. at

360-61.)

19.     In October 2007, Guzman wrote an e-mail to Haiman-Marrero asking if she was

attending a symposium called, "Is Hispanic Advertising Dead?"  Haiman-Marrero replied,

"Nope.  It's a waste of time and money.  Hispanic agencies are on the brink of extinction."

(Lern. Dec., Exh. 7.)

20.     For calendar year 2008, *Tempo's* average pages, editorial and advertising content,

its revenue, and its operating income all decreased from 2007, with average operating income at

approximately 50% of what it had been in 2007:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 13.3 | 6.9 | 6.4 | $61,006.33 | $14,226.08 |

(Racano Aff. at ¶¶ 10-13.)

21.     In January 2008, Guzman acknowledged *Tempo's* length dropping to 10 pages

because of low ad revenue:  "I'm over it, going down to 10 pages that is."  (Lern. Dec., Exh. 3.)

22.     In February and April 2008, *Tempo* ran as 8-page sections (Racano Aff., Exh. 1 at

NYP-1305-06), which Guzman considered to be "tiny one[s]."  (Lern. Dec., Exh. 4.)

23.     In May 2008, *Tempo* struggled to sell advertising for the June issue, and Guzman

wrote to Haiman-Marrero, "I'm looking at last year's issue . . .  And you were able to get so

many gorgeous ads."  (Id., Exh. 5.)  Paul Armstrong, a Post executive in its Sales Department,

---

[4] True and correct copies of referenced excerpts of the deposition of Joseph Robinowitz, dated June 14, 2012 ("Robin. at [page]"), are attached to the Lern. Dec. as Exhibit 2.  The affidavit of Carole Sovocool, dated May 6, 2013, submitted in support of Defendants' motion for summary judgment, is herein designated "Sovo. Aff."

responded, "I understand your disappointment . . . .  The economy is tanking and we are down against last year in all sectors."  (Id.)

24.  In June 2008, Guzman wrote to Haiman-Marrero regarding *Tempo's* difficulty selling advertising, "I'm sorry Sami.  I feel your pain.  But the economy really is in the dumps – and you know when the general market sneezes, the ethnic market gets the flu."  (Id., Exh. 6.)

25.  On June 25, 2008, the Post eliminated Haiman-Marrero's position to reduce costs, which left Guzman as the only employee dedicated to *Tempo*, and responsibility for the sale of advertising into *Tempo* was transitioned to the Post's Sales Department.  (Racano Aff. at ¶ 13.)

26.  During calendar year 2009, *Tempo* again saw across-the-board decreases in each of its average pages, editorial and advertising content, revenue, and operating income to such an extent that *Tempo* averaged monthly losses:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 4.9 | 2.1 | 2.9 | $20,479.67 | ($3,776.33) |

(Id. at ¶ 10.)

27.  On January 19, 2009, Allan directed Managing Editor Joseph Robinowitz to "closely examine all costs associated with [*Tempo*] and other sections . . . with a view to eradicating all but the most essential costs as we continue to battle this miserable economic climate."  (Lern. Dec., Exh. 8.)

28.  In February 2009, the Post reduced the frequency of its section, *Page Six the Magazine*, from weekly to approximately quarterly (Scial. at 281) and terminated almost all of its 37 dedicated employees.  (Lerner Dec., Exh. 29, at NYP-862.)  Its editor, Margi Conklin, was retained because (i) she had a contract for a guaranteed term; (ii) there was an open position at

her compensation level for which she was qualified; and (iii) *Page Six* continued as a publication with Conklin as editor.  (Id. at NYP-781; Scial. at 281; Allan at 398-99.)[5]

29.     The July through September 2009 issues of *Tempo* were 3, 2, and 5 pages in length, and lost $13,688, $13,747 and $2,339, respectively.  (Racano Aff., Exh. 1 at NYP-1308.)

30.     While in 2007, *Tempo* had generated average revenue per issue of $77,638.25, with an average profit of $28,206.67, in 2009 it generated only average revenue of $20,479.67 – a decline of 74% – and a monthly loss of $3,766.33.  (Id. at ¶ 10.)

31.     *Tempo's* average revenue and operating income per issue declined from 2006 through 2009 as follows:



(Id. at ¶ 13)

32.     On August 17, 2009, the Post's Publisher, Paul Carlucci, proposed to its Executive Committee that *Tempo* be closed as a monthly section.  (Id., Exh. 2 at NYP-489-91.)

---

[5] True and correct copies of referenced excerpts of the deposition of Amy Scialdone, dated June 28, 2012 and April 16, 2013 ("Scial. at [page]"), are attached to the Lern. Dec. as Exhibit 11.

33.    On September 8, 2009, following news that the "September issue . . . will also not make a profit," a decision was made to close *Tempo* as a monthly and eliminate the *Tempo* editor position that was held by Guzman.  (Id. at NYP-4619-20; Jehn at 234.)[6]

34.    The October issue of *Tempo* sold no advertising and was not published.  (Racano Aff. at ¶ 14; Lern. Dec., Exh. 10.)  *Tempo* was never published again after its September 2009 issue.  (Scial. at 375-76.)

35.    Following the elimination of the *Tempo* editor position, the sections that had been temporarily reassigned to Guzmen from Sovocool were returned to Sovocool.  (See Sovo. Aff. at ¶ 8; Robin. at 91-92.)

36.    These sections represented a small portion of Sovocool's workload, and she reabsorbed them without any effect to her performance.  (Sovo. Aff. at ¶¶ 4-6, 8.)

37.    Some of the non-*Tempo* sections Guzman edited are no longer published by the Post.  (Id. at ¶ 9.)

38.    When her position was eliminated, Guzman earned a salary of $137,807 per year.  (Racano Aff., Exh. 4.)  Sovocool earned a salary of $80,850 at this time.  (Id., Exh. 3.)

39.    After the *Tempo* editor position was eliminated, Allan "asked three editors if there was a position . . . anywhere at the paper that Ms. Guzman might fill at her compensation."  (Allan at 397.)[7]

40.    The sole editorial position open was a junior Associate Editor position on the Post's hard-news Metro Desk, a very different position from the *Tempo* editor position that paid $82,000 per year, or over 40% less, than Guzman's salary.  (Allan at 398; Racano Aff., Exh. 5.)

---

[6] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn, dated June 26, 2012 and February 14, 2013 ("Jehn at [page]"), are attached to the Lern. Dec. as Exhibit 9.
[7] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Lern. Dec. as Exhibit 12.

41.   Allan did not offer Guzman the position because:

> Her compensation was $135,000 [*sic*] a year, this job is open at
> $82,000 a year. . . .  It is my view that an employee who had been
> forced to take a very large pay cut in the order of $55,000 or
> $50,000 would not be a happy employee. . . .  I made that decision
> in the interest of the newspaper.  I didn't believe it was appropriate
> or right to offer her a job that would have caused her such a
> significant pay cut.

(Allan at 398-99.)

42.   On September 29, 2009, Guzman was notified that her employment would be

terminated as of that date because of the closure of *Tempo* and the lack of an appropriate

alternative position.  (Scial. at 287.)

## II.   Facts Relating to Guzman's Claim of Retaliation

43.   On February 18, 2009, the Post published a political cartoon depicting a

chimpanzee having been shot by two police officers, one of whom remarks, "They'll have to find

someone else to write the next Stimulus Bill."  (The "Stimulus Cartoon.")  (AC, Exh. A.)

44.   The Stimulus Cartoon makes reference to a famous chimpanzee attack which had

occurred earlier that week in Connecticut.  (Lern. Dec., Exh. 14.)

45.   Guzman first saw the cartoon in the *New York Post* newspaper following its

publication.  (AC ¶ 87.)

46.   Allan, the Post's Australian Editor-in-Chief who selected the cartoon for

publication, believed the chimpanzee symbolized the Congressional authors of the stimulus bill,

as the cartoon made explicit reference to the *writers* of the bill.  (Allan at 44, 350-51.)

47.   On the day that the cartoon was published, Guzman spoke to Jennifer Jehn, the

head of the Post's human resources about the cartoon, and complained that she believed the

cartoon to be racist.  (Jehn at 191-99.)  This was the first and only complaint that she made to the

9

Post's human resources department, and she never made any complaint to counsel for the Post, as required by the Post's anti-harassment policy.  (Guz. at 166-67.)

48.     Guzman did not complain to Jehn about any conduct by Michael Riedel or Anne Aquilina, and did complain about Les Goodstein saying "Cha Cha" at this time.  (Guz. at 151-53.)

49.     It is undisputed that Guzman complained about not other incidents contributing to her purported hostile work environment than (i) the McGreevey photograph and Steve Dunleavy story told by Allan, and (ii) Goodstein complimenting her.  (Id. at 184, 188.)

50.     The Post's anti-harassment policy is effective.  (See, e.g., Scial. at 152-53.)

51.     It is undisputed that Jehn only told Allan that Guzman complained about the Stimulus Cartoon.  (Allan at 68; Jehn at 246-48.)

52.     The Publisher, who closed Tempo for financial reasons, was unaware of Guzman's complaint.  (Carl. at 129.)[8]

53.     Guzman claims a personal relationship with Justice Sonia Sotomayor.  (Guz. at 572 ["I love Sonia Sotomayor.  Q:  So you are biased in her favor, correct?  A:  I love her, yes."].)[9]  In August 2009, Guzman made a request to Allan to travel to Washington, D.C. to cover a private party for Justice Sotomayor; Allan denied this request because Guzman was a friend of Sotomayer's, "had been conflicted," and because the Post does not "assign people to cover people on the basis of friendships."  (Allan at 394.)  On September 4, 2009, Guzman made a request to Robinowitz to travel to Washington, D.C. to cover a second event, Justice

---

[8] True and correct copies of referenced excerpts of the deposition of Paul Carlucci, dated June 22, 2012 ("Carl. at [page]"), are attached to the Lern. Dec. as Exhibit 32.
[9] True and correct copies of referenced excerpts of the deposition of Sandra Guzman, dated October 13, 2011 and February 13, 2012 ("Guz. at [page]"), are attached to the Lern. Dec. as Exhibit 15.

Sotomayor's investiture.  (Lern. Dec., Exh. 16.)  Robinowitz denied this request because the Post

has a Washington, D.C. bureau to cover such a story in a more cost-effective manner.  (Id.)

54.     Guzman's 2009 annual performance appraisal ("APA") score was reduced from

"4 – Exceeds Standards" to "3 – Meets Standards" because she received a disciplinary warning

for using a Post vendor to obtain personal benefits in January 2009, a month prior to the Stimulus

Cartoon's publication.  (Lern. Dec., Exh. 17 at NYP-528).  Guzman's supervisor, Robinowitz,

did not consider the warning in preparing the initial draft of her 2009 APA (Robin. at 237), and,

when the Post's APA Review Committee reviewed this draft – as it does for all employees – the

warning was factored into the APA, reducing her score.  (Jehn at 289.)

55.     Guzman's compensation, standing and employment were not affected by the

change to her 2009 APA score:  the Post had a salary freeze in effect that year (Racano Aff.,

Exh. 2 at NYP-4434-36) and Guzman's employment was not terminated for performance or

disciplinary reasons.  (Robin. at 105.)

56.     Guzman received the warning because she used a Post vendor to style her for a

personal event (Lern. Dec., Exh. 17 at NYP-528), even though she had provided him with a

written "letter of authorization" to solicit merchandise for her that used the Post's name.  (Lern.

Dec., Exh. 17 at NYP-1585.)  The Post learned of this when it was contacted by a Manolo

Blahnik representative, who complained that the vendor was using the Post's name and

threatening the two companies' relationship in a bid to acquire free merchandise for Guzman.

(Id. at NYP-247-48.)

### III.   Facts Relating to Guzman's Hostile Work Environment Claims

A.   The Post has an Anti-Harassment Policy of Which
     Guzman was Aware

57.   The Post has and had at all relevant times a written anti-harassment policy which directs complaints of discrimination to either the Post's HR department or an attorney for the Post.  (See Lern. Dec., Exh. 26; Scial. at 64-66; Jehn at 54, 57.)

58.   Guzman was aware of the Post's anti-harassment policy.  (Guz. at 126-28.)

B.   Facts Relating to Guzman's Claim of Sexual Harassment

59.   On or about April 20, 2007, Guzman was drinking with three female Post journalists at Langan's, a bar located near the Post's offices (Guz. at 137, 148) discussing, in Guzman's words, "who fucked who."  (Guz. at 466-67; Lern. Dec., Exh. 19.)

60.   Allan joined the journalists during this conversation and shared an anecdote that a famous Post columnist, Steve Dunleavy, purportedly had sex with a female fan in a closet at Langan's.  (Guz. at 137, 469; Allan at 238.)

61.   Guzman's companions laughed at the story.  (Lern. Dec., Exh. 19.)  Guzman responded "eww," "[n]ot because I [Guzman] stand on any high moral ground – just the thought of anyone fucking a near dead drunk skeleton [Dunleavy] was not funny.  I fuck for pleasure – and this semmed [sic] more like toture. [sic]"    (Id.; Guz. at 471-72.)

62.   Guzman was free to leave during Allan's story, but did not, and she did not voice an objection to Allan telling this story.  (Guz. at 472-74.)

63.   Allan did not think the story would offend Guzman or the other journalists. (Allan at 241.)

64.     On the same night, Allan received on his BlackBerry a photograph from the

Post's Photo Desk and showed it to the journalists.  (Guz. at 474-75.)  The image had been e-

mailed to him for his consideration for publication.  (Allan at 203-04.)

65.     At this time, the table was "just talking about news of the day."  (Guz. at 138.)

66.     The image on Allan's Blackberry was of a photograph of a naked man that was

displayed in the bedroom of former New Jersey Governor Jim McGreevey, and this image was

evidence in his then-ongoing and public divorce proceedings.  (Guz. at 138-39; Allan at 201-05.)

67.     Allan showed the image to the Post journalists, including male editor Jesse

Angelo, with whom he was conversing after one of them asked to see the image.  (Allan at 200-

01.)

68.     Guzman looked at the image and responded jocularly, "How Chelsea of you."

(Lern. Dec., Exh. 19; Guz. at 477.)  Guzman, who lives in Chelsea, later explained in a writing:

"Chelsea is the Gay capital of the Northwaest [*sic*].  So this was a very gay – and hense [*sic*] –

normal thing to do on [*sic*] my hood."  (Lern. Dec., Exh. 19; Guz. at 477.)

69.     Guzman did not state that she was offended at being shown the image, did not

leave the conversation, and did not instruct the other female journalists not to look at the image.

(Guz. at 139-40, 143.)

70.     This was the only time that Allan showed Guzman a picture of a naked man.

(Guz. at 134.)

71.     Guzman alleges that an individual named Les Goodstein referred to her as "sexy"

and "beautiful."  (AC ¶ 40.)

72.     Goodstein is and has been at all relevant times an employee of the company News

America, Inc., which he joined in January 2006 to acquire and run community-focused

newspapers in New York City.  (Good. at 14.)[10]   At no time was Goodstein an employee of the Post.  (Id. at 14-15.)

73.    Goodstein was never Guzman's supervisor.  (Guz. at 408-09.)

74.    From the start of his employment in January 2006 through October 2008, his office was located on a different floor from the Post's offices, requiring elevator access; starting in October 2008, his office was located in a different building.  (Good. at 75; Guz. at 388-90.)

75.    When *Tempo* was almost closed in or about mid-2006, Goodstein provided assistance to *Tempo* to improve its performance.  (Good. at 90-92; Racano Aff. at ¶ 11.)

76.    Goodstein worked on *Tempo* from approximately June 2006 through November 2007 and met with Guzman approximately monthly.  (Good. at 103, 118; Guz. at 193.)

77.    Guzman testified that when Guzman and Goodstein met, he would compliment her by telling her she looked "sexy" and/or "beautiful" (Guz. at 192, 205-06), and he "leered" at her, describing his look as, "As a woman you know it when you see it."  (Id. at 394.)

78.     Guzman recalled only two instances of his complimenting:  first, while standing in an elevator bank, Goodstein stated "[Y]ou are looking beautiful and sexy in that dress" (id. at 385-86, 389, 395), and, second, Goodstein referenced her shoes as being "sexy," to which she responded with a joke, stating, "[I]f you want to borrow my shoes, you can."  (Id. at 191-92, 398-99.)[11]

79.    Goodstein never made any sex-based or lewd remark, propositioned her, touched, or attempted to be alone with her.  (Guz. at 189, 398, 413-15.)

80.    Guzman's work "did not suffer for [Goodstein's conduct]."  (Id. at 416-18.)

---

[10] True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 15, 2012 ("Good. at [page]"), are attached to the Lern. Dec. as Exhibit 21.
[11] Goodstein testified that he did not refer to Guzman as "sexy" and/or "beautiful." (Good. at 147-49.)

81.   Guzman never told Goodstein that anything he said offended her or asked him to stop.  (Id. at 190, 192.)

82.   Guzman considers "compliment[ing]" a co-worker as "beautiful" to be "something a friend does, as a colleague does," as she has called co-workers "beautiful."  (Guz. at 170.)

83.   It is undisputed that Guzman never complained to the Post about Goodstein's compliments until, at the earliest, when she spoke to Jennifer Jehn in February 2009, almost three years after she and Goodstein began working together in the summer of 2006, and more than a year after they stopped working together in late 2007.  (Guz. at 188.)[12]

84.   Goodstein and Guzman had a collegial relationship when they worked together; for instance, in June 2007, Guzman suggested a lunch meeting with Goodstein, stating:   "Can't wait.  Lets [sic] have lunch at Sofrito."  (Lern. Dec., Exh. 25 at NYP-2315.)

85.   Guzman suggested that her son and Goodstein's son should "get together."  (Guz. at 191.)

86.   In e-mail to Goodstein, Guzman referred to other women as "gorgeous."  (Lern. Dec., Exh. 25 at NYP-2312.)

87.   In May 2009, after Guzman no longer worked with Goodstein, she attended a dinner honoring him and greeted him and his wife.  (Id. at 147.)

88.   Guzman stopped attending the Post's daily editorial meetings in late 2005 or early 2006.  (Guz. at 266.)  It is undisputed that Guzman cannot recall a single sexually-offensive comment made at these meetings, even after  reviewing notes that she made of these meetings,

---

[12] The fact of Guzman's complaint is disputed, as Jehn testified that Guzman never complained to her about Goodstein.  (Jehn at 191-93.)

though she admitted any sex-related comments were part of discussions of news stories.  (Guz. at 109-10.)

89.     Guzman never heard any sex-based comments in the Post's newsroom that were to or about Guzman or any other employees.  (Id. at 253.)  When in the newsroom, Guzman sometimes heard comments relating to celebrities bodies in connection with news stories.  (Id. at 248-49, 253.)  Guzman cannot recall a single specific comment or relevant time frame.  (Id. at 248.)  Guzman never asked any person in the newsroom to stop making comments or complained about these comments in accordance with the Post's complaint procedure.  (Id. at 253.)

90.     Guzman testified that Photography Editor David Boyle used the word "harem" when speaking to her referring to his staff.  (Id. at 486.)

91.     Guzman did not consider this to be sexual harassment of her.  (Guz. at 485.)  She considered this to be merely "unprofessional" conduct.  (Id. 494.)

92.     Guzman never asked Boyle to stop using the term "harem."  (Id. at 491.)

93.     Boyle was not Guzman's supervisor.  (Id.)  Guzman did not verbally object to Boyle making these alleged statements.  (Id. at 491.)  Guzman did not complain to Jehn about Boyle in February 2009.  (Jehn at 191-93.)

███████████████████████████████████████████████████████

95.     Guzman lifted her shirt to show her nipples to female coworkers while at the bar Langan's.  (Id. at 282-86.)

96.     Guzman "flirt[ed]" with at least one co-worker at a work function.  (Id. at 325.)

97.     Guzman made unwanted "aspersions about [the] sexuality" of a co-worker sufficiently severe for him to complain about her conduct.  (Lern. Dec., Exh. 24, at NYP-1379; Guz. at 319-21.)

98.     Guzman initiated communications with male and female co-workers about sex toys, erotic fiction, and seeking solace with a stripper.  (Id. at NYP-3954, -3933, -3903; Guz. at 287-88.)

99.     Guzman referred to male colleagues as "guapo" (handsome), "lindo" (pretty), "baby," and "babe."  (See, e.g., Lern. Dec., Exh. 24 at NYP-1638, -2352, -3941, -3950.)

100.    Guzman discussed the physical attractiveness of others with colleagues.  (Id. at NYP-1634, -3944, -3945, -3951.)

101.    Guzman referred to other women as "puta" and "bitch" when communicating with her Post colleagues.  (See id. at NYP-3949, -3944.)

102.    Guzman described the body-parts of celebrities and co-workers as "sexy" and otherwise complimented their bodies and breasts in the workplace.  (See, e.g., id. at NYP-3945.)

## C.    **Facts Relating to Guzman's False Claim of Racial Harassment**

103.    In 2007, Goodstein once greeted Guzman as "Cha Cha"; she immediately responded, "Don't call me that," and he never did so again.  (Guz. at 189-90, 401-02.)

104.    On one unspecified date, Anne Aquilina, the Post's administrative editor, asked Guzman if candles in her office related to "Santeria" or "Voodoo."  (Guz. at 227.)  Santeria is "one of [Guzman's religious practices]."  (Id. at 225-26.)

105.    It is undisputed that Michael Riedel, the Post's Broadway columnist, did no more to offend Guzman than sing "I Want to Live in America" from *West Side Story* in a Spanish accent in Guzman's presence.  (Guz. at 218.)

17

106.    It is undisputed that Riedel sang songs from *West Side Story* in the Post's offices more than three times from in or about 2008 through early 2009.  (Riedel Aff. at ¶ 10; Guz. at 529 ["I cannot recall how many times."].)  Riedel's singing of this song coincided with the Broadway revival of of *West Side Story*.  (Id. at ¶¶ 6-10.)

107.    In 2008 and until approximately March 2009, when the revival of *West Side Story* opened, Riedel and Guzman discussed *West Side Story*, coverage of the musical,  and its history, including Chita Rivera's performance in the original production, which Guzman described as a "classic."  (Id. at ¶ 7, Exh. 1 at NYP-3684.)

108.    Guzman initiated communications with Riedel regarding *West Side Story* on a number of occasions, and requested that Riedel get her tickets to the performance – which he did – and that he put a friend of hers in contact with the musical's casting director.  (Id. at ¶¶ 4-7, Exh. 1.)

109.    Riedel sometimes sings Broadway show tunes in the Post's office, and these songs are not just limited to *West Side Story*.  (Id. at ¶ 9.)

110.    Riedel did not sing any song to offend Guzman, or because of her race, color and/or national origin, and Guzman never objected to his singing.  He sang because Guzman had expressed to Riedel that she was a fan of the music of *West Side Story*.  (Id. at ¶¶ 9-11.)

111.    Guzman never told Riedel that she was offended by his singing and she never asked him not to sing any song from *West Side Story*.  (Guz. at 214, 219, 434.)

112.    Singing "I Want to Live in America" is the only thing Riedel did that offended Guzman, and she never had any "dispute" with him.  (Id. at 422, 433.)

113.     Guzman's relationship with Riedel was "friendly."  (Guz. at 421-22; Riedel Aff. ¶ 3.)

114.    The "friendly" nature of their relationship is reflected in e-mails between the two, including, when, in January 2008, Guzman e-mailed Riedel in 2008 to wish him a happy birthday.  (Riedel Aff., Exh. 1 at NYP-4414.)

115.    On July 22, 2008, Guzman wrote to Riedel, "When are you back in the office? . . . [H]aven't seen you in weeks.  wanna [*sic*] talk to you about west side story [*sic*].  don't [*sic*] forget me . . . ."  (<u>Id.</u> at NYP-4413.)

116.    On September 15, 2008 Guzman wrote to Riedel, "Is it fair to say that you've completely forgotten about me?  wanted [*sic*] to touch base with you about those two classics."  (<u>Id.</u> at NYP-4421-22.)  In the same e-mail chain, she wrote to Riedel, who was vacationing in Greece:  "If you are trying to make me jealous, mission accomplished.  Wine, ruins, fresh olive oil, sun . . .  damn you Michael.  I want to be you right about now, except of course, I'd love a hot Greek man."  (<u>Id.</u> at NYP-4421.)

117.    In October 2008, Guzman asked Riedel to "make sure" that he "touch[ed] base" with her, and to put one of her friends in touch with the casting director for *West Side Story*.  (<u>Id.</u> at NYP-1781.)

118.    On December 28, 2008, Guzman wrote to Riedel and stated that a television recap of Broadway in 2008 "sucks" because Riedel was not on it, and further stated, "While I can't be your agent, I can be your cheerleader!  I know a high ranking dude at NY 1 and I will talk you up.  You'd be awesome on TV."  (<u>Id.</u> at NYP-4412.)

119.    On March 6, 2009, two days after Guzman published a story on the revival of *West Side Story*, including an interview with Chita Rivera, the original's star (<u>id.</u> at NYP-3684), she e-mailed Riedel, stating, "You crack me up!"  (<u>Id.</u> at NYP-4397.)

120.    On June 2, 2009, Guzman asked Riedel about the play *God of Carnage*:  "Did you like this?  I wanna see it."  (Id. at NYP-4415.)

121.    It is undisputed that during Guzman's employment, Allan made no more than three comments regarding Hispanics that she perceived as offensive, which occurred on December 6, 2004, December 15, 2004, and in or about May 2005.  (Lern. Dec., Exh. 24 at SG_347-48; Guz. at 114.)  These occurred more than four years before Guzman filed her initial Complaint on November 9, 2009 (ECF No. 1), and Allan made no comments regarding Hispanics other than these alleged comments.  (Guz. at 123.)

122.    Guzman did not complain to any Post employee about the allegedly race-based conduct of Riedel, Aquilina or Goodstein, including when she spoke to Jehn in February 2009.  (Guz. at 223, 230-31; Jehn at 191-93, 197.)

IV.    **Guzman's Various Fabrications and Distortions of Fact**

123.    Guzman claims to have edited "over 25 other Features sections . . . each year " "[i]n addition" to *Tempo* (AC ¶ 28), but it is undisputed that she edited no more than 11 additional sections in any year (Guz. at 365-68).

124.    She claims *Tempo* increased the Post's Hispanic readership by 40% (AC ¶ 29), but admits this to be untrue, and that in fact Hispanic readership decreased during her employment (Guz. at 504-08).

125.    Guzman alleges that Allan "rubbed his penis against" a female employee at a party in or about 2007 and made sexually suggestive comments to her.  (AC ¶ 37.)  It is undisputed that this did not happen.  (See Faux at 19-20, 34-38; Allan at 504; Guz. at 168.)[13]

---

[13] True and correct copies of referenced excerpts of the deposition of Nicole Faux, dated March 19, 2012 ("Faux at [page]"), are attached to the Lern. Dec. as Exhibit 29.

126.     Guzman alleges that Allan once referred to Ebony Clark, a very junior employee (a copy assistant) who happens to be African-American , as a "damn girl" because of her race (AC ¶ 39), but he did so from frustration because she was not answering his phone, as her job required, and it is undisputed that he made no reference to race (Clark at 331-33; Allan at 324). Allan has raised his voice at white employees in connection with their work, including Robinowitz, Frank Zini, Chris Shaw, Rich Wilner, and Michael Shain.  (Gott. at 22.)[14]

127.     Guzman alleges that Angelo engaged in "improper" relationships with copy assistants (junior employees) (AC ¶ 46).  This did not happen.  (Angelo at 81, 381.)[15]

128.     Guzman alleges that the Post had a "policy . . . of only hiring White women" to be models for photography shoots (AC ¶ 55) but there is no evidence of this, and Guzman was herself a modeled for the Post at times.  (Lern. Dec., Exh. 32 [depicting Guzman and other non-white models for the Post].)

129.     Guzman alleges that editor Lauren Ramsby – who was not involved in Guzman's termination – referred to Henry Louis Gates as an "angry black man" (AC ¶ 56), but the junior employee who overheard this comment explains that it was part of a longer conversation regarding Mr. Gates' July 2009 arrest and how "a lot of people characterized him" "outside of the Post" in that manner.  (Logan at 60-61, 214-215, 275.)[16]

130.     Guzman alleges that the Post employed only one non-white editor at the time of her termination (AC ¶ 57), but is undisputed that the Post employed many more non-white editors at the time of Guzman's termination.  (See Lern. Dec., Exh. 18, at No. 9.)

---

14 True and correct copies of referenced excerpts of the deposition of Michelle Gotthelf, dated March 29, 2012 ("Gott. at [page]"), are attached to the Lern. Dec. as Exhibit 33.

15 True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 ("Angelo at [page]"), are attached to the Lern. Dec. as Exhibit 13.

16 True and correct copies of referenced excerpts of the deposition of Shari Logan, dated March 9, 2012 ("Logan. at [page]"), are attached to the Lern. Dec. as Exhibit 30.

131.    Guzman alleges that Allan "openly" demeaned individuals protesting the Stimulus Cartoon in February 2009 (AC ¶ 76), but the employee who claims to have heard this (which Allan denies [Allan at 351]) testified that it was made in his private office while he was speaking on a phone, and Clark only heard this statement from Allan and nothing else by him or the person to whom he was speaking, and she "didn't know" to what he referred, and merely "impl[ied]" it was the protestors.  (Clark at 137-39, 147-48.)[17]

132.    Guzman alleges editors "openly" made jokes in the newsroom about the Stimulus Cartoon and/or people protesting it (AC ¶ 77), but it is undisputed that there is no evidence that any editor made any such joke (Logan at 120-21), there were no newsroom discussions about the protestors (id. at 64-65), and the only reference to a "joke" was one editor's explanation that the cartoon was intended to be a "joke," with the chimpanzee representing Congress (id. at 274-75).

133.    Guzman alleges that Logan asked to talk to Allan about her "feelings of discrimination" with respect to the cartoon, and that Allan responded "Absolutely not" before walking away (AC ¶ 83), but Logan, a very junior employee (a copy assistant) only stated, "Can we talk about this?" to which Allan responded, "Absolutely not" since "he didn't want to talk about that.  He had other things to think about that day," and she could not recall him walking away.  (Logan at 62, 152.)

---

[17] True and correct copies of referenced excerpts of the deposition of Ebony Clark, dated May 30, 2012 ("Clark. at [page]"), are attached to the Lern. Dec. as Exhibit 31.

Dated: New York, New York
       May 10, 2013

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP


By:    /s/ Mark W. Lerner
       Marc E. Kasowitz (mkasowitz@kasowitz.com)
       Daniel R. Benson (dbenson@kasowitz.com)
       Mark W. Lerner (mlerner@kasowitz.com)
       Blythe E. Lovinger (blovinger@kasowitz.com)
       Garrett D. Kennedy (gkennedy@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.:(212) 506-1700
Fax:(212) 506-1800

Attorneys for Defendants News Corporation,
NYP Holdings, d/b/a the New York Post,
and Col Allan