# **EXHIBIT 2**

Case 1:09-cv-09323-LGS   Document 146-2   Filed 05/10/13   Page 1 of 6

```
                                                              Page 1
 1
 2      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 3

        AUSTIN FENNER and IKIMULISA
 4      LIVINGSTON,
 5                 Plaintiffs,
 6           vs.                          09CIV9832
                                          (BSJ(RLE)
 7      NEWS CORPORATION, NYP HOLDINGS,
        INC., d/b/a THE NEW YORK POST,
 8      and DAN GREENFIELD and MICHELLE
        GOTTHELF,
 9
                   Defendants.
10      ----------------------------------
        SANDRA GUZMAN,
11
                   Plaintiff,
12
             vs.                          09CIV9323
13                                        (BSJ(RLE)
        NEWS CORPORATION, NYP HOLDINGS,
14      INC., d/b/a THE NEW YORK POST,
        and COL ALLAN, in his official
15      and individual capacities,
16                 Defendants.
        ----------------------------------
17            DEPOSITION OF JOE ROBINOWITZ
18                 New York, New York
19                  June 14, 2012
20
21      Reported by:
22         MARY F. BOWMAN, RPR, CRR
23      JOB NO. 50552
24
25
```

Page 90

```
 1              ROBINOWITZ
 2   termination Sandra Guzman?
 3        MS. LOVINGER: Objection.
 4        A.   Had nothing to do with me. All
 5   I --
 6        Q.   I'm not asking whether it had
 7   something to do with you. My question is --
 8        MS. LOVINGER: The record will
 9    reflect that the witness was again cut
10    off in answering.
11        Q.   Mr. Robinowitz, if you weren't
12   finished, please finish your question. I
13   thought you were finished.
14        A.   Sir, this is a hypothetical. It
15   was not my decision to make. I was carrying
16   out orders. I don't know whether I would
17   agree or disagree. It was something I was
18   asked to do.
19        Q.   I'm not asking you a hypothetical
20   question. I am asking you a question in
21   fact.
22        When you learned that Ms. Guzman's
23   employment was going to be terminated, did
24   you agree with that decision? Yes or no?
25        MS. LOVINGER: Objection.
```

Page 91

```
 1              ROBINOWITZ
 2        A.   I would say that I did, because
 3   more than half of her sections or half of her
 4   sections were gone.
 5        Q.   Well, there were other sections
 6   that she was working on at the time of her
 7   termination, correct?
 8        A.   Correct.
 9        Q.   And those sections were -- strike
10   that.
11        So why couldn't she stay on at the
12   Post and handle those sections going forward?
13        MS. LOVINGER: Objection.
14        A.   Mr. Allan asked me in advance of my
15   learning of her termination -- I went in to
16   see him. Amy Scialdone was with me. The
17   decision was made that she would no longer do
18   those sections.
19        And the reason I know this is
20   because when we went into his office, we
21   said -- we said, we've come to talk about
22   Sandra. His question right at that point to
23   me was, who will pick up her other sections?
24        Q.   And what did you say?
25        A.   Carole Sovocool.
```

Page 92

```
 1              ROBINOWITZ
 2        Q.   Who made the decision to have
 3   Carole Sovocool take over the position --
 4        A.   He said that was fine.
 5        Q.   My question -- you have to let me
 6   finish my question.
 7        A.   Yes, sir, I am sorry.
 8        Q.   My question is, who made the
 9   decision that Carole Sovocool would take over
10   the other sections of the paper that
11   Ms. Guzman was responsible for apart from
12   Tempo?
13        MS. LOVINGER: Objection.
14        A.   When Col asked me that question, I
15   said, I think the best person would be Carole
16   Sovocool. And he said fine.
17        Q.   Did Carole Sovocool actually take
18   over the responsibility for editing the other
19   sections that Ms. Guzman had edited during
20   her employment?
21        A.   Yes.
22        Q.   Is Carole Sovocool Caucasian?
23        A.   Yes, sir.
24        Q.   So I want to make sure the record
25   is clear. When did you and Amy Scialdone go
```

Page 93

```
 1              ROBINOWITZ
 2   to Mr. Allan's office regarding Sandra
 3   Guzman's termination?
 4        A.   At some point after the decision
 5   was made to terminate Tempo.
 6        Q.   When was that decision made?
 7        A.   I don't know the exact date.
 8        Q.   Who made the decision to terminate
 9   Tempo?
10        A.   I don't know.
11        Q.   Did you participate in the decision
12   to terminate Tempo?
13        A.   No, sir.
14        Q.   How did you learn that the Tempo
15   section would be terminated?
16        A.   I can't recall.
17        Q.   Who told you that the Tempo section
18   was going to be terminated?
19        MS. LOVINGER: Objection. Asked
20    and answered.
21        A.   I can't recall.
22        Q.   Was it a male or female who told
23   you that the Tempo section was going to be
24   terminated?
25        MS. LOVINGER: Objection.
```

**Page 102**

ROBINOWITZ

Tempo?
A. No. That wouldn't be my job to do that. I don't know what else there was even available in the newsroom at that time.
Q. Well, did you -- did it ever cross your mind to ask Col Allan if there was additional responsibilities that could be given to Sandra Guzman after Tempo closed?
MS. LOVINGER: Objection.
A. No, I did not ask him that.
Q. Why not?
A. The -- there are four people that report to me at this point, OK, or maybe five. One has been taken away from me. I didn't know she was going to be terminated. I just knew that those other sections that she handled were going to be given to Carole Sovocool. At that point, I knew she was no longer going to be reporting to me.
Q. But then there came a time when you learned that Ms. Guzman was going to be terminated, correct?
A. That is correct.
Q. So why didn't you go to Col Allan

**Page 103**

ROBINOWITZ

at that point and say, is there anything else we can give to Sandra so she doesn't have to be terminated?
MS. LOVINGER: Objection.
A. I didn't -- I mean that's not my responsibility. It's-- you know, the responsibility for the other areas that need coverage in our newsroom, I don't have --
Q. My question --
MS. LOVINGER: He is still answering the question and you're cutting him off.
Q. The reason why I go on to the next question, Mr. Robinowitz, is it appears as if you've finished answering the questions. If you can just keep your voice up, and I will wait for you to finish answering all my questions.
A. OK, I understand.
Q. OK?
I am not asking you whether it was your responsibility to go to Col Allan and talk to him about whether Ms. Guzman should be given additional work. I'm asking you why

**Page 104**

ROBINOWITZ

didn't you go to him and ask him whether Ms. Guzman could be given additional responsibilities rather than be terminated.
A. I simply didn't.
Q. I understand you didn't. I am asking you why didn't you.
MS. LOVINGER: Objection.
A. I didn't.
Q. Why?
MS. LOVINGER: This has been asked and answered.
A. Sir, I didn't ask if there were other things she could do.
Q. I know you didn't ask. My question is, why didn't you go to Col Allan and ask him?
MS. LOVINGER: Objection.
A. I can just give you, in my experience, people come, people go. People are hired, people are fired. People quit, people die. It is not my responsibility in the role I had at that time to do anything except carry out the order.
Q. I understand. But she was a direct

**Page 105**

ROBINOWITZ

report of yours, correct?
A. Right.
Q. And months earlier, you felt that she was doing -- her performance exceeded the standards, correct?
A. Her performance did exceed the standards. She was an excellent employee. Excellent employees have left before, and I haven't gone to my superior and, you know, sought additional work for them.
Q. So you believe that when Ms. Guzman was terminated, she was an excellent employee?
MS. LOVINGER: Objection.
A. I believe that half of the sections that she was handling were gone.
Q. That's not my question. You just said she was an excellent employee. My question, Mr. Robinowitz, is, was she an excellent employee on the day she was terminated?
A. Yes. Her termination had nothing to do with her performance.
Q. At all?

Page 234

ROBINOWITZ

A. I don't know. I can tell you who was -- I'm pretty sure I know who was there during the meeting.
Q. OK.
A. Myself --
Q. Wait. Before you identify the people who were there, do you recall when you met with the appraisal committee in 2009 to go over Ms. Guzman's evaluation for that year?
A. No, sir.
Q. Do you recall the month in 2009 that you participated in such a meeting?
A. No, sir.
Q. Do you recall where the meeting was held?
A. It was held at 1211 6th Avenue.
Q. Where in 1211 6th Avenue was the meeting held?
A. In a conference room on the third floor.
Q. Did the New York Post occupy offices on the third floor of 1211 Avenue of the Americas when you had that meeting?

Page 235

ROBINOWITZ

A. What do you mean, did they occupy?
Q. Did they have offices --
A. There is a series of conference rooms on that floor.
Q. Did News Corp. also have conference rooms on the third floor?
MS. LOVINGER: Objection.
A. I -- I think the conference rooms are used by all kinds of different companies that are associated with, you know, the parent company. But it is where the conference rooms are.
Q. Now, who do you recall being present for the meeting that you had with the appraisal committee to go over Ms. Guzman's draft evaluation?
A. In 2009?
Q. Yes.
A. I'm certain I was there. I'm certain Mr. Allan was there. I'm certain Ms. Jehn was there. I'm certain Paul Carlucci was there.
I don't believe that Amy Scialdone was there. But I have a vague recollection

Page 236

ROBINOWITZ

that Mike Racano might have been there.
Q. When you went to the meeting that day, did you go with the intention of reviewing only Ms. Guzman's work performance or the work performance of some of your other direct reports?
A. All of my direct reports. It is purposely scheduled that day.
Q. OK. And how many direct reports did you have at that time?
A. At that time, it would have been Laura Harris, who is the Post's librarian.
Q. Laura Harris?
A. Yes, sir, Laura Harris, the Post's librarian.
Q. Right.
A. Chris Erikson, who works for features. He's sort of a hybrid. He also did -- does our At Work section on Mondays. I no longer review him, but I did in 2009.
David Landsel, the travel editor.
Carole Sovocool, the special sections editor.
And Sandra Guzman, the Tempo

Page 237

ROBINOWITZ

editor.
Those were my reports in that year that I did performance appraisals for.
Q. Was there a discussion by the group regarding your draft appraisal for Ms. Guzman for 2009?
A. Yes, there was.
Q. Can you describe the discussion that took place?
A. The only thing I recall is that when we got to the actual rating, somebody said, listen, there is nothing in this document that reflects an ethical breach which Sandra was involved in, in January. She was written up for it. That needs to be incorporated in this document so that she knows that we are serious about her upholding the highest standards of business practice, and the rating of a 4 should be reduced as a result of that write-up.
Now, when I did this write-up, I didn't -- I wasn't even considering --
Q. Why not?
A. -- that write-up.

60

Page 282

```
1              ROBINOWITZ
2    question.
3       Q.   Did there come a time when you and
4    Amy Scialdone went to see Col Allan about
5    Sandra Guzman?
6       A.   Yes.
7       Q.   Why did you go see him?
8            MS. LOVINGER:  Objection.  Asked
9    and answered.
10      A.   I have answered.  It has been asked
11   several times and answered.
12           We wanted to discuss Sandra Guzman
13   with him, the matter of Sandra Guzman,
14   because it had been determined that Tempo was
15   closing, and that was half of the sections
16   that she worked on.
17      Q.   I understand.  Now --
18      A.   All the other sections previously
19   had been, you know, edited by Carole
20   Sovocool.  I gradually moved some of that
21   work over to Sandra to equalize out the work.
22      Q.   I understand.
23           So when you --
24      A.   So when we went into his office,
25   the first thing he said was, who is going to
```

Page 283

```
1              ROBINOWITZ
2    pick up the other sections?  It was natural
3    for me to say Carole Sovocool.
4       Q.   I understand.
5            But when you went into that office
6    that day, you had no idea how much time
7    Sandra Guzman had been spending on the other
8    sections separate and apart from Tempo,
9    correct?
10           MS. LOVINGER:  Objection.
11      A.   That is correct.
12      Q.   So is it fair to say that when you
13   went to see Col Allan, Sandra Guzman might
14   have been spending the bulk of her time as a
15   New York Post editor working on the other
16   sections of the newspaper as opposed to
17   spending most of her time on Tempo?  Right?
18           MS. LOVINGER:  Objection.
19      A.   I have no way of knowing.
20      Q.   And as you sit here today, you have
21   no idea, right?
22           MS. LOVINGER:  Objection.  Asked
23   and answered.
24      Q.   You have to answer verbally, not
25   nonverbally.
```

Page 284

```
1              ROBINOWITZ
2       A.   I have no idea.  All I know is when
3    she brought her sections to me, they were
4    top-notch.  The Tempo ones -- there was no
5    performance problem.
6       Q.   I understand that.  That's not in
7    dispute.
8            My question to you is this:  As you
9    sit here today, can you point to any other
10   New York Post employee who had more
11   understanding of the sections that Sandra
12   Guzman was working on at the time she was
13   terminated than you?
14      A.   I -- I think I probably had the
15   most.
16      Q.   OK.
17      A.   But not on how she was spending her
18   time.
19      Q.   OK.  But you were the person who
20   was in the best position to know her work
21   performance, correct?
22      A.   Yes.
23      Q.   At the time she was terminated,
24   correct?
25      A.   Yes, sir.  Yes, sir.
```

Page 285

```
1              ROBINOWITZ
2            MR. THOMPSON:  Let's take a break
3    right now.
4            THE VIDEOGRAPHER:  Going off the
5    record.  The time is 5:41 p.m.
6            (Recess)
7            THE VIDEOGRAPHER:  We are back on
8    the record.  The time is 6:04 p.m.
9            (Exhibit 16, document Bates stamped
10   NYP2327 through 28 marked for
11   identification, as of this date.)
12   BY MR. THOMPSON:
13      Q.   Mr. Robinowitz, please take a
14   minute to look at Deposition Exhibit 16,
15   which is Bates stamped NYP2327 to 2328.
16      A.   OK.
17      Q.   Have you seen this exhibit before?
18      A.   Yes, I have.
19      Q.   Did you see this exhibit back in
20   September of 2007?
21      A.   This was shortly after I became her
22   supervisor.
23      Q.   Did you see this exhibit back in
24   September of 2007?
25      A.   Yes, sir.
```