# **EXHIBIT 11**

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
            Case No. 09-CIV-9832 (BSJ)(RLE)
            Case No. 09-CIV-9323 (BSJ)(RLE)

------------------------------------------x
AUSTIN FENNER and IKIMULISA LIVINGSTON,

                      Plaintiffs,
     v.
NEWS CORPORATION, NYP HOLDINGS, INC.,
d/b/a THE NEW YORK POST and DAN GREENFIELD
and MICHELLE GOTTHELF,
                      Defendants.
------------------------------------------x
SANDRA GUZMAN,
                      Plaintiff,
     v.
NEWS CORPORATION, NYP HOLDINGS, INC.,
d/b/a THE NEW YORK POST and COL ALLAN, in
his official and individual capacities,
                      Defendants.
------------------------------------------x
               CONFIDENTIAL
       VIDEOTAPED DEPOSITION OF AMY SCIALDONE
            New York, New York
            Thursday, June 28, 2012
Reported by:
Amy A. Rivera, CSR, RPR, CLR
JOB NO. 51053
```

Page 62

AMY SCIALDONE - CONFIDENTIAL

1  A.  I don't know who it's operated by.
2  Q.  Is it operated by an entity associated
3  with News Corporation?
4      MR. PIESCO: Objection.
5  A.  I don't know who it's operated by.
6  Q.  You don't know whether it's operated
7  by any entity associated with News Corporation?
8      MR. PIESCO: Objection.
9  A.  I don't know who it's operated by.
10 Q.  That's not the question. I mean, I
11 assume what you're saying is you don't know
12 specifically.
13 A.  I don't know.
14 Q.  So, you don't know if it is operated
15 by a company associated with News Corporation?
16     MR. PIESCO: Objection.
17     How many times do you want her to
18     answer?
19     MR. CLARK: That's a yes-or-no
20     question. She answered it --
21     MR. PIESCO: She did. She said, I
22     don't know three times. I'm looking at it.
23     I don't know, I don't know, I don't know.

Page 63

AMY SCIALDONE - CONFIDENTIAL

1  BY MR. CLARK:
2  Q.  So, your answer is no, you don't know
3  whether it's associated with News Corporation?
4      MR. PIESCO: Objection.
5      Either you know or you don't know.
6  A.  I don't know.
7  Q.  It's a yes or a no, either you know or
8  you don't?
9  A.  I don't know.
10     MR. PIESCO: Would you mind if we take
11     a break?
12     MR. CLARK: No, that's fine.
13     How long do you need?
14     MR. PIESCO: Two minutes? Five
15     minutes? I just need to use the restroom.
16     VIDEOGRAPHER: The time is 11:10 a.m.
17     We're off the record.
18     (Recess.)
19     VIDEOGRAPHER: The time is 11:17 a.m.
20     We're on the record.
21 BY MR. CLARK:
22 Q.  Ms. Scialdone, when --
23 A.  Yeah.
24 Q.  -- we took our break, we were

Page 64

AMY SCIALDONE - CONFIDENTIAL

1  discussing ways employees could complain about
2  harassment in the workplace, and I want to make
3  sure we've covered all of those.
4      I think you mentioned a couple. You
5  mentioned calling alert line, speaking to legal
6  counsel. Are there any other ways consistent with
7  the New York Post policy that employees could
8  complain about harassment in the workplace?
9      MR. PIESCO: Objection.
10     She -- she also testified coming to
11     HR.
12     THE WITNESS: Yeah, I was going to
13     clarify that.
14     MR. PIESCO: That's okay.
15     Go ahead.
16 Q.  Okay, good. So -- so, coming to -- to
17 human resources department would be another way?
18 A.  Yes, and their manager directly, or a
19 supervisor.
20 Q.  Or their -- have -- it would have to
21 be their direct supervisor or would coming to any
22 supervisor be appropriate?
23 A.  They could go to any supervisor --
24 supervisor.

Page 65

AMY SCIALDONE - CONFIDENTIAL

1  Q.  Okay. Are that any other ways that an
2  employee -- that -- strike that.
3      Are there any other ways available
4  under the New York Post policies for an employee
5  to make a complaint about harassment in the
6  workplace?
7      MR. PIESCO: Objection.
8      You can answer.
9  A.  Those are the ones we discussed.
10 Q.  There's no others -- no others you can
11 think of today?
12     MR. PIESCO: Objection. Asked and
13     answered.
14 A.  No.
15 Q.  Now, would that same -- those same
16 paths apply to complaints of retaliation in the
17 workplace?
18     MR. PIESCO: Objection.
19     You can answer.
20 A.  Yes.
21 Q.  So, in 2009, was Jennifer Jehn one of
22 the people that it would be appropriate to
23 complain to about discrimination in the workplace?
24     MR. PIESCO: Objection.

### Page 66

```
1        AMY SCIALDONE - CONFIDENTIAL
2        You can answer.
3    A.  If an employee had any complaint, they
4  could go to Jennifer Jehn, yes.
5    Q.  And would -- would you have been
6  another person that an employee could complain to
7  about discrimination in the workplace?
8        MR. PIESCO:  Objection.
9        You can answer.
10   A.  Yes.
11       MR. CLARK:  I'd like to mark this as
12   Exhibit 1 -- Scialdone 1.
13       (Exhibit Scialdone 1, a newspaper
14       cartoon printout dated February 18, 2009,
15       was marked for identification at this time.)
16  BY MR. CLARK:
17   Q.  Ms. Scialdone, we've just marked as
18  Exhibit 1 a page that has a cartoon on it, and the
19  page is dated February 18, 2009.
20       Do you see that?
21   A.  Yes.
22   Q.  Have you ever seen this cartoon
23  before?
24   A.  Yes.
25   Q.  Is this a cartoon that ran in the New
```

### Page 67

```
1        AMY SCIALDONE - CONFIDENTIAL
2  York Post in February 2009?
3    A.  That's what the date states, yes.
4    Q.  Do you have any reason to think that
5  date's not correct?
6    A.  I can't hear you with the trucks.  I'm
7  sorry --
8    Q.  I'm sorry --
9    A.  -- can you repeat that?
10   Q.  -- do you have any reason to think
11  that date is incorrect?
12   A.  No.
13   Q.  When was the first time you saw this
14  cartoon?
15   A.  I don't recall.
16   Q.  Did you see it before it was published
17  in the paper?
18   A.  No.
19   Q.  Do you recall if you saw it the day it
20  was published?
21   A.  I don't recall.
22   Q.  What was your reaction the first time
23  you saw the cartoon?
24       MR. PIESCO:  Objection.
25   A.  I don't recall.  I was on vacation.  I
```

### Page 68

```
1        AMY SCIALDONE - CONFIDENTIAL
2  can't -- I don't recall the first time I saw it or
3  what my reaction was.
4    Q.  Okay.  So, you were on vacation on
5  February 18, 2009?
6    A.  Yes.
7    Q.  When did you come back from vacation?
8    A.  The following week.
9    Q.  And did you learn about the cartoon
10  before you returned from vacation?
11   A.  Yes.
12   Q.  How did you learn about the cartoon
13  being published?
14   A.  On the radio.
15   Q.  Do you recall when that was?
16   A.  It may have been that afternoon that
17  it ran.
18   Q.  And what did you hear on the radio
19  that -- that first time when you learned about the
20  cartoon?
21   A.  I don't recall exactly, but that there
22  was concern about it.
23   Q.  What kind of concern?
24   A.  I don't recall exactly.
25   Q.  As you sit here today, do you find
```

### Page 69

```
1        AMY SCIALDONE - CONFIDENTIAL
2  this cartoon to be personally offensive to you?
3        MR. PIESCO:  Objection.
4        You can answer.
5    A.  No.
6    Q.  You don't believe this cartoon is
7  offensive --
8        MR. PIESCO:  Objection.
9    Q.  -- in your opinion?
10       MR. PIESCO:  Asked and answered.
11   A.  No.
12   Q.  Are you aware of the history of
13  African Americans being depicted as chimpanzees
14  and apes?
15       MR. PIESCO:  Objection.
16   A.  No.
17   Q.  No, you're not aware of that?
18   A.  No.
19   Q.  As you sit here today, you do not know
20  that African Americans have been depicted as
21  chimpanzees?
22       MR. PIESCO:  Objection.  Asked and
23       answered.
24   A.  No.
25   Q.  Prior to returning from vacation, did
```

Page 150

1      AMY SCIALDONE - CONFIDENTIAL
2          Can we mark this "confidential,"
3   please?
4          MR. CLARK: That's fine.
5          MR. PIESCO: All right.
6          And, also, I just want to remind
7   counsel that I believe there was a ruling on
8   how far we can go in terms of other
9   complaints. So, I just -- obviously, I'm
10  giving you leeway here, but if we start
11  getting into the specifics of this, I think
12  we're going to have to step outside, you and
13  I --
14         MR. CLARK: Okay.
15         MR. PIESCO: -- and chat.
16         MR. CLARK: Okay.
17         MR. PIESCO: Thanks. It's marked.
18  Go back to --
19         MR. LIPPNER: Who is Bill?
20         MR. PIESCO: -- who is Bill Hoffman,
21  from that pen on, please mark the record.
22  Thank you.
23         Sorry. Thanks, Paul.
24  BY MR. CLARK:
25     Q.  Okay. So, why was Bill Hoffman fired?

Page 151

1      AMY SCIALDONE - CONFIDENTIAL
2      A.  For violating our electronics
3   communication policy.
4      Q.  You say, "our electronics
5   communication policy"?
6      A.  The New York Post's electronics
7   communication policy.
8      Q.  And what's the title of that policy,
9   is that it, "the New York Post electronic
10  communication policy"?
11     A.  I believe so. I'd have to look at the
12  top line.
13     Q.  Could it be "News Corporation's
14  electronic communications policy"?
15         MR. PIESCO: Objection.
16     A.  I don't know.
17     Q.  And what's -- how specifically did
18  Bill Hoffman violate this New York Post electronic
19  communications policy?
20         THE WITNESS: Is that privileged?
21         MR. PIESCO: Answer this question.
22         THE WITNESS: Okay.
23     A.  He was viewing sexual pornography in
24  the workplace.
25     Q.  When did this occur?

Page 152

1      AMY SCIALDONE - CONFIDENTIAL
2      A.  A couple of years ago.
3      Q.  And was this reported to HR?
4      A.  Yes.
5      Q.  Who reported it?
6      A.  Paula Froehlich.
7      Q.  Are you aware of any other complaints
8   of New York Post employees being -- strike that.
9          Are you aware of any other instances
10  of New York Post employees being disciplined for
11  viewing pornography in the workplace?
12         MR. PIESCO: Objection.
13     A.  Yes.
14     Q.  How many people would you say?
15         MR. PIESCO: Objection.
16         THE WITNESS: Is this privileged?
17         MR. LIPPNER: Yes. Hang on a second.
18         Yeah, I prefer that --
19         MR. PIESCO: Can we go off the record
20  for two minutes, please? I want to talk to
21  my --
22         MR. CLARK: We can go off the record.
23         VIDEOGRAPHER: The time is 12:48 p.m.
24         We're going off the record.
25         (Recess.)

Page 153

1      AMY SCIALDONE - CONFIDENTIAL
2          (Exhibit Scialdone 3, a memo dated
3   June 2003 bearing Bates numbers NYP-FL 1153
4   through 1160, was marked for identification
5   at this time.)
6          VIDEOGRAPHER: The time is 12:55 p.m.
7          We're on the record.
8          MR. PIESCO: All right. So, Paul,
9   we've been gone like 15 minutes or so.
10         MR. CLARK: Yes.
11         MR. PIESCO: For the record, there was
12  a discussion amongst counsel outside
13  regarding the nature and scope of the
14  questioning on other complaints.
15         My understanding, Paul, is that
16  we're -- plaintiff is going to be compliant
17  with the court's order in that regard, and
18  we're fine with that, but we're going to
19  take this question by question, if that's
20  okay.
21         MR. CLARK: Understood.
22         MR. PIESCO: Okay. Thanks.
23         MR. CLARK: So, I think there's a
24  question pending.
25         MR. PIESCO: I don't think so.

Page 278

AMY SCIALDONE - CONFIDENTIAL
BY MR. CLARK:
1  Q. Did you --
2  MR. PIESCO: Sure.
3  Q. Did you ever make a search --
4  MR. PIESCO: Listen to his question.
5  Q. Did you ever make a search to ensure that any notes you took with respect to the termination of Ms. Guzman were produced to your counsel?
6  A. Yes.
7  Q. When did you do that?
8  A. I don't recall when I was asked, and I produced whatever I had.
9  Q. And are you confident that anything you had was turned over to your counsel?
10 A. Yes.
11 Q. Did you ever speak to anyone at all other than the people we've already discussed about Ms. Guzman in September 2009 with respect to her termination?
12 MR. PIESCO: Objection. Asked and answered.
13 Go ahead.
14 MR. CLARK: No, I asked her about --

Page 279

AMY SCIALDONE - CONFIDENTIAL
BY MR. CLARK:
Q. I asked you about New York Post employees. Now I want to know anyone at all.
MR. PIESCO: Including her husband?
MR. CLARK: Well, I don't care about the marital communication. That's privileged.
MR. PIESCO: Okay --
Q. But --
MR. PIESCO: -- I just want to make sure.
Q. -- did you speak to --
A. And you don't care about my legal counsel --
Q. No, I'm not --
A. -- so --
MR. PIESCO: Stop, stop, stop.
Q. I'm not asking -- I'm just asking --
A. -- not --
Q. -- did you speak in 2000 -- just in 2000 -- September 2009, did you have any conversations about Ms. Guzman's termination with anyone at all that we have not yet discussed?
A. Linda Bobajko.

Page 280

AMY SCIALDONE - CONFIDENTIAL
Q. Okay. Anyone other than Linda?
A. No.
Q. And when did you discuss Ms. Guzman's termination with Linda?
A. When I would have needed to request information on any vacation due while I was creating a separation agreement.
Q. Did you discuss with Ms. Babajko the reasons for Sandra Guzman being terminated?
A. No.
Q. Was there anything else you discussed with Ms. Babajko about Ms. Guzman's termination?
A. No, just the benefits information I needed.
Q. And, again, just to make sure it's absolutely clear: Other than Ms. Babajko and the other the people we've talked about, was there anyone else you discussed Ms. Guzman's determination with in September 2009?
A. No.
Q. Do you know who Margie Conklin is?
A. Yes.
Q. Who is Margie Conklin?
A. Currently?

Page 281

AMY SCIALDONE - CONFIDENTIAL
Q. Well, in 2009, who was Margie Conklin?
A. In 2009.
At the beginning of 2009, she was solely the editor in chief of Page 6 Magazine. Then we had to close that business, and she transitioned over to the deputy Sunday editor.
Q. Do you know who --
A. And --
Q. -- I'm sorry. Go ahead.
A. I'm sorry, I'm trying to be accurate -- and still continued as the editor in chief of Page 6 Magazine.
Q. Do you know who made the decision to transition Ms. Conklin to this other position you talked about?
MR. PIESCO: Objection to that, Paul.
But go ahead.
A. Can you restate the question?
Q. Do you know who made the decision for Ms. Babajko to --
MR. PIESCO: Wrong name.
A. Wrong name.
Q. Sorry, I'm sorry. Ms. Conklin --
A. Yeah.

Page 286

AMY SCIALDONE - CONFIDENTIAL
Q. At the time.
A. At the time, it was 1211 Avenue of the Americas on the 15th floor.
Q. How did -- well, who decided how Ms. Guzman was going to be told? In other words, did you -- did you meet with Joe Rabinowitz and talk about it, or how -- how was that decision made?
    MR. PIESCO: Objection.
A. We spoke prior -- a few minutes prior, and he was going to explain it to her, what was happening, and I was going to take her through the separation agreement.
Q. Do you remember anything else about that conversation with Mr. Rabinowitz before the meeting?
A. No.
Q. Did he say anything else at all?
A. I don't recall.
Q. How did the meeting with Ms. Guzman start?
    MR. PIESCO: Objection.
Q. In other words, she comes -- she comes into your office, correct?

Page 287

AMY SCIALDONE - CONFIDENTIAL
A. Yes.
Q. And then what happened after that?
A. Joe explained why we were there.
Q. Do you remember what Mr. Rabinowitz said?
A. To the best --
    MR. PIESCO: Word for word, in substance, I mean --
Q. In substance, or, you know, as best you can?
A. To the best I can recall, he let her know that the decision had been made to close Tempo, and with that, her position was eliminated, and it was all for cost reasons.
Q. Did Mr. Rabinowitz --
    MR. PIESCO: Are you done? I'm sorry, she looked like she was still --
    THE WITNESS: I was thinking.
    MR. CLARK: Okay. Go ahead.
    MR. PIESCO: Take your time. There's no rush.
A. That's what I recall him starting out saying.

Page 288

AMY SCIALDONE - CONFIDENTIAL
Q. Okay. Do you recall if Mr. Rabinowitz ever told Ms. Guzman that her termination had nothing to do with her performance?
A. I don't recall if he said it had nothing to do with her performance or that he was -- you know, he respected her as an editor, and it was about the -- it was about the publication and not making money. It -- he talked about that at length.
Q. How long did Mr. Rabinowitz speak to Ms. Guzman?
A. For a few minutes.
Q. And in this few minutes was it just Mr. Rabinowitz speaking or did you say anything?
A. When he was explaining why we were there?
Q. Right.
A. He did that.
Q. Okay.
A. I spoke after to explain the package.
Q. What was Ms. Guzman's reaction when she was told that she was being terminated?
A. I believe she questioned it, but knew about the financials. She -- you know, Joe had

Page 289

AMY SCIALDONE - CONFIDENTIAL
mentioned the financials again, and she knew, because it's been something that's been going on for years with the section, trying to keep it going.
Q. When you say, "she questioned it," do you remember more specifically what she said?
A. I don't. I just remember Joe talking more about the financials that she had been aware of.
Q. What was Ms. Guzman's demeanor?
    MR. PIESCO: Objection.
A. I don't recall specifically.
Q. Was she upset?
    MR. PIESCO: Objection.
A. She wasn't upset crying. Was she upset she was leaving The Post? I don't -- I don't know.
    Was she surprised that it happened that day? Perhaps.
Q. Do you remember anything else Ms. Guzman said in that meeting?
A. She had asked about her other section that she had been working on, but Joe had mentioned that similar to what happened with

Page 374

AMY SCIALDONE - CONFIDENTIAL

  2  A.  I don't recall a number. But she
  3  gives that feedback when necessary.
  4  Q.  Do you recall any other editors other
  5  than Ms. Gotthelf that you discussed
  6  Ms. Livingston's performance with at any time?
  7      MR. PIESCO: Objection.
  8      You can answer.
  9  A.  From this warning?
10  Q.  No, at any time?
11  A.  From this warning, I was questioning.
12      MR. PIESCO: Can we try that again?
13      THE WITNESS: Yeah.
14  Q.  I just want to know if you have
15  discussed Ms. Livingston's performance with any
16  other editors at the New York Post other than
17  Ms. Gotthelf?
18      MR. PIESCO: Objection.
19      She also previously testified that
20  Dan -- whatever his name is?
21      THE WITNESS: Greenfield.
22      MR. PIESCO: Greenfield.
23      So, other than those two.
24  Q.  Okay. Other than Mr. Greenfield and
25  Ms. Gotthelf, have you discussed Ms. Livingston's

Page 375

AMY SCIALDONE - CONFIDENTIAL

  2  performance with any other editors at The Post?
  3  A.  No.
  4  Q.  And other than what is listed on this
  5  written warning, do you recall any other
  6  criticisms that Dan Greenfield or Michelle
  7  Gotthelf had of Ms. Livingston?
  8  A.  At this time?
  9  Q.  At any time.
10  A.  I don't recall.
11      MR. CLARK: That's all the questions I
12  have.
13      Thank you, ma'am.
14      MR. PIESCO: Give me two minutes,
15  please?
16      MR. CLARK: Sure.
17      MR. PIESCO: Thank you.
18      VIDEOGRAPHER: The time is 6:27.
19  We're off the record.
20      (Recess.)
21      VIDEOGRAPHER: The time is 6:38 p.m.
22  We're on the record.
23  EXAMINATION
24  BY MR. PIESCO:
25  Q.  Ms. Scialdone, I know it's been a long

Page 376

AMY SCIALDONE - CONFIDENTIAL

  2  day. I have one question for you: After
  3  Ms. Guzman's employment was terminated, did Tempo
  4  ever run again?
  5  A.  No.
  6      MR. PIESCO: That's all I have.
  7      MR. CLARK: Just a quick follow up.
  8  EXAMINATION (CONTINUED)
  9  BY MR. CLARK:
10  Q.  Is -- are you changing your testimony
11  from earlier today, ma'am?
12  A.  Can you read back my testimony?
13  Q.  Well, I mean, we can't go back at this
14  point.
15      I thought you had said that Tempo had
16  transitioned to three editions a year but had not
17  been canceled at the time Ms. Guzman was
18  terminated.
19      MR. PIESCO: Objection. I think that
20  mischaracterizes her testimony.
21      But you can answer.
22  A.  I may have misunderstood your
23  question. I thought you were saying something
24  that was related specifically -- specifically to
25  accuracy of information in the minutes.

Page 377

AMY SCIALDONE - CONFIDENTIAL

  2  Q.  Well, let me just ask --
  3  A.  So, that was the intent.
  4  Q.  Okay. Good. That's what I just
  5  wanted to clarify.
  6      At the time Ms. Guzman was terminated,
  7  the intent of the editors was to transition it to
  8  three times a year --
  9      MR. PIESCO: Objection.
10  Q.  -- correct?
11      MR. PIESCO: Objection.
12      Don't guess. If you know, you know.
13      And just to clarify, when you say,
14  "the time," I don't know what you mean by
15  that.
16      She said she was terminated at a
17  different date than the committee notes that
18  you were questioning her on, and I think it
19  was Exhibit 20. That's the only --
20  BY MR. CLARK:
21  Q.  On -- on -- put it this way: On the
22  day that Ms. Guzman was terminated, was it the
23  intention of the editors of the New York Post to
24  transition Tempo to three times per year?
25      MR. PIESCO: Objection.