# **EXHIBIT 12**

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 1

1                    Allan
2           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
3
    SANDRA GUZMAN,                       )
4                                        )
              Plaintiff,                 )
5                                        )
              vs.                        ) 09CIV9323
6                                        ) (BSJ(RLE)
    NEWS CORPORATION, NYP HOLDINGS,)
7   INC., d/b/a THE NEW YORK POST, )
    and COL ALLAN, in his official )
8   and individual capacities,     )
                                         )
9             Defendants.                )
    ------------------------------)
10
11  (Contains Confidential & Attorneys' Eyes Only Portions Bound Separately)
12
13        VIDEOTAPED DEPOSITION OF COLIN ALLAN
14              New York, New York
15          Tuesday, February 14, 2012
16
17
18
19
20
21
22
23  Reported by:
24  Philip Rizzuti
25  JOB NO. 46188

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 42

Allan

1  of selecting a cartoon, then he should
2  not answer the question based on the
3  editorial privilege.
4      MR. THOMPSON: So we will mark the
5  questions you instruct him not to answer,
6  we will get a ruling. Also I just want
7  to make it clear both of you should not
8  be speaking on the record. You should
9  not object. We have Jordan Lippner
10 objecting, we have you speaking. Who is
11 defending this deposition?
12     MR. LERNER: I am here as counsel
13 for the papers. Mr. Lippner is here as
14 counsel for Mr. Allan.
15     MR. THOMPSON: So Mr. Lippner is
16 going to be counsel for Mr. Allan and
17 your 30(b)(6) witness in this case;
18 because that is what we were told?
19     MR. LERNER: Yes.
20  Q.  All right, let's continue Mr.
21 Allan. So before Rupert Murdoch called you
22 did you know that people were offended by the
23 cartoon?
24  A.  I became aware, yes.

Page 43

Allan

1  Q.  How did you become aware?
2  A.  I don't recall.
3  Q.  You don't recall?
4  A.  I don't.
5  Q.  Well do you recall the first
6  person who told you that people were offended?
7  A.  No.
8  Q.  So as you sit here today the first
9  person you can identify who told you that
10 people were offended was Rupert Murdoch?
11     MR. LERNER: Objection.
12     MR. LIPPNER: Objection.
13  A.  I was aware before then.
14  Q.  I understand that, but my question
15 is different sir. My question is can you
16 identify the first person who told you that
17 people were offended by that cartoon?
18  A.  I cannot.
19  Q.  So as you sit here now the only
20 person that you can recall telling you first
21 that the cartoon offended people was Rupert
22 Murdoch?
23     MR. LERNER: Objection.
24  A.  I was aware people were offended,

Page 44

Allan

1  it was on the blogs.
2  Q.  So let's go back to that
3  conversation you had with your boss. He
4  called you up and he told you that he was
5  aware that people were offended by that
6  cartoon; correct?
7  A.  Yes.
8  Q.  What did you say to him in
9  response to his statement that he knew that
10 people were offended?
11 A.  I told him the cartoon was not
12 offensive. I told him that it mocked the
13 Congressional stimulus bill, and that that was
14 clear, and that it was my opinion that it was
15 inoffensive.
16 Q.  It was not offensive?
17 A.  Yes.
18 Q.  Did you say anything else to
19 Mr. Murdoch during that telephone call?
20 A.  I don't recall.
21 Q.  Do you recall if he said anything
22 else to you about the cartoon during that
23 call?
24 A.  I don't believe so.

Page 45

Allan

1  Q.  Well when you told your boss that
2  the cartoon wasn't offensive how did he
3  respond to that statement?
4  A.  I don't recall.
5  Q.  As you sit here today do you still
6  believe that cartoon is not offensive?
7  A.  Yes.
8  DI Q. So I want to direct your attention
9  again to Deposition Exhibit 1, well let me ask
10 you another question before I go to that
11 exhibit again.
12     Do you believe that it was a
13 mistake to publish that cartoon?
14     MR. LIPPNER: Mr. Allan, with
15 respect to the decision to publish the
16 cartoon you as a journalist have an
17 editorial privilege not to comment on the
18 decision to publish or not publish
19 material in your newspaper, and on that
20 basis I would advise you not to answer
21 that question.
22 Q.  Mr. Allan, are you going to answer
23 that question?
24 A.  I am going to take the advice of

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 66

Allan

1 complained about the monkey cartoon?
2 A. That is correct.
3 Q. When was the very first time
4 Jennifer Jehn told you about Ms. Guzman's
5 complaint about the cartoon; was it the day it
6 was published or sometime after that?
7 MR. LIPPNER: Objection.
8 A. I don't recall.
9 Q. Well did you go to HR to have this
10 conversation with Jennifer Jehn or did she
11 come to your office?
12 MR. LIPPNER: Objection.
13 A. She called me.
14 Q. What did she say when she called
15 you?
16 A. She told me that Sandra was upset
17 about the cartoon, that she had friends who
18 were upset, and she was seeking an explanation
19 from the company.
20 Q. Who was seeking an explanation
21 from the company?
22 A. Sandra Guzman.
23 Q. What did Sandra Guzman want the
24 company to explain according to Jennifer Jehn?

Page 67

Allan

1 MR. LERNER: Objection.
2 A. Why it was published.
3 Q. Did Jennifer Jehn tell you
4 anything else during that call?
5 A. Only that there was no offense
6 meant in the paper publishing the cartoon and
7 that it had been misunderstood, although she
8 appreciated that Sandra had taken offense.
9 Q. So Jennifer Jehn told you that the
10 paper did not intend to offend anyone with the
11 cartoon?
12 A. She told me she had so informed
13 Sandra Guzman.
14 Q. Did she describe to you Sandra
15 Guzman's demeanor at the time?
16 A. Yes.
17 Q. What did she describe about Ms.
18 Guzman's demeanor?
19 A. She was upset.
20 Q. Did Ms. Jehn describe how upset
21 Ms. Guzman was?
22 A. Just upset.
23 Q. Did she tell you that she was
24 crying?

Page 68

Allan

1 A. No.
2 Q. Did she tell you that she was
3 tearful?
4 A. No.
5 Q. Did Ms. Jehn tell you that Sandra
6 Guzman told her that she believed that the
7 monkey cartoon reflected a racist work
8 environment at the New York Post?
9 A. No.
10 Q. Did Ms. Jehn tell you that Sandra
11 Guzman said that the monkey cartoon reflected
12 a sexist work environment at the New York
13 Post?
14 A. No.
15 Q. Did she tell you that Sandra
16 Guzman said that the monkey cartoon reflected
17 a discriminatory work environment at the New
18 York Post?
19 A. No.
20 Q. Did she tell you anything else
21 during that call?
22 A. No.
23 Q. How long did the call last?
24 A. I don't recall.

Page 69

Allan

1 Q. Do you have any idea?
2 A. Couple of minutes.
3 Q. Well in a couple of minutes many
4 things can be said; correct?
5 MR. LIPPNER: Objection.
6 A. Correct.
7 Q. Do you recall anything else that
8 either Ms. Jehn said or you said when she
9 called you to tell you that Sandra Guzman had
10 complained to her about the cartoon?
11 A. No.
12 Q. Did you ever speak to Ms. Jehn
13 again about the fact that Ms. Guzman had
14 complained about the cartoon?
15 A. I don't recall.
16 Q. In February of 2009 who was the
17 person in charge of human resources at the New
18 York Post?
19 A. It was either Jennifer Jehn or Amy
20 Scialdone.
21 Q. Jennifer Jehn?
22 A. Jennifer Jehn, yes.
23 Q. So did Jennifer Jehn tell you that
24 she was going to take any other action with

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 198

Allan

1 Q. So you only remember if a competitor attacks the Post, but not an employee attacks The Post?
2 A. Yes, it is a different thing.
3 Q. Mr. Allan, did you ever show Sandra Guzman a picture of a naked man during her employment as an associate editor?
4 A. I believe I did, yes.
5 Q. When did you show Ms. Guzman a picture of a naked man?
6 A. I believe it happened in a bar.
7 Q. What bar?
8 A. Langan's.
9 Q. Where is that?
10 A. 47th Street.
11 Q. Is it a bar that you have been to many times?
12 A. Often, yes.
13 Q. Is it a bar that other New York Post employees go to?
14 A. Yes.
15 Q. Is it a bar that you have performed work related activities in connection with the Post?

Page 199

Allan

1 A. Yes. Sometimes.
2 Q. What type of work have you performed at Langan's for the Post?
3 A. Well I entertain my staff, I have lunch occasionally with people I know in business.
4 Q. Do you also edit the paper occasionally from Langan's?
5 A. Never, impossible.
6 Q. Do you also talk about potential stories that may appear in the paper while you are at Langan's?
7 A. Of course.
8 Q. Is Langan's a bar that many New York Post employees go to after work?
9     MR. LERNER: Objection.
10 A. Yes.
11 Q. When Sandra Guzman worked at the company was that true?
12 A. Yes.
13 Q. Did you ever see her at Langan's?
14 A. Yes.
15 Q. Did you ever see her more than once at Langan's?

Page 200

Allan

1 A. Yes.
2 Q. How many times did you see Sandra Guzman at Langan's?
3 A. I don't know, several.
4 Q. When she worked at the company did other editors who reported to you also go to Langan's?
5 A. Yes.
6 Q. They went with you to Langan's?
7 A. No, I often saw them there.
8 Q. When you saw those other editors at Langan's did you also talk about work related matters?
9 A. Of course.
10 Q. Describe who was -- strike that.
    Identify who was present when you showed Sandra Guzman a picture of a naked man in Langan's?
11 A. My memory is not clear, but I believe Jesse Angelo was there. Another male editor. I think Danica Lo was there. Sandra Guzman. Maybe one other. Forgive me, my memory is unclear.
12 Q. You don't recall the identity of

Page 201

Allan

the male editor that was there along with Jesse Angelo?
A. It may have been David Boyle, but I am not certain.
    MR. LIPPNER: Don't guess.
    THE WITNESS: Sorry.
Q. What year did this occur?
A. I am sorry, I can't recall.
Q. Did you go to Langan's with Ms. Guzman?
A. No. I walked there by myself.
Q. Did you see her standing there?
A. Yes, when I walked in.
Q. Why don't you describe what happened after you walked into Langan's that day?
A. I had a drink with Jesse Angelo and I think there was somebody else there. We were standing at the bar and we were subsequently joined by Sandra Guzman and whomever was with her.
Q. Did they come over to you?
A. Yes, and I bought them a round of drinks.

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 202

```
 1            Allan
 2     Q.   So Sandra Guzman, and was she with
 3  Danica Lo or somebody else?
 4     A.   I think Danica Lo was there, I am
 5  sorry, I don't remember.
 6     Q.   So continue, what happened after
 7  Ms. Guzman and other employees came up to you?
 8     A.   I bought them a drink. At some
 9  point I received an E-mail from the office
10  that contained for my perusal a picture of a
11  naked man.
12     Q.   Who sent you that picture?
13     A.   Somebody on the photo desk.
14     Q.   Do you recall who?
15     A.   I don't.
16     Q.   Did the E-mail say anything about
17  the picture of the naked man?
18     A.   I don't recall.
19     Q.   What happened after you received
20  the picture of the naked man by E-mail?
21     A.   I was aware of what it was. I had
22  been told by whomever was editing the Sunday
23  paper at the time that we were likely going to
24  obtain a picture, a lewd picture of a man that
25  sat above the bed of the governor of New
```

Page 203

```
 1            Allan
 2  Jersey.
 3     Q.   Who at the time --
 4          MR. LIPPNER: Are you done with
 5  your answer?
 6          THE WITNESS: Yes.
 7     Q.   When you say the governor of New
 8  York are you referring to Jim McGreevey?
 9     A.   Yes.
10     Q.   So you knew that, or thought that
11  the Post was going to get a picture --
12     A.   I knew that we had --
13     Q.   A lewd picture?
14     A.   Yes, I knew that we had obtained a
15  lewd picture of the governor.
16     Q.   Right.
17     A.   And I had asked before I left the
18  office because it was getting late in the day,
19  that they might E-mail it to me.
20     Q.   Please continue?
21     A.   The purpose of the E-mailing it to
22  me was for me to consider it for publication.
23  This was undertaken in the context of the
24  scandal surrounding the governor's sex life,
25  which was public knowledge. And I showed it
```

Page 204

```
 1            Allan
 2  to Jesse Angelo who was with me and we briefly
 3  discussed it. Whether or not or how we might
 4  be able to publish the picture in a way that
 5  was not offensive to people.
 6     Q.   What did you say to Mr. Angelo and
 7  what did he say to you about that?
 8     A.   Well we discussed the obvious,
 9  that we would have to disguise his groin, we
10  would have to cover it up.
11     Q.   Because you didn't want to offend
12  anyone; right?
13     A.   Precisely.
14     Q.   Because you would agree people,
15  some people may get offended if they had to
16  look at a picture of a naked man with his
17  genitals exposed?
18     A.   Possibly.
19     Q.   So did you and Jesse Angelo talk
20  about anything else regarding that picture?
21     A.   No, we just discussed that it was
22  sort of a striking image for the governor of
23  New Jersey to have over his bed, and that we
24  discussed how we might be able to make it
25  suitable for publication.
```

Page 205

```
 1            Allan
 2     Q.   Did you receive this picture on
 3  your Blackberry?
 4     A.   Yes, sir.
 5     Q.   Do you still have that picture on
 6  your Blackberry?
 7     A.   I have an iPhone now, so I don't
 8  know.
 9     Q.   Did you ever save that picture on
10  your Blackberry?
11     A.   I don't know.
12     Q.   So what happened -- strike that.
13          Were you and Jesse Angelo just
14  talking among yourselves about how you can
15  publish this photo without offending anyone?
16          MR. LIPPNER: Objection.
17     A.   We were standing at the bar
18  discussing it.
19     Q.   Was it just the two of you
20  discussing it at that time?
21     A.   Yes.
22     Q.   Then what happened next?
23     A.   One of the ladies asked us what we
24  were talking about.
25     Q.   Who?
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 238

```
                  Allan
1
2     Q.   Who is the owner of Langan's?
3     A.   Des O'Brien.
4     Q.   Des O'Brien?
5     A.   O'Brien.
6     Q.   When did Des O'Brien tell you
7  about Steve Dunlevy having sex with a woman in
8  the closet at Langan's?
9     A.   When I first got here, I guess in
10 2001, 2002.
11    Q.   What did he tell you about that
12 incident?
13    A.   He told me that he had found
14 Dunlevy having sex with a woman in the closet.
15    Q.   At Langan's?
16    A.   Yes, sir.
17    Q.   Did he say if the women's leg was
18 hanging out the closet?
19    A.   No, sir.
20    Q.   Did he describe the woman at all?
21    A.   Not that I recall.
22    Q.   How did you and the owner of
23 Langan's end up talking about Steve Dunlevy
24 having sex with a woman in Langan's?
25       MR. LERNER: Objection to the
```

Page 239

```
                  Allan
1
2  form.
3     A.   He was friendly with Dunlevy.
4     Q.   How did you two end up talking
5  about Dunlevy's sex life?
6     A.   I met him, Dunlevy had introduced
7  us, and in the course of that introduction or
8  soon after he told me the story about Dunlevy.
9     Q.   And you and Steve Dunlevy had gone
10 to Langan's on many occasions; correct?
11    A.   No.
12    Q.   You did go to Langan's with Steve
13 Dunlevy?
14    A.   Occasionally.
15    Q.   You guys would have drinks; right?
16    A.   Yes.
17    Q.   You were not only employees of the
18 company, you were friends?
19    A.   Yes.
20    Q.   So where were you when you
21 repeated this story that Des O'Brien told you
22 about Steve Dunlevy having sex with a woman in
23 the closet at Langan's; were you in the
24 workplace at 1211 Avenue of the Americas or
25 some other place?
```

Page 240

```
                  Allan
1
2         MR. LIPPNER: Objection.
3     A.   I was at Langan's.
4     Q.   Was anyone else present?
5     A.   A bunch of people.
6     Q.   Do you recall who was present?
7     A.   Not really.
8     Q.   Sandra Guzman?
9     A.   New York Post people.
10    Q.   New York Post employees?
11    A.   Yes.
12    Q.   Was Sandra Guzman present?
13    A.   Yes.
14    Q.   Was this the same day you showed
15 the picture, the lewd picture of the naked man
16 to Ms. Guzman that was on your Blackberry?
17    A.   No.
18    Q.   Different day?
19    A.   I believe so.
20    Q.   Besides Ms. Guzman who else was
21 there from the New York Post or the News
22 Corp.?
23    A.   I don't remember. I don't
24 remember.
25    Q.   Well describe what happened in
```

Page 241

```
                  Allan
1
2  Langan's that day when you ended up telling
3  Ms. Guzman about how Steve Dunlevy had sex
4  with a woman in the closet at Langan's?
5         MR. LIPPNER: Objection.
6  Mischaracterizes the testimony.
7     A.   There were a group of people as I
8  stated, Dunlevy I think was there or had left.
9  He became the topic of some conversation
10 because he is a character of note, and I
11 subsequently stated that I had been told by
12 Des O'Brien that he had found him having sex
13 in the closet.
14    Q.   Why did you tell Sandra Guzman
15 that?
16    A.   I told a bunch of people that.
17    Q.   My question is why did you tell
18 Ms. Guzman that?
19        MR. LIPPNER: Objection.
20    A.   I thought she would be amused.
21    Q.   So you thought that Sandra Guzman
22 would be amused to hear her boss tell her
23 about how another male employee had sex with a
24 woman in Langan's?
25    A.   Yes.
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 322

```
 1           Allan
 2      Q.   Who is she?
 3      A.   She used to work in I think the
 4 travel department.
 5      Q.   Was she an older employee?
 6      A.   Older, what does that mean?
 7      Q.   How old was she when she worked at
 8 the paper?
 9      A.   40 or 45.
10      Q.   Did you ever refer to Poochie Myer
11 by stating you can't teach old bitches new
12 tricks?
13      A.   I never said that.
14      Q.   Did you say anything like that?
15      A.   I don't think so.
16      Q.   Did you say anything about
17 teaching old tricks in connection with Poochie
18 Myer?
19      A.   I don't believe so.
20      Q.   You say you don't believe so Mr.
21 Allan --
22      A.   It is not the sort of thing I
23 would say.  I don't recall.
24      Q.   Let me clarify.  Did you say you
25 can't teach old bitches new tricks in
```

Page 323

```
 1           Allan
 2 reference to Poochie Myer, yes or no?
 3      A.   No.
 4      Q.   Did you ever say anything about
 5 teaching new tricks in connection with Poochie
 6 Myer?
 7      A.   I don't recall.
 8      Q.   Did anyone ever tell you that
 9 Poochie Myer accuses you of saying you can't
10 teach old bitches new tricks in reference to
11 her?
12      A.   I never heard that.
13      Q.   That would be totally offensive;
14 correct?
15      A.   You bet.
16      Q.   In violation of the company's
17 discrimination policy; right?
18      A.   Yes.
19      Q.   And sexual harassment policy;
20 right?
21      A.   Yes.
22      Q.   Now did you ever refer to a black
23 female employee as that damn girl?
24      A.   Yes, I did.
25      Q.   Tell us what happened on that
```

Page 324

```
 1           Allan
 2 occasion Mr. Allan?
 3      A.   The phones were ringing, this
 4 person was supposed to answer my phone amongst
 5 others because my assistant was away from the
 6 office.  And the phones were ringing and I
 7 walked out of my office and I raised my voice
 8 and I said something like can somebody tell
 9 that damn girl to answer the phones.
10      Q.   Who was the black employee that --
11 black female employee that you were referring
12 to?
13      A.   I don't know her name.
14      Q.   Why did you refer to that black
15 female employee as a damn girl?
16      A.   I was upset, phones were not being
17 answered, I was wrong.
18      Q.   Was she a woman or a little girl?
19      A.   She was a woman.
20      Q.   Do you think it is appropriate Mr.
21 Allan as the Editor-in-Chief of the Post to
22 refer to a woman as a damn girl?
23      A.   No.  It is wrong.
24      Q.   Did you ever apologize to that
25 female employee for referring to her as quote,
```

Page 325

```
 1           Allan
 2 a damn girl?
 3      A.   No, sir.
 4      Q.   If you believe referring to her as
 5 a damn girl was wrong why didn't you ever
 6 apologize to her?
 7      A.   I didn't come to that conclusion
 8 for some time.
 9      Q.   Well eventually you did come to
10 the conclusion; right?
11      A.   Yes.
12      Q.   After you came to the conclusion
13 did you apologize to that young lady?
14      A.   I am sorry, I don't remember who
15 she was.  She may have left the company, I
16 don't know.
17      Q.   Did you ever inquire as to whether
18 that young lady still works at the Post?
19      A.   No.
20      Q.   Why not if you came to the
21 conclusion that it was wrong to refer to her
22 as a damn girl?
23      A.   I can't answer that question.
24      Q.   When you referred to this black
25 female employee as a damn girl was that in
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 350

Allan

1
2  correct?
3     A.  Yes.
4     Q.  Would you agree that one of the
5  cops depicted in this cartoon is stating --
6  strike that -- states: They will have to find
7  someone else to write the next stimulus bill?
8     A.  Yes.
9     Q.  Now, Mr. Allan, would you agree
10 that in the February 18, 2009 edition of the
11 New York Post there was a picture of President
12 Barack Obama signing the stimulus bill in
13 Denver, Colorado?
14    A.  I don't recall.
15    Q.  Do you recall that there was a
16 picture of the president signing the stimulus
17 bill before the page that contained this
18 cartoon?
19    A.  I don't recall.
20    Q.  Do you recall that the New York
21 Post also ran an editorial which referred to
22 the stimulus bill as Obama's stimulus bill in
23 that same paper on February 18, 2009?
24    A.  I don't recall.
25    Q.  The ape in this picture was

Page 351

Allan

1
2  intended to be President Barack Obama; is that
3  correct?
4     A.  That is incorrect.
5     Q.  Do you recall ever referring to
6  the protesters outside the building as being
7  minorities and uneducated?
8     A.  No.
9     Q.  Did you ever refer to the
10 protesters outside of the building at 1211
11 Avenue of the Americas as being minorities?
12    A.  No.
13    Q.  Did you ever refer to the
14 protesters outside the building as being
15 uneducated?
16    A.  No.
17    Q.  Were the protesters -- strike
18 that.
19        You said earlier I think there
20 were hundreds of protesters in front of the
21 building?
22    A.  Yes.
23    Q.  Did you see them?
24    A.  Yes.
25    Q.  Could you tell if they were mostly

Page 352

Allan

1
2  people of color?
3     A.  Yes.
4     Q.  Did they have signs?
5     A.  I don't recall.
6     Q.  Did they appear to be angry?
7     A.  Yes.
8     Q.  Did you know that they were
9  accusing the New York Post of being racist in
10 connection with this cartoon?
11    A.  Yes.
12    Q.  Mr. Allan, your attorneys in this
13 case filed an answer to Ms. Guzman's amended
14 complaint on behalf of News Corporation, New
15 York Post and yourself. Are you aware of
16 that?
17    A.  Yes.
18    Q.  In paragraph 81 of the answer that
19 was filed on your behalf states that: The
20 plaintiff spoke with Ms. Jennifer Jehn
21 regarding the cartoon.
22        Do you know if that was true or
23 not?
24    A.  Yes.
25    Q.  In paragraph 84 of the answer

Page 353

Allan

1
2  filed on your behalf it states that: The
3  plaintiff spoke with Mr. Rabinowitz about the
4  cartoon.
5         Do you know if that is true?
6     A.  I don't know.
7     Q.  Joe Rabinowitz never told you that
8  Ms. Guzman spoke to him about the cartoon?
9     A.  Not that I recall.
10    Q.  Did you review this answer before
11 it was filed?
12    A.  I don't recall.
13    Q.  Would you have expected Joseph
14 Rabinowitz to tell you that Ms. Guzman spoke
15 to him about the cartoon if that had happened?
16    A.  Yes.
17    Q.  Why?
18    A.  It is not unimportant.
19    Q.  So you would agree, would you not
20 Mr. Allan, the fact that Ms. Guzman spoke to
21 Joe Rabinowitz about the cartoon was
22 important?
23    A.  Yes.
24    Q.  This is something that you should
25 have known about; correct?

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 394

Allan

1 sir?
2
3  A. I don't recall.
4  Q. Was she allowed to go to cover
5 that ceremony for the New York Post?
6  A. No.
7  Q. Why not?
8  A. Because she had told us that she
9 was a friend of Justice Soto Mayor and
10 therefore I felt that she had been conflicted.
11  Q. Conflict?
12  A. Yes. We don't assign people to
13 cover people on the basis of friendships.
14  Q. When Kevin Rudd ran for Prime
15 Minister of Australia did you cover him in the
16 New York Post?
17  A. No.
18  Q. Is it your testimony that there
19 was not a single article written in the New
20 York Post -- can I finish -- about the fact
21 that Kevin Rudd was running for Prime Minister
22 of Australia?
23  A. I don't recall it.
24  Q. Do you recall if there was ever an
25 article in the New York Post about Kevin Rudd

Page 395

Allan

1
2  A. I don't recall.
3  Q. Would it have been inappropriate
4 for an article to have been published about
5 Kevin Rudd in the New York Post based on your
6 relationship with him?
7  A. I didn't have a relationship with
8 him.
9      MR. LERNER: Objection.
10  Q. He was a friend of yours; correct?
11  A. No. I never testified that he was
12 a friend. I knew him for one day.
13  Q. Now Ms. Guzman was terminated in a
14 meeting with Joe Rabinowitz and someone from
15 HR; correct?
16  A. I don't know.
17  Q. Let me ask you, do you know who
18 conveyed to Ms. Guzman that she was being
19 terminated as an associate editor at the Post?
20  A. Jennifer Jehn.
21  Q. How do you know that Jennifer Jehn
22 conveyed that to her?
23  A. She is the head of HR.
24  Q. Other than the fact that she is
25 the head of HR do you know if Jennifer Jehn

Page 396

Allan

1
2 actually met with Ms. Guzman in connection
3 with the termination?
4  A. That is my recollection.
5  Q. Mr. Allan, I am now showing you
6 Allan Deposition Exhibit 21, which is Bates
7 stamped NYP 3892, I ask you to take a moment
8 to look at that document.
9      (Allan Exhibit 21, Bates stamped
10      NYP 3892, marked for identification,
11      as of this date.)
12  A. Yes.
13  Q. Do you recognize this document
14 sir?
15  A. Yes.
16  Q. What is it?
17  A. An open jobs report.
18  Q. What is an open jobs report?
19  A. Jobs that are vacant at the
20 newspaper.
21  Q. This one is dated October 12,
22 2009; correct?
23  A. Yes.
24  Q. So this is dated weeks after Ms.
25 Guzman was terminated; correct?

Page 397

Allan

1
2  A. Yes.
3  Q. Do you see it states open,
4 Haberman, Z, associate metro editor?
5  A. Yes.
6  Q. So when Ms. Guzman was terminated
7 there was an open associate editor position at
8 the paper; is that correct?
9  A. Correct.
10  Q. Was any discussion Mr. Allan about
11 possibly allowing Ms. Guzman to remain
12 employed at the company after Tempo was
13 closed?
14  A. Yes. I asked three editors if
15 there was a position in their departments or
16 anywhere at the paper that Ms. Guzman might
17 fill at her compensation.
18  Q. Who were those three editors?
19  A. Michelle Gotthelf, Jesse Angelo
20 and Catherine Pushkar.
21  Q. Who is Catherine Pushkar?
22  A. She was a features editor.
23  Q. Did you meet with those three
24 editors together or individually when you
25 inquired as to whether there was another

Page 398

Allan

position for Ms. Guzman?
            MR. LIPPNER: Objection.
    A.   Independent.
    Q.   Did you take any notes?
    A.   No.
    Q.   Where did those meetings take place?
    A.   I don't recall.
    Q.   Was anyone else present besides you and each of those editors?
    A.   No.
    Q.   What is the metro desk at the Post?
    A.   Metro desk is the city desk, it is responsible for the reporters who cover the city.
    Q.   Heart of the paper; correct?
    A.   Yes.
    Q.   Why wouldn't Ms. Guzman be allowed to take that open position when Zach Haberman left the paper?
    A.   Her compensation was $135,000 a year, this job is open at $82,000 a year.
    Q.   Mr. Allan, I understand that there

Page 399

Allan

was a difference between the salary, but why didn't you at least offer it to Ms. Guzman before she was fired?
    A.   It is my view that an employee who had been forced to take a very large pay cut in the order of $55,000 or $50,000, would not be a happy employee.
    Q.   Is it your position that that employee would be happier losing $137,000 as opposed to 50,000?
            MR. LERNER: Objection.
    A.   I made that decision in the interest of the newspaper. I didn't believe it was appropriate or right to offer her a job that would have caused her such a significant pay cut.
    Q.   Did you think it was more appropriate to fire her, she would have no job?
    A.   She was hired to produce Tempo, Tempo had ceased to exist.
    Q.   But she worked on 25 other sections --
            MR. LIPPNER: Were you done with

Page 400

Allan

your answer?
            THE WITNESS: Yes.
    Q.   She was working on 25 other sections of the paper at the time the Tempo was closed; is that correct?
            MR. LERNER: Objection. That is a fact not in evidence.
    Q.   Correct?
    A.   Sorry?
    Q.   Isn't it a fact that Ms. Guzman was working on 25 other sections of the paper at the time she was terminated?
            MR. LERNER: Objection.
    A.   She was working on other sections.
    Q.   How many other sections?
    A.   I don't know.
    Q.   So she wasn't only working on Tempo; correct?
    A.   I asked that she be offered work on other sections of the newspaper because Tempo had become so emaciated that it was no longer occupying much of her time. I mean it was coming out once a month and it was tiny, it was small.

Page 401

Allan

    Q.   Isn't it true that you never once considered offering Ms. Guzman that open position that became vacant after Zach Haberman left the paper?
    A.   I considered it and I decided not to do it.
    Q.   Mr. Allan, could you put the Deposition Exhibit 4 in front of you?
    A.   Exhibit 4.
    Q.   It should be there?
    A.   Sorry.
    Q.   It is number 5 -- look at this one?
    A.   Yes.
    Q.   I want to direct your attention to page 7 of that document?
            MR. LERNER: What exhibit number?
            MR. THOMPSON: 5.
    Q.   Do you see where it says interrogatory number 8?
    A.   Yes.
    Q.   Do you see there is a list of names there and in response to that interrogatory, Bill Hoffman, Zach Haberman,

Page 502

Col Allan

1 someone named Lizzie Sullivan?
2 A    I don't recall.
3 Q    Do you know who Lizzie Sullivan is?
4 A    The name rings a bell, but that's all.
5 Q    Do you recall whether she ever worked as a photographer at the New York Post?
6 A    She may have done so.
7 Q    And have you ever been in same room with Ms. Sullivan and Ms. Guzman?
8 A    It's possible.
9 Q    Have you ever been in the same room as Ms. Sullivan and Ikimulisa Livingston?
10 A    I don't know.
11 Q    Have you ever been in the same room as Ms. Sullivan and Austin Fenner?
12 A    I don't know.
13 Q    When you say it's possible that you may have been in the same room with Ms. Guzman and Ms. Sullivan, are you thinking of any particular occasions?
14 A    No. I occasionally go to Post functions and there are possible there. Sometimes there are lots of people, sometimes not so many

Page 503

Col Allan

people. I don't know. I don't recall.
Q    Any particular venues where you believe you would have been in the same room with Ms. Guzman and Ms. Sullivan?
A    Not that I recall.
Q    Did you ever, on any occasion, dance with Ms. Sullivan?
     MR. LERNER: Objection.
A    No.
Q    Have you ever had any physical contact with Ms. Sullivan?
A    No.
Q    Are you aware of any discussion regarding alleged physical contact between yourself and Ms. Sullivan on the part of anybody at the New York Post?
     MR. LERNER: Objection.
A    Yes. Vaguely, yes.
Q    How did you become aware of that discussion?
A    I don't recall. I don't -- I don't remember.
Q    And what was the substance of what was alleged regarding any contact between you and

Page 504

Col Allan

Ms. Sullivan?
     MR. LERNER: Objection. Are you referring to allegations in this lawsuit?
     MR. PEARSON: I'm referring to documents that have been produced in connection with this lawsuit.
     MR. LERNER: Go ahead.
     MR. PEARSON: Can the question be read back for the witness, please?
     (Record read.)
A    I recall a claim that was made at some point that I had interacted with her on a dance floor at a function but -- or a claim that I had danced with her, but that is simply not true.
Q    So, at no time did you ever have any such interaction with Lizzie Sullivan?
A    I walked across the floor of a function room or a bar downtown where there was a Post function. I was going from here to there, one point to another, it caused me to walk across what may have been a dance floor, and I recall that somebody, and I assume it was Ms. Sullivan, made as if to, I guess, kind of dance with me, but I didn't stop. I kept going.

Page 505

Col Allan

     MR. LERNER: Mr. Allan, I would just advise you, don't assume --
     THE WITNESS: Right.
     MR. LERNER: -- if you don't know --
     THE WITNESS: I don't know.
     MR. LERNER: -- something.
A    I don't know, I kept going.
Q    And what kind of function was that?
A    I don't recall.
Q    Was Ms. Guzman in attendance?
A    I don't recall.
Q    Were any other members of the Post's executive committee in attendance?
A    I believe Paul Carlucci was there.
Q    Anyone else from the committee?
A    Maybe Jennifer Jehn.
Q    Others?
A    I don't recall.
     MR. LERNER: Again, don't speculate or guess.
A    All right.
Q    And apart from counsel as always, did you discuss -- or, I should say, don't provide any substance of any conversations with counsel, but