SANDRA GUZMAN-10/13/11

1
2   Q.   And that was offensive to you, but
3   standing in the bathroom and showing your
4   breasts to another person is not offensive?
5       A.   To Mandy, my friend, no.
6   Q.   What about to Mandy and Mackenzie?
7       A.   Mackenzie was not there.
8   Q.   What was the result of your
9   comparison of your breasts with Mandy?
10      MR. THOMPSON:  Objection.
11  Q.   Did you declare a winner?
12      A.   What do you mean.
13  Q.   Did you declare a winner?
14      MR. THOMPSON:  Objection.
15      A.   Did we declare a winner?
16  Q.   Yes.
17      A.   We each declared winners.
18  Q.   You each claimed to be the winner?
19      A.   Yes.
20  Q.   You claimed to have the best
21  nipples and she claimed to have the best
22  nipples?
23      A.   Yes.
24  Q.   Do you enjoy -- Ms. Guzman, you
25  enjoy watching male strippers?

SANDRA GUZMAN-10/13/11

1
2       A.   Not particularly, no.
3   Q.   Have you ever seen a male striper
4   perform?
5       A.   Yes.
6   Q.   Have you ever seen a male striper
7   named El Bestio or La Bestia perform?
8       A.   Yes.
9   Q.   He's a male striper known for
10  his --
11      MR. THOMPSON:  Say it.
12  Q.   -- large endowment?
13      A.   Yes.
14  Q.   And have you discussed El Bestio
15  with a female colleague at work?
16      A.   I actually reported on El Bestio at
17  work.  It was a Page Six item.
18  Q.   And did you tell -- did you tell a
19  female colleague that you have his phone
20  number if she wanted it?
21      A.   I may have.
22  Q.   Did you comfort Mandy Stadtmiller
23  when she was breaking up with her boyfriend
24  Elijah that if all else fails, you have El
25  Bestio's business card?

SANDRA GUZMAN-10/13/11

1
2       A.   I was trying to cheer up a
3   colleague who was depressed because she was
4   having relationship problems, and she was
5   coming to me because she was feeling sad about
6   her relationship falling apart.  So, it was a
7   metaphor for, you're going to be okay.  You're
8   going to be okay.
9   Q.   But you did say it?
10      A.   Yes.
11  Q.   And you've used foul language at
12  work, haven't you?
13      A.   Foul language?
14  Q.   Yes.  Four letter words, the
15  F-word?
16      A.   What else?
17  Q.   Dick, D-I-C-K?
18      A.   I may have.
19  Q.   Didn't you tell one of your
20  colleagues that your husband says that you act
21  like your dick is bigger than his?
22      A.   Mandy, again, is writing a story,
23  she's querying.  I remember this.  Mandy
24  writes about irreverent subjects.  She writes
25  about sex and dating at The Post and she --

SANDRA GUZMAN-10/13/11

1
2   Q.   It's a yes or no question,
3   Ms. Guzman.
4       A.   Yes, yes, yes.
5   Q.   I'm going to show you Guzman
6   Exhibit 17, Bates number NYP '3838.
7       (Defendant's Guzman Exhibit 17,
8   document bearing Bates number NYP
9   '3838, marked for identification, as
10  of this date.)
11  Q.   Have you had a chance to look at
12  it?
13      A.   Yes.
14  Q.   And did you write the e-mail on top
15  of this exhibit to Mandy Stadtmiller saying,
16  "I think my husband would def say he married a
17  bitch, but not for attribution or publication.
18  He says that I act like my dick is bigger than
19  his."
20      MR. THOMPSON:  Objection.
21      A.   If you keep reading it says, "of
22  course it's all said in a very joking manner."
23  Q.   And then it continues, "but I
24  understand his profound feeling about bitchy
25  ways"?

Page 318

1          SANDRA GUZMAN-10/13/11
2    questions about this?  Okay, there you go.
3          MR. THOMPSON:  It's part of the
4       exhibits.
5       A.   Can I have it?  You're confusing
6    me.
7       Q.   What's your definition of sexual
8    harassment?
9       A.   My definition of sexual harassment
10   at the workplace, when I am depicted as a sex
11   object.  When I am called sexy and when a man
12   rubs his penis against female employees,
13   touches them.  When there's an environment
14   where women don't feel comfortable because
15   there's lewd and vulgar environment that keeps
16   her from working there without feeling like
17   she's being constantly humiliated, demeaned
18   because of her gender.
19      Q.   Ms. Guzman, do you know a man named
20   Steve Soldwedel?
21      A.   Yes.
22      Q.   Did you ever harass him?
23      A.   No.
24      Q.   I'm going to show you an e-mail
25   that he wrote to you.  It's going to be Guzman

Page 319

1          SANDRA GUZMAN-10/13/11
2    Exhibit 22, NYP '1739.
3          (Defendant's Guzman Exhibit 22,
4       document bearing Bates number NYP
5       '1739, marked for identification, as
6       of this date.)
7       Q.   And in this e-mail he wrote to you,
8    "Sandra, you may think sexual harassment is
9    something only men can do to women, but you
10   crossed the line twice today.  You don't know
11   me nearly well enough to make aspersions about
12   my sexuality.  You may find it funny, but I
13   finds it tasteless, rude and utterly
14   disrespectful.  Particularly for you to make
15   your remarks in the company of others.  Be
16   thankful I have the tact to hold my tongue.
17   You would not like to be on the receiving end
18   of what your comments inspired me to say.  If
19   you continue to speak of me in such a base and
20   disgusting manner, I'll continue not to
21   retort, but this will be a matter for human
22   resources."
23          Did you receive that e-mail from
24   him on or about October 31, '08?
25      A.   Yes.

Page 320

1          SANDRA GUZMAN-10/13/11
2       Q.   And what did you do to
3    Mr. Soldwedel that provoked him to respond to
4    you and write this e-mail?
5       A.   I was -- we were working on a story
6    about the new technology of DNA that allows
7    human beings to discover their heritage and he
8    was participating in the story.  And there was
9    a photo shoot in Central Park with five other
10   people and I authorized a purchase of
11   magazine -- of T-shirts and I bought a
12   T-shirt.  I guess this T-shirt that he wore
13   was two or three sizes extra large and
14   throughout the shoot, he kept complaining that
15   his T-shirt was big.  And what I said to him
16   was, Steve, did you want a tighter T-shirt.
17   I'm sorry, did you want a tighter T-shirt.
18      Q.   That's it?
19      A.   That's it.
20      Q.   And he -- your testimony is that
21   that's what he -- provoked him to say you
22   crossed the line twice, you made aspersions
23   about his sexuality.  That you were tasteless,
24   rude and disrespectful?
25      A.   That's right.

Page 321

1          SANDRA GUZMAN-10/13/11
2       Q.   And you wrote to him that you
3    regretted that anything you said to him was
4    felt as offensive to him, right?
5       A.   Yes, I was surprised.  I was
6    shocked.
7       Q.   I'm going so show you Guzman
8    Exhibit 23, NYP '1670 and '1669.  It's in
9    reversed Bates order.
10          (Defendant's Guzman Exhibit 23,
11      document bearing Bates numbers '1669
12      through '170, marked for
13      identification, as of this date.)
14      Q.   I'm going to ask you a question
15   about the e-mail at the top of the page.  You
16   can have a chance to look at it, but the
17   question I'm going to ask you is why did you
18   say it's clear from this picture that Steve is
19   black?
20      A.   We were doing a story about DNA and
21   heritage and race and this is like it's
22   obviously that he could be black.  He's
23   obviously not black.  We were trying to
24   discover people's heritage through the DNA.
25      Q.   And were you trying to be funny?

SANDRA GUZMAN-10/13/11

1
2    A.  It was just -- yeah, it was just
3  like oh, it's clear he's black.  Let's see
4  what the DNA finds out.
5          Shirley is the Reporter on the
6  story.
7    Q.  Is Steve Soldwedel black?
8    A.  We discovered, in fact, that he
9  thought he was Italian.  And we discovered
10 that he's actually German with gene mutation.
11   Q.  Does the picture -- does the
12 picture appear to be a picture of a white
13 person or a black person?
14   A.  He appears to be white.  Now, the
15 story we was.
16   Q.  Now, why do you say it's clear from
17 the picture that Steve is black?
18   A.  She's working on a story about DNA.
19 It's, you know, it's like this is what we're
20 going to find out, that he's black.
21   Q.  So, it was a joke?
22   A.  I think so.
23   Q.  Was this a racist comment?
24   A.  No.  In fact, the whole story was
25 about finding people's race.  Finding people's

SANDRA GUZMAN-10/13/11

1
2  heritage.  In fact, this -- the reporter
3  thought she was Jewish because she had a
4  pension for loving synagogues as a child.  So,
5  she wanted to find out if she had Jewish
6  ancestry.
7    Q.  If a white person wrote, it's clear
8  from this picture that Sandra is black about
9  you, would that be -- would you regard that as
10 offensive or racist?
11   A.  In this context when we're trying
12 to do a DNA story, no.
13   Q.  Do you ever work with somebody
14 named Josh Williams?
15   A.  You know, that name doesn't really
16 sound that familiar.
17   Q.  Did you -- was there a photographer
18 that you worked with at The Post named Josh
19 Williams?
20   A.  There were many photographers that
21 I worked with.
22   Q.  Did you see Josh Williams at The
23 Plumm -- party at The Plumm that celebrated
24 the Page Six Magazine opening?
25   A.  I don't remember.

SANDRA GUZMAN-10/13/11

1
2    Q.  You were at that party, right?
3    A.  I was.
4    Q.  You don't remember if you saw Josh
5  Williams though?
6    A.  No.
7    Q.  Do you remember anything you said
8  to Josh Williams?
9    A.  I don't.
10   Q.  Do you remember any physical
11 contact you had with Josh Williams?
12   A.  No.
13   Q.  Are there any Post photographers to
14 whom you said, if I weren't married, I'd love
15 to have my way with you?
16   A.  I don't remember saying that.
17   Q.  Is it possible you said that to
18 him?
19   A.  Maybe.  I don't remember.
20   Q.  And do you remember slapping his
21 rear end?
22   A.  No.
23   Q.  Do you remember groping him that
24 night?
25   A.  Oh, my God, no.

SANDRA GUZMAN-10/13/11

1
2    Q.  Is it possible you slapped his rear
3  end?
4    A.  I don't think so.
5    Q.  Is it possible?
6        MR. THOMPSON:  Objection.
7    A.  I don't know.
8    Q.  Were you drunk at the party?
9    A.  No.
10   Q.  You might have said, if I weren't
11 married, I'd love to have my way with you?
12 That's something you might have said?
13   A.  Maybe I was flirting with him.
14   Q.  Is there anybody else that you
15 flirted with at that party?
16   A.  No.  I don't know.
17   Q.  Are there any other men who work at
18 The Post with whom you flirted?
19   A.  At that party?
20   Q.  No, at The Post, at any time?
21   A.  No.  I can't recall right now.
22   Q.  Do you know if a complaint was ever
23 filed against you?
24   A.  I'm not aware of any complaints
25 being filed against me.

Page 358

SANDRA GUZMAN-10/13/11

1
2   A.   Yes.
3   Q.   And that was throughout 2009 right?
4   A.   Yes.
5   Q.   And did you also learn that ads
6   were not selling for other special sections
7   like the Israeli Day parade, the St. Patrick's
8   Day parade and black history months?
9   A.   Yes.
10   Q.   Sales were weak for the special
11   sections across the board, correct?
12   A.   I believe sales were weak in
13   general for all newspapers.
14   Q.   And when they're weak in general
15   for all newspapers, they're weakest for ethnic
16   advertising, right?
17   A.   I believe that its ethnic market
18   are more adversely effected.
19   Q.   And Tempo lost some big national
20   advertisers in 2009, correct?
21   A.   When Sami left who had those
22   contacts, when she was fired, Tempo also lost
23   those accounts.
24   Q.   What accounts were those?
25   A.   I don't really remember them all.

Page 359

SANDRA GUZMAN-10/13/11

1
2   I know that she went after Johnny Walker and
3   Macy's and she went after JCPenney.  She went
4   after cell phones.  She did fashion/beauty, so
5   I don't remember all of the accounts.  But
6   Sami brought expertise to the sales staff.
7   Q.   And do you know why Sami was let
8   go?
9   A.   I could tell you what she told me.
10   Q.   Do you know the reasons?
11   A.   She told me that they were cutting
12   back.
13   Q.   And did you go out and try to
14   solicit advertisement investments from Johnny
15   Walker, Macy's, JCPenney or cell companies?
16   A.   I personally did not go from time
17   to time if these sales staff felt that I could
18   talk about the content of Tempo and explain
19   it, so that potential advertisers could
20   understand the newspaper and could understand
21   what Tempo was.  I was invited, and depending
22   on my time, I would either go or not.
23   Q.   And who would you work with when
24   you were invited to those, was it Rob
25   Hauptman?

Page 360

SANDRA GUZMAN-10/13/11

1
2   A.   Well, I worked with Patrick Judge
3   who was the head of sales at times.
4   Q.   And was Pat Judge -- sorry.
5   MR. THOMPSON:  She's not finished,
6   Mr. Lerner.
7   A.   Christina Rallo sometimes.  Robert
8   Hauptman.  After Sami left, different --
9   different, it seemed like there were different
10   salespeople put on, on the sales of that
11   section.
12   Q.   And did you ever have conversations
13   with Pat Judge about his and his team's
14   efforts to sell ads for Tempo?
15   A.   Yes.
16   Q.   What was the nature of those
17   conversations?
18   A.   Patrick Judge said he was trying to
19   be the best that he could.  He missed Sami's
20   expertise and he was doing the best he could.
21   Q.   And do you have any reason to
22   believe he wasn't sincere?
23   A.   I don't have any reason to believe
24   he was insincere.
25   Q.   In 2007, Ms. Guzman, you started

Page 361

SANDRA GUZMAN-10/13/11

1
2   working on some sections other than Tempo; is
3   that correct?
4   A.   Yes, my responsibilities had edit
5   responsibilities.
6   Q.   And am I right that those started
7   in 2007?
8   A.   Yes, maybe earlier.  I'm not -- I'm
9   not quite sure of the year, but midway into my
10   time at The Post.
11   Q.   Well, let's take a look at NYP
12   '437.
13   I'm showing you Exhibit Guzman 28,
14   which is Bates number NYP '437 through '439?
15   (Defendant's Guzman Exhibit 28,
16   document bearing Bates numbers NYP
17   '437 through '439, marked for
18   identification, as of this date.)
19   Q.   This is an executive committee
20   agenda and minutes.  And I'm going to direct
21   your attention to the second page.
22   Before I do, you'll note the date
23   is January of '07.  And on the second page
24   under Tempo P and L, there's the line, "Col is
25   giving Sandra Guzman, Tempo editor, additional

Page 362

SANDRA GUZMAN-10/13/11

1
2 work to support her salary." You see that?
3     A.  Yes.
4     Q.  So does that refresh your
5 recollection that your you started getting
6 additional work apart from Tempo on other
7 special sections around the beginning of '07?
8     A.  Yes.
9     Q.  Until that time your special
10 section responsibilities had been limited to
11 Tempo, correct?
12     A.  Yes.  And I also contributed to
13 other parts of the paper.  I wrote stories
14 that appeared in the features section in the
15 news section, and I helped research stories.
16 I covered stories.  So, in addition to Tempo.
17     Q.  Understood.
18         MR. THOMPSON:  No, she's not
19 finished.
20         MR. LERNER:  That's not my
21 question.
22         MR. THOMPSON:  She's answering
23 your question.  You, once again, for
24 the tenth time, you're stopping this
25 witness from answering your question.

Page 363

SANDRA GUZMAN-10/13/11

1
2     A.  So --
3         MR. THOMPSON:  This is responsive
4 to your question.
5         Please continue.
6     A.  So, in addition to working on
7 Tempo, I also contributed --
8         MR. LERNER:  Just for the record,
9 Ken, my question was:  Until that time
10 your special section responsibilities
11 had been limited to Tempo, correct?
12         She's going through every
13 responsibility she had at The Post.
14 My question was what her special
15 section responsibilities were; okay.
16 So, she's not responsive to my
17 question.
18         MR. THOMPSON:  Are you finished,
19 Ms. Guzman?
20         THE WITNESS:  Yes.
21     Q.  Previously, prior to 2007, the only
22 special sections you had edited were Tempo,
23 correct?
24     A.  Yes.
25     Q.  And the special sections that you

Page 364

SANDRA GUZMAN-10/13/11

1
2 started working on in 2007, when Col Allan
3 assigned you some additional duties, were
4 sections that were -- at the time had been
5 edited by a woman named Carole Sovocool,
6 correct?
7     A.  Yes.
8     Q.  And Carole Sovocool was special
9 sections editor, correct?
10     A.  Yes.
11     Q.  Her responsibilities at The Post
12 was special section editing, correct?
13     A.  Yes.
14     Q.  And she remained an employee of The
15 Post throughout your tenure and after your
16 termination by The Post, correct?
17     A.  I don't know about after my
18 termination, but certainly until 2009.
19     Q.  Ms. Guzman, I'm going to show you a
20 stack of documents.  This is marked
21 Defendant's Exhibit Guzman 2009 --
22         MR. THOMPSON:  It's not marked
23 Defendant's Exhibit Guzman 2009.  It's
24 Guzman 29.
25         MR. LERNER:  Sorry, Guzman 29.

Page 365

SANDRA GUZMAN-10/13/11

1
2         (Defendant's Guzman Exhibit 29,
3 document bearing Bates numbers NYP
4 '2405 through '428, marked for
5 identification, as of this date.)
6     Q.  It's Bates number '2405 through
7 '2428 with a cover sheet that says Bates
8 numbers, NYP '2405 through '2428.
9         You see that?
10     A.  Yes.
11     Q.  Are these the special sections that
12 you edited of The New York Post in the year
13 2007?
14     A.  This --
15     Q.  Other than Tempo.
16     A.  Yes.  There may be more.  I don't
17 recollect, but I certainly edited these two,
18 yes.
19     Q.  Well, can you think, as you sit
20 here now, Ms. Guzman, can you think of any
21 other special sections that you edited in
22 2007?
23     A.  I can't think of any.  I'll have to
24 look back.
25     Q.  Exhibit Guzman 30 is Bates number

Page 366

SANDRA GUZMAN-10/13/11
1 
2 '2429 through '2536.  I'm going to have the
3 same question for you, which is:  Are these
4 the special sections that you edited at The
5 New York Post in 2008 other than Tempo?
6         (Defendant's Guzman Exhibit 30,
7     document bearing Bates numbers NYP
8     '2429 through '536, marked for
9     identification, as of this date.)
10     Q.   And if you'll notice they actually
11 are individually stapled.  So, you don't have
12 to turn each page.
13     A.   Yes.
14     Q.   So, is this -- are these the
15 special sections that you edited in 2008?
16     A.   These are the ones that were
17 published, yes.
18     Q.   And did you have an opportunity to
19 count the number that are here?
20     A.   The sections?
21     Q.   Yes.
22     A.   One, two, three, four, five, six,
23 seven, eight, nine, ten.  Eleven?
24     MR. DATOO:   Count them slowly.
25     MR. LERNER:  I count 11.

Page 367

SANDRA GUZMAN-10/13/11
1 
2     MR. DATOO:   That's what I have.
3     Q.   Ms. Guzman, so these are the
4 special sections that you edited that were
5 published?
6     A.   That saw publication.
7     Q.   And you edited sections that were
8 not published in 2008?
9     A.   What happens is, if they're on the
10 calendar, I start assigning stories,
11 recruiting writers, assigning stories and some
12 of them were published either in community
13 paper or in The Post, or not at all or killed.
14 So, I did a lot of work that may not be
15 reflected in the actual publication.
16         The way that a newspaper works is
17 every day, the size of the newspaper
18 fluctuates depending on news.  So, what I can
19 tell you is that these were the ones that were
20 published, but it doesn't reflect all of the
21 work that I did.
22     Q.   Handing you Guzman Exhibit 31.
23         (Defendant's Guzman Exhibit 31,
24     document bearing Bates numbers NYP
25     '2537 through '2607, marked for

Page 368

SANDRA GUZMAN-10/13/11
1 
2     identification, as of this date.)
3     Q.   Which are Bates NYP '2537 through
4 '2607.
5         Are these the special sections
6 other than Tempo that you edited in 2009?
7     A.   There may be.  There's some
8 missing.
9     Q.   What's missing?
10     A.   St. Patrick's Day may be missing.
11     Q.   Did St. Patrick's Day -- did the
12 St. Patrick's Day section get published in
13 2009?
14     A.   I believe so.
15     Q.   Were you the editor of it?
16     A.   Yes.  The casino section, several
17 casino sections.  Real estate section.
18     Q.   Were you the editor of the casino
19 section?
20     A.   Whenever Carole -- Carole had a
21 death in the family.  Her father was dying.
22 And I was asked to edit and take over some of
23 her sections.
24         And real estate and casino was
25 among them.  And I also edited all the parade

Page 369

SANDRA GUZMAN-10/13/11
1 
2 sections.
3         So, I edited the Columbus and the
4 St. Patrick's Day parade, which I believe --
5 which I believe were published that year.
6     Q.   Well, Columbus Day is in October
7 and you were terminated in September, right?
8     A.   Well, would have edited, yes.
9     Q.   It would have been published after
10 you were no longer an employee of The Post
11 right?
12     A.   Right.  So, I meant to the St.
13 Patrick's Day parade, which would have been in
14 March and I helped prepare the casino and the
15 real estate and I helped prepare July 4th
16 parade that are not reflected in the packet
17 that you've given me.
18     MR. LERNER:  We're going to go off
19 the record.
20     THE VIDEOGRAPHER:  The time is
21 8:14 p.m.  We're going offer the
22 record.
23         (Whereupon, an off-the-record
24 discussion was held.)
25     THE VIDEOGRAPHER:  The time is

CONTAINS CONFIDENTIAL PORTIONS

Page 384

```
 1              Guzman
 2         THE VIDEOGRAPHER:  Will the court
 3    reporter please swear in the witness?
 4    SANDRA GUZMAN, called as a witness by the
 5    Defendants, having been duly sworn,
 6    testified as follows:
 7         MR. THOMPSON:  Let the record
 8    reflect that this deposition was
 9    scheduled to begin at 10:00 a.m.
10         We did not start at 10:00 a.m.
11    despite the fact that Ms. Guzman was
12    sitting and ready to begin because of
13    opposing counsel.  This deposition is
14    starting almost 20 minutes after the
15    start date.
16         MR. LERNER:  The record will also
17    reflect if you look it up that the FDR
18    Drive has been closed for two to three
19    hours this morning due to a tractor
20    trailer getting on the southbound FDR
21    and getting stuck and created
22    significant traffic problems in the
23    city.  I come from the north to get to
24    the deposition.  To get to the office so
25    I was delayed some minutes by that.  And
```

Page 385

```
 1              Guzman
 2    that is the reason so I apologize,
 3    Mr. Thompson, but that is the reason for
 4    the delay.
 5         EXAMINATION
 6    BY MR. LERNER:
 7         Q.  Ms. Guzman, you testified in
 8    October that Les Goodstein told you you
 9    looked sexy and beautiful in the office,
10    right?
11             Do you remember that?
12         A.  Yes.
13         Q.  Where did he tell you you looked
14    sexy and beautiful?
15         A.  When I saw him in the elevator.
16             When I saw him in the News Corp.
17    cafeteria on the third floor.
18             And when I met with him in his
19    office on the fifth floor.
20             And any chance and any moment that
21    I bump into him randomly in the building, he
22    would comment.
23         Q.  All right.
24             When was the first time he told
25    you that you looked sexy and beautiful?
```

Page 386

```
 1              Guzman
 2         A.  It was probably the second
 3    meeting.  He commented --
 4         Q.  Was that in his office?
 5         A.  He commented on my dress and on my
 6    shoes and how beautiful I looked in them.
 7         Q.  And what kind of dress, what was
 8    the dress you were wearing?
 9         A.  Simple black dress.
10         Q.  What were your shoes?
11         A.  Black shoes.
12         Q.  And what was the location of that
13    conversation?
14         A.  Elevator on the third floor.
15         Q.  And was that a chance meeting in
16    the elevator or were the two of you going
17    somewhere together?
18         MR. THOMPSON:  Objection.
19         THE WITNESS:  We were going to a
20    meeting.
21    BY MR. LERNER:
22         Q.  What meeting?
23         A.  A meeting that he called to
24    discuss one of the sections that I worked
25    on.
```

Page 387

```
 1              Guzman
 2         Q.  And where were you going for that
 3    meeting?
 4         A.  Third floor conference room.
 5         Q.  Was Sami Marerro also in
 6    attendance at that meeting?
 7         A.  Yes.
 8         Q.  What about Tony Martinez?
 9         A.  I don't remember if Tony was
10    there.
11         Q.  And he told you that -- did he say
12    that your dress looked -- what exactly was
13    the word or words he used to describe your
14    black dress on that occasion?
15         A.  You are looking beautiful and sexy
16    today.
17         Q.  And was Ms. Marerro with the two
18    of you in the elevator when he said that?
19         A.  No.
20         Q.  The two of you proceeded from the
21    elevator to the third floor conference room
22    and joined Ms. Marerro?
23         A.  Yes.  We joined about 20 people
24    from the sales staff.
25         Q.  And where did you get on the
```

3

CONTAINS CONFIDENTIAL PORTIONS

Page 388

Guzman
1
2  elevator?
3      A.   The ninth floor.
4      Q.   Do you know why -- withdrawn.
5          Mr. Goodstein's office was not on
6  the ninth floor of the building, right?
7      A.   No.
8      Q.   So do you know why is that
9  Mr. Goodstein and you got on the elevator at
10 the ninth floor?  If you understand the
11 question why was Mr. Goodstein getting on
12 the elevator with you on the ninth floor?
13         MR. THOMPSON:  Objection.
14         THE WITNESS:  I didn't say that he
15 got on the elevator on the ninth floor.
16 BY MR. LERNER:
17     Q.   Okay.  So how did you -- were you
18 already on the elevator when he got on?
19     A.   I told you this happened on the
20 third floor elevator so I was going down.
21     Q.   To the third floor?
22     A.   And I was -- right.  On the third
23 floor by the elevators.
24     Q.   So it wasn't in the elevator now
25 you are saying it was by the elevator?

Page 389

Guzman
1
2         MR. THOMPSON:  Objection.
3         THE WITNESS:  I am saying it was
4  by the elevators, yes, on the third
5  floor.
6  BY MR. LERNER:
7      Q.   Okay.  Because earlier you
8  testified that it was in the elevator.
9      A.   It was outside the elevators on
10 the third floor.
11     Q.   So five minutes ago when you said
12 it was in the elevator you were wrong?
13     A.   I am clarifying exactly where this
14 man Les Goodstein approached me and sexually
15 harassed me.
16     Q.   Well, I appreciate the
17 clarification.
18     A.   Thank you.
19     Q.   But it doesn't appear to be a
20 clarification.  It appears to be a change.
21         MR. THOMPSON:  Objection.  Is that
22 a question?
23 BY MR. LERNER:
24     Q.   Is that correct?
25         MR. THOMPSON:  Objection.

Page 390

Guzman
1
2         THE WITNESS:  You asked me a
3  question and I am answering it.  I am
4  clarifying the exact place where this
5  exchange took place.  The third floor by
6  the elevator banks.
7  BY MR. LERNER:
8      Q.   You testified before the last time
9  we were together that -- you understand it
10 is important to be precise and clear with
11 your words, right?
12     A.   I understand.
13     Q.   And was anybody else present
14 within earshot when Mr. Goodstein told you
15 that your dress looked sexy and beautiful?
16     A.   Not that I can recall.
17     Q.   Did the two of you then walk
18 together to the third floor conference room?
19     A.   Yes.
20     Q.   And is there anything else he said
21 on that occasion about you or your
22 appearance that you can recall?
23     A.   No.
24     Q.   And is there anything else about
25 his -- did he -- is there anything else that

Page 391

Guzman
1
2  he did on that occasion that caused you to
3  feel -- that you believe was inappropriate?
4      A.   Yes.
5      Q.   On that particular occasion?
6      A.   Yes.  Every time I saw
7  Mr. Goodstein.
8      Q.   No.  Ms. Guzman, I am asking
9  specifically about the occasion when you
10 were outside the elevators on the third
11 floor on your second meeting walking to the
12 conference room, do you have a recollection
13 of anything Mr. Goodstein did on that
14 occasion?
15         MR. THOMPSON:  Mr. Lerner, don't
16 raise your voice to the witness.
17         THE WITNESS:  Is there a reason
18 why you are raising my voice.  I am --
19 BY MR. LERNER:
20     Q.   I just want to be clear in your
21 testimony.
22         MR. THOMPSON:  I want the record
23 to be clear that Mark Lerner is raising
24 his voice at Ms. Guzman.  She is not a
25 child.  She is a grown woman.  You have

CONTAINS CONFIDENTIAL PORTIONS

Page 392

Guzman
1
2  to give her respect.  If you are not
3  going to give her respect we are going
4  to stop this deposition.  You will not
5  raise your voice to this witness.
6       MR. LERNER:  We will stop the
7  deposition if you interfere with it.  We
8  have a video recorder here so the record
9  does not require you to characterize
10 what is going on in the room.  My --
11      MR. THOMPSON:  I will state my
12 position.
13      MR. LERNER:  Excuse me, I am not
14 done.
15      MR. THOMPSON:  Any time you raise
16 your voice to my client --
17      MR. LERNER:  I am not finished.
18      MR. THOMPSON:  That is a fact.
19      MR. LERNER:  I am not finished.
20      MR. THOMPSON:  Don't do that.  It
21 is --
22      MR. LERNER:  I will conduct the
23 deposition in the tone of voice --
24      MR. THOMPSON:  Properly.
25      MR. LERNER:  I will conduct the

Page 393

Guzman
1
2  deposition.
3       MR. THOMPSON:  Not improperly.
4  BY MR. LERNER:
5       Q.   Ms. Guzman, is there anything else
6  that you recall specifically on the occasion
7  of your second meeting with Mr. Goodstein
8  when you were walking from the elevators on
9  the third floor to a conference room that he
10 did besides telling you your dress or you
11 looked sexy and beautiful?
12      A.   He looked at me in a very
13 lascivious way and he looked at me, checked
14 me out up and down.
15      Q.   And how long did that take?
16      MR. THOMPSON:  Objection.
17      THE WITNESS:  It felt like an
18 eternity.
19      I am not going to work to be
20 looked at lasciviously by somebody who
21 is supervising sales of the section I
22 worked for.
23 BY MR. LERNER:
24      Q.   Did you say anything to him about
25 it?

Page 394

Guzman
1
2       A.   No.
3       Q.   What was your response?
4       A.   Disgusted.
5       Q.   No.  What was your verbal or
6  physical response if any?
7       A.   I just ignored him and I walked to
8  the conference room.
9       Q.   What was lascivious about his
10 look?
11      A.   The way that he looked at me up
12 and down as if he is checking someone who is
13 naked, a woman is naked.
14      Q.   And what does that look like?
15      A.   As a woman?
16      Q.   No.  What did it look like to you?
17      A.   As a woman -- I am going to
18 describe it, sir.  As a woman you know it
19 when you see it.
20      Q.   Well, explain for the jury which
21 will be composed of potentially men and
22 women how that appears or what it actually
23 consists of?
24      A.   So he is slowly taking a look from
25 head to toe at my body as if he is observing

Page 395

Guzman
1
2  someone who is naked.  A woman is naked.
3       Q.   But his comment to you was on your
4  dress, right?
5       A.   I was wearing the dress.  It is
6  how the dress looked on me.
7       Q.   And he commented on the dress,
8  right?
9       A.   On how the dress looked on me.
10      Q.   Did he make a comment about your
11 body?
12      A.   You look beautiful and sexy in
13 that dress.
14      Q.   And when you walked from the
15 elevator area to the conference room was
16 there anything that occurred during that
17 walk that you considered objectionable or
18 lascivious that you can recall?
19      A.   No.  But I remember that I walked
20 in back of him so that he would not look at
21 me as he walked, I walked behind him.  I
22 remember that.  I purposefully slowed down
23 my steps so that he can be in front of me.
24      Q.   Is there anything else that you
25 recall about your encounter with

CONTAINS CONFIDENTIAL PORTIONS

Page 396

Guzman
1
2  Mr. Goodstein outside the elevators on the
3  third floor on that occasion that is
4  relevant to your claim?
5      A.   I felt harassed and I felt
6  disgusted that this happened.  That is what
7  I recall.  I recall feeling this is not
8  right.  This is wrong.  I don't come to work
9  to be gawked at.
10      Q.   When was the next time that you
11  experienced anything from Mr. Goodstein that
12  you regard as harassing?
13      A.   Put it this way, I would see
14  Mr. Goodstein in the News Corp. cafeteria on
15  the third floor.  I would see him in the
16  elevator banks in the lobby and every time
17  I -- during meetings and every time we had
18  an encounter Mr. Goodstein had to comment on
19  something that I was wearing on how I looked
20  in my shoes or in my dress.
21      Q.   I am asking you when specifically
22  you recall was the next time that
23  Mr. Goodstein commented?
24      A.   So I met with him on his fourth
25  floor office.

Page 397

Guzman
1
2      Q.   Okay.  You testified last time we
3  were in a deposition together that
4  Ms. Marerro was in those meetings with you
5  and Mr. Goodstein?
6      A.   Most of the time, yes, Ms. Marerro
7  was present.
8      Q.   You testified that she was always
9  with you in those meetings and that
10  sometimes Mr. Martinez was with you?
11      A.   Well, Ms. Marerro stopped working
12  for The New York Post so the times -- there
13  were times that I met with Ms. Goodstein
14  that Ms. Marerro was not present or
15  Mr. Martinez because they both stopped --
16  they were both laid off.
17      Q.   And how many times did that occur?
18      MR. THOMPSON:  Objection.
19      THE WITNESS:  How many times?  I
20  am sorry.
21  BY MR. LERNER:
22      Q.   How many times did you meet with
23  Mr. Goods without the presence of
24  Ms. Marerro?
25      A.   On numerous occasions.

Page 398

Guzman
1
2      Q.   How many?
3      A.   I can't give you a number but
4  numerous occasions.
5      Q.   Where?
6      A.   Mostly his fourth floor office.
7  Fourth or fifth floor office.  Maybe fifth
8  floor, yes, where News America marketing is
9  located.
10      Q.   Again, I would like to know when
11  the second time you felt harassed by
12  Mr. Goodstein was with specific
13  recollections if you have them.  If you
14  don't have them answer I don't remember.
15      A.   I don't remember the second time
16  but I remember the numerous occasions when
17  we would randomly bump into each other in
18  meetings and I remember there was one
19  meeting where as soon as I walked in he
20  chose to comment on the shoes again that I
21  was wearing.
22      Q.   Did you ask him not to comment on
23  your shoes?
24      A.   No.
25      Q.   Is that the occasion when you

Page 399

Guzman
1
2  said, when you offered to let him borrow
3  them as a joke?
4      A.   Yes.
5      Q.   Why was the comment on your shoes
6  offensive?
7      A.   I think if I were a white male he
8  would not be commenting on the way I
9  dressed.
10      I think that he meant to objectify
11  me as a sexual object and I found that
12  offensive.
13      Q.   Anything else?
14      A.   I found his conduct inappropriate,
15  Mark.
16      Q.   Is there anything else about his
17  commenting on your shoes -- what was
18  specifically did he say about your shoes?
19      A.   Sexy shoes.
20      Q.   Were they sexy shoes?
21      MR. THOMPSON:  Wait.  She wasn't
22  finished.
23      THE WITNESS:  Sexy shoes.  He
24  wouldn't even refer to me by my first
25  name or by my last name.

CONTAINS CONFIDENTIAL PORTIONS

Page 400

Guzman
BY MR. LERNER:
 3    Q.   Were they sexy shoes?
 4    A.   No.
 5    Q.   Describe the shoes?
 6    A.   Black shoes, black pumps.
 7    Q.   Back pumps.  Pumps means high
 8 heels?
 9    A.   Black high heels, yes.
10    Q.   It is your testimony that those
11 are not sexy shoes?
12    A.   No.  They are black.
13    Q.   They are black pumps?
14    A.   High heels, yes.
15    Q.   What did you like about those
16 shoes?
17    A.   They were comfortable.
18    Q.   Did you like the fact that they
19 were high heels?
20    MR. THOMPSON: Objection.
21    THE WITNESS: I liked them.
22 BY MR. LERNER:
23    Q.   Did anyone else ever comment on
24 those shoes?
25    A.   Not that I can recall right now.

Page 401

Guzman
 2    Q.   Do you still own those shoes?
 3    A.   Yes.
 4    Q.   Who were they manufactured by?
 5    MR. THOMPSON: Objection.
 6    THE WITNESS: YSL.
 7 BY MR. LERNER:
 8    Q.   If you recall any other specific
 9 occasions during which Mr. Goodstein made
10 what you regard as harassing comments about
11 your appearance can you please describe them
12 specifically now?
13    A.   So there was another occasion when
14 again we were meeting in his office and as I
15 was walking in instead of greeting me with
16 my name he called me Cha-Cha.
17    Q.   Okay.  We discussed this incident
18 the last time you were deposed, correct?
19    A.   Yes.
20    Q.   And he stopped doing that when you
21 let him know you didn't appreciate it,
22 correct?
23    A.   Yes.
24    Q.   And how did you let him know that?
25    A.   Don't call me that.

Page 402

Guzman
 2    Q.   How did he respond when you said
 3 don't call me that?
 4    A.   He was confused.
 5    Q.   But he stopped calling you that,
 6 correct?
 7    A.   Yes.
 8    Q.   And with respect to him calling
 9 you sexy and beautiful you never said don't
10 call me sexy and beautiful, correct?
11    A.   No.
12    Q.   No, you did not say that?
13    A.   No.  I did not.  I would ignore
14 him.
15    Q.   Mr. Goodstein's office was on the
16 fifth floor of the building at 1211 Avenue
17 of the Americas, right?
18    A.   Yes.
19    Q.   What was offensive about the term
20 Cha-Cha to you?
21    A.   First of all, I have a name.
22        Second of all, there is a
23 stereotype that all Latin women are, you
24 know, hot and dancers and Cha-Cha is
25 referring to a dance move on a dance floor.

Page 403

Guzman
 2        Why couldn't he call me by my
 3 name?
 4    Q.   Did you ever write about somebody
 5 who Tempo referred to in a headline as
 6 Cha-Cha Willie?
 7    A.   Are you looking at something that
 8 maybe I should review?
 9    Q.   I am looking at an -- a page from
10 Tempo from 2007 with a headline Cha-Cha
11 Willie, is that a headline that I approved
12 for Tempo?
13    A.   Can I see it?
14    Q.   No.
15    A.   I can't?
16    Q.   There is a question pending.  Did
17 you approve a headline Cha-Cha Willie for
18 Tempo regarding someone named Willie Perry?
19    A.   Can you read some more so that I
20 can -- can you refresh my memory?
21    Q.   Have you ever heard of Willie
22 Perry?
23    A.   I can't recall right now.
24    Q.   Do you know who Willie Perry is?
25    A.   I have interviewed and I have

CONTAINS CONFIDENTIAL PORTIONS

Page 408

```
1              Guzman
2      A.   Yes.
3      Q.   When you bumped into him in the
4  cafeteria or in the elevators or in the
5  hallways how long did these meetings or
6  encounters last?
7      A.   Anywhere -- I don't know.
8  Anywhere from hello, how are you, five
9  minutes, they seemed longer because they
10 were always really uncomfortable.
11     Q.   And these were in -- these
12 encounters were in public areas in the
13 building, right?
14     A.   Yes, sir.
15     Q.   And you were free to walk away or
16 keep going where you were going during these
17 meetings, right?
18     A.   I am not really sure what you are
19 asking me.
20     Q.   Well, if you stood around to talk
21 to Mr. Goodstein for any length of time that
22 was of your own free will, correct?
23     A.   Well, he was supervising the sales
24 of sections that I was working on.
25     Q.   He wasn't your supervisor,
```

Page 409

```
1              Guzman
2  correct?
3      A.   He was not my supervisor but he
4  was supervising the sales so we worked in
5  the -- with the same projects, we worked on
6  the same projects.  So he wasn't a total
7  stranger to me, I would greet him and that
8  is when he took the opportunity to say
9  inappropriate comments.
10     Q.   Specifically the inappropriate
11 comments were sexy and beautiful?
12     A.   Mark, he would always comment on
13 my appearance.  He would always comment on
14 the dresses that I wore or the shoes that I
15 wore and he would always gawk.
16     Q.   And the comments were to use the
17 terms either sexy or beautiful?
18          MR. THOMPSON:  Objection.
19 BY MR. LERNER:
20     Q.   Correct?
21     A.   Yes.
22     Q.   Were these being -- these meetings
23 where you would be standing up during the
24 meeting speaking to him?
25          MR. THOMPSON:  Objection.
```

Page 410

```
1              Guzman
2          THE WITNESS:  The meetings by the
3  elevator banks, the random meetings --
4  BY MR. LERNER:
5      Q.   Correct.
6      A.   -- in the News Corp. cafeteria?
7      Q.   Yes.
8      A.   I would be usually going
9  somewhere.
10          The meetings in his office, I
11 would be sitting down.
12     Q.   There came a time in 2007 when he
13 stopped being involved in Tempo, right?
14     A.   Yes.
15     Q.   How many of these encounters with
16 Mr. Goodstein on the premises of the 1211
17 Avenue of the Americas occurred after he
18 stopped being involved in Tempo?
19     A.   I also told you that we continued
20 to meet after because of his involvement
21 with the Brooklyn and community papers,
22 okay.
23     Q.   How many times did you meet with
24 Mr. Goodstein on the Brooklyn and community
25 papers after he was no longer involved with
```

Page 411

```
1              Guzman
2  Tempo?
3      A.   Numerous times.
4      Q.   How many?
5      A.   I would say two dozen times.
6  Maybe more.
7      Q.   Where were those meetings?
8      A.   His office, at News Corp. office
9  on the fifth floor, News America offices.
10     Q.   And who was in those meetings, you
11 and his deputy?
12     A.   Yes.  Sometimes there were two
13 deputies and sometimes one deputy.
14     Q.   And who were the names -- what
15 were the names of the two deputies?
16     A.   I cannot recall the names.
17     Q.   Were they male or female?
18     A.   One of them was a female and her
19 name starts with a K, K something.  And I
20 believe that she went on maternity leave and
21 then another staffer took over her
22 responsibilities but I can't recall his
23 name.
24     Q.   Did the two deputies ever say
25 anything to you that you considered
```

CONTAINS CONFIDENTIAL PORTIONS

Page 412

                    Guzman
1
2    harassing or abusive?
3        A.    No, sir.
4        Q.    And did you ever say anything to
5    them about Mr. Goodstein's conduct?
6        A.    No, sir.
7        Q.    Were they ever present during
8    Mr. Goodstein engaging in conduct that you
9    considered offensive?
10       A.    No.
11       Q.    Did you ever tell them about it?
12       A.    The two deputies?
13       Q.    Yes.
14       A.    About Mr. Goodstein's --
15       Q.    Yes.
16       A.    -- inappropriate behavior?  No.
17             I told other people.  I complained
18   to other people.
19       Q.    My question was did you tell them
20   about it.
21       A.    Okay.
22       Q.    During what period of time did you
23   have meetings with Mr. Goodstein about the
24   community newspapers?
25             MR. THOMPSON:  Objection.

Page 413

                    Guzman
1
2             THE WITNESS:  During what period
3    of time?  When the newspapers were first
4    initially purchased, there were a lot of
5    discussion about what to do with them,
6    how to integrate them into The New York
7    Post properties.  There were News Corp.
8    properties and so we were trying to
9    figure out what their role was going to
10   be.
11   BY MR. LERNER:
12       Q.    Did Mr. Goodstein ever trap you in
13   a room?
14       A.    Trap me in a room?
15       Q.    Yes.
16       A.    No.
17       Q.    Did he ever -- did he ever touch
18   you?
19             MR. THOMPSON:  Objection.
20   BY MR. LERNER:
21       Q.    In an offensive way?
22       A.    No.
23       Q.    Did he ever ask you out on a date?
24       A.    No.
25       Q.    Did he ever mention sex acts with

Page 414

                    Guzman
1
2    you?
3        A.    No.
4        Q.    Did he ever comment specifically
5    by using the word breasts?
6        A.    No.
7        Q.    Did he ever use the word ass with
8    you to comment about your body?
9        A.    No.
10       Q.    Did he ever refer to your legs
11   specifically?
12       A.    I don't recall.  He may have.
13       Q.    You don't recall, right?
14       A.    I don't recall specifically.
15       Q.    Okay.  Were there times that you
16   were with Mr. Goodstein that he spoke to you
17   in a professional way discussing the
18   business you were doing?
19       A.    Yes.
20       Q.    Did he look you in the eye when he
21   spoke to you?
22       A.    No.
23       Q.    Never?
24       A.    Very few times.  That was part of
25   the problem.  He was always looking at my

Page 415

                    Guzman
1
2    body, at my breasts, at my legs, at my
3    shoes.  That was the inappropriate behavior
4    I was trying to describe.
5        Q.    Did you ever ask him to make more
6    eye contact with you?
7        A.    No.
8        Q.    Did you ever tape record any
9    meetings with Mr. Goodstein?
10       A.    No.
11       Q.    Did you ever write down notes
12   about Mr. Goodstein after your meetings?
13       A.    I don't remember if I wrote down
14   notes about his behavior.
15       Q.    And you never told him that you
16   didn't like the way he was looking at you,
17   correct?
18       A.    No, Mark.
19       Q.    Did he ever prevent you from
20   publishing Tempo?  That sounds like an odd
21   question but --
22       A.    Yes, it is.  I don't understand
23   what you are trying to ask me.
24       Q.    He never stood in the way of
25   getting Tempo out, right?

CONTAINS CONFIDENTIAL PORTIONS

Page 416

1                Guzman
2      A.   I don't know.
3      Q.   He was -- your understanding is he
4  facilitated Tempo, right?
5      A.   My understanding is that he was a
6  fan of the work that Tempo and my team were
7  doing.
8      Q.   You don't have any reason to doubt
9  that, correct?
10     A.   No.
11     Q.   So during the time you were
12 working with Mr. Goodstein you continued to
13 focus your efforts on getting Tempo out,
14 getting any other sections you were working
15 on out and doing a good job, correct?
16     A.   Can you repeat the question?
17     Q.   Sure.
18          During the time you were working
19 with Mr. Goodstein you continued to focus
20 your efforts on getting Tempo out, getting
21 any other sections you were working out and
22 doing a good job, correct?
23     A.   Yes.
24     Q.   And you did a good job, right?
25     A.   Yes.

Page 417

1                Guzman
2      Q.   And did you think that your
3  performance was good during this time
4  period?
5      A.   Notwithstanding the conditions
6  that I had to work under, yes.
7      Q.   You produced the section that you
8  wanted to produce, right?
9      A.   To the best of my ability.  I
10 ignored all the other harassment that I was
11 experiencing.
12     Q.   And you were able to do your job,
13 right?
14     A.   I did my job to the best of my
15 ability.
16     Q.   You were able to do your job well,
17 right?
18     A.   Yes.
19     Q.   You produced an excellent section,
20 right?
21     A.   Yes.  But that didn't mean that I
22 was not affected by his lewd behavior.
23     Q.   My question is your work did not
24 suffer for it, right?
25     A.   No.

Page 418

1                Guzman
2      Q.   No, it did not suffer for it,
3  right?
4          MR. THOMPSON: Objection. She
5      just answered that question.
6          THE WITNESS: No.
7  BY MR. LERNER:
8      Q.   You have actually described
9  yourself as sexy and beautiful, have you
10 not?
11     A.   I may have.
12     Q.   Do you recall writing a list of
13 words to describe yourself and including
14 sexy and beautiful on that list?
15     A.   No.
16     Q.   Who is Sol, S-O-L?
17     A.   Sol is a friend of mine.
18     Q.   Do you remember writing a list of
19 words to describe Sol and writing a list of
20 words to describe yourself and comparing the
21 two?
22     A.   No.
23     Q.   I am going to show you a document,
24 showing you a document marked Guzman Exhibit
25 33.

Page 419

1                Guzman
2          (Handwritten list was marked
3      Guzman Exhibit 33 for identification)
4  BY MR. LERNER:
5      Q.   Ms. Guzman, is this a piece of
6  paper where you wrote down lists of
7  adjectives to describe Sol and yourself?
8      A.   Yes.
9      Q.   Sol is the column on the left and
10 you are the column on the right?
11     A.   Yes.
12     Q.   And who -- is Sol somebody you
13 were involved with?
14     A.   Involved with?
15     Q.   Yes.
16     A.   How do you mean?
17     Q.   Were you ever romantically
18 involved with Sol?
19     A.   No.
20     Q.   What is Sol's last name?
21     A.   Rivera.
22     Q.   Were you involved in any business
23 dealings with Sol?
24     A.   Yes.
25     Q.   What were those dealings?

CONTAINS CONFIDENTIAL PORTIONS

Page 420

Guzman
1
2     MR. THOMPSON:  Objection.
3     THE WITNESS:  Can I answer?
4     Sol and I started a -- as part of
5  my attempt to make money Sol and I
6  started a media consulting partnership.
7     She was my business partner.
8  BY MR. LERNER:
9     Q.   And you described yourself here
10 as, among other things, sexy and beautiful?
11    A.   Yes.
12    Q.   Correct.  You also describe
13 yourself as bitchy?
14    A.   Yes.
15    Q.   You describe yourself as strong
16 and funny?
17    A.   Yes.
18    Q.   Do you still agree that all these
19 adjectives to describe you are accurate?
20    A.   They are different parts of me.
21    Q.   They all are parts of you?
22    A.   At times.
23    Q.   So sexy is part of you?
24    A.   Sure.
25    Q.   And beautiful is part of you?

Page 421

Guzman
1
2     A.   Yes.
3     Q.   As is -- as are bitchy and strong?
4     A.   Yes.
5     Q.   Ms. Guzman, when you started
6  working at The Post in 2003 Michael Riedel
7  was already working at The Post, right?
8     A.   I believe so.
9     Q.   He was already The Post's Broadway
10 columnist and critic, right?
11    A.   I believe so, yes.
12    Q.   And by 2008 you and he had both
13 been working at the paper together for about
14 five years, right?
15    A.   Yes.
16    Q.   Had you gotten to know him during
17 that time period?
18    A.   Know him?
19    Q.   Yes.
20    A.   What do you mean know him?
21    Q.   Were you friendly with him in the
22 office the way two people that might work in
23 an office together would be friendly?
24    A.   Yes.
25    Q.   Did you talk to him from time to

Page 422

Guzman
1
2  time about matters of mutual interest?
3     A.   Yes.
4     Q.   Did you consider him a friend in
5  the office?
6     A.   A co-worker.
7     Q.   Did you consider him a friend?
8     A.   A co-worker.
9     Q.   But a friendly co-worker?
10    A.   Yes.
11    Q.   Did you ever have any dispute or
12 problem with him until the material that you
13 have pled in this lawsuit?
14    A.   Did I have any dispute with him?
15    Q.   Yes.
16    A.   No.
17    Q.   Did he ever -- until the matter
18 that concerned West Side Story came up did
19 he ever do anything to you that you regarded
20 as offensive?
21    A.   Besides every time he saw me
22 singing West Side Story with a Spanish
23 accent.
24    Q.   You need to listen to the
25 question.

Page 423

Guzman
1
2     The question was, until the matter
3  that concerned West Side Story came up did
4  he ever do anything to you that you regarded
5  as offensive?
6     MR. THOMPSON:  She was just
7  clarifying your question.
8     THE WITNESS:  I was.  I was
9  clarifying the West Side incident.
10 BY MR. LERNER:
11    Q.   Apart from the West Side Story
12 incident was there anything that Mr. Riedel
13 ever did that you considered offensive?
14    A.   No.
15    Q.   You sent him an e-mail which was
16 marked in the last deposition Guzman 15 in
17 which you called -- you asked him for some
18 information about who is casting West Side
19 Story, right?
20    A.   Yes.
21    Q.   You called him M in the e-mail,
22 right?
23    A.   Yes.
24    Q.   And you signed it S, right?
25    A.   Yes.

CONTAINS CONFIDENTIAL PORTIONS

Page 432

Guzman
1
2      A.   She told me other things that I
3   didn't print.
4      Q.   Did you ask her why she didn't
5   want you to print those other things?
6      A.   Yes.
7      Q.   What did she tell you?
8      A.   She didn't want to get involved in
9   offending her friends on Broadway.
10      Q.   Did you ever publish your own
11   critique of West Side Story?
12      A.   I don't remember if it was
13   published.  I wanted to.
14      Q.   Have you ever published material
15   that was critical of West Side Story?
16      A.   I don't remember.
17      Q.   Did Mr. Riedel contact West Side
18   Story's casting director for your friend?
19      A.   I don't know.
20      Q.   Did he ever get back to you with
21   the information that you requested about the
22   casting director?
23      A.   I don't remember.
24      Q.   So with respect to Mr. Riedel
25   singing I want to live in America, I like it

Page 433

Guzman
1
2   here in America to you in a Spanish accent
3   was the first thing he did that offended
4   you, correct?
5      A.   Yes.
6      Q.   And Ms. Guzman, it was also the
7   last thing he did that offended you,
8   correct?
9      A.   It was the only thing he -- the
10   only thing he did every time we encountered
11   each other.
12      Q.   It was the only thing that he did
13   that offended you, right?
14      A.   Yes.
15      Q.   You never asked him to stop
16   singing it, right?
17      A.   Just ignored him.
18      Q.   Did you discuss the musical with
19   him?
20      A.   I may have.
21      Q.   Were you interested in his help in
22   your coverage of the musical for Tempo?
23      A.   Yes.
24      Q.   And as the revival was being
25   produced before it opened did you have

Page 434

Guzman
1
2   conversations with him in your office about
3   how you might cover the revival?
4      A.   Not really.  I had pretty much an
5   idea of how I wanted to do it.  I didn't
6   need Michael's help in that regard in how I
7   wanted to cover it.
8      Q.   Didn't you ask him if he could put
9   you in touch with the producer of it?
10      A.   I may have asked him.
11      Q.   And so that would be asking his
12   help for coverage, right?
13      A.   Yes.
14      Q.   So you did ask him for help?
15      A.   But how to cover it is very
16   different.  How to approach the story is
17   very different.
18      Q.   Mr. Riedel has extensive contacts
19   on Broadway, agreed?
20      A.   Agreed.
21      Q.   And if you are going to write a
22   story about West Side Story's being produced
23   on Broadway Mr. Riedel's contacts could be
24   valuable to you, correct?
25      A.   Sometimes.  He is also very much

Page 435

Guzman
1
2   hated on Broadway so.
3      Q.   But his contacts could be valuable
4   to you?
5      A.   Potentially could be or not.
6      Q.   And you sought that out from him,
7   right?
8      A.   I sought that out from him, yes.
9      Q.   Okay.  And you spoke to him about
10   it in the office, right?
11      A.   Yes.
12      Q.   Ms. Guzman, you have been writing
13   a book about The New York Post and your
14   experiences there, correct?
15      A.   I am trying to write -- I have
16   been trying to work on a book about my
17   experiences at The Post.
18      Q.   About its senior editors?
19      A.   About my experiences at The Post,
20   all of them.
21      Q.   You have written multiple chapters
22   of that book, have you not?
23      A.   No.  There are sketches.
24      Q.   You are writing it on the computer
25   that you have now, right?

CONTAINS CONFIDENTIAL PORTIONS

Page 448

Confidential - Guzman
1
2    BY MR. LERNER:
3        Q.   Did you spend time as a child in
4    Santo Domingo?
5        A.   No.  Santo Domingo the country or
6    Santo Domingo the city or Santo Domingo --
7        Q.   Let me read something to you.
8            You wrote, "I knew I was jumping
9    into a pit, a latrine really, like the ones
10   I used to defecate and pee as a little girl
11   in the town that I loved so much, Santo
12   Domingo."
13           Did you write that?
14       A.   I wrote that.
15       Q.   And what were you referring to by
16   Santo Domingo?
17       A.   A town.
18       Q.   What town?
19       A.   A town of Santo Domingo.
20       Q.   Located where?
21       A.   In Puerto Rico but, yes.
22       Q.   Did you spend -- is that a
23   reference to your time in Santo Domingo?
24       A.   Again, I am telling you that this
25   is something -- a story sketch that I am

Page 449

Confidential - Guzman
1
2    creating.
3        Q.   Did you spend --
4        A.   So I spent time in Santo Domingo.
5        Q.   You spent time in Santo Domingo?
6        A.   Yes.
7        Q.   Ms. Guzman, is this funny to you?
8        A.   No.  Not at all.
9        Q.   Do you have a friend named Nina?
10       A.   Yes.
11       Q.   Is Nina somebody you described as
12   the kind of woman who is scrutinous to other
13   women looking for flaws and virtues?
14       A.   No.
15       Q.   Did you go to Babbo with Nina?
16       A.   No.

Page 450

CONTAINS CONFIDENTIAL PORTIONS

Page 464

1              Guzman
2  tale of my life as I remember it as I dream
3  it."
4          Is it correct that this story is
5  an honest tale of your life as you remember
6  it?
7      A.   What story?
8      Q.   The story in this document.
9      A.   These are supposed to be separate
10 files and I am not sure why they are in all
11 one file. So this graph here.
12     Q.   This was one file called dirt
13 eater.doc.
14     A.   Yes.
15     Q.   And your counsel produced the
16 metadata for this file?
17     A.   Yes.
18     Q.   Which said that it was created on
19 February 15, 2008?
20     A.   Yes.
21     Q.   Is that consistent with your
22 recollection of when you wrote this?
23     A.   Yes.
24     Q.   Why did you start writing this on
25 February 15, 2008?

Page 465

1              Guzman
2      A.   I have been -- I am a writer and I
3  am always taking notes. I am always
4  thinking of book ideas and I am trying to
5  write fiction so trying to cultivate that so
6  I also thought about writing my early
7  childhood memoirs and so the working title
8  of my memoir is Dirt Eater.
9      Q.   On the first two pages of this you
10 describe several incidents centering around
11 Langan's, the bar. You talk about being
12 together with your female co-workers talking
13 at the bar, you talk about a story that Col
14 Allan told about a Steve Dunleavy and you
15 talk about seeing a picture on a BlackBerry.
16         Did all of those things happen on
17 the same night or is this a compilation of
18 incidents from different nights?
19     A.   The first two pages is a summary
20 of what happened at Langan's on the night
21 that my boss, the editor of The New York
22 Post, harassed me sexually.
23     Q.   So this is a narrative of one
24 night?
25     A.   It is a summary, yes.

Page 466

1              Guzman
2      Q.   And is it an accurate summary?
3      A.   It is factual.
4      Q.   It -- what does that mean "It is
5  factual"?
6      A.   Everything that I have here
7  happened in the first two pages of this
8  document.
9      Q.   Okay. The "I" in the first two
10 pages is you Sandra Guzman?
11     A.   Yes. This is -- these are three
12 different -- yes.
13     Q.   Okay. So the night started out
14 with you with three of your female New York
15 Post co-workers drinking beer and talking at
16 the bar, right?
17     A.   What night?
18     Q.   The night described in the first
19 two pages of Guzman Exhibit 34.
20     A.   Yes.
21     Q.   And you wrote in the third line,
22 "There were four of us all females talking
23 industry lingo who fucked who, who got a
24 good story."
25         Do you see that?

Page 467

1              Guzman
2      A.   Yes.
3      Q.   And what did you mean by "who
4  fucked who"?
5      A.   The girls and I talked about our
6  relationships, we talked about our
7  boyfriends.
8      Q.   What did you mean by "industry
9  lingo"?
10     A.   We talked about who is working
11 where, what stories each of us were working
12 on, what was happening at -- industry wide,
13 what stories we wanted to get.
14     Q.   And it says you were on your
15 second drink when Col Allan walked in?
16     A.   We had just ordered our second
17 drink.
18     Q.   It doesn't say you just ordered
19 your second drink. It says, "We were all on
20 our second drink."
21     A.   Well, I am telling you that this
22 is a summary.
23     Q.   Okay.
24     A.   So --
25     Q.   All right.

CONTAINS CONFIDENTIAL PORTIONS

Page 468

Guzman

1
2       So your memory is that you had
3   just ordered your second drink?
4       A.   We had just ordered our second
5   drink.
6       Q.   And your memory today four years
7   after this happened is clearer than it was
8   when you wrote this?
9       MR. THOMPSON:  Objection.
10      THE WITNESS:  This was a pretty --
11  this is a pretty -- this highlight of my
12  days at the New York Post.  I remember
13  this.
14  BY MR. LERNER:
15      Q.   So it is -- is it factual or not,
16  Ms. Guzman?
17      A.   The first two pages of the
18  document we are talking about are facts.
19      Q.   They are completely factual?
20      A.   Yes.
21      Q.   You said, "Normally Col would skip
22  by and make a beeline to the men who were at
23  the bar," right?
24      A.   Yes.
25      Q.   Or at least he would always skip

Page 469

Guzman

1
2   by you, correct?
3       A.   Yes.
4       Q.   That is factual?
5       A.   Yes.
6       Q.   So Col Allan didn't make a habit
7   of accosting you or addressing you or
8   speaking to you at the bar; is that correct?
9       A.   Yes.
10      Q.   And you give a description of Col
11  Allan and then you go on to say, "That night
12  the editor shared a story about the time
13  Dunleavy fucked a gorgeous female fan in the
14  bar's closet."
15      Do you see that?
16      A.   Yes.
17      Q.   Now, do you know when that
18  incident occurred, the Dunleavy incident?
19      A.   No.  He didn't -- he was sharing
20  multiple -- many jokes and that was one of
21  many sexual jokes about Dunleavy's sexual
22  history but he didn't say a date.
23      Q.   Okay.  And you don't know if Col
24  Allan was actually testifying from his
25  own -- from witnessing this or if Col was

Page 470

Guzman

1
2   telling a story that had kind of come to him
3   secondhand, do you?
4       A.   He actually said that he witnessed
5   this, he actually -- the stories that he
6   told us that night were all stories that he
7   witnessed about his really good friend
8   Dunleavy whom he has known for more than 30
9   years.
10      Q.   Your testimony is that Col Allan
11  told you that he saw this incident with
12  Dunleavy having sex in the closet?
13      A.   He witnessed that he saw her leg
14  sticking out of the closet as he had sex
15  with this woman.
16      Q.   What you say is that the editor
17  shared a story, right?
18      A.   I summarized, I didn't write all
19  the things that the editor shared that night
20  with us.
21      Q.   Okay.  But your -- okay.  Your
22  account here doesn't say that the editor
23  told you he saw this.  It says he shared a
24  story, right?
25      A.   Right.  He shared a story in which

Page 471

Guzman

1
2   he saw his good friend drink himself drunk
3   and then had -- proceed to have sex with
4   this fan and he witnessed her leg sticking
5   out of the closet.  In fact I believe it was
6   Langan's where this happened.
7       Q.   Are you certain that Mr. Allan
8   told you that he saw this incident?
9       A.   I am certain that all the stories
10  he shared that night he was very specific
11  that he witnessed.
12      Q.   And you listened to the story,
13  right?
14      A.   Yes.
15      Q.   And the girls laughed?
16      A.   Yes.
17      Q.   And you went ooh?
18      A.   I went ooh.
19      Q.   Ooh, and you went ooh, not because
20  you were offended that somebody would
21  describe an incident of sex, you said ooh
22  because, "The thought of anyone fucking a
23  near dead drunk skeleton was not funny.  I
24  fuck for pleasure."
25      A.   It wasn't funny.  It was actually

CONTAINS CONFIDENTIAL PORTIONS

Page 472

```
1                Guzman
2   disgusting.
3       Q.   And you stuck around to listen to
4   the story, right?
5       A.   I stuck around to hang out with my
6   girlfriends.
7       Q.   Nobody was chaining you to the bar
8   stool, right?
9       A.   No.
10      Q.   You could have walked away?
11      A.   Yes.
12      Q.   Right?
13           You wrote in the same paragraph
14  that, "Col Allan only befriends ugly female
15  editors, the she-males."
16           Who were you referring to?
17           MR. THOMPSON:  What paragraph are
18  you referring to?
19           MR. LERNER:  Same paragraph we
20  have been on, five lines from the
21  bottom.
22           MR. THOMPSON:  I see.
23           THE WITNESS:  A former features
24  editor.
25
```

Page 473

```
1                Guzman
2   BY THE VIDEOGRAPHER:
3       Q.   Who is that?
4       A.   Fay Penn.
5       Q.   Well, you actually wrote plural,
6   "He only befriends ugly female editors,
7   she-males."
8       A.   That is what I was thinking.
9       Q.   Is "she-males" a term that you use
10  for women you regard as ugly?
11      A.   No.
12      Q.   Did you regard Fay Penn as ugly?
13      A.   Her attitude more than physically.
14  I was referring to her energy, to her
15  energy, not to her physical appearance.
16      Q.   Well, you wrote that "Col Allan
17  doesn't know how to handle himself around
18  pretty women, he only befriends ugly female
19  editors."  You are talking about physical
20  appearance, correct?
21      A.   When I was thinking about this
22  particular editor, I was thinking more about
23  her energy.
24      Q.   What is a she-male?
25      A.   It is very strong, muscular,
```

Page 474

```
1                Guzman
2   androgenous-looking female.
3       Q.   Is there anybody else at The Post
4   that you regard as an ugly female editor who
5   Col Allan befriends?
6       A.   Who has ugly female energy, male
7   ugly she-male female energy.  No.  I can't
8   think of anybody else at this time.
9       Q.   Isn't a she-male a man who
10  surgically altered to have breasts?
11      A.   No.  Not as I understand it.
12      Q.   And, so you listened to the story
13  about Dunleavy having sex in the closet,
14  right, correct?
15      A.   Correct.
16      Q.   And you did not walk away,
17  correct?
18      A.   Correct.
19      Q.   And then Col Allan displays a
20  photograph on his BlackBerry of a naked man,
21  correct?
22      A.   So after several stories about
23  Dunleavy's sexual exploits Col Allan digs
24  into his pocket, pulls out his BlackBerry
25  and hands it to me and he says, "Look," and
```

Page 475

```
1                Guzman
2   he smirks and he says, "Look at this," and
3   it is a picture of a naked man with his
4   genitalia exposed.
5       Q.   And so Mr. Allan had told several
6   stories about Dunleavy at this point?
7       A.   At this point he had told several
8   sexual stories.
9       Q.   What were the other stories about
10  Dunleavy besides the one about the closet?
11      A.   There was one where Dunleavy slept
12  over his house.  He had given him keys to
13  his apartment and Dunleavy came in the
14  middle of the night and when Mr. Allan went
15  to the restroom or he heard noise he walked
16  into Dunleavy trying to pee in a closet or
17  something, something to that effect so he
18  may have seen Dunleavy's penis.
19      Q.   Do you remember any other stories?
20      A.   And then there was a story,
21  something about Dunleavy once -- Dunleavy
22  has such a voracious sexual appetite that he
23  would probably, to use Mr. Allan's word,
24  fuck a woman without limbs or something to
25  that effect so there were more.  Those were
```

CONTAINS CONFIDENTIAL PORTIONS

Page 476

```
1              Guzman
2  the three I remember most vividly.
3      Q.   And then the -- and after those,
4  and you stuck around to listen?
5      A.   I kind of started zoning out after
6  the first joke.
7      Q.   Your feet were still planted on
8  the floor?
9      A.   Yes.
10     Q.   And you are still there in this
11 group, right?
12     A.   Right. Can you -- you can, your
13 feet can be there and you can physically be
14 present but you can zone out.
15     Q.   And by now -- by then you drank
16 the second beer, right?
17     A.   He paid for, he paid a round for
18 all the girlfriends and I was drinking my
19 second beer.
20     Q.   Okay. And then you see this
21 photograph on his BlackBerry that he shows
22 you, right?
23     A.   Yes.
24     Q.   And you look at the photograph and
25 you make a remark to him about the
```

Page 477

```
1              Guzman
2  photograph that is very Chelsea of you,
3  right?
4      A.   Yes. I was creeped out by it. I
5  was shocked and baffled.
6      Q.   Well, but you said "How Chelsea of
7  you," that is what you said, right?
8      A.   It is what I wrote.
9      Q.   You said this is factual?
10     A.   I definitely told him that. I may
11 have told him other things but I definitely
12 told him.
13     Q.   And Chelsea is a reference to the
14 neighborhood that you live in, right?
15     A.   Yes.
16     Q.   It is the gay capital of the
17 northeast, right?
18     A.   Yes.
19     Q.   Those are your words, right?
20     A.   Yes.
21     Q.   And you said that in your -- what
22 you wrote you said that this would be very
23 normal thing do in your neighborhood, right?
24     A.   Yes.
25     Q.   And you didn't tell Mr. Allan that
```

Page 478

```
1              Guzman
2  you were offended by the picture, right?
3      A.   No.
4      Q.   You didn't tell him that you were
5  offended by the stories he was telling,
6  right?
7      A.   No.
8      Q.   And you could have walked away
9  from the bar, right?
10     A.   You have to understand --
11     Q.   You could have --
12         MR. THOMPSON:  Wait.
13         THE WITNESS:  You have to
14     understand --
15 BY MR. LERNER:
16     Q.   You could have walked away from
17 the bar, correct?
18     A.   This is my boss and it was
19 pretty -- I was stupefied. This never
20 happened to me in my life where my boss, you
21 know, would feel free to be so brazen and
22 talk about cocks and somebody else's sex
23 life and show me pictures of a naked man so
24 I was pretty baffled and stupefied. I
25 actually don't remember moving from where I
```

Page 479

```
1              Guzman
2  was standing.
3      Q.   The picture was a photograph that
4  ran in The New York Post the next day,
5  right?
6      A.   I later learned. At the time I
7  didn't know what it was. At the time I
8  had -- there was absolutely no reason for
9  him to show me the picture so I didn't know
10 what it was and either the day later or two
11 days later it was published in The Post with
12 his genitalia covered.
13     Q.   When The Post buys a photograph
14 they get the whole photograph, right?
15     A.   Certainly that photograph that he
16 showed me wasn't covered up.
17     Q.   Right. And that is the way the
18 photograph was purchased by The Post for
19 publication, right?
20         MR. THOMPSON:  Objection.
21         THE WITNESS:  I believe so.
22 BY MR. LERNER:
23     Q.   You wrote on the second page here,
24 6652, that in the second to last paragraph,
25 "Sex talk, sex play, lewd behaviors was the
```

CONTAINS CONFIDENTIAL PORTIONS

Page 484

Guzman

1
2   him?
3        MR. THOMPSON: Objection. Asked
4   and answered.
5        THE WITNESS: You know, I don't
6   remember that. I don't even remember
7   what Josh Williams looks like.
8   BY MR. LERNER:
9   Q.   If Josh told us that is he lying?
10       MR. THOMPSON: Objection.
11       THE WITNESS: I don't know because
12  he may have me confused with someone
13  else. So I don't remember telling Josh
14  Williams that.
15  BY MR. LERNER:
16  Q.   You listed Josh Williams as a
17  person with knowledge about your case on a
18  disclosure form.
19  A.   So I don't remember what he looks
20  like. And I don't remember that exchange
21  and that is the God's honest truth.
22  Q.   Why did you list him as a person
23  with knowledge of your case?
24  A.   Because he works in the
25  photography department where his boss would

Page 485

Guzman

1
2   frequently refer to women as -- women
3   employees of his as being part of his harem
4   so Josh probably witnessed David Boyle
5   referring to women as part of a team of
6   women who sexually satisfy him, his little
7   girlfriends.
8   Q.   David Boyle didn't sexually harass
9   you, right?
10  A.   He didn't personally sexually
11  harass me but he certainly created an
12  environment that was sexually hostile.
13  Q.   But it wasn't something he did in
14  your presence, correct?
15  A.   Well, in my presence he referred
16  to his female staff as being part of his
17  harem. In my presence to me, David Boyle
18  referred to the women that worked for him as
19  women who were part of his harem and to me
20  that meant that they were there for his
21  pleasure.
22  Q.   And that allegation is not in your
23  complaint, correct?
24  A.   The harem, the sexual -- the
25  harem?

Page 486

Guzman

1
2   Q.   What you just testified to.
3   A.   I believe that I -- what is part
4   of my complaint is that David Boyle did
5   create -- was part of a pattern of behavior
6   displayed by New York Post editors including
7   David Boyle who referred to his staff as
8   being part of his harem. It is part of the
9   complaint. It is absolutely part of the
10  complaint.
11  Q.   You never said in the complaint
12  that he referred to women as a harem,
13  correct?
14  A.   It is part of the complaint.
15  Q.   It is not -- you did not state in
16  your complaint that David Boyle referred to
17  his -- to women as a harem, correct?
18  A.   His staff.
19  Q.   Well, you didn't say that in the
20  complaint. You didn't plead that, correct?
21  A.   As far as I -- my recollection is
22  that I did.
23  Q.   Isn't it a fact this is the first
24  time that you are disclosing that allegation
25  to anybody?

Page 487

Guzman

1
2        MR. THOMPSON: Objection.
3        THE WITNESS: Can I --
4        MR. THOMPSON: Objection.
5   Answer the question.
6        THE WITNESS: Yes -- no, this
7   is --
8        MR. THOMPSON: You are not asking
9   her to disclose any conversations she
10  had with counsel, are you, Mr. Lerner,
11  right?
12       MR. LERNER: Of course not.
13       MR. THOMPSON: So make it clear so
14  she is not confused.
15       THE WITNESS: Right.
16       MR. THOMPSON: Because the
17  question is confusing.
18  BY MR. LERNER:
19  Q.   Have you ever disclosed this
20  allegation about David Boyle making comments
21  about a harem in your EEOC charge, in your
22  federal complaint, in any interrogatory
23  response, in any testimony, in any affidavit
24  ever?
25  A.   Well, I thought I did.

CONTAINS CONFIDENTIAL PORTIONS

Page 488

Guzman
1
2  Q.   It is a yes or no question?
3     MR. THOMPSON: She just answered.
4  You just interrupted her.
5     THE WITNESS: I just said I
6  thought I did.
7  BY MR. LERNER:
8  Q.   You thought you did in what
9  document?
10  A.   In my -- in -- both my original
11  complaint, yes.
12  Q.   If you and your counsel identify
13  that in your original complaint maybe you
14  will call our attention to it in a
15  clarification later because it is not there.
16  A.   Okay. Okay.
17  Q.   When did Mr. Boyle's remark that
18  you overheard or heard him say about a harem
19  allegedly occur?
20  A.   On numerous occasions.
21  Q.   Numerous occasions?
22  A.   Numerous occasions.
23  Q.   Okay. Tell us when those numerous
24  occasions were.
25     MR. THOMPSON: Objection.

Page 489

Guzman
1
2     Let the record reflect that
3  Mr. Lerner has just mocked Ms. Guzman in
4  this deposition. That was totally
5  inappropriate.
6     You need to act professionally,
7  Mr. Lerner.
8     THE WITNESS: Yes, sir.
9     MR. THOMPSON: Do not do that
10  again. I will call the court if you
11  mock Ms. Guzman. She is here to answer
12  your questions not to be mocked by you,
13  sir.
14  BY MR. LERNER:
15  Q.   Ms. Guzman --
16     MR. THOMPSON: Don't do that
17  again.
18  BY MR. LERNER:
19  Q.   Ms. Guzman, tell us when the
20  numerous occasions that you heard Mr. Boyle
21  say that occurred?
22  A.   Well, every time that David Boyle
23  and I would have conversations about
24  photography, about photos, pictures that I
25  needed, or he would come down to the ninth

Page 490

Guzman
1
2  floor where his features department, he
3  would boast actually, boast.
4  Q.   And when did those occur?
5  A.   From the very beginning when he
6  was looking for people to hire, when he
7  introduced me to his new photo assistants,
8  Marie, and Tiffany and Evelyn and Lacey and
9  there is another woman, when he would
10  introduce as the new women would come in he
11  would say, you know, she is, you know --
12  meet the new addition to my harem. He was
13  very boastful about this.
14  Q.   So Mr. Riedel sang this offensive
15  song to you every time he walked by your
16  office and Goodstein acted lascivious every
17  time you bumped into him and Boyle made
18  these comments about women he worked with
19  every time you met him in the office, is
20  that your testimony?
21  A.   My testimony is that pretty much
22  every time I encountered these guys and you
23  are talking about very different incidents
24  at very different times.
25  Q.   Ms. Guzman, aren't you just making

Page 491

Guzman
1
2  this up?
3     MR. THOMPSON: Objection.
4     THE WITNESS: Absolutely not.
5  BY MR. LERNER:
6  Q.   Aren't you just lying so you can
7  try to tell a story where you describe a
8  sexually harassing environment when in fact
9  these incidents did not occur?
10     MR. THOMPSON: Objection.
11     THE WITNESS: Absolutely not. I
12  am telling the truth.
13  BY MR. LERNER:
14  Q.   Isn't it true you had plenty of
15  dealings with David Boyle and Les Goodstein
16  that didn't involve anything like lascivious
17  conduct or references to the harem?
18  A.   I have to tell you, I wish it
19  weren't the truth.
20  Q.   And you never asked -- did you
21  ever ask David Boyle to stop referring to
22  the harem?
23  A.   No.
24  Q.   You never asked Les Goodstein to
25  stop calling you sexy?

CONTAINS CONFIDENTIAL PORTIONS

Page 492

Guzman
1
2    A.   No.
3    Q.   You never asked Mr. Riedel to stop
4  singing from West Side Story, right?
5         MR. THOMPSON:  Objection.
6         This part of the transcript
7  regarding everything in terms of -- you
8  can stop the confidential section when
9  Mr. Lerner started asking Ms. Guzman
10 about Exhibit 34 Bates stamps SG6651 and
11 6652.
12 BY MR. LERNER:
13   Q.   And you wrote in your book which
14 you call the Latinas bible that you are a
15 strong woman who learned early on never to
16 take abuse from anybody and to stand up for
17 yourself, right?
18        MR. THOMPSON:  Objection.  Asked
19 and answered.
20        THE WITNESS:  I keep learning that
21 lesson.
22 BY MR. LERNER:
23   Q.   You wrote that, right?
24   A.   Yes.
25   Q.   And you have told women that that

Page 493

Guzman
1
2  is how they should live their lives, right?
3         MR. THOMPSON:  Objection.  Asked
4  and answered at the last deposition.
5  BY MR. LERNER:
6    Q.   Correct?
7    A.   Correct.
8    Q.   And you endeavored to live your
9  life that way, correct?
10   A.   I try as much as I could.
11 Sometimes I don't.  Sometimes fear comes
12 into my heart.  Sometimes I am afraid to
13 lose my job and so I try to the best of my
14 ability.
15        Sometimes the situation is more
16 overwhelming and I am not as strong as I
17 want to be but I aspire to be strong in the
18 face of sexual harassment and
19 discrimination.
20   Q.   And you told Les Goodstein that he
21 should stop saying Cha-Cha when you didn't
22 like that, right?
23   A.   Yes.
24   Q.   And you told Col Allan that you
25 thought it was a mistake for the paper to

Page 494

Guzman
1
2  cancel the Harlem Week section because you
3  thought it would be bad for the paper's
4  relationship with the minority community,
5  correct?
6    A.   Yes.
7    Q.   Did David Boyle ever do anything
8  to threaten you?
9    A.   I don't understand the question.
10 Threaten me how?
11   Q.   Did David Boyle ever threaten you?
12   A.   Threaten me, how?
13   Q.   In any way.
14   A.   I found his comments about his
15 talented female staffers unprofessional.
16   Q.   Did he ever threaten you?
17   A.   Threaten me like -- I don't
18 understand.
19   Q.   If you complain I will do
20 something to harm your career, that kind of
21 thing?
22   A.   No.
23   Q.   Was he your supervisor?
24   A.   No.
25   Q.   I am going to put before you a

Page 495

Guzman
1
2  document marked Guzman Exhibit 35.
3         (Document Bates numbered SG2341
4  through 2345 was marked Guzman Exhibit 35
5  for identification)
6  BY MR. LERNER:
7    Q.   It is Bates numbered SG2341
8  through 2345.
9         Ms. Guzman, I am going to
10 represent to you that this is an excerpt
11 from one of your handwritten journals.
12        If you look at the first page it
13 has a date of Tuesday, 9/27?
14   A.   Yes.
15   Q.   And if you look at the last page
16 it has a date of Wednesday, 9/28.
17        I am going represent to you that
18 9/27 and 9/28 were Tuesday and Wednesday in
19 the year 2005.  Okay?
20   A.   Okay.
21   Q.   So would you -- you don't have to
22 accept that representation but you can -- my
23 question to you is do you know what year you
24 wrote these notes?
25        MR. THOMPSON:  What notes?  All in

CONTAINS CONFIDENTIAL PORTIONS

Page 504

Guzman

1
2    Q.   Okay. Take a look, if you would,
3 at the first page of Exhibit 36?
4    A.   Okay.
5    Q.   Which is entitled "Hispanic
6 Readers." And it shows a graph of Hispanic
7 readership starting in March 2003 and going
8 to March 2009.
9        Do you see that?
10   A.   Yes.
11   Q.   And it shows Hispanic readership
12 of 248,810 in March 2003 and 238,768 in
13 March of 2009.
14       Do you see that?
15   A.   Yes.
16   Q.   If you go to the next page it is
17 entitled, "New York Post Hispanic Reader
18 Trend." And it starts in year 2003 with
19 284,000 and it ends in '09 with 239,000 and
20 change.
21       Do you see that?
22   A.   Yes.
23   Q.   So, Ms. Guzman, Hispanic
24 readership during your time at The Post
25 began and ended roughly at the same numbers,

Page 505

Guzman

1
2 correct?
3    A.   Yes. That is what it shows here.
4        MR. THOMPSON: Objection.
5 Misstates this document.
6        THE WITNESS: But see --
7        MR. THOMPSON: Mr. Lerner, you
8 just misstated the document.
9 BY MR. LERNER:
10   Q.   You are right. I misstated it.
11       It actually started at 284,000 and
12 ended 50,000 lower, 239,000; is that
13 correct?
14   A.   Yes.
15   Q.   So that aspect of your job by 2009
16 you had not actually achieved an increase in
17 Hispanic relationship for 2009, correct?
18   A.   It is very difficult to achieve it
19 when you don't control the headlines, when
20 you don't make decisions about how to write
21 the headlines that may be deemed
22 inappropriate or racist by readers.
23       It is hard to do a good job when
24 bodega owners are refusing to carry The New
25 York Post because they find it offensive and

Page 506

Guzman

1
2 racist so it is very difficult to do my job
3 when the editor is approving stories that
4 may be deemed racist and inappropriate to
5 the readership.
6    Q.   What is the basis of your claim in
7 light of what you have just said that you --
8 your -- you were able to increase Hispanic
9 readership at The Post by 40 percent when
10 you were there?
11   A.   Because to me Haiman gave me that
12 information. Haiman was in charge of the
13 Tempo sales during my time there so she was
14 the one that actually gave me information.
15   Q.   Did she give it to you -- what did
16 she tell you?
17   A.   She said that the efforts at Tempo
18 were panning out.
19   Q.   When did she say that?
20   A.   When I worked there.
21   Q.   When did she leave?
22   A.   I think she left in 2007 or '8. I
23 am not really sure.
24   Q.   So a year or two before you left,
25 right?

Page 507

Guzman

1
2    A.   Yes.
3    Q.   When did she tell you the words
4 that your -- Tempo efforts were panning out?
5    A.   She would say we have -- the
6 paper's Hispanic readership is increasing
7 and I think she was actually particularly
8 talking about a specific segment of the
9 readership. I don't think this is the
10 entire universe of the Scarborough report.
11 This might be -- there might be a breakdown
12 of the ages so she might be referring to a
13 specific age bracket which is what the
14 advertisers were looking for.
15   Q.   So it is possible that she was
16 only referring to a particular subset of
17 Hispanic readers?
18   A.   Exactly. Exactly.
19   Q.   And did she use the number
20 40 percent or did she say the words increase
21 or pan out?
22   A.   She may have used the number 40
23 percent.
24   Q.   Do you have a specific
25 recollection as you sit here today of her

CONTAINS CONFIDENTIAL PORTIONS

Page 508

Guzman

1
2 saying the number 40 percent?
3     A.   I don't have a specific
4 recollection.  I can tell you that she may
5 have said this during our conversations
6 about the efforts to increase readership.
7     Q.   But your best recollection today
8 is that she said they increased and the
9 efforts were panning out?
10     A.   Yes.
11     Q.   You are not sure what age group
12 she was talking about?
13     A.   I am not sure what age group.
14     Q.   So why did you swear in your
15 pleadings that you increased Hispanic
16 readership by 40 percent?
17     A.   Because that is what I was led to
18 believe.
19     Q.   Ms. Guzman, you are aware that by
20 2009 Tempo was not turning a profit,
21 correct?
22     A.   I was told, yes.
23     Q.   And overall Hispanic readership
24 you are seeing is roughly down from even
25 2003, right?

Page 509

Guzman

1
2     A.   Yes.
3     Q.   So -- and you were making $137,000
4 in 2009, correct?
5     A.   Yes.
6     Q.   So in light of those facts what
7 would the economic justification to The New
8 York Post have been keeping you in your job?
9     A.   I was editing many other sections,
10 I was contributing to other parts of the
11 paper.
12     Q.   Didn't many of the sections, the
13 special sections that you edited in 2009
14 besides Tempo also close down?
15     A.   Not while I was there.
16     Q.   Didn't Harlem Week close?
17     A.   It didn't close.  They weren't
18 able to publish one in The New York Post but
19 it was published in the community papers
20 that News Corp. owned.
21     Q.   So you believe that the economic
22 justification for your continued employment
23 would have been to continue editing several
24 special sections?
25     MR. THOMPSON:  Objection.

Page 510

Guzman

1
2 BY MR. LERNER:
3     Q.   Is that correct?
4     MR. THOMPSON:  Objection.
5     THE WITNESS:  The New York Post I
6 believe doesn't turn a profit and it
7 continues to publish so there is already
8 a philosophy of publishing a paper even
9 though it doesn't turn a profit.
10     And when I first started working
11 on one of the sections, Tempo, the paper
12 wasn't making a profit out of Tempo.  It
13 was much -- when Lockland Murdoch
14 decided to launch, to create this, it
15 wasn't about profit as told to me.  It
16 was about creating an environment where
17 Hispanic readers felt that this paper
18 was friendly to them and cared about
19 them and covered the community.
20     So justification for closing down
21 Tempo, you know if we are going to
22 follow that logic then why not close the
23 newspaper?  The paper does not make
24 money.  It does not make a profit.  It
25 loses.

Page 511

Guzman

1
2 BY MR. LERNER:
3     Q.   So The Post should continue --
4 your position is The Post should continue to
5 employ you to publish a section that they
6 are shutting down and continue to employ you
7 even though you are having no impact on
8 overall Hispanic readership?
9     MR. THOMPSON:  Objection.
10     THE WITNESS:  So the paper
11 continues to employ Col Allen even
12 though the paper loses money every year.
13 BY MR. LERNER:
14     Q.   Would there be a New York Post
15 without Col Allan, Ms. Guzman?
16     A.   Yes.  If it is financed by Rupert
17 Murdoch.
18     Q.   Were you present with Pucci Meyer
19 at any time where she met with the human
20 resources department or the legal
21 department?
22     A.   No.
23     Q.   Do you have any personal knowledge
24 of Pucci Meyer's discussions with the HR
25 department or the legal department?

CONTAINS CONFIDENTIAL PORTIONS

Page 528

```
1              Guzman
2       MR. LERNER: It is your witness --
3  your witness is perjuring herself.
4       MR. THOMPSON: That is false.
5       Mr. Lerner, you have an obligation
6  to conduct yourself professionally in a
7  deposition. You do not have a right to
8  raise your voice at Ms. Guzman or at any
9  other witness. I asked you before not
10 to do that. I am asking you again to
11 stop that improper conduct.
12      If you want to talk to me I can
13 talk to you but you have no right to
14 raise your voice at her so stop it.
15      MR. LERNER: You need to counsel
16 your witness she is under oath.
17      MR. THOMPSON: I don't need to do
18 anything but represent her.
19      MR. LERNER: She cannot perjure
20 herself.
21      MR. THOMPSON: You need to stop
22 trying to badger her and falsely accuse
23 her. She is not your child. She is a
24 grown woman so don't raise your voice at
25 her. Again, if you want to talk, let's
```

Page 529

```
1              Guzman
2  talk.
3       MR. LERNER: Let's go outside.
4       MR. THOMPSON: Let's go outside.
5       THE VIDEOGRAPHER: The time is
6  2:20. We are going off the record.
7       (Discussion off the record)
8       THE VIDEOGRAPHER: The time is
9  2:24 p.m.
10      We are back on the record.
11 BY MR. LERNER:
12   Q.  Ms. Guzman, you cannot recall for
13 how long Mr. Riedel sang West Side Story
14 songs in your presence, correct?
15   A.  No.
16   Q.  No, you cannot recall, right?
17   A.  I cannot recall how many times.
18   Q.  You cannot recall how many days or
19 weeks it went on for, correct?
20   A.  I cannot recall how many days or
21 weeks.
22   Q.  Can you recall --
23   A.  I can --
24      MR. THOMPSON: Are you finished?
25
```

Page 530

```
1              Guzman
2  BY MR. LERNER:
3    Q.  -- when the last time was?
4       MR. THOMPSON: Were you finished
5  with your last answer?
6       THE WITNESS: I cannot recall when
7  the last time it was.
8       And all I can tell you if you are
9  asking me to recollect is that he on
10 numerous occasions would either walk by
11 my office or peek in and sing the West
12 Side Story in a thick Spanish accent.
13 BY MR. LERNER:
14   Q.  Can you recall other than the
15 specific incidents that you have described
16 you encountered with Les Goodstein engaging
17 in conduct that was objectionable can you
18 recall any other specific incidents where
19 Les Goodstein interacted with you with
20 conduct that was objectionable?
21   A.  Other than the ones I have
22 already --
23   Q.  Correct.
24   A.  I can't think of anymore at this
25 time.
```

Page 531

```
1              Guzman
2    Q.  Have you reviewed a complaint by
3  an individual named Mary McLoughlin?
4    A.  Not -- no.
5    Q.  Do you know who Mary McLoughlin
6  is?
7    A.  That name sounds familiar.
8    Q.  I am going to show you a document
9  marked -- there aren't going to be any
10 questions about the document.
11      MR. THOMPSON: Is it going to be
12 an exhibit, Mark?
13      MR. LERNER: No.
14 BY MR. LERNER:
15   Q.  Ms. Guzman, you know an individual
16 named Oscar Montez de Oca, correct?
17   A.  Yes.
18   Q.  In early 2007 you sent him an
19 e-mail asking him to contact you about your
20 attendance at the inaugural ball, correct?
21   A.  May I see that e-mail?
22   Q.  Did you call -- did you contact
23 Oscar Montez de Oca to ask him to call you
24 about the fact that you were attending the
25 inaugural ball?
```

CONTAINS CONFIDENTIAL PORTIONS

Page 568

Guzman

1
2    A.   They have been used, the photos
3    were used for the jacket of my -- actually,
4    no, I don't think they have been used.  I
5    can't recall now if they have been used
6    professionally.
7         The intention was to use them for
8    promotional purposes for my author and
9    speaker appearances.
10    Q.   You were criticized for what you
11    spent on the legends of salsa music photo
12    shoot, correct?
13    A.   I was berated, yes.
14    Q.   You were criticized?
15    A.   I was berated.  You call it
16    criticized.  I was berated, unfairly
17    berated.
18    Q.   Did The Post reimburse you for all
19    the expenses that were incurred on that
20    photo shoot?
21    A.   No.
22    Q.   What expenses were not reimbursed?
23    A.   Probably my transportation to and
24    from the different interviews and meetings I
25    had in coordinating, it was a pretty large

Page 569

Guzman

1
2    photo shoot, pretty historic too.
3    Q.   Do you have an accounting of the
4    expenses that were not reimbursed?
5    A.   Cabs, I am talking about cabs.
6    Q.   Taxicabs?
7    A.   Yes.
8    Q.   Yellow cabs?
9    A.   Yes.
10    Q.   Did you put in for those?
11    A.   I don't.  I didn't put in for
12    those.
13    Q.   The expenses that you did put in
14    for were those reimbursed?
15    A.   The ones that I put in for, yes,
16    the invoices, yes.
17        MR. THOMPSON:  Let the record
18    reflect this subject is an old subject
19    that could have been covered back in
20    October early this morning within the
21    hour-and-a-half time frame the judge
22    gave to the defendants.
23  BY MR. LERNER:
24    Q.   Ms. Guzman, you recently
25    identified Richard Johnson and Colin Myer as

Page 570

Guzman

1
2    persons with knowledge of your claims.  In
3    what respect do they have knowledge of your
4    claims?
5    A.   Do you mean Colin Myler?  Not
6    Myer.  Myler?
7    Q.   Yes.  Colin Myler.
8    A.   Earlier you showed me a sketch of
9    the conference room where the news meetings
10    are held.
11    Q.   Yes.
12    A.   And I had a sketch of the people
13    who were present in that meeting where Col
14    Allan decided to begin talking about his
15    visits to Scores and talk about strippers
16    and talk about his visits to strip joints
17    and Colin Myler was part of the conversation
18    and so was Richard Johnson.  In fact, I know
19    that they visited Scores with Col Allan and
20    they would often talk about those visits
21    during news meetings.  And so --
22    Q.   That is why they are on the
23    disclosure?
24    A.   That is why they are on.  Yes.
25    Q.   Supreme Court Justice Sonia

Page 571

Guzman

1
2    Sotomayor is a close friend of yours,
3    correct?
4    A.   She is a close friend, yes.
5    Q.   You requested to cover two
6    Washington events relating to her
7    appointment to the Supreme Court, correct?
8    A.   Yes.
9    Q.   Did you think it was appropriate
10    for you as a friend of hers to be reporting
11    about her?
12    A.   Well, it was a legitimate news
13    story and I had insight that none of the
14    reporters at The Post had and they did as
15    soon as they found out that she was
16    nominated to be, my editors began to call me
17    to pump information about Sonia.
18    Q.   My question was would it be
19    appropriate for you to report about a
20    friend?
21    A.   It depends on the context of the
22    story.  I can't answer that.
23    Q.   Weren't you biased about her given
24    that you have a long-time friendship with
25    her?

CONTAINS CONFIDENTIAL PORTIONS

Page 572

Guzman

1
2     A.   I have inside information that
3  could be legitimate -- that could make it a
4  very compelling news story.
5     Q.   Do you have a bias in her favor
6  because of your long-time friendship?
7     A.   I love Sonia Sotomayor.
8     Q.   So you are biased in her favor,
9  correct?
10    A.   I love her, yes.
11    Q.   Have you ever covered the Supreme
12 Court as a reporter?
13    A.   No.
14    Q.   Do you know who the chief justice
15 of the Supreme Court is?
16    A.   Yes.
17    Q.   Who?
18    A.   Roberts.
19    Q.   Can you name any of the other
20 justices?
21       MR. THOMPSON:  Objection.
22 Objection.
23       THE WITNESS:  Well, I can tell you
24    that Kennedy and Scalia and Alito and
25    Thomas and Ruth Bader Ginsburg and now

Page 573

Guzman

1
2     Elena Kagan and in fact they were going
3  to be at this private reception that I
4  was going have access to.
5  BY MR. LERNER:
6     Q.   The reception that you -- that you
7  did not attend?
8     A.   The reception that I attended on
9  my own time paying my own money that I would
10 have been able to report on and gotten
11 really great information because it wasn't
12 just about Sonia.  The President was there
13 at this reception, President Obama and so
14 was Michelle Obama.
15    Q.   Ms. Guzman, the question was did
16 you attend that reception?
17    A.   I did.
18    Q.   Okay.  In your complaint you
19 stated that you believed you were retaliated
20 against by being reduced a level in your
21 performance evaluation in 2009, right?
22    A.   In my review, yes.
23    Q.   Were you aware that you were also
24 reduced one level in your performance
25 evaluation in 2008?

Page 574

Guzman

1
2     A.   Yes.
3     Q.   And do you know why you were
4  reduced in 2008?
5     A.   The evaluations are two-fold.  So
6  the employee does a self-evaluation.
7     Q.   Ms. Guzman --
8     A.   Right.  I am trying explain the
9  context.
10    Q.   I withdraw the question.
11    A.   Okay.
12    Q.   Did you have any conversations
13 with anybody who was responsible for
14 reducing your evaluation rating about why
15 they did it?
16       MR. THOMPSON:  What year?
17 Objection.
18       MR. LERNER:  2008.
19       MR. THOMPSON:  Okay.  Withdrawn.
20       THE WITNESS:  Can I see the
21    evaluation?
22 BY MR. LERNER:
23    Q.   No.
24    A.   Why not?  I need to see who wrote
25 it.

Page 575

Guzman

1
2     Q.   Repeat the question.  We will take
3  it one question at a time.
4     A.   Okay.
5     Q.   You said you did have a
6  conversation about somebody who reduced
7  your -- with somebody about the reduction of
8  your rating, correct?
9     A.   Yes.
10    Q.   Who?
11    A.   And I am telling you that I don't
12 right now remember who was supervising me in
13 2008.  Maybe it was Joe Rabinowitz, maybe it
14 was Chris Shaw, so I needed to refresh,
15 recollect my memory.  So if you showed me
16 the document I could see.
17    Q.   In 2008 your review was done by
18 Joe Rabinowitz.
19    A.   Okay.
20    Q.   What did he tell you about the
21 reduction of your rating in 2008?
22    A.   Well, Joe Rabinowitz told me that,
23 you know, he felt that this was a more clear
24 number for me.  He didn't tell me that I was
25 doing a poor job.  It was just that, you