UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SANDRA GUZMAN,                                      :
                                                    :
                    Plaintiff,          :     No. 09 Civ. 9323 (LBS)
                                                    :
      v.                                            :
                                                    :
NEWS CORPORATION, NYP HOLDINGS,                     :
INC., d/b/a THE NEW YORK POST,                      :
and COL ALLAN, in his official and                  :
individual capacities,                              :
                                                    :
                    Defendants.         :
-------------------------------------------------------------X

## AFFIDAVIT OF SANDRA GUZMAN

STATE OF NEW YORK          )
                           )    ss.:
COUNTY OF NEW YORK         )

        SANDRA GUZMAN, being duly sworn, deposes and says:

1.    I submit this affidavit in connection with the Amended Complaint that I filed against News Corporation, NYP Holdings, Inc., d/b/a The New York Post, (together, the "Company") and Col Allan (collectively, the "Defendants") on October 12, 2010 (filed in its original form on November 9, 2009).

2.    I am a Black and Puerto Rican female.

3.    I worked as an Associate Editor of The New York Post (the "Post") from July 2003 until I was unlawfully terminated on or around September 29, 2009.

4.    As an Associate Editor, I was responsible for numerous special sections which covered subjects that touched on various editorial areas. By September 2009, a much greater

1

percentage of my time was spent working on other special sections than was spent working on *Tempo*, which was a monthly section. At that time, I was working at least nine or ten other sections, including Education, "Go Green," Black History Month, another Black-community-focused section, and sections regarding various annual parades (St. Patrick's Day, Columbus Day, Salute to Israel, etc.).

5. In increments beginning in 2004 and continuing through 2008, I started handling a large volume of special sections (generally producing a special section every two weeks in the year leading up to my termination in 2009) after a performance evaluation meeting with Joe Robinowitz, my supervisor at the time, in which he told me that I was doing a great job and that, in addition to *Tempo*, they could use my help on more special sections. He also said that my special sections were very good, that I had a knack for knowing what the readers want, and that I was meticulous and did good work. He told me that the special sections would be divided between me and Carole Sovocool. At that time, I was already producing the Black History Month special section and two other special sections in addition to *Tempo*. My work created new revenue streams for the Post in excess of $1.5 million.

6. It would be inaccurate and inappropriate to attempt to determine my workload based purely upon the number of special sections on which I worked. My approach to producing special sections, with my background in journalism, was very different from that of Carole Sovocool, whose background was in marketing. I researched the stories that appeared in my special sections and would take more care in developing content and assigning stories, whereas Ms. Sovocool would generally seek story ideas from event or organization representatives or recycle press releases. Therefore, I believe that the special sections I produced were of high quality and markedly better than those generally produced by Ms. Sovocool. I also had many

other duties besides editing the special sections for which I was responsible. Furthermore, many of the stories on which editors and journalists work do not end up in print.

7.      I also was increasingly involved in the Post's digital and online offerings, and was blogging and assigning stories to freelancers to generate online content, which was a way that I had discussed with my supervisors to appeal to Hispanic and Latino readers by having *Tempo*-like content online. I also was involved in various Company-wide initiatives, on which I worked with News Corp. employees, such as diversity and environmental programs.

8.      In an effort to help the Post increase Hispanic readership and increase its appeal to the Latino community, I sat for several months on the Metro desk and edited stories, made calls if help was needed on a story, rewrote stories and would consult with Deputy Publisher Jeff Booth and Head of Marketing/Promotion Vincent Montori, among others, about making sure that the newspaper reflected the diversity of New York in its different stories and sections. I recommended sponsoring community events and concerts and establishing relationships with community organizations, as well as making parts of News Corp.'s facilities (screening room, etc.) available to or hosting events for such organizations.

9.      Carole Sovocool, who in an affidavit submitted in support of Defendants' motion for summary judgment represents that she assumed responsibility for the special sections on which I worked while at the Company, is White.

10.     Jennifer Jehn of Human Resources came to my office after the February 18, 2009 publication in the Post of a political cartoon depicting President Obama as a chimpanzee that had been shot by police officers. When I talked with Jennifer Jehn of Human Resources ("HR"), she told me that I could trust her and talk with her because that is what she is there for as part of HR.

3

At that time, I reported to Ms. Jehn many examples and incidents of harassment and discrimination that I had witnessed and which were reported to me by other Company employees. Among the examples of harassment and discrimination that I related to Ms. Jehn were: Mr. Goodstein's regular sexual harassment of myself and other female employees, Defendant Allan's sexual harassment and racially demeaning conduct (including in executive committee meetings, in which he sometimes showed up drunk, discussed the strippers at a strip club called "Scores," and made various racist and sexist remarks, including a joke at Travel Editor Pucci Meyer's expense that "You can't teach an old bitch new tricks"), David Boyle calling his female subordinates his "harem," male supervisors sleeping with female interns while promising them jobs (and one male employee telling a young intern, "I will give you a permanent job if you give me a blow job"), and other highly disturbing and discriminatory conduct. I also told Ms. Jehn that I generally found the work environment at the Company to be offensive, sexist, racist and homophobic. Ms. Jehn asked what I would recommend that the Company do about the situation. I recommended that at the very least the Company should conduct sensitivity and diversity training for the entire staff, including management, to make it clear that it is not only unacceptable but illegal to behave the way many executives, managers and employees were behaving.

11.     Around the time of the publication of the chimpanzee cartoon, Joe Robinowitz came to the 9th floor where my office was and tried to convince me that the cartoon was not racially offensive, told me I should stop listening to Al Sharpton and that the Post would not apologize for it. I told Mr. Robinowitz that there was a broader problem regarding race at the Company that needed to be addressed.

4

12.     Also around the time of the chimpanzee cartoon's publication, Paul Armstrong came to my office and said he wanted to talk about the controversy.  I told Mr. Armstrong that the cartoon pointed out a bigger problem at the Company regarding race, and that it was offensive for management to accuse its minority employees of being overly emotional about the cartoon.  I also told Mr. Armstrong during that conversation about the sexual harassment Les Goodstein subjected me to, including staring at my body while licking his lips, commenting on my clothes and shoes being "sexy," and referring to me as "Cha Cha Number 1" and Sami Haiman-Marrero, who is Latina and was sales manager for *Tempo*, as "Cha Cha Number 2."  I told Mr. Armstrong that I was not comfortable being alone in meetings with Mr. Goodstein because of this sexually harassing behavior.  Mr. Armstrong said in response that his intern was not comfortable around Mr. Goodstein either, for similar reasons, but that is just the way Mr. Goodstein is.  Mr. Armstrong did not recommend that I report any of what I had said to him to HR.

13.     Michael Riedel, the Broadway columnist for the Post, consistently and seriously offended me with his conduct based upon my race, ethnicity and national origin (Black Hispanic Puerto Rican).  Mr. Riedel very much upset me on many occasions by greeting me with singing in a fake, exaggerated and high-pitched "Latino" accent, which was an obvious and hurtful caricature that did not at all resemble or pay homage to the performance of Chita Rivera (who is a Latina and speaks with an accent in English naturally due to her heritage) when she played "Anita" in West Side Story.  Mr. Riedel did this far more than two or three times, and although I did not ask him to stop doing it, I did try to stop the singing quickly each time by changing the subject or interjecting that he should "not quit [his] day job."  Despite my outward friendliness towards Mr. Riedel, I was repelled by this unwelcome and distasteful behavior.

5

14. In or around 2008, a White male Features editor and supervisor, Steven Lynch, who supervised more than two dozen employees and whose office was located on the 9th floor told a female employee, Danica Lo, that he was going to start hiring more "testosterone" in order to bring more "intelligence" into his department, implying that women are less intelligent than men.

15. The approximately 21 Company employees about whom Defendants' counsel asked me about at the end of the second day of my deposition on February 13, 2012, were nearly all junior level editors who did not participate in executive committee meetings and did not have any authority on major editorial decisions. These minority employees therefore were not in a position to effectively alter the Post's workplace practices or editorial point of view. I often discussed the dearth of African-American and Hispanic editors at the Post with my coworkers, including Danica Lo, Leonard Greene, Rakhi Mirchandani, David Landsel, Eric Hedgus and Nicole Faux, among many others.

16. Following the departure of Lachlan Murdoch as the Post's Publisher, Defendant Allan, the Post's Editor-in-Chief, evinced no interest whatsoever in issues concerning increasing Hispanic readership or minority communities. Whenever such matters were raised in executive committee meetings or other settings, Defendant Allan would brush off the topic, saying that I was the expert and unambiguously indicating that he wanted nothing to do with and had nothing to say with regard to such matters.

17. About two weeks after my termination from the Company on September 29, 2009, I had dinner with Gregg Birnbaum, the then-Political Editor for the Post. At that dinner, Mr. Birnbaum said that he was certain that I had been fired in retaliation for my complaints to

Human Resources in the wake of the February 2009 chimpanzee cartoon controversy. This dinner took place at a restaurant called Le Singe Vert in the Chelsea neighborhood of New York City.

18.     I had various discussions with Lachlan Murdoch about ways in which News Corp. and other affiliates could get more in tune with diversity issues. This is how I came to be recommended for a Company-wide Latino diversity initiative called the News Corp. Hispanic Diversity Initiative, which was headed by Mitsy Wilson and Rick Ramirez of News Corp.'s diversity department. I shared many of the incidents of racial, sexual and national origin-related harassment I had experienced with Ms. Wilson and Mr. Ramirez.

19.     When News Corp. purchased a string of small community newspapers, one of the Managing Editors at the Post asked me to create and edit various special sections (on education, Black community issues, and environmental or "Green" initiatives) to help the editors of those small newspapers, but was instructed to hand off my work product to News Corp. so it could be passed on to the community newspapers.

20.     Mitsy Wilson and Rick Ramirez, News Corp. employees with whom I served on the News Corp. diversity committee, actively recruited employees to the Post.

21.     The terms and conditions of my employment included employment policies and procedures, as well as employee benefits plans, administered and created by News Corp., including, but not limited to, health insurance and retirement savings plans.

22.     Margi Conklin was still employed at the Post at the time of my termination in September 2009 as an editor in a position created for her.

7

23. My Complaint does not contain every discriminatory, harassing, retaliatory, offensive, degrading and/or improper comment or act that I witnessed, experienced and/or had described to me during my employment with Defendants.

24. I also have not described in this affidavit every discriminatory, harassing, retaliatory, offensive, degrading and/or improper comment or act that I witnessed, experienced and/or had described to me during my employment with the Defendants.

25. I also rely on the allegations made in my Complaint and in the affidavits submitted by other current and former employees in support of my Complaint.

_____
Sandra Guzman

Sworn to before me on
May 23, 2013

_____
Notary Public

LAWRENCE MICHAEL PEARSON
Notary Public, State of New York
No. 02PE6225600
Qualified in New York County
Commission Expires July 26, 20_14_

8