**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
SANDRA GUZMAN,                          :

                         :

                Plaintiff,     :           No. 09 Civ. 9323 (LGS)

                         :

            v.                  :

                         :

NEWS CORPORATION, NYP HOLDINGS,   :
INC., d/b/a THE NEW YORK POST, and COL  :
ALLAN, in his official and individual capacities,  :

                         :

                Defendants.    :
-------------------------------------------------------------- X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS NYP HOLDINGS, INC. AND COL ALLAN'S MOTION FOR SUMMARY JUDGMENT

THOMPSON WIGDOR LLP

85 Fifth Avenue
New York, NY 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 3

    I.     MS. GUZMAN'S OUTSTANDING CONTRIBUTIONS TO THE NEWSPAPER .... 3

    II.    MS. GUZMAN WORKED UNDER THE SHADOW OF OPPRESSIVE SEXUAL
          AND RACIAL HOSTILITY AND DISCRIMINATION .............................................. 4

    III.   MS. GUZMAN COMPLAINED TO MANAGEMENT AND HUMAN
          RESOURCES ABOUT THE COMPANY'S RACIST AND SEXIST CONDUCT .... 8

    IV.   MS. GUZMAN WAS RETALIATORILY AND DISCRIMINATORILY
          TERMINATED DUE TO HER PROTECTED COMPLAINTS ................................ 10

ARGUMENT ............................................................................................................................ 14

    I.     SUMMARY JUDGMENT STANDARD ................................................................... 14

    II.    ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFF'S
          DISCRIMINATORY TERMINATION CLAIMS AND ARE SUPPORTED BY
          SUBSTANTIAL EVIDENCE ................................................................................... 14

        A.  Plaintiff Has Established a *Prima Facie* Case of Discriminatory Termination .... 15

        B.  Evidence Reveals Factual Issues Regarding the "Legitimate, Non-Discriminatory"
            Reason for Firing Ms. Guzman .......................................................................... 17

    III.   ISSUES OF FACT AND SUBSTANTIAL EVIDENCE PRECLUDE SUMMARY
          JUDGMENT ON MS. GUZMAN'S RETALIATION CLAIMS ............................... 19

    IV.   MS. GUZMAN HAS ALLEGED AND THE EVIDENCE SHOWS AN
          EXTREMELY HOSTILE WORK ENVIRONMENT AT THE COMPANY FOR
          WOMEN AND MINORITIES UNDER ALL APPLICABLE STATUTES ............. 21

        A.  Ms. Guzman Frequently Was Subjected To and Encountered Unlawful
            Harassment Based Upon Race, Color and National Origin ................................... 22

        B.  Ms. Guzman Frequently Was Subject To and Encountered Unlawful Sexual
            Harassment Based Upon Her Gender ................................................................. 25

V.    PLAINTIFF MADE PROTECTED COMPLAINTS ABOUT THE COMPANY'S HOSTILE ENVIRONMENT AND DISCRIMINATION MULTIPLE TIMES ........27

VI.   DEFENDANT ALLAN MAY BE HELD INDIVIDUALLY LIABLE UNDER THE NYSHRL, NYCHRL, AND SECTION 1981 .............................................................30

CONCLUSION ......................................................................................................................31

# TABLE OF AUTHORITIES

## CASES

Adams v. City of New York,
    837 F.Supp.2d 108, 126 (2d Cir. 2011) ............................................................25

Alston v. New York City Transit Authority,
    14 F.Supp.2d 308 (S.D.N.Y. 1998) ...............................................................20

Barounis v. New York City Police Dept.,
    No. 10 Civ. 2631(SAS), 2012 WL 6194190 (S.D.N.Y. Dec. 12, 2012) .........................23

Beachum v. AWISCO New York,
    785 F. Supp. 2d 84, 94 (S.D.N.Y. 2011) ......................................................16

Caban v. Richline Group, Inc.,
    No. 10 Civ. 559 (ALC), 2012 WL 2861377 (S.D.N.Y. 2012) ..........................24

Chambers v. TRM Copy Centers Corp.,
    43 F.3d 29, 37 (2d Cir. 1994) .....................................................................15

Cloke-Brown v. Bank of Tokyo-Mitsubishi UFJ Ltd.,
    2011 WL 666187 (S.D.N.Y. Feb. 9, 2011) ...................................................30

Cosgrove v. Sears, Roebuck & Co.,
    9 F.3d 1033 (2d. Cir. 1993) .........................................................................19

Cruz v. Coach Stores Inc.,
    202 F.3d 560, 570 (2nd Cir. 2000).................................................................27

Delville v. Firmenich, Inc.,
    No. 08 Civ. 10891(JPO), 2013 WL 363391, at *10 n.8 (S.D.N.Y. Jan. 31, 2013) ...........18

Durkin v. Verizon New York, Inc.,
    678 F. Supp. 2d 124, 133 (S.D.N.Y. 2009) ....................................................30

Espinal v. Goord,
    558 F.3d 119, 129 (2d Cir.2009) .................................................................17

Fairbrother v. Morrison,
    412 F.3d 39, 53 (2d Cir.2005) ....................................................................28

Faragher v. City of Boca Raton,
    524 U.S. 775, 778 (1998) .......................................................................28, 29

Farrugia v. North Shore Univ. Hosp.,
    820 N.Y.S.2d 718, 724 (N.Y. Sup. Ct. 2006)................................................25

Ferraro v. Kellwood Co.,
    440 F.3d 96, 102 (2d Cir. 2006) .................................................................29

Gallo v. Alitalia-Linee Aeree Italiane-Societa Per Azioni,
    585 F. Supp.2d 520, 538 (S.D.N.Y 2008) ..................................................24

Gallo v. Prudential Res. Serv.,
    22 F.3d 1219, 1224 (2d Cir. 1994) .......................................................14, 18

George v. Liverpool Cent. School Dist.,
    2000 WL 1499342 (N.D.N.Y. Sept. 29, 2000)........................................25, 26

Gordon v. New York City Bd. of Educ.,
    232 F.3d 111, 116 (2d Cir. 2000) ..............................................................20

Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,
    252 F.3d 545, 554 (2d Cir.2001) ...............................................................17

Graham v. Long Island R.R.,
    230 F.3d 34, 39 (2d Cir. 2000) ..........................................................14, 16

Grant v. Bethlehem Steel Corp.,
    622 F.2d 43, 45–46 (2d Cir. 1980) ............................................................19

Guzman v. New York,
    877 F.Supp.2d 74, 77 (S.D.N.Y. 2012) ......................................................17

Harris v. Forklift Sys., Inc.,
    510 U.S. 17, 21 (1993) .............................................................................21

Holtz v. Rockefeller & Co., Inc.,
    258 F.3d 62, 75 (2d Cir.2001).....................................................................22

Howe v. Town of Hempstead,
    No. 04 Civ. 0656(DRH)(ETB), 2006 WL 3095819 at *7 (E.D.N.Y. Oct. 30, 2006)........16

Howley v. Town of Stratford,
    217 F.3d 144 (2d Cir.2000) .......................................................................23

Ifill v. United Parcel Service,
    No. 04 Civ. 5963(LTS), 2005 WL 736151, at *3 (S.D .N.Y. Mar. 29, 2005) .................30

In re Goldberg,
    487 B.R. 112, 125 (2013) ................................................................................24

Jasco Tools, Inc. v. Dana Corp.,
    574 F.3d 129, 152 (2d Cir. 2009) ....................................................................14

Kulak v. City of New York,
    88 F.3d 63, 71 (2d Cir. 1996) .........................................................................14

Leibovitz v. New York City Transit Authority,
    252 F.3d 179, 190 (2d Cir. 2001) ....................................................................27

Lennert-Gonzalez v. Delta Airlines, Inc.,
    No. 11 Civ. 1459 (JMF), 2013 WL 754710 (S.D.N.Y. 2013)..........................19

Loeffler v. Staten Island Univ. Hosp.,
    582 F.3d 268, 278 (2d Cir. 2009) ....................................................................25

Mandell v. Cnty. of Suffolk,
    316 F.3d 368, 379 (2d Cir.2003) .....................................................................16

McDonnell Douglas v. Green,
    411 U.S. 792 (1973) ........................................................................................15

Mihalik v. Credit Agricole Cheuvreux N. America, Inc.,
    09 Civ. 1251 (DAB), 2011 WL 3586060, at *9 (S.D.N.Y. July 29, 2011) ......25

Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101, 116 (2002) ................................................................................22

Patrowich v. Chem. Bank,
    63 N.Y.2d 541, 542 (1984)..............................................................................30

Petrosino v. Bell Atl.,
    385 F.3d 210, 220 (2d Cir. 2004) ...............................................22, 26, 27, 28

Powell v. Nat'l Bd. Of Med. Exam'rs,
    364 F.3d 79, 84 (2d Cir. 2004) .......................................................................14

Prince v. Madison Square Garden,
    427 F. Supp. 2d 372, 382 (S.D.N.Y. 2006) .....................................................28

Pucino v. Verizon Wireless Communications, Inc.,
    618 F.3d 112, 119-20 (2d Cir. 2010)...............................................................22

Ramos v. Marriott International, Inc.,
    134 F.Supp.2d 328, 338 (S.D.N.Y. 2001) ..................................................15

Redd v. N.Y.S. Div. of Parole,
    678 F.3d 166, 175 (2d Cir. 2012) ..........................................................22

Schiano v. Quality Payroll Systems, Inc.,
    445 F.3d 597, 605 (2d Cir. 2006) ..........................................................22

Stewart v. City of New York,
    11 Civ. 6935 (CM), 2012 WL 2849799, at *13 (S.D.N.Y.  July 10, 2012) ......................25

Summa v. Hofstra University,
    708 F.3d 115 (2d Cir. 2013) ..............................................................21

Sumner v. U.S. Postal Service,
    899 F.2d 203 (2d Cir. 1990) ..........................................................19, 24

Terry v. Ashcroft,
    336 F.3d 128, 141 (2d Cir. 2003) ..........................................................19

Tomassi v. Insignia Financial Group, Inc.,
    478 F.3d 111, 116 (2d Cir. 2007) ......................................................14, 17

Torres v. Pisano,
    116 F.3d 625, 632 (2d Cir. 1997) ..........................................................21

Tunis v. Corning Glass Works,
    698 F.Supp. 452 (S.D.N.Y.1988) ..........................................................26

Turley v. ISG Lackawanna, Inc.,
    803 F. Supp. 2d 217, 251 (W.D.N.Y. 2011)....................................................29

Velez v. McHugh,
    No. 09 CV 0925 (GAY), 2011 WL 778693, at *2 (S.D.N.Y. Mar. 2, 2011) ....................14

Watson v. E.S. Sutton, Inc.,
    No. 02 Civ. 2739(KMW), 2005 WL 2170659, at *22 (S.D.N.Y. 2005) ........................24

Williams v. New York City Housing Auth.,
    872 N.Y.S.2d 27, 31 (1st Dep't 2009)......................................................25

Woodard TWC Medical Solutions, Inc.,
    09 CV 3000 (BSJ), 2011 WL 70386, at *9 (S.D.N.Y. Jan. 4, 2011)...............................15

Zakrzewska v. New School,
    14 N.Y.3d 469 (2010)..............................................................................................29

Zambrano-Lamhaouhi v. N.Y. City Bd. of Educ.,
    No. 08-CV-3140 (NGG)(RER), 2011 WL 5856409 at *9 (E.D.N.Y. Nov. 21, 2011)......22

## STATUTES

Fed. R. Civ. P. 56 (c) ...........................................................................................................14

42 U.S.C. § 1981 ..........................................................................................................*passim*

42 U.S.C. § 2000e (Title VII)......................................................................................*passim*

N.Y. Exec. Law § 296(1) (NYSHRL) ........................................................................*passim*

N.Y.C. Admin. Code § 8-107 (NYCHRL) ...................................................................*passim*

Plaintiff Sandra Guzman ("Ms. Guzman" or "Plaintiff") submits this memorandum of law in opposition to the motion for summary judgment filed by Defendants NYP Holdings, Inc. d/b/a the New York Post (the "Post") or, together with News Corporation ("News Corp."), (the "Company") and Col Allan ("Defendants") to dismiss Plaintiff's Amended Complaint ("AC").[1]

## PRELIMINARY STATEMENT

Defendants consistently distort the record and omit crucial evidence that reveals the myriad material issues of fact in this case. Ms. Guzman, a Black Puerto Rican female, worked at the Post as an Associate Editor for more than six years before she was terminated for her increasingly strong and public objections to the relentless and unapologetic sexist, racist and xenophobic conduct of the Post's and News Corp.'s management and senior personnel. The Company's complete indifference to racial sensitivity was put on full display by the publication in the Post of a political cartoon portraying the recently inaugurated President Obama as a chimpanzee slain by police officers. The resulting outrage occasioned Ms. Guzman's attempt to alert the Company's Human Resources department to the broader problems at the Company, including rampant sexual harassment and racial stereotyping, for which Ms. Guzman paid with her job just months later, in September 2009.

Defendants claim that Ms. Guzman was fired solely because the Post stopped publishing an "unprofitable" monthly section, called *Tempo*, oriented towards the Hispanic community. At the time Ms. Guzman was terminated, the Company had decided only to curtail *Tempo*'s publication schedule and only actually discontinued *Tempo* later, illustrating the pretextual nature of Defendants' purported justification. *Tempo* previously had great success after a

---

[1] Submitted in support of Plaintiff's opposition to the motion are the affidavit of Sandra Guzman, dated May 23, 2013 ("Guz. Aff."), as well as the declaration of Lawrence M. Pearson, dated May 24, 2013 ("Pear. Dec."), to which all other exhibits referenced herein, unless otherwise specified, are attached. Exhibits attached to the declaration of Mark W. Lerner, dated May 10, 2013 and attached to Defendants' motion ("Lern. Dec.") also will be referenced.

temporary downturn in advertising sales, and was profitable as recently as 2008 (as well as for some months of 2009), in contrast to the Post as a whole, which yearly loses at least several million dollars.

Defendants claim Ms. Guzman's hostile work environment allegations total only "three isolated and trivial episodes," though their own memorandum reveals many more disturbing incidents of sexual harassment and intimidation. Defendants aggregate incidents, but do not count separately, episodes such as Defendant and Editor-In-Chief Col Allan publicly displaying a nude photograph of a man to female employees at a local bar and his remarking in an executive committee meeting that "You can't teach old bitches new tricks" about a senior female staff member. News Corp. executive Les Goodstein, Ms. Guzman's supervisor, repeatedly told her she was "sexy" and "beautiful" while licking his lips, and called her "Cha Cha Number 1" in reference to her being a Latina who he found sexually attractive. Defendants label such comments "inoffensive compliments" or "benign," and try to equate this conduct with Ms. Guzman complimenting a female colleague's weight loss. Defendants would disqualify Ms. Guzman from civil rights protections because she is an adult woman who talks with friends or writes professionally about sexual, racial or ethnic topics, displaying even now their contempt for individuals who seek to redress unlawful discrimination and retaliation.

Ms. Guzman produced dozens of special sections in addition to *Tempo* during her employment, and her work on these sections was widely praised. Indeed, Ms. Guzman's contributions to other parts of the Post show how easily she could have been transferred into another role rather than terminated. By comparison, Defendants transferred a similarly situated White editor, while refusing to offer Ms. Guzman an available Editor position.

Defendants' attempt to bootstrap the First Amendment's protections into an exemption from the anti-discrimination laws must fail, and ignores that Plaintiff objected to the Company's racially discriminatory environment and practices, not just its speech.

## STATEMENT OF FACTS

### I.   MS. GUZMAN'S OUTSTANDING CONTRIBUTIONS TO THE NEWSPAPER

Sandra Guzman was hired as an Associate Editor in July 2003 to "give expert advice on issues and trend in the New York Latino community," produce a "regular" Latino-oriented section and advise the Company on how to better market to the Hispanic community, which she did for over six years until her discriminatory and retaliatory termination in September 2009. [2] (Lern. Dec. Ex. 1; Pear. Dec. Ex. 2 at NYP0506-0512; AC ¶ 24; Guz. at 343).  Ms. Guzman was hired by Lachlan Murdoch, then the Post's Publisher and Deputy COO of News Corp., and he told her the new section's primary goal was not profit, but to "creat[e] environment where Hispanic readers felt that [the Post] was friendly to them and cared about them and covered the community."  (Guz. at 510:12-19; Pear. Dec. Ex. 3 at SG 6951-6952).  Ms. Guzman's accomplishments included conducting exclusive interviews with top newsmakers, creating and writing a daily blog, and generating, through her concepts and editing, millions dollars of advertising revenue.  (Guz. Aff. at ¶ 5; Pear. Dec. Ex. 4 at NYP 4212-4214, Ex. 9 at SG 1062). In fact, from 2001 to February 2009, almost completely corresponding to Ms. Guzman's tenure, the Post vastly outperformed its main competitor, the New York Daily News (the "Daily News"), in growing Hispanic readership: the Post gained 109,505 Hispanic readers, an increase of 70%, while the Daily News lost 111,339, a decrease of 22%.  (Pear. Dec. Ex. 5 at NYP 0638).

---

[2] True and correct copies of referenced excerpts of the deposition of Sandra Guzman, dated October 13, 2011 and February 13, 2012 ("Guz. at [page]"), are attached to the Pear. Dec. as Exhibit 1.

Ms. Guzman's performance reviews and the testimony of her supervisors and colleagues demonstrate her exemplary performance and dedication as Associate Editor. Ms. Guzman's July 8, 2009 review, given only two months before her termination, states, "Sandra oversees and produces first-rate <u>sections</u>. . . . The sections are well-edited, well-designed and contain interesting reads and interviews and scores of useful tips, pointers and tidbits of valuable information." (Pear. Dec. Ex. 6 at NYP 0301-302; AC ¶ 30) (emphasis added). Additionally, Joe Robinowitz, a Managing Editor, testified that Ms. Guzman's sections were "top quality." (Rob. at 138:9).[3]   In addition to many other duties, Ms. Guzman was responsible for all editorial content and production of 25 special sections per year, including editions of *Tempo*, which had a "whopping" circulation of 667,119. (Rob. at 62-63; Pear. Dec. Ex. 8 at SG 0079; Guz. Aff. ¶ 5; Pear. Dec. Ex. 9 at SG 1062, Ex. 6 at NYP 0301). These are but a few examples of Ms. Guzman's accomplishments.

## II.  MS. GUZMAN WORKED UNDER THE SHADOW OF OPPRESSIVE SEXUAL AND RACIAL HOSTILITY AND DISCRIMINATION

While Ms. Guzman dedicated herself to producing high-quality content and increasing the Post's readership, she endured a disturbing and hostile workplace environment. Ms. Guzman did her best to withstand a barrage of harassment and do her job at a high level. (Guz. at 417).

 Ms. Guzman experienced many incidents of degrading and repulsive sexual harassment beyond the handful sketched by Defendants. Les Goodstein, Senior Vice President of News Corp., regularly stared at Ms. Guzman's body in an overtly sexual manner while licking his lips. (Guz. at 185:17-20, 191, 273, 394, 396:13-20, 398, 413-14; Pear. Dec. Ex. 10 at SG 6785). Mr. Goodstein also would regularly comment on Ms. Guzman's appearance and dress, calling her

---

[3] True and correct copies of referenced excerpts of the deposition of Joe Robinowitz, dated June 14, 2012 ("Rob. at [page]"), are attached to the Pear. Dec. as Exhibit 7.

"sexy" in the workplace on many occasions.  (Guz. at 191, 206, 395, 398-99; Good. at 147).[4]  At

the time, Mr. Goodstein held sway over Ms. Guzman, as he took over advertising sales for

*Tempo* in 2006.  (Guz. at 408:20-409:6).  Ms. Guzman would sometimes respond facetiously to

Ms. Goodstein's unwelcome comments to deflect them and change subjects, as she did when he

told her that her shoes looked "sexy," by saying "[I]f you want to borrow my shoes, you can."

(Guz. at 191-92, 398-99; Pear. Dec. Ex. 12 at ¶ 23 (Affidavit of S. Guzman, July 19, 2010)).  In

or around 2007, Mr. Goodstein called Ms. Guzman "Cha Cha #1," mocking her race, ethnicity

and national origin, while sexualizing her as a Latina.  (Guz. Aff. at ¶ 12; Guz. at 189:18-22).

Mr. Goodstein also referred to Sami Haiman-Marrero, who marketed *Tempo* and is a Hispanic

woman, as "Cha Cha #2." (Guz. at 189:18-22; Guz. Aff ¶ 12).  Ms. Guzman vociferously

objected to this conduct to Mr. Goodstein. (Guz. at 189:23-25, 401:24-25, 493:20-23). Mr.

Goodstein's harassment was not directed solely at Ms. Guzman, as he commonly stared at the

breasts and buttocks of female employees. (Pear. Dec. Ex. 12 at ¶ 23).

Such sexually hostile behavior was perpetrated and endorsed at management's highest

levels.  Defendant Allan, the Editor-in-Chief, in executive committee meetings with his highest-

ranking editors, regularly made outrageous sexist remarks, including mocking senior female

employees with statements such as, "You can't teach old bitch new tricks." (Guz. at 240-41).

This conduct is substantiated by Ms. Guzman's contemporaneous handwritten notes, which say,

"Talk of butts, boobs, strippers … were part of the daily conversation among the white men [at]

the table," with a diagram of where those who attended executive committee meetings sat.  (Guz.

at 496-97; Pear. Dec. Ex. 13 at SG 2343).  Allan also screamed across the newsroom, "Will you

---

[4] True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 15, 2012 ("Good. at
[page]"), are attached to the Pear. Dec. as Exhibit 11.

tell that damn girl to answer the damn phone?" in reference to Ebony Clark, a Black female. (Clark at 331;[5] Guz. at 175:17; AC ¶ 39).

Defendants concede that on or around April 2007, Allan approached a group of female employees at a bar, among them Ms. Guzman, and decided to regale them with a story about a senior male employee having public drunken sex with a woman in the same bar. (Def. Mem. at 9; Guz. at 137, 469-70; Allan at 237-41).[6] Ms. Guzman was disgusted by these unwelcome comments. (Guz. at 471-74). Allan also, without provocation, displayed a photograph on his phone of a naked man in which his genitals were fully visible to female employees in public, including Ms. Guzman. (Guz. at 133:6-10, 134:3-8, 140:17-22, 142:16-20, 474:22-475:4). Defendant Allan received this picture in connection with a news story, but it was not relevant to the work of any of the female employees present, including Ms. Guzman, and was shown to them by Allan without the benefit of the man's genitals being redacted (as they were when the photograph appeared in the Post). (Guz. at 143-44, 474-75, 479; Lern. Dec. Ex. 20).

Allan, who admitted the picture was "lewd," showed this photograph to the female employees purely out of prurient interest, and "smirked," "laughed" and said "look at this" while he did so. (Guz. at 139, 475; Allan at 202-04; 212:21-24). Ms. Guzman made it clear that this conduct was unwelcome, and called his behavior "creepy." (Guz. at 133:11-15.) Ms. Guzman's reluctance to offend the Editor-in-Chief contributed to her withholding a stronger objection to his comments or being shown the photo. (Guz. at 138, 142-43, 477, 478:18-479:2).

Rampant sexism at the Company was further exhibited by Executive Photography Editor David Boyle, who, in conversation with Ms. Guzman, referred to the young, attractive women he

---

[5] True and correct copies of referenced excerpts of the deposition of Ebony Clark, dated May 30, 2012 ("Clark at [page]"), are attached to the Pear. Dec. at Exhibit 14.
[6] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 21, 2013 ("Allan at [page]"), are attached to the Pear. Dec. as Exhibit 15.

hired into junior positions as his "harem," a term that was widely known in the workplace for

Mr. Boyle's female subordinates. (Guz. at 485-86; McLough. at 14:10-11; 23, 25-26, 28:22).[7]

The Company's management and employees also consistently demeaned racial

minorities, including African-Americans and Hispanics.  Anne Aquilina, an administrative

editor, asked Ms. Guzman if candles in her office were related to "Santeria" or "Voodoo,"

reflecting stereotypes held regarding minorities among the Company's management.  (Guz. at

224, 227-228).  Michael Riedel, a white male columnist, sang the song "America" from the

musical "West Side Story" at Ms. Guzman in a mock, insulting "Spanish" accent several times

and would often greet Ms. Guzman in a "thick Spanish accent."  (Guz. at 142:5-11, 210-11, 215-

16, 527, 530; Guz. Aff. ¶ 13).[8]  Ms. Guzman found this conduct offensive on the basis of her

race, ethnicity and national origin. (Guz. at 216:13-22).

Once again, the Post's Editor-In-Chief, Defendant Allan, was the standard-bearer for

hostile, discriminatory and stereotyping conduct.  In morning editorial meetings, Allan "joked"

about baseball player Pedro Martinez, who is Dominican, being in New York City for surgery,

and said that if any crimes were committed, people should "check them out, it might be Pedro,"

and asked Ms. Guzman if Mr. Martinez "carried a gun or a machete" to her interview with him.

(Guz. at 111-115).  Allan described groups of protesters outside the Company's building who

gathered in response to a political cartoon depicting President Obama as a dead chimpanzee, as

"not smart, and most of them are minorities."  (Guz. 101:13-19; Pear. Dec. Ex. 17 at SG 0165;

Clark at 130, 137, 146-48).  Moreover, the patently racist term "nigger" was frequently used at

the Post.  Allan testified that Steve Dunleavy, a former columnist at the Post, referred to an

---

[7] True and correct copies of referenced excerpts of the deposition of Mary McLoughlin, dated April 30, 2012("McLough. at [page]"), are attached to the Pear. Dec. as Exhibit 16.

[8] Mr. Riedel's rendition did not at all approximate the performances of Chita Rivera or Rita Moreno, who actually are Hispanic, in the original Broadway production or film, respectively, contrary to Defendants' unconvincing assertion that Mr. Riedel was merely singing it "the way it was performed on Broadway." (Guz. Aff. ¶ 13).

African-American employee of the Post as the Post's "token nigger." (Allan at 252:22-254:8; Ang. at 359:24-363:13).[9] Allan made no attempt to rebuke Mr. Dunleavy for using this language. Id. Allan also repeatedly approved racially offensive content in the Post, including the Cartoon, discussed infra. (Allan at 62). Ms. Guzman's experience at the Company also was greatly affected by the steady stream of racially and sexually offensive incidents she learned of from coworkers. Among other incidents, Ms. Guzman was told that Allan rubbed his erect penis against employee Nicole Faux and made lewd comments about her breasts. (Guz. at 168-69).

III.   **MS. GUZMAN COMPLAINED TO MANAGEMENT AND HUMAN RESOURCES ABOUT THE COMPANY'S RACIST AND SEXIST CONDUCT**

A shocking and painful public exhibition of the Company's racist worldview was published in the Post on February 18, 2009 in the form of a cartoon depicting President Obama as a chimpanzee shot and killed by police officers (the "Cartoon"). Ms. Guzman believed that the chimpanzee in the cartoon was intended to depict President Obama as a primate and that the cartoon was racist, which Defendants do not dispute. (Def. Mem. p. 6; AC ¶ 68; Ex. A).

Jennifer Jehn, Senior Vice President of Human Resources, visited Ms. Guzman in her office on the same day the cartoon was published, at which time Ms. Guzman told Ms. Jehn not only that the cartoon was racist, but described many other instances of racist and sexist conduct, as well as the generally racist and sexist working conditions and policies, at the Company. (Guz. at 150-154). Ms. Guzman was outraged by the Cartoon and felt she could no longer allow the Company to ignore the discrimination to which she and her colleagues were routinely subjected. (Guz. at 335). Ms. Guzman informed Ms. Jehn of the full range of harassing and discriminatory conduct she had witnessed and learned of from colleagues at the Company, including, but not limited to: Mr. Goodstein's sexual harassment, Defendant Allan's sexual harassment and racially

---

[9] True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 and April 5, 2013 ("Ang. at [page]"), are attached to the Pear. Dec. as Exhibit 18.

demeaning conduct, David Boyle's female subordinates being called his "harem," incidents reported to Ms. Guzman in which supervisors slept with interns while promising them jobs, and other highly disturbing and discriminatory conduct. (Guz. at 187:9-15, 151-52;[10] Guz. Aff. ¶ 10).

Through this complaint, Ms. Guzman's offense at the Cartoon and her complaints about management's harassing and discriminatory conduct became known to the Company's upper management.  (Allan at 64-66; Jehn at 246-47).[11]  Ms. Guzman also responded to a multitude of emails she got from dismayed readers regarding the Cartoon, offering her regrets, and copied several Post executives, including Jesse Angelo, the Metro Desk Editor, who berated her for copying him on the emails (though she had done so in order for Company management to see the readers' responses). (Guz. 335-336; Pear. Dec. Ex. 20 at NYP 1818-1819).  The Post's top management was indignant over the controversy and hostile to those who dared point out the Company's racial callousness.  Mr. Robinowitz called the people protesting the Cartoon "dumb" and told Ms. Guzman to stop listening to Al Sharpton when she told him the cartoon revealed broader problems at the Company.  (Guz. at 330-331, Guz. Aff. ¶ 11).  Defendant Allan commented in his office that the Cartoon's detractors were "not smart" and that the "majority of them are minorities."  (Clark at 137, 146, 148; Guz. at 101).  To this day, although he admits it may have been "prudent" to label the chimpanzee as "Congress," Defendant Allan remains unapologetic, and believes the cartoon is fine as-is, even though many were racially offended by it.  (Allan at 438:25-439:2, 440).

---

[10] Defendants may attempt to argue that Ms. Guzman's testimony limits this complaint to conduct by Mr. Goodstein and Defendant Allan, but this is simply not true.  When providing testimony regarding her discussion with Ms. Jehn, Ms. Guzman was questioned about what she had told Ms. Jehn about the incident in which Defendant Allan had shown her a photograph of a nude man and was asked, "Did you tell her anything else about that?," to which Ms. Guzman replied, "About that? … No, I don't recall telling her anything else about that." (Guz. at 152; see also Guz. at 335:5-6 ("So I told her many things during that meeting.  Many, many things.")).

[11] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn, dated June 26, 2012 and February 14, 2013 ("Jehn at [page]"), are attached to the Pear. Dec. as Exhibit 19.

Before the outrage triggered by the Cartoon compelled Ms. Guzman to make an official complaint (Guz. at 335), Ms. Guzman had complained informally several times. Specifically, Ms. Guzman told Rick Ramirez and Mitsy Wilson, members of a News Corp. diversity committee on which she sat, that Defendant Allan engaged in racist and sexist conduct (including showing a picture of a naked man on his phone), "created a sense in the newsroom that gave men the freedom to treat women as sex objects," and that she "had personally experienced discrimination and sexism in the workplace." (Guz. at 153-154; 157). Ms. Guzman also complained about Allan showing her the nude photo to Paul Armstrong, a member of management. (Id. at 145-46). Ms. Guzman told Mr. Armstrong that this behavior was "inappropriate," "offensive," "demeaning" and "humiliating." (Id. at 148:18-25). Ms. Guzman also reported the "discrimination and sexism" she suffered to Lisa Barnett, who is "part of the management team" and DeDe Brown, a member of the Executive Team. (Id. at 161:2-12). Ms. Guzman complained to Mr. Armstrong, Ms. Barnett and Ms. Brown about Mr. Goodstein's "lascivious and disgusting behavior." (Id. at 184:10-185:5). Ms. Guzman complained to Mr. Armstrong about this behavior "[m]any, many times." (Id. at 186-87). Once Ms. Guzman made an official complaint to Human Resources ("HR"), however, upper management (and those with decision-making authority) learned of her complaints. (Allan at 64-66; Jehn at 246-47).

## IV.   MS. GUZMAN WAS RETALIATORILY AND DISCRIMINATORILY TERMINATED DUE TO HER PROTECTED COMPLAINTS

Company management began treating Ms. Guzman in a markedly negative manner in the weeks and months after her complaint to Ms. Jehn of HR. For example, her reported expenses for *Tempo* were scrutinized more closely than they had been in the past, seemingly in an effort to identify performance problems or other issues that could provide a pretext for her termination. (Guz. at 340:16-22). In addition, story ideas pitched by Ms. Guzman, including special access to

events regarding the investiture of Justice Sonia Sotomayor, which would have received a fair hearing in the past, were dismissed by management, including Defendant Allan.  (Guz. at 184; Allan at 394).  Ms. Guzman's 2009 performance review was admitted to be very positive, but when Ms. Guzman was given a "Meets Expectations" rating, Mr. Robinowitz told her that he thought she deserved a better performance review, but "the big guy, meaning Col Allan, would not let her get a higher number." (Guz. at 577: 8-12, 578).[12]

On September 29, 2009, Ms. Guzman was summarily terminated without warning, only seven months after she complained about the racist and sexist environment and practices at the Company. (Scial. at 289, 342).  Gregg Birnbaum, a senior editor of the Post, told Ms. Guzman that he was "sure" Allan had retaliated against Ms. Guzman. (Guz. at 605-06; Guz. Aff. ¶ 17). The Company's proffered explanation for Ms. Guzman's termination, the discontinuance of *Tempo* ("She was hired to produce Tempo, Tempo had ceased to exist," Allan at 399), does not hold up, as Ms. Jehn testified that it was merely "a recommendation that the frequency of the *Tempo* section would … most likely be reduced."  (Jehn at 16:16-19 [Day 2]).

An email from Defendant Allan to Ms. Guzman's supervisor, Mr. Robinowitz on January 19, 2009 reveals that, prior to Ms. Guzman's February 2009 complaint to Ms. Jehn, the Post was not planning to close, but rather to continue publishing, *Tempo* despite the financial climate. (Lern. Dec. Ex. 8).  Defendants' representation that *Tempo* was irretrievably unprofitable is further belied by the Company's data, which indicates "Last year [Fiscal Year (FY) 2008], the *Tempo* monthly sections generated $107,000 in operating profit," while noting an FY 2009 loss of $27,000 (other information shows "Profit before Depreciation" of $345,213 for *Tempo* in FY

---

[12] Defendants again distort the record and assert, without any citation to deposition transcripts whatsoever, that Ms. Guzman "lied" about a letter of authorization she gave to a vendor.  Ms. Guzman very clearly explained at deposition that she provided the letter of authorization to a stylist who was to borrow samples from designers for Ms. Guzman's use covering 2009 inauguration events, and not to seek shoes from Manolo Blahnik; Ms. Guzman denied any knowledge that the stylist would attempt to use the letter improperly.  (Guz. at 535-36; 542-43).

2008).  (Pear. Dec. Ex. 21 at NYP489-490, NYP579).  The affidavit of Michael Racano, the

Post's Chief Financial Officer, further belies the purported reason for firing Ms. Guzman.  Mr.

Racano's affidavit points out that for calendar years 2006-2008, *Tempo* was in the black to the

tune of $14,107 to $28,206, whereas in 2009 the purported losses were a modest $3,776 (an

amount surely offset by Ms. Guzman's services to other parts of the newspaper) and *Tempo* had

made money in one of its past three months.  (Racano Aff. ¶¶ 10, 14).

Another Associate Editor, Margi Conklin, who is White and did not complain about the

racist and sexist environment at the Company, was treated differently from Ms. Guzman.  (Allan

at 396).  Although the closing of Ms. Conklin's magazine, *Page 6*, around February 2009 left her

with reduced responsibilities, management worked with her to preserve her job. (Guz. at 587,

592:17-25, 593; Pear. Dec. Ex. 22 at NYP 2067-68).  Many, but not all, of *Page 6*'s staff were

terminated, and some of the fired staff was hired back by the Post. Lern. Dec. Ex. 27 at NYP-

862.  Nor is Ms. Conklin's contract an adequate explanation for retaining her generally, and

particularly as it expired in July 2009 and she remained at the Post at the time of Ms. Guzman's

termination.  (Lern. Dec. Ex. 27; Guz. Aff. ¶ 22).  All this took place within a few months of Ms.

Guzman's termination, and yet Ms. Guzman was not similarly accommodated or handled.

Defendants admit that Ms. Guzman's duties on other special sections were transferred to

a White coworker, Carole Sovocool, who allegedly earned $80,850 (around the $82,000 salary of

an open Associate Editor position into which Ms. Guzman could easily have been transferred).

(Def. Mem. p. 6; Allan at 398; Guz. Aff. ¶ 9).  Contrary to the representations of Ms. Sovocool

that Ms. Guzman's work on other special sections was light with little or no editing required, Ms.

Guzman put more time into developing sections, editing them and ensuring their quality (and

therefore increasing their chances of success) than Ms. Sovocool typically did, in addition to her

many other duties.  (Sovo. Aff. ¶ 5; Guz. Aff. ¶¶4-8).  Whether Ms. Guzman had enough work to keep her position, or if her duties were easily absorbed by Ms. Sovocool is squarely at issue.

Allan's contention that he personally decided against offering an $82,000 editorial position to Ms. Guzman demonstrates his animus and the pretextual nature of the explanation for her termination.  (Allan at 398-99).[13]  Allan concedes he played a role in the termination of Ms. Guzman, and asserts that he "didn't believe it was appropriate or right to offer her a job that would have caused her a significant pay cut."  (Allan at 398-99).  Ms. Guzman's pay was effectively cut by $137,801 upon termination, and she certainly would have preferred a pay cut to termination.  (Guz. at 209).

Defendants also present figures regarding the supposed losses of *Tempo*, at $3,766.33 per month in 2009 (with average revenue per issue of $20,479.67).  (Def. Mem. p. 4).[14]  Even accepting Defendants' figures (which Plaintiff does not), the yearly losses of the Company with regard to *Tempo* would total only $45,195.96 per year, accounting for only .0006% of the Post's 2009 losses.  Indeed, the Post lost $70 million in 2009 and $30 million in 2005.  (Pear. Dec. Ex. 25).  The history of *Tempo* and the Post's financial struggles were nothing new at the time of Ms. Guzman's September 2009 termination.  Indeed, because the cancellation of *Tempo* had not yet occurred and an open editorial position existed at the time, Ms. Guzman's termination was not at all necessitated by circumstances. (Pear. Dec. Ex. 24 at NYP 0488).

---

[13] Indeed, Ms. Jehn of Human Resources said that she was told that "no options" existed for a transfer of Ms. Guzman, further refuting Defendant's supposed explanation for terminating Ms. Guzman rather than offering her an open position.  (Jehn at 12 [Day 2]).

[14] However, it is unclear whether these figures take into account Ms. Guzman's entire salary or only that portion which was attributable to her work on *Tempo*.  Therefore, these figures are of little value to establishing the financial impact of *Tempo* or Ms. Guzman's salary on the financial health of the Company.

# ARGUMENT

## I.      SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c)(2), summary judgment must be denied on

any claims for which a "genuine issue as to any material fact" exists.  Fed. R. Civ. P. 56(c)(2).

In the instant case, issues of material fact exist regarding Defendants' retaliatory motivations and

pretextual justifications for Ms. Guzman's termination.  Genuine disputes supported by specific

factual evidence remain regarding the discriminatory animus harbored by Defendants.

In employment discrimination cases, summary judgment is generally inappropriate.[15]

Defendants must establish that, based upon the evidence, they are "entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c)(2).  Moreover, the Court must view all facts in the light

most favorable to Ms. Guzman, resolving ambiguities and drawing all inferences in her favor.

See Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009); Tomassi v. Insignia

Financial Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007).  As detailed below, Ms. Guzman is able

to support all elements of her claims with factual evidence that rises well above a mere

"scintilla" of evidence or "conclusory" assertions.  See Powell v. Nat'l Bd. Of Med. Exam'rs,

364 F.3d 79, 84 (2d Cir. 2004); Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

## II.     ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFF'S DISCRIMINATORY TERMINATION CLAIMS AND ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff's discriminatory termination claims based upon her race, color and national

origin are supported by substantial evidence regarding Defendants' animus against and disparate

---

[15] See, e.g., Velez v. McHugh, No. 09 CV 0925 (GAY), 2011 WL 778693, at *2 (S.D.N.Y. Mar. 2, 2011) (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)) (In employment discrimination cases, "[c]aution should be exercised in addressing summary judgment motions . . . where intent and state of mind are at issue"); Gallo v. Prudential Res. Serv., 22 F.3d 1219, 1224 (2d Cir. 1994) ("Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.").

treatment of minorities, particularly Hispanic, Black and Puerto Rican individuals.  Significant

evidence undermines Defendants' purported legitimate, non-discriminatory reasons.

### A. Plaintiff Has Established a *Prima Facie* Case of Discriminatory Termination

Discriminatory termination claims are subject to the three-step burden-shifting analysis in

McDonnell Douglas v. Green, 411 U.S. 792 (1973).  A *prima facie* case requires a plaintiff to

show: (1) that she belongs to a protected class; (2) that she was performing her duties

satisfactorily; (3) that she was discharged; and (4) that her discharge occurred in circumstances

giving rise to an inference of discrimination on the basis of his membership in that class.

Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).  Plaintiff's burden "is so

minimal that some courts simply assume the existence of a *prima facie* case."  Ramos v. Marriott

International, Inc., 134 F.Supp.2d 328, 338 (S.D.N.Y. 2001).

The threshold is lower under the NYCHRL.  In keeping with its broad remedial purposes,

a violation that is "borderline" under Title VII or the NYSHRL may pass muster under the more

liberal NYCHRL standard. See Woodard TWC Medical Solutions, Inc., 09 CV 3000 (BSJ), 2011

WL 70386, at *9 (S.D.N.Y. Jan. 4, 2011).  "Thus, less egregious conduct than that required

under Title VII may support a claim of employment discrimination under the NYCHRL.'" Id.

Specifically, the complained-of conduct must consist of "nothing more than what a reasonable

victim of discrimination would consider 'petty slights and trivial inconveniences.'" Id.

Defendants only dispute whether Ms. Guzman has satisfied the fourth prong of a *prima

facie* case, i.e., that her termination happened in a manner that gives rise to an inference of

discrimination. (Def. Mem. p. 14).  A large of amount of evidence supports an inference of

discrimination against Ms. Guzman in relation to her termination, demonstrating that she was

treated differently from her similarly situated coworkers on the basis of her race, sex, national

origin and color.  See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir.2003) (observing that disparate treatment "is a recognized method of raising an inference of discrimination"). Defendants blatantly ignore essential evidence by stating there is no proof of "more favorable treatment of one not in her protected class" regarding her termination.  (Def. Mem. p. 14).  A prime fact issue in this case concerns Margi Conklin, a White employee who, like Ms. Guzman, headed a once-profitable monthly section that was losing money in 2009. However, the Post did not terminate Ms. Conklin; instead, the Company found a new job for her. See Facts § D.

Defendants further assert that "there is no comparator 'similarly situated in all material facts' to [Plaintiff] who was treated more favorably."  (Def. Mem. p. 14).  Whether a plaintiff is similarly situated to comparators presents a fact issue not for resolution on summary judgment. See Mandell 316 F.3d at 379; Graham, 230 F.3d at 39 (2d Cir. 2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury.").  Ms. Guzman was similarly situated to Ms. Conklin in all material respects, their circumstances need not be identical for an inference of discrimination to be drawn; thus, a reasonable jury could make such a finding.  See Beachum v. AWISCO New York, 785 F. Supp. 2d 84, 94 (S.D.N.Y. 2011).

Racist and sexist comments are not "stray" and "may constitute evidence of an intent to discriminate" if a "sufficient nexus exists between the comments and the adverse employment action." Howe v. Town of Hempstead, No. 04 Civ. 0656(DRH)(ETB), 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006).   All that is necessary to demonstrate such a nexus exists is that "the comments were made by the decision-maker or by someone who had great influence over the decision-maker." Id.  Here, myriad incidents involving senior management, who either sat on the Executive Committee or had close access to Allan, involving sexist and racist conduct, support an inference of animus on the part of Defendant Allan and others, such as Mr. Goodstein and Mr.

Robinowitz.  See Facts § B.  Defendants falsely state that the only evidence Plaintiff can present

supporting an inference of discrimination relates to the Post's published content.  (Def. Mem. at

15).  Nonetheless, the Post's published content was at all relevant times approved by Allan and

Ms. Guzman's other supervisors, including Mr. Robinowitz.  See Facts § B.  Therefore, a nexus

exists between management's harassing and discriminatory conduct, published material

approved by the managers and an inference of discrimination against Ms. Guzman based upon

her sex, race, color and national origin.

　　　The harassment and discrimination Plaintiff faced persisted for years, and therefore the

Cartoon was not "temporally remote" and could indeed show animus by Defendants a mere

seven months later.  There is no "bright line to define the outer limits beyond which a temporal

relationship is too attenuated" in this Circuit.  Espinal v. Goord, 558 F.3d 119, 129 (2d Cir.2009)

(quoting Gorman–Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554

(2d Cir.2001)).  Indeed, courts analyze "the permissible inferences that can be drawn from

temporal proximity in the context of particular cases." Espinal, 558 F.3d at 129–30.[16]

## B.  Evidence Reveals Factual Issues Regarding the "Legitimate, Non-Discriminatory" Reason for Firing Ms. Guzman

　　　As a threshold matter, Defendants attempt to heighten Ms. Guzman's burden under Title

VII, Section 1981 and the NYSHRL.  Defendants posit that Ms. Guzman must prove that

Defendant's legitimate, non-discriminatory reason for the elimination of her job is pretextual and

---

[16] The cases cited by Defendants on this point are inapposite. These decisions relate to discovery issues. Judge Ellis already rejected these arguments when they were appropriately raised, albeit in an attempt to manufacture a non-existent privilege, during discovery. See Guzman v. New York 877 F.Supp.2d 74, 77 (S.D.N.Y. 2012)(finding Allan's motivation in publishing the Cartoon relevant).  Furthermore, Defendants' arguments regarding First Amendment protected speech are a red herring.  (Def. Mem. at pp. 15-16 n.16). Where evidence of discrimination exists, an employer's professed views and attitudes may be used to demonstrate animus.  See, e.g., Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111 (2d Cir. 2007) (discriminatory remarks relevant to determining whether "decision-maker was motivated by assumptions or attitudes relating to the protected class").  Ms. Guzman is not "cherry-picking" content, but instead highlights content reviewed and approved by Defendant Allan which, combined with other evidence, demonstrates his discriminatory attitudes towards minorities.  However, even if the Court did not consider published content as probative on of animus, ample evidence documents such intent.

that "the real reason" for her termination "was discrimination." (Def. Mem. at 17)(emphasis added). That is not the applicable standard. Rather, Ms. Guzman need only show that her membership in a protected class was a motivating factor for her termination.[17]

Defendants' contentions that Ms. Guzman was terminated only because of the economic troubles of *Tempo* are thoroughly disputed. First, the decision to stop publishing *Tempo* altogether, rather than to curtail its publication (Ms. Guzman being the only employee assigned to *Tempo* at the time), was not made until after her termination. (Pear. Dec Ex. 24 at NYP 0488). Moreover, in 2009, the New York Post operated at an annual loss of nearly $70 million, of which the purported *Tempo* losses were a miniscule portion. (Pear. Dec Ex. 25 at SG 6963). It therefore strains credulity for Defendants to argue that *Tempo*'s marginal losses had any meaningful impact on the Post, especially since Ms. Guzman had non-*Tempo* duties.

Furthermore, Defendants' statements that no "suitable" position was available for Ms. Guzman itself illustrates the factually disputed nature of Defendant's assertion, since there was, in fact, an $82,000 editorial position available which Ms. Guzman could have filled.[18] (Def. Mem. p. 17). Defendants' conclusory statement that this was "deemed unworkable" is insufficient to eliminate any factual dispute when considering the retention of Ms. Conklin and Ms. Guzman's perspective, as she has said that she would have accepted such a position.

Therefore, Defendants' assertion that Plaintiff "can offer no evidence to rebut" their purported reasons for her termination (Def. Mem. p. 17 (emphasis added)) is patently false, and Defendants' motion regarding these claims should be denied.

---

[17] See Delville v. Firmenich, Inc., No. 08 Civ. 10891(JPO), 2013 WL 363391, at *10 n.8 (S.D.N.Y. Jan. 31, 2013)
[18] See Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219 (1994) (evidence that former employer refused to consider discharged employee for opening that involved similar duties as her previous position presented genuine issues of material fact precluding summary judgment for former employer).

### III.   ISSUES OF FACT AND SUBSTANTIAL EVIDENCE PRECLUDE
### SUMMARY JUDGMENT ON MS. GUZMAN'S RETALIATION CLAIMS

Under all applicable statutes, to prove a *prima facie* case of retaliation, a plaintiff must show: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003). An employer's retaliatory motivation violates Title VII "even if valid objective reasons for the discharge exist." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033 (2d. Cir. 1993). "The McDonnell Douglas burden shifting framework applies to claims of retaliation under Title VII, the NYSHRL, and the NYCHRL." Lennert-Gonzalez v. Delta Airlines, Inc., No. 11 Civ. 1459 (JMF), 2013 WL 754710 (S.D.N.Y. 2013). Plaintiff's claims regarding Defendants' retaliation for her February 2009 complaints of discrimination and harassment are well-supported.

Defendants primarily challenge Plaintiff's ability to establish a *prima facie* case of retaliation based upon the supposed lack of evidence of a causal connection between her termination and protected activity. (Def. Mem. p. 18). "The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or … directly through evidence of retaliatory animus." Sumner v. U.S. Postal Service, 899 F.2d 203 (2d Cir. 1990). Ms. Guzman's termination happened close in time to her protected activity, and pretext may be demonstrated by temporal proximity such as that present in the instant case. See Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45–46 (2d Cir. 1980) (eight-month period between EEOC complaint and retaliatory action permitted an inference of causal relationship). Furthermore, Defendants' retaliatory motive is demonstrated, *inter alia*, by Defendant Allan's and Mr. Robinowitz's disapproval of and displeasure regarding

19

Ms. Guzman's protests of and objections to the Cartoon, as well as the termination of other employees who objected to the Cartoon (Austin Fenner and Ikimulisa Livingston, the Plaintiffs in a related case, No. 09 CV 9832 (LBS)).

Management's treatment of Ms. Guzman worsened from the time of her February 2009 complaint until she was terminated, supporting causation and closer temporal proximity. After February 2009, Ms. Guzman's expenses for *Tempo* were scrutinized more closely, she was refused the opportunity to cover the investiture of Justice Sotomayor and had her performance rating retroactively lowered to "Meets Standards" by Col Allan. (Guz. at 569; Facts § D, supra).

It is well-established that"[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). Nevertheless, Defendants implausibly and futilely claim that they were not aware of Ms. Guzman's complaint, and cite only then-Post Publisher Paul Carlucci's self-serving testimony (Carl. at 129) [19] as support, despite Ms. Guzman's express complaint to the HR. Defendant Allan claims he was only aware of Ms. Guzman's objection to the Cartoon, rather than to the Company's discriminatory employment practices. (Allan at 68; Jehn at 246-48). Defendant Allan's selective recollection cannot be credited, and the extent of his knowledge and understanding of Ms. Guzman's protected complaint is at issue. In any event, Ms. Guzman need not demonstrate that individual decision-makers knew of her protected complaints to satisfy the second prong of this analysis. See Alston v. New York City Transit Authority, 14 F.Supp.2d 308 (S.D.N.Y. 1998) ("plaintiff need not show that individual decision-makers within the [Company] knew that she had …complain[ed]").

---

[19] True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 22, 2012 ("Carl. at [page]"), are attached to the Pear. Dec. as Exhibit 20.

Weeks before Ms. Guzman made her protected complaint to Ms. Jehn, Defendant Allan sent Mr. Robinowitz an email in January 2009 that showed there were no near-term plans to shut down *Tempo*. The evidence demonstrating discriminatory animus further supports a finding of pretext. See Summa v. Hofstra University, 708 F.3d 115 (2d Cir. 2013)("evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in the Title VII context are pretextual").[20]

## IV.   MS. GUZMAN HAS ALLEGED AND THE EVIDENCE SHOWS AN EXTREMELY HOSTILE WORK ENVIRONMENT AT THE COMPANY FOR WOMEN AND MINORITIES UNDER ALL APPLICABLE STATUTES

The record reveals unrelenting harassment suffered by Ms. Guzman and others which was so severe and pervasive, it changed how she viewed and could function at her job. Ms. Guzman found the Company's workplace to be hostile based upon her gender, race, color and national origin. "Intimidation, ridicule, and insult," the signifiers of a hostile workplace, were routine at the Company, with high-ranking members of management among some of the worst offenders. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Hostile work environments involve severe or pervasive "harassment … of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997). A plaintiff is not required to demonstrate that her work environment was "both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."

---

[20] Defendants' argument that Ms. Guzman's complaint regarding the Cartoon was non-protected is based upon their own assertion that Ms. Guzman's complaint did not relate to the Company's discriminatory employment practices. (Def. Mem. p. 19 n.22). Ms. Guzman flatly denies this and related in detail the scope of her February 2009 complaint. (Guz. at ; Guz. Aff. ¶ 10). Furthermore, Ms. Guzman's complaint, to the extent it related to the Cartoon, was about how it exemplified the Company's treatment and attitude towards African-Americans generally and the Company's own employees. In fact, Judge Barbara Jones already found that Ms. Guzman properly alleged that she "objected not just to the paper's content but to the general work environment at the Post and the way the editorial staff dealt with the publication of the content at issue." (Dkt. No. 34).

Redd v. N.Y.S. Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012).  Individual occurrences

underlying hostile work environment should not be viewed "in isolation" or "in piecemeal

fashion." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002).  A plaintiff need not

recall each specific example of harassing behavior in detail to survive summary judgment. See

Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 119-20 (2d Cir. 2010).  As

with employment discrimination cases generally, courts grant summary judgment in hostile work

environment cases "sparingly." Redd, 678 F.3d at 178.[21]

Defendants acknowledge that the threshold for establishing a hostile environment claim

under the NYCHRL is much lower than under the other statutes, as a plaintiff must show only

that "she has been treated less well than other employees because of her [protected class]."

Zambrano-Lamhaouhi v. N.Y. City Bd. of Educ., No. 08-CV-3140 (NGG)(RER), 2011 WL

5856409 at *9 (E.D.N.Y. Nov. 21, 2011) (citations omitted).  The record of noxious and

unlawful harassment in the instant case is extensive, and Defendants' motion for summary

judgment on these claims should be denied.

## A. Ms. Guzman Frequently Was Subjected To and Encountered Unlawful Harassment Based Upon Race, Color and National Origin

Defendants incorrectly argue that only those incidents of unlawful harassment occurring

within the relevant statute of limitations may serve as the basis for establishing a hostile work

environment.  All of Ms. Guzman's allegations and the incidents in the record must be taken into

account in determining whether the claims meet the relevant standards. See Petrosino v. Bell

Atl., 385 F.3d 210, 220 (2d Cir. 2004)("[I]in the case of a hostile work environment claim, the

statute of limitations requires that only one sexually harassing act demonstrating the challenged

---

[21] See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 75 (2d Cir.2001) ("The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact."); see also Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 605 (2d Cir. 2006) ("the line between boorish and inappropriate behavior and actionable sexual harassment ... is admittedly indistinct, [and] its haziness counsels against summary judgment").

work environment occur within 300 days of filing; once that is shown, a court and jury may

consider 'the entire time period of the hostile environment" in determining liability.'").[22]

Defendants strategically ignore many of the incidents showing that the Company's

workplace was permeated with harassment, and that high-ranking managers engaged in such

behavior.  The race (Hispanic-Latino), color (black) and national origin (Puerto Rican) of Ms.

Guzman and other Company employees were expressly ridiculed, insulted or stereotyped

knowingly and relentlessly.  None of these are "facially neutral incidents," but were comments

and other acts demonstrating bias and hostility against the minority groups to which Plaintiff

belongs.  Incidents in which Ms. Guzman was called "Cha Cha #1," spoken to in a mock

"Spanish accent" or asked about the dangerous proclivities of a famous Hispanic athlete all

overtly reference her race, ethnicity or national origin.

Defendants' characterization that Ms. Guzman's hostile environment claims rest upon

only "five incidents" is transparently false.  (Def. Mem. p. 22; Facts § B, supra).  The record

shows a pattern of demeaning racial remarks and conduct aimed at minorities, and particularly

African-Americans and Hispanics, by the Company's White senior management, which attacks

them and accuses them of stupidity, violence, oversensitivity and other and negative

stereotypical qualities.[23]

Ms. Guzman also testified that the drumbeat of unlawful racial harassment affected her

ability to do her job, making it much more difficult and driving her to complain informally to

various members of management.  (See, e.g., Guz. at 154, 162:11-15, 184:22-25, 187:6-8, 330:8-

---

[22] See also  Barounis v. New York City Police Dept., No. 10 Civ. 2631(SAS), 2012 WL 6194190 (S.D.N.Y. Dec. 12, 2012)("[B]ecause a hostile work environment claim is comprised of a series of separate acts that collectively constitute an unlawful employment practice, some of the component acts can fall outside the statutory time period.").

[23] The mere number of incidents has no bearing on the viability of a hostile work environment claim. See  Howley v. Town of Stratford, 217 F.3d 144 (2d Cir.2000)(reversing district court for granting summary judgment and failing to consider the totality of the circumstances where conduct alleged involved one public tirade).[23]

11, 341, 505:23-506:5, 412:17-18).  A plaintiff's job performance need not deteriorate due to

unlawful harassment for it to be sufficiently severe or pervasive to alter materially the terms and

conditions of her employment.  See Gallo v. Alitalia-Linee Aeree Italiane-Societa Per Azioni,

585 F. Supp.2d 520, 538 (S.D.N.Y 2008) (argument that plaintiff's "superior" job performance

rules out hostile environment "so silly as not to warrant a serious comment on it").

Ms. Guzman is not required to have complained about every instance of harassment she

experienced or learned of—this is a mischaracterization of the law and an attempt to set an

impossible bar for hostile environment claims.  Ms. Guzman complained many times to the

Post's management and administration, including Ms. Jehn, Mr. Goodstein, Mr. Ramirez, Ms.

Wilson, Ms. Brown, Mr. Armstrong and Ms. Barnett.  Facts § D.  Opposition to harassing

behavior "can be formal or informal, including complaints to managers or officers of an

employer."  In re Goldberg 487 B.R. 112, 125 (2013) (citing Sumner v. United States Postal

Serv., 899 F.2d 203, 209 (2d Cir.1990)).  A plaintiff's complaint, formal or informal, of

harassing behavior also can establish that she was subjectively offended.  Caban v. Richline

Group, Inc., No. 10 Civ. 559 (ALC), 2012 WL 2861377 (S.D.N.Y. 2012).  Defendant's

contention that Ms. Guzman could not have been offended due to her professional status or

personal habits bears no relevance to her subjective offense. See Watson v. E.S. Sutton, Inc. No.

02 Civ. 2739(KMW), 2005 WL 2170659, at *22 (S.D.N.Y. 2005) (photographer's website with

nude photographs "hardly relevant" to whether she could be subjectively offended by sexually

demeaning comment).[24] Ms. Guzman's complaints establish her subjective offense.

Ms. Guzman's "friendly" interactions with Mr. Riedel, which Ms. Guzman said were, in

fact, very uncomfortable for her (Guz. Aff. ¶ 13), do not bar her from finding his conduct

---

[24] Defendants make much of the fact that Ms. Guzman approved a headline that included "Cha-Cha Willie."
However, this headline simply reflected the subject of the story's nickname. (Guz. at 405: 14, 17)

extremely offensive and discriminatory. See George v. Liverpool Cent. School Dist. 2000 WL 1499342 (N.D.N.Y. Sept. 29, 2000) (denying summary judgment motion where former live-in boyfriend testified that plaintiff was not offended by harasser's behavior and that she had a "somewhat flirtatious relationship" with harasser). Rather than eliminate issues, Defendants have highlighted some of the points of contention that could be expected to be the focus at trial.[25]

Defendants' argument that Ms. Guzman has experienced no more than "petty slights and trivial inconveniencies" is completely untenable given the record. (Def. Mem. p. 23). Compared to Title VII and the NYSHRL, "claims under the [NYCHRL] must be given 'an independent liberal construction.'" Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (internal quotations omitted). Under the NYCHRL, a plaintiff need not establish "severe or pervasive" conduct to create an actionable hostile work environment, so long as the conduct is worse than "petty slights and trivial inconveniences." Adams v. City of New York, 837 F.Supp.2d 108, 128 (E.D.N.Y. 2011) (internal quotations and citations omitted).[26]

## B. Ms. Guzman Frequently Was Subjected To and Encountered Unlawful Sexual Harassment Based Upon Her Gender

As with Ms. Guzman's race-based claims, Defendants vastly understate the frequency and severity of the record of Ms. Guzman's gender-based claims. Defendant Allan, *inter alia*, has leveled abusive language at female employees in full view of their colleagues on multiple

---

[25] "The standard for maintaining a hostile work environment claim is lower under the NYCHRL; the NYCHRL was 'intended to be more protective than the state and federal counterpart.'" Stewart v. City of New York, 11 Civ. 6935 (CM), 2012 WL 2849799, at *13 (S.D.N.Y. July 10, 2012) (quoting Farrugia v. North Shore Univ. Hosp., 820 N.Y.S.2d 718, 724 (N.Y. Sup. Ct. 2006)). Under the NYCHRL, a plaintiff need not establish "severe or pervasive" conduct to create an actionable hostile work environment, so long as the conduct is worse than "petty slights and trivial inconveniences." See Adams v. City of New York, 837 F.Supp.2d 108, 128 (E.D.N.Y. 2011) (quoting Mihalik v. Credit Agricole Cheuvreux N. America, Inc., 09 Civ. 1251 (DAB), 2011 WL 3586060, at *9 (S.D.N.Y. July 29, 2011) (citing Williams v. New York City Housing Auth., 872 N.Y.S.2d 27, 31 (1st Dep't 2009))). This argument demonstrates Defendants' lack of understanding of the seriousness of the discriminatory conduct at issue in this case.

[26] "[Q]uestions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." Williams, 872 N.Y.S.2d at 38.

occasions, and approached an all-female group of employees to display a non-work-related nude picture of a male prominently displaying his penis, with the transparent intent to shock them. <u>See</u> Facts § B.  Courts have routinely recognized that the display of lewd photographs to an entire office, much less from a supervisor to a subordinate, can serve as a basis for a hostile work environment claim.  <u>See</u>, <u>e.g.</u>, <u>Tunis v. Corning Glass Works</u>, 698 F.Supp. 452 (S.D.N.Y.1988) (allowing hostile work environment claims to proceed past summary judgment where allegations included display of lewd photographs); <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210 (2d Cir. 2004)(commonly displayed offensive material can be particularly offensive to a group or individual.  Mr. Goodstein and Mr. Boyle's abuse of power for their sexual titillation is well documented, <u>see</u> Facts § B, and materially altered Ms. Guzman's employment.

Ms. Guzman's engagement in sexual humor with friends or in consensual sexual relationships has no bearing on whether she can maintain her claims.  Defendants egregiously twist and misrepresent her testimony to sensationalize her conduct.  For example, Defendants assert that Ms. Guzman "lift[ed] her shirt in a 'best nipples' competition with coworkers at a bar" (Def. Mem. p. 11), but, in fact, this interaction between Ms. Guzman and female friends did not occur in the common area of the bar, as Defendants strongly imply.  (Guz. 282, 285-86).  This fact does not preclude Ms. Guzman's claims or subjective offense.  <u>See</u> <u>George v. Liverpool Cent. School Dist.</u> 2000 WL 1499342 (N.D.N.Y. Sept. 29, 2000) (denying summary judgment motion where one coworker testified that plaintiff "told … explicit details of her sex life, made sexual advances … and frequently told jokes with sexual connotations" and another coworker testified that plaintiff "exposed her bra to him").  To argue that any woman who has engaged in conduct with sexual overtones is "fair game" for sexual harassment is itself offensive.  Similarly, Defendant Allan's unwelcome sexual story regarding Steve Dunleavy was not comparable to

Ms. Guzman use of the word "sexy" to compliment another female coworker or celebrity.  (Guz. at 467; Allan at 241-42).  Notably, Ms. Guzman's experience at the Company was also affected by the racially and sexually offensive incidents she learned of from coworkers, such as the harassment of Nicole Faux by Defendant Allan.  Guz. at 168-69.  This evidence is relevant in considering the workplace environment in its totality.[27]

## V.   PLAINTIFF MADE PROTECTED COMPLAINTS ABOUT THE COMPANY'S HOSTILE ENVIRONMENT AND DISCRIMINATION MULTIPLE TIMES

Defendants argue that Plaintiff's hostile work environment claims must be dismissed because the Post did not know, and should not reasonably have known, of the offending conduct.  (Def. Mem. at p. 27).   However, Plaintiff complained numerous times directly to Company management about the hostile work environment to which she was subjected and, therefore, the Company "knew or reasonably should have known about the harassment" and is vicariously liable for same.  Petrosino v. Bell Atl., 385 F.3d 210, 255 (2d Cir. 2004).

Plaintiff complained about a sexually and racially hostile work environment.[28]  Ms. Guzman complained of numerous and specific incidents to Ms. Jehn, Mr. Goodstein, Mr. Ramirez, Ms. Wilson, Ms. Brown, Mr. Armstrong and Ms. Barnett.  See Facts § C.  These

---

[27] See Leibovitz v. New York City Transit Authority, 252 F.3d 179, 190 (2d Cir. 2001)("[E]vidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination"); Cruz v. Coach Stores Inc.., 202 F.3d 560, 570 (2nd Cir. 2000) ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.").

[28] Defendants completely misrepresent the record by stating that Ms. Guzman never complained about racial harassment.  (Def. Mem. at p. 28 (citing Guz. at 151-153)).  Ms. Guzman testified that she complained to Ms. Jehn about "several sexist and racially discriminatory incidents."  (Guz. at 151:1-5).  Defendants also inaccurately state that "Ms. Guzman could not recall if she told Jehn about Riedel's singing [of 'I want to live in America']."  Def. Mem. at p. 28.  To the contrary, Ms. Guzman testified that she "believe[d] [she] mentioned that incident to [Ms. Jehn]."  (Guz. at 222-223).  Defendants also misrepresent that it is undisputed that Plaintiff did not complain about the "Santeria" comment.  Def. Br. at p. 28.  Ms. Guzman unequivocally testified that she did complain about this comment to "Rick [Ramirez], to Mitsy [Wilson] and several other people."  (Guz. at 231:2-6).  Ms. Wilson is the head of Defendant News Corp.'s Diversity Team, and Mr. Ramirez is a member of that team.  Id. 153:18-24; 156:20-21.  Ms. Guzman also complained to Mr. Ramirez and Ms. Wilson about Defendant Allan being a racist and that his behavior "kind of showed the whole newsroom was sexist and racist."  (Guz. at 157:21-24).

complaints were unquestionably sufficient to notify the Post of the hostile work environment to which Plaintiff was subjected.  Thus, the Company is vicariously liable for same regardless of whether the harassers were supervisors.  See Petrosino, 385 F.3d at 225 ("vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.").  These complaints also defeat Defendants' reliance on the Faragher-Ellerth defense because "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer . . . knew of the harassment but did nothing about it."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).

Defendants are only entitled to invoke Faragher-Ellerth if the undisputed evidence establishes: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998).  "The Second Circuit has recently noted that because the employer bears the burden of proving the Faragher-Ellerth defense, even summary judgment on this issue is cautioned against unless "'the evidence is so overwhelming that the jury could rationally reach no other result.'"  Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 382 (S.D.N.Y. 2006) (citing Fairbrother v. Morrison, 412 F.3d 39, 53 (2d Cir.2005).  Defendants cannot satisfy either prong of this burden.

First, the Post did not exercise reasonable care to prevent and correct harassment. Despite Ms. Guzman's numerous complaints, including complaints to management concerning Mr. Goodstein's sexual harassment as early as 2006, the Company took no action to prevent and correct the harassment to which Ms. Guzman was subjected. (Guz. at 185:2-5).  Defendants'

28

assertion that reasonable care is demonstrated "by showing the existence of an anti-harassment policy during the period of the plaintiff's employment . . . ." (Def. Mem. p. 28, quoting Ferraro v. Kellwood Co., 440 F.3d 96, 102 (2d Cir. 2006)) is disingenuous. The full quote from Ferraro is: "[a]n employer may demonstrate the exercise of reasonable care, required by the first element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive." Ferraro, 440 F.3d at 102. Because the Company was aware of the harassment and took no steps to prevent and correct it, the existence of a policy cannot possibly establish reasonable care here.

Second, the Company must show Ms. Guzman failed to use its complaint procedures. "[T]he burden of production shifts to the plaintiff to demonstrate [the] reason(s) … such procedures were not utilized. The employer may then rely on the absence or inadequacy of such … reasons in carrying its ultimate burden of persuasion." Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 251 (W.D.N.Y. 2011) (internal quotations and citations omitted). Defendants cannot establish that Plaintiff "completely failed" to utilize the Post's complaint procedures. As described above, Ms. Guzman did complain to HR and management about both race and sex discrimination. Defendants cite selectively to the Post's complaint procedures, which explicitly permit complaints to be made to "the Company," not just the HR or Legal Departments.[29] Thus, Plaintiff's complaints to Post management, made shortly after the harassment occurred, serve to defeat Defendants' attempted invocation of the Faragher-Ellerth defense.[30]

---

[29] Lerner Dec., Ex. 26 at NYP-69 ("[E]mployees who believe they have been subjected to unlawful workplace harassment or discrimination of any kind, should report the matter as soon as possible to the Company.").

[30] Defendants invoke the meritless Faragher-Ellerth defense to all of Plaintiff's hostile work environment claims without distinction. However, the Faragher-Ellerth doctrine is not a defense to liability under the NYCHRL. See e.g., Zakrzewska v. New School, 14 N.Y.3d 469 (2010) ("[T]he plain language of the NYCHRL precludes the Faragher-Ellerth defense."). Thus, even assuming, arguendo, that the Faragher-Ellerth defense was applicable to Plaintiff's Title VII and NYSHRL claims, the defense cannot be used to shield against Plaintiff's NYCHRL claims.

## VI.   DEFENDANT ALLAN MAY BE HELD INDIVIDUALLY LIABLE UNDER THE NYSHRL, NYCHRL AND SECTION 1981

Defendants argue Defendant Allan was not an aider or abettor under the NYSHRL, NYCHRL, or Section 1981 because "there has not been actionable discrimination, retaliation, or harassment. (Def. Mem. at 29).  However, Ms. Guzman has amply demonstrated the egregious and widespread harassment and retaliation inflicted upon her by Defendant Allan personally.  To impute individual liability, New York law merely requires that an individual participate in discriminatory conduct by "encouraging, condoning or approving" the harassing conduct. Durkin v. Verizon N.Y. 678 F. Supp. 2d 124, 136 (S.D.N.Y. 2007); see also N.Y. Exec. Law § 296(1). Similarly, Section 1981 requires that an individual defendant be "personally involved in the discrimination" for liability to attach.  Ifill v. United Parcel Service, No. 04 Civ. 5963(LTS), 2005 WL 736151, at *3 (S.D .N.Y. Mar. 29, 2005).  See also Cloke-Brown v. Bank of Tokyo-Mitsubishi UFJ Ltd., 2011 WL 666187 (S.D.N.Y. Feb. 9, 2011) ("negligent supervision" or a "failure to take action" enough for individual liability under Section 1981).

Here, Defendant Allan can be held liable as an aider or abettor under Section 1981, the NYSHRL and NYCHRL because, as one of the decision-makers in Ms. Guzman's termination and his role in responding to employee complaints concerning the Cartoon and related concerns, he aided and abetted the discrimination and retaliation of the other Defendants in the case, as well as the unlawful actions of other Company employees.[31]  Therefore, ample basis exists on which to find Defendant Allan individually liable under the applicable statutes.

---

[31] Defendant Allan may be held individually liable as an "employer" under the NYSHRL.  Patrowich v. Chem. Bank, 63 N.Y.2d 541, 542 (1984) (any individual who has "any power to do more than carry out the personnel decisions others" may be held personally liable).

## CONCLUSION

For the foregoing reasons, Plaintiff Sandra Guzman respectfully submits that the motion for summary judgment of Defendants NYP Holdings, Inc., d/b/a The New York Post, and Col Allan regarding the Amended Complaint be denied in its entirety.

Dated: May 24, 2013
    New York, New York            Respectfully submitted,

**THOMPSON WIGDOR LLP**

By: _____

      Douglas H. Wigdor
      Lawrence M. Pearson

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@thompsonwigdor.com
lpearson@thompsonwigdor.com

*Counsel for Plaintiff*

31