UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
SANDRA GUZMAN,                                            :
                                                         :
                                   Plaintiff,            :        No. 09 CV 9323 (LGS)
                  v.                                     :
                                                         :
NEWS CORPORATION, NYP HOLDINGS,                           :
INC., d/b/a THE NEW YORK POST,                            :
and COL ALLAN, in his official and individual            :
capacities,                                              :
                                                         :
                                   Defendants.           :
------------------------------------------------------------ X

## PLAINTIFFS' RULE 56.1 COUNTERSTATEMENT

Pursuant to Local Civil Rule 56.1(b) and in response to Defendants' Rule 56.1 Statement

annexed to the Motion for Summary Judgment by Defendants NYP Holdings, Inc., d/b/a the

New York Post (the "Post") and Col Allan ("Defendant Allan") (together, "Defendants"),

Plaintiff Sandra Guzman, by and through undersigned counsel, Thompson Wigdor LLP,

respectfully submits the following statement of material facts in dispute, which demonstrates that

there are genuine issues of material facts to be tried:

### I.   Guzman's Employment and Subsequent Termination

1.     Plaintiff began her employment with the Post in July 2003 as an Associate Editor,

when she was hired to "plan . . . a regular [newspaper] section aimed at [the Latino]

community." (Lern. Dec., Exh. 1.)[1]

**Response**

Admit[2] that Plaintiff began her employment with the Post in July 2003 as an Associate

Editor pursuant to an employment contract.  Dispute that the sole reason for Plaintiff's hire was

---

[1]Submitted herewith in support of the motion is the declaration of Mark W. Lerner, dated May 10, 2013 ("Lern. Dec."), to which exhibits referenced herein, unless otherwise specified, are attached.

to "plan . . . a regular [newspaper] section aimed at [the Latino] community." The relevant

employment contract (from which Defendants selectively quote) states, *inter alia*:

> Duties.   As Associate Editor, you shall perform all duties
> consistent with your position and such other duties as may be
> assigned to you from time to time in the Editor-In-Chief's and
> Managing Editors' respective discretion.  Such duties shall include,
> among others, that you will serve as a member of the Post's
> Editorial Executive Management Team, you will attend daily news
> conferences and contribute to the ideas and discussion process
> concerning the news of the day.

(Lern. Dec., Exh. 1).  Moreover, the language of Plaintiff's 2003 employment contract is not

material, as this employment contract was inoperative after July 2005.  (Lern. Dec., Exh. 1).  In

addition to her work on *Tempo* (the single "[newspaper] section" referenced in Plaintiff's

employment contract), Plaintiff's responsibilities included, but were not limited to, all editorial

content and production of 25 special sections per year.  (Pear. Dec., Ex. 7, Rob. at 62:25, 63:1-7;

Pear. Dec. Ex. 8 at SG 0079).  Her duties and responsibilities also included reporting, migrating

content to the web, updating the blog she created, and editing around a dozen different special

sections in addition to *Tempo*.  (Pear. Dec. Ex. 9 at SG 1062, Ex. 6 at NYP 0301; Ex. 7, Rob.

63:13).  Dispute any inference that Ms. Guzman was not also hired by Defendant News

Corporation.

      2.     That newspaper section, what would be called Tempo, was to be published on a

monthly basis and was expected to generate a profit (or "operating income") based on revenue

generated from the sale of advertising into it.  (Racano Aff. at ¶ 9.)[3]  The number of total pages

and pages of editorial content per issue was to be driven by the amount of advertising sold.  (Id.)

---

[2]  All statements admitted herein are admitted without prejudice and solely for the purpose of responding to Defendant's Statement of Undisputed Material Facts pursuant to rule 56.1 of the Local Civil Rules of the U.S. District Court for the Southern District of New York and responding to Defendant's motion for summary judgment.

[3]  The affidavit of Michael Racano, dated May 8, 2013, submitted in support of Defendants' motion for summary judgment, is herein designated "Racano Aff."

**Response**

Dispute.  The Post lost $70 million in 2009 and $30 million in 2005. (Pear. Dec. Ex. 25).
The conclusory post-hoc assertion that *Tempo* was expected to generate a profit despite the
overall performance of the Post is implausible.

3.     *Tempo* was first published in October 2003.  (Id. at ¶ 9.)

**Response**

Admit.

4.     In 2003, *Tempo's* per issue length, revenue and operating income averaged as
follows:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 25.3 | 16 | 9.3 | $111,529.33 | $42,071.33 |

(Id. at ¶ 10.)

**Response**

Admit.

5.     In 2004, *Tempo's* overall size increased but it's operating income decreased:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 30.7 | 18.1 | 13.6 | $111,978.67 | $22,468.25 |

(Id. at ¶ 10.)

**Response**

Admit, but dispute any inference that the decrease in *Tempo's* operating income in 2004
played any role in the decision to terminate Plaintiff in late 2009.

6.     In 2003 and 2004, *Tempo* regularly ran between 28 and 40 total pages per issue.

(Id., Exh. 1 at NYP-1298.)

3

**Response**

Admit that *Tempo* ran between 28 and 40 total pages per issue in 2004. Dispute that *Tempo* ran between 28 and 40 total pages per issue in 2003. In 2003, *Tempo* was published on three occasions. (Racano Aff., Exh. 1 at NYP-1298). On two of these three occasions, *Tempo* ran 24 pages. Id. On the third occasion, *Tempo* ran 28 pages. Id.

7.    In 2005, *Tempo's* length, advertising, and revenue all fell, and it operated at a loss throughout the year, with the following average results per issue:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 24 | 14.25 | 9.75 | $68,147.42 | ($24,631.75)[4] |

(Id. at ¶ 10.)

**Response**

Dispute the average results. During parts of 2005, the Post published weekly *Tempo* publications that are not included in the analysis presented by Defendants. (Racano Aff., ¶ 10, n. 3; id. Exh. 1 at NYP-1299). When the weekly *Tempo* publications are included in the analysis, the average operating income improves from ($24,631.75) to ($17,925.50). (Id.). Plaintiff further avers that despite the negative average operating income per publication from January to November 2005, *Tempo* was not shut down. (Id. at ¶ 10). To the contrary, the Post began publishing *Tempo* with increased frequency (once per week as opposed to once per month). (Id., Exh. 1 at NYP-1299-1300).

8.    In 2005, 11 out of the 12 issues of *Tempo* posted negative operating income. (Id., Exh. 1 at NYP-1299.)

---

[4] Negative operating income is designated with parentheses.

**Response**

Dispute.  During parts of 2005, the Post published weekly *Tempo* publications that are not included in the analysis presented by Defendants.  (Racano Aff., ¶10, n. 3, Exh. 1 at NYP-1299).  Therefore, there were actually 18 issues of *Tempo* published in 2005.  (Id.)  Moreover, despite the negative average operating income per publication from January to November 2005, *Tempo* was not shut down.  (Id., ¶10, Exh. 1 at NYP-1299).  To the contrary, the Post began publishing *Tempo* with increased frequency (once per week as opposed to once per month).  (Id., Exh. 1 at NYP-1299-1300).

9.      The Post also published a weekly, single page edition of *Tempo* that typically did not have any advertising and always lost money.  (See, e.g., id. at NYP-1299.)

**Response**

Admit assuming Defendants are referring to the single-page editions of *Tempo* that were published in 2005 on November 16, 23 and 30 and December 7, 21 and 28, and in 2006 on January 4, 18 and 25, February 1, 15 and 22 and March 1.  (Racano Aff., Exh. 1 at NYP-1299-1300).  However, the Post continued to publish *Tempo* for more than three years after these single-page editions (Racano Aff., ¶ 10), and therefore Plaintiff disputes any inference that the referenced lack of advertising and/or losses played any role in the decision to close *Tempo*.

10.      *Tempo* remained unprofitable into early 2006, and lost money in four of its first five issues for that year.  (Id. at NYP-1303.)

**Response**

Admit assuming Defendants are referring to the issues of *Tempo* that were published on January 11, February 8, March 8, April 12 and May 10, 2006.  (Racano Aff., Exh. 1 at NYP-1303).  However, the Post continued to publish *Tempo* for more than three years after the

referenced issues (Racano Aff. at ¶ 10), and therefore Plaintiff disputes any inference that the referenced lack of advertising and/or losses played any role in the decision to close *Tempo*. Plaintiff further avers that while the total loss during the referenced five-month period was ($29,600.00), this is a completely disingenuous citation because the total operating gain in the next month, June 2006, was $100,471.00. (<u>Id.</u>, Ex. 1 at NYP-1303).

11.     Because *Tempo* was losing money, on or about April 17, 2006, Paul Carlucci, then the Post's Publisher, made the decision to cancel *Tempo*. (<u>Id.</u>, at NYP-462-63, NYP-472-73.) Carlucci's decision to close Tempo was accompanied by the decision to lay off Tempo's dedicated staff, including Guzman. (<u>Id.</u> at ¶¶11-12.)

**<u>Response</u>**

Dispute. The sole authority cited for the proposition that Mr. Carlucci, then the Post's Publisher, made the decision to cancel *Tempo* in 2006 and lay off Ms. Guzman are the purported minutes of a New York Post Executive Committee. (Racano Aff. at ¶ 11; Ex. 2 at NYP-462-63). However, when presented with these minutes during his deposition, Mr. Carlucci testified that he had no recollection as to whether a decision was made to close *Tempo* or lay off Ms. Guzman in 2006. (Pear. Dec., Ex. 26, Carl. at 197:8-16; 232:14-21; 234:5-22; 249:2-5). Mr. Carlucci also testified that: (i) the New York Post Executive Committee as a whole, and not he individually, had the authority to cancel *Tempo* (<u>Id.</u> at 200:23-201:25); and (ii) he did not have the authority to terminate the employment of an editor (<u>Id.</u> at 19:13-15).

12.     However, before the Post implemented this decision, Les Goodstein, an employee of a Post affiliated company who attended these meetings because he was responsible for running certain community newspapers, suggested keeping *Tempo* as a monthly, but with implementing certain cost-saving and sales initiatives. (<u>Id.</u> at ¶11-12, Exh. 3 at NYP-445-46)

Carlucci adopted this suggestion and reversed his decision to close Tempo and lay off Guzman.

(Id.)

**Response**

Dispute any inference that Mr. Goodstein is not an employee of Defendant News

Corporation (see 56.1 Counterstatement concerning Defendant News Corporation's

contemporaneously made Motion for Summary Judgment). Further dispute any inference that

Mr. Goodstein was the sole individual in support of continuing to publish *Tempo*. (Pear. Dec.,

Ex. 1, Guz. at 182:4-13). Dispute that Mr. Carlucci reversed "his decision to close *Tempo* and

lay off Guzman" for the reasons cited in response to paragraph 11. Dispute that the sole reason

Mr. Goodstein attended New York Post Executive Committee meetings was "because he was

responsible for running certain community newspapers." Further state that the authority cited by

Defendants does not address the reasons Mr. Goodstein attended the Executive Committee

meetings. (Racano Aff. at ¶11-12, Exh. 3 at NYP-445-46). Admit that certain cost-savings and

sales initiatives were implemented.

13.     Thereafter, the Post took steps to increase *Tempo's* profitability, including, among

other things, increasing the ratio of advertising to editorial content (id. at ¶ 20), cutting *Tempo's*

staff, from six to two full-time employees, Guzman and Sami Haiman-Marrero (id.), and

increasing revenue, including by permitting the Post's sales staff to offer promotional sales not

typically offered by the Post, such as a free twelfth ad if an advertiser purchased ads in eleven

issues of *Tempo*. (Id. at ¶ 20.)

**Response**

Admit.

14.     As a result, for calendar year 2006, *Tempo's* overall size decreased, but its operating income improved, with the following average results per issue:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 17.67 | 9.33 | 8.33 | $77,257.33 | $14,107.75 |

(Id. at ¶ 15.)

**Response**

Admit the accuracy of the numbers presented insofar as they include only the monthly issues of *Tempo*, but dispute that the improved operating income was the result of the measures referenced in paragraph 13.  These measures were purportedly introduced subsequent to June 12, 2006.  (Racano Aff., Exh. 2 at NYP-446).  From January 2006 to June 2006 (the June edition of *Tempo* was published on June 7, 2006) the average operating income of the monthly issues of *Tempo* was $85,497.67.  (Racano Aff., Exh. 1 at NYP-1303).  From July 2006 to December 2006 the average operating income of the monthly issues of *Tempo* was only $69,017.00.  (Id. at NYP-790).

15.     In 2007, *Tempo's* overall size continued to shrink while its average revenue per issue remained stagnant:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 15.8 | 8.1 | 7.8 | $77,638.25 | $28,206.67 |

(Racano Aff. at ¶¶ 10, 16.)

**Response**

Admit, but further state that the average operating income of *Tempo* nearly doubled in 2007.  (Racano Aff. at ¶¶ 10, 16).

16.     Because of the decrease in the number of *Tempo's* editorial pages, Guzman was editing few pages per month; as a result, her editors gave her "additional work to support her salary." (Id.., Exh. 2 at NYP-437-38.)

**Response**

Dispute.  Exhibit 2 to the Racano Aff., which is cited in support of paragraph 16, does not include NYP-437-38.  Moreover, Ms. Guzman was given additional work, including a large volume of special sections after a performance evaluation meeting with Joe Robinowitz, her supervisor at the time, during which he told her that she was doing a great job and that they could use her help on more special sections.  (Guzman Aff. at ¶ 5).  Mr. Robinowitz also said that Ms. Guzman's special sections were very good, she had a knack for knowing what the readers want, and that she was meticulous and did good work.  (Id.).  At that time, she was already producing the Black History Month special section and two other special sections in addition to *Tempo*.  (Id.).  Thus, Ms. Guzman was given the additional work because of her excellent performance.

17.     As a result, in early 2007 a limited number of special sections – periodic topical newspaper inserts – were temporarily reassigned to Guzman, then earning $137,807 per year, from Carole Sovocool, the Post's Special Sections editor who earned $80,850 per year.  (Id., Exhs. 3, 4; Robin. at 282; Sovo. Aff. at ¶¶ 4-6.)[5]

**Response**

Dispute.  See response to paragraph 16.  Moreover, not all of the special sections assigned to Guzman were assigned *from* Ms. Sovocool.  (See Guz. Aff. at ¶ 5) (Mr. Robinowitz stated that "the special sections would be divided between me and Carole Sovocool.  At that time, [Ms. Guzman] was already producing the Black History Month special section and two

---

[5] True and correct copies of referenced excerpts of the deposition of Joseph Robinowitz, dated June 14, 2012 ("Robin. at [page]"), are attached to the Lern. Dec. as Exhibit 2.  The affidavit of Carole Sovocool, dated May 6, 2013, submitted in support of Defendants' motion for summary judgment, is herein designated "Sovo. Aff."

other special sections in addition to *Tempo*.").  Further dispute any inference that the Ms.

Sovocool's work on any given special section would be comparable to Ms. Guzman's.  (See

Guz. Aff. at 6) (" researched the stories that appeared in my special sections and would take

more care in developing content and assigning stories, whereas Ms. Sovocool would generally

seek story ideas from event or organization representatives or recycle press releases.  Therefore, I

believe that the special sections I produced were of high quality and markedly better than those

generally produced by Ms. Sovocool.").

18.    Guzman first started working on sections other than *Tempo* in 2007.  (Guz. at

360-61.)

**Response**

Dispute.  Ms. Guzman clearly testified that prior to 2007 and in addition to *Tempo* she,

*inter alia*, "contributed to other parts of the paper.  I wrote stories that appeared in the features

section in the news section, and I helped research stories.  I covered stories." (Pear. Dec., Ex. 1,

Guz. at 362:12-16).

19.    In October 2007, Guzman wrote an e-mail to Haiman-Marrero asking if she was

attending a symposium called, "Is Hispanic Advertising Dead?"  Haiman-Marrero replied,

"Nope.  It's a waste of time and money.  Hispanic agencies are on the brink of extinction."

(Lern. Dec., Exh. 7.)

**Response**

Admit the contents of the document, but dispute any legal or factual significance.

20.    For calendar year 2008, *Tempo's* average pages, editorial and advertising content,

its revenue, and its operating income all decreased from 2007, with average operating income at

approximately 50% of what it had been in 2007:

10

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 13.3 | 6.9 | 6.4 | $61,006.33 | $14,226.08 |

(Racano Aff. at ¶¶ 10-13.)

**Response**

Admit, but further note that *Tempo* had an operating income of $345,213 for fiscal year 2008. (Racano Aff. at Ex. 1 at NYP-1306).

21.     In January 2008, Guzman acknowledged *Tempo's* length dropping to 10 pages because of low ad revenue: "I'm over it, going down to 10 pages that is." (Lern. Dec., Exh. 3.)

**Response**

Admit, but dispute any legal or factual significance and further state that *Tempo* was profitable in 2006, 2007, 2008, fiscal year 2009 and the first half of 2009. (Racano Aff., Ex. 1).

22.     In February and April 2008, *Tempo* ran as 8-page sections (Racano Aff., Exh. 1 at NYP-1305-06), which Guzman considered to be "tiny one[s]." (Lern. Dec., Exh. 4.)

**Response**

Admit, but dispute any legal or factual significance.

23.     In May 2008, *Tempo* struggled to sell advertising for the June issue, and Guzman wrote to Haiman-Marrero, "I'm looking at last year's issue . . . And you were able to get so many gorgeous ads." (Id., Exh. 5.) Paul Armstrong, a Post executive in its Sales Department, responded, "I understand your disappointment . . . . The economy is tanking and we are down against last year in all sectors." (Id.)

**Response**

Admit, but dispute any legal or factual significance.

11

24.     In June 2008, Guzman wrote to Haiman-Marrero regarding *Tempo's* difficulty selling advertising, "I'm sorry Sami.  I feel your pain.  But the economy really is in the dumps – and you know when the general market sneezes, the ethnic market gets the flu."  (Id., Exh. 6.)

**Response**

Admit the contents of the document, but note that *Tempo* made a $30,000 profit for Defendants in June 2008 (Lern. Aff. at Ex. 6; Racano Aff. at Ex. 1 at NYP-4670), and was profitable to the tune of $170,000 in calendar year 2008 (Racano Aff. at ¶ 10) and made a $345,000 profit in fiscal year 2008.  (Racano Aff. at Ex. 1 at NYP-1306).

25.     On June 25, 2008, the Post eliminated Haiman-Marrero's position to reduce costs, which left Guzman as the only employee dedicated to *Tempo*, and responsibility for the sale of advertising into *Tempo* was transitioned to the Post's Sales Department.  (Racano Aff. at ¶ 13.)

**Response**

Admit that Haiman-Marrer's position was eliminated, but deny knowledge as to why and dispute any legal or factual significance.

26.     During calendar year 2009, *Tempo* again saw across-the-board decreases in each of its average pages, editorial and advertising content, revenue, and operating income to such an extent that *Tempo* averaged monthly losses:

| Avg. Pages | Avg. Edit. Pages | Avg. Adv. Pages | Avg. Total Revenue | Avg. Operating Income |
|---|---|---|---|---|
| 4.9 | 2.1 | 2.9 | $20,479.67 | ($3,776.33) |

(Id. at ¶ 10.)

**Response**

Admit, but note that *Tempo* was profitable over the first half of calendar year 2009, yet only three editions of *Tempo* were published after June, 2009.  (Racano Aff. Ex. 1 at NYP-818).

Also note that *Tempo* was profitable to the tune of $107,000.00 in fiscal year 2009.  (Id. at NYP-1307).

27.     On January 19, 2009, Allan directed Managing Editor Joseph Robinowitz to "closely examine all costs associated with [*Tempo*] and other sections . . . with a view to eradicating all but the most essential costs as we continue to battle this miserable economic climate." (Lern. Dec., Exh. 8.)

**Response**

Admit.  This e-mail demonstrates that there was no plan to eliminate *Tempo* and terminate Ms. Guzman as of January 19, 2009, mere weeks before she engaged in protected activity.  To the contrary, the full text of the e-mail demonstrates that Defendants'' management wanted to continue to publish *Tempo* despite the declining financial condition:

> joe [sic], given the current size of tempo the question is whether we should be spending anything on styling. In fact I believe you should closely examine all costs associated with [*Tempo*] and other sections . . . with a view to eradicating all but the most essential costs as we continue to battle this miserable economic climate.

(Lern. Dec., Ex. 8.).  Thus, prior to Ms. Guzman's protected complaints, the "question" was not whether *Tempo* should be shut down or Ms. Guzman terminated.

28.     In February 2009, the Post reduced the frequency of its section, *Page Six the Magazine*, from weekly to approximately quarterly (Scial. at 281) and terminated almost all of its 37 dedicated employees.  (Lerner Dec., Exh. 29, at NYP-862.)  Its editor, Margi Conklin, was retained because (i) she had a contract for a guaranteed term; (ii) there was an open position at

her compensation level for which she was qualified; and (iii) *Page Six* continued as a publication with Conklin as editor.  (Id. at NYP-781; Scial. at 281; Allan at 398-99.)[6]

**Response**

NYP-862 and 781 are not contained in Lern. Dec., Ex. 29.  Admit that the Post reduced the frequency of its *Page Six the Magazine* section and terminated many of its employees.  However, many of these employees were later rehired.  (Lern. Dec. Ex. 27 at NYP-862).  Admit that Ms. Conklin had an employment contract, but dispute that the contract was the reason she was not terminated.  In fact, that contract expired in July 2009.  (Lern. Dec., Ex. 27).  Ms. Conklin was retained by Defendants beyond July 2009, vitiating any claim that her employment contract was relevant to the decision to retain her.  (Guz. Aff. at ¶ 22).  Dispute that there was an "open position" at Ms. Conklin's level.  Instead, Defendants' created a new position for her that had never before existed.  (Guzman Aff. at ¶ 22; Pear. Dec., Ex. 1, Guz. at 593).  Dispute that NYP-781 and Allan at 398-99 make any reference as to whether Ms. Conklin continued to edit *Page Six*, and these citations therefore are insufficient to establish a "fact."

29.    The July through September 2009 issues of *Tempo* were 3, 2, and 5 pages in length, and lost $13,688, $13,747 and $2,339, respectively.  (Racano Aff., Exh. 1 at NYP-1308.)

**Response**

Admit, but note that *Tempo* was profitable over the first half of calendar year 2009. (Racano Aff. Ex. 1 at NYP-818).  Also note that *Tempo* was profitable to the tune of $107,000.00 in fiscal year 2009.  (Id. at NYP1307).

---

[6] True and correct copies of referenced excerpts of the deposition of Amy Scialdone, dated June 28, 2012 and April 16, 2013 ("Scial. at [page]"), are attached to the Lern. Dec. as Exhibit 11.

30.     While in 2007, *Tempo* had generated average revenue per issue of $77,638.25, with an average profit of $28,206.67, in 2009 it generated only average revenue of $20,479.67 – a decline of 74% – and a monthly loss of $3,766.33.  (Id. at ¶ 10.)

**Response**

Admit, but note that *Tempo* was profitable over the first half of calendar year 2009, and it was only a three-month period that drove the referenced losses and therefore dispute and factual implications regarding the discontinuation of *Tempo*.  (Racano Aff. Ex. 1 at NYP-818).  Also note that *Tempo* was profitable to the tune of $107,000.00 in fiscal year 2009.  (Id. at NYP1307). Further note that *Tempo* had a monthly loss of $24,631.75 in 2005 – a period of a year as opposed to three months – and was not cancelled.  (Racano Aff. at ¶ 10).

31.     *Tempo's* average revenue and operating income per issue declined from 2006 through 2009 as follows:



(Id. at ¶ 13)

**Response**

Admit, but Defendants disingenuously fail to include 2005 in the chart in an attempt to mislead the Court into believing that *Tempo* was not unprofitable prior to 2009.  Indeed, *Tempo*

had a monthly loss of ($24,631.75) in 2005, prior to Ms. Guzman's engagement in protected activity, and was not canceled.  (Racano Aff. at ¶ 10).

32.     On August 17, 2009, the Post's Publisher, Paul Carlucci, proposed to its Executive Committee that *Tempo* be closed as a monthly section.  (Id., Exh. 2 at NYP-489-91.)

**Response**

NYP-491 is not included in Racano Aff., Ex. 2.  Admit for the purposes of this motion, but further note that a complete closure of *Tempo* was not contemplated.  To the contrary, "Paul recommended transitioning the frequency from monthly to two or three times per year." (Racano Aff., Ex. 2 at NYP-490).

33.     On September 8, 2009, following news that the "September issue . . . will also not make a profit," a decision was made to close *Tempo* as a monthly and eliminate the *Tempo* editor position that was held by Guzman.  (Id. at NYP-4619-20; Jehn at 234.)[7]

**Response**

Admit for the purposes of this motion, but further note that a complete closure of *Tempo* was not contemplated.  To the contrary, "The recommendation [was] to reduce the frequency of the *Tempo* product to quarterly."  (Racano Aff., Ex. 2 at NYP-490).

34.     The October issue of *Tempo* sold no advertising and was not published.  (Racano Aff. at ¶ 14; Lern. Dec., Ex. 10.)  *Tempo* was never published again after its September 2009 issue.  (Scial. at 375-76.)

---

[7] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn, dated June 26, 2012 and February 14, 2013 ("Jehn at [page]"), are attached to the Lern. Dec. as Exhibit 9.

**Response**

Admit, but note that the decision not to publish *Tempo* after September 2009 could not have been the reason for Ms. Guzman's termination because the termination had already taken place.  (Racano Aff., Ex. 2 at NYP-490); Pear. Dec., Ex. 19, Jehn at 16:16-19 [Day 2]).

35.     Following the elimination of the *Tempo* editor position, the sections that had been temporarily reassigned to Guzmen from Sovocool were returned to Sovocool.  (See Sovo. Aff. at ¶ 8; Robin. at 91-92.)

**Response**

Admit, but refers to response to paragraph 17 concerning Defendants' disputed characterization that certain sections were assigned *from* Sovocool.

36.     These sections represented a small portion of Sovocool's workload, and she reabsorbed them without any effect to her performance.  (Sovo. Aff. at ¶¶ 4-6, 8).

**Response**

Dispute.  Contrary to the representations of Ms. Sovocool that Ms. Guzman's work on other special sections was light and little or no editing was required, Ms. Guzman invested more time in developing these sections, editing their content and ensuring the quality of their content (and therefore increasing their chances of success) than Ms. Sovocool typically did, in addition to her many other duties.  (Sovo. Aff. ¶ 5; Guz. Aff. ¶¶4-8).  Plaintiff further refers to her response to paragraph 17.

37.     Some of the non-*Tempo* sections Guzman edited are no longer published by the Post.  (Id. at ¶ 9.)

**Response**

Admit for the purposes of this motion, but dispute any legal or factual significance.

17

38.     When her position was eliminated, Guzman earned a salary of $137,807 per year. (Racano Aff., Exh. 4.)  Sovocool earned a salary of $80,850 at this time.  (Id., Exh. 3.)

**Response**

Admit for the purposes of this motion.

39.     After the *Tempo* editor position was eliminated, Allan "asked three editors if there was a position . . . anywhere at the paper that Ms. Guzman might fill at her compensation." (Allan at 397.)[8]

**Response**

Admit for the purposes of this motion, but dispute any legal of factual significance, as well as the characterization that Ms. Guzman's position was "eliminated."

40.     The sole editorial position open was a junior Associate Editor position on the Post's hard-news Metro Desk, a very different position from the *Tempo* editor position that paid $82,000 per year, or over 40% less, than Guzman's salary.  (Allan at 398; Racano Aff., Exh. 5.)

**Response**

Admit that an Associate Editor position was open at a salary of $82,000 per year at the time Ms. Guzman was terminated.  Deny that the position was "very different" from Ms. Guzman's position, as she was also an "associate editor."

41.     Allan did not offer Guzman the position because:

> Her compensation was $135,000 [*sic*] a year, this job is open at $82,000 a year. . . .  It is my view that an employee who had been forced to take a very large pay cut in the order of $55,000 or $50,000 would not be a happy employee. . . .  I made that decision in the interest of the newspaper.  I didn't believe it was appropriate or right to offer her a job that would have caused her such a significant pay cut.

---

[8] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Lern. Dec. as Exhibit 12.

(Allan at 398-99.)

**Response**

Dispute. Ms. Guzman's pay was effectively cut by $137,801 upon her termination, and she would have preferred a pay cut to termination. (Pear. Dec., Ex. 1, Guz. at 209). Mr. Allan's fabricated excuse is also disputed by Ms. Jehn, who testified that she was told that "no options" existed for a transfer of Ms. Guzman. (Pear. Dec., Ex. 19, Jehn at 12 [Day 2]). Defendants cannot get their story straight as to why Ms. Guzman was not retained, which evidences their lame attempts at justifying a patently discriminatory and retaliatory termination.

42.      On September 29, 2009, Guzman was notified that her employment would be terminated as of that date because of the closure of *Tempo* and the lack of an appropriate alternative position. (Scial. at 287.)

**Response**

Dispute. Ms. Guzman was told at the time of her termination that the decision was made because of "advertising issues" and *Tempo*. (Pear. Dec., Ex. 1, Guz. 587-89). Nothing was mentioned concerning the "lack of an appropriate alternative position." (Id.).

**II.      Facts Relating to Guzman's Claim of Retaliation**

43.      On February 18, 2009, the Post published a political cartoon depicting a chimpanzee having been shot by two police officers, one of whom remarks, "They'll have to find someone else to write the next Stimulus Bill." (The "Stimulus Cartoon.") (AC, Exh. A.)

**Response**

Admit.

19

44.     The Stimulus Cartoon makes reference to a famous chimpanzee attack which had occurred earlier that week in Connecticut.  (Lern. Dec., Exh. 14.)

**Response**

Disputed.  The Cartoon makes reference to President Barack Obama, and the President is depicted as a chimpanzee being shot by two police officers.  (Pear. Dec., Ex. 29).  The day prior to the publication of the Cartoon, President Barack Obama signed the Stimulus Bill into law. The Cartoon makes specific reference to this, as one of the police officers remarks:  "They'll have to find someone else to write the next Stimulus Bill."  (Id.).  A picture of President Obama signing the stimulus bill was published on a page of the Past adjacent to the Cartoon.

45.     Guzman first saw the cartoon in the *New York Post* newspaper following its publication.  (AC ¶ 87.)

**Response**

Admit.

46.     Allan, the Post's Australian Editor-in-Chief who selected the cartoon for publication, believed the chimpanzee symbolized the Congressional authors of the stimulus bill, as the cartoon made explicit reference to the *writers* of the bill.  (Allan at 44, 350-51.)

**Response**

Dispute.  See response to paragraph 44.

47.     On the day that the cartoon was published, Guzman spoke to Jennifer Jehn, the head of the Post's human resources about the cartoon, and complained that she believed the cartoon to be racist.  (Jehn at 191-99.)  This was the first and only complaint that she made to the Post's human resources department, and she never made any complaint to counsel for the Post, as required by the Post's anti-harassment policy.  (Guz. at 166-67).

**Response**

Dispute.  Defendants mischaracterize the extent of Ms. Guzman's complaints to Ms.

Jehn, as they were not limited to the Cartoon.  In fact, Ms. Guzman expressly testified that she

complained to Ms. Jehn about "several sexist and racially discriminatory incidents."  (Pear. Dec.,

Ex. 1, Guz.. at 151:1-5).  At that time, "[Ms. Guzman] reported to Ms. Jehn many examples and

incidents of harassment and discrimination that [she] had witnessed and which were reported to

[her] by other Company employees.  Among the examples of harassment and discrimination that

[she] related to Ms. Jehn were:  Mr. Goodstein's regular sexual harassment of [her] and other

female employees, Defendant Allan's sexual harassment and racially demeaning conduct

(including in executive committee meetings, in which he sometimes showed up drunk, discussed

the strippers at a strip club called "Scores," and made various racist and sexist remarks, including

a joke at Pucci Meyer's expense that "You can't teach an old bitch new tricks"), David Boyle

calling his female subordinates his "harem," supervisors sleeping with interns while promising

them jobs (and one male employee telling a young intern, "I will give you a permanent job if you

give me a blow job"), and other highly disturbing and discriminatory conduct.  [Ms. Guzman]

also told Ms. Jehn that [she] generally found the work environment at the Company to be

offensive, sexist, racist and homophobic.  Ms. Jehn asked what [she] would recommend that the

Company do about the situation.  [Ms. Guzman] recommended that at the very least the

Company should conduct sensitivity and diversity training for the entire staff, including

management, to make it clear that it is not only unacceptable but illegal to behave the way many

executives, managers and employees were behaving."  (Guzman Aff. at ¶ 10).

Moreover, prior to her complaints to Ms. Jehn, Ms. Guzman complained several times.

Specifically, Ms. Guzman told Rick Ramirez (an attorney) and Mitsy Wilson, members of a

News Corp. diversity committee on which she sat, that Defendant Allan engaged in racist conduct and sexist conduct (including showing her a picture of a naked man on his phone), "created a sense in the newsroom that gave men the freedom to treat women as sex objects," and that she "had personally experienced discrimination and sexism in the workplace." (Pear. Dec., Ex. 1, Guz. at 153-154; 157). Ms. Guzman also complained about Allan showing her a nude photograph to Paul Armstrong, a member of management. (Id. at 145-46). Ms. Guzman told Mr. Armstrong that this behavior was "inappropriate," "offensive," "demeaning" and "humiliating." (Id. at 148:18-25). Ms. Guzman also reported the "discrimination and sexism" she suffered to Lisa Barnett, who is "part of the management team" and DeDe Brown, a member of the Executive Team. (Id. at 161:2-12). Moreover, Ms. Guzman complained to Mr. Armstrong, Ms. Barnett and Ms. Brown about Mr. Goodstein's "lascivious and disgusting behavior." (Id. at 184:10-185:5). Ms. Guzman complained to Mr. Armstrong about this behavior "[m]any, many times. Dozens of times." (Id. at 186:22-187:8).

48.    Guzman did not complain to Jehn about any conduct by Michael Riedel or Anne Aquilina, and did complain about Les Goodstein saying "Cha Cha" at this time. (Guz. at 151-53).

**Response**

Plaintiff refers to her response to paragraph 47, and further states that she testified that she believes she did raise the Mr. Riedel behavior with Ms. Jehn. (Pear. Dec., Ex. 1,Guz. at 223).

49.    It is undisputed that Guzman complained about not other incidents contributing to her purported hostile work environment than (i) the McGreevey photograph and Steve Dunleavy story told by Allan, and (ii) Goodstein complimenting her. (Id. at 184, 188.)

**Response**

Dispute.  Plaintiff refers to her response to paragraph 47.

50.      The Post's anti-harassment policy is effective.  (See, e.g., Scial. at 152-53.)

**Response**

Dispute.  First, this proposition relies on a reference to a single instance in which an employee was disciplined for viewing pornography at work.  (Lern. Dec., Ex. 7, Scial. at 152-53).  Second, that employee was not disciplined pursuant to the anti-harassment policy -- Ms. Scialdone specifically stated that the employee was disciplined pursuant to the electronic communications policy.  (Id. at 51-53).  Third, the anti-harassment policy is not effective given the prevalence of sexual and racial harassment in Defendants' workplace.  Ms. Guzman and other Hispanic and female employees experienced many incidents of degrading and repulsive sexual and racial harassment at the hands of Les Goodstein, Col Allan and Michael Riedel, among others.  (Pear. Dec., Ex. 1, Guz. at 111-115, 133-34, 137, 140, 142-44, 168-69, 175, 185:17-20, 189:18-22, 191, 206, 224, 227-228, 240-241, 273, 394, 395, 396:13-20, 398-399, 413-14, 469-75, 485-86; Pear. Dec. Ex. 10 at SG 6785; Pear. Dec. Ex. 11, Good. at 147; Ex. 12 at ¶ 23; Ex. 13 at SG 2343; Ex. 14, Clark at 130, 137, 146-48; Ex. 15, Allan at 237-41, 252:22-254:8; Ex. 16, McLough. at 14, 23, 25-26, 28; Guz. Aff. at ¶¶ 12-13; Lern. Dec. Ex. 20).  Therefore, the Company's anti-harassment policy was not effective.

51.      It is undisputed that Jehn only told Allan that Guzman complained about the Stimulus Cartoon.  (Allan at 68; Jehn at 246-48).

**Response**

Dispute.  Ms. Guzman complained to Ms. Jehn about a wide variety of discriminatory conduct (see response to paragraph 47).  Ms. Jehn then spoke with Ms. Allan about Ms.

23

Guzman's complaint. (Pear. Dec., Ex. 15, Allan at 68; Ex. 19, Jehn at 246-48). It is implausible that Ms. Jehn neglected to inform Mr. Allan about any of Ms. Guzman's complaints other than those about the Cartoon, particularly because they spoke about the complaint for "a couple of minutes." (Pear. Dec., Ex. 15, Allan at 68). The conversation would have taken mere seconds if the Cartoon complaint was the only complaint related to Mr. Allan.

52.    The Publisher, who closed Tempo for financial reasons, was unaware of Guzman's complaint. (Carl. at 129.)

**Response**

Dispute. The Publisher, Paul Carlucci, was not solely responsible for the decision to close *Tempo*, as Mr. Allan testified (Pear. Dec., Ex. 15, Allan at 124:6-11):

> Q:    Tell us the substance of any of your conversations with Paul Carlucci about Sandra Guzman?
>
> A:    I recall a conversation with Paul and Jennifer Jehn **when we made the decision to close Tempo**.

As explained in response to paragraphs 47 and 51, Mr. Allan and Ms. Jehn's knowledge of Ms. Guzman's complaints is in dispute. Further dispute that *Tempo* was closed for financial reasons. Defendants also present figures regarding the supposed losses of Tempo, at $3,766.33 per month in 2009. Even accepting Defendants' figures (which Plaintiff does not), the yearly losses of the Company with regard to *Tempo* would total only $45,195.96 per year, accounting for only .0006% of the Post's 2009 losses. Indeed, the Post lost $70 million in 2009 and $30 million in 2005. (Pear. Dec. Ex. 25). The history of *Tempo* and the Post's financial struggles were nothing new at the time of Ms. Guzman's September 2009 termination, and the sudden decision to close *Tempo* was not attributable to three negative months given the history of the financial stability of the publication (see responses to paragraphs 1-34).

53.     Guzman claims a personal relationship with Justice Sonia Sotomayor.  (Guz. at

572 ["I love Sonia Sotomayor.  Q:  So you are biased in her favor, correct?  A:  I love her,

yes."].)[9]  In August 2009, Guzman made a request to Allan to travel to Washington, D.C. to

cover a private party for Justice Sotomayor; Allan denied this request because Guzman was a

friend of Sotomayer's, "had been conflicted," and because the Post does not "assign people to

cover people on the basis of friendships."  (Allan at 394.)  On September 4, 2009, Guzman made

a request to Robinowitz to travel to Washington, D.C. to cover a second event, Justice

Sotomayor's investiture.  (Lern. Dec., Exh. 16.)  Robinowitz denied this request because the Post

has a Washington, D.C. bureau to cover such a story in a more cost-effective manner.  (Id.)

**Response**

Admit Ms. Guzman's relationship with Justice Sotomayor, but dispute the reason she was

not permitted to travel to Washington, D.C. to cover the event.  Indeed, this action was only one

aspect of the changes in the way the Company's management treated Ms. Guzman immediately

after her February 2009 complaint until her termination.  For example, her reported expenses for

*Tempo* were scrutinized more closely than they had been in the past, seemingly in an effort to

identify performance problems or other issues that could provide a pretext for her termination.

(Guz. at 340:16-22).  In addition, story ideas pitched by Ms. Guzman, including the referenced

special access to events regarding the investiture of Justice Sonia Sotomayor, which would have

received a fair hearing in the past, were dismissed by management, including Defendant Allan.

(Guz. at 184; Allan at 394).  Ms. Guzman's 2009 performance review was admitted to be very

positive by Company management, but when Ms. Guzman was only given a "Meets

Expectations" rating, Mr. Robinowitz told her that he thought she deserved a better performance

---

[9] True and correct copies of referenced excerpts of the deposition of Sandra Guzman, dated October 13, 2011 and February 13, 2012 ("Guz. at [page]"), are attached to the Lern. Dec. as Exhibit 15.

review, but "the big guy, meaning Col Allan, would not let her get a higher number." (Guz. at

577: 8-12, 578).  These are mere examples of the negative treatment Ms. Guzman was subjected

to only after her protected complaints, demonstrating that those complaints motivated the

negative treatment.  Thus, the reason for Ms. Guzman's request being denied is in dispute.

     54.    Guzman's 2009 annual performance appraisal ("APA") score was reduced from

"4 – Exceeds Standards" to "3 – Meets Standards" because she received a disciplinary warning

for using a Post vendor to obtain personal benefits in January 2009, a month prior to the Stimulus

Cartoon's publication.  (Lern. Dec., Exh. 17 at NYP-528).  Guzman's supervisor, Robinowitz,

did not consider the warning in preparing the initial draft of her 2009 APA (Robin. at 237), and,

when the Post's APA Review Committee reviewed this draft – as it does for all employees – the

warning was factored into the APA, reducing her score.  (Jehn at 289.)

**Response**

     Admit that Ms. Guzman's annual performance appraisal ("APA") score was reduced

from a 4 to a 3, but dispute that it had anything to do with a disciplinary warning.  Further refer

to the response to paragraph 55.  Further, Mr. Robinowitz was aware of the disciplinary warning

received by Ms. Guzman when he recommended she received a "4".  (Pear. Dec., Ex. 7, Rob. At

238).  Ms. Guzman very clearly explained at deposition that she engaged in no wrongdoing that

would justify a disciplinary warning.  (Id. at Ex. 1, Guz. at 535-36; 542-43).  Thus, the reason for

the reduction is in dispute.

     55.    Guzman's compensation, standing and employment were not affected by the

change to her 2009 APA score:  the Post had a salary freeze in effect that year (Racano Aff.,

Exh. 2 at NYP-4434-36) and Guzman's employment was not terminated for performance or

disciplinary reasons.  (Robin. at 105).

**Response**

Dispute.  Ms. Guzman's standing changed from a "4 – Exceeds Standards" to a "3 – Meets Standards."

56.     Guzman received the warning because she used a Post vendor to style her for a personal event (Lern. Dec., Exh. 17 at NYP-528), even though she had provided him with a written "letter of authorization" to solicit merchandise for her that used the Post's name.  (Lern. Dec., Exh. 17 at NYP-1585.)  The Post learned of this when it was contacted by a Manolo Blahnik representative, who complained that the vendor was using the Post's name and threatening the two companies' relationship in a bid to acquire free merchandise for Guzman. (Id. at NYP-247-48.)

**Response**

Dispute.  Ms. Guzman very clearly explained at deposition that she provided the letter of authorization to a stylist who was to borrow samples from designers for Ms. Guzman's use covering 2009 inauguration events, and not to seek shoes from Manolo Blahnik; Ms. Guzman denied any knowledge that the stylist would attempt to use the letter improperly.  (Pear. Dec. at Ex. 1, Guz. at 535-36; 542-43).

III.     **Facts Relating to Guzman's Hostile Work Environment Claims**

A.     The Post has an Anti-Harassment Policy of Which
       Guzman was Aware

57.     The Post has and had at all relevant times a written anti-harassment policy which directs complaints of discrimination to either the Post's HR department or an attorney for the Post.  (See Lern. Dec., Exh. 26; Scial. at 64-66; Jehn at 54, 57.)

**Response**

Dispute in part.  The policy does not state that employees cannot make complaints to persons other than HR or Legal.  (Lern. Dec., Ex. 26).  In fact it states that "[E]mployees who believe they have been subjected to unlawful workplace harassment or discrimination of any kind, should report the matter as soon as possible to **the Company**."  Id. (emphasis added).

58.     Guzman was aware of the Post's anti-harassment policy.  (Guz. at 126-28.)

**Response**

Admit.

B.      Facts Relating to Guzman's Claim of Sexual Harassment

59.     On or about April 20, 2007, Guzman was drinking with three female Post journalists at Langan's, a bar located near the Post's offices (Guz. at 137, 148) discussing, in Guzman's words, "who fucked who."  (Guz. at 466-67; Lern. Dec., Exh. 19.)

**Response**

Dispute in part.  Ms. Guzman explained that the quoted language referred to: "The girls and I talked about our relationships, we talked about our boyfriends."  (Lern. Dec., Ex. 15, Guz. at 466-67).

60.     Allan joined the journalists during this conversation and shared an anecdote that a famous Post columnist, Steve Dunleavy, purportedly had sex with a female fan in a closet at Langan's.  (Guz. at 137, 469; Allan at 238.)

**Response**

Admit.

61.     Guzman's companions laughed at the story.  (Lern. Dec., Exh. 19.)  Guzman responded "eww," "[n]ot because I [Guzman] stand on any high moral ground – just the thought

of anyone fucking a near dead drunk skeleton [Dunleavy] was not funny.  I fuck for pleasure –
and this semmed [*sic*] more like toture. [*sic*]"    (Id.; Guz. at 471-72.)

**Response**

Admit the contents of the document, but dispute any inference that the incident was not
offensive to Ms. Guzman:  "This is my boss and it was pretty -- I was stupefied.  This never
happened to me in my life where my boss, you know, would feel free to be so brazen and talk
about cocks and somebody else's sex life and show me pictures of a naked man so I was pretty
baffled and stupefied.  I actually don't remember moving from where I was standing."  (Pear.
Dec. Ex. 1, Guz. 478).  Further state that Mr. Allan told numerous other offensive sexual stories,
including, *inter alia*, claiming that Mr. Dulevy "has such a voracious sexual appetite that he
would probably, the use Mr. Allan's word, fuck a woman without limbs."  (Id. at 475).

62.    Guzman was free to leave during Allan's story, but did not, and she did not voice
an objection to Allan telling this story.  (Guz. at 472-74.)

**Response**

Admit the contents of the document, but dispute any inference that the incident was not
offensive to Ms. Guzman:  "This is my boss and it was pretty -- I was stupefied.  This never
happened to me in my life where my boss, you know, would feel free to be so brazen and talk
about cocks and somebody else's sex life and show me pictures of a naked man so I was pretty
baffled and stupefied.  I actually don't remember moving from where I was standing."  (Pear.
Dec. Ex. 1, Guz. 478).

63.    Allan did not think the story would offend Guzman or the other journalists.
(Allan at 241.)

**Response**

Dispute as absurd on its face and, to the extent this fact is true, it is further evidence of

Mr. Allan's sexist character.

64.     On the same night, Allan received on his BlackBerry a photograph from the

Post's Photo Desk and showed it to the journalists.  (Guz. at 474-75.)  The image had been e-

mailed to him for his consideration for publication.  (Allan at 203-04.)

**Response**

Admit.

65.     At this time, the table was "just talking about news of the day."  (Guz. at 138.)

**Response**

Admit.

66.     The image on Allan's Blackberry was of a photograph of a naked man that was

displayed in the bedroom of former New Jersey Governor Jim McGreevey, and this image was

evidence in his then-ongoing and public divorce proceedings.  (Guz. at 138-39; Allan at 201-05.)

**Response**

Admit.

67.     Allan showed the image to the Post journalists, including male editor Jesse

Angelo, with whom he was conversing after one of them asked to see the image.  (Allan at 200-

01.)

**Response**

Dispute any inference that Ms. Guzman invited Mr. Allan's to show her the photograph.

In fact, the display of the naked photograph to Ms. Guzman was completely "unprovoked."

(Pear. Dec., Ex. 1, Guz. at 134:3-8).

68.    Guzman looked at the image and responded jocularly, "How Chelsea of you." (Lern. Dec., Exh. 19; Guz. at 477.)  Guzman, who lives in Chelsea, later explained in a writing: "Chelsea is the Gay capital of the Northwaest [*sic*].  So this was a very gay – and hense [*sic*] – normal thing to do on [*sic*] my hood."  (Lern. Dec., Exh. 19; Guz. at 477.)

**Response**

Admit, but deny any legal or factual relevance.

69.    Guzman did not state that she was offended at being shown the image, did not leave the conversation, and did not instruct the other female journalists not to look at the image. (Guz. at 139-40, 143.)

**Response**

Admit to the extent that Ms. Guzman did not state she was offended at the time she was shown the photograph and did not leave the conversation or instruct others not to look at the image, but dispute any inference that the incident was not offensive to Ms. Guzman:  "This is my boss and it was pretty -- I was stupefied.  This never happened to me in my life where my boss, you know, would feel free to be so brazen and talk about cocks and somebody else's sex life and show me pictures of a naked man so I was pretty baffled and stupefied.  I actually don't remember moving from where I was standing."  (Pear. Dec. Ex. 1, Guz. 478).

70.    This was the only time that Allan showed Guzman a picture of a naked man. (Guz. at 134.)

**Response**

Admit.

71.    Guzman alleges that an individual named Les Goodstein referred to her as "sexy" and "beautiful."  (AC ¶ 40.)

**Response**

Admit and further state that Les Goodstein, Senior Vice President of Defendant News Corp., would regularly fix Ms. Guzman's body with a lascivious stare while licking his lips and leer at her body in an overtly sexual manner. (Pear. Dec., Ex. 1, Guz. at 185:17-20, 191, 273, 394, 396:13-20, 398, 413-14; Pear. Dec. Ex. 10 at SG 6785). Mr. Goodstein also would regularly comment upon Ms. Guzman's appearance and dress, calling her "sexy" and "beautiful" on many occasions. (Pear. Dec., Ex. 1, Guz. at 191, 206, 395, 398-99; Ex. 11, Good. at 147). In or around 2007, Mr. Goodstein called Ms. Guzman "Cha Cha #1," mocking her race, ethnicity and national origin, while sexualizing her as a Latina. (Guz. Aff. at ¶ 12; Pear. Dec., Ex. 1, Guz. at 189:18-22). Mr. Goodstein also referred to Sami Haiman-Marrero, who marketed *Tempo* and is a Hispanic woman, as "Cha Cha #2." (Id.). Ms. Guzman immediately vociferously objected to this conduct to Mr. Goodstein. (Pearson Aff., Ex. 1, Guz. at 189:23-25, 401:24-25, 493:20-23). Mr. Goodstein's harassment was not directed solely Ms. Guzman, as he commonly stared at the breasts and buttocks of female employees. (Pear. Dec. Ex. 12 at ¶ 23).

72.   Goodstein is and has been at all relevant times an employee of the company News America, Inc., which he joined in January 2006 to acquire and run community-focused newspapers in New York City. (Good. at 14.)[10] At no time was Goodstein an employee of the Post. (Id. at 14-15.)

**Response**: Dispute in part because Mr. Goodstein was an employee of News Corp., as his title, email address and business card all indicate. (Good. at 14-15, 51).

73.   Goodstein was never Guzman's supervisor. (Guz. at 408-09.)

---

[10] True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 15, 2012 ("Good. at [page]"), are attached to the Lern. Dec. as Exhibit 21.

**Response**: Dispute because Ms. Guzman took day-to-day direction from Mr. Goodstein. (Guz, at 201-202).

74.    From the start of his employment in January 2006 through October 2008, his office was located on a different floor from the Post's offices, requiring elevator access; starting in October 2008, his office was located in a different building.  (Good. at 75; Guz. at 388-90.)

Response: Admit.

75.    When *Tempo* was almost closed in or about mid-2006, Goodstein provided assistance to *Tempo* to improve its performance.  (Good. at 90-92; Racano Aff. at ¶ 11.)

**Response**

Admit.

76.    Goodstein worked on *Tempo* from approximately June 2006 through November 2007 and met with Guzman approximately monthly.  (Good. at 103, 118; Guz. at 193.)

**Response**

Admit the timeframe that Mr. Goodstein worked on *Tempo*, but dispute that Ms. Guzman and Mr. Goodstein met only monthly.  In fact, they met numerous times by chance throughout the course of their employment and further met during meetings for publications other than *Tempo*.  (Pear. Dec., Ex. 1, Guz. at 398, 408-410).

77.    Guzman testified that when Guzman and Goodstein met, he would compliment her by telling her she looked "sexy" and/or "beautiful" (Guz. at 192, 205-06), and he "leered" at her, describing his look as, "As a woman you know it when you see it."  (Id. at 394.)

**Response**

Admit and further refer to Plaintiff's response to paragraph 71.

33

78.     Guzman recalled only two instances of his complimenting:  first, while standing in an elevator bank, Goodstein stated "[Y]ou are looking beautiful and sexy in that dress" (id. at 385-86, 389, 395), and, second, Goodstein referenced her shoes as being "sexy," to which she responded with a joke, stating, "[I]f you want to borrow my shoes, you can."  (Id. at 191-92, 398-99.)

**Response**

Dispute.  Ms. Guzman testified:

> Q:    Where did [Mr. Goodstein] tell you you looked sexy and beautiful?
>
> A:    When I saw him in the elevator.  When I saw him in the News Corp. cafeteria on the third floor.  And when I met with him in his office on the fifth floor.  And any chance and any moment that I bump into him randomly in the building, he would comment.

(Pear. Dec., Ex. 1, Guz. at 385).  She further testified that:

> A:    Put it this way, I would see Mr. Goodstein in the News Corp. cafeteria on the third floor. I would see him in the elevator banks in the lobby and every time I -- during meetings and every time we had an encounter Mr. Goodstein had to comment on something that I was wearing on how I looked in my shoes or in my dress.

(Id. at 396).

79.     Goodstein never made any sex-based or lewd remark, propositioned her, touched, or attempted to be alone with her.  (Guz. at 189, 398, 413-15.)

**Response**

Dispute.  The comments referred to in the preceding paragraphs are sex-based and lewd.

80.     Guzman's work "did not suffer for [Goodstein's conduct]."  (Id. at 416-18.)

**Response**

Admit, but further state that "that didn't mean that [Ms. Guzman] was not affected by his lewd behavior." (Pear. Dec., Ex. 1, Guz. at 417).

81.     Guzman never told Goodstein that anything he said offended her or asked him to stop. (Id. at 190, 192.)

**Response**

Dispute.  Ms. Guzman immediately told Mr. Goodstein to stop calling her "Cha Cha." (Pear. Dec., Ex. 1, Guz. at 189:23-25, 401:24-25, 493:20-23).

82.     Guzman considers "compliment[ing]" a co-worker as "beautiful" to be "something a friend does, as a colleague does," as she has called co-workers "beautiful." (Guz. at 170.)

**Response**

Dispute.  Defendants have disingenuously reordered the text of Ms. Guzman's testimony and added their own characterizations.  The testimony only states that Ms. Guzman may have told her friend and colleague that she looked good because she was on "Weight Watchers," and the friend may have asked "how do I look." (Lern. Dec., Ex. 15, Guz. at 170).

83.     It is undisputed that Guzman never complained to the Post about Goodstein's compliments until, at the earliest, when she spoke to Jennifer Jehn in February 2009, almost three years after she and Goodstein began working together in the summer of 2006, and more than a year after they stopped working together in late 2007. (Guz. at 188.)[11]

---

[11] The fact of Guzman's complaint is disputed, as Jehn testified that Guzman never complained to her about Goodstein. (Jehn at 191-93.)

### Response

Dispute.  Ms. Guzman explicitly testified that she complained to post Executive Paul Armstrong, Post Management Team member Lisa Barnett and a member of the Executive Team, DeDe Brown, about Mr. Goodstein's "lascivious and disgusting behavior."  (Id. at 184:10-185:5).  Ms. Guzman complained to Mr. Armstrong about this behavior "[m]any, many times."  (Id. at 186-87).

84.    Goodstein and Guzman had a collegial relationship when they worked together; for instance, in June 2007, Guzman suggested a lunch meeting with Goodstein, stating:  "Can't wait.  Lets [sic] have lunch at Sofrito."  (Lern. Dec., Exh. 25 at NYP-2315.)

### Response

Dispute Defendants' characterization of the relationship as collegial in light of the pervasive sexual and racial harassment Ms. Guzman was subjected to by Mr. Goodstein.  Admit the contents of the referenced document, but dispute and legal or factual significance.

85.    Guzman suggested that her son and Goodstein's son should "get together."  (Guz. at 191.)

### Response

Admit, but state that they never did.  (Lern. Dec., Ex. 15, Guz. at 191).

86.    In e-mail to Goodstein, Guzman referred to other women as "gorgeous."  (Lern. Dec., Exh. 25 at NYP-2312.)

### Response

Admit, but deny any legal or factual significance.

87.    In May 2009, after Guzman no longer worked with Goodstein, she attended a dinner honoring him and greeted him and his wife.  (Id. at 147.)

**Response**

Admit, but deny any legal or factual significance.

88.     Guzman stopped attending the Post's daily editorial meetings in late 2005 or early 2006. (Guz. at 266.)  It is undisputed that Guzman cannot recall a single sexually-offensive comment made at these meetings, even after  reviewing notes that she made of these meetings, though she admitted any sex-related comments were part of discussions of news stories.  (Guz. at 109-10.)

**Response**

Admit that Ms. Guzman stopped attending the Post's daily editorial meetings.  Dispute the remainder.  Not one citation provided by Defendants refers in any way to Ms. Guzman's recollection of sexually offensive comments at executive meetings.

89.     Guzman never heard any sex-based comments in the Post's newsroom that were to or about Guzman or any other employees. (Id. at 253.)  When in the newsroom, Guzman sometimes heard comments relating to celebrities bodies in connection with news stories. (Id. at 248-49, 253.)  Guzman cannot recall a single specific comment or relevant time frame. (Id. at 248.)  Guzman never asked any person in the newsroom to stop making comments or complained about these comments in accordance with the Post's complaint procedure. (Id. at 253.)

**Response**

Dispute on the basis that Defendants misrepresent Ms. Guzman's testimony, which included that "I would be walking by the newsroom and it would be banter in the newsroom talking about Jenna Jameson's breasts and other celebrities.  Lindsay Lohan's breasts, were the real or were they not.  Talking about stripper jokes.  These – this was an environment where

lewd and vulgar exchange between mostly men happened." (Lern. Dec., Ex. 15, Guz. at 248).

Ms. Guzman did not testify that these conversations had to do with news stories. She also did

not testify that she never heard any sex-based comments in the Post's newsroom that were to or

about Guzman or any other employees, but rather that she never overheard sex-based comments

about her or any colleague's breasts. (Id.). Admit that Ms. Guzman did not contemporaneously

complain to HR about things she heard in the newsroom.

90.  Guzman testified that Photography Editor David Boyle used the word "harem"

when speaking to her referring to his staff. (Id. at 486.)

**Response**

Admit

91.  Guzman did not consider this to be sexual harassment of her. (Guz. at 485.) She

considered this to be merely "unprofessional" conduct. (Id. 494.)

**Response**

Dispute on the basis that Defendants are mischaracterizing Ms. Guzman's testimony,

which was "he didn't personally sexually harass me but he certainly created an environment that

was sexually hostile." (Lern. Dec., Ex. 15, Guz. at 485).

92.  Guzman never asked Boyle to stop using the term "harem." (Id. at 491.)

**Response**

Admit, but deny any legal and factual significance.

93.  Boyle was not Guzman's supervisor. (Id.) Guzman did not verbally object to

Boyle making these alleged statements. (Id. at 491.) Guzman did not complain to Jehn about

Boyle in February 2009. (Jehn at 191-93.)

**Response**

Admit that Mr. Boyle was not Ms. Guzman's supervisor, and that Ms. Guzman did not verbally object to Mr. Boyle, but dispute that Ms. Guzman did not complain to Jehn about Mr. Boyle in February 2009.  Ms. Guzman did in fact complain to Jehn about Mr. Boyle in February 2009.  (Guzman Aff. at ¶ 10).

94.     Guzman had sex with a baseball player just prior interviewing him for the Post in 2006-07. (Guz. at 450-51.)

**Response**

Admit, but deny any legal and factual significance.

95.     Guzman lifted her shirt to show her nipples to female coworkers while at the bar Langan's.  (Id. at 282-86.)

**Response**

Admit, but deny any legal and factual significance and further state that this occurred in the restroom and not publicly.

96.     Guzman "flirt[ed]" with at least one co-worker at a work function.  (Id. at 325.)

**Response**

Dispute.  Ms. Guzman testified that she was "maybe" flirting.  (Lern. Dec., Ex. 15, Guz. at 325).

97.     Guzman made unwanted "aspersions about [the] sexuality" of a co-worker sufficiently severe for him to complain about her conduct.  (Lern. Dec., Exh. 24, at NYP-1379; Pear. Dec., Ex. 1, Guz. at 319-21.)

**Response**

Lern. Dec., Ex. 24 does not contain NYP-1379.  Dispute.  Ms. Guzman responded to these accustions with the following: "I regret that anything I have said to you in anyway was felt

39

as offensive to you.  It is not my intention nor is it my style."  Lern. Dec., Ex. 23 at NYP-1379.

Ms. Guzman was "surprised" and "shocked" that the colleague in question felt she had made

aspersions about his sexuality.  (Pear. Dec., Ex. 1, Guz. at 321).

98.    Guzman initiated communications with male and female co-workers about sex

toys, erotic fiction, and seeking solace with a stripper.  (Id. at NYP-3954, -3933, -3903; Guz. at

287-88.)

**Response**

Lern. Dec., Ex. 24 does not contain NYP-3954, -3933, -3903.  Admit, but dispute any

legal or factual significance.

99.    Guzman referred to male colleagues as "guapo" (handsome), "lindo" (pretty),

"baby," and "babe."  (See, e.g., Lern. Dec., Exh. 24 at NYP-1638, -2352, -3941, -3950.)

**Response**

Lern. Dec., Ex. 24 does not contain NYP-1638, -2352, -3941, -3950.  Admit, but dispute

any legal or factual significance.

100.    Guzman discussed the physical attractiveness of others with colleagues.  (Id. at

NYP-1634, -3944, -3945, -3951.)

**Response**

Lern. Dec., Ex. 24 does not contain NYP-1634, -3944, -3945, -3951.  Admit, but dispute

any legal or factual significance.

101.    Guzman referred to other women as "puta" and "bitch" when communicating

with her Post colleagues.  (See id. at NYP-3949, -3944.)

**Response**

Lern. Dec., Ex. 24 does not contain NYP-1634, -3944, -3945, -3951.  Admit, but dispute any legal or factual significance.

102.    Guzman described the body-parts of celebrities and co-workers as "sexy" and otherwise complimented their bodies and breasts in the workplace.  (See, e.g., id. at NYP-3945.)

**Response**

Lern. Dec., Ex. 24 does not contain NYP-3945.  Admit, but dispute any legal or factual significance.

C.    **Facts Relating to Guzman's False Claim of Racial Harassment**

103.    In 2007, Goodstein once greeted Guzman as "Cha Cha"; she immediately responded, "Don't call me that," and he never did so again.  (Guz. at 189-90, 401-02.)

**Response**

Admit in substance, but clarify that Mr. Goodstein called Ms. Guzman "Cha Cha number 1," mocking her race, ethnicity and national origin, while sexualizing her as a Latina.  (Pear. Dec., Ex. 1, Guz. at 189:18-22; Guz. Aff ¶ 12).  Mr. Goodstein also referred to Sami Haiman-Marrero, who marketed *Tempo* and is a Hispanic woman, as "Cha Cha number 2." (Id.).

104.    On one unspecified date, Anne Aquilina, the Post's administrative editor, asked Guzman if candles in her office related to "Santeria" or "Voodoo."  (Guz. at 227.)  Santeria is "one of [Guzman's religious practices]."  (Id. at 225-26.)

**Response**

Admit that Anne Aquilina asked Ms. Guzman if candles in her office related to "Santeria" or "Voodoo."  Dispute Defendants' misleading characterization that "Santeria is "one

of [Guzman's religious practices]."  Ms. Guzman testified:  "I do not practice the religion of Santeria.  I'm not an initiate of Santeria."  (Pear. Dec., Ex. 1, Guz. at 225).

> 105.    It is undisputed that Michael Riedel, the Post's Broadway columnist, did no more to offend Guzman than sing "I Want to Live in America" from *West Side Story* in a Spanish accent in Guzman's presence.  (Guz. at 218.)

**Response**

Dispute that singing "I Want to Live in America" is the only thing Riedel did that offended Guzman, as Mr. Riedel would also often greet Ms. Guzman in a "thick Spanish accent."  (Guzman Aff. at ¶ 13).

> 106.    It is undisputed that Riedel sang songs from *West Side Story* in the Post's offices more than three times from in or about 2008 through early 2009.  (Riedel Aff. at ¶ 10; Guz. at 529 ["I cannot recall how many times."].)  Riedel's singing of this song coincided with the Broadway revival of of [sic] West *Side Story*.  (Id. at ¶¶ 6-10.)

**Response**

Admit, but dispute any legal or factual significance with regard to the fact that Riedel's singing coincided with the Broadway revival of *West Side Story*.

> 107.    In 2008 and until approximately March 2009, when the revival of *West Side Story* opened, Riedel and Guzman discussed *West Side Story*, coverage of the musical, and its history, including Chita Rivera's performance in the original production, which Guzman described as a "classic."  (Id. at ¶ 7, Exh. 1 at NYP-3684.)

**Response**

Admit, but dispute any legal or factual significance.

42

108.    Guzman initiated communications with Riedel regarding *West Side Story* on a

number of occasions, and requested that Riedel get her tickets to the performance – which he did

– and that he put a friend of hers in contact with the musical's casting director.  (Id. at ¶¶ 4-7,

Exh. 1.)

**Response**

Admit for the purposes of this motion.

109.    Riedel sometimes sings Broadway show tunes in the Post's office, and these

songs are not just limited to *West Side Story*.  (Id. at ¶ 9.)

**Response**

Dispute.  Ms. Guzman testified (Pear. Dec., Ex. 1, Guz. at 211):

A:      [t]he only [Mr. Riedel] he sang were from West Side Story, and he did it
        in a Spanish accent.

Q:      You never heard him sing from other musicals in the office, Ms. Guzman?

A:      Not to me.

Q:      Not to you, but what about to himself or to other people. You never heard
        him sing another song from another musical?

A:      No.

Q:      Isn't it a fact that he would sing songs from lots of Broadway musicals?

A:      Not to me.

110.    Riedel did not sing any song to offend Guzman, or because of her race, color

and/or national origin, and Guzman never objected to his singing.  He sang because Guzman had

expressed to Riedel that she was a fan of the music of *West Side Story*.  (Id. at ¶¶ 9-11.)

**Response**

Dispute.  Mr. Riedel sang the song "America" from the musical "West Side Story" at Ms.

43

Guzman in a fake, mock, insulting, exaggerated and "high-pitched" "Spanish" accent several times, and would often greet Ms. Guzman in a "thick Spanish accent." (Pear. Dec., Ex. 1, Guz. at 142:5-11, 210-11, 215-16, 527, 530; Guz. Aff. ¶ 13). This was an obvious and hurtful caricature that did not at all resemble or pay homage to the performance of Chita Rivera (who is a Latina and speaks with an accent in English naturally due to her heritage) when she played "Anita" in West Side Story. (Guz. Aff. ¶ 13). As the Broadway Columnist for the Post, Mr. Riedel would certainly be aware of the offensive and racist nature of his actions. Although Ms. Guzman did not ask him to stop doing it, she did try to stop the singing quickly each time by changing the subject or interjecting that he should "not quit [his] day job." (Id.). She also explicitly told Mr. Riedel that West Side Story is a racist musical when he would sing his songs to her. (Pear. Dec., Ex. 1, Guz. at 213-14). Ms. Guzman disputes vehemently that she is a fan of West Side Story, as it is "famously racist," and conveyed this to Mr. Riedel. (Id.).

111.    Guzman never told Riedel that she was offended by his singing and she never asked him not to sing any song from *West Side Story*. (Guz. at 214, 219, 434.)

**Response**

Admit. However, she did try to stop the singing quickly each time by changing the subject or interjecting that he should "not quit [his] day job." (Id.). She also told Mr. Riedel that West Side Story is a racist musical when he would sing his songs to her. (Pear. Dec., Ex. 1, Guz. at 213-14).

112.    Singing "I Want to Live in America" is the only thing Riedel did that offended Guzman, and she never had any "dispute" with him. (Id. at 422, 433.)

44

**Response**

Dispute that singing "I Want to Live in America" is the only thing Riedel did that offended Guzman, as Mr. Riedel would also often greet Ms. Guzman in a "thick Spanish accent." (Guzman Aff. at ¶ 13).  Admit that she never had any "dispute," but deny any legal or factual significance.

113.    Guzman's relationship with Riedel was "friendly."  (Guz. at 421-22; Riedel Aff. ¶ 3.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior." (Guzman Aff. at ¶ 13).

114.    The "friendly" nature of their relationship is reflected in e-mails between the two, including, when, in January 2008, Guzman e-mailed Riedel in 2008 to wish him a happy birthday.  (Riedel Aff., Exh. 1 at NYP-4414.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior." (Guzman Aff. at ¶ 13).

115.    On July 22, 2008, Guzman wrote to Riedel, "When are you back in the office? . . . [H]aven't seen you in weeks.  wanna [sic] talk to you about west side story [sic].  don't [sic] forget me . . . ." (Id. at NYP-4413.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior." (Guzman Aff. at ¶ 13).

116.     On September 15, 2008 Guzman wrote to Riedel, "Is it fair to say that you've completely forgotten about me?  wanted [*sic*] to touch base with you about those two classics." (Id. at NYP-4421-22.)  In the same e-mail chain, she wrote to Riedel, who was vacationing in Greece: "If you are trying to make me jealous, mission accomplished.  Wine, ruins, fresh olive oil, sun . . .  damn you Michael.  I want to be you right about now, except of course, I'd love a hot Greek man."  (Id. at NYP-4421.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior."  (Guzman Aff. at ¶ 13).

117.     In October 2008, Guzman asked Riedel to "make sure" that he "touch[ed] base" with her, and to put one of her friends in touch with the casting director for *West Side Story*.  (Id. at NYP-1781.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior."  (Guzman Aff. at ¶ 13).

118.     On December 28, 2008, Guzman wrote to Riedel and stated that a television recap of Broadway in 2008 "sucks" because Riedel was not on it, and further stated, "While I can't be your agent, I can be your cheerleader!  I know a high ranking dude at NY 1 and I will talk you up.  You'd be awesome on TV."  (Id. at NYP-4412.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior."  (Guzman Aff. at ¶ 13).

119.    On March 6, 2009, two days after Guzman published a story on the revival of *West Side Story*, including an interview with Chita Rivera, the original's star (id. at NYP-3684), she e-mailed Riedel, stating, "You crack me up!"  (Id. at NYP-4397.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior."  (Guzman Aff. at ¶ 13).

120.    On June 2, 2009, Guzman asked Riedel about the play *God of Carnage*:  "Did you like this?  I wanna see it."  (Id. at NYP-4415.)

**Response**

Admit, but further state that "despite [Ms. Guzman's] outward friendliness towards Mr. Riedel, [she] was repelled by [his] unwelcome and distasteful behavior."  (Guzman Aff. at ¶ 13).

121.    It is undisputed that during Guzman's employment, Allan made no more than three comments regarding Hispanics that she perceived as offensive, which occurred on December 6, 2004, December 15, 2004, and in or about May 2005.  (Lern. Dec., Exh. 24 at SG_347-48; Guz. at 114.)  These occurred more than four years before Guzman filed her initial Complaint on November 9, 2009 (ECF No. 1), and Allan made no comments regarding Hispanics other than these alleged comments.  (Guz. at 123.)

**Response**

Admit, but deny any legal or factual significance.

122.    Guzman did not complain to any Post employee about the allegedly race-based conduct of Riedel, Aquilina or Goodstein, including when she spoke to Jehn in February 2009.  (Guz. at 223, 230-31; Jehn at 191-93, 197.)

**Response**

Dispute.  The testimony of Ms. Guzman cited by Defendants does not support their claim

that she did not complain to any Post employee about the allegedly race-based conduct of Riedel,

Aquilina or Goodstein.  First, Ms. Guzman testified that she believes she did complaint to Ms.

Jehn about Mr. Riedel singing to her.  (Pear. Dec., Ex. 1, Guz. at 223).  Second, Ms. Guzman

testified that she complained to Rick Ramirez and Mitsy Wilson, representatives of Defendant

News Corp. about the Aquilina conduct.  (Id. at 231).  Third, Ms. Guzman did complaint to Ms.

Jehn about Mr. Goodstein's harassment.  (Guzman Aff. ¶ 10).

**IV.    Guzman's Various Fabrications and Distortions of Fact**

123.    Guzman claims to have edited "over 25 other Features sections . . . each year "

"[i]n addition" to *Tempo* (AC ¶ 28), but it is undisputed that she edited no more than 11

additional sections in any year (Guz. at 365-68).

**Response**

Dispute.  The cited testimony clearly includes Ms. Guzman's statements that the exhibits

she was being shown did not "reflect all of the work [she] did."  (Pear. Dec., Ex. 1, Guz. at 367).

Ms. Guzman was in fact responsible for all editorial content and production of 25 special

sections per year even according to Defendants' witnesses.  (Pear. Dec., Ex. 7, Rob. at 62:25-

63:7; Pear. Dec. Ex. 8 at SG 0079).

124.    She claims *Tempo* increased the Post's Hispanic readership by 40% (AC ¶ 29),

but admits this to be untrue, and that in fact Hispanic readership decreased during her

employment (Guz. at 504-08).

**Response**

Dispute.  In fact, from 2001 to February 2009, which almost completely corresponds to

Ms. Guzman's tenure, the Post vastly outperformed its primary competitor, the New York Daily News (the "Daily News") in growing Hispanic readership: the Post gained 109,505 Hispanic readers, an increase of 70%, while the Daily News lost 111,339, a decrease of 22%. (Pear. Dec. Ex. 5 at NYP 0638).

125.    Guzman alleges that Allan "rubbed his penis against" a female employee at a party in or about 2007 and made sexually suggestive comments to her. (AC ¶ 37.) It is undisputed that this did not happen. (See Faux at 19-20, 34-38; Allan at 504; Guz. at 168.)

**Response**

Dispute. Ms. Faux's account of her contact with Mr. Allan during her deposition was clearly designed ward off any retaliation. She denied being touched by Mr. Allan's penis, and denies that the dance was uncomfortable, yet somehow remembers after 5 years that: "[a]t one point when I was dancing . . . when I had turned around . . . my knees were slightly bent when I was dancing, and they knocked into [Mr. Allan's] leg." (Lern. Dec., Ex. 28, Faux at 21). This recollection is clearly sugar-coating the truth – that Mr. Allan sexually harassed Ms. Faux. Ms. Guzman also was told by Ms. Faux herself that Defendant Allan rubbed his erect penis against Nicole Faux, a Company employee, and made lewd comments about her breasts and stated that she was scared to be alone with him. (Pear. Dec., Ex. 1 at Guz. at 168-69).

126.    Guzman alleges that Allan once referred to Ebony Clark, a very junior employee (a copy assistant) who happens to be African-American , as a "damn girl" because of her race (AC ¶ 39), but he did so from frustration because she was not answering his phone, as her job required, and it is undisputed that he made no reference to race (Clark at 331-33; Allan at 324).

Allan has raised his voice at white employees in connection with their work, including

Robinowitz, Frank Zini, Chris Shaw, Rich Wilner, and Michael Shain.  (Gott. at 22.)[12]

**Response**

Admit that Guzman alleges that Allan once referred to Ebony Clark, a very junior

employee (a copy assistant) who happens to be African-American , as a "damn girl" because of

her race (and gender), and that Mr. Allan made no direct reference to race when he made this

comment.  However, in light of pervasive discrimination at the Company described throughout

this counterstatement, racial intent can be inferred.

127.    Guzman alleges that Angelo engaged in "improper" relationships with copy

assistants (junior employees) (AC ¶ 46).  This did not happen.  (Angelo at 81, 381.)[13]

**Response**

Dispute that the self-serving denial of Mr. Angelo is sufficient to unequivocally establish

that he did not engage in an "improper" relationship with a copy assistant.

128.    Guzman alleges that the Post had a "policy . . . of only hiring White women" to be

models for photography shoots (AC ¶ 55) but there is no evidence of this, and Guzman was

herself a modeled for the Post at times.  (Lern. Dec., Exh. 32 [depicting Guzman and other non-

white models for the Post].)

**Response**

Dispute.  Lern. Dec., Ex. 32 does not contain a photograph of Guzman or any other non-

white models.   Further dispute that a single example of a non-white model being depicted in the

---

12 True and correct copies of referenced excerpts of the deposition of Michelle Gotthelf, dated March 29, 2012 ("Gott. at [page]"), are attached to the Lern. Dec. as Exhibit 33.
13 True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 ("Angelo at [page]"), are attached to the Lern. Dec. as Exhibit 13.

Post would serve to unequivocally establish that the Post does not have a policy aimed at only hiring White women to model.

129.    Guzman alleges that editor Lauren Ramsby – who was not involved in Guzman's termination – referred to Henry Louis Gates as an "angry black man" (AC ¶ 56), but the junior employee who overheard this comment explains that it was part of a longer conversation regarding Mr. Gates' July 2009 arrest and how "a lot of people characterized him" "outside of the Post" in that manner.  (Logan at 60-61, 214-215, 275.)[14]

**Response**

Admit, but further note that the fact that Ms. Ramsby was not the only individual who ever called Mr. Gates an "angry Black man" does nothing to diminish the racist nature of the comment.  Ms. Ramsby was did not say "a lot of people characterize him" as an "angry Black man."  In contrast, she herself called Mr. Gates an "angry Black man."  (Lern. Dec., Ex. 29, Logan at 60-61, 214-215, 275).

130.    Guzman alleges that the Post employed only one non-white editor at the time of her termination (AC ¶ 57), but is undisputed that the Post employed many more non-white editors at the time of Guzman's termination.  (See Lern. Dec., Exh. 18, at No. 9.)

**Response**

Dispute.  (Pear. Dec., Ex. 28, ¶¶ 6-7).

131.    Guzman alleges that Allan "openly" demeaned individuals protesting the Stimulus Cartoon in February 2009 (AC ¶ 76), but the employee who claims to have heard this (which Allan denies [Allan at 351]) testified that it was made in his private office while he was speaking on a phone, and Clark only heard this statement from Allan and nothing else by him or

---

[14] True and correct copies of referenced excerpts of the deposition of Shari Logan, dated March 9, 2012 ("Logan. at [page]"), are attached to the Lern. Dec. as Exhibit 30.

the person to whom he was speaking, and she "didn't know" to what he referred, and merely "impl[ied]" it was the protestors.  (Pear. Dec., Ex. 14, Clark at 137-39, 147-48.)[15]

**Response**

Admit, and notes that Mr. Allan stated: "most of them are minorities and the majority of them are uneducated."  (Pear. Dec., Ex. 29, ¶¶ 6-7).

132.    Guzman alleges editors "openly" made jokes in the newsroom about the Stimulus Cartoon and/or people protesting it (AC ¶ 77), but it is undisputed that there is no evidence that any editor made any such joke (Logan at 120-21), there were no newsroom discussions about the protestors (id. at 64-65), and the only reference to a "joke" was one editor's explanation that the cartoon was intended to be a "joke," with the chimpanzee representing Congress (id. at 274-75).

**Response**

Dispute.  Mr. Robinowitz and Frank Vinny called the people protesting the Chimpanzee Cartoon "dumb" and Mr. Robinowitz also told Ms. Guzman that the Cartoon was not offensive and she should stop listening to Al Sharpton.  (Pear. Dec., Ex. 1, Guz. at 330-331, Guz. Aff. ¶ 11).  Defendant Allan commented in his office that the Chimpanzee Cartoon's detractors were "not smart" and that the "majority of them are minorities."  (Pear. Dec., Ex. 14, Clark at 137, 146, 148; Ex. 1, Guz. at 101).

133.    Guzman alleges that Logan asked to talk to Allan about her "feelings of discrimination" with respect to the cartoon, and that Allan responded "Absolutely not" before walking away (AC ¶ 83), but Logan, a very junior employee (a copy assistant) only stated, "Can we talk about this?" to which Allan responded, "Absolutely not" since "he didn't want to talk

---

[15] True and correct copies of referenced excerpts of the deposition of Ebony Clark, dated May 30, 2012 ("Clark. at [page]"), are attached to the Lern. Dec. as Exhibit 31.

about that.  He had other things to think about that day," and she could not recall him walking away.  (Logan at 62, 152.)

**<u>Response</u>**

Admit, but note that Defendants' characterization is completely consistent with Ms. Guzman's allegations.

Dated: May 24, 2013
      New York, New York

Respectfully submitted,

THOMPSON WIGDOR LLP

By: _____
      Douglas H. Wigdor
      Lawrence M. Pearson

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@thompsonwigdor.com
lpearson@thompsonwigdor.com

*Counsel for Plaintiffs*