# Exhibit 1B

Page 338

SANDRA GUZMAN-10/13/11

1
2  same complaint over and over again every time
3  you responded to anybody who e-mailed you,
4  right?
5      A.  To the hundreds of people who were
6  offended by the racist cartoon, yes.
7      Q.  So, he ended up with hundreds of
8  e-mails that you sent?
9      A.  Everybody who was on that master
10 list received the same response.
11     Q.  So, you could understand that he
12 was annoyed that you were -- that your e-mails
13 were filling his e-mail box with hundreds of
14 the exact same response, right?
15     A.  I didn't appreciate his tone, no.
16     Q.  Did you have permission to put him
17 on an automatic e-mail response?
18     A.  Did I have his permission?
19     Q.  Yes.
20     A.  He was part -- I was replying to
21 everybody.
22     Q.  Did you have permission to place an
23 automatic e-mail response on your computer?
24     A.  I asked Jennifer Jane if I could
25 reply.  And Jennifer Jane said yes, I have the

Page 339

SANDRA GUZMAN-10/13/11

1
2  right to reply.
3      Q.  Did you ever give Ms. Jane a
4  written complaint?
5      A.  No.
6      Q.  Did The Post apologize for the
7  cartoon?
8      A.  Yes, three different times.
9  Finally, it ended with Rupert Murdock having
10 to weigh in.
11     Q.  Were you satisfied with his
12 apology?
13     A.  Yes, but I felt that we needed an
14 apology for the internal coworkers, and that
15 never came.
16     Q.  You've alleged that the -- that
17 after you made your complaints known to
18 Ms. Jane and others about the cartoon, that
19 you were subjected to a series of retaliatory
20 actions, correct?
21         MR. THOMPSON:  Objection.
22     A.  Yes.
23     Q.  And those included increased
24 scrutiny of your expenses?
25     A.  It included my getting fired,

Page 340

SANDRA GUZMAN-10/13/11

1
2  unjustly fired.
3      Q.  Did it include increased scrutiny
4  of your expenses?
5      A.  It included increased -- it
6  included my not getting the review that I
7  deserved and my being told by my supervisor,
8  Joe Rabinowitz, Sandra, I would have given you
9  a better review, but I was instructed by
10 Col Allan not to.
11     Q.  And what else did it include?
12     A.  What else did what include?
13     Q.  The retaliation that you suffered.
14     A.  The way I was retaliated against?
15     Q.  Yes.
16     A.  Increased scrutiny on stories.
17 Increased scrutiny on the kinds of stories
18 that I would pursue.  Where before, I didn't
19 have any kinds of scrutiny on stories that
20 incurred some expenses.  That before, I wasn't
21 I wasn't requested to provide justification
22 for these stories.
23     Q.  Before you complained about the
24 cartoon?
25     A.  Yes.

Page 341

SANDRA GUZMAN-10/13/11

1
2      Q.  It's your contention in this
3  lawsuit that the Complaint that you brought in
4  the wake of the cartoon caused all of these
5  retaliatory acts to occur; is that right?
6      A.  I had been complaining to
7  management before February 2009 about the
8  racist and sexist behavior at The Post.  In
9  February of 2009, I complained directly to HR.
10 I had been complaining about it.
11         When I complained in February 2009
12 to HR, when I complained externally and
13 internally, I began to feel the retaliation.
14     Q.  After you complained to HR?
15     A.  Yes.
16     Q.  Ms. Guzman, were there any acts of
17 retaliation that you experienced prior to your
18 complaints to HR about the cartoon?
19     A.  Prior to my complaining?
20     Q.  Yes.
21     A.  On February 19th?
22     Q.  Yes.
23     A.  About the cartoon?
24     Q.  Yes.
25     A.  Not that I can recall, no.

Page 342

SANDRA GUZMAN-10/13/11

1     SANDRA GUZMAN-10/13/11
2     Q.  How did you learn about the job
3  opportunity at The New York Post that
4  ultimately resulted in you being hired?
5     A.  Chickie Cartagena.
6     Q.  Did you -- and what did --
7     A.  And Thea --
8     Q.  What did that individual tell you?
9     A.  I'm sorry?
10    Q.  What did that individual tell you?
11    A.  That The New York Post was looking
12  for an associate editor to help launch a
13  Hispanic supplement to help them do something
14  to gain Hispanic readership in New York.
15    Q.  And did you apply for the job?
16    A.  And I -- yes, I called Emathea
17  Disney and Emathea Disney and I met and she
18  thought I was perfect for the job and she
19  introduced to me Lachlan Murdoch and Lachlan
20  Murdoch and I had a conversation and I was --
21  I was recruited.
22    Q.  How many interviews did you have?
23    A.  I remember having several with
24  Emathea and several with Lachlan --
25    Q.  And you were hired to --

Page 343

1     SANDRA GUZMAN-10/13/11
2     A.  -- Murdoch.
3     Q.  -- start Tempo and to advise The
4  Post about matters relating to the Hispanic --
5  potentially Hispanic readership, correct?
6     A.  Right.  And also to advise them on
7  matters of other news issues such as public
8  education.  I have children in the public
9  schools, so as a New Yorker with kids in
10  public schools, yeah.
11       So, they wanted me to make
12  contributions to Hispanics, but also to other
13  areas of the paper.
14    Q.  Well, your employment agreement
15  does not refer to education or other trends
16  that don't effect the Latino community, does
17  it?
18    A.  Can I see?  It.
19    Q.  Sure this is going to be Guzman
20  Exhibit 25.  And it's base numbered NYP '506
21  through NYP '512.
22       (Defendant's Guzman Exhibit 25,
23       document bearing Bates numbers NYP
24       '506 through '512, marked for
25       identification, as of this date.)

Page 344

1     SANDRA GUZMAN-10/13/11
2     Q.  I'll direct your attention to the
3  paragraph number three.  Have you had a chance
4  to look at that?
5     A.  Yes.
6     Q.  And Ms. Guzman, is Exhibit 25 the
7  employment agreement that you had with The
8  Post when you started in 2003?
9     A.  Yes.
10    Q.  Is it your signature on the last
11  page?
12    A.  Yes.
13    Q.  And does paragraph three reflect
14  the duties that you were hired to perform?
15    A.  Yes.
16    Q.  So, does this say anything about
17  providing any expertise relating to education?
18    A.  No.  It does say you will --
19  required -- such duties shall should, among
20  others, that you would serve as a member of
21  The Post editorial executive management team.
22  Will you attend daily news conference and
23  contribute to the ideas and discussion process
24  concerning the news of the day, which can
25  include education, which can include a number

Page 345

1     SANDRA GUZMAN-10/13/11
2  of different topics.
3     Q.  Well, it could include anything,
4  right?
5     A.  Yes.
6     Q.  So, one of your duties was to
7  contribute at The Daily News conferences
8  right?
9     A.  To contribute, yes.
10    Q.  And those, you stopped attending at
11  the end of 2005, right?
12    A.  I was told I was not needed.
13    Q.  The other duties that you were
14  expected to give expert advice on issues and
15  trends in the New York Latino community right?
16    A.  Yes.
17    Q.  And then the third thing was to
18  plan and launch a regular section for the
19  Latino community right?
20    A.  That's right.
21    Q.  That agreement expired two years
22  after it was executed right?
23    A.  Yes.
24    Q.  July of 2005, right, correct?
25    A.  Where does to say that?

## Page 366

SANDRA GUZMAN-10/13/11

1    SANDRA GUZMAN-10/13/11
2  '2429 through '2536.  I'm going to have the
3  same question for you, which is:  Are these
4  the special sections that you edited at The
5  New York Post in 2008 other than Tempo?
6       (Defendant's Guzman Exhibit 30,
7       document bearing Bates numbers NYP
8       '2429 through '536, marked for
9       identification, as of this date.)
10      Q.  And if you'll notice they actually
11  are individually stapled.  So, you don't have
12  to turn each page.
13      A.  Yes.
14      Q.  So, is this -- are these the
15  special sections that you edited in 2008?
16      A.  These are the ones that were
17  published, yes.
18      Q.  And did you have an opportunity to
19  count the number that are here?
20      A.  The sections?
21      Q.  Yes.
22      A.  One, two, three, four, five, six,
23  seven, eight, nine, ten.  Eleven?
24      MR. DATOO:  Count them slowly.
25      MR. LERNER:  I count 11.

## Page 367

1    SANDRA GUZMAN-10/13/11
2      MR. DATOO:  That's what I have.
3      Q.  Ms. Guzman, so these are the
4  special sections that you edited that were
5  published?
6      A.  That saw publication.
7      Q.  And you edited sections that were
8  not published in 2008?
9      A.  What happens is, if they're on the
10  calendar, I start assigning stories,
11  recruiting writers, assigning stories and some
12  of them were published either in community
13  paper or in The Post, or not at all or killed.
14  So, I did a lot of work that may not be
15  reflected in the actual publication.
16      The way that a newspaper works is
17  every day, the size of the newspaper
18  fluctuates depending on news.  So, what I can
19  tell you is that these were the ones that were
20  published, but it doesn't reflect all of the
21  work that I did.
22      Q.  Handing you Guzman Exhibit 31.
23      (Defendant's Guzman Exhibit 31,
24      document bearing Bates numbers NYP
25      '2537 through '2607, marked for

## Page 368

1    SANDRA GUZMAN-10/13/11
2      identification, as of this date.)
3      Q.  Which are Bates NYP '2537 through
4  '2607.
5      Are these the special sections
6  other than Tempo that you edited in 2009?
7      A.  There may be.  There's some
8  missing.
9      Q.  What's missing?
10      A.  St. Patrick's Day may be missing.
11      Q.  Did St. Patrick's Day -- did the
12  St. Patrick's Day section get published in
13  2009?
14      A.  I believe so.
15      Q.  Were you the editor of it?
16      A.  Yes.  The casino section, several
17  casino sections.  Real estate section.
18      Q.  Were you the editor of the casino
19  section?
20      A.  Whenever Carole -- Carole had a
21  death in the family.  Her father was dying.
22  And I was asked to edit and take over some of
23  her sections.
24      And real estate and casino was
25  among them.  And I also edited all the parade

## Page 369

1    SANDRA GUZMAN-10/13/11
2  sections.
3      So, I edited the Columbus and the
4  St. Patrick's Day parade, which I believe --
5  which I believe were published that year.
6      Q.  Well, Columbus Day is in October
7  and you were terminated in September, right?
8      A.  Well, would have edited, yes.
9      Q.  It would have been published after
10  you were no longer an employee of The Post
11  right?
12      A.  Right.  So, I meant to the St.
13  Patrick's Day parade, which would have been in
14  March and I helped prepare the casino and the
15  real estate and I helped prepare July 4th
16  parade that are not reflected in the packet
17  that you've given me.
18      MR. LERNER:  We're going to go off
19  the record.
20      THE VIDEOGRAPHER:  The time is
21  8:14 p.m.  We're going offer the
22  record.
23      (Whereupon, an off-the-record
24  discussion was held.)
25      THE VIDEOGRAPHER:  The time is

CONTAINS CONFIDENTIAL PORTIONS

1                    Guzman

2     UNITED STATES DISTRICT COURT

      SOUTHERN DISTRICT OF NEW YORK

3     ------------------------------x

      SANDRA GUZMAN,

4

                 Plaintiff,

5

         vs.           90 Civ. 9323(BSJ)(RLE)

6

      NEWS CORPORATION, NYP

7     HOLDINGS, INC., d/b/a

      THE NEW YORK POST, and

8     COL ALLAN, in his official

      and individual capacities,

9

                 Defendants.

10    ------------------------------x

11

12             SANDRA GUZMAN

13          New York, New York

14        Monday, February 13, 2012

15      CONTAINS CONFIDENTIAL PORTIONS

16

17

18

19

20

21

22

23

24    Reported by:  Steven Neil Cohen, RPR

25    Job No. 46187

CONTAINS CONFIDENTIAL PORTIONS

Page 384

Guzman

1
2      THE VIDEOGRAPHER:  Will the court
3   reporter please swear in the witness?
4   SANDRA GUZMAN, called as a witness by the
5      Defendants, having been duly sworn,
6      testified as follows:
7      MR. THOMPSON:  Let the record
8   reflect that this deposition was
9   scheduled to begin at 10:00 a.m.
10     We did not start at 10:00 a.m.
11  despite the fact that Ms. Guzman was
12  sitting and ready to begin because of
13  opposing counsel.  This deposition is
14  starting almost 20 minutes after the
15  start date.
16     MR. LERNER:  The record will also
17  reflect if you look it up that the FDR
18  Drive has been closed for two to three
19  hours this morning due to a tractor
20  trailer getting on the southbound FDR
21  and getting stuck and created
22  significant traffic problems in the
23  city.  I come from the north to get to
24  the deposition.  To get to the office so
25  I was delayed some minutes by that.  And

Page 385

Guzman

1
2   that is the reason so I apologize,
3   Mr. Thompson, but that is the reason for
4   the delay.
5   EXAMINATION
6   BY MR. LERNER:
7      Q.   Ms. Guzman, you testified in
8   October that Les Goodstein told you you
9   looked sexy and beautiful in the office,
10  right?
11     Do you remember that?
12     A.   Yes.
13     Q.   Where did he tell you you looked
14  sexy and beautiful?
15     A.   When I saw him in the elevator.
16     When I saw him in the News Corp.
17  cafeteria on the third floor.
18     And when I met with him in his
19  office on the fifth floor.
20     And any chance and any moment that
21  I bump into him randomly in the building, he
22  would comment.
23     Q.   All right.
24     When was the first time he told
25  you that you looked sexy and beautiful?

Page 386

Guzman

1
2      A.   It was probably the second
3   meeting.  He commented --
4      Q.   Was that in his office?
5      A.   He commented on my dress and on my
6   shoes and how beautiful I looked in them.
7      Q.   And what kind of dress, what was
8   the dress you were wearing?
9      A.   Simple black dress.
10     Q.   What were your shoes?
11     A.   Black shoes.
12     Q.   And what was the location of that
13  conversation?
14     A.   Elevator on the third floor.
15     Q.   And was that a chance meeting in
16  the elevator or were the two of you going
17  somewhere together?
18     MR. THOMPSON:  Objection.
19     THE WITNESS:  We were going to a
20  meeting.
21  BY MR. LERNER:
22     Q.   What meeting?
23     A.   A meeting that he called to
24  discuss one of the sections that I worked
25  on.

Page 387

Guzman

1
2      Q.   And where were you going for that
3   meeting?
4      A.   Third floor conference room.
5      Q.   Was Sami Marerro also in
6   attendance at that meeting?
7      A.   Yes.
8      Q.   What about Tony Martinez?
9      A.   I don't remember if Tony was
10  there.
11     Q.   And he told you that -- did he say
12  that your dress looked -- what exactly was
13  the word or words he used to describe your
14  black dress on that occasion?
15     A.   You are looking beautiful and sexy
16  today.
17     Q.   And was Ms. Marerro with the two
18  of you in the elevator when he said that?
19     A.   No.
20     Q.   The two of you proceeded from the
21  elevator to the third floor conference room
22  and joined Ms. Marerro?
23     A.   Yes.  We joined about 20 people
24  from the sales staff.
25     Q.   And where did you get on the

3

CONTAINS CONFIDENTIAL PORTIONS

Page 392

Guzman
1
2  to give her respect. If you are not
3  going to give her respect we are going
4  to stop this deposition. You will not
5  raise your voice to this witness.
6      MR. LERNER: We will stop the
7  deposition if you interfere with it. We
8  have a video recorder here so the record
9  does not require you to characterize
10 what is going on in the room. My --
11     MR. THOMPSON: I will state my
12 position.
13     MR. LERNER: Excuse me, I am not
14 done.
15     MR. THOMPSON: Any time you raise
16 your voice to my client --
17     MR. LERNER: I am not finished.
18     MR. THOMPSON: That is a fact.
19     MR. LERNER: I am not finished.
20     MR. THOMPSON: Don't do that. It
21 is --
22     MR. LERNER: I will conduct the
23 deposition in the tone of voice --
24     MR. THOMPSON: Properly.
25     MR. LERNER: I will conduct the

Page 393

Guzman
1
2  deposition.
3      MR. THOMPSON: Not improperly.
4  BY MR. LERNER:
5      Q.   Ms. Guzman, is there anything else
6  that you recall specifically on the occasion
7  of your second meeting with Mr. Goodstein
8  when you were walking from the elevators on
9  the third floor to a conference room that he
10 did besides telling you your dress or you
11 looked sexy and beautiful?
12     A.   He looked at me in a very
13 lascivious way and he looked at me, checked
14 me out up and down.
15     Q.   And how long did that take?
16     MR. THOMPSON: Objection.
17     THE WITNESS: It felt like an
18 eternity.
19     I am not going to work to be
20 looked at lasciviously by somebody who
21 is supervising sales of the section I
22 worked for.
23 BY MR. LERNER:
24     Q.   Did you say anything to him about
25 it?

Page 394

Guzman
1
2      A.   No.
3      Q.   What was your response?
4      A.   Disgusted.
5      Q.   No. What was your verbal or
6  physical response if any?
7      A.   I just ignored him and I walked to
8  the conference room.
9      Q.   What was lascivious about his
10 look?
11     A.   The way that he looked at me up
12 and down as if he is checking someone who is
13 naked, a woman is naked.
14     Q.   And what does that look like?
15     A.   As a woman?
16     Q.   No. What did it look like to you?
17     A.   As a woman -- I am going to
18 describe it, sir. As a woman you know it
19 when you see it.
20     Q.   Well, explain for the jury which
21 will be composed of potentially men and
22 women how that appears or what it actually
23 consists of?
24     A.   So he is slowly taking a look from
25 head to toe at my body as if he is observing

Page 395

Guzman
1
2  someone who is naked. A woman is naked.
3      Q.   But his comment to you was on your
4  dress, right?
5      A.   I was wearing the dress. It is
6  how the dress looked on me.
7      Q.   And he commented on the dress,
8  right?
9      A.   On how the dress looked on me.
10     Q.   Did he make a comment about your
11 body?
12     A.   You look beautiful and sexy in
13 that dress.
14     Q.   And when you walked from the
15 elevator area to the conference room was
16 there anything that occurred during that
17 walk that you considered objectionable or
18 lascivious that you can recall?
19     A.   No. But I remember that I walked
20 in back of him so that he would not look at
21 me as he walked, I walked behind him. I
22 remember that. I purposefully slowed down
23 my steps so that he can be in front of me.
24     Q.   Is there anything else that you
25 recall about your encounter with

CONTAINS CONFIDENTIAL PORTIONS

## Page 396

Guzman

1  Mr. Goodstein outside the elevators on the
2  third floor on that occasion that is
3  relevant to your claim?
5      A.   I felt harassed and I felt
6  disgusted that this happened.  That is what
7  I recall.  I recall feeling this is not
8  right.  This is wrong.  I don't come to work
9  to be gawked at.
10     Q.   When was the next time that you
11 experienced anything from Mr. Goodstein that
12 you regard as harassing?
13     A.   Put it this way, I would see
14 Mr. Goodstein in the News Corp. cafeteria on
15 the third floor.  I would see him in the
16 elevator banks in the lobby and every time
17 I -- during meetings and every time we had
18 an encounter Mr. Goodstein had to comment on
19 something that I was wearing on how I looked
20 in my shoes or in my dress.
21     Q.   I am asking you when specifically
22 you recall was the next time that
23 Mr. Goodstein commented?
24     A.   So I met with him on his fourth
25 floor office.

## Page 397

Guzman

2      Q.   Okay.  You testified last time we
3  were in a deposition together that
4  Ms. Marerro was in those meetings with you
5  and Mr. Goodstein?
6      A.   Most of the time, yes, Ms. Marerro
7  was present.
8      Q.   You testified that she was always
9  with you in those meetings and that
10 sometimes Mr. Martinez was with you?
11     A.   Well, Ms. Marerro stopped working
12 for The New York Post so the times -- there
13 were times that I met with Ms. Goodstein
14 that Ms. Marerro was not present or
15 Mr. Martinez because they both stopped --
16 they were both laid off.
17     Q.   And how many times did that occur?
18        MR. THOMPSON:  Objection.
19        THE WITNESS:  How many times?  I
20 am sorry.
21 BY MR. LERNER:
22     Q.   How many times did you meet with
23 Mr. Goods without the presence of
24 Ms. Marerro?
25     A.   On numerous occasions.

## Page 398

Guzman

2      Q.   How many?
3      A.   I can't give you a number but
4  numerous occasions.
5      Q.   Where?
6      A.   Mostly his fourth floor office.
7  Fourth or fifth floor office.  Maybe fifth
8  floor, yes, where News America marketing is
9  located.
10     Q.   Again, I would like to know when
11 the second time you felt harassed by
12 Mr. Goodstein was with specific
13 recollections if you have them.  If you
14 don't have them answer I don't remember.
15     A.   I don't remember the second time
16 but I remember the numerous occasions when
17 we would randomly bump into each other in
18 meetings and I remember there was one
19 meeting where as soon as I walked in he
20 chose to comment on the shoes again that I
21 was wearing.
22     Q.   Did you ask him not to comment on
23 your shoes?
24     A.   No.
25     Q.   Is that the occasion when you

## Page 399

Guzman

2  said, when you offered to let him borrow
3  them as a joke?
4      A.   Yes.
5      Q.   Why was the comment on your shoes
6  offensive?
7      A.   I think if I were a white male he
8  would not be commenting on the way I
9  dressed.
10        I think that he meant to objectify
11 me as a sexual object and I found that
12 offensive.
13     Q.   Anything else?
14     A.   I found his conduct inappropriate,
15 Mark.
16     Q.   Is there anything else about his
17 commenting on your shoes -- what was
18 specifically did he say about your shoes?
19     A.   Sexy shoes.
20     Q.   Were they sexy shoes?
21        MR. THOMPSON:  Wait.  She wasn't
22 finished.
23        THE WITNESS:  Sexy shoes.  He
24 wouldn't even refer to me by my first
25 name or by my last name.

CONTAINS CONFIDENTIAL PORTIONS

Page 400

Guzman

BY MR. LERNER:
2    Q.   Were they sexy shoes?
3
4    A.   No.
5    Q.   Describe the shoes?
6    A.   Black shoes, black pumps.
7    Q.   Back pumps.  Pumps means high
8  heels?
9    A.   Black high heels, yes.
10   Q.   It is your testimony that those
11 are not sexy shoes?
12   A.   No.  They are black.
13   Q.   They are black pumps?
14   A.   High heels, yes.
15   Q.   What did you like about those
16 shoes?
17   A.   They were comfortable.
18   Q.   Did you like the fact that they
19 were high heels?
20       MR. THOMPSON:  Objection.
21       THE WITNESS:  I liked them.
22 BY MR. LERNER:
23   Q.   Did anyone else ever comment on
24 those shoes?
25   A.   Not that I can recall right now.

Page 401

Guzman

2    Q.   Do you still own those shoes?
3    A.   Yes.
4    Q.   Who were they manufactured by?
5       MR. THOMPSON:  Objection.
6       THE WITNESS:  YSL.
7  BY MR. LERNER:
8    Q.   If you recall any other specific
9  occasions during which Mr. Goodstein made
10 what you regard as harassing comments about
11 your appearance can you please describe them
12 specifically now?
13   A.   So there was another occasion when
14 again we were meeting in his office and as I
15 was walking in instead of greeting me with
16 my name he called me Cha-Cha.
17   Q.   Okay.  We discussed this incident
18 the last time you were deposed, correct?
19   A.   Yes.
20   Q.   And he stopped doing that when you
21 let him know you didn't appreciate it,
22 correct?
23   A.   Yes.
24   Q.   And how did you let him know that?
25   A.   Don't call me that.

Page 402

Guzman

2    Q.   How did he respond when you said
3  don't call me that?
4    A.   He was confused.
5    Q.   But he stopped calling you that,
6  correct?
7    A.   Yes.
8    Q.   And with respect to him calling
9  you sexy and beautiful you never said don't
10 call me sexy and beautiful, correct?
11   A.   No.
12   Q.   No, you did not say that?
13   A.   No.  I did not.  I would ignore
14 him.
15   Q.   Mr. Goodstein's office was on the
16 fifth floor of the building at 1211 Avenue
17 of the Americas, right?
18   A.   Yes.
19   Q.   What was offensive about the term
20 Cha-Cha to you?
21   A.   First of all, I have a name.
22       Second of all, there is a
23 stereotype that all Latin women are, you
24 know, hot and dancers and Cha-Cha is
25 referring to a dance move on a dance floor.

Page 403

Guzman

2       Why couldn't he call me by my
3  name?
4    Q.   Did you ever write about somebody
5  who Tempo referred to in a headline as
6  Cha-Cha Willie?
7    A.   Are you looking at something that
8  maybe I should review?
9    Q.   I am looking at an -- a page from
10 Tempo from 2007 with a headline Cha-Cha
11 Willie, is that a headline that I approved
12 for Tempo?
13   A.   Can I see it?
14   Q.   No.
15   A.   I can't?
16   Q.   There is a question pending.  Did
17 you approve a headline Cha-Cha Willie for
18 Tempo regarding someone named Willie Perry?
19   A.   Can you read some more so that I
20 can -- can you refresh my memory?
21   Q.   Have you ever heard of Willie
22 Perry?
23   A.   I can't recall right now.
24   Q.   Do you know who Willie Perry is?
25   A.   I have interviewed and I have

CONTAINS CONFIDENTIAL PORTIONS

Page 404

Guzman

1
2  edited hundreds and hundreds and hundreds of
3  pages throughout my career.
4      Q.   Did you review all of the pages of
5  Tempo before it was published?
6      A.   Yes.
7      Q.   Each month?
8      A.   Yes.
9      Q.   So a headline in Tempo would be
10 reviewed by you before it would be
11 published, right?
12     A.   Yes, yes.
13     Q.   So if a headline ran Cha-Cha
14 Willie then you reviewed it before it ran?
15     A.   Yes.  And actually that is not
16 Tempo.  That is the Black History Month
17 section.
18     Q.   Is it a section that you edited?
19     A.   Yes.
20     Q.   So same question.  If it is a
21 section you edited did you review the
22 mockups before they were printed?
23     A.   Yes.
24     Q.   And approved the headlines?
25     A.   Yes.

Page 405

Guzman

1
2      MR. LERNER:  Let's mark it.
3      (Page from the Harlem Week section
4  was marked Guzman Exhibit 32 for
5  identification)
6  BY MR. LERNER:
7      Q.   Is Exhibit 32 a page from Harlem
8  Week section that you edited?
9      A.   Yes.
10     Q.   And you approved the headline,
11 Cha-Cha Willie?
12     A.   Yes.
13     Q.   Did you write that headline?
14     A.   That is his name.  No.  My copy
15 editor did.
16     Q.   His name is Cha-Cha Willie?
17     A.   That is his nickname.
18     Q.   Did you interview him?
19     A.   No.
20     Q.   Do you know who did?
21     A.   Georgette Roberts.
22     Q.   Georgette Roberts is a reporter at
23 The Post?
24     A.   Part time.  She is a freelancer.
25     Q.   She is an African American

Page 406

Guzman

1
2  employee of The Post?
3      A.   Yes.
4      Q.   Do you regard this story or the
5  headline as offensive?
6      A.   No.
7      Q.   Were you ever on the fifth floor
8  of the New York -- withdrawn.
9          Were you ever on the fifth floor
10 of 1211 Avenue of the Americas for a reason
11 other than meeting with Mr. Goodstein?
12     A.   Yes.
13     Q.   How many times other than for a
14 meeting with Mr. Goodstein?
15     A.   Several times.
16     Q.   How many is "several"?
17     A.   About a dozen times.
18     Q.   Do you have a specific
19 recollection of being on the floor?
20     A.   Yes.
21     Q.   For what reasons?
22     A.   I was asked to help edit and think
23 about the content for a series of community
24 newspapers that News Corp. purchased,
25 Brooklyn and Queens Courier, there were

Page 407

Guzman

1
2  dozens of newspapers that Rupert Murdoch
3  purchased and I was asked to think about
4  content for them.
5          I was being considered as -- we
6  were exploring the potential of starting a
7  Queens section and the person in charge of
8  the community papers was Mr. Goodstein and
9  his deputy, I can't recall her name, Kylie
10 or something, I can't recall her name, his
11 deputy was charged with supervising these
12 papers and so we would meet on the fifth
13 floor to talk about content.  And stories
14 and how we could, what was the word we used,
15 just cross-pollinate the content that I was
16 creating for The Post and vice versa.
17     Q.   Mr. Goodstein was not in these
18 meetings, correct?
19     A.   On some of them he was not.
20     Q.   You never testified before that
21 Mr. Goodstein was in meetings with you about
22 the community newspapers.
23     A.   You didn't ask me.
24     Q.   Do you have a recollection of
25 that?

CONTAINS CONFIDENTIAL PORTIONS

Page 408

Guzman

1
2    A.   Yes.
3    Q.   When you bumped into him in the
4  cafeteria or in the elevators or in the
5  hallways how long did these meetings or
6  encounters last?
7    A.   Anywhere -- I don't know.
8  Anywhere from hello, how are you, five
9  minutes, they seemed longer because they
10  were always really uncomfortable.
11    Q.   And these were in -- these
12  encounters were in public areas in the
13  building, right?
14    A.   Yes, sir.
15    Q.   And you were free to walk away or
16  keep going where you were going during these
17  meetings, right?
18    A.   I am not really sure what you are
19  asking me.
20    Q.   Well, if you stood around to talk
21  to Mr. Goodstein for any length of time that
22  was of your own free will, correct?
23    A.   Well, he was supervising the sales
24  of sections that I was working on.
25    Q.   He wasn't your supervisor,

Page 409

Guzman

1
2  correct?
3    A.   He was not my supervisor but he
4  was supervising the sales so we worked in
5  the -- with the same projects, we worked on
6  the same projects.  So he wasn't a total
7  stranger to me, I would greet him and that
8  is when he took the opportunity to say
9  inappropriate comments.
10    Q.   Specifically the inappropriate
11  comments were sexy and beautiful?
12    A.   Mark, he would always comment on
13  my appearance.  He would always comment on
14  the dresses that I wore or the shoes that I
15  wore and he would always gawk.
16    Q.   And the comments were to use the
17  terms either sexy or beautiful?
18    MR. THOMPSON:  Objection.
19  BY MR. LERNER:
20    Q.   Correct?
21    A.   Yes.
22    Q.   Were these being -- these meetings
23  where you would be standing up during the
24  meeting speaking to him?
25    MR. THOMPSON:  Objection.

Page 410

Guzman

1
2    THE WITNESS:  The meetings by the
3  elevator banks, the random meetings --
4  BY MR. LERNER:
5    Q.   Correct.
6    A.   -- in the News Corp. cafeteria?
7    Q.   Yes.
8    A.   I would be usually going
9  somewhere.
10    The meetings in his office, I
11  would be sitting down.
12    Q.   There came a time in 2007 when he
13  stopped being involved in Tempo, right?
14    A.   Yes.
15    Q.   How many of these encounters with
16  Mr. Goodstein on the premises of the 1211
17  Avenue of the Americas occurred after he
18  stopped being involved in Tempo?
19    A.   I also told you that we continued
20  to meet after because of his involvement
21  with the Brooklyn and community papers,
22  okay.
23    Q.   How many times did you meet with
24  Mr. Goodstein on the Brooklyn and community
25  papers after he was no longer involved with

Page 411

Guzman

1
2  Tempo?
3    A.   Numerous times.
4    Q.   How many?
5    A.   I would say two dozen times.
6  Maybe more.
7    Q.   Where were those meetings?
8    A.   His office, at News Corp. office
9  on the fifth floor, News America offices.
10    Q.   And who was in those meetings, you
11  and his deputy?
12    A.   Yes.  Sometimes there were two
13  deputies and sometimes one deputy.
14    Q.   And who were the names -- what
15  were the names of the two deputies?
16    A.   I cannot recall the names.
17    Q.   Were they male or female?
18    A.   One of them was a female and her
19  name starts with a K, K something.  And I
20  believe that she went on maternity leave and
21  then another staffer took over her
22  responsibilities but I can't recall his
23  name.
24    Q.   Did the two deputies ever say
25  anything to you that you considered

CONTAINS CONFIDENTIAL PORTIONS

Page 412

Guzman

1
2  harassing or abusive?
3      A.  No, sir.
4      Q.  And did you ever say anything to
5  them about Mr. Goodstein's conduct?
6      A.  No, sir.
7      Q.  Were they ever present during
8  Mr. Goodstein engaging in conduct that you
9  considered offensive?
10     A.  No.
11     Q.  Did you ever tell them about it?
12     A.  The two deputies?
13     Q.  Yes.
14     A.  About Mr. Goodstein's --
15     Q.  Yes.
16     A.  -- inappropriate behavior?  No.
17         I told other people.  I complained
18  to other people.
19     Q.  My question was did you tell them
20  about it.
21     A.  Okay.
22     Q.  During what period of time did you
23  have meetings with Mr. Goodstein about the
24  community newspapers?
25     MR. THOMPSON:  Objection.

Page 413

Guzman

1
2      THE WITNESS:  During what period
3  of time?  When the newspapers were first
4  initially purchased, there were a lot of
5  discussion about what to do with them,
6  how to integrate them into The New York
7  Post properties.  There were News Corp.
8  properties and so we were trying to
9  figure out what their role was going to
10  be.
11  BY MR. LERNER:
12     Q.  Did Mr. Goodstein ever trap you in
13  a room?
14     A.  Trap me in a room?
15     Q.  Yes.
16     A.  No.
17     Q.  Did he ever -- did he ever touch
18  you?
19     MR. THOMPSON:  Objection.
20  BY MR. LERNER:
21     Q.  In an offensive way?
22     A.  No.
23     Q.  Did he ever ask you out on a date?
24     A.  No.
25     Q.  Did he ever mention sex acts with

Page 414

Guzman

1
2  you?
3      A.  No.
4      Q.  Did he ever comment specifically
5  by using the word breasts?
6      A.  No.
7      Q.  Did he ever use the word ass with
8  you to comment about your body?
9      A.  No.
10     Q.  Did he ever refer to your legs
11  specifically?
12     A.  I don't recall.  He may have.
13     Q.  You don't recall, right?
14     A.  I don't recall specifically.
15     Q.  Okay.  Were there times that you
16  were with Mr. Goodstein that he spoke to you
17  in a professional way discussing the
18  business you were doing?
19     A.  Yes.
20     Q.  Did he look you in the eye when he
21  spoke to you?
22     A.  No.
23     Q.  Never?
24     A.  Very few times.  That was part of
25  the problem.  He was always looking at my

Page 415

Guzman

1
2  body, at my breasts, at my legs, at my
3  shoes.  That was the inappropriate behavior
4  I was trying to describe.
5      Q.  Did you ever ask him to make more
6  eye contact with you?
7      A.  No.
8      Q.  Did you ever tape record any
9  meetings with Mr. Goodstein?
10     A.  No.
11     Q.  Did you ever write down notes
12  about Mr. Goodstein after your meetings?
13     A.  I don't remember if I wrote down
14  notes about his behavior.
15     Q.  And you never told him that you
16  didn't like the way he was looking at you,
17  correct?
18     A.  No, Mark.
19     Q.  Did he ever prevent you from
20  publishing Tempo?  That sounds like an odd
21  question but --
22     A.  Yes, it is.  I don't understand
23  what you are trying to ask me.
24     Q.  He never stood in the way of
25  getting Tempo out, right?

10

CONTAINS CONFIDENTIAL PORTIONS

Page 416

Guzman

1
2     A.   I don't know.
3     Q.   He was -- your understanding is he
4  facilitated Tempo, right?
5     A.   My understanding is that he was a
6  fan of the work that Tempo and my team were
7  doing.
8     Q.   You don't have any reason to doubt
9  that, correct?
10    A.   No.
11    Q.   So during the time you were
12  working with Mr. Goodstein you continued to
13  focus your efforts on getting Tempo out,
14  getting any other sections you were working
15  on out and doing a good job, correct?
16    A.   Can you repeat the question?
17    Q.   Sure.
18         During the time you were working
19  with Mr. Goodstein you continued to focus
20  your efforts on getting Tempo out, getting
21  any other sections you were working out and
22  doing a good job, correct?
23    A.   Yes.
24    Q.   And you did a good job, right?
25    A.   Yes.

Page 417

Guzman

1
2     Q.   And did you think that your
3  performance was good during this time
4  period?
5     A.   Notwithstanding the conditions
6  that I had to work under, yes.
7     Q.   You produced the section that you
8  wanted to produce, right?
9     A.   To the best of my ability.  I
10  ignored all the other harassment that I was
11  experiencing.
12    Q.   And you were able to do your job,
13  right?
14    A.   I did my job to the best of my
15  ability.
16    Q.   You were able to do your job well,
17  right?
18    A.   Yes.
19    Q.   You produced an excellent section,
20  right?
21    A.   Yes.  But that didn't mean that I
22  was not affected by his lewd behavior.
23    Q.   My question is your work did not
24  suffer for it, right?
25    A.   No.

Page 418

Guzman

1
2     Q.   No, it did not suffer for it,
3  right?
4         MR. THOMPSON: Objection.  She
5  just answered that question.
6         THE WITNESS: No.
7  BY MR. LERNER:
8     Q.   You have actually described
9  yourself as sexy and beautiful, have you
10  not?
11    A.   I may have.
12    Q.   Do you recall writing a list of
13  words to describe yourself and including
14  sexy and beautiful on that list?
15    A.   No.
16    Q.   Who is Sol, S-O-L?
17    A.   Sol is a friend of mine.
18    Q.   Do you remember writing a list of
19  words to describe Sol and writing a list of
20  words to describe yourself and comparing the
21  two?
22    A.   No.
23    Q.   I am going to show you a document,
24  showing you a document marked Guzman Exhibit
25  33.

Page 419

Guzman

1
2         (Handwritten list was marked
3  Guzman Exhibit 33 for identification)
4  BY MR. LERNER:
5     Q.   Ms. Guzman, is this a piece of
6  paper where you wrote down lists of
7  adjectives to describe Sol and yourself?
8     A.   Yes.
9     Q.   Sol is the column on the left and
10  you are the column on the right?
11    A.   Yes.
12    Q.   And who -- is Sol somebody you
13  were involved with?
14    A.   Involved with?
15    Q.   Yes.
16    A.   How do you mean?
17    Q.   Were you ever romantically
18  involved with Sol?
19    A.   No.
20    Q.   What is Sol's last name?
21    A.   Rivera.
22    Q.   Were you involved in any business
23  dealings with Sol?
24    A.   Yes.
25    Q.   What were those dealings?

CONTAINS CONFIDENTIAL PORTIONS

Page 432

Guzman

1
2      A.   She told me other things that I
3   didn't print.
4      Q.   Did you ask her why she didn't
5   want to print those other things?
6      A.   Yes.
7      Q.   What did she tell you?
8      A.   She didn't want to get involved in
9   offending her friends on Broadway.
10     Q.   Did you ever publish your own
11  critique of West Side Story?
12     A.   I don't remember if it was
13  published.  I wanted to.
14     Q.   Have you ever published material
15  that was critical of West Side Story?
16     A.   I don't remember.
17     Q.   Did Mr. Riedel contact West Side
18  Story's casting director for your friend?
19     A.   I don't know.
20     Q.   Did he ever get back to you with
21  the information that you requested about the
22  casting director?
23     A.   I don't remember.
24     Q.   So with respect to Mr. Riedel
25  singing I want to live in America, I like it

Page 433

Guzman

1
2   here in America to you in a Spanish accent
3   was the first thing he did that offended
4   you, correct?
5      A.   Yes.
6      Q.   And Ms. Guzman, it was also the
7   last thing he did that offended you,
8   correct?
9      A.   It was the only thing he -- the
10  only thing he did every time we encountered
11  each other.
12     Q.   It was the only thing that he did
13  that offended you, right?
14     A.   Yes.
15     Q.   You never asked him to stop
16  singing it, right?
17     A.   Just ignored him.
18     Q.   Did you discuss the musical with
19  him?
20     A.   I may have.
21     Q.   Were you interested in his help in
22  your coverage of the musical for Tempo?
23     A.   Yes.
24     Q.   And as the revival was being
25  produced before it opened did you have

Page 434

Guzman

1
2   conversations with him in your office about
3   how you might cover the revival?
4      A.   Not really.  I had pretty much an
5   idea of how I wanted to do it.  I didn't
6   need Michael's help in that regard in how I
7   wanted to cover it.
8      Q.   Didn't you ask him if he could put
9   you in touch with the producer of it?
10     A.   I may have asked him.
11     Q.   And so that would be asking his
12  help for coverage, right?
13     A.   Yes.
14     Q.   So you did ask him for help?
15     A.   But how to cover it is very
16  different.  How to approach the story is
17  very different.
18     Q.   Mr. Riedel has extensive contacts
19  on Broadway, agreed?
20     A.   Agreed.
21     Q.   And if you are going to write a
22  story about West Side Story's being produced
23  on Broadway Mr. Riedel's contacts could be
24  valuable to you, correct?
25     A.   Sometimes.  He is also very much

Page 435

Guzman

1
2   hated on Broadway so.
3      Q.   But his contacts could be valuable
4   to you?
5      A.   Potentially could be or not.
6      Q.   And you sought that out from him,
7   right?
8      A.   I sought that out from him, yes.
9      Q.   Okay.  And you spoke to him about
10  it in the office, right?
11     A.   Yes.
12     Q.   Ms. Guzman, you have been writing
13  a book about The New York Post and your
14  experiences there, correct?
15     A.   I am trying to write -- I have
16  been trying to work on a book about my
17  experiences at The Post.
18     Q.   About its senior editors?
19     A.   About my experiences at The Post,
20  all of them.
21     Q.   You have written multiple chapters
22  of that book, have you not?
23     A.   No.  There are sketches.
24     Q.   You are writing it on the computer
25  that you have now, right?

CONTAINS CONFIDENTIAL PORTIONS

Page 464

Guzman

1
2  tale of my life as I remember it as I dream
3  it."
4        Is it correct that this story is
5  an honest tale of your life as you remember
6  it?
7    A.   What story?
8    Q.   The story in this document.
9    A.   These are supposed to be separate
10  files and I am not sure why they are in all
11  one file.  So this graph here.
12    Q.   This was one file called dirt
13  eater.doc.
14    A.   Yes.
15    Q.   And your counsel produced the
16  metadata for this file?
17    A.   Yes.
18    Q.   Which said that it was created on
19  February 15, 2008?
20    A.   Yes.
21    Q.   Is that consistent with your
22  recollection of when you wrote this?
23    A.   Yes.
24    Q.   Why did you start writing this on
25  February 15, 2008?

Page 465

Guzman

1
2    A.   I have been -- I am a writer and I
3  am always taking notes.  I am always
4  thinking of book ideas and I am trying to
5  write fiction so trying to cultivate that so
6  I also thought about writing my early
7  childhood memoirs and so the working title
8  of my memoir is Dirt Eater.
9    Q.   On the first two pages of this you
10  describe several incidents centering around
11  Langan's, the bar.  You talk about being
12  together with your female co-workers talking
13  at the bar, you talk about a story that Col
14  Allan told about a Steve Dunleavy and you
15  talk about seeing a picture on a BlackBerry.
16        Did all of those things happen on
17  the same night or is this a compilation of
18  incidents from different nights?
19    A.   The first two pages is a summary
20  of what happened at Langan's on the night
21  that my boss, the editor of The New York
22  Post, harassed me sexually.
23    Q.   So this is a narrative of one
24  night?
25    A.   It is a summary, yes.

Page 466

Guzman

1
2    Q.   And is it an accurate summary?
3    A.   It is factual.
4    Q.   It -- what does that mean "It is
5  factual"?
6    A.   Everything that I have here
7  happened in the first two pages of this
8  document.
9    Q.   Okay.  The "I" in the first two
10  pages is you Sandra Guzman?
11    A.   Yes.  This is -- these are three
12  different -- yes.
13    Q.   Okay.  So the night started out
14  with you with three of your female New York
15  Post co-workers drinking beer and talking at
16  the bar, right?
17    A.   What night?
18    Q.   The night described in the first
19  two pages of Guzman Exhibit 34.
20    A.   Yes.
21    Q.   And you wrote in the third line,
22  "There were four of us all females talking
23  industry lingo who fucked who, who got a
24  good story."
25        Do you see that?

Page 467

Guzman

1
2    A.   Yes.
3    Q.   And what did you mean by "who
4  fucked who"?
5    A.   The girls and I talked about our
6  relationships, we talked about our
7  boyfriends.
8    Q.   What did you mean by "industry
9  lingo"?
10    A.   We talked about who is working
11  where, what stories each of us were working
12  on, what was happening at -- industry wide,
13  what stories we wanted to get.
14    Q.   And it says you were on your
15  second drink when Col Allan walked in?
16    A.   We had just ordered our second
17  drink.
18    Q.   It doesn't say you just ordered
19  your second drink.  It says, "We were all on
20  our second drink."
21    A.   Well, I am telling you that this
22  is a summary.
23    Q.   Okay.
24    A.   So --
25    Q.   All right.

CONTAINS CONFIDENTIAL PORTIONS

Page 468

Guzman
2  So your memory is that you had
3  just ordered your second drink?
4      A.   We had just ordered our second
5  drink.
6      Q.   And your memory today four years
7  after this happened is clearer than it was
8  when you wrote this?
9      MR. THOMPSON:  Objection.
10      THE WITNESS:  This was a pretty --
11  this is a pretty -- this highlight of my
12  days at the New York Post.  I remember
13  this.
14  BY MR. LERNER:
15      Q.   So it is -- is it factual or not,
16  Ms. Guzman?
17      A.   The first two pages of the
18  document we are talking about are facts.
19      Q.   They are completely factual?
20      A.   Yes.
21      Q.   You said, "Normally Col would skip
22  by and make a beeline to the men who were at
23  the bar," right?
24      A.   Yes.
25      Q.   Or at least he would always skip

Page 469

Guzman
2  by you, correct?
3      A.   Yes.
4      Q.   That is factual?
5      A.   Yes.
6      Q.   So Col Allan didn't make a habit
7  of accosting you or addressing you or
8  speaking to you at the bar; is that correct?
9      A.   Yes.
10      Q.   And you give a description of Col
11  Allan and then you go on to say, "That night
12  the editor shared a story about the time
13  Dunleavy fucked a gorgeous female fan in the
14  bar's closet."
15      Do you see that?
16      A.   Yes.
17      Q.   Now, do you know when that
18  incident occurred, the Dunleavy incident?
19      A.   No.  He didn't -- he was sharing
20  multiple -- many jokes and that was one of
21  many sexual jokes about Dunleavy's sexual
22  history but he didn't say a date.
23      Q.   Okay.  And you don't know if Col
24  Allan was actually testifying from his
25  own -- from witnessing this or if Col was

Page 470

Guzman
2  telling a story that had kind of come to him
3  secondhand, do you?
4      A.   He actually said that he witnessed
5  this, he actually -- the stories that he
6  told us that night were all stories that he
7  witnessed about his really good friend
8  Dunleavy whom he has known for more than 30
9  years.
10      Q.   Your testimony is that Col Allan
11  told you that he saw this incident with
12  Dunleavy having sex in the closet?
13      A.   He witnessed that he saw her leg
14  sticking out of the closet as he had sex
15  with this woman.
16      Q.   What you say is that the editor
17  shared a story, right?
18      A.   I summarized, I didn't write all
19  the things that the editor shared that night
20  with us.
21      Q.   Okay.  But your -- okay.  Your
22  account here doesn't say that the editor
23  told you he saw this.  It says he shared a
24  story, right?
25      A.   Right.  He shared a story in which

Page 471

Guzman
2  he saw his good friend drink himself drunk
3  and then had -- proceed to have sex with
4  this fan and he witnessed her leg sticking
5  out of the closet.  In fact I believe it was
6  Langan's where this happened.
7      Q.   Are you certain that Mr. Allan
8  told you that he saw this incident?
9      A.   I am certain that all the stories
10  he shared that night he was very specific
11  that he witnessed.
12      Q.   And you listened to the story,
13  right?
14      A.   Yes.
15      Q.   And the girls laughed?
16      A.   Yes.
17      Q.   And you went ooh?
18      A.   I went ooh.
19      Q.   Ooh, and you went ooh, not because
20  you were offended that somebody would
21  describe an incident of sex, you said ooh
22  because, "The thought of anyone fucking a
23  near dead drunk skeleton was not funny.  I
24  fuck for pleasure."
25      A.   It wasn't funny.  It was actually

CONTAINS CONFIDENTIAL PORTIONS

Page 472

```
 1            Guzman
 2  disgusting.
 3      Q.  And you stuck around to listen to
 4  the story, right?
 5      A.  I stuck around to hang out with my
 6  girlfriends.
 7      Q.  Nobody was chaining you to the bar
 8  stool, right?
 9      A.  No.
10      Q.  You could have walked away?
11      A.  Yes.
12      Q.  Right?
13          You wrote in the same paragraph
14  that, "Col Allan only befriends ugly female
15  editors, the she-males."
16          Who were you referring to?
17          MR. THOMPSON:  What paragraph are
18  you referring to?
19          MR. LERNER:  Same paragraph we
20  have been on, five lines from the
21  bottom.
22          MR. THOMPSON:  I see.
23          THE WITNESS:  A former features
24  editor.
25
```

Page 473

```
 1            Guzman
 2  BY THE VIDEOGRAPHER:
 3      Q.  Who is that?
 4      A.  Fay Penn.
 5      Q.  Well, you actually wrote plural,
 6  "He only befriends ugly female editors,
 7  she-males."
 8      A.  That is what I was thinking.
 9      Q.  Is "she-males" a term that you use
10  for women you regard as ugly?
11      A.  No.
12      Q.  Did you regard Fay Penn as ugly?
13      A.  Her attitude more than physically.
14  I was referring to her energy, to her
15  energy, not to her physical appearance.
16      Q.  Well, you wrote that "Col Allan
17  doesn't know how to handle himself around
18  pretty women, he only befriends ugly female
19  editors."  You are talking about physical
20  appearance, correct?
21      A.  When I was thinking about this
22  particular editor, I was thinking more about
23  her energy.
24      Q.  What is a she-male?
25      A.  It is very strong, muscular,
```

Page 474

```
 1            Guzman
 2  androgenous-looking female.
 3      Q.  Is there anybody else at The Post
 4  that you regard as an ugly female editor who
 5  Col Allan befriends?
 6      A.  Who has ugly female energy, male
 7  ugly she-male female energy.  No.  I can't
 8  think of anybody else at this time.
 9      Q.  Isn't a she-male a man who
10  surgically altered to have breasts?
11      A.  No.  Not as I understand it.
12      Q.  And, so you listened to the story
13  about Dunleavy having sex in the closet,
14  right, correct?
15      A.  Correct.
16      Q.  And you did not walk away,
17  correct?
18      A.  Correct.
19      Q.  And then Col Allan displays a
20  photograph on his BlackBerry of a naked man,
21  correct?
22      A.  So after several stories about
23  Dunleavy's sexual exploits Col Allan digs
24  into his pocket, pulls out his BlackBerry
25  and hands it to me and he says, "Look," and
```

Page 475

```
 1            Guzman
 2  he smirks and he says, "Look at this," and
 3  it is a picture of a naked man with his
 4  genitalia exposed.
 5      Q.  And so Mr. Allan had told several
 6  stories about Dunleavy at this point?
 7      A.  At this point he had told several
 8  sexual stories.
 9      Q.  What were the other stories about
10  Dunleavy besides the one about the closet?
11      A.  There was one where Dunleavy slept
12  over his house.  He had given him keys to
13  his apartment and Dunleavy came in the
14  middle of the night and when Mr. Allan went
15  to the restroom or he heard noise he walked
16  into Dunleavy trying to pee in a closet or
17  something, to that effect so he
18  may have seen Dunleavy's penis.
19      Q.  Do you remember any other stories?
20      A.  And then there was a story.
21  something about Dunleavy once -- Dunleavy
22  has such a voracious sexual appetite that he
23  would probably, to use Mr. Allan's word,
24  fuck a woman without limbs or something to
25  that effect so there were more.  Those were
```

CONTAINS CONFIDENTIAL PORTIONS

Page 476

Guzman

1
2  the three I remember most vividly.
3      Q.    And then the -- and after those,
4  and you stuck around to listen?
5      A.    I kind of started zoning out after
6  the first joke.
7      Q.    Your feet were still planted on
8  the floor?
9      A.    Yes.
10     Q.    And you are still there in this
11 group, right?
12     A.    Right.  Can you -- you can, your
13 feet can be there and you can physically be
14 present but you can zone out.
15     Q.    And by now -- by then you drank
16 the second beer, right?
17     A.    He paid for, he paid a round for
18 all the girlfriends and I was drinking my
19 second beer.
20     Q.    Okay.  And then you see this
21 photograph on his BlackBerry that shows
22 you, right?
23     A.    Yes.
24     Q.    And you look at the photograph and
25 you make a remark to him about the

Page 477

Guzman

1
2  photograph that is very Chelsea of you,
3  right?
4      A.    Yes.  I was creeped out by it.  I
5  was shocked and baffled.
6      Q.    Well, but you said "How Chelsea of
7  you," that is what you said, right?
8      A.    It is what I wrote.
9      Q.    You said this is factual?
10     A.    I definitely told him that.  I may
11 have told him other things but I definitely
12 told him.
13     Q.    And Chelsea is a reference to the
14 neighborhood that you live in, right?
15     A.    Yes.
16     Q.    It is the gay capital of the
17 northeast, right?
18     A.    Yes.
19     Q.    Those are your words, right?
20     A.    Yes.
21     Q.    And you said that in your -- what
22 you wrote you said that this would be very
23 normal thing do in your neighborhood, right?
24     A.    Yes.
25     Q.    And you didn't tell Mr. Allan that

Page 478

Guzman

1
2  you were offended by the picture, right?
3      A.    No.
4      Q.    You didn't tell him that you were
5  offended by the stories he was telling,
6  right?
7      A.    No.
8      Q.    And you could have walked away
9  from the bar, right?
10     A.    You have to understand --
11     Q.    You could have --
12         MR. THOMPSON:  Wait.
13         THE WITNESS:  You have to
14     understand --
15 BY MR. LERNER:
16     Q.    You could have walked away from
17 the bar, correct?
18     A.    This is my boss and it was
19 pretty -- I was stupefied.  This never
20 happened to me in my life where my boss, you
21 know, would feel free to be so brazen and
22 talk about cocks and somebody else's sex
23 life and show me pictures of a naked man so
24 I was pretty baffled and stupefied.  I
25 actually don't remember moving from where I

Page 479

Guzman

1
2  was standing.
3      Q.    The picture was a photograph that
4  ran in The New York Post the next day,
5  right?
6      A.    I later learned.  At the time I
7  didn't know what it was.  At the time I
8  had -- there was absolutely no reason for
9  him to show me the picture so I didn't know
10 what it was and either the day later or two
11 days later it was published in The Post with
12 his genitalia covered.
13     Q.    When The Post buys a photograph
14 they get the whole photograph, right?
15     A.    Certainly that photograph that he
16 showed me wasn't covered up.
17     Q.    Right.  And that is the way the
18 photograph was purchased by The Post for
19 publication, right?
20         MR. THOMPSON:  Objection.
21         THE WITNESS:  I believe so.
22 BY MR. LERNER:
23     Q.    You wrote on the second page here,
24 6652, that in the second to last paragraph,
25 "Sex talk, sex play, lewd behaviors was the

CONTAINS CONFIDENTIAL PORTIONS

Page 484

Guzman

1
2  him?
3        MR. THOMPSON: Objection. Asked
4  and answered.
5        THE WITNESS: You know, I don't
6  remember that. I don't even remember
7  what Josh Williams looks like.
8  BY MR. LERNER:
9     Q.   If Josh told us that is he lying?
10       MR. THOMPSON: Objection.
11       THE WITNESS: I don't know because
12  he may have me confused with someone
13  else. So I don't remember telling Josh
14  Williams that.
15 BY MR. LERNER:
16    Q.   You listed Josh Williams as a
17  person with knowledge about your case on a
18  disclosure form.
19    A.   So I don't remember what he looks
20  like. And I don't remember that exchange
21  and that is the God's honest truth.
22    Q.   Why did you list him as a person
23  with knowledge of your case?
24    A.   Because he works in the
25  photography department where his boss would

Page 485

Guzman

1
2  frequently refer to women as -- women
3  employees of his as being part of his harem
4  so Josh probably witnessed David Boyle
5  referring to women as part of a team of
6  women who sexually satisfy him, his little
7  girlfriends.
8     Q.   David Boyle didn't sexually harass
9  you, right?
10    A.   He didn't personally sexually
11  harass me but he certainly created an
12  environment that was sexually hostile.
13    Q.   But it wasn't something he did in
14  your presence, correct?
15    A.   Well, in my presence he referred
16  to his female staff as being part of his
17  harem. In my presence to me, David Boyle
18  referred to the women that worked for him as
19  women who were part of his harem and to me
20  that meant that they were there for his
21  pleasure.
22    Q.   And that allegation is not in your
23  complaint, correct?
24    A.   The harem, the sexual -- the
25  harem?

Page 486

Guzman

1
2     Q.   What you just testified to.
3     A.   I believe that I -- what is part
4  of my complaint is that David Boyle did
5  create -- was part of a pattern of behavior
6  displayed by New York Post editors including
7  David Boyle who referred to his staff as
8  being part of his harem. It is part of the
9  complaint. It is absolutely part of the
10  complaint.
11    Q.   You never said in the complaint
12  that he referred to women as a harem,
13  correct?
14    A.   It is part of the complaint.
15    Q.   It is not -- you did not state in
16  your complaint that David Boyle referred to
17  his -- to women as a harem, correct?
18    A.   His staff.
19    Q.   Well, you didn't say that in the
20  complaint. You didn't plead that, correct?
21    A.   As far as I -- my recollection is
22  that I did.
23    Q.   Isn't it a fact this is the first
24  time that you are disclosing that allegation
25  to anybody?

Page 487

Guzman

1
2        MR. THOMPSON: Objection.
3        THE WITNESS: Can I --
4        MR. THOMPSON: Objection.
5        Answer the question.
6        THE WITNESS: Yes -- no, this
7  is --
8        MR. THOMPSON: You are not asking
9  her to disclose any conversations she
10  had with counsel, are you, Mr. Lerner,
11  right?
12       MR. LERNER: Of course not.
13       MR. THOMPSON: So make it clear so
14  she is not confused.
15       THE WITNESS: Right.
16       MR. THOMPSON: Because the
17  question is confusing.
18 BY MR. LERNER:
19    Q.   Have you ever disclosed this
20  allegation about David Boyle making comments
21  about a harem in your EEOC charge, in your
22  federal complaint, in any interrogatory
23  response, in any testimony, in any affidavit
24  ever?
25    A.   Well, I thought I did.

CONTAINS CONFIDENTIAL PORTIONS

Page 492

```
                 Guzman
1
2        A.   No.
3        Q.   You never asked Mr. Riedel to stop
4   singing from West Side Story, right?
5        MR. THOMPSON: Objection.
6        This part of the transcript
7   regarding everything in terms of -- you
8   can stop the confidential section when
9   Mr. Lerner started asking Ms. Guzman
10  about Exhibit 34 Bates stamps SG6651 and
11  6652.
12  BY MR. LERNER:
13       Q.   And you wrote in your book which
14  you call the Latinas bible that you are a
15  strong woman who learned early on never to
16  take abuse from anybody and to stand up for
17  yourself, right?
18       MR. THOMPSON: Objection. Asked
19  and answered.
20       THE WITNESS: I keep learning that
21  lesson.
22  BY MR. LERNER:
23       Q.   You wrote that, right?
24       A.   Yes.
25       Q.   And you have told women that that
```

Page 493

```
1                Guzman
2   is how they should live their lives, right?
3        MR. THOMPSON: Objection. Asked
4   and answered at the last deposition.
5   BY MR. LERNER:
6        Q.   Correct?
7        A.   Correct.
8        Q.   And you endeavored to live your
9   life that way, correct?
10       A.   I try as much as I could.
11  Sometimes I don't. Sometimes fear comes
12  into my heart. Sometimes I am afraid to
13  lose my job and so I try to the best of my
14  ability.
15       Sometimes the situation is more
16  overwhelming and I am not as strong as I
17  want to be but I aspire to be strong in the
18  face of sexual harassment and
19  discrimination.
20       Q.   And you told Les Goodstein that he
21  should stop saying Cha-Cha when you didn't
22  like that, right?
23       A.   Yes.
24       Q.   And you told Col Allan that you
25  thought it was a mistake for the paper to
```

Page 494

```
1                Guzman
2   cancel the Harlem Week section because you
3   thought it would be bad for the paper's
4   relationship with the minority community,
5   correct?
6        A.   Yes.
7        Q.   Did David Boyle ever do anything
8   to threaten you?
9        A.   I don't understand the question.
10  Threaten me how?
11       Q.   Did David Boyle ever threaten you?
12       A.   Threaten me, how?
13       Q.   In any way.
14       A.   I found his comments about his
15  talented female staffers unprofessional.
16       Q.   Did he ever threaten you?
17       A.   Threaten me like -- I don't
18  understand.
19       Q.   If you complain I will do
20  something to harm your career, that kind of
21  thing?
22       A.   No.
23       Q.   Was he your supervisor?
24       A.   No.
25       Q.   I am going to put before you a
```

Page 495

```
1                Guzman
2   document marked Guzman Exhibit 35.
3        (Document Bates numbered SG2341
4   through 2345 was marked Guzman Exhibit 35
5   for identification)
6   BY MR. LERNER:
7        Q.   It is Bates numbered SG2341
8   through 2345.
9        Ms. Guzman, I am going to
10  represent to you that this is an excerpt
11  from one of your handwritten journals.
12       If you look at the first page it
13  has a date of Tuesday, 9/27?
14       A.   Yes.
15       Q.   And if you look at the last page
16  it has a date of Wednesday, 9/28.
17       I am going represent to you that
18  9/27 and 9/28 were Tuesday and Wednesday in
19  the year 2005. Okay?
20       A.   Okay.
21       Q.   So would you -- you don't have to
22  accept that representation but you can -- my
23  question to you is do you know what year you
24  wrote these notes?
25       MR. THOMPSON: What notes? All in
```

CONTAINS CONFIDENTIAL PORTIONS

Page 496

1       Guzman
2    this document?
3        MR. LERNER: Exhibit 35.
4        THE WITNESS: It was during my
5    time that I worked at The Post.
6  BY MR. LERNER:
7    Q.   Was it in September 2005?
8    A.   I am not sure.
9    Q.   Okay.  Could you look at page
10   2343.
11       Ms. Guzman, this is a reference on
12   page 2343 to editorial meetings that you
13   attended early in your career at The Post,
14   right?
15   A.   Yes.
16   Q.   You attended those meetings in
17   2004 and 2005, right?
18   A.   '3, '4, '5 and maybe '6.  I am not
19   sure.
20   Q.   You testified that you stopped
21   going at the end of 2005.
22   A.   Okay.  Okay.
23   Q.   When did you write the material on
24   page 2343?
25   A.   In the meeting that I attended

Page 497

1       Guzman
2    where, again, the talk became of my boss'
3    trips to Scores and strippers and where the
4    meeting descended into parlor talk about
5    women's bodies.
6    Q.   Can you read what you wrote at the
7    top?
8    A.   Sure.  "Talk of butts, boobs,
9    strippers, football, betting, race horsing
10   were part of the daily conversations among
11   the white men in the table."
12   Q.   What is the diagram that you drew?
13   A.   It is a diagram of a table.
14   Q.   Where are you in this diagram?
15   A.   I am sitting by the window sill
16   in -- opposite of Col Allan, opposite side
17   of Col Allan, as far away from him as I
18   could be.
19   Q.   Were there stories in the paper
20   about strippers that were being discussed?
21   A.   On that particular day there may
22   have been a story.  There is always a story
23   about some kind of stripper, whether it is
24   real or not, many of the conversations ended
25   up being about strippers in the news room.

Page 498

1       Guzman
2    Q.   The Post publishes a lot of
3    stories about strippers, right?
4    A.   Particularly during the Col Allan
5    regime, yes.
6    Q.   And during the Col Allan regime
7    The Post published stories about celebrities
8    with large breasts?
9    A.   Yes.
10   Q.   Published pictures of celebrities
11   in bikinis, right?
12   A.   Yes.
13   Q.   The Post would purchase paparazzi
14   photos of celebrities on the beach, that
15   sort of thing?
16   A.   Yes.
17   Q.   And publish them, right?
18   A.   Yes.
19   Q.   And these were the editorial
20   meetings where what is going to be published
21   in the next day's paper is discussed,
22   correct?
23   A.   Well, this particular meeting,
24   yes.
25   Q.   This meeting refers to the 11:00

Page 499

1       Guzman
2    a.m. editorial meetings that happened
3    everyday led by Col Allan to determine what
4    is in the next day's paper, right?
5    A.   Yes.
6    Q.   Were you assigned a seat on the
7    window sill or did you take that seat?
8    A.   There were no more seats that day
9    at the table when I arrived to the meeting
10   so that is where I sat.
11   Q.   That day?
12   A.   Yes.
13   Q.   You have sat at the table though,
14   right?
15   A.   Yes.
16   Q.   Was Lauren Ramsby in the meeting
17   that day?
18   A.   Lauren Ramsby was in and out of
19   the meeting that day.
20   Q.   What about Paula Froelich?
21   A.   No.
22   Q.   She attended sometimes, right?
23   A.   When Richard Johnson wasn't
24   available.
25   Q.   What about who attended from

CONTAINS CONFIDENTIAL PORTIONS

Page 504

Guzman

2    Q.   Okay.  Take a look, if you would,
3  at the first page of Exhibit 36?
4    A.   Okay.
5    Q.   Which is entitled "Hispanic
6  Readers."  And it shows a graph of Hispanic
7  readership starting in March 2003 and going
8  to March 2009.
9        Do you see that?
10    A.   Yes.
11    Q.   And it shows Hispanic readership
12  of 248,810 in March 2003 and 238,768 in
13  March of 2009.
14        Do you see that?
15    A.   Yes.
16    Q.   If you go to the next page it is
17  entitled, "New York Post Hispanic Reader
18  Trend."  And it starts in year 2003 with
19  284,000 and it ends in '09 with 239,000 and
20  change.
21        Do you see that?
22    A.   Yes.
23    Q.   So, Ms. Guzman, Hispanic
24  readership during your time at The Post
25  began and ended roughly at the same numbers,

Page 505

Guzman

2  correct?
3    A.   Yes.  That is what it shows here.
4        MR. THOMPSON:  Objection.
5  Misstates this document.
6        THE WITNESS:  But see --
7        MR. THOMPSON:  Mr. Lerner, you
8  just misstated the document.
9  BY MR. LERNER:
10    Q.   You are right.  I misstated it.
11        It actually started at 284,000 and
12  ended 50,000 lower, 239,000; is that
13  correct?
14    A.   Yes.
15    Q.   So that aspect of your job by 2009
16  you had not actually achieved an increase in
17  Hispanic relationship for 2009, correct?
18    A.   It is very difficult to achieve it
19  when you don't control the headlines, when
20  you don't make decisions about how to write
21  the headlines that may be deemed
22  inappropriate or racist by readers.
23        It is hard to do a good job when
24  bodega owners are refusing to carry The New
25  York Post because they find it offensive and

Page 506

Guzman

2  racist so it is very difficult to do my job
3  when the editor is approving stories that
4  may be deemed racist and inappropriate to
5  the readership.
6    Q.   What is the basis of your claim in
7  light of what you have just said that you --
8  your -- you were able to increase Hispanic
9  readership at The Post by 40 percent when
10  you were there?
11    A.   Because to me Haiman gave me that
12  information.  Haiman was in charge of the
13  Tempo sales during my time there so she was
14  the one that actually gave me information.
15    Q.   Did she give it to you -- what did
16  she tell you?
17    A.   She said that the efforts at Tempo
18  were panning out.
19    Q.   When did she say that?
20    A.   When I worked there.
21    Q.   When did she leave?
22    A.   I think she left in 2007 or '8.  I
23  am not really sure.
24    Q.   So a year or two before you left,
25  right?

Page 507

Guzman

2    A.   Yes.
3    Q.   When did she tell you the words
4  that your -- Tempo efforts were panning out?
5    A.   She would say we have -- the
6  paper's Hispanic readership is increasing
7  and I think she was actually particularly
8  talking about a specific segment of the
9  readership.  I don't think this is the
10  entire universe of the Scarborough report.
11  This might be -- there might be a breakdown
12  of the ages so she might be referring to a
13  specific age bracket which is what the
14  advertisers were looking for.
15    Q.   So it is possible that she was
16  only referring to a particular subset of
17  Hispanic readers?
18    A.   Exactly.  Exactly.
19    Q.   And did she use the number
20  40 percent or did she say the words increase
21  or pan out?
22    A.   She may have used the number 40
23  percent.
24    Q.   Do you have a specific
25  recollection as you sit here today of her

CONTAINS CONFIDENTIAL PORTIONS

Page 508

Guzman

2  saying the number 40 percent?
3      A.   I don't have a specific
4  recollection.  I can tell you that she may
5  have said this during our conversations
6  about the efforts to increase readership.
7      Q.   But your best recollection today
8  is that she said they increased and the
9  efforts were panning out?
10     A.   Yes.
11     Q.   You are not sure what age group
12  she was talking about?
13     A.   I am not sure what age group.
14     Q.   So why did you swear in your
15  pleadings that you increased Hispanic
16  readership by 40 percent?
17     A.   Because that is what I was led to
18  believe.
19     Q.   Ms. Guzman, you are aware that by
20  2009 Tempo was not turning a profit,
21  correct?
22     A.   I was told, yes.
23     Q.   And overall Hispanic readership
24  you are seeing is roughly down from even
25  2003, right?

Page 509

Guzman

2      A.   Yes.
3      Q.   So -- and you were making $137,000
4  in 2009, correct?
5      A.   Yes.
6      Q.   So in light of those facts what
7  would the economic justification to The New
8  York Post have been keeping you in your job?
9      A.   I was editing many other sections,
10  I was contributing to other parts of the
11  paper.
12     Q.   Didn't many of the sections, the
13  special sections that you edited in 2009
14  besides Tempo also close down?
15     A.   Not while I was there.
16     Q.   Didn't Harlem Week close?
17     A.   It didn't close.  They weren't
18  able to publish one in The New York Post but
19  it was published in the community papers
20  that News Corp. owned.
21     Q.   So you believe that the economic
22  justification for your continued employment
23  would have been to continue editing several
24  special sections?
25          MR. THOMPSON:  Objection.

Page 510

Guzman

2  BY MR. LERNER:
3      Q.   Is that correct?
4          MR. THOMPSON:  Objection.
5          THE WITNESS:  The New York Post I
6  believe doesn't turn a profit and it
7  continues to publish so there is already
8  a philosophy of publishing a paper even
9  though it doesn't turn a profit.
10          And when I first started working
11  on one of the sections, Tempo, the paper
12  wasn't making a profit out of Tempo.  It
13  was much -- when Lockland Murdoch
14  decided to launch, to create this, it
15  wasn't about profit as told to me.  It
16  was about creating an environment where
17  Hispanic readers felt that this paper
18  was friendly to them and cared about
19  them and covered the community.
20          So justification for closing down
21  Tempo, you know if we are going to
22  follow that logic then why not close the
23  newspaper?  The paper does not make
24  money.  It does not make a profit.  It
25  loses.

Page 511

Guzman

2  BY MR. LERNER:
3      Q.   So The Post should continue --
4  your position is The Post should continue to
5  employ you to publish a section that they
6  are shutting down and continue to employ you
7  even though you are having no impact on
8  overall Hispanic readership?
9          MR. THOMPSON:  Objection.
10          THE WITNESS:  So the paper
11  continues to employ Col Allen even
12  though the paper loses money every year.
13  BY MR. LERNER:
14     Q.   Would there be a New York Post
15  without Col Allan, Ms. Guzman?
16     A.   Yes.  If it is financed by Rupert
17  Murdoch.
18     Q.   Were you present with Pucci Meyer
19  at any time where she met with the human
20  resources department or the legal
21  department?
22     A.   No.
23     Q.   Do you have any personal knowledge
24  of Pucci Meyer's discussions with the HR
25  department or the legal department?

CONTAINS CONFIDENTIAL PORTIONS

Page 524

Guzman

2  cohort with him in publishing the racist
3  cartoon.
4      Q.  I am sorry.  What did Mr. -- I
5  thought Mr. Angelo sent you an e-mail saying
6  why am I getting these e-mails?
7      A.  He called me.  He called me as
8  well.
9      Q.  Go ahead.
10     A.  And he yelled at me and he asked
11  me to stop, he didn't want to be part of
12  the -- he didn't want to be copied on my
13  responses.
14     Q.  What else did he say?
15     A.  And he hung up.
16     Q.  So he told you he didn't want to
17  be copied on your responses?
18     A.  Yes.
19     Q.  Okay.  He didn't berate you for --
20  he didn't criticize what you wrote in the
21  responses, correct?
22     A.  He don't want to talk about it.
23     Q.  He didn't want --
24     A.  Hear it.
25     Q.  Do you know how many e-mails he

Page 525

Guzman

2  received from your responses?
3      A.  No.
4      Q.  Could it have been dozens?
5      A.  Probably more.
6      Q.  Over 100?
7      A.  Probably more.
8      Q.  So is that what Mr. Angelo was
9  complaining about when he called you?
10         MR. THOMPSON:  Objection.
11  BY MR. LERNER:
12     Q.  Yes or no?
13     A.  I guess so.
14         He shouldn't have approved the
15  publication of that cartoon.
16         MR. LERNER:  How much time do we
17  have on this tape?
18         THE VIDEOGRAPHER:  We have about
19  20 minutes.
20         MR. LERNER:  Twenty minutes, okay.
21  Let's go off the record for a
22  minute.
23         THE VIDEOGRAPHER:  The time is
24  1:06 p.m.  We are going off the record.
25         (Luncheon recess: 1:06 p.m.)

Page 526

Guzman

2         AFTERNOON SESSION
3              2:13 p.m.
4         THE VIDEOGRAPHER:  The time is
5  2:13 p.m.
6         We are back on the record with
7  video 3.
8  BY MR. LERNER:
9      Q.  Ms. Guzman, for how many weeks did
10  Michael read allegedly sing the songs from
11  West Side Story to you?
12     A.  Numerous times.
13     Q.  How long did it go on for?
14     A.  I can't tell you how many weeks.
15  I can tell you that many of the times that
16  Michael Riedel would pass by my office or go
17  into my office to talk to me he would.
18         MR. LERNER:  Off the record.
19         (Discussion off the record)
20         THE VIDEOGRAPHER:  The time is
21  2:18 p.m.
22         We are back on the record.
23  BY MR. LERNER:
24     Q.  Ms. Guzman, the question is for
25  how many weeks did Mr. Riedel sing the song

Page 527

Guzman

2  from West Side Story to you?
3      A.  I can't give you a number of
4  weeks.  I can tell you --
5      Q.  You can't recall how long it went
6  on for?
7      A.  I can tell you that as soon as I
8  moved to the ninth floor where Mr. Riedel is
9  located, as soon as I got an office on the
10  ninth floor and we became friendly, on many
11  numerous occasions he would introduce
12  himself or greet me rather, greet me, with a
13  thick Spanish accent.
14     Q.  This is a completely new
15  allegation, Ms. Guzman.
16         MR. LERNER:  Let's go off the
17  record.  Ken, you and I need to speak.
18         MR. THOMPSON:  Wait, wait.  We are
19  not going off the record.  This is the
20  second time Mark Lerner has raised his
21  voice at this witness.
22         MR. LERNER:  I am not raising my
23  voice.
24         MR. THOMPSON:  You always -- the
25  record is clear.

CONTAINS CONFIDENTIAL PORTIONS

## Page 528

Guzman

2 MR. LERNER: It is your witness --
3 your witness is perjuring herself.
4 MR. THOMPSON: That is false.
5 Mr. Lerner, you have an obligation
6 to conduct yourself professionally in a
7 deposition. You do not have a right to
8 raise your voice at Ms. Guzman or at any
9 other witness. I asked you before not
10 to do that. I am asking you again to
11 stop that improper conduct.
12 If you want to talk to me I can
13 talk to you but you have no right to
14 raise your voice at her so stop it.
15 MR. LERNER: You need to counsel
16 your witness she is under oath.
17 MR. THOMPSON: I don't need to do
18 anything but represent her.
19 MR. LERNER: She cannot perjure
20 herself.
21 MR. THOMPSON: You need to stop
22 trying to badger her and falsely accuse
23 her. She is not your child. She is a
24 grown woman so don't raise your voice at
25 her. Again, if you want to talk, let's

## Page 529

Guzman

2 talk.
3 MR. LERNER: Let's go outside.
4 MR. THOMPSON: Let's go outside.
5 THE VIDEOGRAPHER: The time is
6 2:20. We are going off the record.
7 (Discussion off the record)
8 THE VIDEOGRAPHER: The time is
9 2:24 p.m.
10 We are back on the record.
11 BY MR. LERNER:
12 Q. Ms. Guzman, you cannot recall for
13 how long Mr. Riedel sang West Side Story
14 songs in your presence, correct?
15 A. No.
16 Q. No, you cannot recall, right?
17 A. I cannot recall how many times.
18 Q. You cannot recall how many days or
19 weeks it went on for, correct?
20 A. I cannot recall how many days or
21 weeks.
22 Q. Can you recall --
23 A. I can --
24 MR. THOMPSON: Are you finished?
25

## Page 530

Guzman

2 BY MR. LERNER:
3 Q. -- when the last time was?
4 MR. THOMPSON: Were you finished
5 with your last answer?
6 THE WITNESS: I cannot recall when
7 the last time it was.
8 And all I can tell you if you are
9 asking me to recollect is that he on
10 numerous occasions would either walk by
11 my office or peek in and sing the West
12 Side Story in a thick Spanish accent.
13 BY MR. LERNER:
14 Q. Can you recall other than the
15 specific incidents that you have described
16 you encountered with Les Goodstein engaging
17 in conduct that was objectionable can you
18 recall any other specific incidents where
19 Les Goodstein interacted with you with
20 conduct that was objectionable?
21 A. Other than the ones I have
22 already --
23 Q. Correct.
24 A. I can't think of anymore at this
25 time.

## Page 531

Guzman

2 Q. Have you reviewed a complaint by
3 an individual named Mary McLoughlin?
4 A. Not -- no.
5 Q. Do you know who Mary McLoughlin
6 is?
7 A. That name sounds familiar.
8 Q. I am going to show you a document
9 marked -- there aren't going to be any
10 questions about the document.
11 MR. THOMPSON: Is it going to be
12 an exhibit, Mark?
13 MR. LERNER: No.
14 BY MR. LERNER:
15 Q. Ms. Guzman, you know an individual
16 named Oscar Montez de Oca, correct?
17 A. Yes.
18 Q. In early 2007 you sent him an
19 e-mail asking him to contact you about your
20 attendance at the inaugural ball, correct?
21 A. May I see that e-mail?
22 Q. Did you call -- did you contact
23 Oscar Montez de Oca to ask him to call you
24 about the fact that you were attending the
25 inaugural ball?

CONTAINS CONFIDENTIAL PORTIONS

Page 532

Guzman

1
2      A.   I did not ask him to contact me
3   about it.  I remember having a conversation
4   about my attending -- my covering the
5   inaugural ball.
6      Q.   Showing you Exhibit 38.
7      (E-mail dated January 7, 2009 from
8   Guzman to Montez was marked Guzman Exhibit
9   38 for identification)
10  BY MR. LERNER:
11     Q.   This is an e-mail from you to
12  Oscar Montez on January 7, 2009 subject,
13  "Call me.  Your numbers are not working.  It
14  is about the presidential ball."  Is that
15  correct?
16     A.   Uh-huh.
17     Q.   You reached --
18        MR. THOMPSON:  I am sorry.  She
19     has to verbally answer.
20        THE WITNESS:  Yes.
21  BY MR. LERNER:
22     Q.   So you reached out to Oscar Montez
23  to have him contact you about the ball?
24     A.   Yes.
25        MR. THOMPSON:  Objection.

Page 533

Guzman

1
2   BY MR. LERNER:
3      Q.   And why did you do that,
4   Ms. Guzman?
5      A.   I wanted to tell him that I was
6   going to cover the -- one of the inaugural
7   balls of President Barak Obama's.
8      Q.   Why did you call?
9      A.   Share the news and try to get
10  information on who was going, if he knew any
11  designers designing the First Lady's ball
12  gowns and other outfits, he is a stylist so
13  I wanted to get information on it and I
14  wanted to share the great news.  I thought
15  it was very exciting that I would be going
16  to cover and witness an historic event.
17     Q.   And you were interested, you were
18  calling him to have him -- to ask him if he
19  could style you for a ball, right?
20     A.   So he volunteered and he said, oh,
21  this is really exciting, you know, you
22  should let me style you and we discussed how
23  we could do the story.
24        And he said I have a list of
25  designers, some of them have been contacted

Page 534

Guzman

1
2   by the First Lady's office and maybe you
3   could do a story on what the First Lady is
4   wearing and kind of, you know, speculate as
5   a lot of the news -- fashion news bloggers
6   were doing around the issue of what the
7   First Lady was going to wear.
8      Q.   So one of the things he said was
9   you should let me style you?
10     A.   So -- yes.
11     Q.   And this was somebody that you
12  had -- whose services you had utilized in
13  your capacity as an editor at The Post,
14  right?
15     A.   Yes.
16     Q.   You hired him to do styling and
17  The Post paid him for services, right?
18     A.   Yes.
19     Q.   And he offered to style you and
20  you accepted?
21     A.   He offered to do it as a friend.
22  He said, "Sandra, this is really exciting.
23  I would love to do this for you."
24        And I said all right.
25     Q.   When you say "as a friend," you

Page 535

Guzman

1
2   mean for free?
3      A.   This was not going to be -- right,
4   he was not doing it for a job.
5      Q.   He wasn't doing it for pay?
6      A.   Right.
7      Q.   And a week later you drafted and
8   provided him with a letter of responsibility
9   to show vendors, correct?
10     A.   Yes.
11     Q.   And that letter of responsibility
12  was for him to show to vendors to say please
13  allow him to pull clothes and accessories
14  for Ms. Guzman on our behalf, correct?
15     A.   Can I see the letter of
16  responsibility?
17     Q.   Sure.
18        This is NYP1585.  It has been
19  marked Guzman Exhibit 39.
20        (Document Bates numbered NYP1585
21  was marked Guzman Exhibit 39 for
22  identification)
23  BY MR. LERNER:
24     Q.   Is Exhibit 39 the letter of
25  responsibility that you drafted and sent to

CONTAINS CONFIDENTIAL PORTIONS

Page 536

Guzman

1
2  him?
3      A.   Yes.
4      Q.   Did he receive it?
5      A.   I believe so.
6      Q.   His e-mail address is
7  godlovefashion2@aol.com?
8      A.   Yes.
9      Q.   And you understood when you
10  drafted this the purpose was, when it says
11  "Please allow him to pull clothes," it is to
12  show to vendors so that he can pull clothes,
13  right?
14      A.   Yes.  It is -- yes.
15      Q.   And pull clothes means -- does
16  pull clothes mean borrow or get free
17  samples?
18      A.   Borrow samples.
19      Q.   "Borrow samples."
20           And you were giving him this
21  letter so that he could borrow free samples
22  of clothing and/or shoes or other items of
23  dress for you to attend one of the balls
24  down in Washington, D.C., right?
25      A.   Yes, and actually, write about

Page 537

Guzman

1
2  them.
3      Q.   Yes what?
4      A.   Yes and write about them.
5      Q.   You didn't copy your supervisor on
6  this letter of responsibility, did you?
7      A.   I did not copy my supervisor on
8  most of my correspondence.
9      Q.   So that is a yes, right?
10      A.   I did not, yes, that is -- that is
11  a yes.
12      Q.   This is on -- this letter of
13  responsibility was sent on January 14, 2009,
14  correct?
15      A.   Yes.
16      Q.   That is the Wednesday before the
17  inaugural ball that you went to?
18           MR. THOMPSON:  Did you say 2009,
19  Mr. Lerner?
20           MR. LERNER:  Sorry.  I said the
21  wrong date.
22           MR. THOMPSON:  It says 2008.
23           MR. LERNER:  The record says that
24  I said 2009.
25           MR. THOMPSON:  That is why I

Page 538

Guzman

1
2  corrected you.  Because the document I
3  have says --
4           MR. LERNER:  The top of the
5  document which has the e-mail stamp says
6  January 14, 2009.
7           MR. THOMPSON:  I got it.  It has
8  two different dates.  Okay.  I
9  understand.
10  BY MR. LERNER:
11      Q.   Ms. Guzman, do you see that?
12      A.   I see the two dates, two different
13  dates, yes.
14      Q.   So what date was this e-mail sent,
15  January 14 of '09 or January 14 of '08?
16      A.   Of -- the inaugural ball was
17  January 2008.
18      Q.   Wasn't the election in 2008?
19      A.   I am sorry.  January 2009, yes, so
20  I have the wrong date there.
21      Q.   Right.
22           So if you look at the top it
23  says -- where it says sent, it says sent
24  Wednesday, January 14, 2009?
25      A.   Yes.

Page 539

Guzman

1
2      Q.   So that is the correct date,
3  right?
4      A.   Yes.
5      Q.   And below where it says 2008 that
6  is a typo, correct?
7      A.   Yes.
8      Q.   That was your typo?
9      A.   Yes.
10      Q.   Now, a couple of days later you
11  learned that there was an incident at Manolo
12  Blahnik involving Oscar Montez de Oca,
13  right?
14      A.   I learned, yes, that there was an
15  incident.
16      Q.   Oscar was accused of throwing his
17  weight around, to use an expression, with
18  Blahnik, right?
19           MR. THOMPSON:  Objection.
20           THE WITNESS:  I don't remember
21  exactly, you know, if weight around was
22  what -- the way it was described.
23  BY MR. LERNER:
24      Q.   Okay.  What is your recollection
25  of what Oscar did?

CONTAINS CONFIDENTIAL PORTIONS

Page 540

```
1                Guzman
2      A.  My recollection was that Oscar was
3  acting unprofessionally or something like
4  that, yes.
5      Q.  He was demanding shoes from Manolo
6  Blahnik, right?
7      A.  That is what I was told.
8      Q.  He was demanding that they be
9  given to him for free, correct?
10      A.  That is what I was told by my
11  supervisor, Joe Rabinowitz.
12      Q.  That prompted Mr. Rabinowitz to
13  demand a written explanation from you,
14  correct?
15      A.  Absolutely.  And it prompted me to
16  demand of Oscar what was going on as well.
17      Q.  And did you know that Col Allan
18  demanded a written explanation?
19      A.  That is what Mr. -- Joe Rabinowitz
20  told me.
21      Q.  And you provided a written
22  explanation, right?
23      A.  I did.
24      Q.  Let's look at NYP241 through 242.
25  This will be Guzman Exhibit 40.
```

Page 541

```
1                Guzman
2          (Document Bates numbered NYP241
3  through 242 was marked Guzman Exhibit 40 for
4  identification)
5  BY MR. LERNER:
6      Q.  If you could look at the first
7  e-mail in this document chronologically
8  which would be the e-mail at the bottom of
9  the page, do you see that, it says from
10  Guzman Sandra to Rabinowitz, Friday
11  January 16, 20:18, 20:18 being the time in
12  2009.
13          Do you see that?
14      A.  Yes.
15      Q.  Okay.  And it starts, "Hi, Robo"?
16      A.  Yes.
17      Q.  Is this the e-mail that you wrote
18  to Robo providing your explanation in
19  response to his request for an explanation?
20      A.  Right.  So after I spoke with
21  Oscar I received a phone call from Joe
22  Rabinowitz telling me that Oscar may have
23  shown inappropriate behavior with a vendor
24  with Manolo Blahnik to find out what was
25  going on.
```

Page 542

```
1                Guzman
2          And so I called Oscar and this is
3  the letter where after I spoke to Oscar
4  explained exactly what I found out.
5      Q.  Okay.  So you knew, Ms. Guzman,
6  because you sent the letter of
7  authorization, that Oscar would be seeking
8  to pull clothes for you, right?
9      A.  I knew he was going to pull
10  clothes for me, yes.
11      Q.  All right.
12          And you wrote to Mr. Rabinowitz,
13  the first paragraph, "I just spoke with
14  Oscar Montez de Oca and I asked him what, if
15  anything, happened with Manolo Blahnik.  He
16  claims there was a lack of communication
17  between he and the reps.  He further stated
18  that this miscommunication had to do with
19  me.  He had approached them on my behalf
20  which was news to me."
21          Did you write that?
22      A.  Yes.
23      Q.  So, so you told Mr. Rabinowitz
24  that the fact that Oscar had approached this
25  vendor on your behalf was news to you,
```

Page 543

```
1                Guzman
2  correct?
3      A.  Yes.
4      Q.  That was not true, it wasn't news
5  to you?
6      A.  It was news to me that he had
7  approached Manolo Blahnik.
8      Q.  But you knew he was going to pull
9  clothes from a vendor, right?
10      A.  I did not know he was going to
11  call Manolo Blahnik on my behalf.
12      Q.  But you knew he was going to be
13  approaching vendors of clothing or shoes on
14  your behalf, correct?
15      A.  Actually, I knew that he was going
16  to approach designers on my behalf.
17      Q.  So when you wrote, "He had
18  approached them on my behalf which was news
19  to me," it wasn't news to you?
20      A.  It was news to me and I am going
21  to clarify this again, that he was
22  approaching Manolo Blahnik on my behalf.  I
23  didn't know that.
24      Q.  Okay.  And so when you said it was
25  news to me to Mr. Rabinowitz you meant it
```

CONTAINS CONFIDENTIAL PORTIONS

Page 568

Guzman

1
2      A.   They have been used, the photos
3   were used for the jacket of my -- actually,
4   no, I don't think they have been used. I
5   can't recall now if they have been used
6   professionally.
7          The intention was to use them for
8   promotional purposes for my author and
9   speaker appearances.
10     Q.   You were criticized for what you
11  spent on the legends of salsa music photo
12  shoot, correct?
13     A.   I was berated, yes.
14     Q.   You were criticized?
15     A.   I was berated.  You call it
16  criticized.  I was berated, unfairly
17  berated.
18     Q.   Did The Post reimburse you for all
19  the expenses that were incurred on that
20  photo shoot?
21     A.   No.
22     Q.   What expenses were not reimbursed?
23     A.   Probably my transportation to and
24  from the different interviews and meetings I
25  had in coordinating, it was a pretty large

Page 569

Guzman

1
2   photo shoot, pretty historic too.
3      Q.   Do you have an accounting of the
4   expenses that were not reimbursed?
5      A.   Cabs, I am talking about cabs.
6      Q.   Taxicabs?
7      A.   Yes.
8      Q.   Yellow cabs?
9      A.   Yes.
10     Q.   Did you put in for those?
11     A.   I don't.  I didn't put in for
12  those.
13     Q.   The expenses that you did put in
14  for were those reimbursed?
15     A.   The ones that I put in for, yes,
16  the invoices, yes.
17        MR. THOMPSON:  Let the record
18     reflect this subject is an old subject
19     that could have been covered back in
20     October early this morning within the
21     hour-and-a-half time frame the judge
22     gave to the defendants.
23  BY MR. LERNER:
24     Q.   Ms. Guzman, you recently
25  identified Richard Johnson and Colin Myer as

Page 570

Guzman

1
2   persons with knowledge of your claims.  In
3   what respect do they have knowledge of your
4   claims?
5      A.   Do you mean Colin Myler?  Not
6   Myer.  Myler?
7      Q.   Yes.  Colin Myler.
8      A.   Earlier you showed me a sketch of
9   the conference room where the news meetings
10  are held.
11     Q.   Yes.
12     A.   And I had a sketch of the people
13  who were present in that meeting where Col
14  Allan decided to begin talking about his
15  visits to Scores and talk about strippers
16  and talk about his visits to strip joints
17  and Colin Myler was part of the conversation
18  and so was Richard Johnson.  In fact, I know
19  that they visited Scores with Col Allan and
20  they would often talk about those visits
21  during news meetings.  And so --
22     Q.   That is why they are on the
23  disclosure?
24     A.   That is why they are on.  Yes.
25     Q.   Supreme Court Justice Sonia

Page 571

Guzman

1
2   Sotomayor is a close friend of yours,
3   correct?
4      A.   She is a close friend, yes.
5      Q.   You requested to cover two
6   Washington events relating to her
7   appointment to the Supreme Court, correct?
8      A.   Yes.
9      Q.   Did you think it was appropriate
10  for you as a friend of hers to be reporting
11  about her?
12     A.   Well, it was a legitimate news
13  story and I had insight that none of the
14  reporters at The Post had and they did as
15  soon as they found out that she was
16  nominated to be, my editors began to call me
17  to pump information about Sonia.
18     Q.   My question was would it be
19  appropriate for you to report about a
20  friend?
21     A.   It depends on the context of the
22  story.  I can't answer that.
23     Q.   Weren't you biased about her given
24  that you have a long-time friendship with
25  her?

CONTAINS CONFIDENTIAL PORTIONS

Page 576

1          Guzman
2  know, not too many people get 4s and 3s.
3     Q.  Ms. Guzman, just to be clear, we
4  may be misunderstanding one another.
5       When I say did you know that in
6  2008 you were -- your rating was reduced by
7  one level, what I am referring to is the
8  level initially recommended by your
9  supervisor Joe Rabinowitz versus the level
10  that was ultimately assigned to you after
11  the APA committee met.
12       I am not comparing your final
13  review with your self review.
14     A.  What I remember is -- of the
15  process is that -- I am just trying to --
16  can you restate the question?
17     Q.  Okay. Let's go to 2009.
18     A.  Okay.
19     Q.  In 2009 your supervisor submitted
20  a performance review with a rating and the
21  committee, APA committee reduced your level
22  by -- your rating by one level, correct?
23     A.  Well, I know that Joe told me he
24  had to reduce it because Col Allan would not
25  let him give me a higher number.

Page 577

1          Guzman
2     Q.  Okay. Did you know that there was
3  a reduction in 2008 of one level that was
4  required by the APA review committee?
5     A.  Yes. These reviews happened but
6  Joe ultimately told me that this was his
7  decision in 2008.
8       In 2009 he was very specific that
9  he had to change it begrudgingly because,
10  and to use his words, the big guy, meaning
11  Col Allan, would not let me get a higher
12  number.
13     Q.  Did he say why Col Allan took that
14  position?
15     A.  He didn't go into details.
16     Q.  Did he tell you if anybody else
17  besides Col Allan was involved in that
18  decision?
19     A.  No. He just said --
20     Q.  Did he tell you who else was at
21  the APA committee meeting?
22     A.  He just said the big guy. He was
23  very specific to point to Col Allan as the
24  person telling him --
25     Q.  I understand.

Page 578

1          Guzman
2       In 2008 did Mr. Rabinowitz tell
3  you why you were reduced by one level?
4     A.  I remember having a conversation
5  with him about the nature of these
6  evaluations and how many times he couldn't
7  give higher numbers because that would merit
8  a salary increase and the number that I was
9  trying to negotiate with him because this
10  was a negotiation was actually a number
11  below from the most excellent number and
12  he -- I remember he said to me --
13     Q.  Ms. Guzman, I am sorry.
14     A.  -- if you were a 5 you would be
15  running this paper.
16     Q.  The question I asked is, did
17  Mr. Rabinowitz tell you why you were reduced
18  by one level, it is a yes or no question.
19  Either he did or he didn't. If I want to
20  know --
21     A.  Yes.
22     Q.  -- what the answer was I will
23  follow up and ask you to tell us what he
24  told you.
25     A.  Okay.

Page 579

1          Guzman
2     Q.  And do you have any other belief
3  as to why your rating was reduced in 2008?
4     A.  I believe that it had to do with
5  discrimination. I believe I was treated
6  differently than -- I believe I was treated
7  differently than my white co-workers.
8     Q.  How do you know that other people
9  were not treated similarly to you with
10  respect to APA evaluations in 2008?
11     A.  Because I saw how perfectly
12  talented African American reporters and
13  Hispanic employees were treated.
14     MR. THOMPSON: She is answering
15  your question. This is directly
16  responsive --
17     MR. LERNER: No, it is not
18  responsive.
19     THE WITNESS: Yes, it is.
20     MR. THOMPSON: Yes, it is.
21     MR. LERNER: I don't believe it
22  is.
23     MR. THOMPSON: It is. She is
24  answering your question.
25     The question was how do you know

CONTAINS CONFIDENTIAL PORTIONS

Page 584

Guzman

1
2    A.    What Joe Rabinowitz told -- yes.
3    Q.    Who told you that it was
4  retaliatory?
5    A.    Joe Rabinowitz, my supervisor.
6    Q.    And what were the words he used?
7    A.    He said the big guy would not give
8  you a better evaluation.
9    Q.    And did he say that it was in
10 retaliation for you complaining about
11 anything?
12   A.    He wasn't specific about why not.
13   Q.    Did he say -- did he use the word
14 retaliatory or retaliation?
15   A.    It was inferred.
16   Q.    Did he use that word?
17   A.    He didn't use that word.  What he
18 said was, "I would have given you a higher
19 evaluation but the big guy would not let
20 me."
21   Q.    Is that all he said?
22   A.    Yes.
23   Q.    Ms. Guzman, can you describe the
24 meeting at which you learned you would no
25 longer have a position at The Post?

Page 585

Guzman

1
2      MR. THOMPSON:  This is another
3  area that falls into the category of
4  subject matter that could have been
5  delved into at Ms. Guzman's first day of
6  deposition or the one hour-and-a-half
7  that Judge Ellis allotted.
8      MR. LERNER:  We understand.  You
9  have a standing objection.
10     MR. THOMPSON:  A standing
11 objection is not to object to every
12 question that is improper in violation
13 of the judge's order.  That is my
14 standing objection.
15 BY MR. LERNER:
16   Q.    Who was at the meeting in which
17 you were fired from the post, Ms. Guzman?
18   A.    September 29, 2009, Joe Rabinowitz
19 and Amy Scialdone.
20   Q.    And did they tell you why you were
21 being terminated?
22   A.    They told me, yes, why.
23   Q.    Who told you?
24   A.    Amy Scialdone.
25   Q.    What did she say?

Page 586

Guzman

1
2    A.    That Tempo was being discontinued.
3    Q.    Did she give you any other reasons
4  for your termination?
5    A.    No.
6    Q.    Did you have an employment
7  contract with The Post?
8    A.    Initially I did.
9    Q.    Did you have a contract at the
10 time you were terminated?
11   A.    A running contract, no.
12   Q.    Did -- what did you do after the
13 meeting?
14     MR. THOMPSON:  Objection.
15     THE WITNESS:  I cried.
16 BY MR. LERNER:
17   Q.    Did you leave The Post?
18   A.    I had to physically leave.  I was
19 escorted out.
20   Q.    Do you have any personal knowledge
21 as to why Page 6, the magazine, was closed
22 down?
23   A.    The same reasons that the Tempo
24 was being shut down.
25   Q.    Which was what?

Page 587

Guzman

1
2    A.    Advertising issues.
3    Q.    Lack of revenue?
4    A.    Yes.
5    Q.    Do you have any personal knowledge
6  regarding the layoffs that happened as a
7  result of the closing of Page 6, the
8  magazine?
9    A.    Actually I do.  A white female
10 editor --
11   Q.    My question is about the layoffs.
12   A.    The layoffs.  Yes.
13   Q.    Many, many people were laid off,
14 correct?
15   A.    Right.
16   Q.    And there was an editor named
17 Margie Conklin who was not laid off, right?
18   A.    Right.
19   Q.    Do you have any personal knowledge
20 of her contractual relationship with The
21 Post?
22   A.    No.
23   Q.    Following your termination did you
24 ever speak with Col Allan about your
25 termination?

CONTAINS CONFIDENTIAL PORTIONS

Page 592

Guzman

1
2     Q.   Did it say that you were an
3  employee at will at all times?
4     A.   I don't remember the exact words.
5        Can I read it again?
6     Q.   Did the contract lapse?
7     A.   It lapsed.
8     Q.   Was it renewed by The New York
9  Post, do you have any further contracts?
10    A.   No.
11    Q.   Did you regard yourself as an
12 employee at will after that contract lapsed?
13    A.   Yes.
14    Q.   Did you think you should have been
15 offered a different job at The Post instead
16 of being terminated?
17    A.   I wanted to be treated just like
18 Margie Conklin was treated. They -- a white
19 woman in a similar position, her section was
20 reduced in frequency and instead this white
21 woman was -- they created a position for her
22 with additional duties. I wasn't given that
23 opportunity.
24       I was treated differently because
25 I am Hispanic and because I am black.

Page 593

Guzman

1
2     Q.   Did you understand that there was
3  a position available on the Sunday New York
4  Post that Ms. Conklin was qualified to do
5  when Page 6, the magazine, was shut down?
6     A.   No.  This position was created for
7  Margie.  This position did not exist and
8  they created additional duties for Margie.
9     Q.   What was name of that position?
10    A.   She was some features director or
11 something.  It was --
12    Q.   What was the title?
13    A.   I don't remember the title.  But
14 it was a position above what Steve and
15 Katherine were doing.
16    Q.   Was it with respect to the feature
17 section or the Sunday paper?
18    A.   It may have been to both.  I
19 remember her making contributions to both.
20    Q.   And was a -- do you know if there
21 was a vacant position that she filled?
22    A.   I know that they created a
23 position for her with new duties that were
24 not there prior to this position.
25    Q.   How do you know that?

Page 594

Guzman

1
2     A.   Because I was working there at the
3  time and this was the chatter of the water
4  cooler.
5     Q.   So this was water cooler chatter?
6     A.   Yes.
7     Q.   And did you -- did the water
8  cooler chatter include the details regarding
9  Ms. Conklin's contract with The Post?
10    A.   No.
11    Q.   Do you know what her contract with
12 The Post said?
13    A.   No.
14    Q.   Have you ever seen her contract?
15    A.   No.
16    Q.   Did anyone tell you in management
17 that this new position was created for
18 Ms. Conklin?
19    A.   No.
20    Q.   Did you ask for a new position to
21 be created for you?
22    A.   No.
23    Q.   Did you think that you should have
24 been offered an editor position on the city
25 desk?

Page 595

Guzman

1
2     A.   I think I should have been given
3  an opportunity to try out, yes.  My
4  contributions at the paper, yes.
5     Q.   Isn't it a fact that you -- do you
6  think you should have been offered a
7  position to try out on the city desk?
8     A.   Sure.
9     Q.   Do you know what the city desk
10 editor position that was open in the fall of
11 2009 paid?
12    A.   I don't know.
13    Q.   Did you know that it paid about
14 40 percent less than you were making?
15    A.   I don't know.  I come highly
16 qualified and highly experienced.
17    Q.   Are you aware of any New York Post
18 editor that was offered a job at a salary
19 40 percent less than they were making
20 before?
21    A.   I don't know.
22    Q.   Had you ever been tried out on the
23 city desk?
24    A.   My first several months at the
25 paper were on the city desk.

CONTAINS CONFIDENTIAL PORTIONS

Page 604

Guzman

1
2     A.    Beautifully.
3     Q.    How much was she paid for it?
4     A.    I think she may have been paid 4
5  or $500, $600, I don't remember.
6     Q.    Has that story been published?
7     A.    Yes.  And I don't know if she has
8  been paid yet.
9     Q.    Have you had any other full-time
10 employment besides Heart and Soul --
11 withdrawn.
12         Have you had any full-time
13 employment since you left The Post?
14    A.    Full time as in -- as I had in The
15 Post?
16    Q.    A job?
17    A.    No.
18    Q.    What about part-time employment?
19    A.    Just the contracts -- no, just the
20 contracts and what we have discussed, the
21 freelance assignments.
22    Q.    Okay.  We are going to take a
23 brief break and probably come back and
24 finish up.
25         THE VIDEOGRAPHER:  The time is

Page 605

Guzman

1
2  4:07 p.m. and we are going off the
3  record.
4         (Recess)
5         THE VIDEOGRAPHER:  The time is
6  4:22 p.m.
7         We are back on the record with
8  video number 4.
9  BY MR. LERNER:
10    Q.    Ms. Guzman, you indicated in your
11 filings in this case that Greg Birnbaum told
12 you some information about what he thought
13 was the reason for your termination from the
14 post.  Do you remember that?
15    A.    Yes.
16    Q.    Did he tell you this information
17 directly, him to you?
18    A.    Yes.  In person.
19    Q.    And he said that he thought your
20 termination was because you had complained
21 about the cartoon?
22    A.    He told me it was a retaliation
23 for my complaining about the racist and
24 sexist environment and in particular about
25 the racist cartoon.

Page 606

Guzman

1
2     Q.    Did he tell you what the basis of
3  his belief of that was?
4     A.    He said he couldn't tell me but he
5  was sure.
6     Q.    So he did not tell you --
7     A.    The specifics.
8     Q.    If he -- he didn't tell you where
9  that information came from, correct?
10    A.    No.
11    Q.    Did he say that the information
12 came from somewhere?
13    A.    He did not.  He did not tell me
14 where the information came from.
15    Q.    Did you ask him?
16    A.    Yes.
17    Q.    Did he indicate whether or not he
18 was involved in the decision?
19    A.    No.  He said it was a retaliation.
20    Q.    Did he say whether or not he was
21 involved?
22    A.    From Col Allan -- no.
23    Q.    Did you ever date Greg Birnbaum?
24    A.    No.
25    Q.    Have you ever been to his

Page 607

Guzman

1
2  apartment?
3     A.    No.
4     Q.    Has ever been to yours?
5     A.    No.
6     Q.    Do you have a friendship with him
7  now?
8     A.    Yes.
9     Q.    Are you in touch with him?
10    A.    Yes.
11    Q.    And what is your relationship with
12 him?
13    A.    We are friends.  We are
14 colleagues.  Another journalist.
15    Q.    Do you know where he works?
16    A.    Yes.
17    Q.    Where?
18    A.    Politico.
19    Q.    There is a reference to a Politico
20 reporter in the memoirs that you are
21 writing, Memoirs of a Tabloid Reporter, that
22 stuff?
23    A.    The fictionalized?
24    Q.    The material we went over earlier.
25    A.    Yes.