# Exhibit 15

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 1

1              Allan
2       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
3
   SANDRA GUZMAN,                    )
4                                    )
           Plaintiff,                )
5                                    )
           vs.                       ) 09CIV9323
6                                    ) (BSJ(RLE)
   NEWS CORPORATION, NYP HOLDINGS,)
7  INC., d/b/a THE NEW YORK POST, )
   and COL ALLAN, in his official )
8  and individual capacities,       )
                                     )
9          Defendants.               )
   ------------------------------)
10
11  (Contains Confidential & Attorneys' Eyes Only Portions Bound Separately)
12
13       VIDEOTAPED DEPOSITION OF COLIN ALLAN
14              New York, New York
15          Tuesday, February 14, 2012
16
17
18
19
20
21
22
23  Reported by:
24  Philip Rizzuti
25  JOB NO. 46188

TSG Reporting - Worldwide      877-702-9580

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

### Page 62

Allan

     cartoon, who is Sean Delonas?
  A. He is the cartoonist.
  Q. Who created that cartoon?
  A. Correct.
  Q. Did Mr. Delonas give you that cartoon to approve before it was published?
     MR. LIPPNER: Objection.
     MR. LERNER: Objection.
  Q. You can answer?
  A. Yes.
  Q. Did you approve it before its publication?
  A. Yes.
  Q. Did any other editor at the New York Post approve that cartoon before its publication?
  A. No.
  Q. So you made the decision?
  A. Yes.
  Q. Solely your decision?
  A. Yes.
  Q. Ms. Guzman stated in her E-mail, I have raised my objections to management, Sandra Guzman. Do you see that?

### Page 63

Allan

  A. Yes.
  Q. When you read this E-mail for the very first time did you know that Ms. Guzman had raised objections to the cartoon?
     MR. LERNER: Objection. Mr. Thompson, I am looking, this is an E-mail, it has been 100 or 200 addresses on it, so it takes a while to go through. But I don't see Col Allan's name as a recipient of this particular E-mail, so --
     MR. THOMPSON: I understand that Mr. Lerner, but he has already said that this is the E-mail that he saw after the person came into his office.
     MR. LERNER: I am describing for clarity.
     MR. THOMPSON: But he has already stated that he has seen this before.
  Q. Mr. Allan, did you know when you looked at Ms. Guzman's E-mail the day you learned about it that she had raised objections to management about the cartoon?
  A. I don't recall.

### Page 64

Allan

  Q. How did you react when you read her E-mail?
  A. React; what does that mean?
  Q. Well were you happy, were you unset?
  A. I was disappointed.
  Q. Why were you disappointed?
  A. I felt that if she was troubled by the cartoon that she might have raised those concerns with the people that she worked for and with before she did so publicly.
  Q. Do you know if she did raise her concerns about the cartoon with any editor at the New York Post?
  A. I don't recall.
  Q. Do you know if she raised the concerns about the cartoon to anyone in human resources?
  A. Yes.
  Q. Who did she raise her concerns to?
  A. Jennifer Jehn.
  Q. How do you know that she raised the concerns about the cartoon with Jennifer Jehn?

### Page 65

Allan

  A. Jennifer told me so.
  Q. Did Jennifer tell you before or after you saw this E-mail reflected in Exhibit 2?
  A. I don't recall.
  Q. Is Jennifer Jehn the only person that you recall telling you that Sandra Guzman raised complaints about the cartoon?
  A. Yes.
  Q. In February of 2009 Joe Rabinowitz was Sandra Guzman's direct supervisor; is that correct?
  A. Correct.
  Q. Did Mr. Rabinowitz tell you that she had complained to him about the cartoon?
  A. I don't recall.
  Q. Well let me ask you, you said you were disappointed in Ms. Guzman, wouldn't you remember if Joe Rabinowitz told you that she had complained about it?
  A. I am sorry, I don't recall.
  Q. So as you sit here now you don't recall ever speaking or communicating with Joe Rabinowitz about the fact that Sandra Guzman

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 66

```
                      Allan
 1
 2   complained about the monkey cartoon?
 3       A.   That is correct.
 4       Q.   When was the very first time
 5   Jennifer Jehn told you about Ms. Guzman's
 6   complaint about the cartoon; was it the day it
 7   was published or sometime after that?
 8            MR. LIPPNER:  Objection.
 9       A.   I don't recall.
10       Q.   Well did you go to HR to have this
11   conversation with Jennifer Jehn or did she
12   come to your office?
13            MR. LIPPNER:  Objection.
14       A.   She called me.
15       Q.   What did she say when she called
16   you?
17       A.   She told me that Sandra was upset
18   about the cartoon, that she had friends who
19   were upset, and she was seeking an explanation
20   from the company.
21       Q.   Who was seeking an explanation
22   from the company?
23       A.   Sandra Guzman.
24       Q.   What did Sandra Guzman want the
25   company to explain according to Jennifer Jehn?
```

Page 67

```
                      Allan
 1
 2            MR. LERNER:  Objection.
 3       A.   Why it was published.
 4       Q.   Did Jennifer Jehn tell you
 5   anything else during that call?
 6       A.   Only that there was no offense
 7   meant in the paper publishing the cartoon and
 8   that it had been misunderstood, although she
 9   appreciated that Sandra had taken offense.
10       Q.   So Jennifer Jehn told you that the
11   paper did not intend to offend anyone with the
12   cartoon?
13       A.   She told me she had so informed
14   Sandra Guzman.
15       Q.   Did she describe to you Sandra
16   Guzman's demeanor at the time?
17       A.   Yes.
18       Q.   What did she describe about Ms.
19   Guzman's demeanor?
20       A.   She was upset.
21       Q.   Did Ms. Jehn describe how upset
22   Ms. Guzman was?
23       A.   Just upset.
24       Q.   Did she tell you that she was
25   crying?
```

Page 68

```
                      Allan
 1
 2       A.   No.
 3       Q.   Did she tell you that she was
 4   tearful?
 5       A.   No.
 6       Q.   Did Ms. Jehn tell you that Sandra
 7   Guzman told her that she believed that the
 8   monkey cartoon reflected a racist work
 9   environment at the New York Post?
10       A.   No.
11       Q.   Did Ms. Jehn tell you that Sandra
12   Guzman said that the monkey cartoon reflected
13   a sexist work environment at the New York
14   Post?
15       A.   No.
16       Q.   Did she tell you that Sandra
17   Guzman said that the monkey cartoon reflected
18   a discriminatory work environment at the New
19   York Post?
20       A.   No.
21       Q.   Did she tell you anything else
22   during that call?
23       A.   No.
24       Q.   How long did the call last?
25       A.   I don't recall.
```

Page 69

```
                      Allan
 1
 2       Q.   Do you have any idea?
 3       A.   Couple of minutes.
 4       Q.   Well in a couple of minutes many
 5   things can be said; correct?
 6            MR. LIPPNER:  Objection.
 7       A.   Correct.
 8       Q.   Do you recall anything else that
 9   either Ms. Jehn said or you said when she
10   called you to tell you that Sandra Guzman had
11   complained to her about the cartoon?
12       A.   No.
13       Q.   Did you ever speak to Ms. Jehn
14   again about the fact that Ms. Guzman had
15   complained about the cartoon?
16       A.   I don't recall.
17       Q.   In February of 2009 who was the
18   person in charge of human resources at the New
19   York Post?
20       A.   It was either Jennifer Jehn or Amy
21   Scialdone.
22       Q.   Jennifer Jehn?
23       A.   Jennifer Jehn, yes.
24       Q.   So did Jennifer Jehn tell you that
25   she was going to take any other action with
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 202

Allan
Q. So Sandra Guzman, and was she with Danica Lo or somebody else?
A. I think Danica Lo was there, I am sorry, I don't remember.
Q. So continue, what happened after Ms. Guzman and other employees came up to you?
A. I bought them a drink. At some point I received an E-mail from the office that contained for my perusal a picture of a naked man.
Q. Who sent you that picture?
A. Somebody on the photo desk.
Q. Do you recall who?
A. I don't.
Q. Did the E-mail say anything about the picture of the naked man?
A. I don't recall.
Q. What happened after you received the picture of the naked man by E-mail?
A. I was aware of what it was. I had been told by whomever was editing the Sunday paper at the time that we were likely going to obtain a picture, a lewd picture of a man that sat above the bed of the governor of New

Page 203

Allan
Jersey.
Q. Who at the time --
MR. LIPPNER: Are you done with your answer?
THE WITNESS: Yes.
Q. When you say the governor of New York are you referring to Jim McGreevey?
A. Yes.
Q. So you knew that, or thought that the Post was going to get a picture --
A. I knew that we had --
Q. A lewd picture?
A. Yes, I knew that we had obtained a lewd picture of the governor.
Q. Right.
A. And I had asked before I left the office because it was getting late in the day, that they might E-mail it to me.
Q. Please continue?
A. The purpose of the E-mailing it to me was for me to consider it for publication. This was undertaken in the context of the scandal surrounding the governor's sex life, which was public knowledge. And I showed it

Page 204

Allan
to Jesse Angelo who was with me and we briefly discussed it. Whether or not or how we might be able to publish the picture in a way that was not offensive to people.
Q. What did you say to Mr. Angelo and what did he say to you about that?
A. Well we discussed the obvious, that we would have to disguise his groin, we would have to cover it up.
Q. Because you didn't want to offend anyone; right?
A. Precisely.
Q. Because you would agree people, some people may get offended if they had to look at a picture of a naked man with his genitals exposed?
A. Possibly.
Q. So did you and Jesse Angelo talk about anything else regarding that picture?
A. No, we just discussed that it was sort of a striking image for the governor of New Jersey to have over his bed, and that we discussed how we might be able to make it suitable for publication.

Page 205

Allan
Q. Did you receive this picture on your Blackberry?
A. Yes, sir.
Q. Do you still have that picture on your Blackberry?
A. I have an iPhone now, so I don't know.
Q. Did you ever save that picture on your Blackberry?
A. I don't know.
Q. So what happened -- strike that. Were you and Jesse Angelo just talking among yourselves about how you can publish this photo without offending anyone?
MR. LIPPNER: Objection.
A. We were standing at the bar discussing it.
Q. Was it just the two of you discussing it at that time?
A. Yes.
Q. Then what happened next?
A. One of the ladies asked us what we were talking about.
Q. Who?

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 210

Allan
1
2   A. They looked at it.
3   Q. How long did they look at it?
4   A. I don't know, briefly.
5   Q. Do you recall the reaction?
6   A. They laughed.
7   Q. Both of them laughed?
8   A. Yes.
9   Q. Did they say anything in response
10  besides laughing?
11  A. No. Wow maybe.
12  Q. Are you guessing or do you recall
13  that?
14  A. No. They laughed.
15  Q. So all you recall is that they
16  laughed and you don't recall them saying
17  anything regarding that picture?
18  A. No.
19  Q. How long did they hold the picture
20  and look at it?
21  A. Briefly. Seconds.
22  Q. Seconds?
23  A. Yes.
24  Q. Where was Jesse Angelo at the
25  time?

Page 211

Allan
1
2   A. Standing right next to me.
3   Q. Did he say anything when the women
4   were looking at the picture?
5   A. No.
6   Q. Did the women ask who is this guy?
7   A. I told them.
8   Q. What did they say to you when you
9   showed them the picture?
10  A. They asked prior to me showing
11  them the image, they asked what was so
12  interesting, why are you talking about what is
13  on your Blackberry, and I told them we had a
14  lewd photograph of a naked man in Governor
15  McGreevey's bedroom. So they wanted to see
16  it.
17  Q. Was there any other discussion
18  that you had with those female employees about
19  the picture of the naked man?
20  A. No. Only -- no.
21  Q. Do you recall that Jesse Angelo
22  said anything while those women were looking
23  at the picture of the naked man?
24  A. I don't. I don't remember.
25  Q. After you showed the picture of

Page 212

Allan
1
2   the naked man on your Blackberry did you get
3   your Blackberry back?
4   A. Yes.
5   Q. Then what happened at that point?
6   A. Nothing. I got another drink.
7   Q. Did you continue to converse?
8   A. Sure.
9   Q. With the female employees?
10  A. Yes.
11  Q. What did you and Sandra Guzman
12  talk about at that time?
13  A. I can't remember.
14  Q. Is it your testimony Mr. Allan
15  that you can't recall a single word that
16  Sandra Guzman said to you during this incident
17  when you claim she was present to see this
18  picture?
19  A. I can't, it was in a bar years
20  ago, I have no memory.
21  Q. Do you think it was appropriate as
22  the Editor-in-Chief of the Post to show female
23  employees a lewd picture of a naked man?
24  A. Yes.
25  Q. Do you think it was in violation

Page 213

Allan
1
2   of any of the company's policies regarding
3   discrimination or harassment?
4   A. No.
5   Q. Now I am showing you what has been
6   marked as Allan Deposition Exhibit 8 and I ask
7   that you take a moment to look at it. For the
8   record it is Bates stamped NYP 3999.
9       (Allan Exhibit 8, document Bates
10      stamp NYP 3999, marked for
11      identification, as of this date.)
12  Q. Tell me if you recognize this,
13  sir?
14  A. Yes.
15  Q. What is it?
16  A. I believe it is the photograph of
17  the man in Governor McGreevey's room.
18  Q. So is this the picture that you
19  showed to Sandra Guzman in Langan's that day?
20      MR. LIPPNER: Objection.
21  A. Yes.
22  Q. Now you see at the top of this
23  exhibit it says byline Richard Rinaldi,
24  Courtesy Yossi. Do you know who those
25  individuals are?

Page 234

Allan
1
2  images are shared with multiple people at the
3  Post, men and women.
4      Q.   But you showed these two pictures
5  of naked men to female employees on April of
6  2007 and then September of 2008; correct?
7      A.   Correct.
8      Q.   Mr. Allan, who is -- do you know
9  Steve Dunlevy?
10     A.   Yes.
11     Q.   Who is he?
12     A.   He is a former columnist for the
13 Post.
14     Q.   Is he white or black?
15     A.   White.
16     Q.   He is from Australia?
17     A.   Originally, yes.
18     Q.   You have known him for over 30
19 years?
20     A.   Yes.
21     Q.   Is he one of your good friends?
22     A.   Yes.
23     Q.   Has he ever spent a night at your
24 house?
25     A.   Yes.

Page 235

Allan
1
2      Q.   You live on the upper west side?
3      A.   Yes.
4      Q.   Steve Dunlevy has spent a night at
5  your house more than once; correct?
6      A.   No more than twice.
7      Q.   But he spent a night at your house
8  when he worked at the paper; correct?
9      A.   Yes.
10     Q.   You were the boss at the time;
11 correct?
12     A.   Yes.
13     Q.   And when he left there was a big
14 farewell party for him; correct?
15     A.   Yes.
16     Q.   You attended that party; correct?
17     A.   I did.
18     Q.   Rupert Murdoch attended it as
19 well; correct?
20     A.   Correct.
21     Q.   It was a lavish affair for Steve
22 Dunlevy; correct?
23     A.   If you describe an Irish bar as
24 lavish, I suppose so.
25     Q.   Where was it held at, that

Page 236

Allan
1
2  farewell party?
3      A.   It was a bar on the west side.
4      Q.   How long did Steve Dunlevy work at
5  the Post?
6      A.   Many years, I don't know
7  precisely.
8      Q.   What was his position at the Post?
9      A.   He was a columnist and an
10 executive at one point.
11     Q.   Executive of the Post?
12     A.   Yes.
13     Q.   Did he ever have any positions at
14 News Corporation?
15     A.   No.
16     Q.   Did he ever serve on any
17 committees at News Corp.?
18     A.   No.
19     Q.   Do you know by the way Mr. Allan
20 if any New York Post employees ever served on
21 any internal committees at News Corp.?
22     A.   No.
23     Q.   No that you don't know or no --
24     A.   I don't know.
25     Q.   Do you know what the News Corp.

Page 237

Allan
1
2  Hispanic Diversity Council is?
3      A.   No.
4      Q.   Does News Corp. have a Go Green
5  Committee?
6      A.   I don't know.
7      Q.   Did you ever hear Steve Dunlevy
8  make any comments about his sex life in the
9  workplace?
10     A.   No.
11     Q.   Did you ever hear him make any
12 comments about his sex life at Langan's?
13     A.   No.
14     Q.   Did you ever talk to Mr. Steve
15 Dunlevy about his sex life?
16     A.   Never.
17     Q.   Did you ever make any jokes or
18 comments about Steve Dunlevy's sex life?
19     A.   Maybe, yes.
20     Q.   Tell us the occasions when you
21 commented about Steve Dunlevy's sex life?
22     A.   I repeated a story that I had
23 heard from the owner of Langan's about Dunlevy
24 having sex with a women in the closet at
25 Langan's.

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 238

Allan
1
2     Q.   Who is the owner of Langan's?
3     A.   Des O'Brien.
4     Q.   Des O'Brien?
5     A.   O'Brien.
6     Q.   When did Des O'Brien tell you
7  about Steve Dunlevy having sex with a woman in
8  the closet at Langan's?
9     A.   When I first got here, I guess in
10 2001, 2002.
11    Q.   What did he tell you about that
12 incident?
13    A.   He told me that he had found
14 Dunlevy having sex with a woman in the closet.
15    Q.   At Langan's?
16    A.   Yes, sir.
17    Q.   Did he say if the women's leg was
18 hanging out the closet?
19    A.   No, sir.
20    Q.   Did he describe the woman at all?
21    A.   Not that I recall.
22    Q.   How did you and the owner of
23 Langan's end up talking about Steve Dunlevy
24 having sex with a woman in Langan's?
25        MR. LERNER: Objection to the

Page 239

Allan
1  form.
2
3     A.   He was friendly with Dunlevy.
4     Q.   How did you two end up talking
5  about Dunlevy's sex life?
6     A.   I met him, Dunlevy had introduced
7  us, and in the course of that introduction or
8  soon after he told me the story about Dunlevy.
9     Q.   And you and Steve Dunlevy had gone
10 to Langan's on many occasions; correct?
11    A.   No.
12    Q.   You did go to Langan's with Steve
13 Dunlevy?
14    A.   Occasionally.
15    Q.   You guys would have drinks; right?
16    A.   Yes.
17    Q.   You were not only employees of the
18 company, you were friends?
19    A.   Yes.
20    Q.   So where were you when you
21 repeated this story that Des O'Brien told you
22 about Steve Dunlevy having sex with a woman in
23 the closet at Langan's; were you in the
24 workplace at 1211 Avenue of the Americas or
25 some other place?

Page 240

Allan
1
2        MR. LIPPNER: Objection.
3     A.   I was at Langan's.
4     Q.   Was anyone else present?
5     A.   A bunch of people.
6     Q.   Do you recall who was present?
7     A.   Not really.
8     Q.   Sandra Guzman?
9     A.   New York Post people.
10    Q.   New York Post employees?
11    A.   Yes.
12    Q.   Was Sandra Guzman present?
13    A.   Yes.
14    Q.   Was this the same day you showed
15 the picture, the lewd picture of the naked man
16 to Ms. Guzman that was on your Blackberry?
17    A.   No.
18    Q.   Different day?
19    A.   I believe so.
20    Q.   Besides Ms. Guzman who else was
21 there from the New York Post or the News
22 Corp.?
23    A.   I don't remember. I don't
24 remember.
25    Q.   Well describe what happened in

Page 241

Allan
1
2  Langan's that day when you ended up telling
3  Ms. Guzman about how Steve Dunlevy had sex
4  with a woman in the closet at Langan's?
5        MR. LIPPNER: Objection.
6        Mischaracterizes the testimony.
7     A.   There were a group of people as I
8  stated, Dunlevy I think was there or had left.
9  He became the topic of some conversation
10 because he is a character of note, and I
11 subsequently stated that I had been told by
12 Des O'Brien that he had found him having sex
13 in the closet.
14    Q.   Why did you tell Sandra Guzman
15 that?
16    A.   I told a bunch of people that.
17    Q.   My question is why did you tell
18 Ms. Guzman that?
19        MR. LIPPNER: Objection.
20    A.   I thought she would be amused.
21    Q.   So you thought that Sandra Guzman
22 would be amused to hear her boss tell her
23 about how another male employee had sex with a
24 woman in Langan's?
25    A.   Yes.

Page 242

Allan

Q. You find that amusing?
A. I do.
Q. Why?
A. Well it is unusual behavior.
Q. I understand it is unusual, but you find it amusing. Explain why you find it amusing that Steve Dunlevy had sex with a woman in the closet in Langan's?
A. Because I assume it would have been uncomfortable.
Q. What would have been uncomfortable?
A. Having sex in a closet.
Q. So that is why you find it amusing?
A. In part.
Q. Is there any other reason why you find that incident amusing?
A. No.
Q. Did you also believe it was amusing to tell female employees that story -- strike that.
    Did you also find it amusing to tell Ms. Guzman that story?

Page 243

Allan

MR. LIPPNER: Objection.
A. I don't recall. I don't remember. It was in the context of a group of people having a drink.
Q. But the people were employees of the New York Post?
A. Some were, yes.
Q. Some were employees of News Corp.?
A. New York Post.
Q. Now you would agree would you not Mr. Allan that when you described this incident with Steve Dunlevy having sex with a woman in a closet in Langan's, that that was not newsworthy; right?
A. I agree.
Q. And you didn't tell Ms. Guzman or anyone else that was present at the time you were telling the story because it was a potential news article; right?
A. Correct.
Q. Do you think it was appropriate as the Editor-in-Chief of the New York Post for you to have told Ms. Guzman about the story of Steve Dunlevy having sex with some woman in

Page 244

Allan

the closet of a bar?
A. I believe it was harmless.
Q. Do you think it was in violation of any policy covering New York Post employees?
A. No.
Q. Do you think it was offensive to tell Ms. Guzman the story about Steve Dunlevy having sex with some woman in a bar?
A. No, it was not a lewd story.
Q. Did Ms. Guzman come up to you on that occasion when you told the story about Steve Dunlevy or did you go over to her at Langan's?
A. I don't recall.
Q. Do you recall having any -- strike that.
    Do you recall describing any other sex stories about Steve Dunlevy to Ms. Guzman on that occasion?
A. No.
Q. Did you ever describe any sex stories about Steve Dunlevy in Ms. Guzman's presence on any other occasion?

Page 245

Allan

A. No.
Q. Did you ever tell anyone Mr. Allan that when Steve Dunlevy spent the night at your house on one occasion you found him either urinating or attempting to urinate in one of your closets?
    MR. LERNER: Objection.
A. No, sir.
Q. Did you ever tell anyone that you saw Steve Dunlevy's penis when he was spending the night at your house one night?
A. No.
Q. Did you ever tell anyone -- strike that.
    Did you ever Ms. Guzman that Steve Dunlevy would have sex with a woman with no limbs?
A. With what?
Q. A woman without limbs?
A. No.
Q. Arms and legs?
A. No.
Q. You find that funny?
A. I never heard such a question.

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 250

```
 1              Allan
 2   his breath on the occasions you smelled it in
 3   the news room?
 4       A.   I am sorry, ask the question
 5   again.
 6       Q.   Do you have any personal firsthand
 7   knowledge of why Steve Dunlevy had alcohol on
 8   his breath on the occasions you smelled
 9   alcohol on his breath in the news room?
10       A.   No.
11       Q.   And you were the Editor-in-Chief
12   of the Post when you smelled alcohol on his
13   breath multiple times; correct?
14       A.   Correct.
15       Q.   You never thought about
16   investigating why Steve Dunlevy had alcohol on
17   his breath in the news room on those
18   occasions, did you?
19       A.   No, sir, I knew why.
20       Q.   You never contacted HR about that
21   fact; correct?
22       A.   No, sir.
23       Q.   Did you ever tell Rupert Murdoch
24   that one of the columnist at the New York Post
25   was walking around the news room with alcohol
```

Page 251

```
 1              Allan
 2   on his breath?
 3       A.   No, sir.
 4       Q.   Why not?
 5       A.   It is not a matter for him.
 6       Q.   Not a matter for him?
 7       A.   No, sir.
 8       Q.   I thought that the buck stopped
 9   with him regarding the New York Post?
10           MR. LERNER: Objection.
11       A.   A columnist was doing his work
12   well, very well.
13       Q.   Did you ever discipline Steve
14   Dunlevy for having alcohol on his breath in
15   the news room on those occasions?
16       A.   Never.
17       Q.   Did you ever think about
18   disciplining him?
19       A.   Never.
20       Q.   Did you ever inquire at any point
21   on any occasion with Steve Dunlevy as to why
22   he had alcohol on his breath in the news room?
23       A.   I have answered the question.
24       Q.   Answer?
25       A.   I have answered the question.
```

Page 252

```
 1              Allan
 2       Q.   Have you inquired, did you inquire
 3   on any occasion?
 4       A.   No.
 5       Q.   Nothing stopped you from
 6   inquiring; right?
 7       A.   No.
 8       Q.   You had the power as the
 9   Editor-in-Chief to inquire why one of your
10   staffers was walking around the news room with
11   alcohol on his breath; correct?
12           MR. LIPPNER: Objection.
13       A.   Yes.
14       Q.   You, Mr. Allan, have also walked
15   around the news room with alcohol on your
16   breath during the day; correct?
17       A.   Never.
18       Q.   Isn't it a fact that during your
19   tenure as Editor-in-Chief of the Post you have
20   consumed alcohol in the day?
21       A.   Never.
22       Q.   Did you ever hear Steve Dunlevy
23   ever refer to a black person as a nigger?
24       A.   Yes.
25       Q.   How many times have you heard
```

Page 253

```
 1              Allan
 2   Steve Dunlevy refer to a black person as a
 3   nigger?
 4       A.   Once.
 5       Q.   Do you recall the year you heard
 6   him refer to a black person as a nigger?
 7       A.   Very well.
 8       Q.   What year was it, sir?
 9       A.   2001.
10       Q.   Can you describe where you were
11   when Steve Dunlevy referred to a black person
12   as a nigger?
13       A.   It was my first day at the Post,
14   and he and Neil Travis had invited me at the
15   end of that first day for a drink at Langan's
16   to meet some of the people who worked at the
17   paper. So I happily went and they introduced
18   me to a number of people. One of those people
19   was a black man named Robert George. Steve
20   Dunlevy introduced him to me as, and I quote,
21   our token nigger, quote.
22       Q.   Our token nigger?
23       A.   Yes, sir.
24       Q.   How did you respond Mr. Allan?
25       A.   I was --
```

Page 254

```
1            Allan
2       Q.   To his statement that Robert
3   George was the New York Post token nigger?
4       A.   I was shocked and deeply offended.
5       Q.   Did you say anything to Steve
6   Dunlevy at the time you heard him refer to
7   Robert George as the token nigger?
8       A.   No.
9       Q.   Why not?
10      A.   It was my first day at the
11  newspaper, I had just arrived from Australia.
12  I was shocked by the expression.  There were a
13  group of people around including Jesse Angelo,
14  and subsequently Jesse Angelo spoke to
15  Mr. Dunlevy about his language.
16      Q.   How did Robert George respond when
17  Steve Dunlevy introduced him to you as the
18  token nigger?
19      A.   It seemed to me they were friends,
20  it seemed to me that he took no offense, but
21  what he said was unforgivable also.
22      Q.   How did Mr. George respond after
23  Steve Dunlevy called him a token nigger?
24      A.   He laughed.
25      Q.   Did he do anything else?
```

Page 255

```
1            Allan
2       A.   No.
3       Q.   Do you know if Jesse Angelo also
4   heard Steve Dunlevy call Robert George a token
5   nigger?
6       A.   He did, yes.
7       Q.   You know if anyone else from the
8   Post or News Corp. heard Steve Dunlevy refer
9   to Robert George as a token nigger?
10      A.   There were a couple of other
11  people there, I don't recall.
12      Q.   You mentioned Neil Travis.  Who is
13  Neil Travis?
14      A.   Neil Travis was a columnist on the
15  newspaper.
16      Q.   Was he present at the time?
17      A.   I believe so.
18      Q.   Do you know if Neil Travis also
19  heard Steve Dunlevy refer to Robert George as
20  a token nigger?
21      A.   I don't know, I can't answer that.
22      Q.   Would you agree Mr. Allan that one
23  of the worse words -- strike that.
24           Would you agree Mr. Allan that one
25  of the worse names you can call a black person
```

Page 256

```
1            Allan
2   is nigger?
3       A.   Yes, sir.
4       Q.   Why do you think that is one of
5   the worse names a black person can be called?
6       A.   I have been married for almost 30
7   years, my wife's mother is black.  She is a
8   Aborigine, my wife is part Aborigine, my four
9   children are part Aborigine.  Therefore the
10  expression is deeply offensive to me.  For it
11  to be anything else would be a betrayal of my
12  family.  I trust that answers your question.
13      Q.   Was Steve Dunlevy disciplined for
14  calling Robert George a token nigger?
15      A.   He was.
16      Q.   How was he disciplined?
17      A.   Jesse Angelo told him that it was
18  unacceptable and it must never happen again.
19      Q.   Was he disciplined in any other
20  way?
21      A.   I don't know.
22      Q.   So as far as you know sitting here
23  the only discipline given to Steve Dunlevy for
24  calling a black employee of the Post a token
25  nigger was that he was spoken to by Jesse
```

Page 257

```
1            Allan
2   Angelo?
3       A.   Yes.  He was spoken to very
4   firmly, he was told it was unacceptable and it
5   must never happen again.
6       Q.   Did you tell Jesse Angelo to
7   terminate Steve Dunlevy because he had used
8   such an ugly racial slur against Robert
9   George?
10      A.   No, I did not.
11      Q.   Did you tell Jesse Angelo --
12  strike that.
13           Why didn't you tell Jesse Angelo
14  to fire Steve Dunlevy for calling Robert
15  George a token nigger?
16      A.   It was my first day here, I am
17  sorry, what he said was deeply offensive and
18  wrong.
19      Q.   I understand.  My question is why
20  didn't you call for his termination?
21      A.   I believed at the time that the
22  discipline, the way in which Jesse had spoken
23  to him and the fact that he made it very clear
24  that it must never happen again was
25  sufficient.
```

Page 394

```
1              Allan
2    sir?
3        A.   I don't recall.
4        Q.   Was she allowed to go to cover
5    that ceremony for the New York Post?
6        A.   No.
7        Q.   Why not?
8        A.   Because she had told us that she
9    was a friend of Justice Soto Mayor and
10   therefore I felt that she had been conflicted.
11       Q.   Conflict?
12       A.   Yes. We don't assign people to
13   cover people on the basis of friendships.
14       Q.   When Kevin Rudd ran for Prime
15   Minister of Australia did you cover him in the
16   New York Post?
17       A.   No.
18       Q.   Is it your testimony that there
19   was not a single article written in the New
20   York Post -- can I finish -- about the fact
21   that Kevin Rudd was running for Prime Minister
22   of Australia?
23       A.   I don't recall it.
24       Q.   Do you recall if there was ever an
25   article in the New York Post about Kevin Rudd?
```

Page 395

```
1              Allan
2        A.   I don't recall.
3        Q.   Would it have been inappropriate
4    for an article to have been published about
5    Kevin Rudd in the New York Post based on your
6    relationship with him?
7        A.   I didn't have a relationship with
8    him.
9              MR. LERNER:  Objection.
10       Q.   He was a friend of yours; correct?
11       A.   No. I never testified that he was
12   a friend. I knew him for one day.
13       Q.   Now Ms. Guzman was terminated in a
14   meeting with Joe Rabinowitz and someone from
15   HR; correct?
16       A.   I don't know.
17       Q.   Let me ask you, do you know who
18   conveyed to Ms. Guzman that she was being
19   terminated as an associate editor at the Post?
20       A.   Jennifer Jehn.
21       Q.   How do you know that Jennifer Jehn
22   conveyed that to her?
23       A.   She is the head of HR.
24       Q.   Other than the fact that she is
25   the head of HR do you know if Jennifer Jehn
```

Page 396

```
1              Allan
2    actually met with Ms. Guzman in connection
3    with the termination?
4        A.   That is my recollection.
5        Q.   Mr. Allan, I am now showing you
6    Allan Deposition Exhibit 21, which is Bates
7    stamped NYP 3892, I ask you to take a moment
8    to look at that document.
9              (Allan Exhibit 21, Bates stamped
10       NYP 3892, marked for identification,
11       as of this date.)
12       A.   Yes.
13       Q.   Do you recognize this document
14   sir?
15       A.   Yes.
16       Q.   What is it?
17       A.   An open jobs report.
18       Q.   What is an open jobs report?
19       A.   Jobs that are vacant at the
20   newspaper.
21       Q.   This one is dated October 12,
22   2009; correct?
23       A.   Yes.
24       Q.   So this is dated weeks after Ms.
25   Guzman was terminated; correct?
```

Page 397

```
1              Allan
2        A.   Yes.
3        Q.   Do you see it states open,
4    Haberman, Z, associate metro editor?
5        A.   Yes.
6        Q.   So when Ms. Guzman was terminated
7    there was an open associate editor position at
8    the paper; is that correct?
9        A.   Correct.
10       Q.   Was any discussion Mr. Allan about
11   possibly allowing Ms. Guzman to remain
12   employed at the company after Tempo was
13   closed?
14       A.   Yes. I asked three editors if
15   there was a position in their departments or
16   anywhere at the paper that Ms. Guzman might
17   fill at her compensation.
18       Q.   Who were those three editors?
19       A.   Michelle Gotthelf, Jesse Angelo
20   and Catherine Pushkar.
21       Q.   Who is Catherine Pushkar?
22       A.   She was a features editor.
23       Q.   Did you meet with those three
24   editors together or individually when you
25   inquired as to whether there was another
```

Contains Confidential & Attorneys' Eyes Only Portions Bound Separately

Page 398

1   Allan
2   position for Ms. Guzman?
3       MR. LIPPNER: Objection.
4       A. Independent.
5       Q. Did you take any notes?
6       A. No.
7       Q. Where did those meetings take
8   place?
9       A. I don't recall.
10      Q. Was anyone else present besides
11  you and each of those editors?
12      A. No.
13      Q. What is the metro desk at the
14  Post?
15      A. Metro desk is the city desk, it is
16  responsible for the reporters who cover the
17  city.
18      Q. Heart of the paper; correct?
19      A. Yes.
20      Q. Why wouldn't Ms. Guzman be allowed
21  to take that open position when Zach Haberman
22  left the paper?
23      A. Her compensation was $135,000 a
24  year, this job is open at $82,000 a year.
25      Q. Mr. Allan, I understand that there

Page 399

1   Allan
2   was a difference between the salary, but why
3   didn't you at least offer it to Ms. Guzman
4   before she was fired?
5       A. It is my view that an employee who
6   had been forced to take a very large pay cut
7   in the order of $55,000 or $50,000, would not
8   be a happy employee.
9       Q. Is it your position that that
10  employee would be happier losing $137,000 as
11  opposed to 50,000?
12      MR. LERNER: Objection.
13      A. I made that decision in the
14  interest of the newspaper. I didn't believe
15  it was appropriate or right to offer her a job
16  that would have caused her such a significant
17  pay cut.
18      Q. Did you think it was more
19  appropriate to fire her, she would have no
20  job?
21      A. She was hired to produce Tempo,
22  Tempo had ceased to exist.
23      Q. But she worked on 25 other
24  sections --
25      MR. LIPPNER: Were you done with

Page 400

1   Allan
2   your answer?
3       THE WITNESS: Yes.
4       Q. She was working on 25 other
5   sections of the paper at the time the Tempo
6   was closed; is that correct?
7       MR. LERNER: Objection. That is a
8   fact not in evidence.
9       Q. Correct?
10      A. Sorry?
11      Q. Isn't it a fact that Ms. Guzman
12  was working on 25 other sections of the paper
13  at the time she was terminated?
14      MR. LERNER: Objection.
15      A. She was working on other sections.
16      Q. How many other sections?
17      A. I don't know.
18      Q. So she wasn't only working on
19  Tempo; correct?
20      A. I asked that she be offered work
21  on other sections of the newspaper because
22  Tempo had become so emaciated that it was no
23  longer occupying much of her time. I mean it
24  was coming out once a month and it was tiny,
25  it was small.

Page 401

1   Allan
2       Q. Isn't it true that you never once
3   considered offering Ms. Guzman that open
4   position that became vacant after Zach
5   Haberman left the paper?
6       A. I considered it and I decided not
7   to do it.
8       Q. Mr. Allan, could you put the
9   Deposition Exhibit 4 in front of you?
10      A. Exhibit 4.
11      Q. It should be there?
12      A. Sorry.
13      Q. It is number 5 -- look at this
14  one?
15      A. Yes.
16      Q. I want to direct your attention to
17  page 7 of that document?
18      MR. LERNER: What exhibit number?
19      MR. THOMPSON: 5.
20      Q. Do you see where it says
21  interrogatory number 8?
22      A. Yes.
23      Q. Do you see there is a list of
24  names there and in response to that
25  interrogatory, Bill Hoffman, Zach Haberman,

```
                                                          Page 421
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------X
      AUSTIN FENNER and IKIMULISA
 4    LIVINGSTON,
              Plaintiffs,
 5       vs.                          No. 09 Civ 9832
      NEWS CORPORATION, NYP HOLDINGS,
 6    INC., d/b/a THE NEW YORK POST and
      DAN GREENFIELD and MICHELLE
 7    GOTTHELF,
              Defendants.
 8    ------------------------------X
      SANDRA GUZMAN,
 9            Plaintiff,
         vs.                          No. 09 Civ 9323
10    NEWS CORPORATION, NYP HOLDINGS
      INC., d/b/a THE NEW YORK POST,
11    COL ALLAN, in his official and
      individual capacities,
12            Defendants.
      ------------------------------X
13
14           VIDEOTAPED DEPOSITION OF COL ALLAN
                          VOLUME II
15                     New York, New York
                       February 21, 2013
16
17
18
19
20
21
22    Reported by:
23    Bonnie Pruszynski, RMR
24    Job 57922
25
```

Page 438

Col Allan

1
2  A  No.
3  Q  Okay. Did you believe it was the
4  right decision in 2009?
5  A  Yes.
6  Q  Okay. And why was it the right
7  decision? Why do you stand by that decision?
8  A  Because I understood that the
9  stimulus bill was written by the Congress, and
10 that the cartoonist had used a news event that was
11 contemporary as they -- as cartoonists do, to link
12 two disparate events that -- a monkey had attacked
13 a woman in Connecticut, the police had shot the
14 monkey and he connected those two events. This
15 was an attack on the congressional stimulus bill
16 which the cartoonist clearly believes was a bad
17 bill.
18 Q  And following the publication of the
19 cartoon in 2009 -- during 2009, following the
20 publication of the cartoon, did you believe that
21 any changes should have been made to that cartoon
22 prior to its publication?
23     MR. LERNER: Objection. Asked and
24 answered.
25 A  It may have been prudent to have

Page 439

Col Allan

1
2  clearly labeled the monkey Congress.
3  Q  When you heard the suggestion or
4  received the suggestion that a label could have
5  been affixed to the primate in the cartoon --
6  A  No, sir. I didn't receive that.
7  Q  Okay. Please --
8  A  I didn't receive that suggestion.
9  Q  Okay. Then how did that suggestion
10 come to your attention?
11 A  It was a consequence of the fact that
12 there were protests about the cartoon.
13 Q  But if you didn't receive the
14 suggestion that it be labeled, how did you become
15 aware of that suggestion?
16 A  From those people who were critical
17 of the cartoon.
18 Q  Okay. So, that suggestion did come
19 to your attention somehow, yes?
20 A  Yes, it came from people who were
21 critical of the cartoon.
22 Q  Okay. Did it come from protestors
23 outside the New York Post?
24 A  I don't recall.
25 Q  Or from a letter to the editor?

Page 440

Col Allan

1
2  A  Any number of those things.
3  Q  Or potentially from commentary in the
4  media?
5  A  Yes.
6  Q  So, sitting here today and reviewing
7  that cartoon, do you believe the primate in that
8  cartoon should be labeled Congress?
9     MR. LERNER: Objection.
10 A  No.
11 Q  So, you believe the cartoon is fine
12 as is?
13 A  Yes. I believed that at the time and
14 I believe it now.
15 Q  Even knowing that various people, you
16 said many people, took offense at the cartoon on a
17 racial basis?
18 A  Yes.
19 Q  Did anyone else at the New York Post
20 express to you, following the publication of the
21 cartoon, that they believed that it was a mistake
22 to publish that cartoon?
23     MR. LERNER: Objection, "else"?
24 Q  Did anyone else at the New York Post?
25 A  I don't recall.

Page 441

Col Allan

1
2  Q  I will restate the question.
3     MR. LERNER: I don't understand who
4  the "else" is referring to.
5  BY MR. PEARSON:
6  Q  Did anyone other than yourself tell
7  you, anyone else who works for -- let's start
8  again, all right. You know, there are objections
9  being dispersed here and I understand the question
10 should be rephrased.
11    Did anyone else who works -- did
12 anyone else who works or worked at the New York
13 Post tell you, after the publication of this
14 cartoon, that they believed it was a mistake to
15 publish it?
16    MR. LERNER: Objection.
17 A  Possibly.
18 Q  Why do you say "possibly"?
19 A  I don't recall. It's possible.
20 Q  Did you have any discussions with
21 anyone about the publication of the cartoon at the
22 Post after it was published?
23 A  Yes, sir.
24 Q  Apart from any -- strike that.
25    And apart from Ebony Clark, a woman