UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

:

SANDRA GUZMAN,

                        Plaintiff,     :

                               :     **09 Civ. 09323 (LGS)**

       -against-     :

                               :     <u>OPINION AND ORDER</u>

NEWS CORPORATION,  NYP HOLDINGS,     :
INC. d/b/a THE NEW YORK POST and COL     :
ALLAN,     :

                     Defendants.  :

:

------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff Sandra Guzman brings employment discrimination claims on the basis of her

sex, race and national origin against three defendants News Corporation ("News Corp."), NYP

Holdings, Inc., d/b/a the New York Post (the "Post") and Mr. Col Allan, Editor-in-Chief of the

Post (collectively "Defendants").  Plaintiff asserts claims against all Defendants based on section

1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), the New York State Human

Rights Law, New York Executive Law §§ 290 *et seq.* (the "NYSHRL"), and the New York City

Human Rights Law and New York Administrative Code §§ 8-101 *et seq.* (the "NYCHRL").

Plaintiff asserts claims  based on Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §§ 2000e *et seq.* ("Title VII") only against the Post and News Corp.  Her claims allege

discriminatory firing, retaliation and a hostile work environment.

      News Corp. moves for summary judgment arguing that Plaintiff's claims against it fail

because News Corp. is not Ms. Guzman's employer and is not liable as a single or joint

employer with the Post.  The Post and Mr. Allan move for summary judgment, arguing that

Plaintiff's harassment, discrimination and retaliation claims fail as a matter of law.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/28/2013

For the reasons that follow, News Corp.'s motion for summary judgment is granted.  The Post's and Mr. Allan's summary judgment motion is denied.

## I.      Background

The following facts are drawn from the parties' submissions in connection with the instant motions.  The facts are undisputed unless otherwise noted.

### A.  The parties

Sandra Guzman, who is a black, Hispanic, Puerto Rican female, worked at the Post as an associate editor from July 2003 to September 29, 2009.

News Corp. owns hundreds of companies worldwide.  News Corp.'s subsidiaries, which are primarily media companies, employ approximately 50,000 to 60,000 individuals.

The Post publishes the daily newspaper, *New York Post*, and is a wholly owned subsidiary of News America Incorporated ("NAI"), which in turn is a subsidiary of News Publishing Australia Holdings Ltd., which in turn is a subsidiary of News Corp.

News Corp. and the Post both have offices at 1211 Avenue of the Americas, New York, New York.  While they each pay rent separately to a third party, the companies share conference rooms on the third floor, and Post employees have access to News Corp.'s cafeteria.  Plaintiff maintains, and Defendants dispute, that the Post and News Corp. share offices on the eighth floor.  Each company has its own human resource, finance, information technology and security departments.  The companies maintain separate bank accounts and separate financial books and records.  News Corp. employees are not involved in the printing or distribution of the Post's daily newspaper.

Defendant Col Allan has been employed as Editor-in-Chief of the Post since 2001. Defendant Allan was a member of the Post's Executive Committee and had the authority to make certain decisions concerning Plaintiff's employment.

During the relevant times, the Post's Executive Committee was comprised of Paul Carlucci (Publisher), Col Allan (Editor-in-Chief), Jennifer Jehn (Human Resources), Michael Racano (Chief Financial Officer) and Amy Scialdone (Human Resources), who were employees of the Post.  In addition, Les Goodstein attended Executive Committee meetings starting in January 2006 as head of the Community Newspaper Group, a separate company owned by NAI. Plaintiff contends that Mr. Goodstein was employed by both NAI and News Corp.; Defendants maintain that Mr. Goodstein was employed only by NAI.

Plaintiff highlights individuals who had roles at News Corp. or NAI, who also were involved at the Post.  Of the four members on the Post's Board of Directors, two—Mr. Rupert Murdoch and Mr. David Devoe—occupied similar positions on News Corp.'s Board.  Mr. Lachlan Murdoch, the Publisher of the Post from 2002 to 2005, was simultaneously COO at News Corp., when he hired Ms. Guzman.  Mr. Rupert Murdoch, the Chairman of News Corp. as well as the Post, had a role in hiring two successive Publishers of the Post:  Mr. Paul Carlucci and Mr. Jesse Angelo.  As publisher of the Post, Mr. Carlucci reported directly to the COO of News Corp.  Jordan Lippner, Senior Vice President and Deputy General Counsel at NAI, also had roles at the Post and News Corp.  For example, Post employees could lodge complaints with Mr. Lippner relating to their work environment at the Post, and Mr. Lippner served as a 30(b)(6) witness for the Post in the present litigation.

**B.  Ms. Guzman and *Tempo*: 2003 to 2008**

Ms. Guzman was hired by Lachlan Murdoch, the Post's then Publisher and Deputy Chief Operating Officer of News Corp., in July 2003 as an associate editor to increase the Post's readers in the Latino community.  Ms. Guzman originally was hired to create and edit a monthly newspaper section called *Tempo*, which was aimed at the Latino community and supported by advertisement sales.

Ms. Guzman's employment agreement was with the Post; she received her paychecks from the Post and sat in the Post's offices.  After Ms. Guzman's original contract with the Post expired on July 6, 2005, she continued to work as an associate editor for the Post without entering a new contract.

Although Ms. Guzman received her review in an envelope that read "News Corp.," she was supervised and reviewed by Post employees.  Ms. Guzman shared benefits with News Corp. employees (such as a retirement and health insurance plan), followed employment policies that were promulgated by News Corp. (such as the EEO and Electronic Communications policies) and attended a News Corp. holiday party.  In addition to her work at the Post, Ms. Guzman served on two News Corp. committees, the Hispanic Counsel and the Cool Change committee, comprised of individuals from different News Corp. subsidiaries who met to discuss carbon-neutral initiatives.

*Tempo* initially was successful, running on average between 24 and 30.7 pages from 2003 to 2005, depending on the number of advertising pages sold.  Its staff grew from one to six dedicated employees.  In 2006, the average pages per issue dropped to 17.67.  *Tempo*'s advertising and total average pages continued to decrease in 2007, 2008 and 2009, with pages per issue averaging 15.83, 13.3 and 4.9 respectively.

4

According to Defendants, Mr. Carlucci, the Post's then Publisher, first decided to cancel *Tempo* and terminate Ms. Guzman's employment on or about April 17, 2006.  The notes of the April 24, 2006 Executive Committee meeting reflect that the Committee discussed the severance package that Ms. Guzman would receive upon her discharge.  In June 2006, Mr. Goodstein, head of the Community Newspaper Group, suggested implementing aggressive cost cutting measures and maintaining *Tempo.*  Thereafter, the Post took steps to increase *Tempo*'s profitability, including increasing the ratio of advertising to editorial content and cutting *Tempo*'s staff from six to two full-time employees, Ms. Guzman and Sami Haiman-Marrero.  From approximately June 2006 through November 2007, Mr. Goodstein assumed a more active role with *Tempo*, which required Ms. Guzman to work collaboratively with him.

Starting in 2007, Ms. Guzman assumed responsibility for editing additional sections of the Post.  By July 2009, Ms. Guzman was responsible for the editorial content and production of at least 25 special sections per year, including the education, Parade, Black History Month, Harlem Week and Go Green sections.  Ms. Guzman testified that she also produced special content for NAI's Community Newspaper Group.  Defendants assert that these sections were reassigned from the Post's Special Sections editor to give Ms. Guzman work to justify her high salary in light of the decline in advertising sold for *Tempo* and the reduction in its size.  Ms. Haiman-Marrero's employment was terminated to reduce *Tempo*'s costs in June 2008, and responsibility for the sale of advertising was transitioned to the Post's general advertising group.

### C.  Environment at the Post

Plaintiff alleges that the Post had a racially and sexually hostile work environment.  Ms. Guzman testified that she routinely heard sexually charged conversations in the news room, including sexual comments about "female body parts" by male employees.  Ms. Guzman also

stated that she heard improper comments at the executive editorial meetings that she attended from 2003 until approximately 2005: for example, Defendant Allan expressed disapproval of a female editor's story list by saying, "It's hard to teach old bitches new tricks," and equated a Latino Major League Baseball pitcher to a "criminal" by asking if he had brought a "gun or machete" to the interview.  Ms. Guzman testified that Photography Editor David Boyle regularly used the word "harem" when referring to his staff, which comprised a group of young, attractive women, whom he had hired.

Michael Riedel, the Post's Broadway columnist, regularly greeted Ms. Guzman by singing, "I want to live in America," from *West Side Story* with a Spanish accent.[1]  On one occasion, Anne Aquilina, the Post's administrative editor, asked Ms. Guzman if candles in her office related to "Santeria or Voodoo."

According to Ms. Guzman, Mr. Goodstein commented on her appearance whenever she saw him, telling her that she looked "sexy" or "beautiful."   She further testified that Mr. Goodstein habitually looked her "up and down" as though she were "naked," leered at her body in an overtly sexual matter and licked his lips.    Ms. Guzman declared that Mr. Goodstein also "routinely stared at the breasts and buttocks" of other female employees in her presence.  In or around 2007, Mr. Goodstein called Ms. Guzman "Cha Cha #1" and referred to Ms. Haiman-Marreo, who marketed *Tempo* at that time and is a Hispanic woman, as "Cha Cha #2."[2]  Ms.

---

[1] Reidel's singing coincided with the Broadway revival of West Side Story.  Guzman initiated communications with Riedel regarding *West Side Story* on a number of occasions, and requested that Riedel get her tickets to the performance—which he did—and that he put a friend of hers in contact with the musical's casting director.

[2] Ms. Guzman immediately responded, "Don't call me that," and he never did so again.  Mr. Goodstein testified that he remembered referring to Ms. Guzman and Ms Haiman-Marreo as "Chachas" and that he recalled complimenting Ms. Guzman's dress once at the Hispanic Federation Gala in the presence of his wife, but did not recall other specific instances of commenting on Ms. Guzman's appearance and denied leering or staring intensely at her.

Guzman testified that she tried to avoid Mr. Goodstein, but at some point, Defendant Allan instructed her that she needed to cooperate with him.  Ms. Guzman worked closely with Mr. Goodstein from approximately June 2006 through November 2007.

On or around April 20, 2007, Ms. Guzman was drinking with three female Post journalists at a bar near the Post's offices, frequented by Post employees.  Defendant Allan joined the three women and shared stories about the "voracious sexual appetite" of former-Post columnist Steve Dunleavy, including a story about how Mr. Dunleavy purportedly had sex with a female fan in a closet of the bar where they were.  On this same evening, Defendant Allan showed the women a picture on his Blackberry of a naked man whose genitals were visible.  According to Ms. Guzman, Defendant Allan placed his Blackberry in her hands asking, "What do you think of this?"  According to Defendant Allan, the women asked him what he was looking at, he explained that it was a "lewd" photo and then showed it to them when they asked to see it.  The image was published in the Post soon thereafter, but with the subject's genitals redacted.[3]

Ms. Guzman also submits evidence concerning other incidents of harassment that she did not personally witness.  In 2001, Steve Dunleavy, a white, former-Post columnist, once called a black employee a "token nigger," and, according to Ms. Guzman, referred to Hispanics as "Spics" in drafts of his news article.  Defendant Allan yelled loudly in the newsroom that somebody should "tell that damn girl to answer the phone!" in reference to a black, female employee, who felt "humiliated" and "embarrassed."  According to Ms. Guzman, supervisors

---

[3] In Mr. Allan's version, Jesse Angelo, a male editor, was also present, but Mr. Angelo testified that Mr. Allan had never shown him the photograph.  Mr. Allan remembered telling a group of Post employees about Mr. Dunleavy's sexual exploit at the bar, but claimed that it was not on the same day that he showed Ms. Guzman the picture of the naked man.

slept with interns while promising them jobs, and it was widely discussed at the office and in newspapers that Defendant Allan took two Australian political leaders to a strip club called Scores and visited the club frequently himself during the work day.

Plaintiff also presented evidence of sexualized behavior at the Post office parties.  One female former employee testified that Mr. Boyle displayed inappropriate sexual behavior at the office holiday party and hired a make-up artist to style the young, female members of his staff.  It was widely discussed by members of the Post editorial department that a white, male editor had offered a "permanent reporter job" to a young female copy assistant in exchange for a "blowjob." Ms. Guzman claims that another employee at the Post came into her office and told her in a "distraught manner that Mr. Col Allan had rubbed his erect penis on her buttocks, and was making lewd remarks about how great her breasts looked" at a party, although Defendant Allan and the female employee, who is still employed at the Post, deny that anything inappropriate occurred.

### D.  Disciplinary Incident

In January 2009, Ms. Guzman was planning to travel to the inauguration of President Barrack Obama in Washington, D.C. to cover some of the events for the newspaper and *Tempo*'s website.  On January 14, 2009, she provided a "letter of responsibility" to a Post stylist so that he could borrow samples from designers for Ms. Guzman's use during the inaugural events.  On January 16, 2009, a representative from Manolo Blahnik contacted the Post to determine whether the stylist, who reportedly "pitch[ed] a hissy-fit" when denied free shoes was truly authorized to act on behalf of the Post.  Thereafter, Defendant Allan "clarified" in an email to Ms. Guzman that she did not have authorization to cover any of the inaugural events for the Post and would need to request all vacation time going forward in writing.

On January 19, 2009, Defendant Allan inquired by emails to Mr. Robinowitz and Mr. Racano about *Tempo*'s previous expenditures with regards to the stylist and stated "given the current size of [T]empo the question is whether we should be spending anything on styling. [I]n fact [I] believe you should closely examine all costs associated with this and other sections that fall under your responsibility with a view to eradicating all but the most essential costs as we continue to battle this miserable economic environment." Ms. Guzman subsequently received a written warning on January 27, 2009, regarding the event:

> [Y]ou used extremely poor judgment and violated the Post's conflict of interests rules when you had a stylist, who is contracted to provide professional services on behalf of the Post, assist you for your personal benefit – namely, using him to dress you for inauguration parties. Making matters worse, as a direct result of your having engaged in this misconduct, the stylist himself then engaged in inappropriate conduct in trying to obtain for you items of clothing from fashion retailers/designers . . . for your personal benefit.

As part of her 2009 annual performance review, Ms. Guzman's direct supervisor, Mr. Robinowitz recommended that she be evaluated as "4 – Exceeds Standards," but the score was reduced to "3 – Meets Standards" at the direction of Defendant Allan, who instructed Mr. Robinowitz to factor in Ms. Guzman's ethical breach with the stylist.

### E.  The Cartoon

On February 18, 2009, the Post published a political cartoon depicting a dead chimpanzee having been shot by two police officers, one of whom remarks: "They'll have to find someone else to write the next Stimulus Bill" (the "Cartoon"). Many people, including Ms. Guzman, believed that the Cartoon symbolized President Barack Obama and were upset that the first black president had been analogized to an ape.

The day after the Cartoon was published, a protest took place in front of the Post's offices.  A black female employee testified that she heard Defendant Allan state on the phone, moments after he looked out the window at the protestors: "Most of them are minorities and the majority of them are uneducated."  The employee told Ms. Guzman about Defendant Allan's comments in tears.  She also testified that she heard Defendant Allan make a comment concerning "blacks and being monkeys."  A second black, female Post employee, testified that she asked Defendant Allan if she could talk about the Cartoon with him when she brought a document to his office; he responded, "Oh, absolutely not."

Mr. Rupert Murdoch, Chairman of the Post and of News Corp., eventually issued an apology for the Post's decision to publish the Cartoon.  Defendant Allan, by contrast, maintains that the dead chimpanzee symbolized Congress, not the President, and denies that the Cartoon was racist or improper.

### F.  Complaints about the Cartoon

The day the Cartoon was published, Jennifer Jehn, the Post's Senior Vice President of Human Resources, became aware that Ms. Guzman was upset about it and stopped by her office. Ms. Guzman told Ms. Jehn that she believed the Cartoon to be racist and offensive and that she was upset about being associated with it.

Ms. Guzman testified that at the same meeting she told Ms. Jehn that she believed the Cartoon epitomized a larger problem with racism at the Post and complained, among other things, about Mr. Goodstein's sexual harassment, Defendant Allan's sexual harassment and racially demeaning conduct, Mr. Reidel's singing, David Boyle calling his female subordinates his "harem" and supervisors propositioning young, female interns while promising them jobs. Ms. Guzman testified that she asked Ms. Jehn to conduct workshop trainings on sexual

harassment and racism, and to take a look at recruitment efforts to hire more women and people of color.  In contrast, Ms. Jehn testified that the conversation was limited to Ms. Guzman's complaining that she was upset about the content of the Cartoon and that Ms. Guzman did not tell her that she believed that the Cartoon was representative of a racially hostile environment at the Post or describe any incident of harassment.  Ms. Jehn spoke to Defendant Allan about Ms. Guzman's complaints.

After the Cartoon was published, Ms. Guzman sent an email to the entire management staff at the Post and to members of the public stating, "Please know that I had nothing to do with the Sean Delonas cartoon.  I neither commissioned or approved it.  I saw it yesterday with the rest of the world.  And, I have raised my objections to management."  Defendant Allan saw a copy of this email and was disappointed that Ms. Guzman had not "raised those concerns with the people that she worked for and with before she did so publicly."

Around the time of the publication of the Cartoon, Mr. Robinowitz, Ms. Guzman's direct supervisor, tried to convince her that the Cartoon was not racially offensive and told her to stop listening to Al Sharpton.  Ms. Guzman told Mr. Robinowitz that the Post had a deeper problem regarding race that needed to be addressed.

### G.  Other Complaints

The Post's written anti-harassment policy directs employees to send complaints of discrimination to the Post's human resources department, an attorney for the Post or the Alertline phone service.   In addition to her complaint to Ms. Jehn in February 2009, Ms. Guzman claims that she made other complaints, which Defendants dispute.  Ms. Guzman testified that she complained to Rick Ramirez, a News Corp. attorney, and Mitsy Wilson, members of the News Corp. diversity committee, about racial and sexual discrimination and harassment in the

workplace.[4]  Ms. Guzman also testified that she complained to Paul Armstrong, Lisa Barnett and

DeDe Brown, who were members of the Post's executive management team, concerning Mr.

Goodstein's conduct and reported the photo incident to Mr. Armstrong.

### H.  Increased Scrutiny

Ms. Guzman states that after her February 2009 complaint her reported expenses for

*Tempo* were scrutinized more closely, including expenses for a Legends of Salsa Music photo

shoot, and that her story ideas were dismissed by management.  In August 2009, Ms. Guzman

made a request to travel to Washington, D.C. to cover a private party for Supreme Court Justice

Sonia Sotomayor, which was denied.  Defendant Allan testified that he denied the request

because Ms. Guzman was a friend of the Justice, and Defendant Allan believed that this created a

conflict.  On September 4, 2009, Ms. Guzman made a request to her supervisor that she be

permitted to travel to Washington, D.C. to cover Justice Sotomayor's investiture.  This request

was also denied, according to Defendants, because the D.C. bureau of the Post could cover the

story in a more cost-effective manner.

### I.  Page Six

In February 2009, the Post reduced the publication frequency of Page Six the Magazine

section from weekly to approximately quarterly and terminated almost all of its dedicated 37

employees.  The editor, Margi Conklin, a white female, was retained; she was transitioned to the

deputy Sunday editor position.  At the time, Ms. Conklin had a contract for a guaranteed term.

Ms. Conklin was retained at the Post after her contract expired in July 2009.

---

[4] Ms. Guzman understood Mr. Ramirez and Ms. Wilson to be members of the human resources department because "they recruit people of color to work at the different News Corp. companies."

### J.  Closure of *Tempo*

Advertising revenue at the Post took a "nose dive" in the wake of the 2008 market crash, and *Tempo* was no exception.  On August 17, 2009, Mr. Carlucci again proposed that *Tempo* be discontinued as a monthly section and reduced in frequency to two or three times per year.  On September 8, 2009, a decision was made at an Executive Committee meeting to suspend *Tempo* as a monthly section because it was not profitable, and to eliminate the *Tempo* editor position that was held by Ms. Guzman.  The parties dispute who precisely was responsible for the decision.

It is undisputed that Ms. Guzman's employment was not terminated for performance or disciplinary reasons.  Her supervisor, Mr. Robinowitz, testified that she was an excellent employee.  After the *Tempo* editor position was "eliminated," Defendant Allan and Ms. Jehn inquired whether there was a position anywhere at the paper that Ms. Guzman might fill.  At the time Ms. Guzman was discharged on September 29, 2009, she earned a salary of $137,807 per year.  A junior editor position was open on the Post's hard-news Metropolitan Desk.  The position paid $82,000 per year, more than 40% less than Ms. Guzman's salary.

Ms. Guzman was informed of the Post's decision to terminate her employment in a meeting on September 29, 2009, after which she was physically escorted out of the Post.  The sections that had been reassigned to Ms. Guzman were returned to the Special Sections Editor, who earned a salary of $80,850 per year when Ms. Guzman was discharged.  *Tempo* was not published again after September 2009.

## II.  Summary Judgment Legal Standard

A motion for summary judgment may not be granted unless all of the submissions taken together show "that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see El Sayed v. Hilton Hotels Corp.*, 627

F.3d 931, 933 (2d Cir. 2010).  "The moving party bears the burden of establishing the absence of

any genuine issue of material fact."  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336,

340 (2d Cir. 2010).  In deciding a motion for summary judgment, a court must "construe the

facts in the light most favorable to the non-moving party and must resolve all ambiguities and

draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d

Cir. 2011) (citations and internal quotation marks omitted).  Not every disputed factual issue is

material in light of the substantive law that governs the case. "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment must be granted with caution in employment discrimination cases,

especially those that turn on the employer's intent.  *See Holcomb v. Iona Coll.*, 521 F.3d 130,

137 (2d Cir. 2008); *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Direct evidence of an employer's discriminatory intent is often hard to obtain, and plaintiffs in

discrimination suits often must rely on the cumulative weight of circumstantial evidence.  *See,*

*e.g.*, *Holcomb*, 521 F.3d at 137; *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)

("[A]n employer who discriminates against its employee is unlikely to leave a well-marked trail,

such as making a notation to that effect in the employee's personnel file.").  At the summary

judgment stage, the court must carefully distinguish between evidence that could allow a

reasonable fact finder to infer that discrimination caused the adverse employment decision and

"evidence that gives rise to mere speculation and conjecture."  *Woodman v. WWOR-TV, Inc.*, 411

F.3d 69, 75 (2d Cir. 2005) (citations and internal quotation marks omitted).

III.     **Standards for Parent Company Liability for Employment Discrimination**

In addition to the Post, where it is undisputed that Plaintiff was employed, Plaintiff

argues that News Corp. is also liable for her claims of discrimination, harassment and retaliation

because the Post and its indirect corporate parent, News Corp., are a "single employer," or in the

alternative, "joint employers."   A parent company is not ordinarily liable for the employment

discrimination of its subsidiary, except if the requirements of the single employer doctrine or the

joint employer doctrine are satisfied.  *Gulino v. New York State Educ. Dep't,* 460 F.3d 361, 378

(2d Cir. 2006) (Title VII claims); *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d

210, 216–17 (S.D.N.Y. 2010) (Section 1981 and the local New York anti-discrimination

statutory claims).

### A.  Single Employer Doctrine

Under the single employer doctrine the court examines whether a parent and subsidiary

are so integrated that in effect they are acting as one with respect to the plaintiff's employment.

To determine whether a parent and subsidiary comprise a single employer subject to joint

liability for employment-related acts, the court considers evidence of "(1) interrelation of

operations, (2) centralized control of labor relations, (3) common management, and (4) common

ownership or financial control."  *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d

Cir. 1995) (quoting *Garcia v. Elf Atochem N.A.*, 28 F.3d 446, 450 (5th Cir. 1994).  Although no

one factor is determinative, "[t]he policy behind the single employer doctrine . . . . is most

implicated where one entity actually had control over the labor relations of the other entity, and,

thus, bears direct responsibility for the alleged wrong."  *Murray v. Miner*, 74 F.3d 402, 405 (2d

Cir. 1996).  There is a strong presumption that a parent is not the employer of its subsidiary's

employees.  "[T]he law only treats the employees of a corporate entity as the employees of a

15

related entity under extraordinary circumstances," just as the law only pierces the veil of a corporate entity under extraordinary circumstances. *Id.* at 404.

### 1.   Interrelation of Operations

To assess whether a parent dominates the subsidiary's operation, courts may examine: whether the two entities shared employees, services, records, and equipment, and whether the parent was involved directly in the subsidiary's daily business decisions relating to production, distribution, marketing, advertising and finances, as well as other factors not relevant to the evidence here. *See Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 603 (S.D.N.Y. 2012) (quoting *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 309 (S.D.N.Y. 1998) *aff'd*, 182 F.3d 899 (2d Cir. 1999)).  The evidence shows that the Post and News Corp. were distinct entities with distinct business operations.  The Post and News Corp. have separate employees, bank accounts, marketing departments, finance departments, computer systems, databases and security.

Plaintiff argues that the fact that the Post and News Corp. share office space supports a finding that the companies are integrated.  However, for the most part, their office space is separate.  The two companies occupy separate floors in the same office building, accessible only to their respective employees—with the limited exception of shared conference rooms on the third floor, the News Corp. cafeteria and possibly certain offices on the eighth floor.  The Post and News Corp. each pays separate rent for its respective office space.

Although the parties largely agree that the Post independently published its newspaper, Plaintiff argues that News Corp. exercised control over marketing and advertising at the Post through Mr. Rupert Murdoch's involvement in editorial decisions.  First, as Chairman of News Corp., Mr. Rupert Murdoch can maintain some amount of communication with senior employees

16

of News Corp.'s subsidiaries without collapsing corporate formalities.  More significant, Mr.

Rupert Murdoch was simultaneously Chairman of the Post, and there is no evidence that his

involvement with the Post extended beyond his role as its Chairman.  As discussed below, the

fact that the Chairman of the Board of one company was Chairman of a separate company,

without more, does not show that the second company was integrated with the first.  *See United*

*States v. Bestfoods*, 524 U.S. 51, 69 (1998).

In sum, the evidence is insufficient to raise a question of fact that the operations of the

Post and News Corp. were integrated for purposes of the single employer doctrine.

### 2.  Centralized Control of Labor Relations

The next factor, whether the parent and subsidiary have a "centralized control of labor

relations," is the "crucial element" of the single employer inquiry.  *Parker v. Columbia Pictures*

*Indus.*, 204 F.3d 326, 341 (2d Cir. 2000); *accord Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d

1235, 1241 (2d Cir. 1995) (noting that the "critical" question is "'[w]hat entity made the final

decisions regarding employment matters related to the person claiming discrimination?'"

(quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983))).

Here there is no issue of fact as to who controlled the central aspects of Ms. Guzman's

employment.  The Post, and not News Corp., was responsible for her hiring, firing, supervision

and evaluation.  Ms. Guzman was hired by Mr. Lachlan Murdoch, who was Publisher of the Post

at the time.  That News Corp. also employed Mr. Lachlan Murdoch as COO at News Corp.,

without more, does not show that he was acting on behalf of News Corp. when he hired Ms.

Guzman.  Moreover, the Post and its employees indisputably evaluated and compensated Ms.

Guzman.   The Post's Executive Committee was responsible for her termination.  The evidence

does not show that News Corp. controlled Ms. Guzman's employment through Mr. Goodstein's

attendance of the Executive Committee meetings.  Mr. Goodstein—who was employed by NAI, and according to Plaintiff, also News Corp.—attended Executive Committee meetings due to his work with NAI's Community Newspaper Group, was the only one of approximately six attendees and was the only attendee who was not employed by the Post.

A less probative, but still relevant, issue is which company controlled other employment matters that affected Post employees generally, including Plaintiff.  She argues that News Corp. exercised control through certain policies that the Post adopted—such as the EEO policy, electronic communications policy and Standards of Business Conduct.  The record does not reflect that News Corp. enforced these policies at the Post, and the fact that the Post adopted policies promulgated by News Corp. is insufficient to show that News Corp. exercised centralized control over the Post's employees.  *See Snyder v. Advest, Inc.*, No. 06 Civ. 1426, 2008 WL 4571502, at *7 (S.D.N.Y. June 8, 2008) ("[T]he mere fact that Plaintiff agreed to be bound by certain standards of conduct set forth by [the parent's policies] does not indicate that [the parent company] exercised control over or made final decisions regarding the employment of Plaintiff.") (alterations omitted) (quoting *Ennis v. TYCO Int'l Ltd.*, No. 02 Civ. 9070, 2004 WL 548796, at *4 (S.D.N.Y. Mar. 18, 2004))); *Woodell v. United Way of Dutchess Cnty.*, 357 F. Supp. 2d 761, 769 (S.D.N.Y. 2005) ("The fact that [the parent] . . . offers general policy statements or guidelines on employment matters is not sufficient evidence to establish centralized control.") (citations omitted).

Plaintiff also points to News Corp. employee benefits, such as the retirement and healthcare plans, which were available to Post employees, as evidence of centralized control over Post employees.  Whether these were in fact News Corp. benefits is in dispute, but drawing all inferences in Plaintiff's favor, the fact that a parent and its subsidiary "maintained the same

18

benefits does not suggest centralized control of labor relations." *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 347 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1199 (2d Cir. 1998); *see Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 405 (S.D.N.Y. 1999) ("[A] common benefits package speaks only to economies of scale and not to centralized control of labor relations.") (citation, internal quotation marks and alterations omitted).  Likewise, the fact that Ms. Guzman received performance reviews in News Corp. envelopes does not show that News Corp. had any role in her evaluation or compensation.

The evidence is insufficient to raise a question of fact that News Corp. and the Post had centralized control over employee relations for purposes of the single employer doctrine.

### 3. Common Management

Plaintiff's evidence of common management is insufficient to support her argument that the Post and News Corp. are an integrated, single employer.  Plaintiff has provided evidence that several News Corp. employees simultaneously had roles at the Post.  Two of the four members of the Post's Board of Directors occupied similar positions on News Corp.'s Board.  Mr. Lachlan Murdoch was COO of News Corp. as well as Publisher of the Post when he hired Ms. Guzman, and Mr. Rupert Murdoch, Chairman of both companies, had some role in hiring the successive Publishers of the Post.  Ms. Guzman also highlights the multifaceted roles of Mr. Lippner and Mr. Goodstein, who although officially employed at NAI, also had roles at the Post and News Corp.

These executives' dual roles, without more, do not demonstrate that News Corp. exercised control over Ms. Guzman's employment.  The presumption is that "corporate personalities remain distinct" and "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their

19

common ownership." *Bestfoods*, 524 U.S. at 69 (citation omitted); *accord Herman*, 18 F. Supp. 2d at 312 ("As a general matter, the Court must consider evidence of common management in the light of the well established principle that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership.") (citation and internal quotation marks omitted); *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308, 2011 WL 2119748, at *5 (S.D.N.Y. May 23, 2011); *Kelber v. Forest Elec. Corp.*, 799 F. Supp. 326, 331 (S.D.N.Y. 1992).

Plaintiff also argues that the common management prong is satisfied here because senior employees at the Post, like Publisher Paul Carlucci, reported to Mr. Rupert Murdoch, the Chairman of News Corp.  Ignoring Mr. Rupert Murdoch's role as Chairman of the Post, Plaintiff takes the argument one step further, arguing, in essence, that News Corp. exerts control over the Post's Human Resources department because the head of that department reports to the Post's Publisher, who in turn reports to the Chairman of News Corp.  This argument likewise fails to prove company integration, even when inferences are drawn in Plaintiff's favor.  Courts have found that even though senior employees "ultimately report to the parent's officers . . . this exercise of control does not [necessarily] exceed the control normally exercised by a parent." *Balut*, 988 F. Supp. at 347 (alterations omitted) (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993)).

Plaintiff's evidence of common management is insufficient for a reasonable jury to conclude that News Corp. and the Post had centralized control over employee relations for purposes of the single employer doctrine.

### 4.  Common Ownership or Financial Control

A fourth factor relevant to the single employer doctrine is common ownership or financial control.  It is undisputed that News Corp. is the ultimate parent and owner of the Post.  Nevertheless, the two companies maintain independent finances, bank accounts, expenses and profit and loss statements.  This factor alone does not support a finding of centralized control.  *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 254 (S.D.N.Y. 2007).

Considering all four factors in the light most favorable to Plaintiff,  Plaintiff has not presented evidence from which a reasonable jury could conclude that News Corp. and the Post were sufficiently integrated that they should be considered Ms. Guzman's single employer for purposes of her claims of employment discrimination.

### B.  Joint Employer

In determining whether a parent and subsidiary both should be liable for employment discrimination under the joint employer doctrine, the court reviews whether the employee actually works for each of the two entities, even though she is an employee of only one.

> Where this [joint employer] doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (citations omitted).

Ms. Guzman was asked to create and edit special sections for the Community Newspaper Group (which was owned by NAI), and to hand off her work product to News Corp.  Ms. Guzman also was approached by News Corp. to sit on the Cool Change committee and the Hispanic Counsel along with employees from various News Corp. subsidiaries.  These tasks

21

were sporadic and insignificant taken in the context of all of Ms. Guzman's work for the Post and insufficient for a reasonable jury to find that Plaintiff was a de facto employee of News Corp.

Plaintiff's claims against News Corp. fail as a matter of law because she has not presented evidence sufficient to raise an issue of fact as to an employment relationship between her and News Corp. under either the single employer or joint employer doctrine. Accordingly, News Corp.'s motion for summary judgment is granted.

## IV.    Hostile Work Environment

Ms. Guzman contends that Defendants subjected her to unlawful discrimination and harassment in violation of § 1981, Title VII, the NYSHRL and the NYCHRL, "which was so severe and pervasive, it changed how she viewed and could function at her job."

### A.  Legal Standard

To survive a motion for summary judgment on a claim that racial or sexual harassment has caused hostile work environment under § 1981, Title VII or the NYSHRL, a plaintiff must demonstrate: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)) (Title VII); *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) (§ 1981); *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998 (N.Y. 2004) (NYSHRL). While hostile work environment claims under § 1981, Title VII and the

NYSHRL are governed by the same standard, the NYCHRL is analyzed under a different standard.[5]

Plaintiff's evidence must show that the conduct at issue created a work environment that is both objectively and subjectively hostile, but the environment need not be "unendurable" or "intolerable." *See Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir. 2003). "A plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2001) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). "Although one encounter may constitute a hostile work environment, conduct that can be categorized as a few isolated incidents, teasing, casual comments or sporadic conversation will not be deemed to create a hostile work environment." *Jessamy v. City of New Rochelle, N.Y.*, 292 F. Supp. 2d 498, 511 (S.D.N.Y. 2003) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (additional citations omitted)). "The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which

_____

[5] The NYCHRL requires "an independent liberal construction *in all circumstances*," not solely hostile work environment claims. Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the "Restoration Act") (emphasis added). The Restoration Act makes clear that "interpretations of state or federal provisions worded similarly to [NYCHRL] provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed 'as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise' and only to the extent that those State- or federal-law decisions may provide guidance as to the 'uniquely broad and remedial' provisions of the local law." *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009) (the Restoration Act); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (reversing district court decision that erroneously applied federal standard to NYCHRL claim); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 277–79 (2d Cir. 2009) (explaining that the Restoration Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state anti-discrimination law"). Consequently, the Court considers Plaintiff's NYCHRL claims separately from her other claims throughout the opinion, but addresses them only when the evidence is insufficient to maintain Plaintiff's claims under the federal and state statutes.

particular behavior occurs and is experienced by its target." *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation, internal quotation marks and alterations omitted). Relevant circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (alterations omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

The Supreme Court recently clarified the standard for imputing to the employer the conduct that created the hostile environment: "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions[,]" but "[i]n cases in which the harasser is a 'supervisor,' . . . the employer is strictly liable" if the supervisor's harassment culminates in a tangible employment action, such as hiring, firing, failing to promote or reassignment with significantly different responsibilities. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). If no tangible employment action is taken, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Faragher*, 524 U.S. at). In assessing an employer's response to complaints of harassment, the Second Circuit has instructed that it is relevant whether the response was "immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior." *Summa*, 708 F.3d at 124 (alterations in original) **(**quoting *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997)).

24

Under the NYCHRL, harassment need not be "severe and pervasive" to be actionable, and the employer may still be liable for a hostile work environment, even in the absence of a tangible employment action.  *See Williams*, 872 N.Y.S.2d at 31 (holding that "' severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability").  "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.'"  *Mihalik*, 715 F.3d at 111 (citation omitted).  The employer may still prevail on summary judgment if it proves that "the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"  *Id.* at 111 (quoting *Williams*, 872 N.Y.S.2d at 41; *see also Lennert-Gonzalez v. Delta Airlines, Inc.*, No. 11 Civ. 1459, 2013 WL 754710, at *8 (S.D.N.Y. Feb. 28, 2013).

### B.  Application of Law to Facts

The record here contains sufficient evidence of harassment to create triable questions of fact on Ms. Guzman's hostile work environment claims on the basis of sex, race and national origin.

### 1.  Sexual Harassment

While Defendants argue that there is no evidence that harassment was either severe or pervasive, Ms. Guzman has provided evidence of a sexually charged environment at the Post, permeating the newsroom, meetings and holiday parties.  Ms. Guzman testified that Mr. Goodstein leered at her in a suggestive manner and commented on her appearance at every one of their frequent encounters.  The evidence also includes reports of an inappropriate request for a sexual favor, supervisors sleeping with interns and an editor calling his female employees his "harem."

25

Ms. Guzman further provided evidence that Defendant Allan showed her and female co-workers a picture of a naked man, discussed the sexual exploits of a colleague, reportedly visited and entertained visitors at a strip club during the work day, referred to women as "old bitches," and reportedly inappropriately touched a female colleague and made lewd remarks to her at an office party.  In addition to Ms. Guzman's testimony, the record reflects the testimony of others who participated in or witnessed incidents of harassment.  If a jury were to credit Ms. Guzman's evidence, it could reasonably find that the sexual harassment was severe and pervasive under the federal and state statutes and that the conduct complained of was neither petty nor trivial under the NYCHRL.

Defendants argue that Ms. Guzman was not subjectively offended based on evidence that she interacted civilly with the co-workers who were harassing her and engaged in sexual behavior herself.  This evidence is insufficient to establish that Ms. Guzman was not offended, if not irrelevant.  Civility toward a harasser does not excuse harassment or signify subjective acceptance, particularly in an employment setting.  Moreover, sexual harassment by Plaintiff's supervisors is not excused by whatever sexual conduct Plaintiff may have engaged in with others.

Defendants also argue that Plaintiff has not adduced evidence sufficient to satisfy the second requirement for proof of sexual harassment, that the challenged conduct was discriminatory.  Defendants claim that the alleged conduct did not occur *because* of Ms. Guzman's gender.  *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) ("In order to show that the allegedly harassing conduct was motivated by gender, or that 'gender played a motivating part in an employment decision,' a female plaintiff must show that one of the reasons for the harassment or the decision was that she 'was a woman.'" (quoting

26

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion))).  Given the gender based nature of the alleged harassing incidents, Plaintiff has raised an issue of fact as to discriminatory intent.  *See Petrosino v. Bell Atl.*, 385 F.3d 210, 222 (2d Cir. 2004) ("[W]orkplace disparagement of women, repeated day after day over the course of several years without supervisory intervention, stands as a serious impediment to any woman's efforts to deal professionally with her male colleagues.").

Defendants invoke the affirmative defense against an employer's imputed liability and argue that Ms. Guzman did not adequately notify her supervisors of the alleged harassment, and did not avail herself of the Post's anti-harassment policy.  However, Ms. Guzman testified that she used the company's procedures for reporting harassment by complaining to Jennifer Jehn in Human Resources in February 2009.  She also testified that she complained to three members of the Post's executive management team.  Plaintiff has adduced sufficient evidence to raise an issue of fact about the adequacy of her complaints of sexual harassment.  For all of these reasons, her claims of sexual harassment raise sufficient issues of fact that a reasonable jury could find in her favor.

### 2.  Harassment on the Basis of Race and National Origin

Plaintiff's  evidence of severe or pervasive harassment on the basis of her race and national origin also raise questions of fact sufficient to defeat summary judgment.  Mr. Reidel sang "I want to be in America" in a Spanish accent to Ms. Guzman on many occasions and once called her "Cha Cha #1."  Defendant Allan asked whether a Hispanic baseball star, whom Ms. Guzman interviewed, brought a weapon to an interview, allegedly implying that he was a criminal.  Ms. Guzman argues that Ms. Acquila's comments about Ms. Guzman's candles, although facially neutral, were racially charged.

The Court does not consider Defendants' allegedly racist decision to publish the Cartoon in assessing the sufficiency of Plaintiff's evidence.  The decision to publish editorial content, even offensive editorial content, is protected by the First Amendment.  *See, e.g.*, *McClellan v. Cablevision of Conn., Inc.*, 149 F.3d 161, 167 n. 12 (2d Cir. 1998) (noting that "a newspaper publisher has a First Amendment right to control the editorial content of the newspaper"); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986) ("[U]nder the First Amendment the decision of what to select must almost always be left to writers and editors."); *Rosario v. New York Times Co.*, 84 F.R.D. 626, 631 (S.D.N.Y. 1979) ("Title VII and Section 1981 are directed to business judgments, not editorial judgments.").  However, while Ms. Guzman cannot bring an employment discrimination claim against the Post for publishing an allegedly racist cartoon, her hostile work environment claim also encompasses the way that the Post dealt with the publication of the Cartoon and the issues that arose after the Cartoon was published, including the increased racial tensions in the office.  *See Guzman v. News Corp.*, 877 F. Supp. 2d 74, 77 (S.D.N.Y. 2012) ("Title VII and Section 1981 are not concerned simply with judgments, but also with motivations.").  Ms. Guzman states that she complained to Human Resources that the Cartoon exemplified the Post's treatment and attitude toward African-Americans generally and at the Post, and also complained about Defendant Allan's racially demeaning conduct and Mr. Reidel's singing.   She also complained to members of the News Corp. diversity committee and others about racial as well as other forms of discrimination.

Plaintiff further submits evidence of racial harassment observed only by others as part of her hostile work environment claim.  *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000) ("'[T]he mere fact that the plaintiff was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work

environment claim' because 'the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment.'" (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997))).  Plaintiff's evidence consists of Ms. Guzman's testimony and the testimony of several other individuals concerning comments by Defendant Allan that can be interpreted as racially derogatory, including dismissing protestors because they are "uneducated" and "minorities" and openly referring to a black copy assistant as a "damn girl" in the newsroom.

Taken together, the first-hand and second-hand experiences and observations, as well as Plaintiffs' complaints, are sufficient to raise an issue of fact for the jury as to whether Plaintiff's work environment was altered because of her race and national origin and whether her complaints constituted her reasonable availment of corrective opportunities that the Post provided.  The jury also could conclude that Plaintiff's claims of race and national-origin discrimination are neither petty nor trivial under the NYCHRL.  Consequently, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims on the basis of race and national origin is denied.

## V.    Discriminatory Discharge

Plaintiff has adduced evidence sufficient to show that Defendants' termination of Guzman's employment was motivated by impermissible discrimination.

### A.   Standard

Plaintiff asserts a claim of unlawful termination on the basis of her race and national origin pursuant to § 1981, the NYSHRL and the NYCHRL.  The Court applies the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) to

evaluate Plaintiff's claim of discriminatory discharge  for the purposes of summary judgment.[6]
*See Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 354 (2d Cir. 1980) (applying the three-part
*McDonnell Douglas* burden-shifting analysis in § 1981 context); *Mandell v. Cnty. of Suffolk*, 316
F.3d 368, 377 (2d Cir. 2003) (applying federal standards of proof to discrimination claims under
the NYSHRL context); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001)
(applying the *McDonnell Douglas* burden-shifting analysis in the NYCHRL context).  As noted
above the NYCHRL is reviewed "independently from and more liberally than" federal or state
discrimination claims.  *Loeffler*, 582 F.3d at 278 (citation and internal quotation marks omitted).

## B.  The Prima Facie Case

First, the plaintiff has the burden of proving by a preponderance of the evidence a *prima
facie* case of discrimination.  *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53
(1981).  To make out a *prima facie* claim based on an alleged discriminatory discharge, a
plaintiff must show that: "(1) she is a member of a protected class; (2) her job performance was
satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under
conditions giving rise to an inference of discrimination."  *Demoret v. Zegarelli*, 451 F.3d 140,
151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802).  "Generally speaking, a
plaintiff's burden of establishing a prima facie case in the context of employment discrimination

---

[6] If summary judgment is denied and the case reaches the jury, the burden shifting test is set aside and the jury must
decide simply whether discrimination motivated the adverse action.  *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134,
154 (2d Cir. 2010) ("[T]rial judges should not import uncritically language used in the traditional
*McDonnell Douglas* formulation into jury charges . . . .") (citation, internal quotation marks and alterations
omitted); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 118 (2d Cir. 2000) ("In an employment
discrimination or retaliation case, the job of the jury is simply to decide whether an impermissible factor was a
motivating factor in the adverse employment action.  The jury therefore does not need to be lectured on the concepts
that guide a judge in determining whether a case should go to the jury.") (citation omitted).

law is minimal." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)

(citation and internal quotation marks omitted).

Defendants do not dispute that the first three elements of the *prima facie* case are

satisfied.  Plaintiff, a black, Hispanic, Puerto Rican female is a member of a protected class.  She

was "an excellent employee," and her discharge constitutes an adverse employment action.

Defendants dispute only the fourth prong of a *prima facie case*—that Ms. Guzman's termination

gives rise to an inference of discrimination.

 "A showing of disparate treatment—that is, a showing that the employer treated plaintiff

less favorably than a similarly situated employee outside his protected group—is a recognized

method of raising an inference of discrimination for purposes of making out a prima facie case."

*Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (citation and internal quotation

marks omitted).  To raise an inference of discrimination with evidence of disparate treatment, the

plaintiff and the comparator must be "similarly situated in all material respects."  *See Graham v.*

*Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted) (noting that

the Second Circuit adopted the Sixth Circuit's "all material respects" standard).  The "material

respects" test does not require "a showing that both cases are identical."  *Ruiz*, 609 F.3d at 493–

94.  Rather, "[t]he standard for comparing conduct requires a reasonably close resemblance of

the facts and circumstances of plaintiff's and comparator's cases."  *Id.* at 494.  This involves an

examination of the acts, context and surrounding circumstances.  *See Graham*, 230 F.3d at 40

("What constitutes 'all material respects' therefore varies somewhat from case to case. . . .").

Whether two employees are similarly situated ordinarily presents a question of fact for the jury.

*Id.* at 39 (citing *Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 684 (2d Cir. 1998),

*cert. denied*, 525 U.S. 1139 (1999)).

31

Plaintiff argues that she was treated differently than Margi Conklin, a white editor. Rather than discharge Ms. Conklin, when her once-profitable, weekly section (Page Six) was decreased, the Post transferred Ms. Conklin to a different position at the Post with additional responsibilities.  Ms. Guzman, by contrast, was terminated when *Tempo* was reduced.  She also points to evidence of allegedly racist remarks as evidence of intent to discriminate.

Defendants argue that Ms. Conklin's situation is not comparable to Ms. Guzman's because the two editors were not similarly situated.  Ms. Conklin and Ms. Guzman had different supervisors and job responsibilities.  Moreover, Ms. Conklin had a valid employment contract when Page Six was reduced, whereas Ms. Guzman's contract had expired before *Tempo* was discontinued.  Plaintiff, on the other hand, argues that the two women are sufficiently similar to be useful comparators and points out that Ms. Conklin's employment continued even after her contract expired.  The issue whether Ms. Guzman and Ms. Conklin were similarly situated must be resolved by a jury.  While Defendants ultimately may be able to persuade the jury that Ms. Guzman and Ms. Conklin were treated differently for non-discriminatory reasons, the evidence of disparate treatment is enough to establish a *prima facie* case of discriminatory discharge. Plaintiff's evidence of discriminatory comments and hostile work environment at the Post strengthens the inference of her *prima facie* case.

### C.  Defendants' Legitimate, Nondiscriminatory Explanation

If the plaintiff succeeds in proving a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision at issue.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Burdine*, 450 U.S. at 254.   The employer's burden at this second step is satisfied by producing evidence sufficient to raise a genuine issue of fact as to whether it discriminated against plaintiff.  *Reeves*,

530 U.S. at 142.  Once the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination completely "drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citing *Burdine*, 450 U.S. at 255).

Defendants argue that Ms. Guzman's position was eliminated as result of *Tempo*'s closing because it failed to sell sufficient advertising and was unprofitable.  Defendants have submitted evidence that *Tempo* sold fewer and fewer ads, resulting in a decrease in editorial pages between 2004 and 2009 when *Tempo* was discontinued.  After the *Tempo* editor position was eliminated, no suitable alternative position was available for Ms. Guzman and Ms. Guzman's few remaining duties returned to the Special Sections editor.

These explanations are sufficient to rebut the presumption of discrimination on the basis of race and national origin established by Plaintiff's *prima facie* case.

### D.  Pretext

Third, since Defendants have submitted evidence of a legitimate non-discriminatory reason for Ms. Guzman's termination, the burden shifts back to the Plaintiff to prove by a preponderance of the evidence that the employer was acting with pretext.  *See Hicks*, 509 U.S. at 530; *Burdine*, 450 U.S. at 253 (citing *McDonnell*, 411 U.S. at 804).  To avoid summary judgment, Plaintiff must identify evidence that would allow a reasonable fact finder to conclude that "the legitimate, non-discriminatory reasons proffered by the defendant[s] were false, and that more likely than not discrimination was the real reason" for the adverse employment action. *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)); *see also Hicks*, 509 U.S. at 515.

Ms. Guzman has pointed to evidence sufficient, when the inferences are drawn in her favor, to permit a reasonable jury to conclude that Defendants stated reasons for terminating her

employment are pretextual.  First, Defendants argue that Ms. Guzman's position was eliminated because *Tempo* failed and was closed.  Plaintiff points out that the decision to close *Tempo* completely was not made until after she was fired, although the decision to reduce the size and frequency of *Tempo* was made prior to Ms. Guzman's discharge.  In addition, while Defendants rely heavily on data suggesting that *Tempo* failed financially, Plaintiff counters with evidence of Tempo's positive performance as compared with the New York Post as a whole, and measured in terms of operating income.  Plaintiff's evidence creates a factual dispute as to whether Defendants decided to discharge her because *Tempo* failed.

The record also reflects that Ms. Guzman could have been transferred to an open editor position as an alternative to terminating her.  Defendant Allan testified that he fired Ms. Guzman rather than offer her the open position because he believed that she would be dissatisfied with the pay decrease; conversely, Ms. Guzman testified that she would have accepted the open position despite the substantial reduction in salary.  While an employer's concern with employee "morale problems" may be genuine, *see Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982), a reasonable fact finder assessing credibility could determine that Defendants stated reasons for refusing to consider Ms. Guzman for the open position were pretextual.

Plaintiff's evidence of pretext is also buttressed by circumstantial evidence of discriminatory animus at the Post, including disputed evidence of discriminatory remarks made by Defendant Allan, who had decision-making authority.  Consequently, Defendants' motion for summary judgment on Plaintiff's claims for discriminatory discharge on the basis of race and national origin is denied.

## VI.   Retaliation

Plaintiff also brings claims for unlawful retaliation in violation of Title VII, § 1981, the NYSHRL and the NYCHRL.  Plaintiff has adduced sufficient evidence of retaliation under these statutes.

### A.  Legal Standard

Retaliation claims, like discrimination claims, are analyzed according to the *McDonnell Douglas* burden-shifting analysis.  *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis"); *Lennert-Gonzalez*, 2013 WL 754710, at *9 ("Courts apply the same standard used in Title VII cases in analyzing NYSHRL retaliation claims and claims under the NYCHRL" except that "there is no requirement that the employee suffer a materially adverse action" under NYCHRL) (citation and internal quotation marks omitted).

To make out a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Summa*, 708 F.3d at 125 (citation and internal quotation marks omitted).  Once a prima facie case of retaliation is established, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Fincher*, 604 F.3d at 720.  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, "but for" the protected activity, she would not have been terminated.  *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).  The Supreme Court recently

clarified that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," as distinct from "a motivating factor," which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006).

Under the NYCHRL, a plaintiff need not prove any "adverse employment action," or show but-for causation but instead must prove that something happened that would be "reasonably likely to deter a person from engaging in protected activity." *Fincher*, 604 F.3d at 723 (citation and internal quotation marks omitted). The NYCHRL analysis should "be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct." *Mihalik*, 715 F.3d at 112 (quoting *Williams*, 872 N.Y.S.2d at 34).

### B.  Plaintiff's Prima Facie Case

Plaintiff submits evidence of a series of allegedly retaliatory acts culminating in her termination, including increased scrutiny of her *Tempo* expenses, refusal of the request to cover the investiture of Justice Sotomayor and the retroactive lowering of her performance rating from "Exceeds Standards" to "Meets Standards" by Defendant Allan. Defendants challenge Plaintiff's ability to establish the second and fourth prongs of the *prima facie* case of retaliation, arguing that (1) Defendants were not aware of Ms. Guzman's complaints and (2) there is no evidence of a causal connection between Ms. Guzman's termination and her complaints.

### 1.  Complaints

Plaintiff has submitted evidence sufficient for a jury to conclude that Defendants were aware of Ms. Guzman's complaints about the Cartoon and the racist and sexist environment at

the Post.  To satisfy the knowledge requirement for her retaliation claim, Plaintiff must show

only "general corporate knowledge that the plaintiff has engaged in a protected activity."

*Gordon*, 232 F.3d at 116.  Ms. Guzman also has submitted evidence that her complaints

(particularly about the Cartoon) were generally known at the Post as well as to Defendant Allan.

### 2.  Causal Connection

Plaintiff also has produced evidence from which a reasonable jury could infer a causal

connection between Ms. Guzman's complaints and her firing.  It is well established in the

Second Circuit that "[t]he causal connection needed for proof of a retaliation claim can be

established indirectly by showing that the protected activity was closely followed in time by the

adverse action."  *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation

marks omitted).  Here Defendants argue that Plaintiff's termination seven months after her

complaint to Ms. Jehn about the Cartoon is too temporally remote to create an inference of

retaliation.  Defendants posit that "the outward bound for a causal connection is three months."

As a matter of law, this is inaccurate.

There is no "bright line to define the outer limits beyond which a temporal relationship is

too attenuated to establish a causal relationship between the [protected activity] and an allegedly

retaliatory action.  This has allowed [courts] to exercise . . . judgment about the permissible

inferences that can be drawn from temporal proximity" within the context of each individual

case.  *Summa*, 708 F.3d at 127–28 (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)).

In a recent case, the Second Circuit held that "[t]he seven-month gap between [plaintiff's] filing

of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively

remote."  *Id.* at 128; *see also Hubbard v. Total Commc'ns, Inc.*, 347 Fed. Appx. 679, 681 (2d

Cir. 2009) (holding that even gaps of four months can support a finding of causation); *Grant v.*

*Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection).

Here, Plaintiff's evidence of unfavorable treatment culminating in her termination is enough to permit a reasonable factfinder to infer causation.[7]  Thus, Plaintiff has established a *prima facie* case sufficient to shift the burden on this motion to the Post to offer legitimate, nondiscriminatory reasons for Plaintiff's termination.

### C.  Legitimate Non-discriminatory Reason

The legitimate, nondiscriminatory reason offered by Defendants for terminating Ms. Guzman is the same that was offered to rebut her *prima facie* discrimination case discussed above: the closure of *Tempo* due to its unprofitability.  Defendants also offer a legitimate, nondiscriminatory explanation for Ms. Guzman's 2009 APA score—a disciplinary warning received in January 2009 prior to her complaining about the Cartoon—and the denial of her request to attend and cover Justice Sotomayor's investiture—conflict due to friendship and unjustifiable travel costs.

### D.  Causation

Because Defendant has offered a legitimate non-retaliatory reason for Ms. Guzman's termination, the burden shifts back to Ms. Guzman to show, at least under the federal and state

---

[7] Ms. Guzman's termination indisputably constitutes an "adverse employment action" under the relevant federal and state statutes.  *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (citation, internal quotation marks and alterations omitted).  However, while the evidence of increased scrutiny, denial of Ms. Guzman's work-related requests and her negative review "can contribute to a finding that an adverse employment action has taken place," these actions themselves do not constitute adverse employment actions for purposes of the statutes.  *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429-30 (S.D.N.Y. 2006) ("[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.") (citation and internal quotation marks omitted).

statutes, that "but-for" the protected activity, she would not have been terminated.  *See Nassar*, 133 S.Ct. at 2534.

Plaintiff argues that the evidence of pretext, discussed above, supports a finding that Plaintiff would not have been fired but-for her complaints.  Ms. Guzman also argues that the evidence of the disparate treatment of Ms. Conklin supports her claim that Defendants' reasons for terminating her employment are pretextual.  *Summa*, 708 F.3d at 131 (reversing district court's grant of summary judgment to defendants on plaintiff's retaliation claim where evidence of disparate treatment showed that defendant's reasons were pretextual).  In addition, Plaintiff presents evidence that other black employees, who complained about the Cartoon, were similarly discharged.  (*See* related case, No. 09 Civ. 9832).

The evidence is sufficient for a jury to find a "but-for" causal connection between Ms. Guzman's complaints about the Cartoon and her termination, or to find that Ms. Guzman would not have been fired in the absence of her complaints about the Cartoon.  There is likewise sufficient evidence to raise an issue of fact as to whether Ms. Guzman's discharge would deter a reasonable person from engaging in protected activity.  Accordingly, Defendants' motion for summary judgment on Ms. Guzman's retaliation claims is denied.

## VII.   Individual Liability

Plaintiff contends that Defendant Allan is liable in his individual capacity for violating § 1981, the NYSHRL and the NYCHRL, as well as for aiding and abetting violations of the NYSHRL and the NYCHRL.

Title VII claims may not be asserted against individuals under Second Circuit law, but individuals may be held liable under § 1981 where there is "some affirmative link to causally connect the actor with the discriminatory action."  *Whidbee*, 223 F.3d at 75 (quoting *Allen v.*

*Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991)); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) (abrogated on other grounds by *Burlington*, 524 U.S. 742 (1998)). Under the NYSHRL and the NYCHRL, an individual who becomes a party to an employee's discrimination "by encouraging, condoning, or approving it" can be held personally liable. *Durkin v. Verizon N.Y., Inc.*, 678 F. Supp. 2d 124, 136 (S.D.N.Y. 2009) (NYSHRL); *see* N.Y. Exec. Law § 296(6) (McKinney) (NYCHRL). In addition, the NYSHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce" unlawful discrimination or retaliation. *Id.* Aiding and abetting liability allows "a co-worker who actually participates in the conduct giving rise to a discrimination claim to be held liable under the NYSHRL [and NYCHRL] even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold v. New York*, 366 F.3d 138, 157–58 (2d Cir. 2004) ("The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL.") (citation and internal marks omitted).

Defendants argue that the claims against Defendant Allan in his individual capacity should be dismissed because there has been no actionable discrimination, retaliation or harassment. *See, e.g.*, *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) ("a plaintiff cannot prevail against an individual on her state claims unless she can first establish the liability of her employer.") (citation and internal quotation marks omitted). As discussed above, Plaintiff has adduced sufficient evidence to support her discrimination, retaliation and harassment claims on this motion. In addition, Plaintiff has adduced sufficient evidence of Defendant Allan's connection to the alleged discrimination so that the individual claims against him survive. Defendant Allan as part of the Executive Committee made the decision to terminate Ms. Guzman, allegedly for discriminatory and retaliatory reasons. His

comments and behavior also ostensibly contributed to her hostile work environment.

Accordingly, Defendants' motion to dismiss Defendant Allan is denied.

## VIII.   Conclusion

For the foregoing reasons, Defendant News Corp.'s motion for summary judgment

[Docket # 137] is GRANTED.  Defendants the Post and Col Allan's motion for summary

judgment [Docket # 143] is DENIED.

The Clerk of Court is directed to terminate the motions.

SO ORDERED.

Dated:  New York, New York
        October 28, 2013

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE