# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
SANDRA GUZMAN,                                             :
                                                           :
                              Plaintiff,                   :    No. 09 Civ. 9323 (LGS)
                                                           :
              v.                                           :
                                                           :
NEWS CORPORATION, NYP HOLDINGS,                            :
INC., d/b/a THE NEW YORK POST, and COL                     :
ALLAN, in his official and individual capacities,          :
                                                           :
                              Defendants.                  :
------------------------------------------------------------- X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS NYP HOLDINGS, INC. AND COL ALLAN'S MOTION FOR SUMMARY JUDGMENT

THOMPSON WIGDOR LLP

85 Fifth Avenue
New York, NY 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

Plaintiff Sandra Guzman ("Ms. Guzman" or "Plaintiff") submits this memorandum of law in opposition to the motion for summary judgment filed by Defendants NYP Holdings, Inc. d/b/a the New York Post (the "Post") or, together with News Corporation ("News Corp."), (the "Company") and Col Allan ("Defendants") to dismiss Plaintiff's Amended Complaint ("AC").[1]

## PRELIMINARY STATEMENT

Defendants consistently distort the record and omit crucial evidence that reveals the myriad material issues of fact in this case. Ms. Guzman, a Black Puerto Rican female, worked at the Post as an Associate Editor for more than six years before she was terminated for her increasingly strong and public objections to the relentless and unapologetic sexist, racist and xenophobic conduct of the Post's and News Corp.'s management and senior personnel. The Company's complete indifference to racial sensitivity was put on full display by the publication in the Post of a political cartoon portraying the recently inaugurated President Obama as a chimpanzee slain by police officers. The resulting outrage occasioned Ms. Guzman's attempt to alert the Company's Human Resources department to the broader problems at the Company, including rampant sexual harassment and racial stereotyping, for which Ms. Guzman paid with her job just months later, in September 2009.

Defendants claim that Ms. Guzman was fired solely because the Post stopped publishing an "unprofitable" monthly section, called *Tempo*, oriented towards the Hispanic community. At the time Ms. Guzman was terminated, the Company had decided only to curtail *Tempo*'s publication schedule and only actually discontinued *Tempo* later, illustrating the pretextual nature of Defendants' purported justification. *Tempo* previously had great success after a

---

[1] Submitted in support of Plaintiff's opposition to the motion are the affidavit of Sandra Guzman, dated May 23, 2013 ("Guz. Aff."), as well as the declaration of Lawrence M. Pearson, dated May 24, 2013 ("Pear. Dec."), to which all other exhibits referenced herein, unless otherwise specified, are attached. Exhibits attached to the declaration of Mark W. Lerner, dated May 10, 2013 and attached to Defendants' motion ("Lern. Dec.") also will be referenced.

1

temporary downturn in advertising sales, and was profitable as recently as 2008 (as well as for some months of 2009), in contrast to the Post as a whole, which yearly loses at least several million dollars.

Defendants claim Ms. Guzman's hostile work environment allegations total only "three isolated and trivial episodes," though their own memorandum reveals many more disturbing incidents of sexual harassment and intimidation. Defendants aggregate incidents, but do not count separately, episodes such as Defendant and Editor-In-Chief Col Allan publicly displaying a nude photograph of a man to female employees at a local bar and his remarking in an executive committee meeting that "You can't teach old bitches new tricks" about a senior female staff member. News Corp. executive Les Goodstein, Ms. Guzman's supervisor, repeatedly told her she was "sexy" and "beautiful" while licking his lips, and called her "Cha Cha Number 1" in reference to her being a Latina who he found sexually attractive. Defendants label such comments "inoffensive compliments" or "benign," and try to equate this conduct with Ms. Guzman complimenting a female colleague's weight loss. Defendants would disqualify Ms. Guzman from civil rights protections because she is an adult woman who talks with friends or writes professionally about sexual, racial or ethnic topics, displaying even now their contempt for individuals who seek to redress unlawful discrimination and retaliation.

Ms. Guzman produced dozens of special sections <u>in addition to</u> *Tempo* during her employment, and her work on these sections was widely praised. Indeed, Ms. Guzman's contributions to other parts of the Post show how easily she could have been transferred into another role rather than terminated. By comparison, Defendants transferred a similarly situated White editor, while refusing to offer Ms. Guzman an available Editor position.

Ms. Guzman's performance reviews and the testimony of her supervisors and colleagues demonstrate her exemplary performance and dedication as Associate Editor. Ms. Guzman's July 8, 2009 review, given only two months before her termination, states, "Sandra oversees and produces first-rate sections. . . . The sections are well-edited, well-designed and contain interesting reads and interviews and scores of useful tips, pointers and tidbits of valuable information." (Pear Dec. Ex. 6 at NYP 0301-302; AC ¶ 30) (emphasis added). Additionally, Joe Robinowitz, a Managing Editor, testified that Ms. Guzman's sections were "top quality." (Rob. at 138:9).[3] In addition to many other duties, Ms. Guzman was responsible for all editorial content and production of 25 special sections per year, including editions of *Tempo*, which had a "whopping" circulation of 667,119. (Rob. at 62-63; Pear. Dec. Ex. 8 at SG 0079; Guz. Aff. ¶ 5; Pear. Dec. Ex. 9 at SG 1062, Ex. 6 at NYP 0301). These are but a few examples of Ms. Guzman's accomplishments.

## II. MS. GUZMAN WORKED UNDER THE SHADOW OF OPPRESSIVE SEXUAL AND RACIAL HOSTILITY AND DISCRIMINATION

While Ms. Guzman dedicated herself to producing high-quality content and increasing the Post's readership, she endured a disturbing and hostile workplace environment. Ms. Guzman did her best to withstand a barrage of harassment and do her job at a high level. (Guz. at 417).

Ms. Guzman experienced many incidents of degrading and repulsive sexual harassment beyond the handful sketched by Defendants. Les Goodstein, Senior Vice President of News Corp., regularly stared at Ms. Guzman's body in an overtly sexual manner while licking his lips. (Guz. at 185:17-20, 191, 273, 394, 396:13-20, 398, 413-14; Pear. Dec. Ex. 10 at SG 6785). Mr. Goodstein also would regularly comment on Ms. Guzman's appearance and dress, calling her

---

[3] True and correct copies of referenced excerpts of the deposition of Joe Robinowitz, dated June 14, 2012 ("Rob. at [page]"), are attached to the Pear. Dec. as Exhibit 7.

4

"sexy" in the workplace on many occasions. (Guz. at 191, 206, 395, 398-99; Good. at 147).[4] At the time, Mr. Goodstein held sway over Ms. Guzman, as he took over advertising sales for *Tempo* in 2006. (Guz. at 408:20-409:6). Ms. Guzman would sometimes respond facetiously to Ms. Goodstein's unwelcome comments to deflect them and change subjects, as she did when he told her that her shoes looked "sexy," by saying "[I]f you want to borrow my shoes, you can." (Guz. at 191-92, 398-99; Pear. Dec. Ex. 12 at ¶ 23 (Affidavit of S. Guzman, July 19, 2010)). In or around 2007, Mr. Goodstein called Ms. Guzman "Cha Cha #1," mocking her race, ethnicity and national origin, while sexualizing her as a Latina. (Guz. Aff. at ¶ 12; Guz. at 189:18-22). Mr. Goodstein also referred to Sami Haiman-Marrero, who marketed *Tempo* and is a Hispanic woman, as "Cha Cha #2." (Guz. at 189:18-22; Guz. Aff ¶ 12). Ms. Guzman vociferously objected to this conduct to Mr. Goodstein. (Guz. at 189:23-25, 401:24-25, 493:20-23). Mr. Goodstein's harassment was not directed solely at Ms. Guzman, as he commonly stared at the breasts and buttocks of female employees. (Pear. Dec. Ex. 12 at ¶ 23).

Such sexually hostile behavior was perpetrated and endorsed at management's highest levels. Defendant Allan, the Editor-in-Chief, in executive committee meetings with his highest-ranking editors, regularly made outrageous sexist remarks, including mocking senior female employees with statements such as, "You can't teach old bitch new tricks." (Guz. at 240-41). This conduct is substantiated by Ms. Guzman's contemporaneous handwritten notes, which say, "Talk of butts, boobs, strippers … were part of the daily conversation among the white men [at] the table," with a diagram of where those who attended executive committee meetings sat. (Guz. at 496-97; Pear. Dec. Ex. 13 at SG 2343). Allan also screamed across the newsroom, "Will you

---

[4] True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 15, 2012 ("Good. at [page]"), are attached to the Pear. Dec. as Exhibit 11.

5

tell that damn girl to answer the damn phone?" in reference to Ebony Clark, a Black female. (Clark at 331;[5] Guz. at 175:17; AC ¶ 39).

Defendants concede that on or around April 2007, Allan approached a group of female employees at a bar, among them Ms. Guzman, and decided to regale them with a story about a senior male employee having public drunken sex with a woman in the same bar. (Def. Mem. at 9; Guz. at 137, 469-70; Allan at 237-41).[6] Ms. Guzman was disgusted by these unwelcome comments. (Guz. at 471-74). Allan also, without provocation, displayed a photograph on his phone of a naked man in which his genitals were fully visible to female employees in public, including Ms. Guzman. (Guz. at 133:6-10, 134:3-8, 140:17-22, 142:16-20, 474:22-475:4). Defendant Allan received this picture in connection with a news story, but it was not relevant to the work of any of the female employees present, including Ms. Guzman, and was shown to them by Allan without the benefit of the man's genitals being redacted (as they were when the photograph appeared in the Post). (Guz. at 143-44, 474-75, 479; Lern. Dec. Ex. 20).

Allan, who admitted the picture was "lewd," showed this photograph to the female employees purely out of prurient interest, and "smirked," "laughed" and said "look at this" while he did so. (Guz. at 139, 475; Allan at 202-04; 212:21-24). Ms. Guzman made it clear that this conduct was unwelcome, and called his behavior "creepy." (Guz. at 133:11-15.) Ms. Guzman's reluctance to offend the Editor-in-Chief contributed to her withholding a stronger objection to his comments or being shown the photo. (Guz. at 138, 142-43, 477, 478:18-479:2).

Rampant sexism at the Company was further exhibited by Executive Photography Editor David Boyle, who, in conversation with Ms. Guzman, referred to the young, attractive women he

---

[5] True and correct copies of referenced excerpts of the deposition of Ebony Clark, dated May 30, 2012 ("Clark at [page]"), are attached to the Pear. Dec. at Exhibit 14.
[6] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 21, 2013 ("Allan at [page]"), are attached to the Pear. Dec. as Exhibit 15.

hired into junior positions as his "harem," a term that was widely known in the workplace for Mr. Boyle's female subordinates. (Guz. at 485-86; McLough. at 14:10-11; 23, 25-26, 28:22).[7]

The Company's management and employees also consistently demeaned racial minorities, including African-Americans and Hispanics. Anne Aquilina, an administrative editor, asked Ms. Guzman if candles in her office were related to "Santeria" or "Voodoo," reflecting stereotypes held regarding minorities among the Company's management. (Guz. at 224, 227-228). Michael Riedel, a white male columnist, sang the song "America" from the musical "West Side Story" at Ms. Guzman in a mock, insulting "Spanish" accent several times and would often greet Ms. Guzman in a "thick Spanish accent." (Guz. at 142:5-11, 210-11, 215-16, 527, 530; Guz. Aff. ¶ 13).[8] Ms. Guzman found this conduct offensive on the basis of her race, ethnicity and national origin. (Guz. at 216:13-22).

Once again, the Post's Editor-In-Chief, Defendant Allan, was the standard-bearer for hostile, discriminatory and stereotyping conduct. In morning editorial meetings, Allan "joked" about baseball player Pedro Martinez, who is Dominican, being in New York City for surgery, and said that if any crimes were committed, people should "check them out, it might be Pedro," and asked Ms. Guzman if Mr. Martinez "carried a gun or a machete" to her interview with him. (Guz. at 111-115). Allan described groups of protesters outside the Company's building who gathered in response to a political cartoon depicting President Obama as a dead chimpanzee, as "not smart, and most of them are minorities." (Guz. 101:13-19; Pear. Dec. Ex. 17 at SG 0165; Clark at 130, 137, 146-48). Moreover, the patently racist term "nigger" was frequently used at the Post. Allan testified that Steve Dunleavy, a former columnist at the Post, referred to an

---

[7] True and correct copies of referenced excerpts of the deposition of Mary McLoughlin, dated April 30, 2012("McLough. at [page]"), are attached to the Pear. Dec. as Exhibit 16.

[8] Mr. Riedel's rendition did not at all approximate the performances of Chita Rivera or Rita Moreno, who actually are Hispanic, in the original Broadway production or film, respectively, contrary to Defendants' unconvincing assertion that Mr. Riedel was merely singing it "the way it was performed on Broadway." (Guz. Aff. ¶ 13).

7

African-American employee of the Post as the Post's "token nigger." (Allan at 252:22-254:8; Ang. at 359:24-363:13).[9] Allan made no attempt to rebuke Mr. Dunleavy for using this language. Id. Allan also repeatedly approved racially offensive content in the Post, including the Cartoon, discussed infra. (Allan at 62). Ms. Guzman's experience at the Company also was greatly affected by the steady stream of racially and sexually offensive incidents she learned of from coworkers. Among other incidents, Ms. Guzman was told that Allan rubbed his erect penis against employee Nicole Faux and made lewd comments about her breasts. (Guz. at 168-69).

### III. MS. GUZMAN COMPLAINED TO MANAGEMENT AND HUMAN RESOURCES ABOUT THE COMPANY'S RACIST AND SEXIST CONDUCT

A shocking and painful public exhibition of the Company's racist worldview was published in the Post on February 18, 2009 in the form of a cartoon depicting President Obama as a chimpanzee shot and killed by police officers (the "Cartoon"). Ms. Guzman believed that the chimpanzee in the cartoon was intended to depict President Obama as a primate and that the cartoon was racist, which Defendants do not dispute. (Def. Mem. p. 6; AC ¶ 68; Ex. A).

Jennifer Jehn, Senior Vice President of Human Resources, visited Ms. Guzman in her office on the same day the cartoon was published, at which time Ms. Guzman told Ms. Jehn not only that the cartoon was racist, but described many other instances of racist and sexist conduct, as well as the generally racist and sexist working conditions and policies, at the Company. (Guz. at 150-154). Ms. Guzman was outraged by the Cartoon and felt she could no longer allow the Company to ignore the discrimination to which she and her colleagues were routinely subjected. (Guz. at 335). Ms. Guzman informed Ms. Jehn of the full range of harassing and discriminatory conduct she had witnessed and learned of from colleagues at the Company, including, but not limited to: Mr. Goodstein's sexual harassment, Defendant Allan's sexual harassment and racially

---

[9] True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 and April 5, 2013 ("Ang. at [page]"), are attached to the Pear. Dec. as Exhibit 18.

demeaning conduct, David Boyle's female subordinates being called his "harem," incidents reported to Ms. Guzman in which supervisors slept with interns while promising them jobs, and other highly disturbing and discriminatory conduct. (Guz. at 187:9-15, 151-52;[10] Guz. Aff. ¶ 10).

Through this complaint, Ms. Guzman's offense at the Cartoon and her complaints about management's harassing and discriminatory conduct became known to the Company's upper management. (Allan at 64-66; Jehn at 246-47).[11] Ms. Guzman also responded to a multitude of emails she got from dismayed readers regarding the Cartoon, offering her regrets, and copied several Post executives, including Jesse Angelo, the Metro Desk Editor, who berated her for copying him on the emails (though she had done so in order for Company management to see the readers' responses). (Guz. 335-336; Pear. Dec. Ex. 20 at NYP 1818-1819). The Post's top management was indignant over the controversy and hostile to those who dared point out the Company's racial callousness. Mr. Robinowitz called the people protesting the Cartoon "dumb" and told Ms. Guzman to stop listening to Al Sharpton when she told him the cartoon revealed broader problems at the Company. (Guz. at 330-331, Guz. Aff. ¶ 11). Defendant Allan commented in his office that the Cartoon's detractors were "not smart" and that the "majority of them are minorities." (Clark at 137, 146, 148; Guz. at 101). To this day, although he admits it may have been "prudent" to label the chimpanzee as "Congress," Defendant Allan remains unapologetic, and believes the cartoon is fine as-is, even though many were racially offended by it. (Allan at 438:25-439:2, 440).

---

[10] Defendants may attempt to argue that Ms. Guzman's testimony limits this complaint to conduct by Mr. Goodstein and Defendant Allan, but this is simply not true. When providing testimony regarding her discussion with Ms. Jehn, Ms. Guzman was questioned about what she had told Ms. Jehn about the incident in which Defendant Allan had shown her a photograph of a nude man and was asked, "Did you tell her anything else about that?," to which Ms. Guzman replied, "About that? ... No, I don't recall telling her anything else about that." (Guz. at 152; see also Guz. at 335:5-6 ("So I told her many things during that meeting. Many, many things.")).

[11] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn, dated June 26, 2012 and February 14, 2013 ("Jehn at [page]"), are attached to the Pear. Dec. as Exhibit 19.

9

Before the outrage triggered by the Cartoon compelled Ms. Guzman to make an official complaint (Guz. at 335), Ms. Guzman had complained informally several times. Specifically, Ms. Guzman told Rick Ramirez and Mitsy Wilson, members of a News Corp. diversity committee on which she sat, that Defendant Allan engaged in racist and sexist conduct (including showing a picture of a naked man on his phone), "created a sense in the newsroom that gave men the freedom to treat women as sex objects," and that she "had personally experienced discrimination and sexism in the workplace." (Guz. at 153-154; 157). Ms. Guzman also complained about Allan showing her the nude photo to Paul Armstrong, a member of management. (Id. at 145-46). Ms. Guzman told Mr. Armstrong that this behavior was "inappropriate," "offensive," "demeaning" and "humiliating." (Id. at 148:18-25). Ms. Guzman also reported the "discrimination and sexism" she suffered to Lisa Barnett, who is "part of the management team" and DeDe Brown, a member of the Executive Team. (Id. at 161:2-12). Ms. Guzman complained to Mr. Armstrong, Ms. Barnett and Ms. Brown about Mr. Goodstein's "lascivious and disgusting behavior." (Id. at 184:10-185:5). Ms. Guzman complained to Mr. Armstrong about this behavior "[m]any, many times." (Id. at 186-87). Once Ms. Guzman made an official complaint to Human Resources ("HR"), however, upper management (and those with decision-making authority) learned of her complaints. (Allan at 64-66; Jehn at 246-47).

### IV.   MS. GUZMAN WAS RETALIATORILY AND DISCRIMINATORILY TERMINATED DUE TO HER PROTECTED COMPLAINTS

Company management began treating Ms. Guzman in a markedly negative manner in the weeks and months after her complaint to Ms. Jehn of HR. For example, her reported expenses for *Tempo* were scrutinized more closely than they had been in the past, seemingly in an effort to identify performance problems or other issues that could provide a pretext for her termination. (Guz. at 340:16-22). In addition, story ideas pitched by Ms. Guzman, including special access to

## CONCLUSION

For the foregoing reasons, Plaintiff Sandra Guzman respectfully submits that the motion for summary judgment of Defendants NYP Holdings, Inc., d/b/a The New York Post, and Col Allan regarding the Amended Complaint be denied in its entirety.

Dated: May 24, 2013
New York, New York

Respectfully submitted,

**THOMPSON WIGDOR LLP**

By: _____

Douglas H. Wigdor
Lawrence M. Pearson

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
dwigdor@thompsonwigdor.com
lpearson@thompsonwigdor.com

*Counsel for Plaintiff*